```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE EASTERN DISTRICT OF TEXAS

 3                          MARSHALL DIVISION

 4   INTELLECTUAL VENTURES I       )(

 5   LLC                           )(    CIVIL DOCKET NO.

 6                                 )(    2:17-CV-577-JRG

 7   VS.                           )(    MARSHALL, TEXAS

 8                                 )(

 9   T-MOBILE USA, INC., ET AL.    )(    SEPTEMBER 5, 2018

10                                 )(    1:30 P.M.

11                     CLAIM CONSTRUCTION HEARING

12        BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP

13                    UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   FOR THE PLAINTIFF: (See Attorney Attendance Sheet docketed
                          in minutes of this hearing.)
17

18   FOR THE DEFENDANTS:(See Attorney Attendance Sheet docketed
                          in minutes of this hearing.)
19

20   COURT REPORTER:    Shelly Holmes, CSR-TCRR
                         Official Reporter
21                       United States District Court
                         Eastern District of Texas
22                       Marshall Division
                         100 E. Houston Street
23                       Marshall, Texas  75670
                         (903) 923-7464
24

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

I N D E X

September 5, 2018

|                              | Page |
| ---------------------------- | ---- |
| Appearances                  | 1    |
| Hearing                      | 3    |
| Court Reporter's Certificate | 120  |

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated, please.

 3              All right.  This is the time set for claim

 4    construction in the Intellectual Ventures I versus T-Mobile

 5    USA, Inc., et al., matter.  This is Civil Action

 6    2:17-CV-577.

 7              Let me call for announcements on the record.

 8              What says the Plaintiff?

 9              MS. FAIR:  Your Honor, Andrea Fair on behalf of the

10    Plaintiff.  Here with me today, Mr. Martin Black, Mr. Kevin

11    Flannery, Mr. Timothy Dewberry, and from in-house at

12    Intellectual Ventures, Mr. Sven Raz.  And we're ready to

13    proceed, Your Honor.

14              THE COURT:  All right.  Thank you, Ms. Fair.

15              What says the Defendant?

16              MS. SMITH:  Good afternoon, Your Honor.  Melissa

17    Smith on behalf of the Defendants.  I'm joined by Mr. Doug

18    Kubehl, Mr. Jeff Becker, Mr. Johnson Kuncheria, Ms. Melissa

19    Butler, and Ms. Megan LaDriere.

20              And, Your Honor, I know that while it's not a

21    requirement of the Court, your expectation is that client

22    representatives would likely be at a hearing of this

23    nature -- a Markman hearing, and I'll tell you that Ericsson

24    had two in-house lawyers en route today, but they were in a

25    car accident.  They're not able to join us, but the -- but
```

1    good new is that they --

2              THE COURT:  They weren't injured, I hope.

3              MS. SMITH:  Yes, Your Honor, but we apologize for

4    not having client reps present.

5              THE COURT:  All right.

6              MS. SMITH:  And we're ready to proceed.

7              THE COURT:  Thank you, Ms. Smith.

8              Well, unless there's a reason to do otherwise, the

9    Court is persuaded that we should simply get into these

10   disputed terms on a term-by-term basis.

11             Let me hear first from Plaintiffs and then from

12   Defendants from the podium, and we'll work through what we

13   have before us.

14             The Court is aware that there is a dispute

15   regarding the term "optimize" and that in addition to

16   whatever claim construction positions the parties are going

17   to assert, they're going to be at liberty to fully argue

18   their positions regarding that when we get to that term,

19   which is about -- about the fourth one into the list that we

20   have before us.  So with that in mind, let's proceed to take

21   these up on a term-by-term basis.

22             And we'll start with the first disputed term, "in

23   an isochronous manner."  And I'll hear from Plaintiff first.

24             MR. BLACK:  Thank you, Your Honor.

25             The first term is "in an isochronous manner."  IV's

1    construction is in a manner which provides for a consistent

2    timed access.

3           Defendants' construction is according to a

4    consistent time interval.

5           There's probably not a lot of difference between

6    the two constructions as a practical matter.  We do not know

7    exactly why the Defendants have proposed the construction

8    that they did, but we believe that the construction should

9    be faithful to the words of the specification, whereas here,

10   we have two explicit definitions in the specification.

11          So working from the '629 patent, Column 13, we have

12   a definition, isochronous, i.e., consistent timed access of

13   network bandwidth for time-sensitive voice and video.

14   That's where we took our words and construction from,

15   consistent timed access.

16          There's also another place in the specification at

17   Column 61, Line 41, it says:  Isochronous, i.e., in phase

18   with respect to time.

19          Now, Plaintiff would be content with either of

20   these definitions from the specification.  We don't think

21   there's a difference between them.  We broached that with

22   Defendants, and they insist on a construction that includes

23   the word "consistent time interval," which is not something

24   that appears in the patent.

25          In their brief, they wrote at Page 11, the patents

1   define an isochronous connection as one that is in phase

2   with respect to time, unquote, or in more common parlance,

3   delivers packets at consistent time intervals.  And they

4   argue that the latter should be adopted to avoid jury

5   confusion.

6           These patents are quite complex.  We don't think

7   that there's anything that's going to avoid jury confusion

8   short of full expert testimony on the subject.

9           We would be willing, though, to accept the language

10  that Defendants stated in their brief as a definition of

11  isochronous connection, quote, in phase with respect to

12  time, unquote.

13          That also -- that language also comes directly from

14  the specification.  That would be an acceptable compromise

15  to us.

16          I also point out that one of the definitions that

17  the Defendants provided in their submission to the Court

18  also has an alternative definition that says in -- in phase

19  with respect to time.  And another one of their definitions

20  says that the transmissions must be isochronous in the sense

21  they follow a unit time interval or multiples thereof.

22          That's our submission, Your Honor.

23          THE COURT:  With regard to your proposal in a

24  manner which provides for consistent timed access, doesn't

25  the rest of the claim language really address what is being

1  done, and is there a need to incorporate the notion of

2  access here?

3          MR. BLACK:  I agree, Your Honor, I don't --

4          THE COURT:  I mean, that seems to be -- what little

5  sticking point there is between the party, it seems to

6  emanate from the word "access" more than anything else.

7          MR. BLACK:  I agree.  I don't think access is

8  necessary.  We included it simply because it's actually in

9  the specification, and we thought the phrase would be more

10  complete.

11          THE COURT:  Have you ever seen a patent before

12  where there are -- the same word is given two express "i.e."

13  definitions that are different?

14          MR. BLACK:  I don't think -- if you look actually

15  in the dictionary definition that they -- that they

16  provided, you've got both definitions in there.  One of the

17  reasons for it is that "in phase with respect to time" could

18  mean, for instance, the train leaves at 10:00 o'clock every

19  day.  That's in phase with respect to time -- with respect

20  to the departure time of the train.  If it doesn't happen to

21  leave on a Wednesday, the fact that there's a Tuesday and a

22  Thursday train, those are still isochronous because they are

23  in phase with respect to time because the transmission

24  happens on the -- on a multiple of the unit, if you will.

25          They've -- they've tried to insert consistent time

1    intervals.  We're not sure why.  We don't have a

2    non-infringement contention from them explaining their

3    position or why there's a difference.

4         But to answer your question, we have no objection

5    to removing the word "access."  It's clearly dealt with

6    elsewhere in the claim.

7         THE COURT:  All right.  Thank you, counsel.

8         Let me hear a response from the Defendant.

9         MR. KUBEHL:  Good afternoon, Your Honor.

10        THE COURT:  Good afternoon.

11        MR. KUBEHL:  Doug Kubehl for the Defendants.

12        Mr. Mullen, could we have Slide 44?

13        Your Honor, we've given you printed copies of the

14   handouts, and there's two pages on each physical page.  I'll

15   refer to the slide number -- so, for example, I'm referring

16   to Slide 44. It's on physical Page 22.

17        THE COURT:  You show me what you want me to see --

18        MR. KUBEHL:  Yes, sir.

19        THE COURT:  -- and I'll look at the screen.

20        MR. KUBEHL:  Yes, sir.

21        THE COURT:  Okay.

22        MR. KUBEHL:  So the '629 patent, which is where

23   this term appears, addresses a particular problem, and as --

24   as pointed out in the Plaintiff's brief, the problem arises

25   when jitter and other -- jitter and other quality problems

 1  can arise when certain IP flows are scheduled with irregular

 2  time gaps.

 3          So the problem we're trying to solve here is to get

 4  rid of these irregular time gaps.  And not surprisingly,

 5  part of the solution to that problem in the claim is to

 6  place these packets in what's called an isochronous manner.

 7          And there are two "i.e." statements with respect to

 8  the term "isochronous" in the patent specification.  In the

 9  claim --

10          THE COURT:  Have you ever seen that before?

11          MR. KUBEHL:  I can't say that I -- can't say that I

12  have.

13          THE COURT:  I can't recall that I ever have either.

14  Anyway, go ahead.

15          MR. KUBEHL:  So in the context of the claim, we're

16  talking about the placement of one packet in an isochronous

17  manner to the placement of another packet.

18          The specification uses the term "isochronous" not

19  exactly in that context.  It uses it in the context of an

20  isochronous connection and in the context of isochronous

21  traffic.  And so trying to take the language from those

22  "i.e." statements and wedge it into the claims doesn't make

23  the most sense.

24          In particular, with respect to the one that says

25  consistent timed access of network bandwidth for

1    time-sensitive voice and video.  I'd submit it makes some

2    more sense to say in phase with respect to time, but I don't

3    think that gives the jury a lot of guidance as to what this

4    means -- more than what isochronous means.

5           It's -- it's not correct that the term "interval"

6    doesn't appear in the patent in connection with isochronous.

7    We're looking at Slide 46 here.  And at Slide 46, after the

8    patent explains that it's important to maintain an

9    isochronous, i.e., in phase with respect to time connection,

10   it goes on to explain that what happens in -- in an

11   isochronous connection is that the interval between packets

12   stays the same.

13          There's an example given that we've highlighted in

14   blue here where the same slot is applied in every one of the

15   subsequent frames.  That interval between each of those blue

16   packets is the same.  It's .5 milliseconds every time.

17          Another way to do it would be in the diagonal,

18   which we don't have shaded here, but it's shown in gray, and

19   it's -- it's got an oval around with it Reference No. 1482.

20   Again, those packets have a consistent interval between

21   them.  It's .49 milliseconds in that case.

22          So the patent does use the term "interval" to

23   describe what's meant by placing packets in an isochronous

24   manner.  It means you place them so that the interval

25   between packets stays the same.  We think that that's an

1 understandable construction, and it's faithful to the

2 patent.  And that's why we construed it that way.

3          THE COURT:  Would you agree, Mr. Kubehl, that

4 what -- with what Mr. Black said, that there's not a huge

5 amount of difference between the parties here?

6          MR. KUBEHL:  I don't know that there's a huge

7 amount of difference in -- in the meanings.  It kind of -- I

8 guess it depends on how you apply the meanings.  I don't

9 think there's a lot of room to debate about whether

10 something is or is not at a consistent time interval.

11          What exactly is meant by consistent timed access is

12 probably open for further debate and may need further

13 construction down the road.

14          THE COURT:  All right.  Thank you for your

15 argument.

16          Do you have any kind of a brief rebuttal,

17 Mr. Black, or are you ready to move on?

18          MR. BLACK:  I think we can move on, Your Honor.

19          THE COURT:  Okay.  Then we'll go to the next term

20 for construction, "periodic variation."  Let me hear from

21 Plaintiff first.

22          MR. BLACK:  Thank you, Your Honor.

23          The -- again, I'm not sure that there's much of a

24 difference between the parties' views and whether it's a

25 matter of wordsmithing.  Our concern has to do with the use

1    of the words "placement between frames."

2         THE COURT:  I have a feeling we're going to make up

3    for this lack of difference when we get into the further

4    terms.

5         MR. BLACK:  Okay.  Your Honor.  The -- that is

6    true.

7         The problem with their definition is it's rather

8    convoluted.  And unlike the previous one which they said

9    would help assist the jury, it's very difficult to see how

10   this definition, when plugged into the claim, will assist

11   the jury.

12        The relationship between frame slots and then

13   whatever definition Your Honor selects for isochronous is

14   difficult to understand here.

15        We really think the plain meaning would be

16   sufficient, but if we're going to have a construction, it

17   should be regular variation of the location within frames

18   into which the data is placed.

19        Part of the reason for that is Mr. Kubehl showed

20   you the Diagram 14 here, and he had on the left-hand side

21   highlighted in blue the third column over where the packets

22   are all in a row.  That's one example of isochronous.

23        Another example is the diagonal that you see

24   circled where the -- the transmission is moving diagonally

25   one slot at a time.

1          The patent also describes that the slope of the

2   diagonal could be greater and also that the frames could be

3   skipped.  It says that you can put a packet in one frame and

4   then skip a couple frames and then skip a couple frames.  If

5   it's all in -- there's a lot of different patterns that go

6   into isochronous and periodic variation.

7          Here's an example.  Diagonal reservation is in

8   blue.  The diagonal reservation with the greater slope is in

9   yellow, and you'll see that they're -- the frames here have

10  been skipped.

11         So we just need to have enough flexibility with the

12  claim term to cover all these potential examples, not just

13  the one that he showed in blue which in the language that he

14  selected said, "for example."

15         THE COURT:  What would your reaction, counsel, be

16  to a possible construction that would be repeated variation

17  by a particular amount between sequential frames?  What

18  would your reaction to that be?

19         MR. BLACK:  I'm hesitating because the claim

20  element is actually no periodic variation, but they've --

21         THE COURT:  Yeah, I understand there's a negative

22  before the term.

23         MR. BLACK:  Yeah, so it'd be no -- I'm sorry, Your

24  Honor, could you repeat that?

25         THE COURT:  Repeated variation by a particular

1  amount between sequential frames.

2          MR. BLACK:  Might be able to work with that, Your

3  Honor.  I'd need to -- I'd need to confer and think about it

4  a little bit.  But I understand where you're going.

5          THE COURT:  I mean, I think you've actually

6  acknowledged that where the variation is periodic, it varies

7  by a regular amount, correct?

8          MR. BLACK:  Yes.

9          THE COURT:  Okay.  What else, Mr. Black?

10          MR. BLACK:  That's it, Your Honor.

11          THE COURT:  All right.  Mr. Kubehl, you can start

12  with the same question.  How would you react to that

13  potential construction?

14          MR. KUBEHL:  If -- if that construction recognizes

15  that the -- the periodic variation has to be in the context

16  of an isochronous placement, that may be something we can

17  work with.  I'll confer with the team.

18          But the two points that -- that we're raising with

19  our construction, number one, in this dependent claim,

20  that's talking about the placement of the same packets that

21  the independent claim was talking about.  The independent

22  claim required that to be an isochronous placement.  That

23  still has to be an isochronous placement in the dependent

24  claim.

25          And, number two, we're talking about placing

1    packets in two different frames, not two packets within the

2    same frame.  And I think we've got agreement on that.  If

3    you -- if you go to Slide 52, this is a statement from IV's

4    opening brief talking about this claim.  They say the -- in

5    the claimed method, the number of time slots between the

6    placement of the first and second data packets is

7    consistent.

8            In other words, that interval remains the same.

9    It's still an isochronous placement.  And it results in the

10   data packets being placed in a different slot location

11   within successive transmission frames.  In other words, it's

12   not two packets within the same frame, it's one packet in

13   one frame and a second packet in a successive frame.

14           So those are the two points that we're covering

15   with our construction when we say it's changing the

16   placement between the frames while maintaining a consistent

17   time interval.

18           Our construction is not seeking to read out

19   something with a slope that is not one.  He showed you a

20   slide with a slope of 1 and then a slope that was not 1, but

21   it still had variation.

22           If -- if it would make them feel better to say

23   between the place -- changing the placement between

24   successive frames while maintaining a constant time

25   interval, that will be fine.  It's not our intent to

1    eliminate slopes that are not equal to 1.

2            THE COURT:  All right.  Anything else?

3            MR. KUBEHL:  No, Your Honor.

4            THE COURT:  Mr. Black, do you have any follow-up?

5            MR. BLACK:  Yes, Your Honor.  I think we've gotten

6    potentially to the nub of where they're -- where they're

7    going here.

8            They -- he said something about putting two packets

9    in the same frame.  And what they do is -- based on our

10   discovery is that they will take two packets, mix them

11   together, and send it out as effectively one packet in one

12   frame.  And then they'll wait a couple of frames and then

13   send the next one.  And then those transmissions are

14   isochronous in the sense that they're phased in time, and

15   they're equally spaced apart, but since they put two packets

16   together at once, they're going to claim for

17   non-infringement purposes that they're no longer sending

18   them with consistent time intervals or -- or it's not

19   periodic variation, and that's where the rub is going to be

20   at trial.

21           Now, whatever the construction is, we, A, think we

22   can meet it, and, B, we'll offer Doctrine of Equivalents on

23   that because putting two packets together in one frame, if

24   that doesn't literally infringe, it would infringe under the

25   Doctrine of Equivalents.  But that seems to be what the nub

1  and the real issue is, not a -- not a real construction

2  point.

3          THE COURT:  All right.  Well, let's move on then to

4  host workstation.  And I'll hear from Plaintiff first.

5          MR. FLANNERY:  Good afternoon, Your Honor.  Kevin

6  Flannery.  And if I may, picking up on what Your Honor said

7  earlier, perhaps we'll start to ease into areas where

8  there's disputes with the term "host workstation."

9          I think that this is a classic case of Defendants

10  are trying to unduly narrow well-known claim terms when

11  there's no reason to do so based upon the intrinsic

12  evidence.

13          We have a very straightforward definition of a

14  computer or other device that communicates with other

15  computers on the network that includes a terminal interface

16  to a set end-point.

17          And this is supported by the specification, as

18  we've shown here and shown in our brief.  And, really,

19  there's -- the Defendants would like to read three

20  limitations into this term.

21          The first one is requiring that the relevant flow

22  always be capable of flowing to or from the subscriber

23  end-point.  But we know from the specification that that's

24  not always required, and there are examples of host

25  workstations communicating with other workstations, not

1    always a subscriber end-point.

2           The second limitation that they try to read in is

3    that the host computers be con -- configured to use Internet

4    Protocol only.  And as we see, again, from the

5    specification, that's only an example of a protocol that can

6    be used.  There's other protocols in the specification, such

7    as transmission control protocol, TCP, and UDP.

8           And then finally, Your Honor, the Defendants want

9    to limit the term to an end-point, and this is an area where

10   they just look at pictures, the figures in the patent

11   specification, and see that an example of a host workstation

12   is an end-point.  And they just simply say, ah-ha, it must

13   be an end-point because the picture shows it as such.

14          But as we see from the complete specification, we

15   see host workstations communicating with other computers

16   throughout the network and not -- there's nothing in the

17   specification that says that it must be an end-point.

18          THE COURT:  So your conception of the term

19   "workstation" would include potentially a router or an

20   Ethernet hub or for that matter, wiring?

21          MR. FLANNERY:  I don't think so, Your Honor, no.

22          THE COURT:  Okay.

23          MR. FLANNERY:  I don't think that those would have

24   an interface, terminal or interface as claimed.

25          Unless Your Honor has any further questions,

1    that's -- that's all I have.

2            THE COURT:  Do you agree with the Defendants'

3    proposal that the host workstation is capable of running

4    applications?

5            MR. FLANNERY:  Yes, Your Honor.

6            THE COURT:  Okay.  I think that's all my questions,

7    counsel.

8            MR. FLANNERY:  Thank you.

9            THE COURT:  Thank you.

10           Let me hear from Defendants, please.  If you'll

11   announce yourself for the record and proceed, counsel.

12           MR. KUNCHERIA:  Will do.  Johnson Kuncheria for the

13   Defendants, and I'll be addressing "host workstation."

14           Next slide, please.

15           As mentioned, host workstation appears in Claim 12

16   of the '971 patent.  Defendants' construction, it is

17   consistent with the '971 patent, and requires that it be an

18   end point running one or more applications and capable of

19   serving as a source or destination of an IP flow to or from

20   a subscriber end-point.

21           IV, on the other hand, asserts that plain meaning

22   implies -- and that simply can be any computer or other

23   device that communicates with other computers on a network

24   and include the terminal or interface to accept input.

25           The parties agree, as you noted, that host

1  workstations must run applications, but the parties continue

2  to dispute whether a host workstation is a particular type

3  of end-point as described in the '971 patent, is the

4  Defendants' position, or if it's merely any network device

5  that accepts input, which apparently is IV's position.

6        IV's construction is at least incomplete because it

7  does not capture the parties' agreement that host

8  workstations must run applications, and it is overbroad

9  because as you recognized, does not recognize that a host

10  workstation is an end-point and not an intermediate device,

11  as Your Honor --

12        THE COURT:  Your -- your construction includes the

13  word "running one or more applications."  Is it more correct

14  to say "running," or is it more correct to say "that can

15  run"?  Must the -- must the running be continuously taking

16  place, or is it adequate that it may not be running, but it

17  is capable of running?  And if it's not running 24 hours a

18  day, does whatever it is fail to meet your construction?

19        MR. KUNCHERIA:  I think I would have to confer with

20  the rest of the team, but I don't think it was the intention

21  to create a distinction there.

22        THE COURT:  Okay.  That -- that was my question.

23        MR. KUNCHERIA:  Okay.

24        THE COURT:  Go ahead.

25        MR. KUNCHERIA:  In -- in IV's reply brief, IV

1    asserts that the plain meaning applies and that host

2    workstation is just a host computer that also functions as a

3    workstation.  However, for -- for the term "host

4    workstation," they do not offer a definition.  They simply

5    state that it's a staple term of computer science.

6            In its opening brief, again, it stated that a host

7    workstation is just a commonly used generic term and doesn't

8    really define that term.

9            So our -- our construction is actually taken from

10   the context of the '971 patent.

11           Next slide, please.

12           Throughout the '971 patent, every workstation is

13   described as an end-point and not an intermediate device.

14   Here are two such examples.  One is Figure 3B on the left,

15   and Figure 5A on the -- on the right.

16           In both situations, both -- both a subscriber

17   workstation and a host workstation are both workstations,

18   and, therefore, are end-points in this network and not one

19   of the intermediate devices.

20           But while -- while that is true -- while it's true

21   that a workstation is an end-point, there is a -- there is a

22   difference, and the patent makes a difference between a

23   subscriber workstation and a host workstation.  And that --

24   that is what we believe, Your Honor, IV's construction fails

25   to appreciate, that there's a distinction between a host

workstation and a subscriber workstation.

I believe one of IV's slides, I think it's Slide 16, had -- had -- had an excerpt from the patent, Column 30, 49-56, where it -- it tried to suggest that host computer -- that term is interchangeable with a client or subscriber workstation or a server or a host workstation.  That's not the case.

If you look at that cite, it's clear that host -- host computers -- there are two types of those.  One is a client or subscriber workstation.  The other is either a server 136 or a host workstation 136.  They are not the same thing.

Next slide.

THE COURT:  Well, what's your reaction to counsel's -- opposing counsel's answer to my question that he doesn't think their construction would be so broad as to include things like a router or wiring or an Ethernet hub? Doesn't that comport with what you're telling me?

MR. KUNCHERIA:  That does comport with what I'm -- what I'm -- what I'm advocating, but I'm not sure that the word "interface" captures that, and so we would like to make it clear.  If they -- if they agree with that point, I think they -- I would challenge them to -- to -- I would ask them why our construction doesn't capture that concept, which is unclear by the word "interface" and how that necessarily

1    excludes intermediate devices.

2           THE COURT:  Well, if -- if I were to agree with you

3    about the concept of an end-point, would there be a need to

4    construe this term beyond it's plain and ordinary meaning

5    with an understanding that it would be limited to an

6    end-point application?  Because that -- that -- seems to me

7    that's where the real fight is here.

8           If it's -- if it's broader than whether it's

9    limited to an end-point or it's not limited to an end-point,

10   then clarify that for me.  But that seems to be where most

11   of the disagreement between the parties is.

12          MR. KUNCHERIA:  Yes, that -- that is a fundamental

13   aspect of it, and -- and the fact that it's an end-point is

14   also clarified by the fact that it's a source or definition

15   of an IP flow to another device on a network, which is the

16   subscriber workstation at least capable of doing that.

17          And so I think that -- that phrase makes it clear

18   what the end-point is doing or what -- what it can do, at

19   least.

20          And with respect to the parties agreement, I would

21   also mention that the parties do agree that host workstation

22   runs applications, so we would ask that that be part of the

23   construction, as well.

24          THE COURT:  Anything else?

25          MR. KUNCHERIA:  Yes.  Just quickly here, this

1    slide, as I mention, the parties agree that a host

2    workstation must run applications.

3         IV concedes that point, but it does -- it refuses

4    to concede the reason why host workstation runs

5    applications.  As you can see here in the far right of

6    Figure 5A, there's an application layer 512f which runs

7    applications.

8         The reason that it has an app -- applications

9    running -- running at application layer 512f is so that it

10   can communicate with the applications 512a running on

11   subscriber workstation.  And the excerpt to the left makes

12   that clear.

13        Here in this particular example, flow 500 is

14   described as originating from application layer 512a, and

15   the rest of the discussion describes how it -- how it makes

16   its way up and down the various protocol stacks and across

17   the network to the host workstation.

18        As the highlighted portion in the bottom left makes

19   clear, the host workstation 136a flows -- IP flows all the

20   way on to application layer 512f.

21        Next.

22        This illustrates -- this illustrates the path that

23   it takes.

24        That's all, Your Honor.

25        THE COURT:  All right.  Anything further on this

1    term from Plaintiff?

2            MR. FLANNERY:  Just very briefly, Your Honor.  We

3    would be fine with the -- the plain -- what the plain

4    meaning is Your Honor proposed.  The problem with end-point

5    is we don't know what an end-point means.  They -- they

6    point to a picture -- a figure from the patent, and somehow

7    that's supposed to define what end-point means in all

8    circumstances.  And we just don't understand that, and we

9    think it will add to the confusion.

10           That's all.

11           THE COURT:  All right.

12           MR. FLANNERY:  Thank you, Your Honor.

13           THE COURT:  Thank you.

14           Let's go on then to the next series of disputes.

15           The next disputed term is to optimize end-user

16   quality of service for an Internet Protocol flow.  And it

17   also looks like the two following terms pretty much are

18   subsumed by the same arguments, those terms being "so as to

19   optimize end-user quality of service associated with said IP

20   flow," and then "so as to optimize end-user Internet

21   Protocol quality of service."

22           Is there any reason that counsel on either side

23   sees that the Court shouldn't hear argument on these three

24   as a -- a group or a bucket of terms?  That seems to make

25   the most sense to me.

1             MR. BLACK:  Yes, Your Honor, we agree.

2             MR. KUBEHL:  We agree.

3             THE COURT:  Then let's proceed on that basis, and

4    we'll start with Plaintiff.

5             MR. BLACK:  Thank you, Your Honor.

6             As you intimated, perhaps we have more disagreement

7    about these terms than the previous ones.  So I'd like to

8    start by handing up a copy of the Federal Circuit decision

9    which --

10            THE COURT:  You may approach.

11            MR. BLACK:  -- you probably have a copy of, but...

12            Okay.  So yesterday when I got on the plane, we had

13   one case.  And as I got off the plane and read the Federal

14   Circuit decisions, I realized that we have a different case.

15   So many of my slides will be relevant, but some of them are

16   24 hours behind.  We have a fast-moving situation here.

17            So I want to spend the argument here talking about

18   what the Federal Circuit said and what they didn't say,

19   talking about what the claim elements are in this case, and,

20   most importantly, what the actual claims are in this case,

21   and try to set the stage for what Your Honor actually has to

22   decide and then figure out how we can get from here to a

23   final decision because some of the issues that are lurking

24   have not been fully briefed yet.

25            There are a lot of claims that have the elements

1  "so as to optimize" in them which have not been addressed in

2  the briefing.  And I want to make clear that we don't

3  believe they all rise or fall together.

4       The way the Defendants briefed the case was to say

5  optimize end-user quality of service is indefinite, and then

6  they assumed that every claim that has that element in it

7  would also fall.  And we disagree with that.

8       Under Nautilus, a claim is indefinite -- a claim is

9  indefinite under Section 112 if it lacks reasonable

10  certainty when applied by one of skill in the art.  Even

11  claim terms like "aesthetically pleasing," which is the

12  jumping off point for Datamize, a claim which says make an

13  aesthetically pleasing vase would be indefinite because no

14  one would be able to judge which was aesthetically pleasing

15  or which was not.

16       However, if the claim was drafted "make an

17  aesthetically pleasing vase by painting it blue," that would

18  be a definite claim which one of skill in the art,

19  presumably a potter here, could apply, and that claim would

20  be definite.

21       So we've got to look for language in the claim or

22  the specification which would make even an unclear claim

23  element definite to one of skill in the art.

24       Now, the way we put the case in the briefs was we

25  argued that these claim terms meant that you need to

1  differentiate between service classes, and the Federal

2  Circuit has ruled that -- that -- I believe that that

3  construction of the term "so as to differentiate between

4  types of traffic or service" is not entirely consistent with

5  the Federal Circuit's decision of yesterday.

6          They proceeded in a different route.  They said

7  that that phrase was indefinite and issue preclusion

8  applied.  I'll address that last.  They didn't go the next

9  step to analyze the claims properly to determine whether

10 there was anything else within specific claims, which would

11 permit one to put metes and bounds around the claim.

12         That's a critical error in their approach.

13         Now, the Federal Circuit opinion on Page 4 sets out

14 the two claims that were at issue in the Delaware case.  And

15 Claim 20 is the claim that was found indefinite, and it has

16 the phrase "so as to optimize end-user application IP QoS

17 requirements of said software application," not of an IP

18 flow.

19         But I also want to point out Claim 1, which says it

20 allocates bandwidth resource to an Internet Protocol -- IP

21 flow associated with a software application of a user based

22 on IP QoS requirements.  And I'm pointing that out because

23 that claim was never challenged as indefinite.  The Federal

24 Circuit didn't find it indefinite.  And that's because

25 network engineers understand that applying QoS is something

1   that's done every day.

2          And the argument that QoS is too vague is not -- is

3   not a proper approach here.  The -- the claim term that got

4   the patentee in trouble here was the word "optimize."

5          So the approach that we have to take is the Federal

6   Circuit having said that optimize quality of service is

7   insufficient to provide the metes and bounds of a claim, we

8   have to look at the claims that are at issue in this case,

9   which --

10          THE COURT:  Isn't -- isn't part of the problem here

11   or potential problem not only what the meaning of optimize

12   is but the context in which it's used, i.e., that it is an

13   end-user who optimizes the quality of service, and what may

14   be optimization to one end-user may not be optimization to

15   another end-user, and, therefore, the -- the idea of

16   indefiniteness is injected into the situation?

17          MR. BLACK:  I'll agree with 90 percent of what you

18   said, Your Honor, that that's the problem, except the

19   optimization is certainly done by the network operator,

20   because they're the ones who control the classification of

21   service and other things.

22          The problem that the Federal Circuit was concerned

23   with that the Defendants have argued until now is that you

24   can't evaluate whether you've gotten to optimization without

25   having some understanding of users' views of the quality of

1    the service.

2          So just slight -- slight difference in what you

3    said.  It's always -- these claims are obviously directed to

4    network operators.

5          So the question is, is there something in the

6    claims that we have in this case which would give us the

7    structure -- the definiteness that could be applied by an

8    expert in an infringement case.

9          So let me turn to '971 patent, Claim 12.

10         And if I could switch to the ELMO.

11         So this is the -- it's a long claim, Your Honor,

12   and this is the -- there are three elements that come before

13   this which aren't relevant to us, but these elements are the

14   elements that define a scheduler under Claim 12 of the '971

15   patent.

16         And this claim has been briefed.

17         And if I might just step away for a second and get

18   a highlighter?

19         THE COURT:  Sure.

20         MR. BLACK:  Thank you.

21         So I think -- I think this claim illustrates the --

22   the issue, Your Honor.  If we -- we have a scheduler that

23   allocates resources of said shared wireless network among

24   said wireless network stations to optimize quality of

25   service, QoS.

1          Now, what's going on here is selection is being

2   made among wireless stations as to which one is going to get

3   opt -- optimized end-user quality of service.

4          Now, if we stop there, our position yesterday was

5   that differentiating among service classes would be

6   sufficient.  This claim, as it stands now with just the

7   yellow highlighting, I believe would not meet the Federal

8   Circuit -- Circuit's standard for indefiniteness.

9          However, the claim goes on and provides context and

10  structure.  First, the claim says:  For an Internet protocol

11  flow.

12         Now, that is saying that you pick a particular

13  Internet protocol flow from the flows going through the

14  system.  You're not optimizing the entire system.  This

15  claim is only about optimizing a single flow, which we say

16  can be done by prioritizing that flow to one of skill in the

17  art.

18         Now, IP flow is obviously not something that a user

19  knows what it is, at least the vast majority of users don't

20  know what IP flows are.  There's no mechanism available in

21  the patent or elsewhere to ask users about how they feel

22  about their IP flows.  This claim is directed to something

23  different.  It's directed to a network engineer about

24  prioritizing the IP flow.

25         The rest of the claim goes on to explain how to

1  optimize the flow.  It says -- first of all, it's only

2  talking about in this claim flows that are associated with

3  one of latency-sensitive and a jitter-sensitive application.

4  Like voice, for instance, is latency-sensitive.

5        The packets have to arrive on time.  If you drop

6  the packets, the voice call will have inferior quality.

7  That's a fact of life in telecommunications.  It's not

8  subjective.  If you loose voice packets, you'll reduce the

9  quality of the service.

10        And this claim is directed to a specific IP flow,

11  either latency or jitter-sensitive.  Voice is actually both.

12        And then it says:  What do you do with that flow?

13  Well, the scheduler has an assigning means that assigns

14  future slots and uses an advanced reservation algorithm

15  which is discussed in the patent, reserve a first slot --

16  slot for a first data packet, reserve a second slot for a

17  second data packet, and then it says quite clearly that you

18  must do so in an isochronous manner.

19        Now, isochronous, as we've already discussed,

20  everybody agrees, requires some consistency in the timing,

21  some phase relationship between the timing.  These are

22  instructions to a network engineer how to apply the claim.

23        Now, I want to give -- I want to give an analogy

24  here that -- think about trains leaving the station.  That's

25  in a way what packets are.  And if the CEO of a company went

1    to the vice president in charge of scheduling trains and

2    said, build me a system that optimizes the quality of

3    service for our customers, the vice president would say, I

4    don't know how to do that.  What do you mean?  There are too

5    many variables involved.

6          And -- but if the president said, build me a system

7    that gives priority to Train 42 no matter what happens --

8    and that's our IP flow, Train 42 -- the vice president would

9    know how to build that, and his competitors would know how

10   to look at the system and determine whether or not it met

11   that requirement.

12         And if the president went further and said, build

13   me a system that Train 42 always leaves on time every time

14   at 10:00 o'clock in the morning every day of the week and do

15   everything you can to prioritize that train, then we'd know

16   that's isochronous.

17         So the point, Your Honor, is it is true now, as a

18   matter of the law of the case, the Federal Circuit has said

19   the claim element "optimize QoS" in and of itself does not

20   provide necessary information to provide definiteness under

21   Section 112.

22         But we've got to go look at each and every claim in

23   which that element appears to determine whether there are

24   other things in the claim like Claim 12 which would make it

25   definite.

```
 1            Now, the briefing and on the -- on the Rule 4.3
 2   statement that you have refers to a -- I think four claims
 3   only.  There are -- I'm not sure exactly how many, but there
 4   are several dozen dependent claims that -- that depend off
 5   of the independent claim, including ones that limit this to
 6   voice or video, including ones that limit the claims in
 7   other ways like determining the quality of service by
 8   looking at port numbers, for instance, which is subjective.
 9            None of that's been briefed because the way that
10   the Defendants put the case was, well, if this claim element
11   is indefinite, then all the claims are indefinite.  But
12   that's wrong as a matter of law.  Claim element is not
13   indefinite.  The claim has to be indefinite.  And they
14   haven't met their burden on that.
15            Now, my concern about this, I could sit here
16   quietly and have Your Honor rule however you're going to
17   rule, and then when we pop up at summary judgment stage,
18   you'd find that there are a bunch of dependent claims that
19   haven't been dealt with yet, which I think would probably
20   make the Court disappointed with us, even though it's my
21   view it's the Defendants' obligation to raise the issue.
22            So we've got these lurking claims which now have to
23   be dealt with.  If our construction was selected, you
24   wouldn't have to worry about it.  But with the construction
25   Defendants have proposed, we've got to go claim-by-claim to
```

1   determine definiteness, and we don't have that kind of a

2   record here.

3        THE COURT:  So you're telling me that if a claim

4   element is indefinite and that element is present in the

5   asserted claims, as well as certain unasserted claims, that

6   even though the element itself in this hypothetical is

7   judged to be indefinite and the same element is present in

8   each claim, there must be an individualized analysis of each

9   claim one at a time, as opposed to finding that the flaw of

10  the indefinite element causes the resulting claims no matter

11  where it's found to be indefinite?

12       MR. BLACK:  Absolutely, Your Honor.  Technically, a

13  claim term is not indefinite.  A claim is indefinite if the

14  claim within the metes and bounds of the claim fails to tell

15  one of skill in the art how to apply it with reasonable

16  certainty.

17       Give you an example.  Say you had a claim for a

18  laser beam that has a large amount of wattage, large amount

19  of power.  That would be indefinite because no one knows

20  what large means.  But if you had a dependent claim or you

21  had the claim written in the form, a laser with a large

22  amount of wattage wherein the amount is greater than 50

23  watts, well, then you've got something you can apply.  That

24  claim would be indefinite.  But the former claim would be

25  indefinite.  You've got to look at the entire claim in

1    context to make a determination about whether the claim is

2    indefinite.

3          THE COURT:  Of course, we -- we function under the

4    premise, though, that if the independent claim from which a

5    dependent claim refers is indefinite and fails, then the

6    dependent claim is going to have to fail itself, correct?

7          MR. BLACK:  That is not correct, Your Honor.

8    Invalidity has to be dealt with claim-by-claim.  If you

9    think about obviousness or anticipation, an independent

10   claim could easily be invalid, but a dependent claim might

11   save it.

12         Same thing with indefiniteness.  If an independent

13   claim is unclear but the clarity is provided in a dependent

14   claim, the claim scope is the scope of the dependent claim.

15   So that's my example.  A laser with -- with a lot of power

16   wherein the amount of power is greater than 50 watts, that

17   claim is definite.  If it was structured Claim 1, a laser

18   with a large amount of power; Claim 2, a laser according to

19   Claim 1 wherein the power level is greater than 50 watts,

20   the position would be Claim 2 is valid and definite, Claim 1

21   is not.

22         THE COURT:  Let me ask you another question.

23   You've argued to me that in this context optimize -- to

24   optimize end-user quality of service is not a judgment made

25   by each potential end-user but is a directive to the system

1    operator to achieve a constant level of quality that

2    end-users as a whole would find optimized or improved or

3    pleasing, for lack of a better word.  If that's true, as an

4    attempt to get away from every individual end-user being the

5    judge of what's optimized, and, therefore, having a

6    situation that's indefinite, are you really any better off

7    by saying it's not all end-users, but it's each system

8    operator because every system operator may take these

9    instructions and attempt to achieve or optimize quality of

10   service that to one end-user is something different than to

11   another -- or, excuse me -- to -- one operator is different

12   than to another operator?  Whether -- whether you apply the

13   optimization process to each end-user or you apply it to a

14   single operator within each system, with multiple systems,

15   don't you have the same problem that you have when you look

16   at it from the perspective of each end-user?

17          MR. BLACK:  I've got two answers, and I want to

18   make sure --

19          THE COURT:  Well, I hope the question is clear.

20          MR. BLACK:  I understand the question.  I've got

21   two answers.  One -- one, I want to differ with the premise;

22   and, two, I want to --

23          THE COURT:  I'll listen to them both.

24          MR. BLACK:  Okay.  So the -- there's nothing wrong

25   with a claim that says in form, network operators, behold,

1  here is an invention that allows you to have flexibility,

2  which was unknown in the prior art.  Before, all you could

3  do was use the same QoS parameters for any traffic going

4  through the system.  That was the prior art.

5          Now I give you options.  I give you flexibility.  I

6  give you the ability to optimize, meaning prioritize,

7  customize the system for you in any way that you believe is

8  appropriate.

9          It's a little like building a radio with a new knob

10  on it to manage the volume, and the claim says a volume knob

11  that allows the users to optimize the volume for their own

12  benefit.  I've described an invention.  I don't have to show

13  and poll users.

14          So I disagree a little bit with your -- with your

15  premise, Your Honor.

16          But the second point is a deeper one, which we

17  really don't have a record on yet, and that's this.  If the

18  traffic -- first of all, this claim relates to a single IP

19  flow.  And if you prioritize -- our submission is that if

20  you prioritize that IP flow over the other things in the

21  system, and this claim tells you how to do that, it tells

22  you to use an advanced reservation algorithm, it tells you

23  how to put the packets, and it tells you very specifically,

24  make sure you send those packets for that voice call on time

25  every time and you give them priority.

1              Now, if those objective facts are true, the network

2    operator, the user, and anybody would consider that to be

3    optimized -- an optimized call within the confines of the

4    system.

5              When you start talking about comparing optimization

6    at the system level where you're saying make a nice system,

7    optimize the system, yes, there's an issue, but this claim

8    doesn't say that.  It effectively says prioritize a single

9    IP flow and do it by making sure that, A, you pick a jitter

10   or latency-sensitive flow and that you send the flow to the

11   user in an isochronous fashion.  That's sufficient detail

12   because send the packets on time every time.  That's enough

13   to tell one of skill in the art where the metes and bounds

14   of the claim are.

15             In other words, it's saying optimize by doing the

16   following eight things.  And if those things are done, you

17   will have an optimized call.

18             I don't know if Your Honor would -- perhaps willing

19   to accept further briefing on this issue.  It's come up, you

20   know, rather abruptly before the hearing, and perhaps it

21   depends on what my colleague says or would like to do.

22             THE COURT:  Let me -- let me hear complete

23   argument, and then I'll -- I'll carry that notion.

24             MR. BLACK:  Yes, sir.

25             Okay.  Can we put up -- can we switch back to the

1   slides, please?

2          And I'd like to put up Slide 27.  Oh, I've got the

3   clicker.  So 20 -- I'll start with 24.

4          So one of the things the patent says is that QoS

5   can be thought of as a mechanism to selectively allocate

6   scarce resources.  There are two sentences in which QoS is

7   used.  On the one hand, it's a -- QoS is a mechanism used by

8   the network operator.  On the other hand, it's something

9   that the user experiences.

10         Okay.  So, Your Honor, here's -- here's an example

11  of what happens with the invention.  If you combine voice

12  packets and HTTP IP packets and send them all at the same

13  time, the invention gives you a tremendous advantage because

14  you can use one set of frequencies, one channel to the

15  phone, if you will, one pipe, sometimes they say.

16         The problem is if you don't -- if you can't

17  differentiate between the types of traffic in the pipe,

18  you're going to make mistakes.

19         Like here what we're trying to show is that the

20  green arrows are where the device expects to receive a voice

21  packet, and if it doesn't, the quality of the -- of the call

22  is going to degrade.  And we don't have that because this

23  system doesn't know how to prioritize the voice packets.

24         In the next example, which describes the invention,

25  the voice packets are received on time, and, therefore, the

```
1   voice flow and the quality of the service is going to be
2   optimized.
3        Now, there is support in the specification relating
4   to the use of optimization, particularly with voice and
5   video.  And that's at Column 21, Lines 41 to 50.
6        There's an example here that says by using QoS
7   requirements to build the wireless transmission frames,
8   optimal QoS performance can result over the entire range of
9   applications being handled by the system.  And then it gives
10  an example.  And this example can rely on the specification
11  in order to cure an indefiniteness issue.
12       Here's an example.  For example, latency and
13  jitter-sensitive IP telephony, other H.323-compliant IP
14  streams, and real-time audio and video streams can be given
15  a higher priority for optimal placement in the wireless
16  transmission frames.
17       And what that's saying is when you're talking about
18  packets that are jitter and latency-sensitive, you have to
19  make sure that they get top priority.  That's what's meant
20  by optimize when optimized is used in connection with an
21  isochronous IP stream, and particularly with respect to any
22  dependent claims that explicitly claim voice or video.
23       That would be sufficient even under the Federal
24  Circuit's standard to provide the metes and bounds of the
25  claims to provide reasonable certainty to one of skill in
```

1   the art.

2           THE COURT:  What else?

3           MR. BLACK:  That's it for now, Your Honor.

4           THE COURT:  Let me hear a response from Defendants.

5           MR. KUBEHL:  Mr. Mullen, could we have Slide No. 3,

6   please?

7           Your Honor, I'll start with the issue preclusion

8   issue related to this term, if that's all right?

9           THE COURT:  That's fine.

10          MR. KUBEHL:  So with respect to issue preclusion of

11  the four factors that -- that this jurisdiction looks at,

12  the one factor that was at issue was whether, in fact, this

13  was an identical issue.  The other factors have been

14  satisfied.

15          There was some debate earlier about whether there

16  were any special circumstances.  Now that we have the

17  Federal Circuit's affirmance of the Delaware's Court's

18  finding of invalidity, there is no special circumstance.  It

19  comes down to whether the -- the issue between the two cases

20  is identical.

21          The issue that the Delaware Court took up, and I'm

22  looking at Slide 7 here, and it's a -- it's a shot from the

23  Delaware Court's order, was what it means to optimize

24  end-user QoS.

25          The specific finding that the Court made was that

1  the term "optimize," as it's used in the '248 patent, is

2  indefinite.  The term, not -- not the entire claim as a

3  whole is indefinite, but the term "optimize," as it's used

4  in that patent, in particular, optimizing end-user QoS, was

5  found to be indefinite.

6        With respect to the Federal Circuit opinion --

7  we're looking at Slide 8 here -- the Federal Circuit looked

8  at the term and found that QoS requirements are entirely

9  subjective and user-defined.  As the Delaware Court did, the

10 Court looked at the specification and recognized that QoS is

11 described as being a continue -- a continuum that's defined

12 by the network performance characteristics most important to

13 the particular user.

14        The Delaware Court recognized and the Federal

15 Circuit has recognized that when it comes to optimizing this

16 user-specific term, it is optimized in the manner that the

17 user defines it being optimized.  In other words, it's

18 optimized when the user says it's optimized.

19        As Your Honor pointed out, different users, whether

20 it be end-users or network operators, can have different

21 views as to what is optimal.  In particular, in a system

22 where you've got competing demands coming from different

23 applications and different flows, what it means to optimize

24 with respect to one user is something different than another

25 user might find.

1          That was the issue that was taken up in Delaware

2   and at the Federal Circuit.  What does it mean to optimize

3   end-user quality of service?  And that is the same issue

4   here.

5          THE COURT:  Is there any reason why Chief Judge

6   Stark's signature keeps showing up on the slides?  I mean, I

7   believe -- I believe he signed it.

8          MR. KUBEHL:  I think we just wanted to make that

9   extra clear, Your Honor.

10         THE COURT:  Okay.  All right.

11         MR. KUBEHL:  The -- the patents in this case all

12  think -- all share the same disclosure.  It's the same named

13  inventor.  It's the same 80-plus columns of disclosure.

14  Same priority claim.

15         I want to turn to the -- to the specific claims at

16  issue.

17         In Delaware, Claim 20 of the '248 patent was taken

18  up, and that claim begins by discussing optimizing end-user

19  application Internet protocol quality of service to IP

20  flows.

21         It then goes on, and in the body of the claim

22  recites optimizing end-user application QoS requirements of

23  said software applications -- uses those terms

24  interchangeably.  Whether you're talking about an end-user

25  QoS requirement of a flow or an end-user QoS requirement of

1    an application, even this claim doesn't regard those as

2    different concepts.

3         Comparing that to the claims in this case, you see

4    that both claims recite optimizing end-user quality of

5    service.  That was the term that the Delaware Court and the

6    Federal Circuit found to be indefinite.

7         Both of the claims -- 20 in the previous case and

8    12 in this case -- recognize that there's a correspondence

9    between software applications and their associated IP flows.

10   That's highlighted in green in this slide.  Both claims

11   recognize that.

12        And as I've pointed out before, both claims

13   recognize the concept of optimizing end-user QoS for a flow.

14   The application creates the flows.  Whether you're talking

15   about the requirements of the application or the

16   requirements of the flow, you're talking about the same

17   thing, and the claims treat those interchangeably.

18        We'll see in the upcoming slides the rest of the

19   patents treat those interchangeably.  We'll see that the

20   prosecution history treated them interchangeably, and that

21   IV, both in its argument to the Delaware Court and to the

22   Federal Circuit, treated those interchangeably.

23        THE COURT:  What's your response to Mr. Black's

24   argument earlier that even if the same claim element is

25   present in multiple claims and even if that element evinces

1    an indefinite result, that that doesn't taint those claims

2    across the board, but each one's got to be viewed and

3    analyzed on a claim-by-claim basis for various reasons as

4    he -- as he discussed?  What's -- I assume he presented that

5    argument to me in anticipation that you would argue the

6    opposite.  What is your position on that?

7         MR. KUBEHL:  I -- I do disagree with him there.

8    The dependent claims off of an independent claim that is

9    found to be invalid for having an -- an indefinite claim

10   term are likewise invalid.

11        This is not a situation where a dependent claim

12   says:  And further optimizing comprises this step.  We don't

13   have that here.  We have independent claims that talk about

14   optimizing end-user QoS, and we have dependent claims that

15   talk about further elements that you have to do to satisfy

16   that dependent claim, but they're not phrased as "and here's

17   what I mean by optimizing" where optimizing comprises doing

18   Step X, Y, Z.  We don't have that here.

19        So in this case, finding invalidity of the

20   independent claim with respect to the optimization renders

21   the dependent claims invalid, as well.

22        THE COURT:  You're telling me there's nothing in

23   the dependent claims that could possibly save the validity,

24   given the independent claims' potential indefiniteness based

25   on optimize?

1          MR. KUBEHL:  I believe that's true.  I believe you

2    will not find the dependent claim that's recited as wherein

3    optimizing end-user QoS comprises, and then it gives some

4    definite explanation.

5          THE COURT:  But I gather you agree the Court would

6    at least have a burden to look at each dependent claim and

7    make sure that that representation is accurate.

8          MR. KUBEHL:  With respect to the issue preclusion

9    motion, our motion asks for a finding of issue preclusion

10   with respect to any of the claims that have the "optimize"

11   term and those -- and dependent claims.

12          It was IV's burden to raise any issues.  If it

13   thought there was a material difference in claim language,

14   it was their burden to raise that.  They didn't do that,

15   other than the one issue we're going to talk about today,

16   which is whether there's any difference between optimizing

17   end-user QoS for an application and optimizing end-user QoS

18   for a flow.

19          THE COURT:  All right.  What else do you have for

20   me, counsel?

21          MR. KUBEHL:  So the next slide, Slide 13, compares

22   Claim 20 to Claim 1.  And, again, you see both claims recite

23   the same term that the Federal Circuit has found to be

24   indefinite, optimize end-user QoS.

25          Same thing with respect to Claim 19 of the '206

1    patent.  Both claims recite optimize end-user QoS.  You'll

2    see Claim 19 of the '206 patent does not recite the -- with

3    respect to an IP flow.  It just has a generic term "optimize

4    end-user IP QoS."

5          So looking at -- looking at the patents, and I'm

6    looking at Slide 16, I want to show you two parts of the

7    patent that deal with QoS requirements of flows and

8    applications.  And I want to show you that the patents treat

9    those as the same.

10         On the left, we're looking at the '206 patent,

11   Column 13, Lines 17 through 28.  And you see an explanation

12   from the patent that IP flows have various requirements.

13   They can be bandwidth-sensitive.  They can be

14   latency-sensitive.  They can be jitter-sensitive.  Examples

15   of QoS requirements for IP flows.

16         On the right, the '206 patent, Column 68, Lines 24

17   to 39, different applications have different requirements.

18   And you see that those requirements are the same ones we

19   just went through for the flows.  Amounts of bandwidth,

20   jitter, and latency.

21         The requirements -- the IP QoS requirements for a

22   flow are no different -- let me restate.

23         The end-user QoS requirements for a flow are no

24   different than the end-user QoS requirements for an

25   application, and the patent makes that clear.

1           In the passage at the right, you can see that the

2    way the patent describes that you get the QoS requirements

3    for the applications is you look in the IP flow QoS

4    requirements lookup table.

5           So if you want to know what the requirements are

6    for the application, just look at the requirements for the

7    flow because they're the same thing.

8           On Slide 17, what we're showing here is a section

9    of the Delaware order.  I apologize for Judge Stark's

10   signature there.  I think it's meant to just tell you that's

11   where it's coming from.

12          THE COURT:  That's fine.  I'm just curious if my

13   bad penmanship is on display somewhere else in the country

14   today.

15          MR. KUBEHL:  I bet it is.

16          So here what we see is that the Delaware Court

17   considered the same type of arguments we're hearing from the

18   Plaintiff here.  Plaintiff had identified in that case parts

19   of the -- of the specification that talked about how you can

20   make any particular application or flow work the best way

21   that it could be and the parameters that you would use for

22   that particular flow.

23          And, of course, the Delaware Court found that to be

24   not persuasive in light of the discussion in the patent of

25   optimizing end-user QoS being completely up to the user.

1          But what I want to point out here is -- is these

2   are two things that in Delaware, IV pointed to the Court and

3   said:  This supports us as to what the patent means by

4   optimizing an application.

5          And what you see on the left is it's not talking

6   about applications, it's talking about flows, voice traffic,

7   data traffic.  It's talking about requirements of different

8   flows, yet they didn't find any difference between

9   applications and flows then.

10          On the right, you see from Column 14, 43 through

11   50, of the '248 patent -- this is IV pointing to the patent

12   about what the requirements are for applications, how some

13   applications need speed, some applications need quality.

14          And what's -- what's telling here is that in this

15   case, when they briefed to you what does it mean to optimize

16   IP QoS for a flow, they pointed to this same passage on the

17   right that talks all about applications and nothing about

18   flows.

19          So IV, both in its briefing here and in its

20   arguments to the Delaware Court, has equated those two.

21   There is no difference between end-user QoS requirements of

22   a flow and end-user QoS requirements of an application.

23          I want to show you one more on Slide 49 [sic].  It

24   goes to this idea of -- that somehow there's a difference

25   between whether a network operator is looking at it or

1    whether an end-user of a phone is looking at it.

2         On the top, that's a citation from IV's brief to

3    Your Honor in this case, and they make that argument that

4    the task of optimizing end-user QoS associated with a flow

5    is performed by a network operator.

6         On the bottom, you see their Federal Circuit appeal

7    brief.  This is where they were arguing regarding

8    optimization of end-user QoS of an application.  And they

9    made exactly the same argument.  They told the Federal

10   Circuit in the context of end-user QoS for an application

11   that the claim requires optimizing a particular data flow,

12   and that that's associated with an application, and it's

13   done from the perspective of the network operator, and that

14   the network operators would know how to optimize that.

15        This is the same issue -- in fact, it's the same

16   arguments -- of course, it's not necessary for issue

17   preclusion for them to have made all the same arguments.

18   But in this case, they did.  There is no difference between

19   QoS requirements of a flow in an application.

20        In the -- in the issue preclusion briefing in their

21   last paper to you, they said:  Well, Defendants have talked

22   about the fact that the patent equates these two concepts.

23   And they said in -- in the claim construction briefing,

24   that's the place where we'll tell you what all the

25   differences are.  And so we waited for those differences,

1   and what we saw in their briefing is that they actually

2   equated the two again.

3          What they've done is they've relied on prosecution

4   history for the term "optimize end-user quality of service,"

5   period.  Not for a flow, but just generally optimize

6   end-user quality of service.  And they say the prosecution

7   history with respect to this term, that informs you what it

8   means to optimize end-user quality of service for the flow.

9          And when we look at the -- the arguments that were

10  made with respect to that claim term -- I'm looking at Slide

11  22, and it's citing to Exhibit 7 of Docket 111 at Page 12 --

12  the applicant explained that by that claim term, "optimizing

13  end-user QoS," the end-user QoS was associated with an

14  end-user application.

15         So, again, no distinction being drawn between flows

16  and applications.  And if, in fact, it is true that you can

17  look at this prosecution history to define what it means to

18  optimize end-user quality of service for a flow, well, that

19  proves that there's no difference between that and IP

20  quality of service for an application because that's what

21  this was talking about.

22         I'll give you an example of the dependent claim

23  issue.  Looking at Slide 23 here, this is in the '206

24  patent.  Claim 121 is -- is the claim that has this term "to

25  optimize end-user quality of service for an Internet

1    Protocol flow."  And so you can see in Claim 121, you have

2    to do an allocation of resources that will optimize this

3    end-user quality of service for the flow.

4         Then in Claim 129 -- this is one of the dependent

5    claims that their briefing now points to -- they say:  Well,

6    wait a minute.  Can't that save it?  Can't that provide it

7    definiteness?

8         Well, this is not saying wherein optimizing

9    end-user quality of service comprises accounting for service

10   level agreements.  Instead, it says:  Allocating further

11   comprises.  There's something more in Claim 129 that you

12   have to do beyond 121.  121 required allocating to optimize.

13   129 requires another step.  Not only do you have to optimize

14   it, but you also -- also have to account for service level

15   agreement-based priorities.

16        So that's an example that the dependent claims

17   don't change the analysis here.  These dependent claims

18   don't say:  Wherein optimizing means this.  That's not what

19   we have here.  The dependent claims don't say these -- these

20   claims.

21        So the argument that we have that issue preclusion

22   doesn't apply is an argument that supposedly in Delaware it

23   was focused only on end-user QoS of an application, whereas

24   here, it's end-user QoS of an IP flow.  That's -- that's

25   wrong.  There's no difference between those two concepts.

1   We see that from the claim itself, of Claim 20, that uses

2   both of those phraseologies, both in terms of for a flow and

3   for an application.

4        We -- we saw the patent specification equating the

5   two.  We saw IV's arguments both to the Delaware Court and

6   to the Federal Circuit equating the two and also in the

7   prosecution history.

8        And for that reason, we believe that issue

9   preclusion does apply here.  It is the same issue.  It has

10  already been decided.  It's been proven by clear and

11  convincing evidence that the term "optimizing end-user

12  quality of service" in the disclosure of these patents,

13  which is the same disclosure here, that's been proven by

14  clear and convincing evidence.  And it's the same issue

15  here.

16       I can address, if -- if Your Honor likes, the

17  indefiniteness of the term here as -- as a stand-alone

18  argument or --

19       THE COURT:  I'd like you to do that, Mr. Kubehl.

20  But before I do, let's take a short recess.  And then when I

21  come back, I'll have you address that, all right?

22       MR. KUBEHL:  Thank you, Your Honor.

23       THE COURT:  Court stands in recess.

24       COURT SECURITY OFFICER:  All rise.

25       (Recess.)

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated, please.

 3              All right.  Mr. Kubehl, why don't you continue

 4    where we left off at the recess?

 5              MR. KUBEHL:  Thank you, Your Honor.

 6              We're looking at Slide 29, Your Honor.

 7              I want to take just a -- a minute to address the

 8    claim language we're dealing with here.  What you see in

 9    IV's briefing and in some of the language that we heard from

10    counsel today, it's a focus on optimizing an IP flow.  What

11    is optimized in the claims is an IP flow.  The claims

12    require optimizing for an IP flow.

13              Well, the -- the language -- as Your Honor pointed

14    out earlier, the claim language is optimizing end-user QoS

15    for the flow, not optimizing a flow, optimizing end-user

16    QoS.  That's in every one of the claims.  And, again, that's

17    the term that the Delaware Court and the Federal Circuit

18    found to be indefinite.

19              What the patent says about QoS -- and this is at

20    Slide 30, looking at Column 11, Lines 41 to 56 -- is that

21    QoS can be a relative term finding different meanings for

22    different users.  It explains at the next line's

23    paraphrasing here that different applications or flows can

24    have different needs.

25              And it picks up at Line 51, that perhaps it's best
```

1    to understand QoS as a continuum, defined by what network

2    performance characteristic is most important to a particular

3    user, and the user's SLA.

4           At Column 13, Line 29, it says:  Ultimately, the

5    end-user experience is the final arbiter of QoS.

6           So this thing called QoS, the patent tells us, is a

7    very subjective term, and that is the thing that we're

8    optimizing.

9           Looking at Slide 31, we're looking at the '206

10   patent, Column 12, Lines 7 through 17.  It explains that QoS

11   can be thought of as a mechanism to selectively allocate

12   scarce networking transmission and communication resources

13   to differentiated classes of network traffic.  And it

14   explains how things can change.  The type of traffic can

15   change.  The demands of the users can change.  The

16   conditions of the networks can change.

17          But, ultimately, it's desirable that the QoS

18   mechanism operate in a manner that provides the user with

19   optimal service in whatever manner the user defines it.

20          And that's language that the Delaware Court and the

21   Federal Circuit focused on when it comes to what does this

22   patent say about how to optimize QoS.  You do it in whatever

23   manner the user defines it.

24          So you won't find one part of the patent that says

25   here's how you optimize end-user QoS for an application, and

1    here's how you optimize end-user QoS for an IP flow.  What

2    it says is, if you want to optimize end-user QoS, you do

3    that in whatever manner the user defines it because after

4    all, it's really in the eye of the beholder, the user, as to

5    what it views as optimal.

6         I want to look briefly -- if we can go back to

7    Slide 13, Mr. Mullen.

8         So on the right-hand side, we see Claim 1 of the

9    '206 patent.  And where the "optimizing end-user quality of

10   service" term appears, and you heard arguments earlier today

11   about other language in Claim 12 of the '971 patent talking

12   about different modules, in different slot prioritizations.

13   Again, you don't see any of that in Claim 1 of the '206

14   patent.  It's just bare optimizing end-user quality of

15   service associated with an IP flow.

16        And what the patent has to say about optimizing

17   end-user quality of service is it's up to the user to define

18   how to do that.

19        THE COURT:  Do both -- do both sides have a clear

20   understanding, as we sit here today, of the exact asserted

21   claims, both independent and dependent in the case?  I

22   didn't see a -- an overview of that in the briefing that

23   sometimes is present.

24        MR. BLACK:  I believe we probably have agreement on

25   which claims are asserted.  We do not have agreement on

1  which claims are implicated by the indefiniteness motion

2  because their 4.3 statement only listed the claims they

3  asserted to be indefinite as four or five claims.

4         It now appears they want to throw all the others

5  under the bus, as well, on the theory that dependent claims

6  are automatically indefinite, which was not briefed, by the

7  way, and which is wrong.

8         So we have a problem there, and I'll show Your

9  Honor a couple of dependent claims that have particular

10  issues when it's my turn.

11         THE COURT:  Well, just for the Court's benefit,

12  within the next 24 hours, why don't you two meet and confer

13  and just file a notice with the Court, at least clarifying

14  for me the universe of the asserted claims here.

15         MR. BLACK:  Yes, Your Honor.

16         THE COURT:  Okay.  Go ahead, Mr. Kubehl.

17         MR. KUBEHL:  Thank you, Your Honor.

18         One point that you heard from IV's counsel was this

19  idea that the claim was focused on just optimizing a single

20  flow and that that somehow made a difference.

21         If you look at Claim 20 on the left-hand side here,

22  that's the '248 invalid claim, and you can see what was

23  optimized there was end-user QoS of said software

24  application -- of a single software application.

25         So this idea that Claim 12 talked about of an IP

1  flow or -- or Claim 1 of the '206 patent talking about

2  optimizing associated with a flow, that's no different of an

3  issue.  The same claim language appeared in Claim 20.  It

4  was "of said software application."

5          With respect to Claim 12, there were arguments made

6  about -- recitations in the claim about different modules

7  that this scheduler could have.  Well, what we see in Claim

8  20 is similar to what we saw in the invalidated claim.

9          In the invalidated claim, it was a system that was

10 optimizing among multiple flows, and in the body of the

11 claim, it said optimize for said -- optimizing end-user QoS

12 for said software application.

13         Here, we have a scheduler that allocates resources

14 among multiple wireless network stations to optimize

15 end-user quality of service.  And what -- what everyone

16 seems to agree on, including their expert, is that this is a

17 system that is not dealing with one application or one flow

18 in isolation and simply applying what you think might be

19 best for that -- that application or flow.

20         This is a system that's dealing with trade-offs.

21 When you're talking about optimizing, you're talking about

22 trade-offs.  I don't have enough resources to do everything

23 I'd like to to treat everything in the ideal way, so let me

24 optimize it to do the best that I can.

25         If you go to Slide 36, Mr. Mullen.

1          So this is from Dr. Williams.  This is IV's expert.

2  And he explains that the network operator needs to make

3  trade-offs in the allocation of those resources.  That's the

4  subject of the patents in dispute.  He explains the

5  specification describes how a network will seek to provide

6  optimized IP flows in an environment where multiple IP flows

7  are competing for network resources.

8          In this claim, whether it's Claim 12, talking about

9  allocating between multiple devices and optimizing a flow,

10  or whether you're talking about optimizing a flow in Claim 1

11  of the '206 patent, all -- all acknowledge that this is a

12  system where you're -- you've got to deal with compete --

13  with competing needs for your limited resources.

14          And so I, either as a network operator or as an

15  end-user using multiple applications, I need to decide what

16  do I think is optimum, because for my voice traffic, I could

17  give ultimate high priority to that and treat it in an ideal

18  way, but that might be at the expense of bandwidth intensive

19  traffic.  Or it might be at the expense of other voice

20  traffic.  Maybe I'm willing to do that.  Maybe I'm not.

21  What's optimal in my view?  That's what this patent teaches

22  us.  And that's the problem from the indefiniteness

23  standpoint, that you can't have a claim that's subject to

24  the vagaries of one person's opinion.

25          Again, Column 12, Line 7 through 17 here, this is

1  what the patent has to say on optimizing, that although

2  things change, including the demands of the users change,

3  ultimately, what you want is a QoS mechanism that operates

4  in a manner that provides the user with optimal service in

5  whatever manner the user defines it.

6           I have a -- a number of criticisms of the

7  construction that they've proposed.  But I'm not sure that

8  they're proposing it anymore.  I'm not sure if I heard this

9  morning that in light of the Federal Circuit argument,

10 they're withdrawing that.  I guess I need some clarification

11 on that.  If they're still proposing it, I've got some

12 criticisms.

13          THE COURT:  I didn't hear Plaintiff's counsel

14 formally withdraw anything.  Can you clarify that for me,

15 Mr. Black?

16          MR. BLACK:  I have not -- I have not withdrawn it,

17 Your Honor.

18          THE COURT:  Okay.  Then go ahead and give me what

19 you have, Mr. Kubehl.

20          MR. KUBEHL:  Yes, Your Honor.

21          Mr. Mullen, can I have Slide 12 -- 32, please?

22          So IV's construction, as shown on this slide --

23 again, the claim term is "optimizing end-user QoS," either

24 for an IP flow or associated with an IP flow.  And they say

25 that just means differentiating between types of traffic or

1  services and allocating different levels of system resources

2  to an IP flow.

3         That construction does two things.  Number one, it

4  takes the concept of end-user QoS out of the claim.  There

5  are many ways that I can differentiate types of traffic and

6  allocate different levels of resources that have nothing to

7  do with QoS requirements of an IP flow.

8         So it's overly broad in reading out the concept of

9  end-user QoS.

10         The other thing it does is it reads the concept of

11  optimization out of the claims that recite it.  And this is

12  illustrated on Slide 33.  Slide 33 we see Claim 109 of the

13  '206 patent.  Okay.  That's a claim that is not subject to

14  this motion.  It does not recite optimizing end-user QoS

15  requirements for a flow or otherwise.

16         What it does recite is that you classify packets

17  according to end-user quality of service requirements of the

18  packets and that you schedule the packets -- essentially

19  that you differentiate between the types of packets, and you

20  give some level of resources to the packets.

21         Claim 121 is a dependent claim, and it adds another

22  requirement.  It adds the requirement that you have to

23  allocate resources to optimize end-user quality of service

24  for an Internet Protocol flow.

25         So if you -- if you accept IV's construction,

1  they're essentially construing it to mean what Claim 109 is

2  reciting where Claim 109 does not require optimization.  And

3  then when you get to Claim 121, there's nothing more in 121

4  that it would be adding.  If optimization already meant

5  different -- differentiating between types of traffic or

6  service and giving system resources to the flow, 121

7  wouldn't add anything where it requires it to be optimized.

8          There are parts of the specification that IV and

9  its expert rely on.  On Slide 34, we see on the left-hand

10  side they're -- they're pointing to this part of the

11  specification that says that you can use QoS to

12  differentiate between types of traffic.  You can give

13  different levels of system resources to that.  Agree, the

14  patent does say that, but it's describing something like

15  what's happening in Claim 109.  It says nothing about

16  optimization, just like Claim 109 says nothing about

17  optimization.

18          With respect to the prosecution history that they

19  rely on, at Slide 35, we've got a citation to Docket 111,

20  Exhibit 5.  It's at Pages 13 to 14.  This is a portion of

21  the prosecution history that they rely on where they say

22  this is where the definition of optimizing end-user QoS for

23  a flow comes from.

24          We've shown Your Honor that that prosecution

25  history actually was talking about end-user QoS for an

1   application, so they've got a serious problem there with

2   respect to the issue preclusion issue.

3          But even if you look past that, what you see

4   happening in the prosecution history was there was a prior

5   art reference that had no ability to distinguish one type of

6   application from another.  And the argument was made, well,

7   my claim talks about optimizing end-user quality of service.

8          And to be able to optimize end-user quality of

9   service, they argued, you have to at least be able to

10  differentiate between different types of services or

11  different applications because if -- if you can't even

12  differentiate, how could you ever provide optimized

13  treatment to a flow or flows?

14         So they didn't define optimizing QoS as merely

15  differentiating between types of traffic and then giving

16  different levels of -- of resources to the traffic.  They

17  were saying that that's a -- an initial hurdle that you have

18  to overcome to even get to the point where now you can

19  optimize.  If you treat everything just the same, you can't

20  optimize.  The first step is you're going to have to

21  differentiate between different types of service.  And once

22  you do that, you can optimize.

23         But because the prior art didn't even have the

24  ability to differentiate between types of service, it was

25  argued that it certainly then can't optimize because you

1  can't optimize without first differentiating.  That's the

2  argument.  It wasn't a definition of what it means to

3  optimize.

4          I will -- unless Your Honor has questions, I'll

5  step down.

6          THE COURT:  All right.  Thank you, counsel.

7          I'll hear a brief rebuttal from Plaintiff.  Go

8  ahead, Mr. Black.

9          MR. BLACK:  Thank you, Your Honor.

10         Couple of points.  First, it -- it appears that we

11  have a difference with respect to the standard.  They took

12  the position, and we disagree, that if an independent claim

13  is invalid, that all dependent claims are invalid.  We'd

14  like the opportunity to provide some case law to the Court

15  on that point.

16         Second, he did then go and look at some of the

17  independent claims but not all of them.  And I want to show

18  Your Honor a couple of them just so we know what we're

19  dealing with here.

20         If you could switch to the ELMO.

21         THE COURT:  Tell me this, Mr. Black --

22         MR. BLACK:  Yes.

23         THE COURT:  -- you said he showed you some of them

24  but not all of them.  Is it his burden, or is it your

25  burden to --

1          MR. BLACK:  It's absolutely -- it's absolutely his

2     burden, both on collateral estoppel and on indefiniteness.

3     The burden always lies with the Defendant to establish the

4     right to a defense.

5          They -- they briefed collateral estoppel.  We -- we

6     put in our brief that we disagreed that all the claims were

7     of the same scope.  We identified claims that were

8     different.  It's not up to us to demonstrate invalidity.

9          The statute, 280 -- 283, maybe, says each claim is

10    dependent -- is considered independently for purposes of

11    validity.

12         And if -- if Your Honor reviews the cases that

13    they're relying on on collateral estoppel, the claim

14    language was either absolutely identical or -- or very, very

15    close.  You don't have all the variation that we have here.

16         With respect to indefiniteness, their obligation

17    under the local rules is to identify the claims that they're

18    going to establish indefiniteness on at the claim

19    construction hearing, and then it's their obligation to

20    brief it.

21         Now, the way claim construction is done under the

22    rules, where the Plaintiff goes first but the Defendant

23    presents indefiniteness in their responsive brief and then

24    we do a reply brief, we had a little bit of a dust-up here

25    because they initially said they weren't going to rely on

1    any new expert declarations, so we didn't take an expert --

2    an expert deposition.  They said they were going to rely on

3    the declaration in Delaware, but that, of course, didn't

4    address any of the claim language in this case.

5           So we complained about that.  They produced a --

6    you know, I don't know, a 10 or 20-page declaration at that

7    point.  And then we had a limited time to provide a reply

8    brief, no deposition.  So we don't have really a well-joined

9    exercise, even on the claims that they did brief.

10          But they haven't briefed these other claims.  If we

11   had the opportunity -- for instance, he pointed to the

12   claims relating to the SLA.  That's a service level

13   agreement.  Even if you took everything they said as true

14   with respect to the claims, if the user has entered into a

15   service level agreement with the carrier about which --

16   which IP flows or which applications are going to get

17   priority, then you can establish infringement.  The user

18   will have defined infringement in that instance.

19          So that's one issue.  It's not been -- we mentioned

20   that in the briefing.  It's not really been briefed.

21          There are other claims, like Claim 27 -- let's see

22   if I can -- if you look at Claim 27, Your Honor, this is

23   dependent on Claim 1 of the '206.  It says:  A method

24   further comprising -- and it gives you a couple of

25   options -- determining a QoS requirement for said flow.

```
 1            So we've got our Internet flow -- our IP flow.

 2   We've determined a QoS requirement for the flow.  And then

 3   Claim 30 gives you narrowed options for doing that.  It says

 4   you do that -- you determine a QoS requirement for the flow

 5   based on at least one of a source address, a destination

 6   address, a UDP port number.  Those are -- that's addressing

 7   information inside the packets.  The users have no access to

 8   that.

 9            This claim says you set the QoS requirement for the

10   IP flow in Claim 1 based on a computerized address built

11   into the packet.

12            That's sufficient to give one of skill in the art

13   an understanding as to how to perform the claim.  And even

14   if a broad open-ended claim that says end-user QoS needs to

15   be optimized, once you've got all this detail and the

16   specific QoS requirement that you abide by an instruction

17   in a source used -- based on a source address or a

18   destination address, that's sufficient specificity.

19            Our point is, we haven't briefed that issue.  They

20   didn't present it.  They didn't even identify Claim 30 on

21   their Rule 4.3 statement as one that they were challenging

22   in this case.  They've taken the view -- incorrect view

23   under the law that if a claim element has some subjectivity

24   in it, that every claim that includes the claim element is

25   indefinite.
```

1          We say that's wrong.  And we say they didn't meet

2    their burden of proof on indefiniteness on many of these

3    claims, certainly by definition.  If they had a burden and

4    they didn't discuss it in their brief, then they haven't met

5    the burden.

6          Now, I don't know what to do about that, Your

7    Honor.  This was the time to deal with those issues.  Is

8    there a waiver?  Should we do further briefing?

9          Another option -- I know it's not normally

10   preferable, but we've got -- we're late in the case in some

11   ways.  We have expert reports on October 1st.  We could

12   handle this through expert reports and depositions and then

13   present the whole thing in a package to you for summary

14   judgment.

15         But we've got to have a different option, and the

16   Defendant says here are four claims we're going to raise at

17   the claim construction hearing.  And by the way, throw a

18   hundred other claims under the bus.

19         THE COURT:  Well, let me -- let me carry that issue

20   for right now.

21         MR. BLACK:  Sure.

22         THE COURT:  I'll hear the rest of your substantive

23   argument, and then we'll come back to that.

24         MR. BLACK:  Sure, Your Honor.

25         So I also want to point out that Claim -- just

1  another example is Claim 132.  And that's one that

2  explicitly says that the flow is a specific type of flow,

3  Voice over IP or video application.

4          And our expert has said, and we believe that Voice

5  over IP applications are different.  There are -- network

6  engineers understand what you need to do to optimize a Voice

7  over IP flow.

8          In a system like this, you need to give it

9  priority.  It is latency-sensitive.  It is jitter-sensitive.

10 And you need to make sure that you -- the packets arrive on

11 time, for instance, by using isochronous transmission.

12         And, again, we say that if the claim is narrowed

13 not to any application, not to any IP flow, but to a Voice

14 over IP flow that is latency-sensitive and jitter-sensitive

15 and where the packets are placed in a particular fashion, as

16 described in the claim, and where that fashion requires

17 isochronous on-time placement, that is a sufficiently

18 definite claim to satisfy the reasonable certainty test.

19         I note that in the Datamize case, even with a

20 phrase like "aesthetically pleasing," which is so clearly

21 and obviously vague and subjective, what could be more

22 subjective than aesthetically pleasing.  And that case was

23 not decided in three paragraphs.  The Federal Circuit looked

24 very hard at the claim language, the prosecution history,

25 the specification to see that despite the fact that the

1   claim on its face was as subjective as could be, whether or

2   not there was structure in the patent that you could put to

3   help define and cabin the meaning of aesthetically pleasing,

4   that's the job that we need to do with every claim that they

5   say is indefinite, and we haven't done that work yet.

6           THE COURT:  Did the Federal Circuit do a similar

7   job in the Delaware case that just came down?

8           MR. BLACK:  They did not, Your Honor.  They --

9   they -- the difficulty in the Delaware case was that the --

10  there wasn't much in the claim.  There was a -- a statement

11  about a software application, and then we had to rely on

12  means-plus-function analysis.  And they said that's not good

13  enough.  You can't point to the whole patent.

14          And we understand that.  We have to take that as

15  the law.  But one bad apple doesn't ruin the bunch.  One

16  poorly-drafted claim, which is certainly what we have as a

17  matter of federal law now, does not ruin every claim that

18  covers this concept.  And the patentee did try to cover this

19  concept.

20          If we could go to our -- back to our slides,

21  please.  And Slide 31.

22          So this is the prosecution history, and the

23  inventor said, the present invention, and how many times has

24  a -- has a Plaintiff been hung up on that?  It's meaningful

25  when someone says that.  The present invention optimizes

1    end-user quality of service by differentiating between types

2    of traffic or service types so that differing levels of

3    system resources can be allocated to these different types.

4              That's pretty close to a definition of optimize.

5              Now, that is part of the invention here.   The

6    Federal Circuit construed Claim 20, the means-plus-function

7    claim, not to include this, to be much more open-ended.   But

8    we're only asking for what the inventor claimed.   If he had

9    one badly-drafted claim, that doesn't ruin the entire

10   family.   And we need to do the work to look at the claims

11   more specifically.   That hasn't been done yet.

12             That's all I have, Your Honor.

13             THE COURT:   All right.   Thank you, Mr. Black.

14             MR. KUBEHL:   Your Honor, could I respond very

15   briefly, just with respect to the --

16             THE COURT:   I'm open -- I'm open to comments from a

17   procedural standpoint.   I think I've heard enough

18   substantive arguments.

19             MR. KUBEHL:   Understood.

20             Just from the procedural standpoint, on the issue

21   preclusion motion, our motion asked for a finding of issue

22   preclusion with respect to the independent claims we

23   identified and any other dependent claims that they were

24   going to assert in this case.   By the time they responded,

25   they had asserted their claims in this case.   And at that

1  point, if they had an argument that some dependent claim

2  somehow saved them, it was incumbent upon them to bring that

3  up.

4        What we did in the claim construction process is we

5  addressed the arguments that they had made.  So the issue

6  was ripe as to the dependent claims.  They're waiting until

7  now to decide they want a second chance at it and now trying

8  to identify some additional differences, and it's too late

9  for that, certainly from an issue preclusion standpoint.

10       THE COURT:  With regard to a claim construction

11  standpoint and given the local rules that would place a

12  burden on any party challenging the indefiniteness of a

13  claim, what's your posture on that?

14       MR. KUBEHL:  That by -- by having identified the

15  independent claims, that that covers the dependent claims

16  unless there's some difference in claim meaning in those

17  dependent claims.  If there was a difference in the claim

18  meaning, it was incumbent upon the Plaintiff to raise those

19  as presenting a different issue for construction.

20       THE COURT:  All right.  Do you have any brief

21  response to that, Mr. Black?

22       MR. BLACK:  Yes, Your Honor.  Collateral estoppel

23  requires identicality of the claims.  We did identify a

24  number of claims in the briefing that we said were different

25  and said you have to go claim-by-claim.  This -- but more

1   importantly, on claim construction --

2          THE COURT:  Well, let me just say this.  I'm not

3   inclined to conflate the issue preclusion motion with the

4   assertions of indefiniteness raised through the claim

5   construction process.

6          MR. BLACK:  Understood.

7          THE COURT:  These are not the same things in my

8   view.

9          MR. BLACK:  I -- I agree completely, Your Honor.

10         And on claim construction, then we're left with a

11  problem that they only identified in their Rule 4.3

12  statement four or five claims.  They did not identify the

13  other claims.  They made no argument that those claims are

14  also indefinite.  The burden, of course, is on them to

15  establish indefiniteness by statute, by clear and convincing

16  evidence, by -- you know, under the -- under the governing

17  standard.  And it's their burden to come forward for the

18  record.

19         We do not agree that all of these claims have the

20  same scope.  I think we provided a number of examples kind

21  of on the fly and in argument today, but it's plain that

22  they don't have the same scope, particularly in light of the

23  Federal Circuit's ruling on what the key phraseology means.

24         They didn't brief it.  They didn't raise it

25  pursuant to the local rules.  They didn't -- they decided --

```
1   they made a tactical choice by the way.  They said, you know
2   what, we've got this badly drafted Claim 20 in the '248.
3   They're trying to say there's nothing different and throw
4   the burden back on the Plaintiff to establish that his
5   claims which were issued by the Patent Office and clearly
6   have different scope, and then say it's our burden, and it's
7   not our burden.
8             THE COURT:  Let me ask you this.  Where does this
9   Court stand with regard to an opinion issued yesterday by
10  the Federal Circuit as to the Delaware case?
11            MR. BLACK:  I --
12            THE COURT:  I mean, this is hot off the press.
13            MR. BLACK:  Right.
14            THE COURT:  And at this point, I don't know if IV
15  intends to seek a rehearing or an en banc review or a writ
16  to the Supreme Court.  Everybody's talked today as if this
17  was final and non-appealable, but it's clearly not.
18            Now, it may become that, but in the interim, until
19  it does become that or unless Plaintiffs are going to
20  stipulate that they're not going to seek any further review,
21  what's my posture with regard to relying upon and
22  implementing the ruling that was issued yesterday by the
23  Federal Circuit?
24            MR. BLACK:  Well, Your Honor, there's -- of course,
25  there's no mandate which would require you to do anything.
```

1    That mandate would issue to Delaware, not here.

2         For collateral estoppel purposes, we can see that

3    there is a judgment to which collateral estoppel attached.

4    But that happened when the Delaware judgment came out.  If

5    you put collateral estoppel aside, as I think you must, the

6    question is what's the persuasive force of the opinion?  It

7    doesn't have any binding effect here.

8         What we're really talking about when we get right

9    down to it is what's the Federal Circuit -- or perhaps even

10   a different panel of the Federal Circuit going to do with

11   the record in this case, hopefully once it's fully

12   developed, and taking that -- that -- taking the decision

13   they just issued, what's the persuasive effect here?  It

14   doesn't have any kind of binding dispositive effect, unless

15   collateral estoppel applies.

16        THE COURT:  Well, I understand the mandate hasn't

17   issued, and I understand that this is far from being final

18   and non-appealable.

19        But I'm also not prepared to just say it has no

20   impact at all and that I should ignore the reasoning and the

21   rationale and the analysis set forth by the Federal Circuit.

22   And to the extent there's an applicability to the present

23   case before me -- you know, maybe I'm not saying this in the

24   best possible way, but I seem to be somewhat caught on the

25   horns of a dilemma between the de jure effect and the

1    de facto realities.

2           Here I am with an opinion that but for a reversal

3    that is purely speculative, it's at some point going to be

4    binding precedent, but it's not binding today.

5           But do I expect and should I expect a different

6    panel on a different day to come up with a completely

7    different result?  Probably not.

8           MR. BLACK:  I agree, Your Honor, and --

9           THE COURT:  I mean, there's some reality check

10   that's got to be applied here.

11          MR. BLACK:  And I take that fully on board, and

12   that's why I started my argument the way I did with the

13   Federal Circuit decision.

14          So I think the reality is that the Federal Circuit

15   has ruled that the term in and of itself -- this is what

16   they've ruled, and they've gone no further, Your Honor.  The

17   term in and of itself is -- is inadequate to put -- to

18   create the metes and bounds of certainty required by Section

19   112.

20          They haven't considered other narrower claims which

21   have additional verbiage in it, additional limitations which

22   put structure around what it means to optimize.

23          If -- if you were to take the proposition that

24   every claim that has the word "optimize" in it is indefinite

25   as a matter of law, which effectively is what they've said,

1   I believe that that would be error.  Every claim needs to be

2   construed separately.

3          And, candidly, the difficult job for Your Honor is

4   to figure out where on the sliding scale here of these

5   claims, some of which are broader and some of which are

6   quite narrow, is the Federal Circuit likely to stop when

7   they go up on appeal.

8          Now, at the moment, we haven't done that analysis.

9   There are two things that we could do to create a more

10  robust record for Your Honor to make that determination.

11  One would be to carry this through summary judgment.

12  Another would be -- some Courts have done this -- I know

13  it's not common here -- but to have the experts come in and

14  create a factual record.

15         The Supreme Court in Teva versus Sandoz has said

16  that indefiniteness is dependent on facts, and those facts

17  must be given deference on appeal.  So if Your Honor were to

18  make factual findings with respect to credibility of

19  experts, Your Honor is -- would be able to -- we'd have a

20  more robust record and something that -- that might assist

21  on appeal.

22         THE COURT:  Have you got some input on this

23  discussion, Mr. Kubehl?  I'd be happy to hear it if you do.

24         MR. KUBEHL:  Yes, Your Honor.

25         With respect to the finality of the Federal Circuit

1    opinion from an issue preclusion standpoint, it does not

2    matter that there are still avenues to challenge the Federal

3    Circuit's opinion.  Even when there's no Federal Circuit

4    opinion, the Federal Circuit has told us that the pendency

5    of an appeal has no effect on the finality and the binding

6    effect of a trial Court's holding.  That's the Pharmacia v.

7    Upjohn case, 170 F.3d 1373.

8              THE COURT:  Well, beyond -- beyond your issue

9    preclusion motion --

10             MR. KUBEHL:  Yes, Your Honor.

11             THE COURT:  -- back to the -- to the alternative

12   context of claim construction and where I am today, what's

13   your view?

14             MR. KUBEHL:  With respect to a claim like Claim 12

15   that they've talked about today and his suggestion that

16   maybe we should drop the experts out and create a factual

17   record, Claim 12 has been at issue since the beginning of

18   this case, since we filed our motion to dismiss.  It's been

19   issued -- at issue through the claim construction.  They

20   filed two expert declarations.  And for the first time

21   today, we heard lawyer argument about all the other elements

22   in Claim 12 that supposedly made a differ -- difference.

23             To the extent that those are arguments that they

24   thought should have been made, that time has come and gone.

25   It's not time to bring in a new expert and have them submit

1  a new declaration lining up to the attorney arguments that

2  were made today.

3       THE COURT:  Well, both of you gentlemen have told

4  me the other one has been left on the dock with the ship

5  having sailed away.  Only the problem is you're both

6  pointing at the other one saying the ship has sailed.

7       Mr. Black has told me you've failed to comply with

8  the local rules and identify claims that would be challenged

9  as indefinite here beyond those limited claims that have

10  been identified in the claim construction briefing.  You've

11  told me that in light of the Federal Circuit's finding of --

12  its finding with regard to optimize, that if there's

13  something in dependent claims that might save independent

14  claims, then it's Plaintiff's obligation to bring forward

15  that proof, and they haven't done it, so that ship has

16  sailed.

17       I'm not sure both ships can have sailed here the

18  way both of you have argued in -- you know, toward the

19  other.

20       I am somewhat perplexed as to where I go from here

21  in light of -- in light of the evolving context that the

22  Court finds itself in.  And I'm looking for not competing

23  arguments as much as I am for practical suggestions.

24       And I -- I hear Plaintiff's suggestion about

25  building a record based on expert testimony, although that's

1    something I would -- that's something I would want to think

2    about before reacting to positively or negatively.

3            If you've got anything of an alternative nature,

4    Mr. Kubehl, I would welcome hearing it.

5            MR. KUBEHL:  Well, I'm -- I'm understanding that

6    Your Honor doesn't want to hear that --

7            THE COURT:  Well, I know you want me to say you win

8    across the board and game over.

9            MR. KUBEHL:  Everyone here would like to hear that.

10           THE COURT:  Yeah, and -- and -- well, Plaintiffs

11   would perhaps like to hear it in a different context --

12           MR. KUBEHL:  Sure.

13           THE COURT:  -- but I understand.

14           MR. KUBEHL:  They'd like to hear their version of

15   that.

16           THE COURT:  Yeah.  And I'm -- I'm struggling here

17   not with what the competing -- competing parties would each

18   like to hear but what I think is open to the Court from both

19   a substantive and a procedural basis where I find myself

20   today.

21           MR. KUBEHL:  Perhaps if we take two minutes to

22   confer among our teams, we can see if we can suggest

23   something to Your Honor.

24           THE COURT:  Well, let's -- let's do this, because

25   the clock continues to run.  Let's go ahead and while you're

1    here, I want to -- I don't want to fail to take advantage of

2    the argument you have for me on these other disputed terms.

3    And then assuming we get that done, then I'm more than happy

4    to return to this topic and see what -- what solutions might

5    be crafted or at least suggested.

6           So let's -- let's do this.  Effectively, in my

7    view, the "optimized" terms, including those three

8    identified earlier, have been argued.

9           That brings us to this series of

10   means-plus-function terms, beginning with "assigning means

11   for assigning future slots of a transmission frame," et

12   cetera, from Claim 12 of the '971 patent.

13          Let me hear the parties' argument on that, and

14   we'll start with the Plaintiff again.

15          MR. FLANNERY:  Your Honor, if I may, it may be most

16   efficient to take the next four in a row at one time.

17          THE COURT:  I have no problem with that.  Is there

18   any -- any objection to that from Plaintiff?

19          MR. KUBEHL:  No objection.

20          THE COURT:  Excuse me, Defendant?

21          MR. KUBEHL:  No objection.

22          THE COURT:  Let's do it that way then.

23          MR. FLANNERY:  Your Honor, with -- and with that in

24   mind, I think -- I think the primary dispute rests with the

25   means for reserving the first and second slot which we'll

1    get to in a few minutes, but I just want to point out

2    some -- some points that we mostly discussed in our brief

3    along the way, but I want to reemphasize them.

4           So if we can get to the next slide.  I had it the

5    wrong way.

6           So, Your Honor, the first element is the assigning

7    means in and of itself, which that has three subparts.

8           Defendants, with respect to the assigning means,

9    want to incorporate implementing an algorithm into this

10   element.

11          And we think that that's going to create some jury

12   confusion because the next element, the "means for implying

13   an advanced reservation algorithm," explicitly sets forth

14   that there's going to be an algorithm.

15          So now if -- if you think about how this

16   construction might come together and look to a jury, they're

17   going to see something about implementing an algorithm

18   before they even get to the next subpart of the claim, which

19   is the advanced reservation algorithm.  So we have some

20   concern about some confusion there and don't know why that's

21   necessary there from Defendants when the next term is going

22   to hook in an algorithm.

23          And then one other point with respect to their

24   construction of this phrase is the assigning future slots to

25   a portion of an IP flow.  We think that that claim element

1    should actually be construed in the context of the means for

2    applying an advanced reservation algorithm and that the --

3    it should be focused on assigning future slots to data

4    packets based on the priority of an IP flow, not just

5    assigning future slots based on the IP flow.  It's assigning

6    future slots to data packets based on the priority of the IP

7    flow.  They're effectively reading the need to assign future

8    slots to data packets out of the invention.

9            So I'll turn now to the means for reserving a first

10   and second slot and take those together, Your Honor, because

11   I think that will help with the analysis.

12           So we've got a means for reserving a first slot,

13   and a means for reserving a second slot, and these are

14   talking about a future transmission frame -- frame, and then

15   something subsequent to the future transmission frame.

16           So the claim explicitly provides the reference

17   point.  The -- the claim says reserve a slot for a first

18   data packet in a future transmission frame and then reserve

19   a slot for a second data packet in a transmission frame

20   subsequent in time to the first future frame.

21           So we have two packet frames here, a first packet

22   frame and a second packet frame.  And the reference

23   specifically described -- explicitly claimed is the future

24   transmission frame.

25           So if we see this graph -- or this graphic down

1  below, we have a first packet frame, and the claim requires

2  that that's the reference point.  And then the second packet

3  frame is going to be subsequent in time.  This is very

4  straightforward.  The claim has the reference point.

5          Defendants want to change that entirely.  So they

6  want to introduce this concept of a current frame, and they

7  want the current frame to be the reference point.  The claim

8  explicit -- explicitly says what the reference point is, but

9  they want to change it entirely, effectively rewriting the

10  claim to introduce this concept of a current frame.  And we

11  think that's going to cause jury confusion.  And here's why.

12          So the construction that IV is offering is

13  supported by the specification, and the claim -- Claim 12 is

14  directed to scheduling packets by reserving slots in future

15  frames.  So the reserving takes place with respect to the

16  future.

17          This is an advanced scheduler.  This is what the

18  claimed invention is about.  It's about reserving slots in

19  future frames.

20          Defendants' construction, with respect to the

21  current frame, is going to effectively preclude the current

22  frame from being the claimed future frame.  So this is

23  Figure 14.  They rely on this with respect to this term

24  "current frame" here.  Okay.  This claim is showing -- it's

25  a static view of the placement of packets.

1            So the current frame here is 1402 N.  We have to

2    take into account that that current frame has already been

3    reserved for.  So at one point in time, that was a future

4    frame that was going to be reserved.

5            So that current frame there that has slots in it,

6    those were previous -- previously reserved, and then packets

7    filled therein so that current frame was, in fact, prior to

8    this static image.  Current Frame N was at one point going

9    to be reserved, and at that point, that current frame would

10   have been a future frame.

11           Defendants are going to wipe that all out here by

12   making the current frame the reference point.  And that's

13   going to helpless -- hopelessly confuse the jury.

14           And here's a clear explanation as to why that would

15   happen.  So they're eliminating the first packet frame or

16   the future frame as a reference point and making the current

17   frame the reference.  And then their construction is the

18   first packet frame is at least one frame in the future from

19   the current, and the second packet frame is at least two

20   frames in the future from the current.

21           So now we have that graphic similar to what we had

22   before where we were using the future transmission frame as

23   the reference point because that's what the claim says.

24           And now, with this graphic, we've substituted

25   Defendants' current frame as their reference point.

1          And they say that the first packet frame is at

2    least one frame in the future from the current frame.  So

3    that's the purple line, Your Honor.  It could be any one of

4    those packets from -- any one of those frames, I'm sorry.

5    The packet could go in any one of those frames, the frame

6    next to it, two frames down, three frames down.

7          According to Defendants, the current frame is the

8    reference point.  The second packet frame is at least two

9    frames in the future from the current.  So that's the red

10   line.  Okay.  Frames here, 2 and 3.

11         So if you follow Defendants' logic, since the

12   current frame is the reference and you're going to put the

13   first packet at least one frame in the future from the

14   current frame, so it could be three away.  So here we have

15   the purple is the first packet frame, and that's been placed

16   at least two frames from the current frame.

17         The second future frame has been placed at least

18   two frames from the current frame.  But they're reversed.

19         The first packet frame, which is the future frame,

20   is no longer the reference point for the second future

21   frame.  So by adding this current frame, which we have no

22   idea why they want to do this because they're changing

23   explicit reference point in the patent claim itself, they've

24   created this ambiguity in how it works.

25         The jury is going to be hopelessly confused by

1    this.

2         Another example.  Again, taking their language

3    exactly as it reads, use the current frame as a reference

4    point, put the first packet frame at least one away, and put

5    the second pack -- second packet frame at least two away,

6    where they can both be then in the same place.  Now we have

7    two packet frames in the same place, and they're not even

8    isochronous anymore.

9         It's -- it's that simple, Your Honor.  They're

10   playing a word game.  The claims explicitly have a reference

11   point.  It's the future transmission frame.  They're trying

12   to change it entirely with this current frame language, and

13   that messes everything up.

14        That's all I have, Your Honor.

15        THE COURT:  All right.  Let me hear a response,

16   please.

17        MR. KUBEHL:  Mr. Mullen, Slide 60, please.

18        Your Honor, what we're looking at in Slide 60 is

19   Figure 14 from the patent.  We've got the figure on the

20   right.  We've got text describing the figure on the left.

21   At the top of the figure, the figure labels frame that it

22   calls Frame N, as in Nancy, as the current frame.  And it

23   labels the Frames N plus 1, N plus 2, and so on -- so forth

24   going down and -- down in the rows as the future frames.

25        And the patent explains that the current Frame N

1    and the future Frames N plus 1 and N plus 2, those are

2    frames that are to be transmitted.  They haven't been

3    transmitted yet.  The current frame is the most recent one

4    in time.  It's the next one to be transmitted, and

5    everything beyond that are future frames.

6              The means for reserving a first slot for a first

7    packet in a future frame, we think that future frame here

8    needs a reference point.

9              So we heard arguments just now about supposed

10   problems with our reference point when you get to the next

11   claim element talking about the second packet going into a

12   subsequent frame.  The first time that we've heard any of

13   those arguments.

14             What we didn't hear is an explanation for why don't

15   we need a reference point for this first claimed future

16   frame.  Future relative to what?  What they're arguing --

17   this is on Slide 63 -- this is their reply brief at 9.  What

18   they want to be able to argue is that after the current

19   frame gets transmitted and now there's a next frame that now

20   will be the current frame, they want to say at that point,

21   that current frame is actually a future frame.

22             They do not want to use any kind of a tether or

23   anchor or reference point as to what this first future frame

24   is because they want to be able to argue that anything is a

25   future frame, including what the patent calls the current

1  frame.

2         So if we go -- if we go back to the figure, Figure

3  14, current frame is N.  That's shown in yellow here.  It's

4  Number 1402.  The future frames are N plus 1, N plus 2, and

5  so on.  So N plus 1 is a future frame, and it's in the

6  future relative to the current frame.  Neither one of those

7  has been transmitted yet, right?

8         So the patent supports the idea that if I have

9  transmitted a frame and I'm looking at the next one, that

10  next one is now the current frame.  It's not a future frame.

11  It's the current frame.

12         And what IV wants to do is to point to what the

13  patent would call the current frame, and tell the jury

14  that's a future frame.

15         The patent doesn't allow that.  It has to be a

16  future frame.  And the way we know it's future is rel --

17  relative to the current frame, it happens later in time.

18  That's why we want current frame as part of the construction

19  for this element.

20         Now, they're raising for the first time with

21  respect to the next claim term, the claim term talking about

22  reserving a second packet.  Well, the patent describes that.

23  Again, Frame N plus 1 is the future frame.  Frame N plus 2

24  is a transmission frame subsequent in time to the future

25  frame, all right?

1          If -- if we go with IV's view that the current

2    frame can be transmitted, and then N plus 2 would be the --

3    the frame that they're looking at, well, N plus 2 would no

4    longer be a transmission frame that's subsequent in time to

5    a future frame.  It would be subsequent in time to a current

6    frame but not to a future frame.

7          So that's why it's also appropriate to use current

8    frame in the definition of this claim element, the means for

9    reserving the second slot in the transmission frame

10   subsequent in time to the future transmission frame.

11         So I didn't hear any argument today about why it's

12   not appropriate to use current frame in the first claim

13   element relative to what -- what is a future frame in the

14   first place.  What I heard was all arguments about this

15   term.  And what -- what was revealed in those arguments is

16   that IV wants to argue that the frame that is going to be

17   transmitted next, that that's a future frame.

18         And that's not what the patent says.  The patent

19   calls that a current frame.  And it says it's only those

20   frames that happen after that current frame that are the

21   future frames.

22         THE COURT:  All right.

23         MR. KUBEHL:  Briefly, on the assigning means, we've

24   pointed out that the Federal Circuit precedent on this is

25   that when the patent describes something as being

1  implemented on a generic processor, you do have to describe
2  an algorithm.  We did describe an algorithm here.
3        If they want to put "associated with a packet"
4  here, I think that's fine.  I think it's encompassed by what
5  we say as described in the '971 patent at Column 61:65
6  through 62:11.  That has the language within there that
7  they're asking for.  So I don't think that's a real dispute
8  here.
9        And then with respect to the means for applying an
10 advanced reservation algorithm, really the dispute there is
11 the patent has particular sections that describe the
12 advanced reservation algorithm.  It's a particular algorithm
13 that works in a particular way.
14       There are other parts of the patent that describe
15 assigning future slots, but not using the advanced
16 reservation algorithm.
17       So our point is that the corresponding structure
18 here should be limited to those parts of the specification
19 that actually describe using the advanced reservation
20 algorithm and not to those parts of the specification which
21 we've highlighted in yellow on Slide 73 that deal more
22 generically with assigning future slots but not necessarily
23 using the advanced reservation algorithm.
24       Unless Your Honor has any questions, I'll step
25 down.

1          THE COURT:  No.  Although I'm not sure that

2   Plaintiffs have conceded that the sub-frame schedulers are

3   general purpose processors.

4          MR. KUBEHL:  We've pointed to the parts of the

5   specification that describe those as general purpose

6   processors, and I -- we haven't seen any argument to the

7   contrary.

8          THE COURT:  All right.  Thank you, Mr. Kubehl.

9          MR. KUBEHL:  Thank you, Your Honor.

10          THE COURT:  Anything in brief rebuttal from

11   Plaintiffs?

12          MR. FLANNERY:  No, Your Honor.

13          THE COURT:  Okay.  Then let's next move to and take

14   up -- next would be "the analyzed contents" and "the

15   analyzed packet contents," correct?  That's what it looks

16   like to me.  Let me hear some argument on these terms.

17          MR. DEWBERRY:  Respectfully, Your Honor, I believe

18   we have one more term, "means for taking into account

19   service level agreement."

20          THE COURT:  Okay.  Then I did not mean to overlook

21   that.  Let me hear Plaintiff's argument on that.

22          MR. DEWBERRY:  Thank you, Your Honor.  I couldn't

23   give up my first opportunity to argue a Markman.

24          THE COURT:  Well, why don't you go to the podium

25   and begin.

1          MR. DEWBERRY:  All right.  Thank you, Your Honor.

2          We're looking at the next term which is "means for

3    taking into account service level agreement."

4          THE COURT:  For the record, this is Mr. Dewberry,

5    correct?

6          MR. DEWBERRY:  Yes, this is Mr. Dewberry arguing

7    for Intellectual Ventures, Your Honor.

8          THE COURT:  Go ahead.

9          MR. DEWBERRY:  So, Your Honor, we're looking at

10   Dependent Claim 18, which includes this term "means for

11   making" -- "taking into account service level agreement

12   (SLA) based priorities for said IP flow."

13         And as you'll see, we have conflicting --

14   conflicting constructions.

15         We would argue that IV's construction, which is

16   taking into account SLA priority data table 1570 to affect

17   the queuing function and provide different service levels to

18   users is supported by the specification.

19         The function is also taking into account service

20   level agreement-based priorities, and there's no dispute on

21   that term at this point.

22         Our problem with Defendants' construction, which

23   I'll go back to here, is that it requires an algorithm that

24   increases or decreases queuing priority of an IP flow.

25         Your Honor, this is a very narrow reading of what

1 this algorithm -- assuming there is an algorithm in

2 Defendants' construction -- that it must increase or

3 decrease the priority.  In other words, it reads out the

4 possibility that the priority would remain the same as

5 whatever the default priority would be.

6        THE COURT:  But you're not conceding in the

7 requirement that there be an algorithm here at all, are you?

8        MR. DEWBERRY:  Well, Your Honor, we would say that

9 the -- the claim does describe a set of rules and conditions

10 for how you would take into account a service level

11 agreement.  And whether that is described as -- explicitly

12 as an algorithm or not, it -- it's -- that's a question of

13 form over substance.

14        So particularly at -- the patent at Column 53,

15 Lines 49 through 57, it actually describes at Figure 9 how

16 one would go about allocating -- or, excuse me, not

17 allocating, but how one would go about prioritizing based on

18 a service level agreement.  And, in fact, the -- the very

19 beginning of this particular column, at Column 53, Line 34,

20 it says:  Figure 9 illustrates how the PRIMMA MAC IP flow

21 scheduler can also take into account a service level

22 agreement in prioritizing frame -- frame slots scheduling --

23 or frame slot scheduling and resource allocation.

24        So -- and then goes on for the -- the rest of the

25 column to describe how one would do that.

1          Now, it does not use the word "algorithm" to

2   describe that, Your Honor, but it does provide you with all

3   the tools a POSITA would need to carry out this particular

4   function.

5          Did that answer your question, Your Honor?

6          THE COURT:  I think so.

7          MR. DEWBERRY:  And further to our point, this

8   particular column at Column 53 also appears to describe an

9   embodiment that does not require that the service level

10  agreement change the queuing priorities of the IP flows.

11  That is just simply absent from this particular embodiment.

12         I believe that's our argument in a nutshell, Your

13  Honor.

14         THE COURT:  All right.

15         MR. DEWBERRY:  Any further questions?

16         THE COURT:  No, I don't think so, Mr. Dewberry.

17  Thank you.

18         Let me hear from Defendants, please.

19         MS. LADRIERE:  Good afternoon, Your Honor.  Megan

20  LaDriere for the Defendants.

21         THE COURT:  Good afternoon.  Please go ahead.

22         MS. LADRIERE:  So like Mr. Dewberry said, we both

23  agree that this is a means-plus-function term.  We both

24  agree on the function as being taking into account service

25  level agreement or SLA-based priorities for the IP flow.

1    The only objection here is to the structures.

2              And what our problem is, is what we proposed is

3    what we think is the only algorithm disclosed in the

4    specification for taking into account the service level

5    agreement.  And our issue with IV's proposed structure --

6    proposed structure is that using this SLA priority data

7    table to affect the queuing function isn't an actual

8    sequence of rules to carry out this particular function of

9    taking into account a service level agreement.  So it

10   doesn't actually give you any rules or guidelines to carry

11   out this function.

12             And so this is the part of the specification we've

13   both taken our structures from.  So the first part of the

14   SLA priority data table can use predetermined service level

15   agreements.  That's what IV is using.

16             And if you look just a couple lines down, it

17   actually specifically says an algorithm can increase queuing

18   priority for messages transmitted to such customers --

19   customers that have an SLA agreement.

20             And IV has completely ignored that part of the

21   specification.  Their only real criticism here is what

22   Mr. Dewberry was just showing us, this part of the '971

23   patent at Column 53, Line 49 to 57, and says -- Defendants

24   are ignoring this and saying here, this is showing you where

25   you can use an example where it's not increasing or

1    decreasing the queuing priority.

2          But -- but this citation shows -- doesn't actually

3    give any algorithm either.  It simply says that the PRIMMA

4    MAC can take into account SLA based priorities.  How can it

5    do that?  Can it be scheduled taking into account SLA

6    priorities?  And that's just a function that we both agree

7    on here.  So --

8          THE COURT:  But your construction -- your proposed

9    construction includes implementing an algorithm that

10   increases or decreases the queuing priority.

11         So despite -- despite what you're showing me here

12   from the record, your proposed construction would read out a

13   situation where the queuing priority remained the same and

14   didn't either increase or decrease, would it not?

15         MS. LADRIERE:  I think that we would be fine if it

16   kept it the same.  I think that was just something that we

17   hadn't noticed until this point, so we'd be fine if it kept

18   it the same.

19         THE COURT:  Okay.  What else do you have for me on

20   this term?

21         MS. LADRIERE:  That's all I have.

22         THE COURT:  All right.

23         MS. LADRIERE:  Thank you, Your Honor.

24         THE COURT:  Thank you.

25         Anything further, Mr. Dewberry?

 1          MR. DEWBERRY:  Just a brief rebuttal, if I may,

 2   Your Honor.

 3          After conferring with co-counsel, I will rest on my

 4   previous argument.

 5          THE COURT:  Okay.  Then let's go to the "analyzed

 6   contents" and the "analyzed packet contents."  Let me hear

 7   from Plaintiff on this one.

 8          MR. FLANNERY:  If you could put up Slide 72,

 9   please.

10          Your Honor, I'll be brief.  I think that our

11   briefing addresses this issue.  But I just want to point out

12   that the Defendants here are claiming that this is going

13   to -- their construction is necessary for antecedent basis

14   to assist the jury.

15          So I'd just ask the Court to look at the claim

16   terms in this context and substitute in, as you -- I assume

17   the Court would do when it's reading the jury instructions

18   to the jury or providing the jury instructions as to what

19   the claims mean and how the Markman rulings are all going to

20   exist.

21          If Defendants were to prevail in this regard on

22   what their antecedent basis is, is all the language in red

23   would be added into the claim after the appearance of the

24   term "analyzed contents."  And now talking about analyzed

25   contents to be communicated over the shared wireless

1  bandwidth when that was already stated.

2          So we just looked at this as an issue.  They're

3  trying to say that this is necessary for antecedent basis.

4  We're looking at this as to whether -- we agree that the

5  antecedent basis is already in the claim.  We just don't see

6  any reason to add all this language, which if you look at it

7  here and if the jury's considering this, we think they're

8  going to be confused.

9          That's all I have Your Honor.

10          THE COURT:  All right.  What's Defendants' posture?

11          MR. BECKER:  Good afternoon, Your Honor.  Jeff

12  Becker for Defendants.

13          THE COURT:  Go ahead, counsel.

14          MR. BECKER:  I'd like to go ahead and just put

15  the -- well, first of all, can we put up Slide 72 from the

16  Plaintiff's presentation?  Would that be possible?

17          I just wanted to point out that there seems to be a

18  typo in the way they've put this in here, that they've put

19  "analyzed contents" in here twice.  I'm sure that was just a

20  typo, but I wanted to point that out.  It probably -- it

21  makes it look a little bit more confusing than I think it

22  really is.

23          But anyway, I'd like to go to the ELMO, just to

24  illustrate -- their -- their main -- their main criticism is

25  that we're putting this entire phrase from the antecedent

101

```
 1  basis.  They've -- they seem to agree that antecedent basis
 2  applies.  And I'd just like to illustrate why we think it's
 3  important to include that whole phrase in these antecedent
 4  bases to clarify the issues for the jury.
 5       THE COURT:  Yeah, I'm having a hard time finding a
 6  whole lot of disagreement here.  I mean, I think you both
 7  agree on the antecedent basis.  It's just what's the best
 8  way to communicate that.
 9       MR. BECKER:  That's correct, and I think what we're
10  trying to do is just clarify the claim because of the --
11  where the -- "analyzed content" appears in the claim, it's
12  not -- you know, to a patent lawyer, it probably is clear
13  that -- someone experienced in patent law that -- what it's
14  referring to.  But I think to a lay juror, it bears some
15  explanation because of the way the claim is laid out, and
16  that's what I'd like to illustrate here.
17       THE COURT:  Okay.  Go ahead.
18       MR. BECKER:  Is that being shown?
19       So I'm just going to focus on Claim 1.  And I'm
20  going to use -- so there's green for downlink, blue for
21  uplink.  Because there's downlink and uplink in this claim,
22  there's two types of packets, two types of analyzing.  And
23  this analyzing content, this comes way at the end.  And the
24  analyzing that pertains to downlink happens way at the
25  beginning.
```

102

```
1         So if we talk about where this antecedent basis
2    term appears, it's down here at the bottom, okay?  But
3    there's actually -- so we -- we agree that the analyzed
4    contents refers back to the analyzed content packets to be
5    communicated over the wireless bandwidth in a downlink
6    direction.
7         But in between those terms there's a whole other
8    analyzing step, and there's a second type of packets that
9    are also being communicated, but those are in the uplink
10   direction.  So -- and that analyzing reservation request
11   step goes on to talk about various contents of those
12   requests that are analyzed and processed for scheduling.
13        So we just don't want the jurors to be confused
14   when it says the analyzed content.  It says to what contents
15   are being referred to with that.  And that's why we think
16   it's important to include the whole phrase up to and
17   including the downlink direction so as to avoid confusion
18   with the packets that are being referred to as being
19   transmitted in the uplink direction.
20             THE COURT:  Okay.  Anything else?
21             MR. BECKER:  That's all I have.
22             THE COURT:  Anything from Plaintiff?
23             MR. FLANNERY:  No, Your Honor.
24             THE COURT:  Okay.  Then let's next move to
25   "allocating the shared wireless bandwidth between the
```

1    wireless base station."

2          There are two similar claim terms here to be taken

3    up together.  Plaintiff's proposing plain meaning, and it

4    looks like Defendants are proposing the language itself with

5    some inserted 1s and 2s, so...

6          MR. BLACK:  Yes, Your Honor.  And being the

7    suspicious sort here on the Plaintiff's side, we wonder what

8    exactly they plan to do with that when we get to trial.  We

9    didn't know until we got their claim construction brief

10   where they told us that adding those 1s and 2s would result,

11   in their view, in -- in adding the elements on the screen

12   here, that the allocation must be dynamic, and you must have

13   variable length downlink sub-frames and variable length

14   uplink sub-frames.

15         But what this is about is -- if I look at -- let me

16   just go back to our diagram of 14 here.  Oh, there we go.

17         So if you look at -- we keep citing to this diagram

18   Figure 14 at the bottom.  And if you look, Your Honor,

19   there's a bunch of lines down the middle there at 1448.  And

20   what that's showing is that each one of these is a down --

21   each -- each row is a -- I can't see -- each -- each row on

22   the left-hand side is a downlink frame, and each row on the

23   right is an uplink frame.  And in the middle, there's a

24   dividing line.

25         And what that's showing is that the frame size is

1    the same in the uplink and downlink, and it doesn't change

2    from frame-to-frame.  Same number of slots on each side.

3    The patent's got another embodiment that allows you to --

4    instead of having, say, 20 downlink slots and 20 uplink

5    slots, you can make it 22 and 18 or -- and you could change

6    that from transmission frame to transmission frame.  That's

7    identified as a -- as one of the potential embodiments.

8           They are trying to, by adding the numerals 1 and 2,

9    give their experts some jumping off point to say that the

10   claim is limited to this dynamic modification in the size of

11   the sub-frames.  It's what I would call a submarine

12   construction.  They're sort of trying to get part way there,

13   and then when we get to trial, all of a sudden it means

14   something we didn't know about.  It's not the right way to

15   proceed here.

16          It's also wrong because the patent clearly states

17   at Column 52 of the '517, that that merely refers to one

18   embodiment of the invention.  It's not even the preferred

19   embodiment, Figure 14.

20          And in addition, we've got dependent claims hanging

21   off these claims that explicitly claim dynamically

22   allocated.  So Claim 1 is you -- the system decides how to

23   allocate.  Claim 2 is do it dynamically, i.e., every frame.

24          And their construction is inappropriate, and what

25   they -- the construction of their construction, which is

 1    going to create a hor -- create a horrible 02 Micro issue, I

 2    suppose, later in the case, is just inappropriate.

 3              THE COURT:  All right.  Thank you, Mr. Black.

 4              What's the response from Defendants?

 5              MR. BECKER:  Your Honor --

 6              THE COURT:  Unless I misunderstood Plaintiffs,

 7    you've been accused of being sneaky.

 8              MR. BECKER:  Well, I would say that if we have a

 9    submarine construction, what they have is a super submarine

10    construction because --

11              THE COURT:  Plain -- plain meaning is a super

12    submarine?

13              MR. BECKER:  Right.  They've -- they've -- they've

14    hidden what they are truly doing with this claim.  And all

15    we're trying to do is add some enumeration for the benefit

16    of the jury as to what is being allocated between what.  We

17    have a step that says -- if you go to Slide 86, please.

18              I'll start with Claim 1.  Claim 1 says:  Allocating

19    the shared bandwidth -- the shared wireless bandwidth

20    between the wireless base station transmitting in the

21    downlink direction and the at least one CPE station

22    transmitting in the uplink direction.

23              Now, taken at face value, that -- that term

24    probably doesn't need construction but for the fact that

25    they seem to have taken this much different view of what

106

1    this plain language actually is.  And once we see what

2    they're arguing, their construction requires erasing

3    portions of this claim and ignoring others.

4         So that's why we think this enumeration is

5    important because what their argument and what their

6    interpretation requires is for the untrained eye to kind of

7    gloss over different aspects of this claim and ignore what

8    it actually says.

9         So that's why we're -- we're arguing that this

10   enumeration would be helpful to say what the shared wireless

11   bandwidth is being allocated between.

12        And, specifically, it's between, one, the wireless

13   base station transmitting in the downlink direction; and,

14   two, the at least one CPE station transmitting in the uplink

15   direction.

16        So there's this clear choice of an allocation of --

17   of how this bandwidth is going to be allocated between the

18   base station transmitting in the downlink and the CPE

19   station transmitting in the uplink.

20        We're not trying to change the plain language of

21   this claim.  All we're trying to do is make it clear and add

22   some pointers that clarify what the plain meaning already

23   says.

24        THE COURT:  Let me ask you this, counsel.  How

25   would you respond to the potential response that both sides

1 really don't disagree that the language here is subject to

2 its plain meaning, what really exists here is a factual

3 dispute that you're trying to bring into claim construction

4 and have me take sides on, rather than apply the plain

5 meaning to the language that really doesn't warrant more

6 than its plain meaning and then let you fight the factual

7 dispute out in front of the jury?

8           MR. BECKER:  Your Honor, I think that we -- we'd

9 agree that we are taking the plain meaning of the claim, and

10 that's all we're asking for.  We're -- we -- we don't --

11 we're not trying to air out a factual dispute here.

12          I think what IV is trying to do in the claim, if

13 you look at their interpretation -- if we move forward to

14 Slide 93.

15          What they -- what they argue -- and this is taken

16 from their reply brief, Page 12 -- they're saying that what

17 this allocating step means is merely allocating something

18 between a wireless base station and a CPE station, or

19 allocating some bandwidth to a wireless base station, some

20 to a first CPE station and some to a second CPE station.

21 And they make this argument with respect to both independent

22 claims.

23          And so if you look at what the impact of that is on

24 the claim -- if you go to the next slide, please.

25          What they're really trying to do is read portions

1    of this claim out, that now you no longer have to make a

2    choice between what the base station is doing and what the

3    UE is doing when you allocate to them.  You can just simply

4    allocate something between the wireless base station and the

5    CPE station regardless of what direction it is.

6            So we do think it's a claim construction dispute.

7    It is about the plain language.  And it's about them trying

8    to take portions of the claim out and ignore those for the

9    purposes of their arguments.

10           And if we go back, I want to just show you Claim 12

11   because it's even more egregious here.

12           If we go back to Slide 87, please.

13           This -- this claim doesn't even say anything about

14   base station and UE or allocating between them.  This one

15   specifically says allocate wireless bandwidth between the

16   uplink direction and the downlink direction.  And if you go

17   back to what their argument is, they're making the same

18   argument about this claim.

19           If you go back to Slide 93.

20           They're trying to rewrite that claim language to

21   say it's between a wireless base station and a CPE station.

22   And, again, that's -- that's requiring a claim construction

23   to support their interpretation.

24           If you go forward one slide -- I'm sorry, to Slide

25   95.

1          They're just writing the uplink and downlink

2     direction directly out of the claim and trying to replace it

3     with something else.

4          So we're -- we think the enumerations help.  All

5     the business about dynamic allocation and sub-frames, we're

6     not trying to read any of that -- any of that into the

7     claim.  We're simply trying to get a ruling that the claim's

8     plain meaning should be enforced.

9          THE COURT:  Okay.  Anything further from Plaintiff

10    on this?

11         MR. BLACK:  No, Your Honor.

12         THE COURT:  Let's go on to "said plurality of

13    packets."

14         MR. BLACK:  Thank you, Your Honor.

15         A plurality of packets is two or more packets.

16    That's the sum total of my argument.

17         THE COURT:  Is there -- I'm not sure I see the

18    dispute here, but maybe I'm just --

19         MR. BLACK:  I don't know what they're doing with --

20    with this, Your Honor.  Plurality of packets is two or more

21    packets, and they've got some convoluted construction.  We

22    don't know what their expert is going to do.  This is a

23    plain meaning definition if I've ever seen one.  It's a

24    little bit like this 1 and 2 issue.  They're -- they're

25    issues that have to get dealt with on infringement.

1          If our -- if our application of the claim is wrong,

2     they can argue non-infringement.  But we've got to take the

3     words of the claim as they are and have our experts apply

4     it.  Unless -- unless there's something in the specification

5     or prosecution history that says don't use plain meaning or

6     a word like "plurality," we've got to use plain meaning.

7          THE COURT:  All right.  Let me hear from Defendant.

8          MR. BECKER:  Thank you, Your Honor.

9          So this issue -- we, frankly, don't know if we have

10    an issue either because IV has consistently side-stepped our

11    arguments.  We told them what we think the claim means and

12    what we -- what we think this means in the meet and confers

13    and during the briefing, and that's this claim recites

14    "plurality of packets," I believe, three times.

15          It first says "a plurality of packets," and then it

16    says "said plurality of packets" twice.  So all we're asking

17    for -- and, frankly, we expected this to be an agreed

18    construction, and we don't know why IV continues to fight it

19    without really engaging on the issue.  And that's that the

20    packets that are referred to throughout the claim have the

21    same meaning.

22          And that's, I think, black letter claim

23    construction law, which may be why they're not willing to

24    engage on it.

25          This same exact issue was previously addressed by

1  this Court, and we're really asking for the same outcome

2  here.  The claims are almost identical.

3       If you move forward to claim -- Slide 102, please.

4       THE COURT:  Well, let me ask you this, counsel.

5  The Plaintiff's proposal says "said two or more packets."

6  So with the inclusion of the word "said," is there really

7  any dispute that we're talking about the same plurality of

8  packets?

9       MR. BECKER:  We think that there will be a dispute

10  about that, and that's why we're asking for a confirmation.

11  We -- we do think that they will end up pointing at

12  different packets.  And there -- there probably will be a

13  factual dispute about that.  And so we are asking for a

14  claim construction that just simply confirms that each time

15  it says "said plurality of packets," that it's referring to

16  the same ones.

17       THE COURT:  Well, unless I'm -- unless I'm

18  mistaken, claim construction is not about the Court

19  resolving factual disputes.

20       MR. BECKER:  And we're not asking the Court to

21  resolve that dispute.  That's for a later day, for expert

22  reports, and for the jury.  But what we are arguing is when

23  it says the "said plurality of packets," that is a claim

24  construction issue as to whether it is referring to the same

25  packets throughout the claim.

1          Your Honor addressed this issue in the Koninklijke

2    case -- I believe it's pronounced that way -- versus Samsung

3    in 2016, and it was the same exact dispute.  The parties had

4    disputed whether data packets must be the same data packets

5    through -- throughout each claim.  And whether or not the

6    accused data packets are the same or different, I think Your

7    Honor's decision in that case recognized that that was a

8    factual dispute and issue of non -- of infringement versus

9    non-infringement.

10         But the claim construction issue is whether each

11   recitation of the -- of that term has the same meaning

12   throughout the claim.

13         And the -- the claim was very close to what we have

14   here where it's -- this was a -- a replication of the claim

15   at issue in that case.  The user station is arranged for

16   issuing data packets.  And then it later refers to "the data

17   packets," "the data packets," and "said data packets."

18         And if you go forward one slide.

19         Your Honor affirmed what Defendants were asking for

20   in that case, which is a construction that the data packets

21   and every recitation of data packets in that claim was

22   issued by the user station according to the first protocol.

23   And that's essentially what we're asking for here.

24         If you go back to Slide 98 -- I'm sorry, Slide 99.

25         We have a -- "a plurality of packets," "said

113

1   plurality of packets," "said plurality of packets," and

2   we're just asking for a ruling that when it says "said" --

3   "said plurality of packets," it's referring to the packets

4   that were classified.

5          THE COURT:  Does Plaintiff dispute that?

6          MR. BLACK:  No, Your Honor.  It says "said

7   packets."  There's an infringement issue.  They're trying

8   to -- they're trying to shift the claim a little bit to the

9   right and have their expert bring it home later.  The

10  packets --

11         THE COURT:  Go to the podium, Mr. Black, please.

12         MR. BLACK:  I'm sorry, Your Honor.

13         They're trying to shift the claim -- this is not

14  appropriate for claim construction.  They're trying -- what

15  we're doing in claim construction, as I've always understood

16  it, is we take claim -- we take words in the claim, and we

17  determine what -- for instance, what will we put in the jury

18  instruction to help inform the jury here.  Your Honor is

19  going to give an instruction presumably on antecedent basis.

20  We agree with that.

21         But they shouldn't be allowed to emphasize some

22  point, let alone put this long 12-word construction in place

23  of the claim language.  We have plurality of packets.  That

24  means said two or more packets.

25         Classification occurs for an IP flow.  The IP flow

114

1    is then -- then proceeds through the system.

2         I don't really know what they're up to here, and I

3    don't understand why plurality of packets -- it's one of

4    those issue -- I don't know what --

5         THE COURT:  You don't know what they're up to, and

6    you don't --

7         MR. BLACK:  Something is going on.

8         THE COURT:  -- you don't trust them.

9         MR. BLACK:  I don't trust them, and that's my job,

10   Your Honor.

11        THE COURT:  Okay.

12        MR. BLACK:  And plain meaning is plain meaning.

13        THE COURT:  All right.

14        MR. BLACK:  I -- I do have a suggestion on the

15   other -- the other point about how to proceed with

16   indefiniteness.

17        THE COURT:  Well, let -- let me say this.  Unless

18   there's something else to be added, I'm going to consider

19   that I've heard the argument on the disputed terms for claim

20   construction today.

21        And that having -- that having been brought to a

22   conclusion, if you have a suggestion, Mr. Black, I'll listen

23   to it, and then I'll afford Mr. Kubehl an opportunity to

24   respond or offer any alternative suggestion at this point.

25        MR. BLACK:  Thank you, Your Honor.

1          So thinking this through, we've got to get -- we've

2   got to get to the right result both procedurally and

3   substantively on the impact of a decision that the Federal

4   Circuit issued yesterday which has a clear impact on this

5   case and which has not been developed fully in the briefing.

6          It's also clear that there are lots of claims that

7   they think are indefinite which you don't have the full

8   record in front of you.

9          We've got two options.  One would be to carry this

10  through summary judgment stage in the ordinary course.  We

11  have -- expert reports are due in three weeks, responsive

12  briefs in October, and then summary judgment briefing.  We

13  could do it that way.

14         We also could work with the Defendants to agree on

15  a grouping of the claims so that we have maybe seven claim

16  groups.  They could then file a summary judgment motion

17  saying exactly what they want.  They can do it now.  We'll

18  deal with, you know, earlier than the norm.  We'd have the

19  experts present their declarations.  Your Honor can read the

20  papers and then decide whether or not you think you'd

21  benefit from hearing live testimony or -- or not.  At least

22  everything would be joined.

23         Our -- the prejudice we suffer by not having this

24  addressed in an orderly fashion through the Rule 4.3

25  statement would be cured.  They would get an opportunity to

1   make their -- put their full case on the record.  We'd have

2   all the protections available to us under Rule 56 for

3   something which would be case dispositive.

4        THE COURT:  You want to react to that for me,

5   Mr. Kubehl?

6        MR. KUBEHL:  Yes, Your Honor.

7        THE COURT:  How does that strike you?

8        MR. KUBEHL:  We would suggest a variation of the --

9   of the second proposal.  We do have trial scheduled for

10  February, and dispositive motions are -- have been pushed

11  back quite a bit close to trial.  So doing this in a

12  dispositive motion standpoint doesn't get a lot of runway,

13  but what we would suggest is that --

14       THE COURT:  Well, the suggestion was that we

15  basically front load a motion for summary judgment on these

16  issues.

17       MR. KUBEHL:  Understood.

18       This -- since this is a claim construction issue,

19  what we would suggest is that the Defendant identify

20  whatever dependent claims are currently asserted that they

21  think make a material difference to the indefiniteness

22  issue, and that the two parties then engage in expedited

23  briefing regarding indefiniteness of those terms.

24       THE COURT:  So are you -- are you telling me

25  basically the same thing Mr. Black said, except you want him

1   to go first as opposed to you going first?

2        MR. KUBEHL:  I -- I don't -- I mean, I don't know.

3   It's a claim construction indefiniteness issue.

4        THE COURT:  I mean, it's all going to get out on

5   the table one way or the other.

6        MR. KUBEHL:  Sure.  Sure.  And just to do it in the

7   most expedient manner, if we can get an identification from

8   Plaintiff as to what are the claims that we're talking about

9   here that you think make a material difference, then at that

10   point, the two parties can do their briefing.  We can work

11   out who goes first, who goes second.  Is it simultaneous?

12        Certainly open to whatever the Court's guidance

13   would be on that, but do it in an expedited fashion so that

14   we can complete the claim construction process and move on

15   to expert work and -- and discovery.

16        THE COURT:  Let me do this.  I asked both of you

17   earlier to check with each other and then file a notice

18   about the clearly asserted claims here so there's no doubt

19   about that, and I want you to go ahead and do that.

20        Let me ask you each to submit by the end of this

21   week -- let's say by noon on Friday, a letter to the Court

22   outlining your proposal as to given the unique -- and I

23   think they are unique circumstances in which the parties and

24   the Court find themselves now -- in this particular context

25   as to how to proceed.

1          I am interested in giving full deference to the

2     Federal Circuit's recent ruling of yesterday, but I'm also

3     mindful of the fact that not -- having not had that, I can't

4     very well expect both sides to have done in advance of today

5     what they would have done had they known about the Federal

6     Circuit's ruling.  I am interested in seeing that nobody is

7     unfairly prejudiced, and yet we don't ignore the

8     requirements of the local patent rules.

9          I think what you've both given me verbally here is

10    not that far apart, and I'd like you to -- I'd like you to

11    meet and confer on this.  If you want to submit a joint

12    proposal, if you can work that out, I'll certainly welcome a

13    joint proposal.  If you can't, then by 5:00 o'clock on

14    Friday, I'd like to see your alternating proposals on how

15    you both think the fairest way is to proceed in light of

16    what we have in front of us today.

17         I'm not going to move the trial date.  I agree with

18    Mr. Kubehl the current dispositive motion practice is as far

19    back in the timeline as it probably can be.  I'm not

20    interested in putting things off that far.

21         I'm more inclined, as I sit here, and I want to

22    reserve the right to consider it further -- I'm more

23    inclined as I sit here to craft some kind of expedited

24    dispositive motion now that will give both sides an

25    opportunity to step back and fill in the gaps, if you will,

1    from where we are today and where we would have been had you

2    known about the Circuit's guidance before today.  And then

3    get that issue properly briefed and presented to the Court

4    and let me give you a decision one way or the other.

5         I'm not interested in somebody saying "gotcha"

6    because you didn't know about this ruling, and, therefore,

7    you didn't raise something you might have otherwise raised

8    before claim construction.  But by the same token, I'm not

9    interested in giving either side or both sides a do-over.

10        I think there -- there ought to be a pretty

11   straightforward path that allows both sides to avoid being

12   prejudiced by the advent of an unexpected ruling from the

13   Circuit in a clearly applicable set of circumstances, but

14   yet a different case from a different district than where we

15   are today.

16        So meet and confer.  If you can agree on a joint

17   proposal to propose to the Court, let me have that from you

18   jointly by Friday.  If not, send me your competing proposals

19   by Friday.  I don't see any reason that even if they're

20   competing and differing proposals, they ought to be more

21   than three pages in length.  So I'm going to limit you to

22   that.

23        All right.  Are there questions?  If not, then the

24   matters before the Court related to claim construction are

25   under submission.  I appreciate your argument and

1    presentations this afternoon.  You're excused.

2              COURT SECURITY OFFICER:  All rise.

3              (Hearing concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4   correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best of my

6   ability.

7

8

9    /S/ Shelly Holmes                      9/14/18
     SHELLY HOLMES, CSR-TCRR                 Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/18

12

13

14

15

16

17

18

19

20

21

22

23

24

25