1         IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF TEXAS

3             MARSHALL DIVISION

4  INTELLECTUAL VENTURES I LLC  )(

5                  )(   CIVIL ACTION NO.

6                  )(   2:17-CV-577-JRG

7  VS.                )(   MARSHALL, TEXAS

8                  )(

9  T-MOBILE USA, INC., ET AL.  )(   JANUARY 3, 2019

10                )(   10:11 A.M.

11           PRE-TRIAL HEARING

12     BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13      UNITED STATES CHIEF DISTRICT JUDGE

14

15  APPEARANCES:

16  FOR THE PLAINTIFF: (See Attorney Attendance Sheet docketed

17                 in minutes of this hearing.)

18  FOR THE DEFENDANTS:(See Attorney Attendance Sheet docketed

19                 in minutes of this hearing.)

20  COURT REPORTER:   Shelly Holmes, CSR, TCRR
                  Official Reporter

21                  United States District Court
                  Eastern District of Texas

22                  Marshall Division
                  100 E. Houston Street

23                  Marshall, Texas  75670
                  (903) 923-7464

24

25  (Proceedings recorded by mechanical stenography, transcript
produced on a CAT system.)

1

2                               I N D E X

3    January 3, 2019

4                                                      Page

5        Appearances                                    1

6        Hearing                                        3

7        Court Reporter's Certificate                 199

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated, please.

 3              All right.  This is the time set for pre-trial

 4  matters before the Court in the Intellectual Ventures I LLC

 5  versus T-Mobile USA, Inc., et al matter.  This is Civil

 6  Case No. 2:17-CV-577.

 7              The Court will call for announcements.

 8              What says the Plaintiff?

 9              MS. FAIR:  Good morning, Your Honor.  Andrea Fair

10  on behalf of the Plaintiff.  And here with me today we have

11  Ms. Nisha Patel, Mr. Marty Black, Mr. Kevin Flannery,

12  Mr. Joe Abraham, and, of course, Mr. Johnny Ward,

13  Ms. Claire Henry, and Mr. Wes Hill.  And we're ready to

14  proceed.

15              THE COURT:  All right.  Thank you, counsel.

16              What's the announcement from Defendants?

17              MS. SMITH:  Good morning, Your Honor.  Melissa

18  Smith on behalf of both Ericsson and T-Mobile.  I am joined

19  on the Ericsson side by Mr. Doug Kubehl, Mr. Jonathan

20  Rubenstein, Mr. Jeff Becker, Mr. Jonathan -- Johnson

21  Kuncheria, Mr. Bryan Parrish, Ms. Melissa Butler, Ms. Megan

22  LaDriere, and in-house for Ericsson, Ms. Jennifer Wells and

23  Mr. Ryan Wirtz.

24              On the T-Mobile side, I have Mr. Asim Bhansali.

25              And we're ready to proceed, Your Honor.
```

1          THE COURT:  All right.  Thank you.

2          All right.  Counsel, as you know, this case is set

3   for jury selection at 9:00 a.m. on Monday, February the

4   4th.

5          Prior to jury selection that day, I'm going to

6   instruct the clerk to play the FJC patent video for the

7   venire panel.

8          You're going to have 30 minutes a side to address

9   the venire panel as a part of the voir dire process.

10         As is typical in this court, your -- each side

11   will be entitled to use up to three minutes of their 30

12   minutes to give a very non-argumentative factual high-level

13   overview of the case just so the panel has a bare bones

14   understanding of what's at issue, no more, no less.

15         If I believe you've gone beyond that and become

16   argumentative, I will let you know about that in front of

17   the panel in a way that I don't think you want me to do, so

18   don't get argumentative with the panel.

19         I'm going to seat eight jurors for this trial, and

20   each side will be entitled to four peremptory challenges.

21   We're going to begin the trial the same day immediately

22   after jury selection.

23         Each side is going to be allocated 13 hours per

24   side to put on their cases-in-chief, not including openings

25   and closings.  Each side will be given 30 minutes per side

for opening statements.  Each side will be given 40 minutes

per side for closing arguments.

The Court, as is typical, will be in chambers by

7:30 each morning during the trial.  It's my practice to

bring the jury in at approximately 8:30.  That intervening

hour is there to resolve remaining disputes that have

festered overnight and have not been otherwise resolved in

the meet and confer process.

I have looked at the parties' stipulated trial

management procedures document, Document 288.  I find

nothing objectionable in there, and I'll approve that.

Pursuant to that, you're to notify my staff not

later than 10:30 each night as to -- regards any remaining

disputes that have not been worked out through the meet and

confer process.

One additional thing I'm going to require is that

10:30 notification is not a stop on efforts to otherwise

resolve disputes.  I am anticipating, and, in fact, I'm

directing that you continue your efforts to meet and confer

and resolve and narrow your disputes even after you notify

the Court at 10:30 where you are.

That -- with that in mind, I'm going to require

that by 7:00 a.m. the next morning, you deliver a binder to

chambers that lays out what has survived the overnight meet

and confer process and is still live with supporting

documents for both Plaintiff and Defendants' positions on

those remaining disputes.

Often I get a report at 10:30, and by 7:30 the

next morning, the landscape has changed drastically and

then I'm spending time getting ready to deal with disputes

that are no longer at issue.

So to avoid that, if you'll bring me an up-to-date

binder by 7:00 a.m. to chambers, I should know exactly

what's still left and the posture it's in so that by 7:30

when I meet with you, I'll have a -- a clear understanding

and not waste any of my time on matters that have otherwise

been worked out or resolved.

I'm going to deal with any objections regarding

deposition designations on a rolling basis.  Those need to

be presented to the Court not later than the day before the

day you plan to use them, so there's plenty of time to make

any adjustments to the cuts without possibly delaying the

trial.

As is my practice, I intend to take up any motions

under Rule 50(a) from either party not at the close of the

Plaintiff's case-in-chief but at the close of all the

evidence after Plaintiff closes any rebuttal case.  And

I'll hear both Plaintiff and Defendants' motions under Rule

50(a) at that point.

After I've heard motions under Rule 50(a), the

1  Court will conduct an informal charge conference in

2  chambers where counsel for -- all counsel for both -- all

3  parties are invited to participate in a casual and

4  informative exchange of thoughts and ideas on areas within

5  the then existing drafts of the charge and verdict where

6  the parties are not in alignment.

7           After I've fully heard from and gotten input from

8  both sides to that informal charge conference, I'll then

9  generate what the Court believes should be the final charge

10  and verdict form, provide it to counsel with an opportunity

11  to review it, and then I'll conduct a formal charge

12  conference on the record where either side can lodge any

13  objections that they believe are required in the best

14  interest of their clients.

15          During the trial, as is the Court's continuing

16  practice, I'm instructing you that you not refer to any

17  individual on the record before the jury by first name

18  only.  Reference to individuals by first name only is not

19  in keeping with the requisite decorum for a United States

20  District Court, and it is inherently confusing in the

21  resulting record.  So I'm instructing counsel not to do it.

22  I'm instructing counsel to ensure your witnesses don't do

23  it.  And if your witnesses do it, then I'll hold counsel

24  responsible.

25          I refer you to the Court's standing order posted

1    on my website regarding protection of proprietary or highly

2    sensitive information through the sealing of the courtroom

3    procedure.  That's what I intend to use during this trial.

4         I would direct that you work diligently, where

5    possible, to group any confidential information in your

6    examination such that we can minimize the number of times

7    that we have to seal and unseal the courtroom because there

8    is a certain amount of disruption involved in that process.

9         Hopefully, we can avoid it being a light switch

10   type on/off, on/off procedure.  But that is the procedure

11   pursuant to that standing order that I intend to use for

12   purposes of protecting proprietary or confidential

13   information.

14        That being said, I do not intend to use a

15   post-trial redaction process for that purpose, and

16   redactions after the trial related to the record are only

17   for those limited areas of confidential information such as

18   Social Security numbers and birth dates and other matters,

19   and they are not for purposes of protecting proprietary or

20   highly sensitive information.  So don't have any confusion

21   in that regard.

22        I assume we have not generated a juror

23   questionnaire in this case yet.  But both sides intend to

24   use a juror questionnaire; is that correct?

25        MS. FAIR:  Yes, Your Honor.  We're in the process

1    of working one out right now.

2         MS. SMITH:  Yes, Your Honor.

3         THE COURT:  All right.  Well, I'm confident that

4    counsel, through local counsel, are aware of the Court's

5    standing order on that, and I'll direct you to that, as

6    well as to the implementation of that through the clerk's

7    office.

8         I think there's a good chance we'll get through

9    all the pre-trial matters today with the exception of

10   exhibit disputes.  I'll take up exhibit disputes as the

11   last item in the pre-trial process because, quite honestly,

12   those generally are narrowed by the earlier rulings, and

13   that's the most efficient way to do it.

14        Assuming that we do not get through exhibit

15   disputes and complete the pre-trial process today, I've

16   reserved January the 30th -- Tuesday, January the 30th on

17   my calendar for a second pre-trial in this case, beginning

18   at 9:00 a.m.  And my hope is that we get through everything

19   but exhibit disputes and can bring you back for that, if

20   necessary, but we will see.  Anything we don't get to

21   today, we'll take up on January the 30th.

22        The Court intends to pre-admit all exhibits in

23   this case through the pre-trial process.  That means I

24   intend to hear and rule on all issues related to

25   admissibility before the trial begins, and to begin the

1  trial with a fixed and finite universe of pre-admitted

2  exhibits.  Those items from that list of pre-admitted

3  exhibits used before the jury and during the trial then

4  become admitted exhibits and are a part of the record in

5  the case.  Those on the list of pre-admitted exhibits not

6  used during the trial or before the jury remain

7  pre-admitted and are not admitted exhibits in the case and

8  are not a part of the record.

9         To keep a clear and accurate tally of what becomes

10  admitted through its use before the jury from the list of

11  pre-admitted exhibits and what remains merely pre-admitted,

12  I intend to have counsel for each side, beginning on the

13  second day of trial, go to the microphone -- go to the

14  podium before I bring the jury in and read into the record

15  those items from the list of pre-admitted exhibits that

16  they have used during the preceding day's portion of the

17  case.

18         And we'll do that on a rolling basis each day to

19  keep up with what's been used from the list of pre-admitted

20  exhibits and is an admitted exhibit in the case and a part

21  of the record and what is not.

22         Obviously, you're to meet and confer on those

23  matters before those renditions are offered into the record

24  in case there are any questions of doubt or uncertainty.

25         In case I forget to mention it later, assuming we

1  do get through everything but the exhibit disputes, then

2  prior to the second pre-trial hearing on January the 30th

3  and by or before noon on Tuesday the 29th, you should file

4  a notice with the Court -- a joint notice regarding

5  outstanding exhibit objections where you can itemize what

6  remains as far as exhibit disputes.  And not only that, you

7  can categorize, or as some lawyers call it, bucketize those

8  disputes into groups so that targeted guidance from the

9  Court can hopefully handle disputes on more than one

10  exhibit at a time.

11       And just to be clear, I do not intend to reargue

12  admissibility of exhibits during the trial.  If it's not

13  been offered and admitted through the pre-admission process

14  that I've described, it's not appropriate to move its

15  admission during the course of the trial.

16       Also, I'm directing that the parties jointly

17  cooperate and prepare 10 juror notebooks for delivery to

18  chambers not later than 3:00 o'clock on January the 28th.

19       Those juror notebooks should be what is typically

20  used for trials of this nature in this court -- that is, an

21  ordinary three-ring binder containing therein a complete

22  copy of each of the patents-in-suit, containing therein a

23  claim construction chart showing simply on a side-by-side

24  basis the claim term that was construed by the Court and

25  the corresponding to it the Court's adopted construction.

1    Nothing more, no analysis, no description from the claim

2    construction order, simply the term as construed

3    side-by-side with the adopted construction from the Court.

4           Also, you should include a single page for each

5    witness in the case, either live or by deposition.  Those

6    witness pages should contain a head and shoulders

7    photograph of the witness superimposed on top of the page

8    with their name identifying them underneath the photograph.

9           Don't characterize the person.  Dr. John Smith is

10   fine.  Dr. John Smith, Plaintiff's expert on damages, is

11   not fine.  So leave the characterization off, but put a

12   complete name underneath the photograph.  The remainder of

13   those pages should be simply ruled lines for note taking.

14          Those witness pages should be individually tabbed

15   in the notebooks.  We often get trials with multiple

16   witnesses and to save jurors flipping through pages, trying

17   to find the right one for the right witness, I'd like a

18   separate tab for each witness page that's inserted in those

19   notebooks.

20          Also, at the rear of the notebooks -- at the back

21   of the notebooks, please include a three-hole punched legal

22   pad for additional note taking.  And in the front pocket,

23   insert a non-clicking ballpoint pen.

24          The Court recognizes that counsel in this case on

25   both sides are experienced trial lawyers and both lead and

1    local counsel have tried cases in this court before, so I

2    won't hit this too hard.  But I think you all know that the

3    Court considers objections that an expert witness has

4    exceeded the scope of their expert report to be highly

5    disruptive.  When they're necessary, make them.  But if I

6    determine that they're being made for purposes of

7    disruption to throw the other side off their tempo or

8    rhythm or for any other non-meritorious purpose, I will

9    impose a penalty.

10           I can't deal with those objections from the bench

11   without sending the jury out of the courtroom, getting the

12   report, going through it, and it takes time.  It disrupts

13   the trial.  And while it may be necessary, and where

14   necessary appropriate, it's not to be made without good

15   cause.

16           And just be mindful that I'll be looking -- I have

17   unfortunately had trials where those objections were made

18   for other than substantive meritorious purposes, and I will

19   be careful to ensure it doesn't happen in this trial.  I

20   don't think it will.  I don't want to hit it too hard.  But

21   I want you to know I'll be mindful of that.

22           Also -- and I'm not prepared to give you specific

23   guidance on this, but I'm assuming you're all aware of it

24   and you've all looked at the Court's calendar.  This is not

25   the only case set for trial the week of February the 4th.

1  I'm working diligently to figure out what we're going to do

2  and how we're going to do it.

3        At this point, you need to be prepared to go to

4  trial on February the 4th.  As we get closer, I may be able

5  to give you more guidance about the other cases that are on

6  the docket.  There's a lot of effort going on in chambers

7  to figure out how we handle what we have on our plate.  But

8  suffice it to say when I know more, you will know more, but

9  right now you need to be prepared to go to trial February

10  the 4th.

11        Are there questions from either Plaintiff or

12  Defendant with regard to these housekeeping matters I've

13  gone over with you about?

14        MR. BLACK:  Just one question, Your Honor.  With

15  respect to deposition rulings on -- if we -- I think the

16  first time that deposition excerpts could be played would

17  be, say, Tuesday morning.  I didn't understand when you

18  would need the objections --

19        THE COURT:  I need to hear about it not later than

20  Monday.

21        MR. BLACK:  Monday, okay.

22        THE COURT:  I don't want to hear about it the day

23  you're going to play it, and then we have to delay things

24  because we've got to go re-cut the tape and -- it takes

25  time.  That's the main point -- that's the main point,

1    Mr. Black.

2              Any other questions?

3              Anything from Defendants?

4              MR. KUBEHL:  No, Your Honor.

5              THE COURT:  All right.  All right.  Then we'll

6    turn to the pending motions before the Court that need to

7    be taken up as a part of this pre-trial process.  The

8    Court's looked at the email communication from the parties

9    as to their suggested order, and I don't have any

10   objections or problems with that, so we'll follow that

11   order in the matters that are set for argument today.

12             Consequently, we will begin with Defendants'

13   motion for partial summary judgment of non-infringement

14   regarding the '629 patent.

15             And I'll hear from the moving Defendants from the

16   podium.

17             Let me just say before we go any further, we've

18   got a roomful of lawyers.  I anticipate I'll be hearing

19   from multiple people today.  Just so we keep the record

20   straight, let's start everybody's presentation with an

21   introduction in the record of who you are and then get into

22   your actual argument so that we keep that straight each

23   time you're at the podium.

24             Go ahead, Mr. Kubehl.

25             MR. KUBEHL:  Good morning, Your Honor.  May it

1    please the Court.  Doug Kubehl on behalf of the Defendants.

2            The first motion we're taking up is Docket

3    No. 205.  It's the motion for partial summary judgment with

4    respect to the '629 patent.

5            The '629 patent is the patent in this case that

6    deals with a system that uses a series of transmission

7    frames that are transmitted one after another to

8    communicate information wirelessly.  Those transmission

9    frames are divided into slots.

10           And the patent addresses a method that determines

11   which particular slots and which particular frames --

12   packets in a series of packets will be assigned to.

13           May I approach with copies of my presentation,

14   Your Honor?

15           THE COURT:  You may.

16           MR. KUBEHL:  What I'm showing on Slide No. 2 here

17   of this presentation is a reproduction of Claim 1 in the

18   '629 patent.  It's the sole independent claim that's

19   asserted in this patent.

20           Among the requirements in Claim 1 is what the

21   parties have referred to as Step D.  In Step D, there are

22   two packets, and each packet is placed into a different

23   slot in a different transmission frame.  And in particular

24   in Step D, the packets have to be placed into the slots in

25   what's called an isochronous manner.  That was a claim term

1   that Your Honor took up in claim construction and

2   determined that it meant that the packets were placed at a

3   consistent time interval with respect to one another.

4          Now, there's different ways that you can end up at

5   the spot where you're now placing packets in an isochronous

6   manner into slots in transmission frames.  This claim

7   covers one particular way, and the particular way covered

8   in this claim uses the steps we've got outlined here in the

9   claim.  Starts with Step A where you apply a reservation

10  algorithm.

11         It's not just applying any reservation algorithm.

12  In this particular reservation algorithm in the step that

13  the parties have called Step b, you reserve a first slot

14  for a first packet in a future transmission frame.

15         In Step c, you reserve a second slot for a second

16  data packet in a transmission frame that's subsequent in

17  time to that future transmission frame.

18         This motion focuses on Elements b and c and the

19  lack of a reservation of future frames -- in particular, a

20  lack of reservation of multiple frames out into the future

21  in the accused product.

22         So I want to start by talking about some of the

23  undisputed facts with respect to the accused product.  In

24  the accused product the transmission frames are 10

25  milliseconds long.  Within each transmission frame, there

1    are 10 what are called transmission time intervals,

2    sometimes called TTIs.  Those are each one millisecond

3    long.

4         The Plaintiff points to the TTI as the alleged

5    slot in the claim.  So it's undisputed that for each and

6    every one of these transmission time intervals, as you go

7    along in time in the accused products, for each of these

8    TTIs, there's a scheduling competition that happens for

9    which UE or UEs are going to get resources during that

10   transmission time interval.

11        On Slide 3 here, we've got a citation to Exhibit 8

12   from our 205 docket.  It's IV's expert, Tim Williams, it's

13   his deposition testimony, and it's at 139:24 through 140,

14   Line 4.  And he agrees that, yeah, within a a specific --

15   within each specific TTI in the accused system there's

16   going to be this scheduling competition that takes place.

17        IV has a second expert in the case.  His name is

18   Douglas Chrissan, and his job in the case was to look at

19   the source code of the Defendants' devices and give a

20   report on how he thought that source code worked.  And he

21   agreed, as well, that there's a scheduling competition that

22   happens between the different UEs as to which UE or UE will

23   get resources in a given TTI.

24        This slide, we've cited to Exhibit 9.  It's

25   Dr. Chrissan's testimony at Page 206, Line 13 to 207,

1   Line 9.  He's asked if he agrees that there's a competition

2   for resources that happens at each TTI.

3        He answers:  If someone wanted to use that

4   terminology, I wouldn't call it outlandish or incorrect.

5   That's the purpose of a scheduler.  A scheduler exists in

6   something called a MAC where M in that word stands for

7   medium, and medium is the resources that are allocated.

8   And when you've got more people that want resources than

9   you've got resources to give, this scheduling -- scheduler

10  is conducting a competition to see which of those people or

11  which of those UEs are going to get those resources.

12       In the next slide, Slide 5, I'm showing you a

13  little bit more detail about what happens during this

14  scheduling competition.  So this is deposition testimony

15  from IV's expert, Tim Williams.  And we've got noted on the

16  slide the source for that testimony.

17       But essentially, what he testifies to is that for

18  each one of these transmission time intervals, you will be

19  calculating what's called a scheduling weight, sometimes

20  called an SD weight.  This scheduling weight will be

21  separate for each phone.  So each phone is having a

22  scheduling weight calculated for it.  And you have to

23  decide which phones have the highest scheduling weight to

24  decide who gets resources in that TTI.  And that happens

25  every single TTI.  Every single TTI you're calculating this

1   weight for all the different phones and deciding who's

2   going to have an opportunity to get the resources.

3          What I'm showing you on Slide 6 is, first, some

4   testimony from Dr. Chrissan who agrees, yes, these -- this

5   happens -- every TTI, you calculate and you recalculate

6   these things for every phone, every TTI.

7          The graph on the bottom of the slide is from

8   Dr. Williams's report, and he's using that to illustrate

9   the calculation of these weights.  So what you're looking

10  at there is along the horizontal axis, that's time.  And so

11  we've got illustrated, for example, at the base of the

12  graph would be times zero, and out where it says "delay

13  budget," we've -- we've said that's, for example, 80

14  milliseconds.  So between that 0 and 80 milliseconds,

15  that's 80 different TTIs.  That's 80 different scheduling

16  competitions that will happen over that course of time.

17         And what's happening is that at time 0, this

18  particular -- particular UE has a scheduling weight of --

19  of zero.  But over time, as more and more TTIs go along and

20  that UE hasn't been granted resources, his weight gets

21  higher and higher.

22         And that continues out until you get to this delay

23  budget at 80 milliseconds.  So at each point along the

24  graph, this UE has a chance to get resources.  At each one

25  of those TTIs, that UE is in the competition and could be

1    granted resources.

2         But at no point in the graph is the UE guaranteed

3    to get any resources.  This is happening for multiple UEs

4    at the same time.  That's undisputed.  And so each of --

5    for each of these UEs, you've got this calculation going on

6    as to at this snapshot in time what does their weight look

7    like.

8         And so each of these UEs is competing with other

9    UEs for access to resources during a given TTI.

10        So points to take away here, at each point in the

11   graph the UE could get a scheduling grant and -- and does.

12   There are times when UEs get grants along the whole

13   spectrum of this line.  And there's no point along this

14   line where the UE is guaranteed to get anything.

15        And we see that, for example, on Slide 7.  This is

16   testimony from Dr. Chrissan, their technical expert who

17   looked at the source code.  He agrees it's not a hundred

18   percent certain that in any given competition that it will

19   result in including a given UE.  That given UE may or may

20   not get resources in a given TTI.  There's nothing

21   guaranteed.

22        On Slide 8, we show testimony from Dr. Chrissan

23   where he agrees -- he's asked that:  Is it true that the

24   UEs that the base station selects are not known to the base

25   station before that step occurs in each of those TTIs?

1          He says:  The exact list of UEs that receive an

2    uplink grant for a given TTI is not final until the end of

3    the scheduling cycle.

4          So each TTI, you look at it anew.  You've got

5    several UEs that want access.  One or more UEs will get

6    access, but you don't know who that's going to be until

7    that TTI.  Undisputed facts.

8          THE COURT:  I'm interested in getting down to

9    where we do have disputed facts and see if we can --

10          MR. KUBEHL:  And here's --

11          THE COURT:  -- put it in context.

12          MR. KUBEHL:  -- here's where we are, sir.

13          THE COURT:  Okay.

14          MR. KUBEHL:  So this is a -- a diagram that IV has

15    put together in its briefing.  And I want to start by

16    giving us a little bit of context here.  If you look at

17    Slide 4, they're showing a timeline here.  It goes from 0

18    to 85 milliseconds.

19          All right.  Again, undisputed.  At each one of

20    those TTIs along that time, there's going to be 85

21    scheduling competitions, and phones can but don't have to

22    get grants in any of those particular TTIs.

23          Their infringement theory relies on a situation,

24    they say, okay, well, a phone could get a grant at 41

25    milliseconds.  And they say that's when the reservation

1  exists that we think in the claim would correspond to the

2  first reservation.

3       Okay.  Well, that phone has been competing all

4  along up until 41.  And it may or may not get a grant at

5  41.  In this particular case it did.  And if it doesn't, it

6  will -- it will still compete to try to get one later.  But

7  the point is no reservation exists here under their theory

8  until time 41.

9       When we look at the second reservation that's

10 required in the claim, they say that happens at time 81.

11 And, again, undisputed that that reservation doesn't exist

12 until time 81.

13      So their theory is that -- remember that in the

14 claim -- and it's most important in Step c.  Step c in the

15 claim, you've got to reserve a pack -- you've got to

16 reserve a slot for a second packet in a transmission frame

17 that's subsequent in time to the future frame.  So not just

18 in the future but further in the future than the future

19 frame.

20      And so what we show here is that at 41

21 milliseconds, they say, well, that's what we say is the

22 future frame.  And in green at 81 milliseconds, they say,

23 that's our -- that's our slot that's further in the future

24 than the future frame.  And they say:  We would meet this

25 claim because if you look at -- I'm on Slide 14 here

1   actually.  If you look at time 36, they say:  Well, for

2   that reservation that ends up happening at 81, that's

3   actually a process that starts back at time 36.

4       So their theory is since there's this process that

5   starts back at 36 and since at that time frame, n+3, which

6   is what they're calling the future frame, since that's in

7   the future relative to when that process began, and since

8   frame n+7, what they're calling the frame that's even

9   further in the future than the future frame, since that's

10  further in the future than n+3, which is still a future

11  frame, they're saying there's our infringement theory.

12      The big problem for that is that it's undisputed

13  that at time 36, there is no reservation for that slot n+7.

14  Any UE could get that slot in the future.  It's a

15  competition.  There will be competitions that are held for

16  every one of those TTIs.

17      In this one, it happened that this UE got a

18  reservation at 81, but it's undisputed -- and, again, this

19  is Exhibit 8, Williams's deposition testimony, Page 134

20  through 5 -- 5 through 7, that that reservation that he's

21  relying on, that that's not made until time 81.

22      So this reservation that he's supposed to be

23  making, that's for a frame that's supposed to be even

24  further in the future than what is the future frame.  He's

25  making that at a time that he admits is at a time when his

1    supposed future frame has already been transmitted.

2              So we show that at -- at Slide 15.

3              So if you look at what's the frame that he says is

4    the future frame in Element c, he says it's Frame n+3.

5    Okay.  When is the -- when is the reservation for the next

6    frame in Element c made?

7              He says:  That happens at time 81.

8              All right.  Well, at time 81, it's undisputed that

9    what he calls the future frame, n+3, that's already been

10   transmitted.  That's in the past.  It's not a future frame.

11             So while the claim requires making a second

12   reservation to a transmission frame that's subsequent in

13   time to the future frame, all he's showing is an alleged

14   reservation to a frame that's subsequent in time to what is

15   a past frame.  And that's not what this claim requires.

16             And for that reason, we think summary judgment

17   should enter.

18             THE COURT:  All right.  Before I hear from

19   Plaintiff, let me ask this question.

20             Respond to the counter point, Mr. Kubehl, that

21   your argument boils down to you can't have a future event

22   because by the time you get to it, it's no longer a future

23   event, it's a current event.

24             So even though it was a future event earlier, by

25   the time it occurs, it's a current event, no longer a

1    future event, and, therefore, you don't meet the

2    requirements of the claim.

3           MR. KUBEHL:  So there's -- there's --

4           THE COURT:  It sounds like linguistics and

5    semantics to me.  Why is it substantively important?

6           MR. KUBEHL:  Sure.  There are -- there are two

7    non-infringement arguments addressed in this motion, and

8    the one you're addressing is with respect to Claim 1(b).

9           Claim 1(b) requires that it has to be a future

10   frame, and our argument is that the thing they're pointing

11   to as a supposed future frame, it's actually what the

12   patent would call the current frame.  And I can explain

13   that to Your Honor if you'd like.

14          But that's the one that you're characterizing as

15   more of a linguistic challenge.

16          The one I'm showing you here is the separate

17   argument on 1(c) where I don't think it's even close.

18          There isn't an argument here.  Everybody agrees

19   that in Step 1(c), it has to be not only a future frame, it

20   has to be in the future relative to another future frame,

21   right?  So I'm at some point in time, and I have to point

22   at something as my supposed future frame.  And then I have

23   to point to something that's subsequent in time to that

24   that I'm making the reservation for.  And that's where I

25   don't think it's even close here because what they're

pointing to here is they're saying, okay, what I'm pointing
to is Frame n+3 as my future frame.  And they say the
reason that's a future frame is because if you look at time
36, that's when the reservation process starts for what
ultimately will be reserved at 81, right?

And so they're saying so I meet that claim because
at least technically, n+3 is still a future frame at that
point.

But it falls apart for them when they have to come
to grips with there's no reservation that happens between
36 and 81.  Their own guy says:  The reservation happens
only at 81.  Up until 81, it's a competition.  Other phones
can get -- get that slot.  This phone might get a slot
before that.  It might get a slot after.  It happened to
get one at 81 at this point.  However it happened, their
guy acknowledges that reservation does not exist until time
81.  That's undisputed.

So it's not a matter of linguistics.  Everybody
agrees you have to show me a future frame and a frame
that's even further in the future from that frame.  And you
have to show me how a reservation was made when the first
frame was a future frame, and there's something even
further in the future.  Everybody agrees on that.

And based on the undisputed facts, that doesn't
happen here.  The thing they're pointing to is a

1   reservation that isn't made -- it isn't completed, it

2   doesn't exist until after what they're calling the future

3   frame has already been transmitted.

4           THE COURT:  All right.  I think that -- that

5   clarifies that point for me.

6           Let me hear a response from Plaintiff.

7           MR. BLACK:  Thank you, Your Honor.  Martin Black

8   for Plaintiff.

9           THE COURT:  Go ahead, Mr. Black.

10          MR. BLACK:  Thank you, Your Honor.

11          Turn to the ELMO.  Thank you.

12          This is a motion for summary judgment.  The

13  standard, of course, is that there must be no genuine issue

14  of material fact at trial.  There must be a missing claim

15  element.

16          There are two types of disputes we have in patent

17  cases.  One is you can have a dispute about the underlying

18  facts about the operation of the system.  And the other is

19  you can have a dispute between the experts as to the

20  application of the claim term under a proper claim

21  construction to those facts.

22          Here we actually have both issues in dispute.

23          Their basic argument is that there is something

24  they call a, quote, scheduling competition every TTI, every

25  millisecond, and that that somehow means that they do not

1   infringe.

2          Of course, the claim does not have the words

3   "scheduling competition" in it.  There's been no

4   construction here that includes the use of a scheduling

5   competition.

6          And, in fact, what they're calling a competition,

7   they're calling it that so that they can try to persuade

8   you now, Your Honor -- and when we get to the jury, this is

9   going to be a very severe problem throughout the trial, I

10  predict, because they are not going to talk about the claim

11  language that requires isochronous treatment.  That means

12  same placement in every frame.  If the frames are 10

13  milliseconds long, then the packet gets Slot 2, the

14  first -- the first time through, then actually Slot 42 on

15  the fourth th frame and Slot 82 in the eighth frame.

16  That's isochronous.  The periodic interval is the same.

17         They're going to argue, oh, that doesn't happen

18  because there's a scheduling competition, implying that

19  it's random.  But that's not true.  The facts are

20  different.

21         During the course of the discovery in the case,

22  and, in fact, in the expert rebuttal report that they

23  provided, they ran a simulation with parameters that were

24  favorable to Ericsson.  At Ericsson's headquarters, they

25  ran this simulation.  And what it showed -- I'm going to

1  put this up here -- is that the, quote, scheduling

2  competition which they imply results in randomization

3  actually results in extraordinarily regularity in the

4  transmission path.

5       What this chart shows -- this is -- if you look on

6  the right side, that's accumulative distribution from 0 to

7  a hundred percent, so at by around 40 milliseconds, reading

8  along the bottom, what you have is about 5 percent of the

9  packets have arrived between 0 and 40 milliseconds apart.

10  Then there's a huge spike right at 40 milliseconds.  Why?

11  Because about 70 percent of the packets are delivered

12  exactly 40 milliseconds apart in an isochronous fashion,

13  exactly.

14       And the rest of the packets on the far right, they

15  have almost no packets delivered between 40 milliseconds

16  and 160 milliseconds apart, and then another bunch at the

17  end that are exactly 160 milliseconds.  Again, isochronous

18  treatment.

19       So rather than having a scheduling competition,

20  which is going to be incredibly misleading for the jury,

21  there is actually regularity built into the system.  It is

22  not dynamic scheduling.  It's not a scheduling competition.

23  It is DBS/SABE algorithm which they built to make this

24  happen and to provide regularity to the transmission.

25       Now, our expert provided two opinions.  The first

1   was by invoking the SABE algorithm, you start a process

2   which results in the packets arriving on time every 40

3   milliseconds or every 160 milliseconds, which is

4   isochronous.

5           The act of invoking the reservation algorithm,

6   which is in the claim, results in isochronous treatment.

7   That is itself the placing of a reservation into the

8   system.  It's a bit like saying I have a standing order for

9   a table at a favorite restaurant at 7:00 o'clock every

10  Sunday night.  That's a reservation over a long period of

11  time.  I don't have to say anything more than that.

12          Now, it might happen that somebody else takes the

13  table or I'm on vacation, that gets overruled.  But it's

14  not a random scheduling competition every time, every

15  millisecond.

16          So we have a dispute about the operation of the

17  system.  That alone precludes summary judgment.  We don't

18  agree with their contention that there's a scheduling

19  competition.

20          Second, there's the application of the claim

21  language to the system itself.  And here the experts

22  differ.  Our expert went further.  He also said in addition

23  to invoking the algorithm, there's also infringement

24  because when I look individually at the software, what I

25  see is that there is a reservation which begins at one time

1   and then results in the transmission of a packet at a

2   second time, and he says that second time is the future

3   frame.

4           They say that's the current frame.  We're going to

5   have a dispute about which frame to the experts is current

6   or future, but that's something that's going to have to be

7   sorted out at trial.

8           Then we have a second transmission at a much later

9   time which I believe everybody agrees is a second

10  transmission would satisfy the claim.

11          But the main point is, this is a motion for

12  summary judgment.  They can only prevail if it -- if the

13  unmistakable evidence in the record, the uncontradicted

14  facts show that there's no genuine issue for trial.

15          We have a classic dispute about the experts.

16  We're going to have a, I'm afraid, difficult problem at

17  trial with them talking about a scheduling competition

18  which is no part of the claim here, and there's going to be

19  some -- a lot of concern about that we're going to see in

20  later motions today, I believe.

21          But the bottom line is we have two experts who

22  disagree about the application of the claim language, and

23  it's not an appropriate case for summary judgment.

24          THE COURT:  All right.  Thank you, counsel.

25          Mr. Kubehl, do you have a brief follow-up?

1          MR. KUBEHL:  I do.

2          THE COURT:  Please make it brief.

3          MR. KUBEHL:  Your Honor, I focus you in my

4   argument on Step Claim 1(c), and I showed you that there is

5   no fact dispute, that that claim element was not met.

6          What you just heard was an argument first about

7   Element 1(d).  Are -- are packets placed isochronously?

8          Are they or are they not placed isochronously?

9   That's a separate claim step, 1(d).  There's -- whether or

10  not packets are placed isochronously in the system is not

11  the issue in this -- in this motion.  This motion is how

12  are the packets placed?  How did you decide where to place

13  the packets?  Did you reserve future slots like the claim

14  requires.

15         The second argument you heard was an argument

16  about Claim Step 1(b), about current slots versus future

17  slots, one that you characterized as more linguistically

18  challenging.  We didn't hear a word about Element 1(c).

19  That's the one that undeniably is missing here, and summary

20  judgment should issue based on it.

21         THE COURT:  All right.  Thank you for your

22  argument, counsel.  I have considered your briefing in

23  advance of the hearing today.  In considering the briefing

24  and the argument that I've heard, the Court's persuaded

25  that this is not a situation appropriate for summary

1    judgment, and I'm going to deny the Defendants' motion for

2    partial summary judgment in this particular.

3         Next let's take up the Defendants' motion for

4    partial summary judgment of non-infringement on the '517

5    patent.  This is Document 206.

6         Let me hear from the moving Defendants, please.

7         MR. KUBEHL:  Your Honor, may I approach with

8    slides?

9         THE COURT:  You may.  Proceed when you're ready,

10   counsel.

11        MR. KUBEHL:  Thank you, Your Honor.

12        There was a claim construction dispute in the '517

13   patent, and it dealt with what I'm showing you on Slide 2.

14   There's language early in the claim that talks about

15   analyzing contents of packets to be communicated over the

16   shared wireless bandwidth in a downlink direction.

17        Later in the claim, there is an allocation that

18   has to be made based on the analyzed contents.  The

19   Defendants in claim construction argued that the analyzed

20   contents had to be the contents of the same packet that was

21   to be communicated over the shared wireless bandwidth from

22   the base station to the CPE station.  That was disputed.

23        Your Honor accepted Defendants' construction in

24   that regard, found that as a matter of antecedent basis

25   that the analyzed contents recited later in the claim must

1   be the same packets that are -- the same packets that are

2   communicated wirelessly from the base station to the CPE.

3            So whatever packet it is that you're going to rely

4   on in this claim from an infringement standpoint as being

5   the one that is communicated wirelessly from the base

6   station to the CPE station, that's the packet whose

7   contents must be analyzed in this claim.

8            They have two theories of infringement.  The first

9   one they call the TEID theory.  What I'm showing you on

10  Slide 3 here is kind of a network diagram of different

11  elements in the network.

12           On the far left, there's an element called a UE.

13  That's the one that they say is the CPE station.  There's

14  an element to the right of that called the eNodeB.  That's

15  the element that they say is the base station in the claim.

16  And in these systems, there will be an IP packet that is

17  transmitted from the eNodeB to the UE.

18           Now, that IP packet originally is received in the

19  network at an element called the PDN Gateway on the far

20  right.  We're showing that here with the No. 1, the IP

21  packet coming in from the right to the PDN Gateway.

22           The PDN Gateway takes that packet, and it appends

23  to the packet -- a header called the GTP-U header.  And it

24  forms this GTP packet that has the GTP-U header, and it has

25  the original IP packet as payload.

1          And that original IP packet is sometimes referred

2    to as the T-PDU.  So that GTP packet is communicated

3    eventually to the base station, and we're showing that by

4    Element No. 3 here.  And at the base station, the GTP

5    header is examined.  The IP packet that gets sent from the

6    base station to the UE is never examined.  That's

7    undisputed.  What gets examined is the GTP header that got

8    put on to that packet.

9          So you've got a situation where the packet that's

10   communicated wirelessly from the alleged base station to

11   the alleged CPE is this IP packet shown at No. 4 and going

12   to No. 5.  And the undisputed evidence is that no part of

13   that packet is analyzed in this TEID theory.

14         Instead, what's analyzed is a GTP header that is

15   never to be communicated wirelessly from a base station to

16   a UE.  It's a header that's appended on to the IP packet

17   that will be communicated wirelessly.  The IP packet is

18   never looked at.  Only this header is looked at, which is

19   never to be communicated wirelessly to any UE.

20         And so for that reason, because the packet that is

21   to be communicated wirelessly, which is that IP packet,

22   because it's undisputed that the contents of that packet

23   are never analyzed, never looked at under this TEID theory,

24   there's non-infringement as a matter of law under the

25   Court's claim construction.  So that's the -- that's the

1    TEID theory.

2          They offer a second theory called the RoHC theory.

3    RoHC stands for robust header compression.  And what I'm

4    showing you on Slide 5 is from their expert reports.  This

5    is their expert's theory on why under this RoHC theory he

6    believes there would be infringement.  And specific --

7    specifically, he says because the scheduler allocates

8    bandwidth based in part on a PQ buffer size, and that PQ

9    buffer size is influenced by whether or not a header is

10   compressed, and that would meet the claim language.  And we

11   believe he's wrong about that.

12         So with robust header compression, headers are

13   compressed which reduces the size of the packet, and

14   multiple packets with compressed headers are put into

15   buffers.

16         The scheduler gets information about the overall

17   buffer size, not information about any particular packet,

18   not information about the size of any particular packet,

19   not information about the contents of any packet, just

20   information about the overall size of a buffer.

21         And Dr. Williams says:  Well, if you allocate

22   based on the buffer size, then I think that's infringement.

23         Well, it's undisputed that the things I just ran

24   through for you, that the buffer size doesn't give you

25   anything about what's in the packets.  That's undisputed.

1    We show that on our Slide 6 and make reference to Exhibit 5

2    from our motion for that support.  Undisputed.  That

3    doesn't tell you anything about the contents of the

4    packets.

5         And so what they've done now in their sur-reply is

6    come back and said:  Well, actually we're not asserting

7    that the claim contents are satisfied by the buffer size.

8    That's not our theory.  We're actually saying our theory is

9    that the contents are the actual IP addresses themselves.

10   That's what the contents are.

11        That theory -- that theory is not expressed in

12   their expert report.  What's expressed in their expert

13   report is that you do it based on the buffer size -- and

14   I'm showing you on Slide 8.  He says you do it based on the

15   buffer size.  And, in particular, that's based on

16   compression of the analyzed original IP address in the

17   packet, not based on an analysis of what's in those

18   packets, not based on any analysis of packets.  It's based

19   on the fact that IP addresses were compressed which reduced

20   size.

21        And when they got put into a buffer with other

22   packets, changed the ultimate buffer size.  That's his

23   theory.  He doesn't have any theory that IP packets are

24   analyzed and that that analyzed content is then used for

25   making a scheduling decision.

1          So we see what's in his report.  We see what his

2     theory is.  It comes down to he's saying that information

3     external to the packet is what he would characterize as

4     information that's supposed to be contents of the packet,

5     information about the size of the packet, the resulting

6     size after compression.  That's all information.  That's

7     not the content of the packet.  It's information that's

8     external to the packet.

9          And during prosecution, our briefing pointed out

10    that they were faced with prior art that was using

11    information that was external to a packet.  There's

12    information about the size of a packet that wasn't taken

13    out of the packet itself.  It was gleaned from another

14    source, and it was information about the packet that was

15    external to the packet.  And they argued to the Patent

16    Office, well, that's not analyzing the contents of the

17    packets.  That's not doing an allocation based on the

18    analysis of contents.  You're using something outside of

19    the packet.  And that's exactly what their theory is doing

20    here.

21          THE COURT:  Isn't -- isn't the argument, though,

22    about what is contents and what it isn't contents and

23    what's inside the packet and what's outside the packet?

24          Aren't those classic factual questions that would

25    not put this in a posture where it would be appropriate for

1     summary judgment?

2           MR. KUBEHL:  I think it's undisputed that the size

3     of the -- the size of the buffer is outside of the packet.

4     I don't think that's a disputed fact at all.  I think it's

5     undisputed that the fact that a header was compressed and

6     resulted in a reduction in size is outside of the packet.

7     Those are not contents of the packet.  And I don't think

8     that's disputed.

9           Their theory now is that the content of the

10    packet, the thing that it is inside the packet is that IP

11    address.  And an IP address is a content of a packet

12    certainly, but there's no theory expressed by their guy

13    that there's an analysis of that content of that packet and

14    that that analysis then is used to allocate.

15          Instead, they point to their expert saying, you

16    look at the buffer size and the buffer size is influenced

17    by the fact that there was a compression of the address.

18    He doesn't express a theory that there's some analysis of

19    the IP address and that analysis drives the allocation.

20    That's lawyer argument that they're making today to avoid

21    summary judgment.

22          THE COURT:  All right.  Let me hear a response

23    from Plaintiff.

24          MS. PATEL:  May it please the Court.  My name is

25    Nisha Patel on behalf of Plaintiff.

1            Your Honor, may I please approach to provide my

2      slides to the Court?

3            THE COURT:  You may.

4            MS. PATEL:  Thank you.

5            THE COURT:  Proceed when you're ready, Ms. Patel.

6            MS. PATEL:  Thank you, Your Honor.

7            IV's theories of infringement under both TEID

8      theory and the RoHC theory satisfy each element of the

9      asserted claims.

10           Your Honor, Defendants' motion should be denied

11     here because various issues of material fact remain as to

12     how the underlying technology operates, and those -- those

13     facts are in dispute by the experts in this case.  These

14     are quintessential facts that should go to a jury to weigh

15     the evidence on both sides.

16           With regard to IV's TEID theory, which I will

17     address first, IV has met its burden of establishing that

18     this function meets Elements 1(a) and 12(a) literally, as

19     well as under D -- DOE.

20           Defendants' arguments are based on a

21     mischaracterization of IV's theory, and, in particular,

22     what IV is reading as the particular packet and what IV is

23     reading on as the content of that packet.

24           To clarify for the Court, I'd like to go through

25     just briefly what IV's TEID theory is.

1           THE COURT:  All right.

2           MS. PATEL:  The data that is to be sent in the

3    downlink direction originates at some source -- for

4    example, the Internet or another UE.  It comes into the

5    telecom network as IP data in the form of an IP packet.

6    That IP packet is sent to various other components

7    throughout the network for additional processing -- for

8    example, the P-GW and the S-GW.

9           These components process the IP packets further,

10   and include important information within that packet, and

11   then further envelope it with this information called a GTP

12   packet.

13          Now, the GTP packet includes its own header, the

14   GTP header, and a payload which includes the original IP

15   packet.

16          Now, after processing at the S-GW and the P-GW,

17   the -- these components transfer the entire GTP packet to

18   the accused eNodeB in the system.  Once the GTP packet

19   arrives at the eNodeB, it examines the GTP header, and, in

20   particular, the TEID header information.

21          The eNodeB has a table.  And based on that table,

22   which include different types of traffic, the eNodeB takes

23   the TEID information from the header of the GTP packet and

24   it determines which bearer to map this packet to based on

25   the contents of the packet, in particular, the type of data

1   that's being transmitted within -- within the packet.  The

2   table informs the eNodeB of which bearer which is

3   associated with -- with certain types of quality of service

4   requirements to transmit the packet on.

5          Now, once the eNodeB analyzes this TEID header and

6   in essence analyzes the contents of the packets, that is

7   the data that is to be transmitted, the eNodeB then

8   discards the TEID because it's been used for allocation

9   purposes at that point.  The eNodeB then places the

10  packet -- the entire GTP packet, without the TEID header

11  information, into a buffer associated with the bearer so

12  that it can ultimately be transmitted in the downlink

13  direction.

14         Now, there are several questions of material fact

15  that remain with regards to the '517 infringement theories.

16         The first is whether or not a person having

17  ordinary skill in the art would consider the GTP packet

18  received at the eNodeB to be a packet.

19         Defendants' argument completely mischaracterizes

20  IV's theory and focuses only on the T-PDU or the original

21  IP packet, but it's IV's theory that the entire GTP packet

22  is a packet.  And that's a question of material fact, Your

23  Honor.

24         It seems, based off of Defendants' argument, that

25  they're saying that the G-PDU is only a data unit, it's not

a packet, but IV's expert has provided a well-reasoned

rationale in his report as to why the GTP packet is, in

fact, a packet.  At the very least, this is a factual

dispute that should certainly go to the jury.

        But there's another question of material fact,

Your Honor, and that is would a person of ordinary skill in

the art consider the TEID header information to be part of

the GTP packet.

        The question here is:  What are the contents of

the packet?  This is, again, a question of material fact

that both experts have opined on.  IV has provided expert

testimony that the TEID header information is indeed part

of the header information of the GTP packet.  And certainly

the parties have, it seems, agreed at least during claim

construction that a packet includes both header information

and payload information.

        Again, Your Honor, this is a question of material

fact that should certainly go to the jury.

        This leads me to my -- the third question of

material fact, which is would a person of ordinary skill in

the art consider the GTP packet to be communicated in one

part of its header, in this case the TEID information, to

be removed before downlink transmission.

        Now, if you look at the actual language of Claim

1, Step a, it reads:  Analyzing contents of packets to be

1   communicated.  The claim does not require communication of

2   the entire packet -- packet content, including all of the

3   header information.  The communication of the payload is

4   what is of primary importance.

5        And Defendants' own expert stated that if one

6   wants to send data, it needs to send it -- it needs to

7   place this data into the information payload field of one

8   or more IP packets.

9        And, importantly, also, Your Honor, is whether the

10  TEID is sent is -- is really inconsequential because the

11  TEID informs the eNodeB of the traffic type contained in

12  the GTP packet payload.  So even if the TEID is removed,

13  the data traffic with the -- which the eNodeB analyzes by

14  way of the TEID information is still transmitted to the

15  destination UE.

16       The real substance of the packet, Your Honor, is

17  its payload, and there is no dispute that the eNodeB

18  transmits the GTP payload wirelessly in the downlink

19  direction.

20       Defendants' argument in this case, Your Honor, is

21  based on a philosophical and factual debate about whether

22  or not a packet is still a packet if its header is removed,

23  and this is a fact tied to the operation of the technology,

24  and it is, again, a quintessential question that should go

25  to the jury.

1          THE COURT:  All right.  Thank you.

2          MS. PATEL:  Your Honor, would you like me to

3    address the RoHC theory?

4          THE COURT:  Yes.  Yes, let's move on to that.

5          MS. PATEL:  Okay.  With regards to the RoH

6    theory -- RoHC theory, Your Honor, IV has also met its

7    burden of establishing that that function meets Elements

8    1(d) and 12(d) literally, as well as under DOE.

9          But the dispute concerning that theory is really

10   tied to, again, Defendants' mischaracterization of IV's

11   theory.

12         Before I get into the dispute, I'd like to clarify

13   for the Court IV's theory as it has been from the beginning

14   and as IV's expert has opined to in this case.

15         After the base station maps the TEID in the packet

16   header to a bearer, it checks whether the bearer has RoHC

17   enabled.  And if it does have RoHC enabled, what it does is

18   it analyzes the original IP address that's within the

19   original IP packet and within the payload of the GTP

20   packet.  And based on analysis of the IP address, if

21   certain conditions are met, the eNodeB then compresses the

22   packet and particularly compresses the original IP address

23   before it's placed into the buffer associated with the

24   bearer.

25         The base station that allocates resources based on

1   its analysis of that IP address, after compressing the IP

2   address, the eNodeBs, like I said, place that compressed

3   packet into the PQ buffer, and the PQ buffer varies

4   depending on the size of the packets within it and, in

5   particular, whether the RoHC function compressed the IP

6   address.

7          And the eNodeB allocates in part based upon the PQ

8   buffer size, but because the eNodeB allocates in part based

9   on the PQ buffer device, the eNodeB is also allocating

10  based on the compression itself.

11         Now, Defendants argue that IV does not assert --

12  that IV asserts that the contents here are the buffer size.

13  That's a complete mischaracterization of IV's theory.  We

14  contend that the contents are met by the original IP

15  address.  Unlike what Defendants argue, this is not the --

16  the sur-reply is not the first time in which IV has pursued

17  this theory.  It is throughout Defendants' expert's report

18  in this case.  Various aspects including, for example, in

19  Paragraph 83 of Dr. Williams's expert report in this case,

20  the analysis of the original IP address based off of that,

21  the eNodeB decides, Your Honor, whether to and how to

22  compress the IP packet which directly impacts the

23  allocation.

24         In telecom networks in general, Your Honor, com --

25  the entire point of compression is to efficiently allocate

1   bandwidth resources amongst various UEs and for the system.

2          Moreover, Defendants argue that, you know, IV has,

3   through prosecution history, disavowed certain claim scope.

4   But that argument is also completely irrelevant because IV

5   does not read contents on buffer size, like I previously

6   said, but rather on the original IP address.  And both are

7   literal and DE -- DOE arguments.

8          Moreover, estoppel should not -- should not apply

9   here because Defendants' claim -- Defendants' arguments are

10  based on prosecution history art statements relating to

11  completely different claims.

12         The '622 claims, which Defendants point to in this

13  case, had claims reading allocating based on contents of

14  packets.  The '517 claims require allocating based on the

15  analyzed contents.  It's completely different terms with

16  different meanings and different significance.  The word

17  "analyzed" adds a lot to the claims, and it's inappropriate

18  for Defendants to rely on statements based off of different

19  claim language to limit the scope of the claims in this

20  case.

21         But even if, Your Honor, the argument were

22  relevant and the claims were substantially similar, which

23  they are not, Defendants have not shown that the alleged

24  disavowal was clear and unmistakable, which is the

25  standard.

1          They rely on the statement on the screen in front

2    of you in which the applicant stated that as to information

3    regarding lengths of packets where the information is

4    located or stored external to packet, it is unreasonable to

5    consider such external length information as contents.

6          But the description that applicant made with

7    regards to this prosecution history is -- is in relation to

8    a reference called the Whitehead reference which operates

9    in a substantially different way than the RoHC

10   functionality and, therefore, should not even be applicable

11   in this case.

12         In the Whitehead reference, there were two

13   different queues, one with the actual packets and one

14   external length information relating to the size of the

15   packets.  That queue did not have -- or that buffer did not

16   have the actual packets.  But the RoHC functionality in the

17   accused system, the buffers include both the packets, and

18   from the packets, the eNodeB determines the size of the

19   buffer.

20         The buffer in Defendants' system is certainly not

21   separate and independent and certainly not external length

22   information.  But regardless, Your Honor, the point in the

23   file history was not that size could never qualify as

24   contents.  It was that in that particular situation,

25   external length information cannot not qualify as contents.

1          For this reason, Your Honor, we believe that

2    Defendants' motion for summary judgment is inappropriate

3    because of all of the various factual questions still

4    remain in dispute.

5          THE COURT:  All right.

6          MS. PATEL:  Thank you.

7          THE COURT:  Thank you, counsel.

8          Briefly, response from Plaintiff?  Do you have

9    anything to add, Mr. Kubehl?

10         MR. KUBEHL:  Very briefly.

11         Your Honor, our motion took up the theories that

12   they have in this case, as they were expressed in their

13   expert reports and as their experts described those in

14   their depositions.

15         Through the process, we've heard a shifting in

16   sands of what those theories are.  I recognize that it's

17   hard for Your Honor to unpack the allegations that are

18   being made now, which we believe are to -- new theories not

19   supported by their reports.

20         We think summary judgment should stand based on

21   the theories that have been expressed so far.  And with

22   respect to any of these new theories, we'll seek to hold

23   him to his report at the trial if there is one.

24         THE COURT:  All right.  Thank you, counsel.

25         I don't remember ever hearing the adjective

1   "philosophical" applied to the word "packets" before, but

2   it's a new day, I guess.

3         On balance, counsel, with regard to this motion,

4   the Court's persuaded that there are surviving and material

5   questions of fact still afoot that are appropriate for

6   trial before the jury, and I'm going to deny Defendants'

7   motion for partial summary judgment regarding

8   non-infringement of the '517 patent.

9         All right.  The next matter we have to take up has

10  to do with the MSJ relating to non -- no willful

11  infringement.  We'll do that after a short recess.  And

12  then it will probably be time for a short lunch break, but

13  we're going to take a short recess, then I'll come back and

14  take up the partial summary judgment by Defendants of no

15  willful infringement.

16        The Court stands in recess.

17        COURT SECURITY OFFICER:  All rise.

18        (Recess.)

19        COURT SECURITY OFFICER:  All rise.

20        THE COURT:  Be seated, please.

21        All right.  Let's continue with the pre-trial

22  matters before the Court, and we'll take up Defendants'

23  partial summary judgment of no willful infringement.

24        Let me hear from the moving Defendant, please.

25        MR. KUNCHERIA:  Good morning, Your Honor.

```
 1              THE COURT:  Good morning.
 2              MR. KUNCHERIA:  My name is Johnson Kuncheria, and
 3    I'll be addressing Defendants' summary judgment of no
 4    willfulness --
 5              THE COURT:  All right.
 6              MR. KUNCHERIA:  -- Docket No. 207 on behalf of
 7    Ericsson and T-Mobile.
 8              THE COURT:  Let's proceed.
 9              MR. KUNCHERIA:  Your Honor, summary judgment of no
10    willfulness is warranted in this case because the record
11    contains no evidence of any egregious misconduct beyond
12    alleged typical infringement.
13              During discovery, Defendants appropriately sought
14    all facts and reasons supporting IV's willful infringement
15    allegations in Common Interrogatory No. 23.  In response,
16    IV merely incorporated by reference its discovery response
17    on actual notice to Defendants of the asserted claims.
18              That discovery response merely alleges knowledge
19    and does not allege pre-suit knowledge of the asserted
20    patents.  Instead, it alleges pre-suit knowledge of
21    different patents in the same family of the patents-in-suit
22    that were asserted by IV in different litigations.  There
23    is no assertion of pre-suit knowledge of the asserted
24    patents.
25              Your Honor, may I approach with slides?
```

```
 1            THE COURT:  Yes, you may approach.

 2            MR. KUNCHERIA:  For the first time in IV's briefs,

 3  IV now speculates that Defendants have pre-suit knowledge

 4  from different patents in prior litigations listing the

 5  patent applications or the asserted patent or uncles or

 6  grandparents of the asserted patents.

 7            However, this Court recognizes that knowledge

 8  alone -- knowledge of the asserted patents alone is

 9  insufficient to establish willfulness.  In Ericsson versus

10  TCL, this Court analyzed the Supreme Court's decision in

11  Halo and observed, as foreshadowed by Justice Breyer, the

12  parties have interpreted willful to mean knowledge of a

13  patent and nothing more.  This Court rejected that

14  interpretation, and, instead, found that knowledge of a

15  certain patent without more cannot justify a finding of

16  willful infringement.

17            It's important to note that the Court in this case

18  made these statements in the context of deciding TCL's

19  summary judgment motion of no willfulness and not whether

20  and in what amount to enhance damages.

21            In that case, in the context of that summary

22  judgment motion of no willfulness by TCL, this Court

23  confirmed that the applicable willfulness standard, as it

24  stands today, necessarily requires egregious infringement

25  behavior.  In that same case, the Court explained that the
```

1    more pertinent question in that context is whether there's

2    any evidence to support a finding of egregious culpable

3    behavior at any time in the case.

4          IV in its sur-rely now relies on Core Wireless to

5    mistakenly suggest that knowledge of a patent alone is

6    enough to survive summary judgment.  In particular, IV

7    asserts that this Court has held that enhanced damages is a

8    separate question from whether a Defendant willfully

9    infringed a patent.  That, however, does not address the

10   question of whether willful infringement requires egregious

11   misconduct.

12         Core Wiles, however, confirms that Halo supplies

13   the standard for willful infringement and that the doctrine

14   of willful infringement requires egregious infringement

15   behavior because that doctrine serves as a sanction for

16   egregious infringement.

17         The Federal Circuit Bar Association's model patent

18   jury instructions also are consistent and recognize that

19   knowledge of a patent alone is not enough for willful

20   infringement.  Those jury instructions inform the jury that

21   they may not determine that the -- the infringement was

22   willful just because the alleged infringer knew of the

23   patent and infringed it.  Instead, willful infringement is

24   reserved for only the most egregious behavior.

25         Under the federal rules, IV is not permitted to

```
1    introduce new willfulness evidence now, given its discovery
2    responses.  IV's failure to identify any egregious
3    misconduct during discovery renders summary judgment
4    inappropriate here because knowledge of asserted patent
5    alone is insufficient to establish willfulness.
6         However, in IV's briefing for the first time, IV
7    now relies on T-Mobile's continued use of the accused
8    feature and multiple releases of Ericsson's software.  IV
9    offers no explanation of how continuing infringement rises
10   to a case of egregious misconduct beyond alleged typical
11   infringement.
12        IV makes no allegation that the character or
13   nature of the alleged infringement has changed.  Instead,
14   it relies on alleged typical infringement, which is
15   insufficient under the Supreme Court's Halo decision.
16        Therefore, Your Honor, we believe summary judgment
17   is appropriate.
18        THE COURT:  Let me hear a response, please.
19        MR. FLANNERY:  Good morning, Your Honor.  Kevin
20   Flannery for Plaintiff.
21        THE COURT:  Good morning.
22        MR. FLANNERY:  The -- Your Honor, in TCL v.
23   Ericsson, the Court specifically said that analyzing --
24   subsequent cases after Halo, that it is the jury that must
25   decide whether the infringement was intentional, and then
```

1   the Court must decide whether the intentional conduct was

2   egregious enough to justify enhanced damages.

3           There's two separate issues at play here,

4   willfulness and enhancement.  Their motion is a summary

5   judgment for no willful infringement.  The issue there is

6   the Defendants' state of mind.  It's a classic issue to be

7   decided by a jury.  It raises genuine factual disputes.

8           They -- they argue that we have nothing more than

9   notice of the patent, but, of course, you didn't hear

10  anything from Plaintiffs regarding their subjective state

11  of mind and whether they have good faith beliefs in

12  non-infringement or not.  Certainly, we're allowed to

13  challenge that in front of a jury, and that's a classic

14  issue of fact.

15          THE COURT:  Tell me where the allegation is in

16  your current complaint, counsel, that pre-suit, the

17  Defendants had particular knowledge of the asserted patents

18  and claims, not just the families from which these patents

19  come.

20          MR. FLANNERY:  I -- I think our case is based upon

21  knowledge of the families, Your Honor -- knowledge of the

22  family.  We -- we do not have evidence showing that they

23  had specific knowledge of these particular patents, but I

24  don't think that that matters under the case law.  I think

25  even knowledge of a patent application and the other

1  applications that are cited in that application has been

2  found to be enough to create an issue of fact for

3  willfulness for the jury.

4          These are -- this isn't just a situation where

5  they knew about a patent application.  They knew about the

6  Malibu patents.  That's what we call them.  I think Your

7  Honor is aware of that.  They knew about the Malibu patents

8  from litigation.

9          What more evidence could they need to know -- to

10  be put on notice about potential infringement issues with

11  respect to a family of patents?  They knew about that

12  family.  We've told them -- we've alleged that.  We've

13  alleged that in our interrogatories.  They were well aware

14  of the Malibu family.

15          And there's inferences that should be drawn in our

16  favor that based upon that knowledge, they had knowledge of

17  these patents.

18          THE COURT:  You know, counsel, you can pick your

19  friends but you can't pick your family, and some families

20  are very small and some families are very large and

21  scattered.

22          To say knowledge of the family of patents is

23  adequate in some cases might be appropriate if the family

24  is a handful of patents, but it might be inappropriate if

25  the handful -- or if the family, rather, of patents is

```
 1  hundreds if not thousands of patents.
 2       I mean, I need -- I need to be shown that the
 3  Defendants had a reasonable knowledge of these particular
 4  patents one way or another.  And to use the family approach
 5  as imprecise and as undefined as that might be is somewhat
 6  troubling.
 7       MR. FLANNERY:  Well, I think that's an issue --
 8  as -- as you phrased it, Your Honor, I think that's an
 9  issue that we should -- can and should be decided by the
10  jury, whether they had notice, based upon the size of the
11  fame.  There's the -- you mentioned that there could be
12  thousands of patents in a family.  I don't think that's the
13  case.  I do think we have a small -- relatively small
14  family of patents here that the jury can be shown.
15       The jury can be shown that -- the number of
16  patents that are in the family, how they relate, and how
17  these patents that are at issue in this case relate to the
18  patent that Defendant clearly had notice of.  So I think
19  those are -- that's a classic issue that can and should go
20  to the jury, Your Honor.
21       THE COURT:  All right.  Let me hear the remainder
22  of your response to Defendants' argument.
23       MR. FLANNERY:  The -- I think as phrased during
24  the opening, that's -- that's my response.  I mean,
25  otherwise, they made arguments in their brief that they
```

1   didn't respond to -- that they didn't raise here regarding

2   their subjective state of mind.  Again, Your Honor, I think

3   that's an issue that's squarely going to be in front of the

4   jury.  They have a witness who came and at the deposition

5   and in a somewhat unique situation where it was done by --

6   by counsel voir diring in the middle of our deposition of

7   an Ericsson witness and getting him to elicit questions

8   about Ericsson's subjective belief or lack thereof, and

9   that's a classic -- classic issue for the jury, and we've

10  briefed that.  So that wasn't -- wasn't addressed during

11  the opening arguments, so I'll just rest on our brief on

12  that point, Your Honor.

13          THE COURT:  All right.  Thank you.

14          Do Defendants have anything additional to add?

15          MR. KUNCHERIA:  Yes, briefly, Your Honor.

16          Two points I'd like to make, Your Honor.  As -- as

17  I had articulated in my opening, their rog response merely

18  asserts awareness of family members of the asserted

19  patents.  It does not allege pre-suit knowledge of the

20  asserted patents.  It is their burden to establish willful

21  infringement.

22          We asked during discovery all facts and reasons

23  why they believe we willfully infringe, and they rely

24  solely on pre-suit knowledge of family members of the

25  asserted patents and not even the -- the patents

1    themselves.

2         Second point I'd like to make, Your Honor, they

3    spoke about the lack of any subjective belief and

4    non-infringement.  We addressed this in our brief at Docket

5    No. 207 at Page 4, and there -- there is testimony of

6    Ericsson's corporate representative identifying the

7    differences between the asserted patents and the accused

8    products.  And he also testified that his competence level

9    in those differences were high.

10        THE COURT:  All right.  With regard to this

11   motion, it's the Court's belief that while knowledge of the

12   asserted patents is necessary, there must be more than

13   simply knowledge.  However, in this case, the question

14   seems to center on whether the Defendants were

15   reasonable -- reasonably put on notice as to the particular

16   patents-in-suit by their knowledge of the patent family or

17   families from which these patents-in-suit now have been

18   specified to come from.

19        I'm not aware of any case law that tells me that

20   knowledge of the family itself, without more, is adequate

21   notice to put the Defendants in a posture to potentially

22   infringe in a willful manner.  And with regard to

23   willfulness pre-complaint, I'm going to grant the

24   Defendants' motion.  With regard to the potential for

25   willfulness post-complaint, I'll deny the Defendants'

1   motion.

2          All right.  It just seems to me there's got to be

3   some nexus with the particular patents-in-suit.  Saying you

4   knew about the family is not too far a step from saying you

5   knew there was this PTO in Virginia, and you should just go

6   check everything there and see if anything there applies.

7   It's too nebulous.  It's too attenuated to meet the

8   threshold to give the Defendants reasonable notice as an

9   underpinning to a potential willfulness finding.

10         All right.  We're going to break for lunch.  When

11  we come back, we'll take up the Defendants' motion for

12  summary judgment regarding invalidity of the '206 patent.

13         It's five minutes until noon.  I will see you back

14  here at 20 minutes until 1:00.

15         We stand in recess.

16         COURT SECURITY OFFICER:  All rise.

17         (Recess.)

18         COURT SECURITY OFFICER:  All rise.

19         THE COURT:  Be seated, please.

20         All right.  We'll reconvene and continue with the

21  pre-trial matters related to the Intellectual Ventures

22  versus T-Mobile, et al., case.  And we'll next take up

23  Defendants' motion for partial summary judgment of

24  invalidity regarding the '206 patent.

25         Let me hear from Defendants, please.

1          MR. PARRISH:  Your Honor, may I approach?

2          THE COURT:  You may.

3          MR. PARRISH:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.

5          MR. PARRISH:  My name is Bryan Parrish on behalf

6    of Ericsson and T-Mobile.  I'll be arguing this motion for

7    summary judgment -- that is the '206 re-issue patent is

8    invalid in view of the '098 PCT publication.

9          THE COURT:  All right.  Proceed with your

10   argument.

11         MR. PARRISH:  The parties agree that the PCT

12   publication discloses details of the asserted claims of the

13   '206 patent.  The only remaining issue for the Court is

14   whether that PCT publication is the prior art based on the

15   priority date of the '206 patent.

16         Now, the '206 patent is a re-issue of U.S. Patent

17   7,251,218.

18         THE COURT:  Just a minute.

19         MR. PARRISH:  Apologies, Your Honor.

20         THE COURT:  Go ahead.

21         MR. PARRISH:  The '206 patent is a re-issue of

22   U.S. Patent 7,251,218.  So the priority date of the '206

23   patent depends on when this '218 patent was first filed.

24         The Defendants contend that under then existing 35

25   U.S.C. Section 111, the statutorily required filing date of

1  the '218 patent is October 24th, 2002.  This is because

2  that was the first date that a Section 112 compliance

3  specification was first submitted to the Patent Office.

4       On the other hand, Plaintiff contends that the

5  filing date should be September 12th, 2002.  This is the

6  date that application papers were submitted to the Patent

7  Office.  And in those application papers, there was an

8  incorporation by reference of a parent specification.

9       Now, the central issue for the Court here is

10  whether then existing 35 U.S.C. Section 111 allowed an

11  applicant to incorporate a specification by reference to

12  obtain a filing date.  Really the key language in the

13  statute is this "shall include" language.

14       The Federal Circuit's description of Section 111

15  in the Baxter case sheds light on what the plain and

16  ordinary meaning of Section 111 is.  In that case, the

17  Federal Circuit explained that under Section 111, in order

18  for an application to be complete and receive a filing

19  date, the application had to have four components, each one

20  of which had to be present in the application.  Relevantly,

21  the Court said a specification, which includes both the

22  written description --

23       THE COURT:  Mr. Flannery, point that microphone

24  up.  Sometimes that helps.  No?

25       Well, do you have any suggestions, Ms. Lockhart?

1           COURTROOM DEPUTY:  Can I go?

2           THE COURT:  Yes.

3           Who did what?

4           COURTROOM DEPUTY:  Ms. Butler.

5           THE COURT:  Okay.  All right.  Whatever that

6    feedback was in the sound system seems to have ceased.  So

7    let's go ahead, counsel.

8           MR. PARRISH:  Thank you, Your Honor.

9           What the Federal Circuit explained in Baxter was

10   that a specification must include both the written

11   description and the claims.  According to the Federal

12   Circuit, the plain language of Section 111 must include all

13   four of these components in order for the specifi -- in

14   order for the application to receive a filing date.

15          Now, in IV's sur-reply they made the argument that

16   then existing Section 111 is silent about the manner and

17   form in which the components of the application must be

18   filed.

19          What you see before you on this PowerPoint slide

20   is the current version of Section 111.  And what you see in

21   the current version of Section 11 [sic] is Subsection C.

22          Subsection C is not present in the existing -- the

23   then existing version of Section 111.  And what Subsection

24   C allows is that the director is allowed to incorporate by

25   reference a prior application specification drawings for

 1   purposes of a filing date.  Notably, this is not in the

 2   then existing version of Section 111 that was in effect

 3   when the '218 patent was first filed.

 4        Now, because the specific facts regarding the

 5   filing date of the '21 [sic] patent are key to this issue,

 6   I'd like to briefly go through a few of the relevant facts.

 7        THE COURT:  All right.

 8        MR. PARRISH:  On September 12th, 2002, the

 9   applicant first submitted papers for the '218 patent.  Now,

10   it's undisputed that a copy of a specification was not

11   included in those filing papers.  Instead, what the

12   application did was submitted a transmittal form.  Here's a

13   copy of that transmittal form that was filed.  There's a

14   check box that indicates that the application is a

15   continuation application.

16        THE COURT:  Let's go ahead, counsel.  I can hear

17   you over the feedback.

18        MR. PARRISH:  I'd like to point out two things

19   about this transmittal form.  One is that the transmittal

20   form itself indicates that the incorporation can only be

21   relied upon when a portion of that patent application's --

22   that patent application's prior disclosure has been

23   inadvertently omitted from the submitted application parts.

24        Now, this is the transmittal document that IV

25   relied on to show that specification was filed during the

1   prosecution of the '218 patent on September 12th.

2           However, if you look at this stamp placed by the

3   PTO on the bottom of this transmittal form, the PTO didn't

4   even believe that they received the specification.  It

5   says:  The PTO is missing the specification, all 158 pages

6   of it.

7           Indeed, shortly after these application papers are

8   filed, the Patent Office sent the applicant notice of

9   incomplete, non-provisional application.  They told the

10  applicant that the specification is missing.  Notably, a

11  filing date has not been accorded to the above identified

12  application.

13          So at this point, although application papers have

14  been filed, no filing date had been given to the

15  application.  Defendants had the opportunity to depose IV's

16  30(b)(6) witness, Mr. Dean Munyon.  In that deposition,

17  Mr. Munyon confirmed that a copy of the detailed

18  description of the specification was not filed on September

19  12th, 2002.  Mr. Munyon also confirmed that there was no

20  copy of the written description included in the contents of

21  the application papers that were filed on September 12th,

22  2002.

23          This is important because five days later the

24  parent application of the '218 patent issued.  On September

25  17th, 2002, the '915 patent issues.  Without the filing

date, there can be no co-pendency between the '218 patent

and the '915 patent.  Without co-pendency under 35 U.S.C.

120, the '218 patent does not claim the benefit of the

earlier priority date.

Eventually, the applicant actually files the

specification.  That happens on October 24th, 2002.  And

this is first time that a copy of a specification is filed.

Again, when we asked IV's 30(b)(6) witness that

only after the '915 parent patent issued, the applicant

submitted a specification to the Patent Office on October

24th, 2002, and he said:  That is correct.

Now, the applicant understood that because the

specification was not filed for first time until October

24th, 2002, the filing date was not until October 24th,

2002.  Indeed, documents submitted by the applicant after

that date all include October 24th, 2002, as the filing

date.

Here you see an information disclosure statement

filed by the applicant, you know, him stating that the

filing date is October 24th, 2002.  This continued

throughout prosecution.

The Patent Office and the applicant both believe

that the filing date was October 24th, 2002, so it was

unsurprising that when the '218 patent issued, it was the

filing date of October 24th, 2002.

1          And this is how it stood for many years.

2    Eventually, IV acquired these patents in 2011.  And shortly

3    thereafter, IV filed a petition to change the filing date

4    of the '218 patent.  This petition occurred almost four and

5    a half years after the '218 patent issued.

6          The Patent Office rejected the application.  They

7    said:  As we just discussed, the applicant was aware of the

8    filing date, and it accepted that it was October 24th,

9    2002.  And kind of a key issue here was the Patent Office

10   said four and a half years has passed.  The public has a

11   right -- a right to rely on this filing date.

12         Now, IV was undeterred by this decision, so they

13   filed a re-issue application which was the current asserted

14   patent in this case.  And during that re-issue proceeding,

15   they filed another petition.

16         This time, the Patent Office granted that

17   petition, and IV's primary argument to that petition was

18   that the filing date of September 12th, 2002, should be

19   granted because that's when an incorporation by reference

20   statement was made to the parent application.

21         The Patent Office's main justification for

22   granting the patent was reliance on MPEP 201.06(c), and

23   that section deals with incorporation by reference.

24         Now, what the portion of the -- portion of the

25   MPEP actually explains is that incorporation by reference

1   is just a safeguard.  It's meant for situations where the

2   applicant accidentally forgets the specification page or a

3   drawing sheet.  It's not meant for the wholesale

4   incorporation by reference of the entire specification.

5          Another thing to note about the section that the

6   MP -- MPEP relied on is it had nothing to do with filing

7   dates.

8          THE COURT:  Do you have something to tell me that

9   it's not meant for the wholesale situation where an entire

10  specification is omitted like you just argued?

11         MR. PARRISH:  Yes, Your Honor.  The very next

12  section that the Patent Office didn't discuss in big bold

13  letters says:  Application not entitled to a filing date.

14  Material needed to accord an application a filing date may

15  not be incorporated by reference.  That's clear from the

16  MPEP, but more importantly, it's clear from the statute.

17         The section says:  Such application shall include

18  a specification -- a patent application or not other --

19  some other application in the chain of priority.  And this

20  is also seen to be contrasted with the now current version

21  of Section 111 which does allow the director to allow

22  incorporation by reference to receive a filing date.

23         Again, we return to the Federal Circuit's decision

24  in Baxter which explains the importance of a specification.

25  It has both written description and claims.  And the

1   omission of any one of these component parts makes the

2   patent application incomplete.

3          Now, IV's main argument is that despite the clear

4   statutory language of Section 111, the PTO's petition

5   decision cannot be set aside by this Court because under

6   Gilead, the decision was not arbitrary, capricious, an

7   abuse of discretion, or otherwise not in accordance with

8   law.  However, even Gilead recognizes that the statute's

9   plain language must ordinarily be regarded as conclusive.

10         In the Baxter court, back to*the Federal Circuit

11  said in Baxter that that -- while the PTO is presumed to

12  have complied with all of the old rules, that presumption

13  cannot overcome by a clear statutory violation.

14         So, Your Honor, Defendants believe that Section

15  111 requires that such application must include a Section

16  112 compliance specification, and that's clear from the

17  statute.  This is consistent with the MPEP that was in

18  effect when the '218 patent was filed, and even the Patent

19  Office's own transmittal document.

20         So under this statute, the PTO's decision to

21  change the filing date of the '218 patent from October

22  24th, 2002, to September 12th, 2002, is reversible because

23  it's a clear statutory violation.

24         As I started off the presentation, given the

25  statutorily required filing date of October 24th, 2002,

1    it's undisputed that the '206 patent is anticipated by the

2    PCT publication.

3            THE COURT:  Why is it appropriate for this Court

4    to reverse the decision of the PTO to change the filing

5    date on the '218 patent?

6            MR. PARRISH:  Yes, Your Honor.  According to the

7    Baxter decision at the Federal Circuit, this Court has the

8    ability to reverse the PTO's decision when there's been a

9    clear statutory violation.

10           Section 111 that was then pending when the '218

11   file was -- was filed, says that such application must

12   include a specification.  The Baxter Court said that an

13   application has four component parts, one of which was a

14   specification.  When a specification is not included, then

15   the applicant is not entitled to a filing date.

16           THE COURT:  So it's fair to say you're hanging

17   your hat on the Baxter decision, pretty much across the

18   board?

19           MR. PARRISH:  And the plain language of Section

20   111 as it was then pending.

21           THE COURT:  And as you read it?  Okay.

22           MR. PARRISH:  Yes, Your Honor.

23           THE COURT:  Let me hear a response from Plaintiff.

24           MR. ABRAHAM:  Good afternoon, Your Honor.  Joseph

25   Abraham for IV.

1          THE COURT:  Good afternoon, counsel.  Let me hear

2   Plaintiff's response.

3          MR. ABRAHAM:  We concur with the Court's

4   inclination to uphold the PTO's decision as a reasonable

5   application of then applicable Section 111.

6          THE COURT:  I didn't say I was inclined to do

7   anything.  I just asked opposing counsel some questions.

8          MR. ABRAHAM:  Fair enough.  Regardless, the -- we

9   would say that nothing in the then applicable version of

10   Section 111 included incorporation by reference.  It was

11   silent.  It said nothing about how a specification was to

12   be included.

13          In connection with the September 2002, '454

14   application, a compliant specification was incorporated

15   by -- by reference.  This was explicitly permitted by MPEP

16   608.01, and it was also consistent with the PTO's duly

17   promulgated form which is part of the record of Exhibit 4

18   to Docket 242.

19          In terms of -- in terms of Defendants' reliance on

20   MPEP 201.06, it does say that material needed to accord a

21   filing date cannot be incorporated by -- incorporated by

22   reference, but it does not say which material is, in fact,

23   needed.  The existence of the check box implies that

24   certain aspects of the application can be so incorporated.

25          The PTO is well within its rights to establish its

own administrative procedures which deserve deference.

Defendants' argument, we think, is based entirely on an incorrect interpretation of the law.  It is based on the mistaken accusation that the decision to correct the '454 application date was in contravention -- in contravention of Section 111.

In terms of Defendants' reliance on the apportionment language, I will refer the Court -- and I'm sorry, if I can get the ELMO -- I'll refer the Court to the language of the Baxter case on which the Defendants rely, which specifically notes that the specification includes both the written description and the claims.  There is no dispute that the '454 application included the claims, which are part of the specification as referenced here in Baxter.

Defendants say that the facts --

THE COURT:  Wait a minute.  Put that back up on the ELMO.

MR. ABRAHAM:  Sure.

THE COURT:  That's Section 1 -- or bracketed 1 that you referred to says the specification, parentheses, which includes both the written description and the claims, close parentheses, and the claims.  So are the claims and the specification the same thing?  Are the claims and the specification not part of the same thing?  I mean, you used

1  what's in the brackets to say the claims were attached,

2  therefore, part of the specification was attached.  But

3  then why is the language in black print following the close

4  paren and claims there?

5      MR. ABRAHAM:  I think we would agree with

6  Defendants' decision to put the [sic] reference there in

7  square brackets, but regardless, we do think that the

8  language of the case clearly contemplates the claims as

9  being part of the specification.

10     THE COURT:  All right.  That's confusing to me.

11     MR. ABRAHAM:  I will agree that this is not a

12 model of clarity, but we certainly -- to the extent that

13 there is any -- anything in Defendants' argument that only

14 a portion of a missing specification can be incorporated by

15 reference, we think then that is -- supports that.

16     THE COURT:  I see your argument.

17     MR. ABRAHAM:  Now, in terms of the facts of

18 Baxter, the Defendants say that it is a distinction without

19 a difference that in Baxter, the specification -- the

20 written description was submitted, but the claims were not.

21 And here, we have the opposite situation where the claims

22 were submitted but the written description was -- was only

23 incorporated by reference.

24     One cannot definitionally incorporate claims from

25 an earlier application, but there is absolutely nothing to

1  prevent the PTO from reviewing an identical specification

2  that was in the -- in the PTO's records in connection with

3  the earlier application.  That's the situation we have

4  here.  We think that Baxter is thus very distinguishable on

5  its facts.

6         And then in terms of Defendants' repeated

7  references to Mr. Munyon throughout, I refer you to

8  Footnote 7 of their reply brief.  It requires them to

9  assume away the existence of this possibility to

10  incorporate by reference.

11        I'm sorry, there is one other thing I will also

12  direct the Court.  Defendants' slide where they present a

13  portion of MPEP 608 and argue that it supports their

14  position, we will, again, just note that MPEP 608

15  specifically provides an application as filed must be

16  complete in its -- in itself in order to comply with 35

17  U.S.C. 112, but material nevertheless may be incorporated

18  by reference.

19        So unless the Court has any further questions, I

20  will rest.

21        THE COURT:  No, counsel.  Thank you.

22        Any brief follow-up by Defendants?

23        MR. PARRISH:  Yes, Your Honor.

24        THE COURT:  It's not you, is it, Mr. Parrish?

25        MR. PARRISH:  It just might be, Your Honor.

1            THE COURT:  Go ahead.

2            MR. PARRISH:  Your Honor, Defendants don't dispute

3    that certain types of information can be incorporated by

4    reference.  What clearly cannot be incorporated by

5    reference is material that is needed under -- needed to

6    afford a filing date, which is a Section 112 compliant

7    specification.

8            The counsel just admitted that the written

9    description portion of the specification was incorporated

10   by reference.  IV's 30(b)(6) witness testified that there

11   is no written -- a copy of the written description was not

12   filed on September 12th, 2002.  Because of that, the filing

13   date of the '218 patent, and thus the priority date of the

14   '206 patent, is October 24th, 2002.

15           THE COURT:  All right.  Well, the Court has some

16   reluctance to reach into an administrative agency of the

17   Executive branch and correct their internal processes in

18   light of the separation of powers doctrine.

19           The Court also sees under the statute that the

20   claims have to be there, they're there, there's question.

21   The claims are a part of the specification for these

22   purposes.  I don't think there's any dispute about that.

23           But there does seem to the Court at least to be a

24   question of material fact as to the omission, and this does

25   not appear to the Court a matter that's ripe for summary

 1  judgment in light of the presence of material questions of

 2  fact.

 3          I'm going to deny -- especially in light of the

 4  fact the alternative is invalidity of the patent.  That's a

 5  harsh remedy in light of a situation that is far from

 6  factually undisputed.  I'm going to deny the partial motion

 7  for summary judgment by Defendants.

 8          Next is Defendants' motion for summary judgment

 9  regarding certain references and whether they are or are

10  not prior art.

11          That appears to be Document No. 210.

12          Let me hear from the moving Defendants -- the

13  moving Defendants on this, please.

14          MS. BUTLER:  Your Honor, may I approach?

15          THE COURT:  You may.  Proceed when you're ready.

16          MS. BUTLER:  Good afternoon, Your Honor.  My name

17  is Melissa Butler, and on behalf of Defendants, I'll be

18  arguing Defendants' motion for summary judgment that

19  certain disputed references are prior art, Docket 210.

20          THE COURT:  All right.  Pull the microphone down a

21  little bit, Ms. Butler.  Thank you.  Go ahead.

22          MS. BUTLER:  Summary judgment that the three

23  references at issue qualify as prior art, printed

24  publications under Section 102 is appropriate.  The three

25  references at issue are all IEEE publications.  These are

not obscure or one-off references like an unpublished

student dissertation or a user guide distributed by sales

representatives.  These are publications by IEEE, well

know, widely relied upon publication in the field.

The issue is whether these three references

qualify as prior art printed publications, and the

uncontroverted evidence establishes that they do.  These

references are not cutting it close on dates.  Each of them

predates the relevant patents by two years.

The evidence demonstrates that they were published

before the priority dates, that they were available in

libraries before the priority dates.  As Defendants' expert

Dr. Hall-Ellis investigated records and concluded that

these three references were cataloged, indexed, and

available in libraries by certain dates, all of which

predate the respective patents.  This is bolstered by the

fact that the conferences for the underlying IEEE

proceedings occurred before the prior dates.

It's further supported by the fact that POSITAs

cited these articles in their own IEEE publications which

also published before priority dates.

And, Your Honor, IV offers no evidence to the

contrary, no library declaration of their own.  IV disputes

the extent to which these references were publicly

available by -- but has no genuine dispute that they are

1    anything other than what they purport to be, references

2    that were publications from 1996 and 1997, as evidenced by

3    the documents themselves.

4         IV argues that there is a separate examination

5    prong that a POSITA must have -- must be able to examine

6    them.  But here, locate and examine are one and the same.

7         They're library references, IEEE publications.

8    There's simply no suggestion that they were available in a

9    library in some form other than a form that could be

10   examined.

11        And, Your Honor, I'd like to step briefly through

12   one of the three publications.  This is the Dyson

13   reference, which is relied on as prior art to the '629

14   patent.  IV's alleged priority date for the '629 patent is

15   July 9th, 1999.  This is the cover of the publication that

16   contains the Dyson reference.  On its cover it says MILCOM

17   '97 Proceedings, listing November 1997 dates.

18        It also lists a copyright date of 1997 by the

19   Institute of Electrical and Electronics Engineers, Inc., or

20   IEEE.  The table of contents lists Dyson under the

21   unclassified technical session occurring on November 4th,

22   1997.  And this is the first page of the art -- of the

23   Dyson article itself, which bears a copyright 1997 IEEE

24   date in the footer.

25        Now, Your Honor, there's some dispute about

1  whether the copyright date is sufficient to establish this

2  as prior art -- as a prior art printed publication, but we

3  know from the -- the copyright statute itself that

4  copyright notices are placed on publicly distributed works.

5          The Federal Circuit also affirmed a PTAB decision

6  involving Ericsson and IV which found that similar

7  copyright evidence was sufficient to establish a similar

8  IEEE article qualified as a prior art printed publication.

9          The PTAB found that they accept the publication

10  information on the IEEE copyright line as evidence of its

11  date of publication and public accessibility.

12          The PTAB found that IEEE is a well-known reputable

13  compiler and publisher of scientific and technical

14  publications and took official notice that members of the

15  scientific and technical communities rely on information in

16  the copyright line of IEEE publications.

17          THE COURT:  Are you telling me, Ms. Butler, that

18  the copyright notation in and of itself not only

19  establishes publication but accessibility?

20          MS. BUTLER:  It establishes the date that the

21  reference was published and publicly available, yes, Your

22  Honor.  And that's not the end all, be all of Defendants'

23  public availability showing, but we do think that the

24  copyright date would be sufficient.

25          THE COURT:  So if I go back in my office and write

1   a breath-taking work of fiction and put a copyright symbol

2   on it, that means it's publicly accessible, even if I don't

3   publish it, print it, distribute it, leave it my locked

4   door of my desk?

5          MS. BUTLER:  No, Your Honor.  In these

6   circumstances where it's the copyright by IEEE, that is a

7   sufficient notification that this well-known publisher has

8   published and distributed the reference.  There are

9   situations -- for example, a user guide.  That may have a

10  copyright date where its distribution relies on whether a

11  sales representative distributes it with a device.  That --

12  that would be different.  But here we have an IEEE

13  publication, a publisher who is heavily relied on in the

14  field, and whose works are available in libraries.

15         THE COURT:  Well, my question is not so much the

16  publication, it's the accessibility component.

17         MS. BUTLER:  Understood, Your Honor.  And here

18  what we'll get to next is Dr. Hall-Ellis's testimony where

19  she investigates whether this was available in libraries.

20         THE COURT:  Go ahead.

21         MS. BUTLER:  Another note on this PTAB decision is

22  that the reference at issue there Stadler was -- was

23  published in the MILCOM '98 Proceedings, which is the same

24  periodical in which the Dyson reference at issue here

25  published, just a different year.  MILCOM '97 is where the

1    Dyson reference appears.

2              THE COURT:  All right.

3              MS. BUTLER:  And, Your Honor, this is not the only

4    PTAB decision finding copyright dates sufficient.  That one

5    was affirmed by the Federal Circuit, but there are -- there

6    are others that also found the copyright notice sufficient

7    to be a date of publication and prima facie evidence of

8    prior art.

9              And so next, Your Honor, Defendants' expert,

10   Dr. Hall-Ellis, on library practices and cataloging

11   investigated library records and determined that each of

12   these references were available by certain dates, all of

13   which predate the priority dates.

14             The basis of her opinion is analyzing the MARC

15   records which are a back end library record created by

16   catalogers.  And she bases her opinions based on the enter

17   date at the top of MARC record.  So this is the MARC record

18   for Dyson that shows the entered date 1997, July 8th.  And

19   Dr. Hall-Ellis analyzes the records and finds that the

20   enter date is the date that the library first cataloged and

21   indexed the underlying item so that the date the MARC

22   record was created, as reflected by this enter date, is

23   when it's accessible to the public.

24             The MARC records also indicate forms of indexing.

25   So there's the subject matter classifications in the 650

1  fields.   There's Dewey classifications in the 082 fields.

2  There's Library of Congress classifications in the 050

3  field.   And those latter two help ensure that similar types

4  of publications are grouped together.

5         And then, finally, Your Honor, Defendants also

6  have evidence that other POSITAs cited these IEEE

7  publications in articles that published before the priority

8  dates of the patents.  So here for Dyson, for example, a

9  POSITA cited Dyson in an article that published in 1998,

10 also bearing the copyright 1998 IEEE date in the footer,

11 and that predates the July 9th, 1999 priority date of the

12 '629 patent.

13        And, finally, Your Honor, at the end of the day,

14 we were a little surprised that IV was contesting the

15 public availability of these IEEE publications because IV

16 stipulated in this case that other IEEE publications

17 qualified as prior art printed publications based on the

18 dates of the documents themselves.

19        For example, this is one of the stipulations that

20 was filed in this case at Docket 164 where IV stipulates

21 that these various references constitute printed

22 publications under 35 U.S.C. 102 and 103.  And this was

23 based on the dates of the publications themselves.  This

24 was before any expert testimony offered -- was offered by

25 Defendants.

1          And so as discussed, we -- we think that the

2     copyright date from IEEE is sufficient to establish that

3     these are printed publications, and IV appeared to have

4     thought so themselves with respect to other references.

5          So for these reasons, summary judgment should

6     enter.

7          THE COURT:  All right.  Ms. Butler, thank you.

8          Let me hear a response from Plaintiff.

9          MS. PATEL:  May I proceed, Your Honor?

10         THE COURT:  You may, Ms. Patel.

11         First of all, tell me why you stipulated to

12    certain IEEE publications as you did and as referenced by

13    opposing counsel and yet are disputing these.  What's the

14    difference?  Why is it -- why is it adequate in one place

15    but not adequate in another place?

16         MS. PATEL:  Your Honor, the publications for which

17    we stipulated were in different IEEE articles, and the

18    facts of those publications were different.  For example,

19    in some of them --

20         THE COURT:  I'm not talking about the substantive

21    content of the articles.  In other words, it sounds like

22    what you're telling me these hurt us more so we want to

23    fight about them.  The others don't hurt as bad so we don't

24    want to fight about them.  That doesn't go to the issue of

25    whether they meet the requirements to be a prior printed

1   publication or not.

2          So if you agreed those were prior printed

3   publications and they're on all fours with these, why

4   aren't these in the same category or to be treated the same

5   way?

6          MS. PATEL:  I understand the Court's perspective,

7   Your Honor.

8          With regard to the particular IEEE publications

9   that IV stipulated to, those publications were different

10  than the publications in question.  For example, some of

11  those publications, and unfortunately, Your Honor, I don't

12  have those in front of me because this was not briefed in

13  Defendants' motion.  But those particular IEEE publications

14  were not -- did not all stem from conferences, for example,

15  but instead from serial publications which are different

16  than IEEE publications which stem from conferences, for

17  example.

18         THE COURT:  That's the distinction?

19         MS. PATEL:  That is one of the distinctions, Your

20  Honor.  Also, that those IEEE publications were different

21  than the publications in question here with regards to the

22  current motion.

23         THE COURT:  Different substantively or different

24  in some other way?

25         MS. PATEL:  They are just different publications.

1   They were not -- they did not all stem from the same IEEE

2   publication.

3          THE COURT:  Well, I understand that they may cover

4   different topics and have different material contained

5   within them, but -- I mean, if the only difference between

6   those you stipulated to as prior publications was that some

7   were ordinary publications in the due course of the IEEE's

8   operations and some related to specific conferences

9   sponsored by the IEEE in which these publications were

10  generated as a part of those conferences, that doesn't seem

11  like much of a distinction to me.

12         MS. PATEL:  Understood, Your Honor.  Another

13  distinction here is also the dates of those publications

14  with regards to the priority dates in question.

15         Again, I don't have those publications in front of

16  me, and I -- I'm not entirely sure which publications

17  Defendants are referring to.  However, the dates in

18  question are -- are different also for the particular

19  publications.

20         THE COURT:  Mr. Black.

21         MR. BLACK:  Yes, Your Honor.  I'm not certain,

22  Your Honor, but I believe that these references on this

23  page, and they'll correct us if we're wrong, may have been

24  published in serial journals, standard monthly or quarterly

25  journals.  Conference proceedings are treated differently.

1   The papers are submitted to the conference.  They're

2   assembled.  The date of a publication of a conference --

3   conference proceedings is not -- is not certain.

4         Also, there's a certain point at which argument

5   is -- would be inappropriate.  And if there was an IEEE

6   publication that was 10 years before the priority date, we

7   wouldn't argue about it.  The ones that are at issue here

8   both have the problem that they were in conference journals

9   which were an uncertain date of publication.  The date of

10  the conference may be known, but the date of the

11  publication unknown.

12        THE COURT:  I understand, Mr. Black.  And I'm

13  happy for you to help out a little bit, but if you're going

14  to make the argument, I'll let her sit down and you can go

15  to the podium.  Go ahead, Ms. Patel.

16        MS. PATEL:  Your Honor, if I may, Defendants'

17  entire argument rests almost solely on the declaration of

18  Dr. Hall-Ellis.  But Dr. Hall-Ellis's declaration has

19  enough holes and open factual questions, and frankly

20  credibility concerns which call her entire declaration and

21  testimony into question.

22        As Defendants came up here and argued, the entire

23  basis of her opinion are these machine readable cataloging

24  indexes for the particular references in -- in question.

25  And, in particular, the entered dates listed on those MARC

records.  But Dr. Hall-Ellis specifically testified that in certain circumstances, a MARC record may be created before the library even receives the reference.  This is the case, for example, in situations where librarians create MARC records to let others know that the publication is forthcoming or in instances in which the publisher creates the MARC record before the reference is even published.

Dr. Hall-Ellis testified in all of these scenarios a MARC record could be created before the date the library ever receives the publication and in some cases before the publication itself.

And Dr. Hall-Ellis's declaration does not indicate anywhere that the particular MARC records in question were not created under those circumstances.

Another point that is very concerning here, Your Honor, is that the MARC records that Defendants rely on were all created before the conference dates in question at which the Dyson, Oliveira, and Choi references were presented, which also call into question the reliability of that entered date.

Dr. Hall-Ellis also noted in her deposition that it's only sometimes possible to determine whether or not a MARC record was even created in advance of the library receiving a particular reference, and that -- that's a huge hole and a huge question of fact that should go to a jury

1   in this situation.

2            Moreover, Dr. Hall-Ellis testified that she only

3   reviewed the 2018 versions of the MARC records in question

4   here, instead of the 1997 and the 1998 MARC records or the

5   revision history for those records.

6            This is important, Your Honor, because for a

7   publication to be publicly accessible, it needs to have

8   been indexed or cataloged in a meaningful way.  The way to

9   determine that is through the search -- the key terms or

10  the subject matter classification.  But those terms,

11  Dr. Hall-Ellis testified, could have been revised over

12  time.

13           It's -- it's -- there's no certainty whatsoever

14  that the key terms of the search words in the 2018 versions

15  of the MARC records that she reviewed were also in the 1997

16  and 1998 versions of the MARC records which are the MARC

17  records that would actually matter for purposes of public

18  accessibility.

19           Moreover, there are some serious credibility

20  issues with Dr. Hall-Ellis's testimony.  She testified that

21  she had included all instances of her prior testimony in

22  her declaration.  But in the deposition it became clear

23  that she had failed to identify over 30 instances in which

24  she gave testimony to the PTAB in the six weeks in advance

25  of her deposition.  And when asked why, she testified

1    specifically that it was her job not to remember, which is

2    both confusing and concerning.

3           Moreover, in every instance in which she has ever

4    given testimony, she has always testified that a given

5    reference was publicly available.  She's always taken the

6    side of the challenger, and this is in more than 120 times.

7    And in 13 of those times at least she has given this same

8    testimony for Defendants' counsel.

9           All of these facts, Your Honor, call into question

10   Dr. Hall-Ellis's credibility, and Defendants have the

11   burden to show public availability.  They've chosen to rely

12   almost solely on Dr. Hall-Ellis's testimony, and the Court

13   or the jury could choose not to believe her because of

14   these credibility issues.

15          Defendants also improperly rely on the IEEE

16   copyright dates in these particular instances for the

17   conference proceedings, but the Federal Circuit and this

18   district has already made clear that the copyright date

19   does not show public accessibility.

20          Defendants cite to a PTAB decision as supporting

21   their conclusion, but in 2016, the PTAB specifically said

22   that the IEEE copyright notice is only probative that IEEE

23   owns the copyright to the article.  It is not probative

24   that the article was ever published by IEEE or anyone else.

25          The only evidence here that is actually undisputed

1    is that IEEE made the three references in question

2    available on its website in 2002.  There is no evidence

3    that's been presented that the IEEE has made those articles

4    available prior to that date.

5           Also, Defendants rely on third-party articles that

6    purportedly cite to Dyson, Choi, and Oliveira -- Oliveira.

7    But those are also insufficient to show public

8    accessibility for a couple of reasons.

9           First, because the cite -- it's unclear that the

10   citing authors even received those references through

11   public channels.  It's very likely that because all of

12   these citing articles are actually also IEEE conference

13   papers, that the citing authors could have been present at

14   the presentations that Dyson, Oliveira, or Choi made and

15   received the paper in a small non-public distribution and

16   then relied on that paper to cite in their article, or --

17   and another question is whether or not the versions of

18   Choi, Oliveira, and Dyson that are cited in these

19   third-party articles are even the same versions of the

20   articles that Defendants rely on.  It's simply a citation.

21   It's not clear what document is actually being referred to,

22   and the document itself does not appear in the third-party

23   articles.

24          For these -- for these reasons, Your Honor,

25   because the copyright dates, the MARC rec -- the MARC

1  records, and the other publications are insufficient to

2  show public accessibility, it's our position that enough

3  factual questions and credibility concerns exist, that

4  these questions should go to a jury in this case.

5          Thank you, Your Honor.

6          THE COURT:  All right.  Thank you, Ms. Patel.

7          Ms. Butler, do you have any follow-up?

8          MS. BUTLER:  Yes, Your Honor.

9          THE COURT:  Tell me, if you will, before you give

10  me any follow-up argument, as precisely as you can, what is

11  the evidence that these were publicly accessible prior to

12  the time that the IEEE put them on -- online?

13         MS. BUTLER:  Excuse me, Your Honor.

14         Your Honor, there's various evidence outlined

15  here.  It's first the evidence from the documents

16  themselves, so that's the copyright date on the article,

17  the copyright date on the Verso, the dates of the

18  conference.

19         THE COURT:  The copy -- the copyright date doesn't

20  move me much as to accessibility.  It does as to

21  publication, but not as to accessibility.  I mean, are

22  these at the IEEE, indexed, and on a shelf where even

23  before they were put on online, someone could walk in and

24  say show me the conference materials from these dates, I

25  want to look at this article that was alluded to during

1    that conference?  Is there evidence of that?  Tell me how

2    there is proof of accessibility by the public.

3         MS. BUTLER:  Your Honor, beyond the copyright

4    dates, the proof of accessibility is -- is their

5    availability in libraries, offered through the testimony of

6    Dr. Hall-Ellis, who analyzed the MARC records and

7    determined that the references were available in libraries

8    by dates certain from the entered dates on the MARC record.

9         THE COURT:  And is that factually disputed by

10   Plaintiffs through either a counter-designation or any

11   other expert?

12        MS. BUTLER:  No, Your Honor.  Plaintiffs are not

13   offering any librarian expert or other expert of their own

14   on public availability.

15        THE COURT:  Okay.  Now, having answered those

16   questions, go ahead and give me any follow-up argument you

17   have.

18        MS. BUTLER:  Yes, Your Honor.  I wanted to follow

19   up on the -- first on IV stipulations.  These references,

20   first of all, predate by a similar amount of time, as the

21   references issued here?  So, for example, Passas was

22   also -- also bears a publication date of November 1997,

23   similar to the 1997 dates at issue here.  And these -- IV

24   raises the distinction of a conference, but, Your Honor,

25   respectfully, that is an after the fact distinction because

1    these references were produced without the cover page that

2    Dr. Hall-Ellis obtained that indicates that they are

3    conference proceedings.

4         And so they were produced with -- like this with

5    the first page of the reference and the copyright date at

6    the bottom, and IV stipulated on that basis.  This

7    conference proceeding that we see here is a title page that

8    Dr. Hall-Ellis obtained when she obtained the references

9    from the library.

10        And, Your Honor, the copyright date is a date that

11   the Federal Circuit found sufficient by the IEEE.  And

12   here, IV seems to be asking for a different result from a

13   Dyson reference and a MILCOM '97 Proceeding as opposed to

14   the MILCOM '98 Proceeding at issue there.

15        But, Your Honor, I'd also like to address the

16   issues with Dr. Hall-Ellis's testimony that IV raises.

17        First, Dr. Hall-Ellis's testimony -- IV raises

18   theoretical possibilities that these references were

19   available at libraries at some date later than the date

20   indicated in the MARC record, that there may have been some

21   delay because, for example, they were a shelf-ready

22   resource or a PCIP, so the MARC record perhaps was prepared

23   in advance of their availability in a library.

24        But, Your Honor, if you look at her testimony, the

25   item -- things like that, for example, a shelf-ready

1  resource involves the publisher putting a mylar jacket on

2  the reference and then sending it to the library.  And

3  these sorts of delays simply don't result in a two-year

4  delay, which is what we have here between the reference

5  being received by the library and its availability.

6        And so even if we take IV's theoretical

7  possibilities to their logical conclusion, there's simply

8  no basis for a reasonable juror to conclude that any delay

9  between the date on the MARC record and the item's

10  publicity availability results in the reference post-dating

11  the patent.

12        It's additionally not the case that Dr. Hall-Ellis

13  analyzed the incorrect MARC records.  There is only one

14  MARC record for the reference in its different forms, and

15  that ensures that the reference is authoritative.  And,

16  though, it can be updated, Dr. Hall-Ellis testified that

17  this enter date that shows July 8th, 1997, upon which she

18  relies is machine automated and cannot be changed or

19  updated.

20        And, finally, the bias that IV -- alleged bias

21  that IV refers to with respect to Dr. Hall-Ellis, the PTAB

22  testimony they refer to are simply written declarations

23  which don't fall within the scope of Federal Rule of Civil

24  Procedure 26, and hence was not included in her report.

25        And, finally, Dr. Hall-Ellis testified that she

didn't know the priority dates for the patents in

investigating these records.  And so she didn't know in

finding that Dyson was cataloged and indexed no later than

July 8th, 1997, that in so finding that meant that -- that

Dyson would be prior art.

THE COURT:  All right.  Anything further?

MS. BUTLER:  Nothing further, Your Honor.

THE COURT:  All right.  Thank you, Ms. Butler.

The Court's persuaded that the copyright date is

adequate to establish publication during the year of the

copyright, which is indisputably in advance of the priority

dates these would be used in connection with.

Given that there's no contravening declaration

from an expert by the Plaintiffs, I'm inclined to accept on

its face the statements by Defendants' declarant that these

were publicly available in a library prior to the time they

were placed online by the IEEE.

The fact that these may be part and parcel of a

conference as opposed to a serial publication is of no

import in the Court's view.  They are clearly IEEE

publications.

There is indicia of reliability here that doesn't

exist in different context or situations with other

publications or publishers.

The arguments by Plaintiff that Defendants'

1  declarant is not reliable, while they may be -- while they

2  may be persuasive, if you can defeat this motion for

3  summary judgment without offering contravening summary

4  judgment evidence, no competing declaration, and merely say

5  the Defendants' declarant might not be believed, then I

6  don't think you could ever grant a summary judgment motion.

7        I'm going to grant the motion.  I think on -- on

8  balance, there's no reason why these should not be treated

9  as prior art.  They've been addressed by the experts.

10  We've got competing opinions from the experts about their

11  effect.  The Court's going to grant the motion with regard

12  to these prior art references.

13        Okay.  That brings us to Defendants' Daubert

14  motion regarding Williams.  That's Document 209.  And

15  that's what we'll take up next.

16        Let me hear from the Defendants, please.

17        MR. BECKER:  Your Honor, may I approach with

18  copies of the slides?

19        THE COURT:  You may.  Counsel, we've got four more

20  of these motions, including this one, and then we've got to

21  get to motions in limine.  Let's see if we can't -- I've

22  tried to give everybody a lot of latitude on how much

23  argument they want to present.  But let's see if we can't

24  pick up the pace a little bit.

25        Go ahead, counsel.

1        MR. BECKER:  Thank you, Your Honor.  My name is

2    Jeff Becker for Defendants Ericsson and T-Mobile.  I'm here

3    to -- I'm going to be arguing Defendants' Daubert motion to

4    strike portions of IV's validity report which is Docket

5    209, and this relates to the exclusion of certain claim

6    construction opinions which are present in that -- in that

7    report which were never disclosed through the claim

8    construction process in this case.

9        If you'd please go to Slide 2.

10       So these terms -- there's four terms that I'd like

11   to talk about, and I'll try to get through them quickly.

12       There's no dispute that there was no claim

13   construction offered by IV for any of these terms during

14   the claim construction process that took place in this

15   case.

16       "Packet" was a term that was involved in several

17   disputed claim terms.  Neither party proposed a specific

18   construction for that term.

19       And then the term "packet-centric" was not

20   addressed during claim construction.

21       "Reservation algorithm," not addressed except

22   through a -- I guess collaterally through some

23   means-plus-function terms that were addressed in a patent

24   that has been -- since been found invalid.

25       And then the "scheduling" term which is recited by

1    the '206 patent.

2         So the issue here -- IV's argument is that

3    its claim -- that its -- that its expert, Dr. Williams, who

4    is offering opinions in this case on both infringement and

5    validity, should be permitted to permit his plain meaning

6    interpretations of these claim terms to the jury because

7    they contend these are plain meaning -- just plain meaning

8    in light of the specification.  And should he be permitted

9    to do that is the issue -- one of the two issues to be

10   addressed in this case -- or with respect to this motion.

11        And we think the clear answer to that is no.  I

12   think once you look at his testimony, you'll see that he's

13   not offering plain meaning.  What he's done is he's

14   acknowledged the plain meaning, looked at the

15   specification, and is arguing for some different meaning to

16   apply based on something he's divined from the

17   specification.

18        And I'll show you some testimony and some examples

19   in his report where he's doing just that.  So he's not

20   using -- he's not applying the prior art to the claims.

21   What he's doing is he's making up interpretations of the

22   claims and then comparing the prior art to those

23   interpretations.  And we think that's improper.

24        The second question for the Court to address is

25   where do we go from here.  As -- as we all know, we're a

1   month away from trial, so what do we do with these -- what

2   we believe are clearly claim construction positions that

3   are in his validity report.  And I'll get to that as -- as

4   well, as we go through this.  Excuse me.

5          So the first question:  Does he get to offer plain

6   meaning opinions to the jury?  They cite Cordis, which is a

7   Federal Circuit case in support of that proposition, but in

8   that case, the Federal Circuit held that that was an

9   improper thing to do.

10          And if you look at the facts of that case, the

11   Defendant was arguing for a meaning of the term "thin

12   walled."  And he had de -- that expert had defined some

13   specific numeric ranges for what it meant to be thin-walled

14   from the intrin -- intrinsic record.  And the Court found

15   that that kind of opinion of narrowing the -- narrowing the

16   plain meaning in view of something the expert found in the

17   intrinsic record was properly excluded from the jury.  And

18   they specifically found that the risk of confusing the jury

19   is high in that situation, and that it was properly

20   excluded.  He was not allowed to testify on that.

21          That's the outcome we're asking for here on these

22   claim terms.  Excuse me.

23          So the first term at issue is "packet" term.  I'm

24   going to spend most of my time on this one, so forgive me

25   if I -- I go through a little more testimony than I will

1  with the other ones.  This -- and the reason is that this

2  term appears in every single remaining asserted claim in

3  the case.

4       And as you recall, we held a Markman hearing in

5  September.  There were several terms that involved the word

6  "packet."  The parties presented their arguments, and two

7  of those terms here on the slide, they analyzed contents,

8  they analyzed packet contents, both in the '517 patent,

9  said plurality of packets in the '206 patent, Claim 9.  In

10  each of those instances, IV stood here in this Court and

11  argued that those terms should have their plain meaning,

12  and -- and they offered no different construction for the

13  term "packet" than the word "packet" itself.

14       And consistently with that position, the Court

15  construed both of those terms in terms of packets.  And

16  these are just recitations of your construction for those

17  two terms where you found those terms, said plurality of

18  packets refer back to the same plurality of packets recited

19  in the phrase classifying a plurality of packets.  There

20  was no dispute about the use of the word "packet" in that

21  construction.

22       Likewise, with the analyzed contents and analyzed

23  packet contents in the '517.

24       So fast forward now to their validity report from

25  Dr. Williams, and we find what they are claiming the plain

meaning of this term "packet" is, is they argue -- and he

argues that that term refers only to a particular kind of

packet, only to IP packets, and that in this patent, when

it says "packet," that means only IP packet.  Doesn't mean

any other kind of packet.  It doesn't mean ATM cell

packets.  It only means IP packet.

He also uses words that don't appear in the claims

at all, like packet-centric and packet-switched, and argues

that because these references don't meet his claimed

definition of those words, that somehow that means the

claims -- somehow that that definition relates to the

claims.  And we'll go through that, as well.

Excuse me.

So we think if you look at his opinions, what he's

doing with the term "packet" is very clear.  And this is

directly from his report.  He said:  The clear intent of

the patent specification is that the term "packet" does not

include ATM cell.

And based on my review of the Malibu patent

specifications, it's my opinion these patents use term

"packet" to exclude ATM cell.  So we deposed him after

serving his report and asked him about that.  And so -- and

I -- I presented him with a dictionary definition of the

word "cell" that in use -- when used in an ATM network,

it's a small unit of data that's been broken up for

1  efficient transmission.  And that's a term synonymous with

2  packet.

3         And we asked him:  So is this dictionary wrong?

4         No was his answer.  It's not wrong.  You could

5  define a cell as a packet.  These patents don't do that.

6         So we asked him:  So your opinion is that they

7  define the term "packet" differently than this dictionary?

8         Yes.  This patent -- he says:  They're -- talking

9  about these patents, are talking about IP packets only.

10        So in IV's briefing, they repeatedly suggest that

11  somehow these opinions are the plain meaning of the word

12  "packet."  And they suggest that he never used the term

13  "lexicographer" to justify why he was using a different

14  definition than the ordinary meaning of packet.  And that's

15  just not true.

16        He volunteered the fact that he was using

17  lexicography, and he knew the ordinary meaning of this

18  term, and that he was using something different.

19        THE COURT:  Let me -- let me stop you and ask a

20  question, Mr. Becker.

21        MR. BECKER:  Sure.

22        THE COURT:  Without construing every word in every

23  claim in every patent as a part of claim construction, how

24  do you suggest the Court keep competing expert witnesses

25  during a trial from offering differing views of what a

```
 1    person of ordinary skill in the art would understand a term
 2    which has been given -- either -- either it's been given
 3    its plain and ordinary meaning or it was never raised and
 4    addressed and therefore has its plain and ordinary meaning,
 5    how do you suggest I prevent experts in trial from
 6    disagreeing about what a POSITA would understand those
 7    plain and ordinary terms to be, unless you're going to have
 8    me construe every word in every claim?
 9             MR. BECKER:  Your Honor, just to make clear, I'm
10    not asking for a construction of packet.  I think that the
11    word "packet" is readily under --
12             THE COURT:  I know you're not asking for a
13    construction of the word "packet."
14             MR. BECKER:  Right.
15             THE COURT:  But you're asking me to keep an expert
16    from telling the jury what that expert's views and opinions
17    are about whether a person -- how a person of ordinary
18    skill would understand a term from one of the claims that's
19    been given its plain and ordinary meaning or was never
20    raised in claim construction and consequently has it plain
21    and ordinary meaning.
22             I don't know how -- I've never tried a patent case
23    where you didn't have competing experts, at least to some
24    degree, offer differing views about what the plain and
25    ordinary meaning of terms were that weren't precisely
```

1  construed and given definitions by the Court during claim

2  construction.  I mean, I can't say you -- competing experts

3  can't talk about this unless you stipulate in advance

4  exactly what the plain and ordinary meaning of every

5  non-construed term would be.

6      It seems to me you're asking me to do something as

7  a practical matter that is just not practical.  So

8  that's -- that's why I asked the question.

9      MR. BECKER:  Well, Your Honor, in this case, I

10  can't speak for every case.  I'd probably need to give that

11  more thought.  But in this case I don't think --

12      THE COURT:  The problem is -- the problem is if

13  you ask me to do it in this case, everyone else will ask me

14  to do it in every other case.

15      MR. BECKER:  Well --

16      THE COURT:  How many times have my prior rulings

17  been cited to me today as to why I should do something in

18  this case that was done in an earlier case?  I mean, you're

19  asking me to open a door I don't know that I can ever

20  close.

21      MR. BECKER:  Well, Your Honor, I'm not -- I'm not

22  sure I'm asking that to be done.  I think what --

23      THE COURT:  That's the way it comes across.  And

24  if you're not, clarify it for me.

25      MR. BECKER:  Right.  What -- I think what we're

1    asking the Court to find here is that what Dr. Williams is

2    doing is testifying about claim construction.

3           Now, there's a line between saying what's a plain

4    and ordinary meaning, which I think is what you're talking

5    about, and then an expert arguing a special meaning that

6    differs from the ordinary meaning that he divined from the

7    specification.  And if -- if he falls into that second

8    category, he's testifying about claim construction, not

9    plain and ordinary meaning.

10          So in this case, and I think the testimony we have

11   on the screen is -- makes that clear.  If we go down to his

12   last question, he says an AT -- I asked him:  But an ATM

13   cell, least in this dictionary definition, is synonymous

14   with the ordinary meaning of packet?

15          He says:  Yes.

16          So he knows what the ordinary meaning is.  He's

17   chosen not to apply the ordinary meaning in favor of a

18   special definition.  And -- and the very last sentence of

19   that he says:  But in this case, the inventor, as I

20   understand it, gets to be his own lexicographer.  He calls

21   a packet a particular thing.  He drew a distinction between

22   what he calls a packet and an ATM cell.  And, therefore,

23   that's the definition I used.

24          So he's not -- he's not saying -- he's not

25   offering an opinion of what plain and ordinary meaning is.

1  He -- he's -- he's acknowledged that he's not doing that.

2  And so that's -- that's the problem I see, and I think that

3  that kind of behavior can be prevented from an order from

4  the Court.  This is not a situation where he's opining on

5  plain and ordinary meaning.

6       If you go forward in his testimony, we offer him

7  two plain and ordinary meaning definitions of packet, and

8  under those definitions, he agreed that an ATM cell would

9  meet those definitions.  So he's not applying plain and

10  ordinary meaning here.  I think that's -- that's the

11  problem we have.  It's -- it's not that he gets -- doesn't

12  get to explain what common telecom words mean.  It's that

13  he's acknowledged what those definitions are and has set

14  them aside in favor of reading something out from the spec

15  that's frankly not there.

16       THE COURT:  All right.

17       MR. BECKER:  So we can -- we can fast forward.

18  You know, this -- this is the standard that I'm talking

19  about here.  This is from an ED Tex case from -- from Judge

20  Payne.  He says:  If an expert testifies that a claim term

21  has a special meaning in light of the intrinsic record,

22  that expert is testifying about claim construction.

23       So he's not -- and that's exactly what

24  Dr. Williams is doing here.  He's acknowledged ordinary

25  meaning, and he's saying, but here in this patent, these

1    terms mean something different.  And that's properly

2    excludable under Daubert and under the Federal Circuit

3    precedent that I -- that I quoted from Cordis.

4            So just -- and just to make clear and -- and to

5    highlight the unreliability of his opinion, because he is

6    offering a claim construction opinion about what this term

7    "packet" means in light of the specification, he says it's

8    different than the ordinary meaning.  They met some special

9    definition that excluded ATM cells.  Well, his opinion

10   conflicts directly with the specification, which talks

11   about multiple kinds of packets, not just IP packets.

12           So the patent talks about an IP packet format, an

13   ATM cell packet format, talks about a different kind of

14   packet called an IPX packet.  And I have the cites here on

15   this Slide 14 from the specification.  These are direct

16   quotes from the spec.

17           So there's no basis for him to go to the jury and

18   argue that these claims are limited to only particular

19   kinds of packets, IP packets.  The specification itself

20   talks about multiple kinds of packets.  That's an

21   unreliable opinion.  That's claim construction.  He's

22   not -- he should not be permitted to do that.

23           THE COURT:  And the Court did not precisely

24   construe the term "packet" during claim construction,

25   correct?

1          MR. BECKER:  That's -- I mean, you used the word

2    "packet" in the claim, the meaning of that term --

3          THE COURT:  Let me ask it another way.  Neither

4    your side or the Plaintiff's side came to me at claim

5    construction and said, Your Honor, we need you to construe

6    the word "packet"?

7          MR. BECKER:  That's correct, and that's still our

8    position today, that it doesn't need construction.  And

9    arguing artificial restrictions on what that means and it

10   can only be particular packets or only particular kinds of

11   systems, that's -- that's kind of claim construction

12   opinions that an -- that an expert shouldn't be permitted

13   to make.

14         THE COURT:  All right.  What else do you have for

15   me?

16         MR. BECKER:  Sure.  I just have --

17         THE COURT:  I mean, if this is more of the same, I

18   understand where you're coming from.

19         MR. BECKER:  Right.  Okay.

20         So I want to cover this one very -- I'll move -- I

21   wanted to cover packet at length.  That's a big one.

22         THE COURT:  I think it's been covered.

23         MR. BECKER:  Right.  So he also uses the term

24   "packet-centric" to distinguish prior art.  That term

25   doesn't appear in the body of any claim.  The packets talk

 1   about -- the patents and the claims talk about packets.

 2   There's no recitation anywhere of packet-centric.  So he's

 3   taken this word "packet-centric," made up his own

 4   definition for it, decided for himself what kind of systems

 5   are excluded or included with respect to packet-centric,

 6   and then he says:  Because of this system is not

 7   packet-centric, it doesn't meet the claim.

 8          The problem is no -- none of these claims say

 9   packet-centric anywhere.  They don't claim a packet-centric

10   system.  This is a quote from his -- from his report.  He

11   says:  The '629 patent is claiming a packet-centric system.

12          It's not.  It doesn't say packet-centric anywhere.

13   Those are words he's added to the claim, and there's not

14   really been any explanation for why he could -- should get

15   to distinguish prior art based on a term that's not even in

16   the claim.

17          THE COURT:  Okay.

18          MR. BECKER:  And that's true with respect to all

19   of the remaining claims.  The only one that mentions

20   packet-centric is in the preamble.  It's presumed not to be

21   limiting.

22          So, again, he's -- just to cover these last two

23   terms quickly -- I only have like two slides each on

24   these -- he is -- for "reservation algorithm," he's made up

25   these four requirements for what it means to be a

1  reservation algorithm.  This is not a claim construction.

2  This is just him saying that this -- this reservation

3  algorithm requires these four things.  And because

4  it doesn't -- the prior art doesn't have these four things,

5  the claim is not met.

6       Well, if this was a claim construction, this would

7  have been a bonanza for our non-infringement argument.

8       Our non-infringement expert had no notice of this

9  -- that this was their construction for reservation

10 algorithm, didn't get to address it in his report, and yet

11 here they are making up these requirements for this term

12 and trying to use it to distinguish prior art.  And we

13 don't think that's proper.

14      He does the same thing with scheduling.  I won't

15 go through it in detail.  But he's using a construction for

16 scheduling that's not the ordinary meaning of that term.

17      So I guess our summary is and what we think should

18 happen from here, and you asked me that question earlier,

19 we don't see an 02 Micro issue here.  The -- the word

20 "packet" as it appears in your constructions is perfectly

21 fine.  The word "packet-centric," there's no 02 Micro

22 dispute because that's not a term of any claim that needs

23 construction.

24      THE COURT:  I gather you have a competing expert

25 prepared to take the stand during trial to tell the jury

1  that Plaintiff's expert's explanation as to what packet

2  means is just not right and why it's not right and why --

3  tell the jury why -- what you've just told me is the case?

4        MR. BECKER:  Well, Your Honor, we had no notice

5  that they were arguing that packet was limited to IP

6  packets only.  And our invalidity expert has prepared his

7  report, selected prior art based on the ordinary meanings

8  of these terms, ATM cells are packets.  Their expert

9  concedes that.

10        So our whole selection and our Defendants -- and

11  our experts' selection of what art he was going to choose

12  to put in his report was based on these plain meanings.

13  So, no, he's not argued that -- he's not explained how, you

14  know, IP -- this claim is not limited to IP packets.  He's

15  had no opportunity to address that.

16        THE COURT:  Your expert is not going to get up and

17  agree that this is the plain and ordinary meaning of these

18  terms as portrayed by Plaintiff's expert.  Your expert is

19  going to get up and tell the jury what the Plaintiff's

20  expert told you the plain and ordinary meaning is, is not

21  the plain and ordinary meaning, I assume.  That's my

22  question to you.

23        MR. BECKER:  I don't think he's going to do that.

24  What our expert is prepared to do is he's addressed --

25  like, for example, with the "packet-centric" term, our

1    non-infringement expert has said if this -- if this

2    "packet-centric" term applies and it's limited in the way

3    that they say it is, then we have this additional

4    non-infringement argument.  He's not offering claim

5    construction opinions on what that means.

6            He's offered explanations as to how the prior art

7    may meet packet-centric, but not -- again, not with respect

8    to claims that don't recite it.  The '206 patent doesn't

9    recite packet-centric --

10           THE COURT:  I understand.

11           MR. BECKER:  -- so he hasn't addressed that claim

12   construction or that term with respect to art that's only

13   in that -- in that packet.

14           THE COURT:  All right.  Let me hear a response

15   from Plaintiff.

16           MR. BLACK:  Thank you, Your Honor.  Martin Black

17   for Plaintiff again.  May I approach and hand up one

18   document, Your Honor?

19           THE COURT:  You may.

20           MR. BLACK:  So I -- what I've just handed up is

21   the final written decision in the IPR relating to Patent

22   7,496,674.  This is Exhibit 2001 from that IPR, which is

23   referred to in the papers.  This is the family member of

24   the patents at issue in this case, and this decision was

25   issued on May 18th, 2015.  This is a final written

1    decision.

2            And on Page 8 -- switch to the ELMO.

3            On Page 8, this is the PTAB's construction, and

4    it's an ordinary plain meaning construction.  They say:

5    Claim terms generally are construed in accordance with the

6    ordinary and customary meaning.  Then there's a little

7    Footnote 8 that says:  The Federal Circuit imposes a

8    stringent standard for narrowing a claim.  They're not

9    applying that standard.  And then they go on to consider

10   the specification as a whole in construing the word

11   "packet."  And they say:  The overall context in which

12   packet is used relates to communication over

13   packet-switched networks.

14           And then as it flips over, particularly with

15   respect to the contention that a packet should be

16   construed, et cetera.  And then after reviewing the

17   specification and applying a plain and ordinary meaning,

18   the PTAB comes to the conclusion that we will construe a

19   packet as a piece or segment of data, slash, media stream

20   that serves as a unit of transmission over a

21   packet-switched network.  That's the construction.  May

22   2015, they were involved in that IPR.  That was the

23   construction that the Patent Office said was ordinary

24   meaning.

25           Now, we come to this case, and they file an IPR in

1  this case against the patents-in-suit, all -- several IPRs.

2  And in each one of those patents, they do not ask for a

3  construction of packet.  They do not inform or discuss with

4  the Patent Office the fact that the word "packet" had

5  already been construed.

6        IV, however, points out to the Patent Office in

7  its filing that this term has already been construed to

8  mean a piece or segment of a data/media stream that serves

9  as a unit of transmission over a packet-switched network.

10  And then IV sought to distinguish various ATM pieces of

11  prior art based on that construction.

12        They didn't take a position.  We did.  But that's

13  an ordinary meaning construction.  That's what the board

14  said was the ordinary meaning.

15        So then we get to the final -- it's not a final

16  written decision, but the institution decision in the case,

17  and the board -- the board says -- I'm sorry, I've got the

18  wrong one.  Okay.  There we go.  The board construes packet

19  and concludes that consistent with the construction applied

20  in the prior IPR, we construe packet to mean a piece or

21  segment of data/media stream, et cetera.

22        This construction is a plain and ordinary meaning

23  construction.  It was developed by looking at the

24  specification and reading it in light of the claims.

25  That's what you're supposed to do.  That's what our expert

1   did.  He came to the conclusion that this is what the

2   claims mean, and that's how he applied the construction.

3           So that's the appropriate way to do an expert

4   analysis.  You don't look at just a random dictionary

5   definition.  You have to look at the specification as

6   whole.  Here we're applying the PTAB's construction.

7           They're saying that we've made this thing up from

8   out of -- out of the air and effectively asking for summary

9   judgment on it when it's contested.

10          Now, they've been very clear.  They have not asked

11  for a construction of packet, Your Honor.  They have said

12  02 doesn't apply.  I'm not sure that's right.

13          If we have an issue about claim construction, the

14  Court may need to deal with it.  I'm a little concerned

15  about how the trial is going to go in that respect, and we

16  may need to make an 02 request to adopt this construction.

17  This would solve the problem if we took this construction

18  from the PTAB.

19          But we're going to have to have the experts

20  reading the specification and giving their opinions in

21  light of plain and ordinary meaning, but that does not mean

22  that we have to accept one dictionary definition from them.

23          You must read it in the context of the claims.  We

24  used ordinary meaning construction, and that was

25  appropriate.  That's the heart of -- that's the heart of

 1    the matter.

 2              THE COURT:  Anything further, Mr. Black?

 3              MR. BLACK:  No, Your Honor.  Just I wanted -- I

 4    guess there is one last thing, which is I -- there's always

 5    a line between what is claim construction and what is the

 6    application of the construction to the facts in the real

 7    world.  There's always -- there's always a line there.

 8    There's always going to be some terms that a -- that an

 9    expert has to explain what he -- he or she thinks is the

10    ordinary meaning.

11              And the position that they've taken is, as Your

12    Honor has implied in the questioning, completely

13    unworkable.  But here I wanted -- I wanted to point out

14    that the construction that we've been applying that they

15    say is made up and fantastical is actually the one that the

16    board applied in the IPR, and that they knew about since

17    May of 2015, and they're claiming waiver and that we

18    tricked them and all that.  It's nonsense.

19              THE COURT:  Of course, the PTAB's standard for

20    claim construction is different than the district court's

21    standard.

22              MR. BLACK:  It -- it is.

23              THE COURT:  At least as of that time.

24              MR. BLACK:  It -- it can be, yes.  It can be

25    different.  In the end, they usually end up with the same

1    constructions, but my point -- that was a plain and

2    ordinary meaning construction, which is what we've done

3    here.

4          THE COURT:  All right.  Do you have anything as a

5    way -- by way of short follow-up, Mr. Becker?

6          MR. BECKER:  Brief follow-up, Your Honor.

7          THE COURT:  Well, let's apply the plain and

8    ordinary meaning at brief.

9          MR. BECKER:  No numerical limits, right?

10         Your Honor, just really quickly, on this -- this

11   IPR, the construction that -- that co -- that Plaintiff's

12   counsel just pointed out, that's absolutely not the claim

13   construction that Dr. Williams applied.  He was very clear

14   in his testimony that when he looks at the word "packet,"

15   that means IP packet only.

16         This construction is much -- is much different

17   than that.  This is as a unit of data for transmission in a

18   packet-switched network.  There's nothing about that

19   construction limiting the term -- the plain and ordinary

20   meaning to IP packet only.

21         And so the construction that Dr. Williams is

22   actually using conflicts with what Plaintiff's counsel just

23   said.  He's not using that construction.  He's saying IP

24   packet only, and there's some specific exclusion of

25   different kinds of packets other than that.

1          So that -- the idea that this is the construction

2     that they applied is just not true.

3          And I think that -- I think that's -- that will do

4     it for me.  I guess I'll keep it brief.

5          THE COURT:  All right.  Well, first of all, the

6     Plaintiffs are not going to tell the jury packet means this

7     because the PTAB said packet means this.  We're not going

8     to argue construction of a quasi-judicial body that's not a

9     part of this Court to the jury in this case.

10          In every case, there is almost inevitably a

11     reality of dueling experts, both as to ultimate opinions

12     and to issues as to plain and ordinary meaning of term

13     language that's not construed by the Court or that's been

14     held to be subject to its plain and ordinary meaning.

15          Daubert is a severe remedy.  Ask the Court to take

16     testimony away from the jury, rather than trust the jury to

17     hear it and address it through vigorous cross-examination.

18          I don't find Plaintiff's retort that the PTAB

19     construed it the way we say it should be given its plain

20     and ordinary meaning to be compelling at all, but that

21     doesn't -- that doesn't mean that I'm prepared to exercise

22     from his report those portions of Plaintiff's expert

23     opinion that may relate to the plain and ordinary meaning

24     of these terms as disputed by Defendants in their motion.

25          The Court can't construe every word of every claim

1    term.   There is a line between applying plain and ordinary

2    meaning and an expert setting himself or herself up as a

3    substitute for the Court and offering legal constructions

4    as to claim construction.

5         I'm not persuaded there's an 02 Micro issue here.

6    I'm not prepared to strike the portions of the expert's

7    report challenged by Defendants.   I'm prepared to go

8    forward on it with vigorous cross-examination from the

9    Defendants.

10        I'll hear the evidence.   If -- if post-trial based

11   on the verdict I'm persuaded that the jury was misled or

12   misinformed, there are tools the Court can or can't -- or

13   can use in light of whatever that verdict might be.

14        I'm going to deny the Daubert motion at this

15   point, but I want Plaintiffs to be clear, I don't want to

16   hear anything about the PTAB and its construction before

17   this jury with regard to packet or any other term.

18        That's irrelevant, and it may go to your argument

19   that what your expert says is, in fact, plain and ordinary

20   meaning, but from -- from a jury confusion standpoint and

21   from a prejudicial standpoint, I think it's -- I think it's

22   inappropriate that that be raised before the jury.   And I

23   want to make that clear at this point so that there's no

24   slip-up and it's done during the trial.

25        The motion is denied.

1            All right.  Let's go to the next pre-trial motion,

2     which is Defendants' Daubert motion regarding Plaintiff's

3     expert, Chrissan.  That's Document 211.

4            MR. KUBEHL:  Your Honor --

5            THE COURT:  Yes, sir.

6            MR. KUBEHL:  -- before we take that up, can I just

7     ask for one point of clarification?  And I know you might

8     need a little time to think about this, but just to raise

9     the issue.

10           So we've got an situation now where in a rebuttal

11    report for the very first time their expert has raised

12    these -- these new constructions that we hadn't heard about

13    in this case, and he's going to make these arguments.  And

14    our experts already had filed their reports not knowing

15    about those and not addressing those.

16           THE COURT:  If you want to move -- if you want to

17    move leave for a supplemental report for the tailored

18    purposes of addressing those terms, then I'll look at your

19    motion.  And there shouldn't -- there shouldn't be need for

20    much time to respond to it from Plaintiffs, and I'll try to

21    give you a prompt answer, but you need to put it writing.

22    And to the extent that's where you're headed and that's

23    what you want to ask for, put it in writing and get it to

24    me ASAP.

25           MR. KUBEHL:  Thank you, Your Honor.

1          THE COURT:  Let's go on, and we'll take up

2     Defendants' motion to exclude expert opinions of

3     Dr. Douglas A. Chrissan.

4          All right.  Counsel, let me hear from -- from

5     Defendants.

6          MR. RUBENSTEIN:  Thank you, Your Honor.  Jonathan

7     Rubenstein for the Defendants, and I will be arguing the

8     Defendants' motion to exclude Dr. Chrissan.

9          May I please approach, Your Honor, with some

10     copies of the presentation?

11          THE COURT:  You may.

12          MR. RUBENSTEIN:  Your Honor, there are really two

13     simple points that we want to make here, and I want to take

14     your guidance to -- to keep this and the remaining motions

15     brief, so I will try to simplify it like that.

16          The first one is that Dr. Chrissan is not

17     qualified to do what he does here.  And, number two, what

18     he does he do is so devoid of analysis and support that it

19     just cannot be reliable enough to send to a jury in this

20     case.

21          So what is Dr. Chrissan really doing?  It's

22     important to put his opinions in perspective because it

23     really sheds light on what he's doing when we -- and how it

24     fits into the case when we walk through his methodology.

25          The one and only purpose of his analysis is to

1  provide valuation for damages, and saying that actually

2  reminds me to clarify one thing.

3        Dr. Chrissan's report has two very distinct

4  components to it.  One is a source code analysis, and the

5  other is this relative technical valuation analysis.

6        The Defendants' motion is directed only to the

7  latter part.  And so when -- when I say that the only

8  purpose of his analysis is -- is to provide a valuation for

9  damages, I'm referring just to the subject of this motion,

10  which is the relative technical valuation.

11        And despite admitting in his deposition that his

12  analysis is not an economic analysis, his opinion is

13  effectively just that here.

14        IV says in its -- in its response brief that --

15  that this is just a -- a comparability analysis that is to

16  be used as an input to Mr. Bratic's comparable license

17  analysis.  Mr. Bratic is -- is IV's primary damages expert.

18  But that's not how this is used, Your Honor.

19        This is a valuation that is applied directly as a

20  numerical apportionment to Mr. Bratic's royalty rate.  And

21  we have to understand this context as we walk through his

22  analysis and discuss his -- discuss the flaws of it.

23        THE COURT:  And isn't he as a technical person and

24  not an economist basically saying this is more important in

25  the industry than that is?  He's not putting dollar figures

1   on any of this.  He's allocating value and worth and

2   importance within the technical world, not the economic

3   world.  Would you --

4           MR. RUBENSTEIN:  Yes.

5           THE COURT:  -- agree with that?

6           MR. RUBENSTEIN:  Yes, I do.  And -- and

7   Dr. Chrissan admits, as we'll see in a slide coming up,

8   that he in no way intended his opinion to be an economic

9   valuation.  It was an opinion about the technical merits of

10  the patents that he analyzed.

11          THE COURT:  The problem is we've got the two-word

12  phrase "technical valuation," and you want to function on

13  the valuation side and the other -- Plaintiffs want to

14  function on the technical side.  And there may be some

15  truth to both.  But let me go ahead and hear your argument.

16          MR. RUBENSTEIN:  Thank you, Your Honor.

17          And you -- you hit briefly on -- on what I was

18  just about to say.  No matter how you brand this analysis,

19  Dr. Chrissan isn't qualified to perform what he did or

20  render opinions about it.

21          He -- Dr. Chrissan is a source code expert.  He's

22  trained as an engineer.  He's not an economist.  He doesn't

23  have any background whatsoever in finance or financial and

24  economic valuations.  And he's certainly not qualified to

25  perform an economic valuation, which this is -- which this

1    opinion effectively is.

2          But even if we believe that -- that his analysis

3    is just a technical analysis, he doesn't have any

4    experience doing what he did here and isn't qualified to

5    provide those opinions about it.

6          And so what we have here is -- I've just

7    highlighted a case that we cited in our brief.  While an

8    expert may rely solely upon experience, he must explain how

9    that experience leads to the conclusion reached, why that

10   experience is specific -- is a sufficient basis for his

11   opinion, and how that experience is reliably applied to the

12   facts.

13         The problem here is that he doesn't have that

14   experience that this case talks about.  IV claims that

15   Dr. Chrissan has patent valuation experience.  And it's --

16   and we've blown up a part of its opposition brief where

17   they say he has experience determining the strengths and

18   weaknesses of patented technology.

19         When he was asked in his dep -- deposition about

20   whether he's ever done anything like this or made an expert

21   report like this, he says:  I've not done a portfolio

22   analysis to this depth or a report to this depth.  I've

23   analyzed portfolios of patents -- I've analyzed portfolios

24   of patents before, and I've analyzed patents before.

25         But what he does here, Your Honor, is

1  fundamentally different than analyzing a portfolio of a

2  patent -- a portfolio of patents or analyzing patents.

3        What he's doing here is performing a relative

4  valuation of the patents, which is a very, very different

5  thing.  And because Dr. Chrissan lacks any education or

6  professional experience that would qualify him as an expert

7  to provide those opinions to the jury, his opinions must be

8  excluded.

9        But setting aside the issue of qualifications, the

10  methodology that he uses contains numerous flaws, and I

11  just kind of want to walk through them at a high level.

12        So, first, Dr. Chrissan was asked to review 18 of

13  Ericsson's patents that it presented to ZTE, one of its

14  licensees, during the course of that particular patent

15  license negotiation.  Then Dr. Chrissan evaluates each of

16  those patents using the four criteria we see here,

17  infringement, design-around potential, novelty, and

18  importance to LTE or commercial value, which is sort of an

19  interesting descriptor given Your Honor's question from a

20  minute ago about the line between technical and economic

21  value and what he's doing here.

22        Then he places each of these 18 Ericsson patents

23  into one of three buckets.  He calls them A-Level, B-Level,

24  and Low Value.  Then he goes on to evaluate the Malibu

25  patents-in-suit.  And finally, he creates a numerical

1    comparison between the technical value of the

2    patents-in-suit and the 18 Ericsson patents that he looked

3    at.

4          And, Your Honor, we -- you know, as will become

5    evident, we believe that there are numerous flaws in each

6    of these steps of the analysis, but we'll kind of, you

7    know, try to make this efficient and blow through and hit

8    the high points.

9          The first one is what he looked at.  He was only

10   asked by IV's counsel to review 18 Ericsson patents.

11         He has no understanding of why he was asked to

12   look at those 18.  And he knows that Ericsson has more than

13   just 18 LTE patents in its portfolio.  Yet he just looked

14   at this 18.  This is sort of a situation of purposeful

15   tunnel vision.  He kept his head down and didn't ask any

16   questions about why the analysis was so limited.

17         Then he takes these 18 patents, and he evaluates

18   them on these four criteria.  And in each of these -- with

19   each of these four, he assigns a high, medium, or low

20   designation to each of the 18 patents with respect to

21   infringement, design-around potential, novelty, and

22   importance to LTE.

23         With respect to infringement -- and we see this

24   over and over and over again, 18 times, once for each

25   patent.  Dr. Chrissan simply recites selected claims from

1  that patent and portions of that patent's abstract, then

2  provides an opinion about whether each of those 18 patents

3  reads on the LTE standard.

4       But the problem, Your Honor, is that in support of

5  his opinions about whether he thinks the patent does or

6  doesn't read on the LTE standard, he doesn't cite to

7  anything at all, nothing that helps us answer the question

8  why do you think that?  Well, what else did you consider?

9       This is simply his -- his own bald opinion about

10  whether he thinks it -- whether he thinks the -- the patent

11  reads on the standard.

12       And the same type of cursory analysis is true for

13  each of the other three buckets, design-around potential,

14  novelty, and importance.

15       Dr. Chrissan provides no more than a single

16  paragraph of analysis for each of these things per patent.

17       There's no empirical data, testing, simulations,

18  or anything like that to support his position about

19  design-arounds.  There's no prior art mentioned at all in

20  his novelty opinion.  And there's no data to support his

21  assessment of importance to LC -- LTE or the commercial

22  value.

23       And in response to this criticism, IV says in its

24  opposition brief that, well, for -- as an example on Page 8

25  of their opposition brief, for validity, Dr. Chrissan

1   offered specific reasons for calling the presumption of

2   validity into question for some patents.  And then they

3   cite a few example paragraphs.

4        Well, we went to the first example paragraph to

5   see what they meant by specific and we blew that up on the

6   right.  This one has to do -- this particular paragraph has

7   to do with novelty, and it doesn't take long to get

8   through.

9        He says:  The con -- concept of the claim is

10  simple to a person of ordinary skill in the art.  He talks

11  about how the claim recites assigning a temporary ID to a

12  mobile station.

13       And then he says:  There's nothing unique or novel

14  about assigning a temporary ID to a mobile station to base

15  station connection.  And for this reason, this patent is

16  especially vulnerable to a validity challenge.  Full stop.

17  That's it.  That's all we get.

18       And, you know, he cites to absolutely nothing

19  there to support this opinion about novelty.  And this is

20  simply an example.  We see this over and over and over

21  again.  His report is a facsimile, so to speak, of these

22  two -- of that paragraph.

23       Then he goes on to do his grouping exercise where

24  Dr. Chrissan places each of the -- the 18 Ericsson patents

25  that he reviews into three buckets, A-Level, B-Level, and

 1   Low Value.  And I want to show this page here because this

 2   is really all we get for his methodology of how he

 3   determined what was in his mind A-Level, what was B-Level,

 4   and what was Low Value.

 5        He says that the A-Level patents rate high for

 6   infringement and importance and at least medium for

 7   novelty.

 8        The B-Levels have -- rate high for one of

 9   infringement or importance and medium for the other and at

10   least medium for novelty.

11        And then he places three patents in the A-Level

12   and seven patents in the B-Level, and he says the rest are

13   Low Value.

14        This grouping method was made completely from

15   whole cloth.  It was made up by Dr. Chrissan with no

16   ability for anyone to check this methodology to see whether

17   it is reliable or whether it would lead to any meaningful

18   opinions that would be appropriate for the jury to

19   consider.

20        After he evaluates the Ericsson patents, he goes

21   to the Malibu patents-in-suit, because that's, of course,

22   the other side of the equation when we're talking about a

23   relative valuation.

24        His evaluation of the Malibu patents is really

25   just an explanation of what each patent covers.

1    Dr. Chrissan doesn't do any kind of analysis along the same

2    lines of what he did with the Ericsson patents.  There was

3    none of this infringement, design-around potential,

4    novelty, importance.  He didn't do any of that.  None of

5    the bucketizing.

6          And I raise that because if we are doing a

7    relative comparability analysis, it seems very curious that

8    the -- that the two analyses that are being done are very

9    different in nature.

10          And, finally, the -- the result of this -- of

11   Dr. Chrissan's analysis is his creation of a numerical

12   comparison between the technical value of the

13   patents-in-suit and the 18 Ericsson patents.

14          And I want to put up these two paragraphs, 274 and

15   275 of his expert report, that tell us his opinion here.

16   And I'll -- I'll read the two -- from 274, he says:  My

17   opinion is that the set of four Malibu patents have more

18   technical value than any two of the Ericsson-ZTE A-Level

19   patents together and possibly all three.

20          And for the B-Levels, he says that his opinion is

21   the set of -- is that the set of four Malibu patents -- and

22   incidentally, this report was done at a time prior to Your

23   Honor's dismissal of the '9 -- the claims in the '971

24   patent, so that's why we see four as opposed to the three

25   that remain today.  And so he says that -- that the four

1 Malibu patents have more technical value than any six of

2 the Ericsson B-Level patents together and possibly seven.

3          There is no explanation here or anywhere about how

4 he concluded that, you know, the four patents have more

5 value than two of the A-Level patents.  Why not one?  Why

6 not all three?

7          No explanation for the B-Levels about why it was

8 six and not four or three or two or -- or anything that

9 really gives us an insight about how he was able to

10 quantify his opinion based on his review of these patents.

11          And, Your Honor, this is -- the -- the -- the

12 conclusion that, you know, that there's -- that the

13 technical value is, you know, more than any two or more

14 than any six combined, this is the type of opinion that we

15 saw LaserDynamics forbid.

16          And when -- LaserDynamics, just as a refresher,

17 said:  Apportionments plucked out of thin air based on

18 vague qualitative notions of relative importance of the

19 technology should be excluded.  Those aren't reliable, and

20 that's 694 F.3d 51 at 69.  This is what -- this is exactly

21 what we're looking at here.  These numbers were plucked out

22 of thin air by Dr. Chrissan with no explanation for them.

23          And we have to remember that -- that this

24 quantification of technical value is the sole input for the

25 apportionment of the royalty rate in Mr. Bratic's damages

1   opinion, which we'll talk about in a little bit.

2        But that's a major disconnect because of what we

3   discussed at the very beginning of this presentation, which

4   is Dr. Chrissan told us in his deposition that he didn't

5   attempt to provide any opinions about economic value and

6   that he agreed that his opinions are based on technical

7   value and what he perceived as technical merits.

8        Now, finally, Your Honor, I did bring up the --

9   the issue about how his analysis was of the four Malibu

10  patents and not the three that remain.

11       After the Court's -- after the Court's order

12  dismissing the claims of the '971 patent and certain claims

13  of the '206 patent, Dr. Chrissan submitted a supplemental

14  expert report where he attempted to sort of -- well, this

15  may be an imprecise term but apportion his opinion about

16  the relative value of the four patents --

17       THE COURT:  I've read the supplemental report.

18       MR. RUBENSTEIN:  Okay -- to -- to just the three

19  patents.  And what we see here is effectively all we've

20  got.  I believe the contribution of the remaining claims of

21  the patents to be 5/6ths of the original technical value.

22  That's it.

23       Again, another number that has just been plucked

24  out of the air without any basis for us to determine how it

25  was calculated or challenge it or otherwise determine that

```
 1    it's reasonable.

 2            Thank you, Your Honor.

 3            THE COURT:  Before I hear a response from

 4    Plaintiff, let's take a short recess.  When we come back,

 5    I'll hear Plaintiff's response.

 6            COURT SECURITY OFFICER:  All rise.

 7            (Recess.)

 8            COURT SECURITY OFFICER:  All rise.

 9            THE COURT:  Be seated, please.

10            All right.  Let me hear Plaintiff's response.

11            MR. FLANNERY:  Good afternoon, Your Honor.

12    Kevin Flannery for IV.

13            THE COURT:  Go ahead, Mr. Flannery.

14            MR. FLANNERY:  Thank you, Your Honor.

15            What -- what IV's experts have done here with

16    respect to the damages analysis is simulates what happens

17    in the real world.  The -- and we've discussed this at

18    length in our brief with respect to showing what -- exactly

19    what Ericsson itself does in its licensing practices in the

20    real world.

21            And what happens is we have a coordinated effort

22    between economists and a technical specialist, somebody can

23    analyze the technical merits of patents.  That's -- that's

24    Dr. Chrissan's role here.

25            If we take the normal patent cases that happen
```

1   every day throughout the country where, for example, say we

2   have one patent at issue in a case and then there's a

3   comparable royalty -- a comparable license that's being

4   analyzed that has one patent and a royalty rate associated

5   with it, the royalty rate is the value that's associated

6   with that comparable patent.

7          But what the -- the technical expert does is come

8   in, draws a comparison, and says, wait a minute, the

9   patent-in-suit here is technically comparable to the patent

10  that is the subject of that license.

11         And then from there, a damages expert will go and

12  do their economic analysis and compare the royalty terms or

13  the price, for example, for that patent that is the subject

14  of the license and come up with a price or royalty or

15  whatever it might be, a lump sum for the patent-in-suit.

16         So that happens all the time.  The Federal Circuit

17  has said that's a normal way to do a comparable analysis --

18  a comparable license analysis for damage purposes under

19  Georgia-Pacific, and that is what happened here.

20         If -- if the Court were to strike Dr. Chrissan's

21  technical valuation because it relates to damages and

22  because somehow ultimately that technical valuation feeds

23  into economic valuation by a damages expert, that calls

24  into question not only what happens every day in the real

25  world but what the Federal Circuit has already found to be

1    reliable and a normal way of analyzing patent damages.

2          So I think that that's really the most that I want

3    to say unless Your Honor has questions about the -- the

4    ability of Dr. Chrissan or his -- his ability to evaluate

5    the situation here, his expertise.

6          The rest of their analysis, I think really goes to

7    the quality of his analysis and the -- the merit of his

8    analysis that are subjects for cross-examination.

9          The --

10         THE COURT:  Talk to me about Dr. Chrissan's

11   supplemental report.

12         MR. FLANNERY:  Okay, Your Honor.  I think that by

13   that point, we had got to the point where Dr. Chrissan had

14   done extensive analysis of all the Ericsson patents and all

15   of the Malibu patents, and he had reported on that

16   extensively.  They -- they were able to take his deposition

17   on that subject.

18         And then Your Honor eliminated one of the patents

19   from the case, and Dr. Chrissan looked at the patents and

20   the relative comparison of them, and we have to take into

21   account he had already done extensive analysis of all the

22   patents that were involved by now.  And he said in his own

23   opinion -- in his judgment that the patents are apportioned

24   technically from their value in the following manner, and

25   he did -- he did his apportionment.

1           Now, at the end of the day, the technical expert

2   always has to do some judgment to come up with some way to

3   determine some valuation from a technical component.

4           This -- this patent is more important than that

5   one or these patents are equal.  That's their judgment.

6           What's notable here, Your Honor, Defendants never

7   had a technical expert who came in and said wait a minute,

8   I can't understand Dr. Chrissan's analysis.  We don't know

9   what to do here.  We don't know how to come up with a

10  comparable analysis.

11          They could have come in and said in their opinion

12  that the Malibu patents -- this technology is not worth

13  half as much as that one or it's worth twice as much.  They

14  didn't do that.  It's all just attorney argument directed

15  at our expert's judgments.

16          THE COURT:  Anything further, Mr. Flannery?

17          MR. FLANNERY:  No, Your Honor.

18          THE COURT:  All right.  Any brief follow-up --

19          MR. RUBENSTEIN:  Yes, Your Honor.

20          THE COURT:  -- Mr. Rubenstein -- Rubenstein or

21  Rubenstein?

22          MR. RUBENSTEIN:  It's Rubenstein, Your Honor.

23  Thanks for asking.

24          THE COURT:  I don't like my mispronounced either.

25          MR. RUBENSTEIN:  All right.

```
 1              THE COURT:  Go ahead.

 2              MR. RUBENSTEIN:  Mr. Flannery mentioned that --

 3    that all their experts were trying to do is simulate what

 4    happens in the real world as a -- as a generic point.

 5              That's okay, but the analysis still has to meet

 6    the benchmarks for rigor and reliability by an expert

 7    witness that is -- that is on deck to provide testimony to

 8    a jury in a trial.  And Dr. Chrissan simply doesn't do

 9    that.

10              And to say that what Dr. Chrissan did is the same

11    thing that Ericsson does is just flat out not true.  In --

12    in no way does Ericsson perform a relative technical

13    valuation of patents in connection with -- in connection

14    with its licensing practices, and there is no evidence in

15    the record to suggest that it does.

16              And, finally, about this -- the -- you know, the

17    idea about technical experts and damages experts working

18    together, Mr. Flannery is right, that's -- that's not a new

19    things.

20              But what we have here is we have the direct

21    importation of this valuation into the reasonable royalty

22    calculation, which sort of takes this situation and removes

23    it from what we may typically see and what the case law may

24    typically describe.

25              Thank you, Your Honor.
```

1          THE COURT:  All right.  Thank you, counsel.

2          Well, with regard to the Defendants' motion to

3    exclude the opinions of Dr. Douglas Chrissan, I'm going

4    to -- I'm going to deny the motion.

5          But I'm going to afford some additional relief in

6    this matter and in the previous matter addressed by the

7    Court concerning Dr. Williams.  I'm going to allow -- and,

8    Mr. Kubehl, you raised the possibility of this awhile back.

9    I'm not going to wait to see a motion in writing.  I'm

10   going to deal with Dr. Williams and Dr. Chrissan here at

11   the same time.

12         Plaintiffs will be permitted to file a second

13   supplemental report for Dr. Chrissan regarding his 5/6th

14   opinion, but only that 5/6th opinion, and I'm denying the

15   Daubert outright as to the prior parts of his opinion that

16   have been denied.  Those can be dealt with on vigorous

17   cross -- with vigorous cross-examination.

18         But Plaintiffs will have an opportunity to file a

19   second supplemental report from Dr. Chrissan regarding

20   solely his conclusions about 5/6th as set forth in the

21   existing supplemental report.

22         And Dr. Williams will be afforded -- Defendants,

23   through Dr. Williams, will be afforded an opportunity to

24   file a supplemental report responding to the issues raised

25   with regard to the plain and ordinary meaning of packet,

1   packet-centric, reservation algorithm, and scheduling that

2   was addressed in the last report from Plaintiffs to which

3   Defendants really didn't get an opportunity to respond.

4          Those supplemental reports in both respects are

5   targeted to only those areas, nothing more.  Don't put

6   anything else in there.  Address those issues, and those

7   targeted supplemental reports in both cases are due by the

8   end of the day on January the 11th.

9          Each opposing side will be entitled to take a

10  two-hour deposition of the responding expert.  And those

11  depositions will both be completed by the end of January

12  16th.

13         Post those depositions, if either Plaintiff or

14  Defendants in their respective cases feel compelled to file

15  another Daubert motion addressing these new supplements --

16  I hope that won't happen, but I've got to afford an

17  opportunity that it may -- those are due by the end of

18  January 21st.

19         Any response to those motions that may be filed

20  are due by the end of January 25th.  And to the extent

21  there are resulting Daubert motions related to these

22  supplement -- one or both of these supplemental reports,

23  I'll take them up on the second pre-trial, January the

24  30th.

25         Any questions?

1              MR. KUBEHL:  Yes, Your Honor.

2              You mentioned that Defendants would be permitted

3  to supplement but you mentioned Dr. Williams.  That may

4  have just been a cross-communication.  Dr. Williams is a

5  Plaintiff's expert.

6              THE COURT:  I'm sorry.

7              MR. KUBEHL:  Did you intend that the Defendants

8  would be intended to supplement?

9              THE COURT:  Yes, yes.

10             MR. KUBEHL:  Thank you, Your Honor.

11             THE COURT:  And what's the name of your expert

12 there, Mr. Kubehl?

13             MR. KUBEHL:  Well, Drs. Wicker and Acampora are

14 the experts.

15             THE COURT:  Well, we don't need to double

16 everything.  Have you got one --

17             MR. KUBEHL:  There's an infringement report, and

18 there's an invalidity report.

19             THE COURT:  Well, my intent was to allow your

20 experts to respond to Dr. Williams as to those terms where

21 we've had the argument about plain and ordinary meaning.

22             MR. KUBEHL:  Understood --

23             THE COURT:  But nothing more.

24             MR. KUBEHL:  Nothing more.

25             THE COURT:  I guess if there's not one person that

1    can address it on both an infringement and an invalidity

2    basis, then you'll have to do it in regard to both of them.

3    Are either of those experts in a position to do it as to

4    both of those issues?

5          MR. KUBEHL:  No.  Each expert is handling one of

6    those issues.

7          THE COURT:  All right.  Then as to the

8    infringement issue as to just those terms, we'll hear one.

9    And as to the invalidity expert, as to just those terms,

10   you'll do a second supplemental report.  Same timeline,

11   same deadlines apply, okay?

12         MR. KUBEHL:  Yes, Your Honor.

13         THE COURT:  Any questions on the Plaintiff's side?

14         MR. BLACK:  No, Your Honor.

15         THE COURT:  Mr. Black, it's customary to stand

16   when you address the Court.

17         MR. BLACK:  I'm sorry, Your Honor.

18         THE COURT:  You know better than that.

19         MR. BLACK:  As soon as I opened my mouth, I -- I

20   apologize.

21         THE COURT:  That's fine.

22         All right.  Let's continue.

23         But just so the record is clear, except in those

24   limited instances that I've just enunciated, the

25   Defendants' motion with regard to Dr. Chrissan is denied.

```
 1              Let's take up the Defendants' motion with regard
 2    to Mr. Bratic.  That is Document 224.
 3              Let me hear from Defendants on this.
 4              MR. RUBENSTEIN:  Your Honor, may I approach again
 5    with this slide deck?
 6              THE COURT:  You may.
 7              MR. RUBENSTEIN:  Thank you.  Your Honor, Jonathan
 8    Rubenstein again for the Defendants.  We'll turn now to
 9    Defendants' motion to exclude Mr. Bratic.
10              Before we dive into an explanation of what we
11    believe are the flaws in Mr. Bratic's analysis, I think
12    it's helpful just to give a high-level overview of -- of --
13    of what his opinions are, and then the construct of the
14    formula that he uses for his royalty opinion.
15              THE COURT:  I've read the briefing,
16    Mr. Rubenstein.  If you can expedite that, it would be
17    helpful.
18              MR. RUBENSTEIN:  Yes, sir.
19              So let's turn to the first part of Mr. Bratic's
20    royalty calculation, which I've tried to sort of depict
21    here on the slide as a -- as a formula.  And we'll hit some
22    of the high points, and then we'll -- and then we'll move
23    on.
24              Mr. Bratic starts his formula by analyzing the
25    royalty rates in 19 Ericsson portfolio licenses.  And as we
```

1   mentioned in the briefing, we believe this is

2   inappropriate, but this isn't an argument like we typically

3   see about how we think that certain licenses are more

4   appropriate to use in a royalty analysis than the

5   Plaintiffs, and we have a disagreement about that.

6          This is rather a -- an argument about whether

7   those Ericsson licenses are sufficiently comparable to use

8   in the first place.

9          And we have the LaserDynamics quote here.  And,

10  you know, the district court must consider licenses that

11  are commensurate with what the Defendant has appropriated.

12  If not, a prevailing Plaintiff would be free to inflate the

13  reasonable royalty analysis with conveniently selected

14  licenses without an economic or other link to the

15  technology in question.

16         And when I asked Mr. Bratic in his deposition

17  about the comparability of licenses, he agreed that one

18  needs to assess the technical and economic comparability of

19  the licenses.

20         And the issue that we have is that he just didn't

21  properly account for the major differences between the 19

22  Ericsson licenses from which he derives this first part of

23  his formula and what the hypothetical license in this case

24  would look like.

25         On one hand, you have the Ericsson licenses, which

1   are portfolio licenses to standards essential patents.  The

2   licenses cover thousands of patents.  They are worldwide in

3   scope.  And in large part they are cross-licenses, if not

4   exclusively cross-licenses.

5        The licenses are typically between two

6   manufacturers of products, and not a single one of the

7   Ericsson licenses that Mr. Bratic uses base -- bases the

8   royalty on this construct of subscriber months that we see

9   Mr. Bratic using in his -- in his analysis.

10        On the other hand, the hypothetical license in

11   this case deals with three patents that are not alleged to

12   be standards essential.  It is a one-way license.

13        IV is not a manufacturer of anything, and

14   according to Mr. Bratic, the hypothetical license would be

15   based on this idea of subscriber months.

16        And in its response, IV says that Mr. Bratic did

17   consider the differences between the licenses and points

18   largely to the -- Dr. Chrissan's analysis about relative

19   valuation between the 18 Ericsson patents that he looked at

20   and the patents-in-suit to, you know, derive some type of,

21   you know, example or representative value of the portfolio.

22        But what he doesn't address is all of the other

23   differences that exist, the worldwide scope, the standards

24   essential issue, all the things that I mentioned on the

25   last slide.

1            And without that kind of analysis or without

2    addressing those issues, then IV hasn't done what it needs

3    to do with respect to showing that these licenses --

4    licenses are sufficiently comparable to form a basis of his

5    royalty analysis.

6            Now, the next stage of the -- in the formula, I

7    suppose, is Mr. Bratic calculates an average cost of

8    handsets that exist in T-Mobile's network.  And the first

9    thing to mention here is that Mr. Bratic's formula that --

10   that we see on the slide -- a lot of it is shaded out now,

11   but is -- his formula is set up to determine a per handset

12   royalty in the middle of this calculation.

13           But this case is about base stations.  This case

14   is not about handsets.  So there's a significant mismatch

15   there between the products he's using as a basis for his

16   analysis, and that mismatch infects his entire analysis.

17           But even more than that, when Mr. Bratic is going

18   about calculating the average costs of the phones that are

19   used in T-Mobile's network -- and he lists many of them,

20   it's many, many pages in his exhibit -- in an exhibit to

21   his report, a significant majority of the phones that exist

22   on that list are already licensed products to these

23   patents.  They're from manufacturers like -- like Apple,

24   like we have here and Samsung and some others that are

25   already licensees to IV's entire portfolio.

1           And so it's a -- a bit of a double-dip if IV is

2   calculating its royalty here at least in part by using

3   licensed products as the basis for the calculation.

4           He -- IV cites in its response a case from this

5   Court -- it was a Google case -- for the proposition that

6   what Mr. Bratic does with respect to calculating the

7   average handset royalty is okay here, and that it is not a

8   double-dip.  It is not -- does not qualify as exhaustion.

9   But the facts of this case are quite a bit different than

10  the facts in the Google case that IV cited.

11          In that case, the question wasn't so much whether

12  the product itself could be subject of -- of a royalty

13  calculation, but rather whether a separate company who

14  provided content for a licensed product, whether the

15  exhaustion doctrine could then apply to that content

16  provider.

17          And the Court's answer to that question was no,

18  that the exhaustion doctrine doesn't stretch that far.

19          But here what we have are actual licensed products

20  that -- the average price of which is being used by

21  Mr. Bratic to calculate a royalty in this case that deals

22  with base stations.

23          Now, we just got through talking about

24  Dr. Chrissan's technical valuation.  And the flaws that --

25  that -- that we perceived in Dr. Chrissan's analysis are

 1   distinct from the flaws that I would like to discuss with

 2   the Court now in how Mr. Bratic uses that data.

 3         And so I want to first take a look at exactly what

 4   Mr. Bratic does, and there's some -- there's some color

 5   coding here.  And I apologize if it's a little hard to

 6   follow.

 7         But what Dr. -- what Mr. Bratic did in Paragraph

 8   324 of his report here is he quoted directly Dr. Chrissan,

 9   the language we looked at before, which is that the

10   patents-in-suit have more technical value than any two of

11   the Ericsson A-Level patents, possibly all three, and any

12   six of the B-Levels and possibly all seven.

13         And what Mr. Bratic does is he takes those words

14   and he simple -- simply converts them into a percentage.

15   It's no more than that.  And this -- this color coding is

16   meant to show -- for example, the yellow in the words "any

17   two," if you look down to the footnote in the bottom of the

18   left part of the slide, that is how Mr. Bratic is

19   numerically representing those words.

20         And he does that with each of the colors in this

21   footnote -- in Footnote 925.  And the result is that these

22   words equate to 37 and a half percent to 50 percent.

23         And when I asked -- because this was a little

24   confusing to us, but when I asked Mr. Bratic about this in

25   his deposition, he said:  Yeah, that's all I did is I took

1    these words, and I made them into a percentage.

2          And then what Mr. Bratic does is he takes the low

3    end of that percentage range, 37 and a half percent,

4    conservatively, he says, and he applies that technical

5    valuation from Dr. Chrissan directly into his reasonable

6    royalty calculation.

7          He does this on a one-to-one basis without any

8    justification or explanation for why a technical valuation

9    can be directly plugged into a reasonable royalty formula

10   without any accounting for how a technical valuation

11   compares to an economic valuation or a financial valuation,

12   which is what we have here in a royalty calculation.

13         Mr. Bratic testified that it is his belief that --

14   that there is a one-to-one relationship between these two

15   valuations, the technical valuation and an economic

16   valuation.

17         But he was unable to provide any real explanation

18   about why or any basis that he thinks there is a one-to-one

19   val -- a one-to-one representation between these two --

20   these two things.  Simply saying that -- that he, you know,

21   relied on what Dr. Chrissan did in his analysis and the

22   valuation that he provided.

23         But this idea that there is a one-to-one

24   correlation between Dr. Chrissan's technical valuation and

25   this economic analysis that Mr. Bratic is doing is directly

1    contradicted by Dr. Chrissan's testimony.  And we saw that

2    in the last motion.  And I've highlighted it again here.

3    Dr. Chrissan said:  Keep in mind, I didn't attempt to

4    provide an economic value.  His opinions are based on

5    technical value and what he perceived as technical metrics.

6          And we also should keep in mind that

7    Dr. Chrissan's relative comparison of the Malibu patents to

8    the Ericsson patents was limited only to 18 Ericsson

9    patents -- 18 of thousands of Ericsson patents that are

10   covered by those license agreements.

11          THE COURT:  That point's been made previously.

12          MR. RUBENSTEIN:  Right.

13          THE COURT:  Let's move along.

14          MR. RUBENSTEIN:  And so the import of that point

15   here is that -- that what Dr. Chrissan was saying is that,

16   well, these patents-in-suit are worth 37 and a half percent

17   of these 18, but what Mr. Bratic is doing is taking that

18   same 37 and a half percent, and he is applying it to

19   royalty rates that come from Ericsson portfolio license --

20   licenses that cover many, many more than just those 18

21   patents.

22          And so effectively, what Mr. Bratic is saying, if

23   he's going to use this 37 and a half percent apportionment,

24   the -- the only logical conclusion from that is that the

25   Ericsson portfolio patents that he analyzed from which he

1   drew the royalty rates, the only value in those portfolio

2   licenses is in those 18 patents that Dr. Chrissan -- that

3   Dr. Chrissan analyzed, rendering valueless all of the other

4   patents, thousands of patents that exist in those license

5   agreements.

6          And Dr. Chrissan told us in his deposition that he

7   has made no representation to Mr. Bratic that the other

8   patents in Ericsson's LTE portfolio are valueless.  And so

9   you have Mr. Bratic making this assumption that is not just

10  illogical, but it is -- you know, it's contradicted by what

11  Dr. Chrissan has said.

12         THE COURT:  Why is that not something that can be

13  dealt with fairly and effectively on cross-examination?

14  Why does that rise to the level of striking the testimony?

15         MR. RUBENSTEIN:  Because --

16         THE COURT:  That seems like classic

17  cross-examination to me.

18         MR. RUBENSTEIN:  -- because, Your Honor, there has

19  to be -- there has to be some type of explanation for how

20  you can import something, you know, one-to-one from a

21  technical valuation to an economic valuation.

22         If Mr. Bratic could have provided some, then we

23  could have attacked it, and we could have used it in front

24  of a jury.  But we have nothing.  We have simply his

25  opinion that is bare and with no basis behind it for -- you

1    know, for this opinion.

2         And we think that that is the reason why -- why --

3    you know, his doing this on a one-to-one basis is something

4    that is more in an exclusion territory, as opposed to a

5    vigorous cross-examination territory.

6         THE COURT:  All right.  What else do you have for

7    me?

8         MR. RUBENSTEIN:  With respect to -- just one

9    more -- one more point not related to this formula but

10   related to one of his other reasonableness checks that I

11   think is worth mentioning very briefly, and it is the

12   reasonableness check that concerns the AT&T license.

13        Mr. Bratic -- Mr. Bratic performed a

14   reasonableness check calculation that's derived from this

15   license agreement which to put into perspective was entered

16   into in the settlement of litigation.

17        And Mr. Bratic assumes, not just illogically again

18   but actually contrary to the testimony in the case that --

19   that AT&T -- the license fee that it paid was only for

20   certain things, when on one hand, AT&T settled eight

21   litigations, got a license to IV's portfolio -- IV I

22   portfolio to tens of thousands of patents.  The same with

23   IV II's portfolio, got rights to future patents.  And AT&T

24   achieved rights for suppliers to products in its network.

25        And Mr. Bratic ignores all of those buckets of

1  rights and says:  Well, you know, what they really paid for

2  was just to settle one of those eight litigations and also

3  to take a license to these patents in this case, as well as

4  the patents that are asserted in the case between these

5  parties that's set for trial in May.  And there's simply no

6  basis to -- to make that -- to make that assumption.

7        Mr. Bratic relies on Mr. Paschke, who is IV's

8  licensing witness, to say that, well, you know, typically

9  for IV, the driver of negotiations are patents that IV has

10 asserted against potential licensees and that have a high

11 likelihood of continuing in litigation.

12       Well, none of those patents were asserted against

13 AT&T, and Mr. Paschke admitted to us that none of those

14 patents were ever even shown or discussed to AT&T during

15 the course of their licensing negotiations.

16       So it seems like simply an opinion that is pulled

17 out of nowhere that has no basis in fact that supports his

18 reason -- so-called reasonableness check based on the AT&T

19 license.

20       And because it relates to Your Honor's last

21 ruling, we did have an issue with Mr. Bratic's supplemental

22 report because it relies entirely on this 1/6th, 5/6th

23 supplemental opinion from Dr. Chrissan.

24       Mr. Bratic testified that he took Dr. Chrissan's

25 supplemental report, and -- and he essentially trimmed his

1    reasonable royalty opinion by 1/6th.  And so to the extent

2    that the Court's ruling from a few minutes ago suggests

3    that there may be issues --

4           THE COURT:  If Dr. Chrissan -- if Dr. Chrissan

5    comes in with something other than 5/6th, I'll hear about

6    it then.  I suspect we're going to see the same number with

7    some additional analysis.

8           MR. RUBENSTEIN:  Okay.  Then that's all I have,

9    Your Honor.

10          THE COURT:  All right.  What's Plaintiff's

11   response?

12          MR. FLANNERY:  Hello, Your Honor.  Kevin Flannery

13   again, and I'll be very brief.

14          THE COURT:  Go ahead, counsel.

15          MR. FLANNERY:  We do believe that these subjects

16   or these -- these objections and criticisms that Defendants

17   have are subject for rigorous cross-examination, and that

18   cross-examination will be met by our experts who will tell

19   the jury that what they're doing is exactly what Ericsson

20   does.

21          For example, we cited Mr. McLeroy's declaration in

22   the briefs where he said that the rates in -- the

23   negotiated royalty rates in Ericsson's licenses are based

24   on the technical merits of Ericsson's patents.

25          The technical merits of Ericsson's patents that

1  are discussed during the negotiations are the

2  representative patents.  That's what's discussed.  They

3  don't discuss the technical merits of the thousand or

4  hundreds of patents that they're talking about.  The two

5  parties that are negotiating the royalty rate -- again,

6  it's Ericsson's testimony, the rates and the licenses are

7  based on the technical merits of Ericsson's patents.

8         The technical merits reside in those 18

9  representative patents, and Dr. Chrissan analyzed them.

10  Mr. Bratic has said that those are the patents that drive

11  the royalty rates, the economic terms of the deal.  And

12  Ericsson's witnesses have confirmed that's the case.

13         That's how they operate, and that's how our

14  experts operate.  So I think everything else is subject to

15  rigorous cross-examination, Your Honor.

16         THE COURT:  All right.  Thank you.

17         MR. FLANNERY:  Thank you, Your Honor.

18         THE COURT:  I assume you don't have anything

19  further, Mr. Rubenstein?

20         MR. RUBENSTEIN:  You assume correctly, Your Honor.

21         THE COURT:  Okay.  Then the motion to exclude by

22  way of Daubert, Mr. Walter Bratic, is denied.

23         And we'll next take up Plaintiff's motion to

24  exclude Dr. Becker's expert opinions.

25         That's Document 225, and we'll hear -- I'll hear

 1   from Plaintiff on this now.

 2          MR. ABRAHAM:  Good afternoon, Your Honor.  Joseph

 3   Abraham, again, for IV.

 4          THE COURT:  Go ahead, sir.

 5          MR. ABRAHAM:  I will -- in light of the argument

 6   that you just went through, I will focus on a couple very

 7   specific aspects of Dr. Becker's opinions.

 8          Mr. Rubenstein in his presentation focused on what

 9   he called a mismatch between Mr. Bratic's use of

10   handset-based licenses in a case that he characterized as

11   involving base stations.  There, we would say that they --

12   both the handsets and the base stations relate to the same

13   LTE services.  Mr. Bratic undertook some -- some analysis

14   to account for the differences.

15          Here, with respect to Dr. Becker, the jumping off

16   points that he's using for his analysis are just too

17   different in kind.

18          They are not at all tethered to the facts of this

19   case.  They don't relate to T-Mobile -- and T-Mobile's use

20   of the patented technology at all.

21          Instead, he focuses on unrelated transactions.

22   He focuses on the purchase price analysis without

23   accounting for the differences and circumstances between

24   Malibu Networks in 2004, as compared to T-Mobile in 2013.

25          With respect to his other methodology, applying

1   IV's R-rankings, he takes IV's license -- licensing

2   revenues for unrelated licensees and uses that as the input

3   to his lower damages analysis.

4          Essentially, he is -- his -- his calculations are

5   both outcome determinative in a way that does not involve

6   any input that specifically relates to T-Mobile, and that's

7   where we say he has a problem under Daubert.

8          Specific -- and a couple of additional

9   illustrations.  Just -- the purchase price methodology, he

10  uses uniform rates of return.  They are not specifically

11  tied to the circumstances of the -- of this case.

12         So, again, any patent or group of patents that IV

13  had bought for approximately the same number -- same amount

14  of dollars at the same amount -- sorry, the same period in

15  time would have resulted in the same license fee under

16  Dr. Becker's methodology as to be paid by T-Mobile in this

17  case.

18         And then, again, jumping back with respect to the

19  R Ranking methodology, the -- his lower bound is determined

20  based on a calculation that -- that relates to license fees

21  that IV has already collected, sometimes from licensees

22  who -- whose business model bears no relation to T-Mobile.

23         So, again, it's outcome determinative based on

24  inputs that are not related to the circumstances of this

25  case.

1            THE COURT:  Anything further?

2            MR. ABRAHAM:  I will very briefly address the

3   Section 287 argument which is simply that here the -- the

4   purpose of Section 287 is so that an accused infringer who

5   purchases -- I'm sorry, who sells, makes, uses an

6   infringing product during a period in which they are not on

7   notice, that's the purpose of Section 287.

8            Here, Dr. Becker's methodology has nothing to do

9   with any particular usage, manufacture, or sale of an

10  infringing product.  He calculates one size fits all

11  damages numbers and then just takes a proportional haircut.

12  That's not what Section 287 is for.

13           THE COURT:  All right.  Thank you, counsel.

14           Let me hear Defendants' response.

15           MR. RUBENSTEIN:  Thank you, Your Honor.  I will

16  also be brief.  To the extent that we may want to use this

17  presentation, I'll -- I'll seek permission to hand it up.

18  But I just want to respond to a few things that Mr. Abraham

19  said.

20           And starting with this idea that what Mr. -- with

21  what Mr. Becker -- Dr. Becker did was not tied to the facts

22  of the case, IV in its -- in its briefing says that

23  Dr. Becker applied the general theory without tying it to

24  the facts in the case, which doesn't really compute for a

25  couple of reasons.

1         One, that's the phraseology that we hear with

2    things like the 25 percent rule, which is a general theory

3    that's not applied to the facts of the case.  That's not

4    why -- that's why we can't use rules of thumb like that

5    anymore.

6         But it's also a little bit confusing because what

7    Mr. -- what Dr. Becker does is use data and information

8    that is directly tied to the parties of the case, the

9    patents in the case, and the Defendants.

10        The purchase price of the patents is one of them.

11   IV's not arguing that a purchase price can't be part of a

12   reasonable royalty analysis.  It's simply claiming that

13   it's not -- that what Dr. Becker -- Becker did isn't tied

14   to the facts of the case.

15        But, you know, Dr. Becker adjusted for cost of

16   ownership, adjusted for the situation in which those

17   patents were purchased, and then specifically took into

18   account Ericsson, IV, and T-Mobile and what they would be

19   thinking in the hypothetical negotiation.

20        And part of that is stepping back and thinking

21   about who is IV, and -- and what is their business and what

22   would have -- what would they have been expecting in a

23   hypothetical negotiation and how do we -- what kind of data

24   can we apply to this purchase price in order to come to a

25   conclusion about what the value of the royalty should be.

1          And IV is an investment company, and -- and they

2   in large part purchase patents with the intent to monetize

3   them through licensing or through sales of the assets.

4          And it holds the patents in -- in funds and

5   expects a rate or return.  And Dr. Becker recognized that.

6   And Dr. Becker mined the data that we have in this case

7   from IV about rates of return that IV expected from a fund

8   level, as well as rates of return that IV had achieved

9   through that fund.

10          And so, you know, Dr. -- Dr. Becker used this

11   information that came directly from IV to help inform what

12   IV could have expected to receive as a return on its

13   investment.

14          And while -- you know, I mean, we hear their

15   criticism that these returns on investment were not

16   tailored to the Malibu portfolio, but that's certainly not

17   the standard.

18          It is, you know, very reasonable for Dr. Becker to

19   use IV's own data about what it would have been thinking as

20   a party to the hypothetical negotiation.

21          Now, the -- I do want to mention the -- the

22   R-Rankings that Mr. Abraham mentioned.  The gist of IV's

23   argument is that the R-Rankings aren't an allocation of

24   value and -- but rather they're just a -- a method of

25   distributing revenue from its portfolio -- from its

1   portfolio licenses.

2         But, you know, as we showed in the briefing, the

3   process that IV uses to make this allocation is very

4   specific.  It's intended to put weight on the patents that

5   were most important to the licensee in that particular

6   negotiation, and it's called a value allocation.

7         And IV may want to run from that term, but it will

8   have the opportunity to have its own witnesses come up and

9   testify at trial about what they believe that term means.

10        But the documents say what they say.  And

11   Dr. Becker is permitted to rely on that.  And IV is free to

12   vigorously cross-examine Dr. Becker about the -- about this

13   value allocation.

14        And he simply uses these R Rankings and the value

15   that has been allocated to these patents as a data point in

16   his range of royalties that includes data that is derived

17   from the purchase price, data that's derived from the R

18   Rankings.  And, again, all tailored to the parties in the

19   case and the patents in the case.

20        THE COURT:  Anything further?

21        MR. RUBENSTEIN:  Nothing, Your Honor.  Thank you.

22        THE COURT:  All right.  Well, with regard to the

23   Plaintiff's motion to exclude the testimony of Dr. Becker,

24   the Court's ruling is much like its ruling with regard to

25   Mr. Bratic, and that is it's denied.

1                Both of these areas of examination, to me, seem to

2      be better dealt with through vigorous cross-examination

3      than exclusion of testimony from the jury.

4                And I'm going to deny the motion from Plaintiff as

5      to Dr. Becker.

6                All right.  That brings us to the motions in

7      limine that are in dispute.  The Court will turn to those

8      next.

9                MS. FAIR:  Good afternoon, Your Honor.  Andrea

10     Fair on behalf of the Plaintiff.

11               THE COURT:  Before we get too far into this,

12     Ms. Fair, have there been any late breaking agreements or

13     narrowing that the Court's not otherwise been informed

14     about regarding any of the motions in limine?

15               MS. FAIR:  I don't believe so, Your Honor.  We did

16     file some agreements with the Court, I believe -- I can't

17     remember frankly if it was -- if it was Friday or Monday.

18     They had to be re-filed yesterday.  So those are on record

19     with the Court.  There hasn't been any since then.

20               THE COURT:  Nothing new today?

21               MS. FAIR:  That's correct.

22               THE COURT:  Okay.

23               MS. FAIR:  So we're starting with IV's Motion in

24     Limine No. 2.  No. 1 was part of the agreement that was

25     filed yesterday.

1        THE COURT:  No. 1 has been withdrawn by agreement,

2   correct?

3        MS. FAIR:  Yes, Your Honor.

4        THE COURT:  Okay.

5        MS. FAIR:  So No. 2 is one that this Court sees a

6   lot.  It's a request to exclude or at least require the

7   Defendants to approach the bench or either party before

8   anybody gets into evidence about the IPRs.

9        I'm going to start with just responding to the

10  Defendants' response because I think we're essentially in

11  agreement, but there's some things we need to talk about

12  with the Court.

13       The Defendants first say:  Well, we agree, but if

14  the door's opened, we should be able to get into it.  They

15  give two examples of that.

16       The first is if we start talking about whether or

17  not the PTO has considered specific prior art references,

18  they should be able to get into the IPRs.

19       There is --

20       THE COURT:  Well, anytime another party opens the

21  door, that creates a possibility the Court's going to grant

22  latitude to the responding party to get a fair response.

23       And as with any limine order, it's clearly not an

24  absolute prohibition.  And if somebody who's protected by

25  the limine ignores it and opens the door, there's no reason

1  why the party that would otherwise be bound by it is going

2  to continue to be bound.

3         MS. FAIR:  Agreed, Your Honor.  I wanted to talk

4  specifically about their first example because -- because I

5  think our concern is we don't intend to say anything about

6  whether the Patent Office has considered any specific prior

7  art that the Defendants are going to be raising.

8         The risk here is that the Defendants are going to

9  want to say:  The PTO has never looked at this.  This is an

10  argument we see in trials where Defendants say:  You,

11  ladies and gentlemen of the jury, are the first people to

12  look at this prior art.

13         So our concern is that the Defendants are going to

14  open their own door because the PTO is looking at this art

15  through the IPRs.  There's a pretty substantial overlap

16  between the prior art in our trial and in what the -- the

17  Patent Office was looking at, so we just want to be --

18         THE COURT:  Isn't there a distinction between what

19  the PTO looked at during the issuance process and what's

20  brought to them through the IPR practice later?

21         MS. FAIR:  Sure, Your Honor, yes.  We just want to

22  make sure that the Defendants don't open their own door by

23  saying:  The PTO has never looked at this.  Oh, by the way,

24  but they're kind of looking at it now because they've

25  instituted review on these patents.

1          THE COURT:  Well, let me just say this.  I'm going

2    to grant this motion in limine, and either side is going to

3    approach and get leave before they talk about the PTAB or

4    IPR proceedings in any way.

5          If at the time the patents were issued certain

6    prior art was not before the PTO, through the issuance

7    process, it's not in the cited references, that's a

8    legitimate point to make, and that's outside the scope of

9    this limine order, okay?

10          MS. FAIR:  Yes, Your Honor.

11          THE COURT:  What's next?

12          MS. FAIR:  Motion in Limine No. 3.  Oh --

13          MR. KUBEHL:  Your Honor, may I have just one point

14    of clarification on that MIL before we move on?

15          THE COURT:  Okay.

16          MR. KUBEHL:  So where it's more likely to come up

17    in this case is some of the prior art that the PTAB has

18    found now does create a substantial question of

19    patentability does appear on the face of the asserted

20    patents.

21          And so certainly if they represent or imply to the

22    jury that you can see that Reference X is right here on the

23    face of the patent, the Patent Office has already looked at

24    that, then we're certainly going to seek to say:  The

25    Patent Office is actually looking at that again right now.

1          THE COURT:  Well, both sides know what's behind

2     both of the doors, and either of you open that door by

3     going too far at your own peril.

4          If one side says they've never seen it, then I

5     expect to be approached by the other side wanting to tell

6     the jury, no, that's not true, they've seen it in another

7     context.

8          If -- you know, overreaching by either party is

9     probably going to result in the party against whom they've

10    been overreached have an opportunity to correct any

11    inaccuracies before the jury.

12         But we're not going to try this case based on what

13    the IPRs are or what the PTAB has done.  This Court's not

14    subject to the rulings of that body, and it's not bound by

15    that body.  And we're not going to -- we're not going to

16    wave -- we're no -- we're no more going to wave PTAB/IPR

17    decisions before the jury than I'm going to let you talk

18    about results in other jury trials in other district

19    courts.  We're going to try this case on these facts in

20    this -- in this court.

21         So if anybody's going to talk about what happened

22    at the PTO, they either need to be sure of where they are,

23    or they need to come see me and say:  Your Honor, before I

24    go into this, I want to tell you what I'm about to ask

25    about.  I'm concerned the other side may think I'm opening

1    the door to something, or I'm violating your limine order,

2    give me some guidance.  That's what the limine process is

3    for.  And I'm going to be a gatekeeper here.

4           But we're going -- we're not going to try this

5    case based on decisions, considerations, arguments

6    presented to any other body, including the PTAB.

7           Does that -- does that give you some guidance,

8    Mr. Kubehl?

9           MR. KUBEHL:  It does.  Just in -- in response to

10   your last comment there, arguments made to the PTAB, the

11   other place that this could come up is Dr. Williams, for

12   example, offering a claim construction that is

13   contradictory or -- or inconsistent with a construction

14   that IV has offered to the Patent Office.

15          Consistent with Core Wireless, we would expect to

16   impeach him with that that he's taking a position that's

17   inconsistent with what the Plaintiff believes that ordinary

18   meaning is.

19          THE COURT:  And if and when that happens, come to

20   the bench and ask for leave before you jump into your

21   impeachment.

22          MR. KUBEHL:  Understood.

23          THE COURT:  Okay?  All right.  We are at IV's MIL

24   No. 3; is that correct, Ms. Fair?

25          MS. FAIR:  Yes, Your Honor.  And if I may have

 1   just a moment.  I only grabbed one stack of papers.  Let me

 2   get my other stack.

 3          So our Limine No. 3 concerns a concern that we

 4   have about how we anticipate the Defendants might use the

 5   inventor's testimony and testimony about the Malibu

 6   Networks prototype product.

 7          Our concern grew out of what we saw them do in

 8   Dr. Jorgensen, the inventor's deposition, as well as in re

 9   -- in their summary judgment briefing, in the claim

10   construction process, and, again, was confirmed in the

11   response in the limine briefing, and that is they've asked

12   him at length about specific aspects of the Malibu Networks

13   product, this prototype, the features that it had, how it

14   worked, how it did scheduling, how various documents

15   describe this prototype, and describe the features of the

16   prototype.

17          They then have taken that testimony and tried to

18   make non-infringement arguments or claim construction

19   arguments to try and show they don't do scheduling the way

20   the Malibu prototype does scheduling.  And if I could just

21   give a quick example.  The cites in the summary judgment

22   brief from the Defendant --

23          THE COURT:  I'll -- I'll -- for purposes of

24   arguing these MILs, I'll accept your representation.  You

25   don't need to prove it to me.  Just say that's what you're

1   afraid they're going to do, and then I'll hear from them.

2          MS. FAIR:  That's what we're afraid they're going

3   to do, Your Honor.  We think that's improper for two

4   reasons.

5          The first is it's improper to compare any two

6   implementations, if you will, of a patent claim and argue

7   either invalidity or non-infringement based on that.  And

8   so -- so our concern is they're going to say, well,

9   Dr. Jorgensen, have him explain the features of this

10  prototype, how it does scheduling.  And what we heard this

11  morning is their non-infringement argument on scheduling

12  about future frames and whether it's a future or current

13  frame, how that is implemented in the Malibu prototype, if

14  it is.  By the way, there's no expert who's taken that

15  prototype and said it reads on these asserted claims.

16         If it is implemented by those claims, the fact

17  that it implements scheduling in any certain way doesn't

18  bear any relevance on whether the accused technology's

19  scheduling functionality also reads on the claims.

20         And so that false comparison as Zenith Labs

21  recognizes runs the risk of confusing the jury by saying:

22  Look, we've got Product A, the Malibu Networks prototype.

23  We've got Product B, our -- and I'm playing the role of the

24  Defendants, right?  We've got our accused technology, and

25  they're different.  And, therefore, we don't infringe.

 1   That's false because there can be more than one way to

 2   infringe, and it's confusing to the jury because it's not

 3   taking the claim language and comparing it to the accused

 4   technology, which is the appropriate analysis to do.

 5          And it's further inappropriate to take the

 6   inventor on cross-examination, question him about how he

 7   understood specific terminology in the context of the

 8   prototype, and then use that to say:  Well, that's what

 9   future transmission means or scheduling in the future means

10   in the context of this patent.

11          That's trying to do claim construction in front of

12   the jury with the inventor to import not even an embodiment

13   from the specification but the prototype itself into a

14   limitation of the accused technology.  And so for those

15   reasons, we have filed this limine.

16          And I'll tell you -- I mean, I think if we look at

17   Page 5 of the response of the motion in limine, we see that

18   the Defendants are trying to do this claim construction

19   through the inventor.  They say:  Defendants intend to

20   discuss the claim language in light of the Malibu

21   technology,the prototype, at the time the patents were

22   filed which provides context for the ordinary meaning of

23   the claim terms.  They're trying to use the prototype to

24   define the claim terms to narrow the invention to exclude

25   infringement of their own product through the inventor.

 1  That use of the prototype is inappropriate.

 2          And the inventor is going to testify about the

 3  problem that he was solving, the way that he solved it, how

 4  he came up with the invention, those sorts of things.

 5          We're not going to be going into great detail

 6  about every single feature of the prototype, and nor should

 7  they be permitted to cross-examine him on it because he's

 8  merely introduced how he solved this problem.

 9          They can cross him on the problem that he solved.

10  Maybe there was art out there that he did or didn't know

11  about, what may or may not have been in the art at the

12  time.  But for them to take specific features of the

13  prototype and try and use those either directly or

14  indirectly to infer that, well, because our product is

15  different than the prototype, we don't infringe, or because

16  you meant future frame in this way, that's the way it must

17  be construed in a patent, and, therefore, we don't

18  infringe, are improper arguments and confusing to the jury.

19          THE COURT:  Let me hear a response from the

20  Defendant.  And you can stay at the podium, Ms. Fair.  It

21  may be more efficient if you're close by.

22          MS. FAIR:  Yes, Your Honor.

23          THE COURT:  Same thing for you, Mr. Kubehl, or

24  whoever is going to argue MILs for Defendants.

25          MR. KUBEHL:  Yes, sir.

```
 1              THE COURT:  What's your response?

 2              MR. KUBEHL:  Your Honor, the Defendants don't seek

 3    to compare the Malibu products or prototypes to the accused

 4    products in this case.

 5              We do seek to elicit testimony from the named

 6    inventor about what kind of system he was working on back

 7    then, what was the business of Malibu, how did that system

 8    work, what did it do?  There's nothing wrong with doing

 9    that.

10              THE COURT:  What you're going to tell me is that

11    this is general background.

12              MR. KUBEHL:  There is general background to be

13    had.  There's also an issue, though, as -- as Your Honor

14    has given us guidance today, that you haven't been in a

15    case where people don't talk about what the ordinary skill

16    of the art folks think that a claim term means.  And as a

17    named inventor, Dr. Jorgensen is presumed to be at least

18    one of ordinary skill in the art.

19              So what his understanding of a word meant at the

20    time he was working on this system and these patents --

21              THE COURT:  I thought an inventor was by

22    definition not a person of ordinary skill in the art.

23              MR. KUBEHL:  He's a person of at least, if not

24    more than ordinary skill in the art.

25              THE COURT:  All right.
```

```
  1              MR. KUBEHL:  So --

  2              THE COURT:  Let me see if I can short-circuit

  3    this.  I'm going to let you go through the proper and

  4    typical background with the inventor.  That's a part of

  5    just about every trial.

  6              But the only proper comparison is the language of

  7    the asserted claims against the accused products, period.

  8              And to the extent anybody goes outside of those

  9    parameters, then they're going to be in trouble with the

 10    Court, and they're going to violate the MIL order that I'm

 11    about to enter.

 12              And while it's true that terms that have not been

 13    construed by the Court or terms that have been given their

 14    plain and ordinary meaning are often susceptible to input

 15    from witnesses about what they understand the plain and

 16    ordinary meaning of that term to be, we're not going to

 17    engage in claim construction.  And anything that gets

 18    within a mile of that is going to be squelched by me before

 19    it gets off the ground.

 20              The time for claim construction has long passed,

 21    and a certain amount of what's going to happen here, and

 22    you both know that, before I say it, is a matter of degree.

 23              There's a fine line between going through the

 24    background of the invention and talking about what came

 25    before and then comparing improperly to things other than
```

1    the accused products.

2         So I'm -- what I'm telling you is I'm going to

3    grant this motion in limine, but the application of this is

4    where you really need to understands where the Court is.

5         And I'm going to allow the Defendants to have a

6    typical background review with the inventor, and I'm going

7    to allow the inventor, if asked, to testify as to his

8    understanding of any plain and ordinary meaning terms that

9    are relevant to his other testimony, not to get up there

10   and just pull words out of the claims and ask him what he

11   thinks the plain and ordinary meaning of those are.  It's

12   all going to have to be in context and be relevant.

13        But beyond that, you're not going to go further

14   than that without leave of the Court.  And if Plaintiff's

15   counsel thinks you're going too far, I expect to have an

16   objection raised.  And I'll deal with it at the time.

17        But this particular -- this particular motion in

18   limine is -- is typical, and it's often a matter of extent

19   or degree.  And I'm not going to know what that extent or

20   degree is until I hear it in real-time in the courtroom.

21        But what I want you both to understand is I'm not

22   going to keep the inventor and the Defendants from talking

23   about the background of the invention and how we got here.

24        But that's not going to be a launching pad for an

25   improper comparison of anything other than the language of

1      the asserted claims against the accused products.

2              Does that -- does that give you --

3              MR. KUBEHL:  It does.

4              THE COURT:  -- adequate guidance?

5              MR. KUBEHL:  Thank you, Your Honor.

6              THE COURT:  With that -- with that clarification,

7      I'm going to grant Plaintiff's Motion in Limine 3.

8              Let's go on to No. 4, Ms. Fair.

9              MS. FAIR:  I'm turning the floor over to

10     Mr. Abraham, Your Honor.

11             THE COURT:  That's fine.

12             MR. ABRAHAM:  Your Honor, Motion in Limine No. 4

13     relates to the prior litigations between IV and Defendants

14     in the District of Delaware.

15             THE COURT:  Didn't I just tell everybody we

16     weren't going to try this case based on what had happened

17     in other courts and other places?

18             MR. ABRAHAM:  You did, and that is exactly what

19     we're hoping will happen in this instance, as well.

20             THE COURT:  I'm going to grant this.  If there's a

21     reason, approach the bench and get leave and give me a

22     reason.  If there's not, then it's prohibited.

23             MR. ABRAHAM:  Thank you, Your Honor.

24             THE COURT:  All right.  No. 5 -- Plaintiff's

25     No. 5, where are we on this?

1          MR. BLACK:  I'm next, Your Honor.  I think you can

2     probably resolve it, as well.  This one relates to

3     communications relating to settlement discussions from the

4     prior litigation which would be even further afield of what

5     you've already ruled on.

6          THE COURT:  Mr. Black, is this one somehow

7     tethered to one of Defendants' MILs?

8          MR. BLACK:  It's tied to Defendants' MIL 5.  We

9     don't believe that they should be permitted to argue that

10    IV didn't offer them a license before settlement -- before

11    filing the lawsuit both because it's untrue and it's

12    irrelevant.

13         And they don't think we should be discussing

14    parallel matters.  And we just should both agree that any

15    settlement discussions relating to the prior case between

16    these parties are off limits, and no one should be implying

17    that there weren't any because that's also irrelevant.

18         THE COURT:  What's -- what's the Defendants'

19    response to this?  Let's just take these two MILs up

20    concurrently.

21         MR. KUBEHL:  Sure.  Your Honor, with respect to

22    Plaintiff's motion, it's undisputed that IV never contacted

23    Ericsson, never offered Ericsson a license to these patents

24    before it sued Ericsson.

25         It should not be able to suggest to the jury by

1   implication that, well, isn't it funny that Company X over

2   here took a license with IV to this portfolio, but Ericsson

3   doesn't have one.  If they open the door in that way or if

4   they make any implication like that, we ought to be able to

5   say, well, the fact is we were never contacted, they never

6   offered us a license to these.

7        THE COURT:  And if the door is open, the door is

8   open.  But unless the implication is made that opens the

9   door, there's no reason to go into that.

10        MR. BLACK:  Right.  But that's a different door,

11   Your Honor.  He's mixing two things up.

12        First of all, they were -- they intervened in the

13   Delaware litigation.  We had settlement discussions with

14   T-Mobile.  They were involved.  His firm -- his firm was --

15   his firm was representing them.  We had a mediation.  They

16   were indemnifying T-Mobile.  And we made an offer which

17   T-Mobile insisted they wanted an offer for the full

18   portfolio which would have included the patents we were

19   litigating and the patents in this case.

20        We're not going to come and say there was a

21   specific offer on these patents.  But any implication that

22   they want to stand up and say, we were never offered a

23   license, we were just sued out of the blue, would be

24   inappropriate.  And that's what our motion is directed to.

25   That --- that would be inappropriate.

1        THE COURT:  I understand that.  I don't see any

2   reason both Plaintiff's 5 and Defendants' 5 shouldn't be

3   granted.

4        And if there's a reason to go into any of what

5   you've just given me, you need to come persuade me of it at

6   the bench before you do it.

7        MR. BLACK:  Appreciate it.  That's what we were

8   asking for is reciprocal.

9        THE COURT:  Question, Mr. Kubehl?

10       MR. KUBEHL:  No, Your Honor.

11       THE COURT:  Then let's move on.  Let's go to

12  Plaintiff's MIL No. 6.

13       MS. PATEL:  Your Honor, may I proceed?

14       THE COURT:  You may.  Welcome back, Ms. Patel.

15       MS. PATEL:  Thank you, Your Honor.

16       With regards to MIL No. 6, what we're seeking

17  here, Your Honor, is an exclusion order that Defendants do

18  not suggest to the jury that any uncharted art discloses or

19  suggests elements of the asserted claims and further

20  precluding them from using any uncharted art as

21  demonstratives for the jury or introducing such art as

22  exhibits.

23       Defendants' invalidity expert, Dr. Acampora,

24  included in his report an exhaustive list of all of the

25  references that he -- he grounds his opinions on.  It's in

1  Paragraph 161 of his report.  And he confirmed further

2  during his deposition that that was an exhaustive list.

3          The issue here, Your Honor, is that we don't want

4  the jury to be confused as to what is being treated as

5  invalidity references and what is not, because Dr. Acampora

6  also in his -- in his report includes references to various

7  other art which he claims informs him of the state of the

8  art at the time, and there's about 15 or 16 other

9  references, including the Yang reference which we briefed

10 and also the Magic WAND reference.

11         Even if Defendants say to the jury in some

12 generalized statement that the prior art references are not

13 being relied on for invalidity but then put them up for the

14 jury in large volumes and say here -- here they are, and

15 this is what they look like, and they look a lot like the

16 other references that we rely on, that would still require

17 IV to come up here and provide some sort of rebuttal which

18 we haven't done because Dr. Acampora has said specifically

19 that those are not references which he's relying on for

20 his -- for purposes of anticipation or obviousness.

21         For this reason, Your Honor, we're seeking an

22 order --

23         THE COURT:  Let me hear a response from

24 Defendants.

25         MS. LADRIERE:  Hello, Your Honor.  Megan LaDriere

 1  for the Defendants.

 2          THE COURT:  What would be the basis to talk about

 3  uncharted prior art?

 4          MS. LADRIERE:  So we are not trying to use this to

 5  show invalidity.  These two references that they briefed

 6  are simply background references to support Dr. Acampora's

 7  belief of what a POSITA would know at the time.

 8          THE COURT:  Can you give me something more

 9  specific than --

10          MS. LADRIERE:  Absolutely.

11          THE COURT:  -- background references?

12          MS. LADRIERE:  Yes.  So the two references that

13  they cite to in their briefing, so Yang is the first one.

14  And Dr. Acampora uses that to support his understanding --

15  or his opinion that a POSITA would understand that constant

16  bit rate traffic is jitter-sensitive.

17          And he says in his opinion -- you know, my opinion

18  is that the POSITA would understand that this -- the

19  constant bit rate traffic is jitter-sensitive.

20          And Yang, this reference that we're not using to

21  show invalidity, that that supports my opinion of what a

22  POSITA would understand.

23          And actually the two cases that IV is relying on

24  actually carve out an exception for this rule.  So that

25  they're saying that no -- Defendants aren't allowed to rely

1    on uncharted prior art, but they are allowed to rely on it

2    for background material, state of the art, and establishing

3    what one of skill in the art would have known at the time

4    of the invention.  That's from the Perdiemco case that they

5    cited.

6              THE COURT:  Well, again, we're back to a point

7    where what we're talking about is a matter of degree.  And

8    if there's a passing reference when he describes what a

9    person of ordinary skill in the art would understand this

10   term to mean in its plain and ordinary meaning --

11             MS. LADRIERE:  Uh-huh.

12             THE COURT:  -- maybe.  But much more than just a

13   passing reference rapidly gets into the area of possible

14   jury confusion and improper areas that should not be raised

15   with uncharted prior art.

16             So, you know, the -- the motion is to exclude any

17   evidence or argument related to uncharted prior art to

18   provide for invalidity.  And that I can grant without any

19   question.

20             That doesn't mean in the very narrow circumstance

21   in passing simply to touch upon as you go through with the

22   testimony about what a person of ordinary skill in the art

23   would understand something to mean, you might mention this

24   reference or that reference.

25             MS. LADRIERE:  Uh-huh.

```
 1            THE COURT:  It's a matter of use.  I mean, if it's

 2   used properly, nobody's going to confuse that as some kind

 3   of invalidating prior art reference and create confusion

 4   with the jury.  If you do much more than that, that risk

 5   becomes real, and it rises rapidly.

 6            MS. LADRIERE:  Understood, Your Honor.

 7            THE COURT:  So I'm going to grant the MIL.  I want

 8   Plaintiffs to understand the very narrow basis upon which I

 9   think what they're talking about doesn't run afoul of the

10   MIL ruling.

11            But, again, this, like the earlier ones we've

12   talked about, is a matter of -- of application in real-time

13   as we go through the testimony before the jury.

14            And if somebody misjudges and miscalculates and

15   overstays their welcome somewhere such that the other side

16   thinks they've violated my MIL ruling, bring it to my

17   attention.

18            And if I agree with them, then I'll grant their

19   objection and take whatever curative steps I think are

20   necessary.  If they haven't, in my opinion, I'll tell them

21   that.

22            I can't sit here today and tell you this is okay,

23   that's not okay.  But I can give you some broad-brush

24   guidance as to -- from a high level what's acceptable and

25   what's not.
```

1           And certainly without question, uncharted prior

2   art should never touch on the invalidity issue whatsoever.

3   That doesn't mean in a very limited passing context it

4   might be appropriate elsewhere.  But that's pretty narrow.

5           MS. LADRIERE:  Absolutely, Your Honor, and that --

6           THE COURT:  I think you understand me.

7           MS. LADRIERE:  Yes.  That's how we intend to use

8   these references.

9           THE COURT:  With that -- with that clarification,

10  I'm going to grant Plaintiff's MIL No. 6.

11          MS. LADRIERE:  Thank you, Your Honor.

12          THE COURT:  Let's go on to No. 7.

13          MS. PATEL:  Thank you, Your Honor.  Actually in

14  light of the Court's ruling on Defendants' MSJ regarding

15  the public accessibility of certain prior art references,

16  IV will be withdrawing MIL No. 7.

17          THE COURT:  Okay.  Then that's withdrawn.

18          MS. PATEL:  Thank you, Your Honor.

19          THE COURT:  What about No. 8?  Hello, Ms. Henry.

20          MS. HENRY:  Good afternoon, Your Honor.  Claire

21  Henry for IV.

22          IV's Motion in Limine No. 8 is dealing with

23  keeping out any reference to the fact that a patent claim,

24  theory, or accused product or functionality in this case

25  was in the case and is now out of the case, either because

1  it was dropped or because it was ruled on by the Court.

2         I don't believe, based on the briefing and our

3  meet and confers on this issue, that there is a real

4  dispute about keeping out the fact that a particular patent

5  or claim has been dropped for this -- from this case.

6         The real meat of -- of this MIL has to do with how

7  Defendants want to use semi-persistent scheduling, and I'm

8  going to take Your Honor way back to the motion to amend

9  IV's infringement contentions, if you'll recall, that

10 originally based on the publicly available information --

11        THE COURT:  So this is not about the damages case

12 and the resulting 5/6th of what's left.

13        MS. HENRY:  Your Honor, there is a small portion

14 of Defendants' response to our MIL that brings up that

15 issue with respect to this.  And we can address that, as

16 well.

17        THE COURT:  All right.

18        MS. HENRY:  I think the real meat here, it has to

19 do with some semi-persistent scheduling, and that that is a

20 little bit of a side issue.  So if Your Honor will recall,

21 originally, Plaintiffs believed that the Defendants

22 implemented an LTE standard scheduler called a

23 semi-persistent scheduler.  And because of that belief,

24 IV's infringement contentions and complaint charted

25 infringement based on semi-persistent scheduling or SPS.

```
 1              After obtaining the confidential information and
 2    the source code from Ericsson, we learned that Ericsson
 3    does not use the standardized semi-persistent scheduling
 4    but has its own proprietary schedule called DBS/SABE and
 5    that that is what they use.  We brought a motion to amend
 6    the infringement contentions.  That motion was granted over
 7    the Defendants' objections, and we then charted the actual
 8    scheduler in use on the claims.
 9              So -- but this motion in limine is meant to say
10    that the Defendants cannot now say:  Well, previously they
11    accused this semi-persistent scheduling, and now they don't
12    anymore.  That's Issue No. 1.  We think that's completely
13    improper because then it's going to require a side show
14    that requires us to explain why that -- why we believe they
15    use it, why we -- why we accused it, why we were allowed to
16    amend it, why you can have two schedulers that work in
17    slightly different ways that both infringe the same claims,
18    and it's going to be very confusing to the jury.  We think
19    it's completely inappropriate.
20              The other issue with respect to semi-persistent
21    scheduling has to do with even if Defendants don't say they
22    previously accused semi-persistent scheduling and now they
23    don't, how can they use semi-persistent scheduling at all?
24    And here's the problem.
25              Defendants have both in their motion for summary
```

1  judgment and in their response to this motion in limine

2  made arguments that make it clear that what they want to do

3  is equate the patent with semi-persistent scheduling.  And

4  then say because they don't do semi-persistent scheduling,

5  they don't infringe the patent.  And that's completely

6  inappropriate.

7       It's -- it's a nuanced argument, but it's not that

8  different from the idea of saying the Defendants cannot say

9  that the sum and substance of an invention is a single

10 embodiment of that invention or a commercial embodiment of

11 that invention.  It's creating confusion in the jury's mind

12 about what is actually at issue in the case.

13      And so it's our position that it would be

14 completely inappropriate for them to talk about

15 semi-persistent scheduling and equate that with

16 infringement in any way, shape, or form or to equate

17 that -- to equate the fact that they don't rely on

18 semi-persistent scheduling as some sort of argument of

19 non-infringement.

20      THE COURT:  Is there anything about your Doctrine

21 of Equivalents claims that would open the door to this

22 semi-persistent scheduling?

23      MS. HENRY:  I don't believe so, Your Honor.  I

24 believe that the argument that the Defendants can make --

25 and, again, this -- Your Honor is correct, this is a point

1  they raised in their response.  They say:  Well, you've got

2  this Doctrine of Equivalents argument, and in order to

3  rebut it and to say that we're different and that there's a

4  different response, we have to say we thought

5  semi-persistent scheduling was somehow inferior to dynamic

6  scheduling, which is another standardized form of

7  scheduling.  And to be really clear, Ericsson has its own

8  proprietary scheduler.

9         What they -- that argument that Ericsson raises,

10  again, requires them to tell the jury or to attempt to tell

11  the jury that semi-persistent scheduling is the same thing

12  as the patent.

13         If Ericsson wants to make an argument that says,

14  we do DBS/SABE, it is different from the patented claims,

15  we think there is something inferior about what would

16  result from the patented claims, and, therefore, your

17  Doctrine of Equivalents argument fails.  They can try to do

18  that.

19         But they can't say that because they personally

20  think that their product -- that their scheduler is

21  different from semi-persistent scheduling, which is not the

22  entirety of these claims, is not an equivalent to these

23  claims, that that means there's no Doctrine of Equivalents

24  argument is a legally improper argument, and they shouldn't

25  be able to make it.

1              And we believe that -- that all of the arguments

2    they raised in their response with respect to how they want

3    to use this fall into the same category.  It all requires

4    that you equate the patented claims with semi-persistent

5    scheduling.  That's legally improper.

6              Unless Your Honor has any questions.

7              THE COURT:  Let me hear a response from

8    Defendants.

9              MR. KUBEHL:  Your Honor, semi-persistent

10   scheduling is a different way of scheduling from what's at

11   issue in this case.  Part of the development history story

12   of what's at issue in this case is the fact that when

13   Ericsson designed its base station, it looked at

14   semi-persistent scheduling.  It tested it.  It compared it

15   to what it does today.  It found it to be inferior.

16   Specific technical reasons why documents showing that, all

17   very important and relevant and totally proper to explain

18   to the jury that there's a different way to do it than what

19   we do today.  It's called SPS.  And we chose not to do SPS.

20   Here's why.  We thought this was bad.  We thought this was

21   better.

22              That can all be done without referencing that SPS

23   was ever asserted in the case or ever dropped from the

24   case.  It has nothing to do with asserting or dropped from

25   the case.  That's important testimony that there's no way

1  that that can be excluded.

2          Now, the issue of it being asserted in the case,

3  that actually is relevant because while it's not being used

4  to compare the product to SPS for purposes of

5  non-infringement, what is relevant is, it is the fact that

6  SPS does reserve future slots.  And it does place packets

7  in an isochronous manner.

8          And the fact that it was asserted, and not only

9  just asserted but in the complaint, it -- the Plaintiff

10  specifically says, yeah, we agree, SPS, that's an example

11  of something that places things in isochronous manner.

12  It's a -- it's an example of something that looks into

13  future frames, so everybody agrees with that, right?  So

14  you've got SPS, and it has these characteristics.  That's a

15  fact that's undisputed.

16          We're doing something that's different than SPS.

17  We chose not to do that.  And that's not a comparison of

18  two products to show non-infringement.  It's an explanation

19  of one product.  One example of what everybody agrees is an

20  example in LTE of how particular parts of the claims would

21  be met.  They agree, and we agree.  And then we've chosen

22  to do it a different way.

23          Now, does that different way meet the claims?

24  We'll have to look at the claims and see if it meets the

25  claims.  But it's not seeking to make a comparison between

```
 1   our products and SPS for purposes of non-infringement.

 2            THE COURT:  All right.

 3            MR. KUBEHL:  I would like to say there are at

 4   least two issues where the fact that it was asserted and

 5   then dropped, one SPS, the other one with respect to the

 6   '971 patent, there are two instances here where it is

 7   important that -- that we be able to explain that.

 8            With respect to SPS being asserted and -- and how

 9   long it was asserted and the process for it to not be

10   asserted now, that is directly relevant to refute their

11   willfulness claim.  They claim that we are willful

12   infringers because we received a copy of a complaint that

13   accused us of infringing by using SPS.  That's their

14   allegation.  They say that -- we're willful because of

15   that.

16            The -- the explanation of what SPS is, why we

17   think that doesn't infringe -- infringe, how we reacted to

18   that, and how that is not in the case, that is relevant to

19   rebut their willfulness case.  And that should come in.

20            With respect -- last point on SPS.  Your Honor is

21   absolutely right on the Doctrine of Equivalents.

22            They're saying that looking into the future and

23   reserving slots is equivalent to not looking into the

24   future -- I'm sorry, I misspoke.

25            They're saying putting packets in an isochronous
```

1  manner is equivalent to not doing that, and a comparison of

2  something that's admitted to do that SPS to our product

3  which does not do that to show that there are significant

4  differences, that there's documentation way pre --

5  pre-dating this lawsuit showing that we believe that that

6  was an inferior method and wouldn't give you the same

7  results is a different way of doing very relevant to the

8  Doctrine of Equivalents analysis.

9           Lastly, on the '971 patent being dismissed, they

10  made the choice in the case to offer a damages report that

11  gave a damages number that tied all four patents together.

12          They said the value of these four patents all

13  together is X.  Then they gave another damages report, and

14  they said, well, 5/6th of the value is for here, and 1/6th

15  is for this other patent.

16          And we need to be able to explain to the jury that

17  there once was another patent and now there's not.  That's

18  where this 5/6th and 1/6th comes from.  We need to be able

19  to explore that other patent to cross-examine why was

20  that -- what did that patent cover, why was it only worth

21  1/5th, how does it compare to the other ones?  That all

22  becomes relevant because of the theories that they have in

23  the case on damages.

24          THE COURT:  All right.  Thank you, Mr. Kubehl.

25          I'm going to grant this motion in limine.  I don't

1   want any mention of SPS before the jury or the 5/6th

2   fraction of a damages case without coming to the bench and

3   getting leave before you do it.

4          I'm persuaded that while there may be some

5   legitimate uses, the risk of confusion and the risk of an

6   improper comparison for non-infringement is pretty high

7   here, and I'm going to serve as a gatekeeper as the

8   evidence develops before the jury.

9          And consequently, the parties are not to mention

10  any product, theory, claim, patent, or other functionality

11  that's been dropped or dismissed from the case without

12  leave from the Court, particularly the SPS issue.

13         That's not to say given the circumstances and

14  perhaps as a part of the rebuttal, the willfulness case,

15  there may be a basis upon which some of this will be proper

16  to come in, but I'm going to be a gatekeeper and see that

17  it comes in only for those purposes I'm persuaded is

18  legitimate -- are legitimate.  So this motion in limine is

19  granted.

20         MS. HENRY:  Thank you, Your Honor.

21         THE COURT:  All right.  Does that complete all of

22  Plaintiff's motions in limine?

23         MS. HENRY:  It does, Your Honor.

24         THE COURT:  Let's move to Defendants'.  Motion in

25  Limine No. 1 still appears to be disputed.  Let me hear

1    from the Defendants on this.

2          MS. LADRIERE:  Megan LaDriere for the Defendants,

3    Your Honor.

4          So this motion in limine, we'd ask that IV is not

5    allowed to present -- prevent -- present evidence or

6    argument about secondary considerations.  As Your Honor

7    knows, a nexus is required in order to show non-obviousness

8    here.  And it's IV's burden to establish those.  And it's

9    our opinion that IV's expert has only provided conclusory

10   opinions about this, provided no examples and no evidence

11   in order to show a sufficient nexus, and we ask that the

12   Court do not allow them to submit any evidence on secondary

13   considerations.

14         THE COURT:  Why is this anything other than a

15   Daubert motion disguised as a motion in limine?

16         MS. LADRIERE:  Uh-huh.  Your Honor, I believe that

17   because there's no evidence and there's nothing supporting

18   his example, just his conclusory opinions, we would like

19   the -- the Court does not allow any evidence or testimony

20   on it or any argument, and that's why we wanted to present

21   it as a motion in limine.

22         THE COURT:  What's Plaintiff's response?

23         MS. PATEL:  Your Honor, may I proceed?

24         THE COURT:  Yes.

25         MS. PATEL:  Your Honor, the issue of whether there

 1   is a sufficient nexus is a factual question for the jury.

 2          Defendants are asking the Court to weigh the

 3   sufficiency of the evidence here.  And -- and like Your

 4   Honor previously mentioned, this is an issue that is

 5   appropriate for MSJ or for Daubert.  That is the proper

 6   vehicle by which they should have brought this motion, but

 7   they chose not to.

 8          Defendants don't rely on a single case in which

 9   such evidence was excluded from a trial.  Instead, they

10   rely only on cases on the merits, which is not surprising.

11          THE COURT:  Let me -- let me save you some breath,

12   Ms. Patel.  I'm going to deny this motion in limine.  The

13   MIL practice is not a place to back door a summary judgment

14   motion or a Daubert motion.

15          And I'm not going to in the context of a motion in

16   limine make an absolute and final determination on a

17   factual issue about whether there is or isn't a sufficient

18   nexus.  This is not appropriate for limine practice, and

19   I'm going to deny it.

20          All right.  Defendants' No. 2.

21          MS. LADRIERE:  Thank you, Your Honor.

22          So No. 2 -- I think this is actually just a minor

23   issue, and I think the parties are almost in agreement.

24          Generally, neither party intends to offer any

25   evidence regarding government or regulatory investigations

1    of either other party.

2           The one issue we bring up here is that when we

3    negotiated this, IV asked that this be reciprocal, and we

4    agreed to that, but IV noted that there's one piece of

5    evidence that our damages expert, Dr. Becker, relies on.

6    It's a study by the Federal Trade Commission that IV

7    indicated it thought would be included in the scope of this

8    MIL.  And so that's really why that this is not agreed to

9    because we would like Dr. Becker to be able to rely on this

10   study.  And I can explain what this study is if that'd be

11   beneficial to Your Honor.

12          THE COURT:  Is this particular study something

13   that could rise to the level of a regulatory investigation?

14          MS. LADRIERE:  We don't believe so.  It was really

15   just a survey that the FTC did to certain patent assertion

16   entities and asked --

17          THE COURT:  And it's in Dr. Becker's report?

18          MS. LADRIERE:  Yes, sir.

19          THE COURT:  Okay.  I'm going to grant this motion

20   in limine, but I'm going to make it mutual as to all

21   parties.  Obviously, given what I've just said, I'm not

22   going to use this to Daubert a portion of Dr. Becker's

23   report, and whatever is in his report, hasn't been

24   challenged by Daubert, stands, and he's permitted to

25   testify about it --

```
 1              MS. LADRIERE:  Thank you, Your Honor.

 2              THE COURT:  -- notwithstanding the MIL ruling.

 3              Let's go to Defendants' No. 3.  What's the dispute

 4    here?

 5              MR. RUBENSTEIN:  Thank you, Your Honor.  Jonathan

 6    Rubenstein again.

 7              I think this is another situation where there's

 8    more agreement than there -- than there is dispute.  The --

 9    the motion in limine has to do with not -- not mentioning

10    total revenue or -- or, you know, total profit for the

11    Defendants.

12              And the -- IV seems to largely be in agreement

13    with that.  The risk, of course, is to, you know, show that

14    they are -- they make a lot of money in revenue.  And to

15    the extent there's any verdict, they may be able to pay it,

16    and IV seems to agree that they don't intend to do that,

17    which is good.

18              However, they seem to take issue with -- with two

19    issues.  One, it not being reciprocal; and, two, that the

20    phrase "or other similar revenue claims" that we see in the

21    MIL.  And in their response, IV says:  It seems to be sort

22    of some back door attempt to preclude IV from putting on

23    evidence of the value of revenues derived through the

24    invention.

25              And generally speaking, I don't really have an
```

1  objection to that, but as Your Honor has alluded to before,

2  it's sort of -- you know, there's lots of flavors of -- of

3  that phrase there.  It depends how it's characterized.  Are

4  they trying to in -- introduce, for example, subscriber

5  revenues from T-Mobile that they argue have some tangential

6  relationship to the technology in the three patents at

7  issue in the case?  That seems very far afield of -- of

8  something --

9          THE COURT:  Let me ask you this, Mr. Rubenstein.

10 Why shouldn't be this mutual and be granted?

11         MR. RUBENSTEIN:  So what you just said at the end

12 of the last motion in limine actually may take care of that

13 because some of our concern was some of what Dr. Becker

14 used in his report about overall views of rates of return

15 for the funds of this Plaintiff --

16         THE COURT:  I'm not -- I'm not going to

17 circumscribe any expert's testimony that's set out in their

18 expert report by way of a motion in limine.

19         If it's not proper in the report, it should have

20 been challenged in a Daubert motion, and the limine

21 practice is not going to intrude on what's not been

22 challenged in the Daubert process and is in any expert's

23 report.  That's assuming it's there, obviously.

24         MR. RUBENSTEIN:  Right, understood.

25         THE COURT:  I'm going to grant this on a mutual

1   basis as to all parties.

2          MR. RUBENSTEIN:  Thank you, Your Honor.

3          THE COURT:  All right.  Let's go on to Defendants'

4   No. 4.

5          MS. LADRIERE:  Your Honor, Defendants are happy to

6   withdraw No. 4.

7          THE COURT:  It is withdrawn.

8          MS. LADRIERE:  Thank you.

9          THE COURT:  No. 5.

10         MS. LADRIERE:  No. 5 was dealt with by Mr. Kubehl.

11  We handled both No. 5 MILs together.

12         THE COURT:  That's right.  It's previously been

13  granted.

14         MS. LADRIERE:  No. 6 has been agreed to, and that

15  was filed with the Court.  So this is the last one, No. 7.

16         THE COURT:  All right.

17         MS. LADRIERE:  So Defendants -- this is a fairly

18  standard request, Your Honor.  This is just that Defendants

19  ask that any matters to which IV has claimed privilege

20  cannot be now offered as a shield at trial -- or as a sword

21  at trial.  We're particularly concerned about IV

22  introducing evidence about certain pre-suit investigations,

23  and we brought that up with IV during negotiations.

24         Their hesitation was this is too broad.  But I

25  think everyone's in agreement to not bring up any

1  privilege -- any issues at trial that privilege was

2  asserted before.

3          THE COURT:  Well, I often -- I often get motions

4  in limine that are in effect asking the Court to order the

5  parties to follow the pre-existing rules that govern the

6  parties' conduct before the Court.  This seems to me to

7  fall in that what I call follow the rules category.

8          Is there some reason why this needs to be granted

9  when we have already in place clear protocols for not going

10  into privilege -- previously asserted privilege matters?

11         MS. LADRIERE:  We agree, Your Honor.  When we

12  talked about it with IV, they were hesitant and said that

13  this was overbroad, and that's why we're presenting it to

14  you today.

15         THE COURT:  Do Plaintiffs have a viewpoint that

16  might be relevant here?

17         MR. BLACK:  We're fine, Your Honor, with -- with

18  your approach.  We understand the rules.

19         THE COURT:  Okay.  Then this will be denied, and

20  the existing rules will be applied.

21         All right.  That looks like all of the motion in

22  limine matters that are disputed before the Court.

23         Is anybody aware of anything else relating to

24  motions in limine the Court hasn't taken up or dealt with?

25         MR. BLACK:  No, Your Honor, from Plaintiffs.

1          THE COURT:  Okay.  That leaves the disputed

2     exhibits which I hope will be substantially narrowed by the

3     guidance you've already received today.

4          Are there questions from either party before we

5     recess for the day, understanding that you'll be back on

6     the 30th?  Of course, if there aren't resulting Daubert

7     motions from the very targeted and limited supplementation

8     I've allowed and if you can work out the exhibits between

9     each other without dispute, you don't have to come back on

10    the 30th.  So let me dangle that carrot in front of

11    everybody.

12         MR. BLACK:  Thank you, Your Honor.

13         THE COURT:  Unless -- unless there's something

14    else, the Court stands in recess.

15         COURT SECURITY OFFICER:  All rise.

16         (Hearing concluded.)

17

18

19

20

21

22

23

24

25

1                           CERTIFICATION

2

3           I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    /S/ Shelly Holmes                      01/14/2019
     SHELLY HOLMES, CSR, TCRR                    Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25