1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF TEXAS

3                   MARSHALL DIVISION

4   INTELLECTUAL VENTURES I LLC, )(

5        PLAINTIFF              )(    CIVIL ACTION NO.

6   VS.                        )(    2:17-CV-577-JRG

7                              )(    MARSHALL, TEXAS

8   T-MOBILE USA, INC., T-MOBILE )(

9   US, INC., ERICSSON INC., AND )(

10  TELEFONAKTIEBOLAGET LM       )(

11  ERICSSON,                   )(    FEBRUARY 4, 2019

12      DEFENDANTS             )(    9:16  A.M.

13              TRANSCRIPT OF JURY TRIAL

14       BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

15            UNITED STATES CHIEF DISTRICT JUDGE

16  APPEARANCES:

17  FOR THE PLAINTIFF:      Mr. T. John Ward, Jr.
                            Ms. Claire A. Henry
18                          Ms. Andrea L. Fair
                            Mr. Wesley Hill
19                          WARD, SMITH & HILL, PLLC
                            1507 Bill Owens Parkway
20                          Longview, Texas 75604

21  COURT REPORTER:         Ms. Shelly Holmes, CSR, TCRR
                            Official Reporter
22                          United States District Court
                            Eastern District of Texas
23                          Marshall Division
                            100 E. Houston Street
24                          Marshall, Texas 75670

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)

```
 1   FOR THE PLAINTIFF:        Mr. Martin J. Black
                               Mr. Kevin M. Flannery
 2                             DECHERT LLP
                               Cira Centre
 3                             2929 Arch Street
                               Philadelphia, Pennsylvania 19104
 4
                               Mr. Joseph M. Abraham
 5                             Mr. Timothy F. Dewberry
                               Mr. Joshua J. Yi
 6                             Mr. Jacob R. Porter
                               DECHERT LLP
 7                             300 West Sixth Street
                               Suite 2010
 8                             Austin, Texas 78701

 9                             Ms. Nisha N. Patel
                               Mr. Ryan T. Banks
10                             DECHERT LLP
                               2440 W. El Camino Real
11                             Suite 700
                               Mountain View, California 94040
12

13   FOR THE DEFENDANTS:       Mr. Douglas M. Kubehl
                               Mr. Jonathan B. Rubenstein
14                             Mr. Jeffery S. Becker
                               BAKER BOTTS LLP
15                             2001 Ross Avenue
                               Dallas, Texas 75201
16
                               Ms. Melissa R. Smith
17                             GILLAM & SMITH LLP
                               303 South Washington Avenue
18                             Marshall, Texas 75670

19                             Mr. Asim M. Bhansali
                               KWUN BHANSALI LAZARUS LLP
20                             555 Montgomery Street
                               Suite 750
21                             San Francisco, California 94111

22

23

24

25
```

PROCEEDINGS

COURT SECURITY OFFICER:  All rise.

(Jury panel in.)

THE COURT:  Thank you.  Be seated, please.

Good morning, ladies and gentlemen.  Thank you for being here.

My name is Rodney Gilstrap, and I am the resident United States District Judge here in the Marshall Division of the Eastern District of Texas.

I've lived in Marshall since 1981.  I practiced law in and around this area for 30 years before I got this job.  I came on the bench here in 2011.

And I will admit to you, I was not born in Texas. I was born in Florida, but as they say, I got here as fast as I could.  I came to Texas to go to college and then stayed and went to law school at Baylor University in Waco.

I am married, I have two grown children, and my wife owns and operates a retail floral business here in Marshall.

Now, I tell you these things because, in a few minutes, I'm going to ask each of you to tell me the same kind of information about each of yourselves, and I think that you're entitled to know as much about me as I'm about to find out from each of you.

We are about to engage in the selection of a jury

1    in a civil case involving allegations of patent

2    infringement.

3          But before we go any further, I want to briefly

4    review with you how we came to have a jury trial system for

5    civil disputes like this one.

6          If you go back in ancient history and you begin

7    with the Pentateuch, the first five books in the Old

8    Testament, you'll find that the ancient Jewish nation

9    empaneled juries to decide issues of property ownership and

10   property value.

11         Also in ancient history, you'll find that the

12   Greeks began using a jury system about 1500 BC.

13         The ancient Romans, as they did with most things,

14   adopted the jury system from the ancient Greeks, and it was

15   the Romans that brought the jury system to what is today

16   England when they conquered that island in the 4th Century

17   AD.

18         So 800 years went by with the jury system being a

19   part of everyday life in England until the 12th Century,

20   and in the 12th Century, a tyrannical king came to the

21   throne of Great Britain named King John, and one of the

22   things

23   King John did was seek to limit and deny the right to trial

24   by jury.

25         King John ended up in a series of disputes with

1   his nobles.  It led to the verge of a civil war.  That

2   civil war was averted by a document that they all agreed to

3   and signed at a place in England called Runnymede.

4          That document, which avoided that civil war and

5   which restored the right to trial by jury in England is

6   something you all probably have heard of before.  It's

7   called the Magna Carta.

8          As a matter of fact, ladies and gentlemen, 28 of

9   the 50 United States have adopted in their own state

10  constitutions the exact language regarding the preservation

11  of the right to trial by jury from the Magna Carta in their

12  own state constitutions.

13         So you can see from that history that when our

14  Founding Fathers came to these shores as British colonists,

15  they brought with them a longstanding and engrained

16  reliance and familiarity with the right to trial by jury.

17         And the right to trial by jury flourished in the

18  British colonies in North America for over a hundred years

19  until another tyrannical king came to the throne of Great

20  Britain.  This time the king's name was King George, III.

21  And King George, III, in addition to many other disputes

22  with his colonists, our forefathers, also sought to deny

23  the right to trial by jury.

24         And when Thomas Jefferson sat down to write the

25  Declaration of Independence, which spells out with

1  particularity the reasons and the disputes which forced the

2  colonies in this -- in this continent -- on this continent

3  to separate from Great Britain and to form our own separate

4  country, one of the specific reasons, one of the specific

5  complaints set forth in the Declaration of Independence was

6  King George, III's attempts to do away with and limit the

7  right to trial by jury among the citizens here in America.

8        So the right to trial by jury is an important and

9  a historically significant part of our heritage as

10  Americans.

11        As a matter of fact, after we gained our

12  independence from Great Britain, we subsequently adopted

13  and passed into law, the Constitution, our supreme

14  governing document.

15        And after the Constitution was adopted and

16  ratified, shortly thereafter, the 10 first -- the first 10

17  amendments to the Constitution, a document we call the

18  Bill of Rights, was adopted and ratified by the several

19  little states to become a part of the Constitution.

20        If you look at the first 10 amendments to our

21  Constitution, you will find therein the Seventh Amendment.

22        The Seventh Amendment guarantees the right to

23  trial by jury in civil disputes like this one.

24        The Seventh Amendment, along with the other nine

25  amendments that form the Bill of Rights, were ratified in

1    1791.

2          So for over -- well over 200 years, every American

3    citizen has had a constitutionally guaranteed right under

4    the Seventh Amendment to resolve their civil disputes

5    through a trial by jury.

6          I always -- I always tell people that appear --

7    citizens like yourselves that appear for jury service, that

8    in my own personal opinion, jury service is the second

9    highest form of public service that any American can

10   undertake.

11         In my personal opinion, the highest form of public

12   service for any American are those young men and women that

13   wear the uniform of our armed forces and put their lives on

14   the line to protect us.

15         But by being here and presenting yourselves for

16   jury duty today, in a very real way, ladies and gentlemen,

17   you are doing your part to preserve, protect, and defend

18   our constitutional right to a trial by jury.

19         Now, later in the process this morning, the

20   lawyers for the parties are going to address those of you

21   on the venire panel, and they're going to ask questions.  I

22   want you to understand the lawyers for neither side are

23   going to be seeking to inquire unduly into your private

24   affairs.

25         In other words, they're not attempting to be nosy

1  or to inject themselves into your personal business.  They

2  are asking questions that they are entitled to ask for the

3  purpose of securing a fair and an impartial jury to hear

4  the evidence -- excuse me -- to hear the evidence in this

5  case.

6          Now, I don't know if it will happen today.  It is

7  a rarity.  It sometimes happens, but it's pretty rare.

8          If any of you should be asked a question by any of

9  the lawyers in this case that you personally believe is too

10 private and too personal for you to answer in front of

11 everyone else, then you simply have the option to say:  I'd

12 like to talk about that with Judge Gilstrap.

13         And if that is your answer, then I will provide an

14 opportunity where you can answer that question outside of

15 the presence of everyone else on the panel.

16         Again, ladies and gentlemen, that doesn't come up

17 often, but if it does, I want you to know that you do have

18 that option.

19         The important thing this morning is that each of

20 you should give, full, complete, and truthful answers to

21 the questions that are asked.  Remember, there are no wrong

22 answers, as long as the answers you give are full,

23 complete, and truthful.

24         Now, the trial of this case will begin today after

25 the jury is selected, and I anticipate it will go

1   throughout the remainder of this week.  I'm hopeful that we

2   can complete the case on Friday of this week.

3         I need to know at this point if there are any of

4   you on the panel that, if you were selected to serve on the

5   jury, would have difficulty being able to be present for

6   the entirety of this week.

7         And by that, I mean, if any of you have prepaid

8   nonrefundable airline tickets someplace, if you have a

9   surgical procedure scheduled for you or an immediate loved

10  one who depends on you, if you have a serious and a

11  compelling reason why you couldn't be here, if selected to

12  serve during this week, then that's something I need to

13  know about.

14        Let me ask if there is anyone on the panel that

15  has such a scheduling issue, if so, would you raise your

16  hands and let me make a note of it.  And if you'll keep

17  them up, please, just a moment.

18        Okay.  No. 18, Mr. Murray.

19        And I can't see the number in the back.  What is

20  your number, ma'am?

21        JUROR AMY YOUNG:  24.

22        THE COURT:  24?  All right.

23        And then No. 7 on the front row of the jury box.

24        Anyone else?  Those three?  All right.  Thank you

25  very much.

```
 1           At this time, I'm going to call for announcements
 2   on the record in the case of Intellectual Ventures I LLC
 3   versus T-Mobile USA, Inc., et al.  This is Civil Case
 4   No. 2:17-CV-577.
 5           And, counsel, as you give your announcements on
 6   the record, please identify yourselves, the members of your
 7   trial team, and any corporate representatives that you have
 8   with you.
 9           We'll begin with the Plaintiff.  What says the
10   Plaintiff?
11           MR. WARD:  Johnny Ward for Intellectual Ventures,
12   and we are ready, Your Honor.  Seated with me at counsel
13   table, trying this case with me is Mr. Marty Black; Kevin
14   Flannery; my law partner, Claire Henry; my law partner,
15   Andrea Fair; and our corporate representative, Mr. John
16   Paschke from Intellectual Ventures.
17           THE COURT:  All right.  Thank you, counsel.
18           What says the Defendants?
19           MR. KUBEHL:  Good morning, Your Honor.  Doug
20   Kubehl, and with me on the trial team is Ms. Melissa Smith,
21   Mr. Jonathan Rubenstein, Mr. Jeff Becker for Defendants
22   Ericsson and T-Mobile.  Our corporate representative for
23   Ericsson is Mr. Johan Norrby, and our corporate
24   representative for T-Mobile is Mr. Stephen McGrath.
25           THE COURT:  And you're ready to proceed?
```

1          MR. KUBEHL:  We are ready to proceed, Your Honor.

2          THE COURT:  Thank you, counsel.

3          Ladies and gentlemen, as I've told you, this is a

4  patent case arising under the patent laws of the United

5  States.

6          What the Plaintiff is claiming in this case is

7  that its three patents are being infringed by the

8  Defendants, and it's seeking money damages because of that

9  infringement.

10         The Defendants deny that they are infringing any

11 of the Plaintiff's patents, and they contend that the

12 patents at issue are invalid.

13         Now, what I've just told you is a very simple,

14 very informal description of the case in layman's terms.

15         I know that you've each seen the patent video

16 prepared by the Federal Judicial Center.  Having seen that,

17 you already know more about patent cases than most ordinary

18 citizens do in our area.

19         Now, as I say, the lawyers on both sides are about

20 to question the panel in order to gather additional

21 information that's appropriate to secure a fair and

22 impartial jury and allow them to rightfully exercise their

23 peremptory challenges.

24         Again, there aren't any wrong answers, as long as

25 the answers you give to the questions that you are asked

 1   are fair -- excuse me, full, complete and truthful.

 2          If, ladies and gentlemen, lawyers for either of

 3   the parties ask a question of the panel or any individual

 4   panel member that I think is improper, I will certainly

 5   stop them and I will certainly tell them.

 6          However, you should understand that these are all

 7   experienced trial lawyers.  They're familiar and well

 8   versed in our Federal Rules of Civil Procedure and the

 9   local rules of this Court, and I don't expect that to

10   happen.

11          One thing I want to discuss with you, however,

12   before the lawyers address you, because it's possible that

13   one or more of them may ask you about your ability to apply

14   this if you're selected to serve on the jury, is the burden

15   of proof.

16          In a patent case, the jury may be called upon to

17   apply two different burdens of proof.  The jury may apply a

18   burden of proof known as the preponderance of the evidence.

19   I'll say that again, the preponderance of the evidence.  As

20   well as a second burden of proof known as clear and

21   convincing evidence.  I'll say that again, clear and

22   convincing evidence.

23          Now, when responding to lawyers' questions about

24   the burden of proof, I need to instruct you that when a

25   party has the burden of proof on any claim or defense by a

1  preponderance of the evidence, it means you, the jury, must

2  be persuaded by the credible or believable evidence that

3  that claim or defense is more probably true than not true.

4  I'll say that again, more probably true than not true.

5          Sometimes this is talked about as being the

6  greater weight and degree of credible testimony.

7          Let me give an example that I hope will be

8  helpful.

9          In front of me I think you can see -- all of you

10  can see the statue of the Lady of Justice.  She's

11  blindfolded.  Her right hand holds the sword of justice

12  which is lowered at her right side.  In her left hand, she

13  holds the Scales of Justice which are elevated, and those

14  scales are balanced and equal.

15          If you think about the burden of proof in this

16  way, over the course of the trial, you'll be hearing

17  evidence from both sides.  And each side's evidence will go

18  on one side or the other of those scales.  And when all the

19  evidence is in, the jury's going to be asked to answer

20  certain questions.  And if a party has the burden of proof

21  by a preponderance of the evidence on any question, if you

22  consider all the evidence placed on one side or the other

23  of those scales, if those scales then tip in favor of that

24  party with the burden of proof, even if they tip ever so

25  slightly, then that party has met the burden of proof of a

1   preponderance of the evidence.

2          On the other hand, ladies and gentlemen, when a

3   party has the burden of proof of proving any defense by

4   clear and convincing evidence, the second burden of proof I

5   mentioned to you, that means that the jury must have an

6   abiding conviction that the truth of the party's factual

7   contentions are highly probable.  Let me say that again, an

8   abiding conviction that the truth of the party's factual

9   contentions are highly probable.  That's a higher standard

10  of proof or burden of proof than the preponderance of the

11  evidence.

12         If you think about the example I gave you with

13  regard to this second burden of proof and after the trial

14  and after all the evidence is in, the evidence for both

15  Plaintiffs and Defendants are on one side or the other of

16  those scales, if a party has the burden of proof on any

17  defense by clear and convincing evidence, those -- to meet

18  that burden of proof, those scales must tip in that party's

19  favor, and they must tip definitely.  They can't just tip

20  ever so slightly.

21         If, however, they do tip definitely in that

22  party's favor, then they have met the burden of proof of

23  clear and convincing evidence.

24         Now, neither of these two burdens of proof that

25  I've talked with about you should be considered or confused

1  with a third and different burden of proof that I'm sure

2  you've all heard about on television and movies and in the

3  media, and that third burden of proof is beyond a

4  reasonable doubt.

5       Beyond a reasonable doubt is a burden of proof

6  that is applied in a criminal case.  It has no application

7  whatsoever in a civil case like this.

8       You should not confuse clear and convincing

9  evidence with beyond a reasonable doubt.  It's not as high

10 a burden of proof as beyond a reasonable doubt, but it is a

11 higher burden of proof than the preponderance of the

12 evidence.

13      I give you these instructions in case the lawyers

14 for one or the other parties in their questioning asks you

15 about your ability to apply those two burdens of proof, the

16 preponderance of the evidence and clear and convincing

17 evidence to the evidence and testimony that's presented in

18 this case.

19      Now, before the lawyers address the panel, we've

20 come to the point in the process where I'm going to ask

21 each of you to tell me about yourselves, similar things to

22 what I mentioned about myself when we started.

23      Each of you will find on the screens in front of

24 you, and I think you have laminated cards, as well, nine

25 specific questions that we're going to ask each of you to

1  answer.

2       And we're going to do this one at a time.  We'll

3  begin with Panel Member No. 1, and our Court Security

4  Officer is going to bring a handheld microphone to each of

5  you to use in answering those questions.

6       When you get that handheld microphone, if you will

7  stand and if you will use that microphone, then answer

8  those nine questions.  And then the microphone can be

9  passed to the next member of the panel, they can stand, use

10  the handheld mic, and answer in the same fashion.

11       Also -- also, ladies and gentlemen, during the

12  lawyers' questioning of the panel as a whole, if you're

13  asked any specific question, you need to wait until the

14  Court Security Officer brings you the microphone before you

15  attempt to answer, and you need to stand and use the

16  handheld microphone when you give your answers.

17       You can all see there are a lot of people in this

18  room.  It's a large courtroom.  And you will not be heard

19  unless you stand and use that handheld microphone when you

20  give your answers.  So please remember to do that.

21       All right.  We will begin that process with Panel

22  Member No. 1.  If the Court Security Officer will take the

23  microphone to our first panel member.

24       Mr. Page, if you'll stand and give us your nine --

25  your answers to those nine questions, please.

1          JUROR PAGE:  Hello everybody.  My name is Ruben

2   Page, and I'm from Pittsburg, Texas.  I've lived there

3   about 38 years.

4          I have two daughters.  One is 38 that's lived at

5   home.  She has Tourette's.  I have another daughter that's

6   40 -- fixing to turn 42 on the 17th.

7          I worked for Luminant for 40 years.  A lot of

8   y'all -- it used to be called TXU.  We have a power plant

9   here in Tatum.  On.

10          January 8th of last year, they closed three of

11   our power plants, and I've been unemployed for a year.  But

12   I worked there for 40 years.

13          I went to Longview High School, and I graduated in

14   1972.  Three weeks after I graduated, I joined the Marines,

15   and I spent eight years in the Marines, three years

16   active -- well, six years, three years active and three

17   years in reserves.

18          My wife's name is Susan Page.  She works for

19   Maven's Menswear.  She's a bookkeeper.  She's been there

20   about 20 years.  And I was on a criminal trial jury in

21   Pittsburg a couple of years ago.

22          THE COURT:  All right, sir.  Thank you very much.

23          If you'll hand the microphone to Ms. Pyle, Panel

24   Member No. 2.

25          Ms. Pyle, if you'll stand and give us your

1   answers, please.

2          JUROR PYLE:  Okay.  My name is Linda Pyle.  I live

3   in Hallsville, Texas.  I have two sons.  Jonathan is 34,

4   and Brandon is 27.

5          I'm not employed right now.  We are -- we own a

6   family business.  We just sold part of it to our -- my son.

7   That's why I'm -- I'm unemployed.  I no longer get a

8   paycheck.  But, anyway, it -- what I did was a bookkeeper.

9          And do I need to tell the name of the business?

10         THE COURT:  I'm sorry, ma'am?

11         JUROR PYLE:  The name of the business, do I --

12         THE COURT:  Please.

13         JUROR PYLE:  Okay.  At that time, it was AutoBody

14   Express in Longview.  And then we also own Pyle Properties

15   and also Tektra Design & Build.  How -- let's see.  I

16   worked for AutoBody Express for right at 15 years.  I

17   graduated from high school in Louisiana.

18         My husband's name is Greg Pyle, and he -- he

19   own -- well, owned AutoBody Express.  He's still an officer

20   on -- in part of AutoBody Express, but -- so he -- he does

21   the Pyle Properties.

22          He's an owner -- owner and officer for that, and

23   then Tektra Design & Build also.  I guess he's a member.

24   And he has been there since '89, so --

25         THE COURT:  Any prior jury service?

1    JUROR PYLE:  I'm sorry?

2    THE COURT:  Do you have any prior jury service?

3    JUROR PYLE:  Yes.  One was a civil, and one was

4  criminal.  The second one was like a sentencing.

5    THE COURT:  And where were those, and when were

6  those?

7    JUROR PYLE:  Here in Harrison County.

8    THE COURT:  At the county courthouse?

9    JUROR PYLE:  Yes.

10    THE COURT:  And how long ago, Ms. Pyle?

11    JUROR PYLE:  The criminal was probably two years

12  ago, the sentencing.  And the one before, that was -- I

13  mean, several years before that.

14    THE COURT:  Okay.  That's fine.  Thank you very

15  much.

16    If you'll hand the microphone to Panel Member

17  No. 3.

18    JUROR MARION:  My name is Adam Marion, and I live

19  in Gilmer, Texas.  I have one 5-year-old.

20    I am working for American Electric Power, and I'm

21  the design engineer there.  I've been there for 30 days.

22    Before that, I was working at Upshur Rural

23  Electric in Gilmer.  I was there for four and a half years.

24  Two years ago, I graduated from UT Tyler with my electrical

25  engineering degree.

```
 1          My wife's name is Courtney Marion, and she's a
 2   stay-at-home mom.  And I -- my only prior jury was being in
 3   a selection in a -- in Upshur County but didn't get any
 4   further than that.
 5          THE COURT:  All right.  You appeared for jury
 6   duty, but you weren't selected?
 7          JUROR MARION:  Yes, sir.
 8          THE COURT:  Okay.  Thank you very much, sir.
 9          If you'll pass the microphone to Panel Member
10   No. 4, Mr. Crabb.
11          JUROR CRABB:  My name is Martin Crabb.  I live in
12   Omaha, Texas.  I have two children, Andy and Chelsea.  Andy
13   is 30, and Chelsea is 26.
14          I work for Walmart in Mount Pleasant, Texas.  I'm
15   an assistant manager.  I've worked there for 25 years.  My
16   educational background is I went to high school, and that's
17   it.
18          My spouse's name is Judy Crabb.  She works for
19   Everybody's Furniture in Mount Pleasant.  She's worked
20   there for a year.  She's in retail sales also.  And I don't
21   have any prior jury service.
22          THE COURT:  All right, sir.  Thank you very much.
23          Next is Panel Member No. 5, Ms. Howell.
24          JUROR HOWELL:  My name is Rhonda Howell.  I'm from
25   Gilmer, Texas.  I have two sons, 37 and 33.
```

1          I work for Gilmer ISD.  I'm a bus driver.  I've
2    worked there almost a year.  GED, 1981.

3          My husband's name is Joe.  He works at Robroy
4    Industries in Gilmer.  He's been there 26 years.

5          And I was on a civil case back in the early '90s.

6          THE COURT:  And where was that, Ms. Howell?

7          JUROR HOWELL:  Gilmer, Upshur County.

8          THE COURT:  All right.  Thank you.

9          No. 6, Mr. Moss.

10          JUROR MOSS:  My name is John Moss.  I've got three
11    kids, 11, 3, and 2 years old.

12          I work for Stewart & Stevenson in Longview as a
13    diesel mechanic.  I've been there six months.  I graduated
14    from Gilmer High School.

15          My wife's name is Amanda Moss.  She works for
16    Peters Chevrolet.  She's been there for six months.  And
17    I've never had prior jury service.

18          THE COURT:  All right, sir.  Next is No. 7,
19    Mr. Swilley.

20          JUROR SWILLEY:  Yes.  Shannon Swilley.  I live in
21    Elysian Fields, Texas just south of here.  Got two kids.
22    My daughter is 17, boy is 11.

23          I own my own pipe-testing company, oil and gas
24    business.  Started it in 2010.  Education is Elysian Fields
25    High School and TSTC Industrial Maintenance.

1          Spouse's name is Stacey Swilley.  She's -- runs

2     the Hearts Way Hospice here in Marshall.  And she's been

3     there, I believe, five years.  And no jury duty.

4          THE COURT:  You've never been -- served on a jury?

5          JUROR SWILLEY:  No, sir.

6          THE COURT:  Okay.  If you'll hand the microphone

7     to the Court Security Officer, he'll take it around to

8     Panel Member No. 8, Ms. Vollmer.

9          JUROR VOLLMER:  Hello.  My name is Amber Vollmer.

10    I live in Hallsville.  Been there for about a year and a

11    half now.  I have one little boy, who's 2, and I'm also six

12    months pregnant with a little girl due in May.

13          I work for Walmart on Estes Parkway in Longview.

14    I've been there probably about a year and a half-ish.  I'm

15    a customer service manager.

16          I went to Union Grove High School in Upshur

17    County, and my sophomore year I decided to leave and finish

18    out my high school education through Penn Foster.  I also

19    graduated from Vista College as a medical assistant.

20          My husband's name is Matthew Vollmer.  He works as

21    a saw operator for Streamflo, the Longview plant.  And he's

22    been there for probably about eight months or so.  And I

23    haven't had any prior jury services.

24          THE COURT:  All right.  Thank you.

25          If you'll hand the microphone to Panel Member

1   No. 9, Mr. Maxie.

2          JUROR MAXIE:  My name is Arlistel Maxie.  I have

3   three children, three girls, 43, 41, and 37 years of age.

4          I've been part of Brookshire's Grocery Company for

5   45 years.  I know y'all thought I was 45 years old.  I work

6   in the meat department where I've been for the entire time.

7   I started at 16 years of age.  I.

8          Have a high school -- graduate of Atlanta High

9   School in Atlanta, Texas.

10          My spouse's name is Linda Maxie.  She's a retired

11   schoolteacher for 27 years, and I talk about retiring too

12   much, so she started back to work this year teaching at

13   Linden High School in Linden, Texas.  She's been there for

14   just this year.

15          I have been called for jury duty here in Marshall

16   one time before, but I was not picked as a juror.

17          THE COURT:  All right, sir.  Thank you very much.

18          Next is Panel Member No. 10, Mr. Young.

19          JUROR MICHAEL YOUNG:  My name is Michael Young.  I

20   live in Bivins, Texas.  I have two children, 26 and 22

21   years of age.

22          I work for Cooper Tire & Rubber Company.  Been

23   there for three years.  Before that, I worked in the

24   oilfield for various companies for ten years.  Before that,

25   I worked for Frito Lay for nine years.  I am divorced and

1  never been picked for a jury.

2          THE COURT:  All right, sir.  Next is No. 11.

3          JUROR SHIRLEY:  My name is Don Shirley.  I live in

4  Atlanta, Texas.  I've got two children, two twin boys, 31

5  years old.

6          I work for Bowie-Cass Electric Cooperative.  Been

7  there for a little over 29 years.  I've got a Bachelor of

8  Art's degree in English with a minor in history.

9          My wife's name is Stephanie.  She's a retired

10  Texas kindergarten teacher.  She was there for 30 years in

11  Atlanta and then in Queen City, Texas.  She's been retired

12  for about five years now.  And I've never served on a jury.

13          THE COURT:  All right, sir.  Thank you very much.

14          Next is No. 12.

15          JUROR STRUTTON:  Melissa Strutton from Ore City,

16  Texas.  I have three grown sons, one of which just joined

17  the Navy a few months ago.

18          I work for Ore City Elementary.  I've been the

19  secretary there for six years, but I've been there for 16.

20  I graduated high school in Pittsburg, Mississippi.

21          My husband's name is Joe.  He works at Gematsu.

22  He is a planner.  He's been there about 21 years.  I did a

23  criminal case in Upshur County once.

24          THE COURT:  How long ago was that?

25          JUROR STRUTTON:  Probably seven, eight years ago.

1          THE COURT:  All right.  Thank you.

2          Next is No. 13, Ms. Thornton.

3          JUROR THORNTON:  My name is Susan Thornton.  I

4    live here in Marshall.  I have two children, 30 and 34.

5          I work for Messick Properties as their business

6    manager.  We own and operate McDonald's restaurants.  I've

7    worked for them for 17 years.  I have a degree in

8    accounting.

9          My husband's name is Don.  He owns his own

10   business and stripes and cleans parking lots, and he

11   started that business in 2010.  And I have never been

12   picked for a jury.

13         THE COURT:  Thank you.

14         No. 14 is next, Ms. Trammell.

15         JUROR TRAMMELL:  Tamela Trammell.  I have two

16   kids.

17         I'm employed by Walmart.  Been there two years.

18   I graduated high school, never been married.  And I've been

19   on a civil jury about five years ago.

20         THE COURT:  Where was that, ma'am?

21         JUROR TRAMMELL:  Here in Marshall.

22         THE COURT:  At the county courthouse?

23         JUROR TRAMMELL:  Yes.

24         THE COURT:  Okay.  Thank you very much.

25         We'll take the microphone around to Panel Member

1    No. 15, Mr. Turner.

2           JUROR TURNER:  Eldon Turner.  I've never been

3    married, have no children.  I'm 20 years retired Air Force.

4           Currently work for the City of Longview Compost

5    Site for 13 years.  I've retired there the 16th of

6    February.

7           THE COURT:  Could you hold that microphone a

8    little closer, and tell me again what you do for the City

9    of Longview?

10          JUROR TURNER:  We operate the Compost Site.

11          THE COURT:  Compost Site.  Okay.  Thank you.

12          JUROR TURNER:  Hallsville high, graduated there.

13          Prior jury service, I served here, civil service,

14   about five years ago.

15          THE COURT:  In this courthouse?

16          JUROR TURNER:  Yes, sir.

17          THE COURT:  Okay.  Thank you very much, sir.

18          Next is No. 16.

19          JUROR SCAFF:  My name is Deborah Scaff.  I go by

20   Debbie.  I have two adult children, 49 and 46.

21          My place of employment before I retired was the

22   Texas school system, which I'm very proud of.  My

23   educational background was high school diploma.

24          My spouse's name is James Scaff.  His place of

25   employment upon retirement was the school system also.

1          Prior to that, we both had 27 years in the banking

2   business.  I have had no prior jury service at all.

3          THE COURT:  All right.  Next is No. 17,

4   Ms. Rambin.

5          JUROR RAMBIN:  My name is Mary Rambin.  I have two

6   kids, 15 and 16.

7          I work for Credit Security Group in Longview,

8   Texas.  We work with mortgage lenders to help people

9   qualify for homes.  I've been there for 15 years.

10          I went to high school and did some college for a

11  business degree but never finished.

12          I am currently going through a divorce, so I don't

13  know if that counts for spouse.  And I have been summoned

14  eight times for jury duty, and I got picked for a criminal

15  trial for November in Upshur County.

16          THE COURT:  And so at this point, you're still

17  married?

18          JUROR RAMBIN:  Yes, sir.

19          THE COURT:  What does your husband do?

20          JUROR RAMBIN:  He works for LeBus International.

21  He's an machinist.

22          THE COURT:  All right.  Thank you, ma'am.

23          No. 18 is next, Mr. Murray.

24          JUROR MURRAY:  My name is Barry Murray.  I live in

25  Marshall, Texas.  I have four kids, two step kids, from 27

1  to 39.  I was employed with Sabine Oil & Gas in Kilgore.

2  Unemployed at the time.  Excuse me, I worked there for nine

3  years.  I have a high school diploma from South Louisiana.

4         My spouse's name is Rebecca Murray.  She also

5  worked at Sabine Oil & Gas for about three years and is a

6  stay at home wife now.  And I have not been picked for any

7  jury duty.

8         THE COURT:  All right, sir.  Thank you very much,

9  Mr. Murray.

10         We'll take the microphone around to Panel Member

11  No. 19, Mr. Willeford.

12         JUROR WILLEFORD:  Good morning.  I'm Clay

13  Willeford.  I live in Ore City, Texas.  I have four

14  children.  My place of employment is Eastern Shore Forest

15  Products.  I'm the general manager there.  I'm like Adam,

16  I've just recently started -- just 30 days at this company.

17         My educational background, I graduated from Spring

18  Hill High School, Kilgore College, University of Texas at

19  Tyler, and LeTourneau University.

20         My spouse's name is Linda.  We've been married 24

21  years.  She works at New Diana Independent School District,

22  and we have been back in this area for about five years, so

23  she is actually starting her sixth year there.  I have sat

24  on two jury services, both civil, one federal in Tyler,

25  roughly 25 years ago and one about 20 years ago locally in

1    Gregg County.

2         THE COURT:  And what does your wife do at the

3    school system?

4         JUROR WILLEFORD:  She's a teacher.

5         THE COURT:  What grade?

6         JUROR WILLEFORD:  Second grade.

7         THE COURT:  Thank you, sir.

8         If you'll pass the microphone to Panel Member.

9         No. 20.

10        JUROR WILGUS:  My name is Phil Wilgus.  I've got

11   four daughters, ranging in age from 18 to 24.  My place of

12   employment -- I currently work for my dad's company.  It's

13   an underwater construction business.  I'm a commercial

14   diver.  I've been working for him for about 30 years.

15        Educational background, I went to Longview High

16   School for two years, and I graduated down in Louisiana

17   from a little town called Hornbeck, Louisiana.  After that,

18   I went to commercial diving school and graduated from

19   commercial diving school in 1981 and been working for my

20   dad ever since.

21        My wife's name Jennifer.  She is a pharmacy tech

22   supervisor for Good Shepherd -- Christus Good Shepherd over

23   in Longview.  She's been there about 21, 22 years,

24   somewhere in there.  I have no prior jury service.

25        THE COURT:  All right, sir.  If you'll hand the

1    microphone to Panel Member No. 21.

2         JUROR MARGERUM:  I'm Robert Margerum.  I live out

3    on Lake Bob Sandlin.  I have one 25-year-old daughter who

4    is a middle school principal in McKinney.  I am presently a

5    special needs bus driver for Pittsburg.  I've been doing

6    that for seven years.

7         I graduated from Arlington High School and then

8    attended one year at Tarrant County Junior College.

9         My wife's name is Sharon Margerum, and she's

10   retired.  She did drive -- she was a bus monitor for

11   Pittsburg also for four years.  And I have four prior jury

12   summons, one in Parker County, two in Tarrant County, and

13   one in Camp County, and they were criminal.

14        THE COURT:  Did you serve on the juries in those

15   cases?

16        JUROR MARGERUM:  Yes.

17        THE COURT:  And how long ago has that been, sir?

18        JUROR MARGERUM:  The one in Camp County was about

19   three years ago, and the one in Tarrant County was --

20        THE COURT:  Earlier than that?

21        JUROR MARGERUM:  Long time ago.

22        THE COURT:  Thank you, sir.  If you'll hand the

23   microphone to No. 22, Ms. Johnson.

24        JUROR JOHNSON:  Hi.  My name is Debra Johnson.  I

25   live in Gilmer, Texas.  I have two grown children.  Retired

1    from the U.S. Army, over 20 years of service.  Some

2    college.  Gerald.

3            THE COURT:  That's your husband's name?

4            JUROR JOHNSON:  That's my husband's name.

5            THE COURT:  All right.

6            JUROR JOHNSON:  He designed offices.  He's retired

7    now.  And how long did he work doing that?  20 years.

8            THE COURT:  That's fine.

9            JUROR JOHNSON:  And no jury service.

10            THE COURT:  Thank you, ma'am.

11            Next is Panel Member No. 23.

12            JUROR KELLY:  My name is Michael Kelly.  I have

13    three children, three girls, three, seven, and 20.  Diesel

14    truck driver.  Work for an oilfield service company.

15    Worked there about 11 years.  Got my GED.

16            My wife's name is Miranda.  We've been together

17    for about 18 years.  She's currently a stay-at-home mom.

18    And she's been doing that for the past seven years.  And no

19    prior jury service.

20            THE COURT:  All right, sir.  Thank you.

21            The Court Security Officer will come get the

22    microphone from you and take it around to Panel Member.

23    No. 24, Ms. Young.

24            JUROR AMY YOUNG:  My name is Amy Young.  I live in

25    Pittsburg, Texas.  I have two sons, 14 and 12.  I am a

1  first grade teacher at Union Hill ISD, and I've been there

2  for two years.

3          I graduated from Henderson High School, Kilgore

4  College, and UT Tyler with a Bachelor of Science in

5  interdisciplinary studies.

6          My husband's name is James Young.  He works at

7  Titus Regional Medical Center in Mt. Pleasant.  He's the

8  cath lab manager and also a nurse.  He's been there 22

9  years.  And I have no prior jury service.

10          THE COURT:  All right, ma'am.  Thank you very

11  much.

12          Next is Panel Member No. 25.

13          JUROR BISSET:  My name is Connie Bisset.  And I

14  live in Marshall, Texas.  I've been here about eight years.

15  I have three kids, ranging 28 to 38.  And I work in

16  Longview at SeeSaw Children's Place.  I work as a secretary

17  in the office -- the administration office there.  I guess

18  I've been there four and a half years.

19          I went to high school in Great Falls, Montana, and

20  I went to college in Seattle Pacific in Seattle.

21          My husband's name is Steve, and we own TMT

22  Stoneworks and Water Design here in Marshall and actually

23  all around the area.  And we've done that for about 30

24  years.  And I have never been on a jury.

25          THE COURT:  All right, ma'am.  Thank you very

 1   much.

 2         Next is No. 26, Mr. Carrington.

 3         JUROR CARRINGTON:  My name is James Carrington.  I

 4   have three kids.  I work for Johnson Controls,

 5   Incorporated.  I've been there for eight years.

 6         THE COURT:  Mr. Carrington, can you hold that mic

 7   a little closer?  I'm having a hard time hearing you.

 8         JUROR CARRINGTON:  Yes.  I work for Johnson

 9   Controls, Incorporated.  I've been there eight years.  I

10   graduated high school.

11         Wife's name is Jackie Carrington.  She works for

12   Caddo Parish School Board as a school teacher.  And she's

13   been there for 11 years.  And I have no jury -- prior jury

14   service.

15         THE COURT:  All right, sir.

16         Next is No. 27, Ms. Allen.

17         JUROR ALLEN:  My name is Lauren Allen.  I'm from

18   Atlanta, Texas.  Been there most of my life.  I don't have

19   any children.  I work for McLeod ISD as a high school

20   English teacher.  Been there about four years now.

21         Back in May, I graduated from University of

22   Phoenix with a Master's in education.  My husband's name is

23   Jeff.  He works as a supervisor for Cooper Tire.  He's been

24   there about five years, I believe.  And I've never served

25   on a jury before.

```
 1          THE COURT:  All right.  Thank you, ma'am.  And
 2   next is Ms. Owens, No. 28.
 3          JUROR OWENS:  My name is Angela Owens.  I'm from
 4   Diana, Texas.  I have three children.  My 27-year-old works
 5   for Gregg County Juvenile and Probation Center.  Proud mom
 6   of two Army boys, 19 and 21.  I'm currently employed with
 7   First National Bank of Hughes Springs.  Prior to that --
 8   I've been there about a year.  Prior to that, I worked at
 9   Walmart for about 23 years and decided to retire.  Went to
10   high school at New Diana High School.  Got all my schooling
11   there.
12          Later, I went on to get a certificate of criminal
13   justice at Kilgore College.  Divorced.  And about -- end of
14   October, beginning of November, I served on a civil case in
15   Upshur County.
16          THE COURT:  All right.  Did the jury return a
17   verdict in that case, ma'am?
18          JUROR OWENS:  I was just an alternative, so I was
19   dismissed right before they done the verdict.
20          THE COURT:  Okay.  Thank you very much.
21          All right.  Ladies and gentlemen, thank you for
22   that information.
23          Now, before the lawyers begin their questioning, I
24   have a couple more things I need to say to you.
25          The jurors that are actually selected to serve in
```

1    this case will serve in the role as the judges of the

2    facts.  And the jurors selected will make the sole

3    determination about what the facts are in this case.

4         Now, my job as the Judge is to rule on questions

5    of law, to handle matters relating to evidence and

6    procedure, to maintain the decorum of the courtroom, and to

7    oversee the flow of the trial.

8         Additionally, I want to say a couple of things to

9    you about our judicial system that I hope will put things

10   in a proper perspective for you.

11        In any jury trial like this one, besides the

12   parties themselves, there are always three participants,

13   the jury, the Judge, and the lawyers.

14        With regard to the lawyers, I think it's important

15   for you -- for each of you to understand that our judicial

16   system is an adversary system, which means simply that

17   during a trial, each of the parties will seek to present

18   their respective cases to the jury in the best light

19   possible.

20        Now, it should be no surprise to any of you that

21   lawyers are often criticized in the media and in the

22   public, but the Court has observed that at least a good bit

23   of that criticism results from a basic misunderstanding

24   about our adversary system where the lawyers act as

25   advocates for the competing parties.

1          As an advocate, a lawyer is ethically and legally

2   obligated to zealously assert his or her client's rights

3   under the rules of our adversary system.

4          And by presenting the best case possible on behalf

5   of their clients, the lawyers hopefully will enable the

6   jury to better weigh the relevant evidence, to determine

7   the truth, and arrive at a just verdict based on that

8   evidence.

9          This adversary system of justice that we have has

10   served our nation well for more than 200 years, and

11   America's lawyers have been and will continue to be an

12   integral and indispensable part of that process.

13          So as we go forward with this trial, even though

14   it's possible from time to time you say -- you may see me

15   frown or growl at the lawyers, it's simply because I'm

16   trying to make sure that their advocacy doesn't get outside

17   the boundaries of our adversary system.

18          But keep in mind, please, they are simply doing

19   their jobs, and I think it's important for all of you to be

20   aware of that as we go forward.

21          Also, ladies and gentlemen, during the course of

22   the trial, I am going to do my very best to make sure that

23   no one on the jury has any idea about what I think about

24   the evidence because evaluating the evidence and from that

25   determining the facts in this case is the job of the jury.

1    It's not my job.

2           So those of you selected to serve on this jury

3    should not take any expressions that you see coming from me

4    or you think you see coming from me as something to

5    consider or as a factor to take into account in making your

6    ultimate decision about what the facts are in this case.

7           All right.  At this time, the lawyers will address

8    the panel.  We'll begin with the Plaintiff.

9           Mr. Ward, you may address the panel on behalf of

10   the Plaintiff.  Would you like a warning on your time?

11          MR. WARD:  I would, Your Honor, a five-minute

12   warning.

13          THE COURT:  All right.  You may proceed when

14   you're ready.

15          MR. WARD:  Good morning.  As I mentioned earlier,

16   my name is Johnny Ward, and I represent Intellectual

17   Ventures.  And I'll refer to them shorthand sometimes as

18   IV, so I'm not talking about what goes in your -- your arm,

19   but that's shorthand that we refer to them, IV.

20          You all have told us a little bit about

21   yourselves.  I'm going to tell you briefly about myself.

22   I've got three children, a 20-year-old in college, an

23   18-year-old senior in high school, and a 16-year-old

24   sophomore.  They're both at Longview High School.

25          My practice is over in Longview.  It's a law firm

1 called Ward, Smith & Hill.  I've been practicing law --

2 this is my 24th year.  My wife was a school teacher at

3 Longview High School.  We've been married for 21 years.

4 She retired to do what I say is the hard job, and that's

5 raise those kids.

6          I've never served on a jury.  I've picked lots of

7 juries.  I've tried lots of cases, but for some reason I

8 always get struck.

9          I tend to know everybody in the -- in the

10 courtroom.  I want to be on one, but unlike you all, y'all

11 probably want to get out of here.  But I do want to be on a

12 jury.  And I do thank you for being here.

13          Now, I told you just a little bit about myself.

14 You've told us a little bit about yourselves.  You probably

15 wouldn't want to hire me as your lawyer unless you know a

16 little bit more, would you?

17          Anybody ready to hire me?  No.  This is a really

18 important case, and that's why Judge Gilstrap gives us 30

19 minutes, which is not a lot of time -- it goes by

20 quickly -- to ask you all some questions about yourselves

21 to find out if you're the right juror for this case.

22          I'm going to tell you briefly about the case.

23 Y'all have figured out that it's a lawsuit involving a

24 dispute over patents.  And these are the three patents.

25 Those of you that make it on the jury will hear a lot more

1   about the patents in this case.

2          You'll also get to hear from the inventor, a

3   gentleman named Jacob Jorgensen.  He lives in Folsom,

4   California.  And he'll tell you about his invention.

5          It relates generally to intelligent base stations

6   that deliver high quality service over a wireless network.

7   That's a mouthful, and you'll learn a lot more about it if

8   you make it on the jury.

9          Now, the Defendants say we're not trespassing on

10  these patents.  They deny that, all right?  They also say

11  if they don't trespass, the patents are all invalid.

12         And they also say -- there's a big dispute about

13  how much money they owe if they're wrong on both of those

14  questions.

15         So we say it's $77 million.  They say it's

16  158,000.  So that's kind of the general parameters of the

17  dispute.  I'm not going to talk to you about the evidence,

18  but you all can tell there's a dispute about a lot of

19  things in this case.

20         I do want you to -- to encourage you to speak up.

21  I'm going to call on you by name because I know none of us

22  know each other, at least I don't think we know each other,

23  and I'm not picking on you, but I want to -- I want to

24  learn some more about you to see if you're the right juror

25  for this case, because when you came to the courthouse this

1   morning, did everyone want to be fair?

2          I think you're -- anyone want to be unfair, just

3   based on what they know so far, that they've got a bone to

4   pick, and they want to be unfair to somebody.

5          Typically not.  But would y'all agree with me that

6   depending upon your life experience, that might impact your

7   ability to be fair to both sides in a case.  And I'll give

8   you an example.

9          If you were in a -- let's say a plaintiff in a car

10  wreck.  Mr. Page, let's say you had a claim, and you were a

11  plaintiff in a car wreck case, and you got called for jury

12  service, and there was a jury, and it was a jury trial

13  involving a car wreck, and there was a plaintiff sitting

14  right on the table close to you, and there was a defendant

15  at this table.

16         You might not be the right juror for that case

17  because you might start out leaning.  Not that you're an

18  unfair person, but because of what's going on in your life

19  right now or what's happened in the past might impact your

20  ability to be fair.

21         So that's what we're trying to find out.  Is there

22  anything that makes you not the right juror for this case?

23  And that's what we'll be asking about.

24         So I want to start out by asking if anyone knows

25  Melissa Smith.  She's an attorney, and she practices here

1    in Marshall, the law firm of Gillam & Smith.  Does anyone

2    know Ms. Smith?

3          And when I say know, I'm using the broadest sense

4    of the term.  I recognize her.  My kids go to school with

5    her kids or for any reason.  Maybe you know someone at her

6    law firm.  Her law partner is Gil Gillam.

7          I don't see anyone raising their hand that knows

8    Ms. Smith or Mr. Gillam.

9          There's also a lawyer in their office whose name

10   is Bobby Lamb.  Does anyone know Mr. Lamb?

11         With Ms. Smith is a law firm called Baker Botts.

12   They're a large -- large law firm all over the country.

13         I don't think that anyone will know any lawyers

14   there, but maybe have been represented by them or maybe you

15   know somebody.  I shouldn't assume anybody.

16         Anybody know the law firm of Baker Botts or ever

17   been represented by them, have family members that work for

18   that law firm.

19         All right.  Here's my next question about jury

20   service.  A number of you indicated that you have been

21   jurors before in jury trials.  Has anyone ever been the

22   foreperson on a jury?

23         And I'm going to do it in this way:  First row,

24   Mr. Page?  Yes, sir.  Can I ask you a question about that?

25              JUROR PAGE:  Sure.

1          MR. WARD:  You were the foreperson?

2          JUROR PAGE:  Yes, sir, I was.

3          MR. WARD:   How long ago was that?

4          JUROR PAGE:  About five years ago.

5          MR. WARD:  And what type was case was it?

6          JUROR PAGE:  Well, it was a criminal case.  A guy

7    had hit a deputy going to work one day.  She was 38 years

8    old.  He was drunk.  And we convicted him, but we didn't

9    find out until after the trial that he actually had a

10   bottle of whiskey in his boot.

11         MR. WARD:  Wow.

12         JUROR PAGE:  But he killed this 38-year-old woman

13   and two kids.

14         MR. WARD:  Terrible.

15         Okay.  And you said you worked for Luminant for

16   40 years?

17         JUROR PAGE:  Yes, I did.

18         MR. WARD:  Were you an operator there?

19         JUROR PAGE:  Yes, I was.

20         MR. WARD:  What specifically did you do?

21         JUROR PAGE:  Well, I was a dragline operator and

22   run shuttles, backhoes, and then in April 15th of 2016,

23   they closed three lines.

24         MR. WARD:  Okay.

25         JUROR PAGE:  I was advised to go to the power

1  plant, and I went over there, and I run front-end loaders

2  and dozers for the past two years.

3       MR. WARD:  Okay.  Thank you, sir.

4       Let me talk to you a little bit about IV and what

5  business they're in.  Obviously, they have filed this

6  lawsuit against T-Mobile and Ericsson, and you all are

7  going to hear about that dispute.

8       You're going to learn that IV is a company that

9  owns tens of thousands of patents.  It does a number of

10  different businesses, but one of those businesses is

11  licensing these patents.

12       They acquire patents from inventors, from

13  different companies.  In this case, you'll learn they

14  bought these patents out of a bankruptcy.

15       Now, they've obviously filed this lawsuit against

16  these companies.  Those of you that make it on the jury

17  have -- will find out that they have found -- they have

18  filed other lawsuits.  They've filed dozens of lawsuits,

19  all right?

20       So here's my question:  I know y'all have answered

21  a questionnaire, and that gave us a lot of information

22  about some feelings and opinions that you all have, and

23  that helps speed this process up.

24       Here's my question to you:  It might be perfectly

25  legal -- and I want to know if you feel this way.  It might

1   be perfectly legal to buy patents and file lawsuits, but I

2   don't like it, all right?

3          If you feel that way, raise your hand, and I want

4   to talk to you about it.

5          Ms. Howell, you and I were grinning at each other.

6   Let me find out if you -- what you were grinning about.

7   Maybe it wasn't about my question.  Not at all.  I missed

8   something.

9          Okay.  Well, let me ask you, since I've called on

10  you, tell me how you feel about that.  Does that start you

11  leaning one way or the other before you've heard any

12  evidence in this case?

13          JUROR HOWELL:  No, sir.

14          MR. WARD:  Okay.  And remind me what you -- you do

15  for a living.

16          JUROR HOWELL:  I drive a school bus for Gilmer

17  ISD.

18          MR. WARD:  That's right.  That's right.

19          All right.  Thank you, ma'am.

20          Ms. Pyle, we just got your questionnaire this

21  morning, and that's where I got some information about your

22  feelings on lawsuits, and I read through it pretty quickly

23  because there were 17 of them, and I felt like I had about

24  five minutes to get through them.

25          Tell me about what I've just told you about, IV

1  and what part of its business is.  Does that start you

2  leaning one way or the other, given your feelings about

3  lawsuits?

4        JUROR PYLE:  I don't think so.

5        MR. WARD:  Okay.

6        JUROR PYLE:  I don't think so.

7        MR. WARD:  Okay.  And I always -- I always get

8  concerned when people say:  I don't think so.  It might.

9        And -- and is that what you're telling me?  It

10 might affect you?

11        JUROR PYLE:  It may.

12        MR. WARD:  Okay.  And that's okay.  And, look,

13 there are no wrong answers.  You can't give a wrong answer.

14        I just want to find out if you start leaning one

15 way or the other in this case before you've heard evidence,

16 and there's -- there's nothing wrong with that.  Leaning

17 doesn't disqualify you.

18        JUROR PYLE:  No.

19        MR. WARD:  So when you say you sort of feel that

20 way, tell me what you feel just based on what I've told

21 you.

22        JUROR PYLE:  Well, I guess them having lots of

23 lawsuits, that kind of --

24        MR. WARD:  That starts you going:  Hmm, I'm not --

25        JUROR PYLE:  Yes.

```
 1          MR. WARD:  -- I'm not sure I like their business.

 2          JUROR PYLE:  I mean, yeah.

 3          MR. WARD:  That's --

 4          JUROR PYLE:  I mean, I don't know any details, but

 5   that does kind of strike me as --

 6          MR. WARD:  Okay.  Something that you look at them

 7   a little bit differently.

 8          JUROR PYLE:  Exactly.

 9          MR. WARD:  Like would it be fair to say that based

10   upon what I've told you about their business, maybe we

11   don't start out on the exact same level with T-Mobile and

12   IV -- I'm -- I'm IV -- T-Mobile and Ericsson?

13          Would that be fair, that we don't start out --

14   before we start the evidence, just based upon their

15   business, we don't start out on the same footing?

16          JUROR PYLE:  I don't quite understand what you're

17   asking.

18          MR. WARD:  Okay.  It's a bad question.

19          JUROR PYLE:  Okay.

20          MR. WARD:  All right.  You said that you -- you

21   have some concerns about their business.

22          JUROR PYLE:  Uh-huh.

23          MR. WARD:  And you start the case -- just based on

24   what I've told you their business is, is it fair to say

25   that we might not start out dead even fair with these
```

```
 1   Defendants?

 2          JUROR PYLE:  Right.  Right.

 3          MR. WARD:  Okay.  And that's regardless of what I

 4   tell you the facts are -- and I'm not going to get into

 5   those.  Maybe I could --

 6          JUROR PYLE:  Right.

 7          MR. WARD:  -- persuade you to bring us back --

 8          JUROR PYLE:  I mean, I can listen and, you know,

 9   work through the --

10          MR. WARD:  Okay.

11          JUROR PYLE:  -- try to figure it out myself --

12          MR. WARD:  Okay.

13          JUROR PYLE:  -- with the others.

14          MR. WARD:  But we start out maybe a little bit

15   behind before --

16          JUROR PYLE:  Right.

17          MR. WARD:  Okay.  Fair enough.

18          Who agrees with Ms. Pyle?  And I'm going to do it

19   this way:  In the first row, anyone agree with Ms. Pyle's

20   feelings about what I told you about IV and its business?

21          Mr. Marion, I'll just pass the mic to you.

22          Ms. Pyle, you can pass the mic to Mr. Marion.

23          THE COURT:  Let me interrupt just a minute.

24          Two things that are important that I need to

25   remind everybody of.  Everything that's said in the
```

1   courtroom is taken down as a part of the transcript by the

2   court reporter.

3         So if you say huh-uh, it doesn't translate into a

4   yes or no.  You need to say yes or no, verbalize your

5   answers.

6         And also, it's very important that you wait until

7   the question is finished before you give the answer, and I

8   assure you the lawyers will wait until you've finished the

9   answer before they ask the next question.  People talking

10   at the same time are a real problem.

11         So if we can avoid those two things, it'd be real

12   helpful.

13         All right, Mr. Ward.  Go ahead.

14         MR. WARD:  Thank you, Your Honor.

15         Mr. Marion, congratulations on starting a new job.

16         JUROR MARION:  Thank you.

17         MR. WARD:  Do you have any feelings one way or the

18   other, based on what I've told you, about IV and its

19   business?

20         JUROR MARION:  No, sir.

21         MR. WARD:  Okay.  I'll go right next to you.

22         Mr. Crabb, I know you worked at -- or you still

23   work at Walmart, correct?

24         JUROR CRABB:  Yes, sir, correct.

25         MR. WARD:  You all get a number of slip-and-fall

```
 1   lawsuits or claims made over the years, I believe; is that
 2   fair?
 3           JUROR CRABB:  Yes, sir.
 4           MR. WARD:  I don't know if that impacts your
 5   ability to -- if you start out leaning one way or the other
 6   in this case.  You tell me.  Do you lean one way or the
 7   other?
 8           JUROR CRABB:  No, sir.  No, sir.
 9           MR. WARD:  Do you lean one way or the other based
10   on what I've told you about IV and its business model?
11           JUROR CRABB:  No.
12           MR. WARD:  Okay.  Anybody else in the front row?
13   I've got limited time so I'm going to try to go front row,
14   second row, and then I'll go out here in the gallery, third
15   row, fourth row, fifth row.
16           Okay.  Anyone agree with what's -- with what
17   Ms. Pyle told me, that maybe IV starts out a little bit
18   behind before they've heard evidence.  Let me ask in the
19   second row.
20           And, Mr. Shirley, we made -- I made eye contact,
21   and I know you're shaking your head.  I wanted to follow up
22   with you and ask you, I didn't quite catch what you do for
23   a living.
24           JUROR SHIRLEY:  I work for an electric --
25           MR. WARD:  I think you -- you need the microphone.
```

```
 1          THE COURT:  And if you will stand up, please, sir.

 2          JUROR SHIRLEY:  I work for an electric

 3  cooperative, do IT for the engineering department.

 4          MR. WARD:  That's right.

 5          Have you ever done any work in wireless

 6  communications?

 7          JUROR SHIRLEY:  Actually, yes, sir.

 8          MR. WARD:  Okay.  Tell me a little bit about what

 9  you've done, what type of work you've done in wireless

10  communication.

11          JUROR SHIRLEY:  Part of the work that I do is

12  communications to substations.  We have 30 substations that

13  are remotely located throughout our system, and we keep

14  track of SCADA, which is data acquisition and

15  communications to these substation.

16          And some of that is done through wireless, and

17  some of it is done through DSL connections and so forth.

18  But, yes, sir.

19          MR. WARD:  All right.  Do you do any business with

20  T-Mobile or Ericsson?  I say you.  Does your company do any

21  business with either of these companies?

22          JUROR SHIRLEY:  No, sir.

23          MR. WARD:  Anything about the fact that you've got

24  some experience in wireless start you leaning one way or

25  the other in this case just based on what I've told you who
```

1   the parties are and what the technology is?

2            JUROR SHIRLEY:  No, sir.

3            MR. WARD:  All right.  Thank you, sir.

4            Let me go to the third row.  I don't -- I hadn't

5   asked anybody.  Anyone have strong feelings one way or the

6   other about what I've told you about what IV's business is?

7            Fourth row?

8            Yes, sir.  Juror No. 21, Mr. Margerum?

9            JUROR MARGERUM:  It's just when I heard they file

10  numerous lawsuits, it makes me think, well, maybe they're

11  making money off of lawsuits instead of the product.

12           MR. WARD:  Well, and I'll tell you -- and that's a

13  good point, and I'll tell you some more about this company.

14  That's -- that's part of what they have to do.

15           They own patents -- and you all will learn that

16  there are no patent police.  We can't call someone -- when

17  you own 10,000 patents and you find out that someone is

18  trespassing on one of them, this is where we come, okay?

19  We come to a courthouse and ask a jury.

20           You don't have to agree with that, and it sounds

21  like you might not agree with what they've got to do to

22  protect their property.  Is that -- would that be a fair

23  statement?

24           JUROR MARGERUM:  Well, I'd have to hear the whole

25  case.

1    MR. WARD:  I understand.  But before you've heard

2  the evidence in the case, do you start leaning a little bit

3  in favor of these Defendants just based on what I've told

4  you about IV's business?

5    JUROR MARGERUM:  Yes.

6    MR. WARD:  All right.  And that's regardless of

7  what I tell you the law or whether it's right or wrong;

8  that's just a feeling you have; you start out leaning.

9    JUROR MARGERUM:  Right now, but I can be

10  persuaded --

11    MR. WARD:  Okay.

12    JUROR MARGERUM:  -- seeing the facts.

13    MR. WARD:  All right.  Thank you, Mr. Margerum.

14    Anybody else in the third -- fourth row agree with

15  Mr. Margerum?

16    And then back row?  Anyone on the back row agree

17  with Mr. Margerum's statements?

18    How many of y'all have heard about a little trade

19  war going on between the United States and China?  Everyone

20  heard about that -- that trade war?

21    Have you heard about the disputes between the

22  United States and China about respecting intellectual

23  property?

24    All right.  And I think that's why you might hear

25  more about patents these days.  There's -- there's some

1    studies that say that as much as 40 percent of the U.S.

2    economy is tied to intellectual property.  There's lots of

3    patents.

4          And as you all know, we're moving more and more to

5    an information society, and technology is at the forefront

6    of -- of U.S. business.  And you're going to find out that

7    IV is there as well with the number of patents it owns.

8          And that's why I tell you that with all these

9    patents that they own, there are -- there's no other forum

10   for them to resolve these disputes except in the

11   courthouse.

12         So I'm going to finish -- finish this -- this

13   section there, and that is, has everyone told me if you

14   start out leaning in favor of these Defendants before we

15   get to the evidence just based upon IV's business?  This

16   is -- I'm not going to ask any more questions.

17         Anyone in the jury box?

18         Anyone in the gallery?

19         All right.  Can I see a show of hands for folks

20   that have been either personally or their business has been

21   a defendant in a lawsuit?

22         All right.  Mr. Murray?

23         JUROR MURRAY:  Yes.

24         MR. WARD:  A civil lawsuit?

25         JUROR MURRAY:  Yeah.  I worked with Sabine, and

1  we've had a lot of claims made against us for saltwater

2  truck drivers and whatnot.

3          MR. WARD:  Okay.  Anything about that experience

4  that starts you leaning in favor of the Defendant or

5  against the Plaintiff?  Obviously, we've brought this

6  lawsuit.

7          JUROR MURRAY:  We ended up having a lot of

8  frivolous lawsuits, but I don't think it'd affect my...

9          MR. WARD:   Wouldn't affect -- affect your opinion

10 in this case?

11         JUROR MURRAY:  I don't think so.

12         MR. WARD:  Okay.  Anybody else whose business or

13 individually -- individually you've been involved in a

14 lawsuit?

15         What about as a witness in a lawsuit?

16         All right.  Got a hand up.  Mr. Kelly?

17         JUROR KELLY:  When I worked for Bolt Oilfield

18 Transport, we had a driver that was drinking on the job.

19 Ran a stop sign, hit a car.  The car hit a man and knocked

20 him through a plate glass window.

21         And prior to that warning, he had been -- he had

22 been drinking on the job, and we thought he was going to be

23 terminated.

24         But our supervisor put him back in a truck and put

25 him back to work.  So after I left that job, they came and

1  asked me if I knew anything about it, and I had personal

2  knowledge of it, so...

3          MR. WARD:  Okay.  You were a witness?

4          JUROR KELLY:  Yeah.

5          MR. WARD:  Anything about that experience,

6  Mr. Kelly, that starts you leaning one way or the other in

7  this case?

8          JUROR KELLY:  No, sir.

9          MR. WARD:  Okay.  Thank you.  We all hear about

10 frivolous lawsuits, right?  And there are a lot of them,

11 right?

12         Everyone agree you hear about frivolous lawsuits?

13 Everyone think frivolous lawsuits are bad for the system?

14         Anyone think frivolous lawsuits are good for the

15 system?  They -- they're expensive.  They slow down our

16 ability to get to court because you've got to deal with

17 those cases.

18         Here's my question, though, anybody in the jury

19 box feel like there are more frivolous lawsuits than there

20 are valid lawsuits?

21         When I say a valid lawsuit, a legitimate dispute

22 where parties can't reach an agreement versus a frivolous

23 lawsuit where there's no basis.  Anyone feel that way, that

24 there's more frivolous lawsuits?

25         All right.  Mr. -- Mr. Page, you feel like there's

1  more frivolous lawsuits than there are legitimate lawsuits?

2       JUROR PAGE:  Yes, I do.

3       MR. WARD:  Okay.  And why do you feel that way?

4       JUROR PAGE:  I don't know.  I read a lot.  I -- I

5  enjoy reading, and I just see a lot of people suing people

6  for seems like no reason.

7       MR. WARD:  All right.  And given the fact that you

8  feel like there's more frivolous lawsuits than valid

9  lawsuits, do you have some concern in your mind that, well,

10  maybe this is one of those frivolous lawsuits?

11       JUROR PAGE:  No.

12       MR. WARD:  Okay.  We don't need to worry about

13  that.  You're not leaning one way or the other?

14       JUROR PAGE:  No.

15       MR. WARD:  All right.  Ms. Pyle, you've told me

16  about your feelings.  Do you feel like before we get

17  started here, are you concerned, well, maybe this is one of

18  those frivolous lawsuits?

19       JUROR PYLE:  Not necessarily.

20       MR. WARD:  Okay.

21       JUROR PYLE:  I mean, no.

22       MR. WARD:  Okay.

23       JUROR PYLE:  I'll say no.

24       MR. WARD:  Okay.  Thank you, Ms. Pyle.

25       All right.  Is that everybody in the jury box?

1            Let's go -- yes, sir, Juror No. 9, Mr. Maxie?

2            JUROR MAXIE:  Yes, sir.  In my line of work, which

3    is the grocery company, I witness a lot of self-spills, and

4    I go around the corner for a second and come back and see

5    them.

6            I've actually witnessed those things for 45 years.

7    But that does not affect my judgment on a civil case.

8            MR. WARD:  You don't start out leaning one way or

9    the other?

10           JUROR MAXIE:  No, sir.

11           MR. WARD:  You work at -- or you still work at

12   Brookshire's?

13           JUROR MAXIE:  Brookshire's Grocery.

14           MR. WARD:  Yes, sir.  You know my law partner, Wes

15   Hill?  He worked at -- at Brookshire's for a number of

16   years.  Do you know Mr. Hill?

17           JUROR MAXIE:  No, I don't know him personally.

18           MR. WARD:  Okay.  He tells me about some of the

19   crazy things that happen in Brookshire's late at night.

20   There's crazy stuff going on there, isn't there?

21           JUROR MAXIE:  Yes, sir.  Yes, sir.

22           MR. WARD:  All right.  Thank you, sir.

23           Ms. Howell, let me follow up with you, Juror.

24   No. 5.  I think you indicated in your questionnaire that

25   you had some strong opinions about lawsuits.

1          JUROR HOWELL:  Yes, sir.

2          MR. WARD:  Okay.  Tell me -- tell me about those

3     opinions about lawsuits.

4          JUROR HOWELL:  Well, I just think that if the

5     government is involved, if somebody has something -- the

6     little person and the government's trying to take it, I'm

7     always going to be for the little person.

8          MR. WARD:  Okay.

9          JUROR HOWELL:  It's just, you know -- I stand

10    behind the government on certain things, but there's

11    certain things I will not stand behind the government on.

12         MR. WARD:  All right.  Well, the good news is the

13    government's not involved in this one.  But that's what

14    you're referring to are lawsuits involving the government?

15         JUROR HOWELL:  Yes, yes.

16         MR. WARD:  Okay.  Thank you, ma'am.

17         All right.  Let me ask you about -- Your Honor,

18    how am I doing on time?

19         THE COURT:  You've got about two minutes before

20    your warning.

21         MR. WARD:  Okay.  I thought I was getting close.

22         T-Mobile -- T-Mobile is one of the -- the

23    Defendants in this case.  Is there anyone in the jury box

24    who owns a T-Mobile phone?

25         All right.  How about in the third, fourth, or

1  fifth row, anyone that owns T-Mobile or has T-Mobile as

2  their service provider?  Nobody?

3          How about AT&T?  If you own AT&T -- if AT&T is

4  your service provider?  Verizon?  Y'all -- you all see

5  these commercials on TV.

6          There's pretty stiff competition, right?  Anyone

7  feel like competition is a bad thing for us as consumers?

8  If you think competition is bad in business, raise your

9  hand.  Nobody, right?  Competition is good.

10         You think that all these companies ought to have

11 to play by the same rules.  Should they play by the same

12 rules, or should some play by a different set of rules?

13 Anyone feel like it's okay for companies to play by a

14 different set of rules?

15         Let me talk to you briefly about patents and what

16 it takes to be held liable.

17         You don't have to know about a patent in order to

18 infringe it, all right?  I think His Honor will instruct

19 the jury at the close of this case that knowledge of a

20 patent is not necessary to prove infringement.

21         Obviously, they know about the patent once the

22 lawsuit gets filed, but you can be liable for trespassing

23 on a patent if you claim you didn't know anything about it.

24         Anybody sitting there right now in the jury box,

25 say, you know what, that might be the law, but it doesn't

1    seem fair that you can be held liable for infringement if

2    you didn't know about the patent?  Anyone feel that way?

3           I tell you what, I haven't talked to Juror No. 7,

4    Mr. -- is it Swilley?

5           JUROR SWILLEY:  Yes, sir.

6           MR. WARD:  You got any feelings one way or the

7    other?  You probably haven't thought about patent

8    infringement ever in your life until I asked that question,

9    have you?

10          JUROR SWILLEY:  No, sir.

11          MR. WARD:  Does that seem strange to you that you

12   could be held liable for patent infringement if you didn't

13   know about the patent?

14          JUROR SWILLEY:  No, sir.

15          MR. WARD:  Okay.  Anybody have a feeling one way

16   or the other, say, you know what, that might be the law,

17   but I don't agree with it?

18          And I'll tell you, it's -- patents are like other

19   property.  If I own a piece of property -- let's say I'm

20   fortunate enough to own the minerals under it, and

21   Exxon-Mobil comes out and drills a well and they take oil

22   and gas out from under the property and they take it for 10

23   years and I figure it out and I say, y'all have been taking

24   my oil and gas for 10 years.  And they say, oh, well, we

25   didn't know it was your property, no harm, no foul.

```
 1            THE COURT:  Five minutes remaining.

 2            MR. WARD:  Who'd feel that way?  No harm, no foul,

 3   you didn't know.  That's not the way it works, is it?  You

 4   trespass -- yes, ma'am, I saw -- Ms. Johnson?

 5            JUROR JOHNSON:  Well, I would just --

 6            MR. WARD:  Hold on -- hold on just a second.

 7   You've got to have the microphone.

 8            JUROR JOHNSON:  I would just say that that's not

 9   right, and as long as everybody follows the law --

10            MR. WARD:  Right.

11            JUROR JOHNSON:  -- you know, you can't be wrong,

12   but --

13            MR. WARD:  And if His Honor instructs you that

14   knowledge of a patent is not necessary to prove

15   infringement, could you follow that?

16            JUROR JOHNSON:  Well, if somebody was on my

17   property taking my minerals and gold and all, I would go

18   after them, yes.

19            MR. WARD:  You kind of got two options, don't you?

20   You can do nothing about it, or you can do something about

21   it, right?

22            JUROR JOHNSON:  Right.  I would do something about

23   it.

24            MR. WARD:  All right.  Thank you, ma'am.

25            Anyone disagree with Ms. Johnson, that if someone
```

1    is trespassing on your property, you wouldn't do anything

2    about it, you'd just let them trespass?  Anyone feel that

3    way?

4            I told you we seek to recover up to $77 million in

5    damages, all right?

6            My question is not about the damages in this case.

7    It's about damages in general.  Anyone sitting there right

8    now -- I'll start out in the jury box -- say, you know

9    what, that's a lot of money, and I don't care what the

10   facts are, I could never award that amount of money to a

11   company like IV?  Anyone in the jury box feel that way?  If

12   you do, raise your hand.

13           Third row?

14           Fourth row?

15           Fifth row?

16           Two last areas.  One is technical knowledge, all

17   right?  And I know that -- let's see, Mr. Shirley has got

18   technical knowledge.

19           There's some folks that are the person that

20   everyone comes to when their cell phone breaks, their

21   laptop breaks, iPod is not working.  I'm one of those.

22           I like all those gadgets, but if they don't work

23   when I try to turn them on, I take them to my kids and get

24   them to reboot or whatever they've got to do.

25           Is there anyone on the jury panel that is that

1  person, that is the person that people bring their

2  electronics to when they break?  Anyone on the jury box is

3  that person?

4          All right.  Mr. Marion.

5          How about third, fourth, or fifth row?  Anybody

6  that -- that person?

7          All right.  I know I'm out of time.  I've got one

8  last question for you all.  I've tried to cover a lot.  You

9  all have given us a lot of information.

10          But is there anyone sitting there right now

11  saying, you know what, if Mr. Ward had asked this question,

12  he would know that I'm not the right juror for this case

13  because I'm leaning against IV?

14          Is there anyone in the jury box that feels that

15  way?  And we can talk about it at the -- up at the bench if

16  it's something that you want to talk about in private.

17          But this is kind of my last chance to talk to you.

18  Anyone feeling that way, that there's a question I didn't

19  ask that you think is information -- you've got information

20  that's important to know?

21          Yes, sir?

22          JUROR SHIRLEY:  Can I talk to you up here?

23          MR. WARD:  We can.  We'll do that -- we'll do that

24  at the end.  We'll just make a note.

25          Anybody else in the jury box?

1          Yes, sir?  Is it Wilgus -- Mr. Wilgus?  Is there

2     something that you want to talk about in private?

3          JUROR WILGUS:  Yes, sir.

4          MR. WARD:  Okay.  Mr. Wilgus -- he's Juror No. 20.

5          Anybody else?

6          All right.  I appreciate your time.  I appreciate

7     you answering my questions and bearing with me.  We look

8     forward to presenting this case to the eight of you that

9     are selected for the jury.

10          THE COURT:  All right.  Ms. Smith, you may address

11     the panel on behalf of the Defendants.  Would you like a

12     warning on your time?

13          MS. SMITH:  I'd like five minutes, Your Honor.

14          THE COURT:  All right.  You may proceed when

15     you're ready.

16          MS. SMITH:  May it please the Court.

17          THE COURT:  Proceed.

18          MS. SMITH:  Good morning, everybody.  I tend to

19     look forward.  But good morning to those of you on the

20     third, fourth, and fifth row, as well.

21          My name is Melissa Smith, and I'm proud to be here

22     this morning representing T-Mobile and Ericsson.

23          Mr. Ward abbreviated his client's name, and I'll

24     do the same.  I often just say T-MO.

25          I'll start with the most important thing I'm going

1   to do this morning, and that's thank each of you.

2          On behalf of the trial team here at the table and

3   our clients, Ericsson and T-MO, we know that every hour,

4   every minute you spend here in the courtroom, the time you

5   spent filling out the questionnaires in advance of today is

6   time away from your work, your family, and your

7   obligations.  And we really appreciate that.

8          The other -- my clients also asked me to thank

9   even possibly more importantly, Mr. Page, Mr. Turner,

10  Ms. Johnson, and the two Army boys that Ms. Owens has.

11  Thank you for your service.

12          Now, you all have -- you've shared some

13  information about yourselves.  You've answered questions

14  from the Court.  You've answered questions from Mr. Ward.

15          And so before I -- I'm the last one to ask you

16  questions, I'll tell you that, but before I start doing

17  that, I'll tell you a little bit about myself.

18          I graduated from UT Austin undergrad, and then

19  like Judge Gilstrap, I went to Baylor Law School.  That was

20  a little over 22 years ago.  And I moved to Marion County

21  22 years ago, about two or three miles outside of

22  Jefferson.  Took a job here on the Marshall courthouse

23  square.  I was working -- my boss was a guy named Gil

24  Gillam.

25          Eventually I convinced him to be his partner.  So

1   now it's called Gillam & Smith.  And we practice in this

2   old yellow house that sits right behind this courthouse.

3          Personally, I am married to a gentleman Steven,

4   who is retired law enforcement.  And we were blessed a

5   little bit later in life, but we were blessed nonetheless

6   with a seven-year-old boy and a five-year-old girl.

7          I used to stand up here and talk about all the

8   great hobbies, I used to ride horses and do all those

9   things, but now I just have time for work and kids.  And

10  that's -- that's about all.

11         T-Mobile, my first client -- it's an easy task to

12  introduce T-Mobile.  For those of you that watched -- did

13  anybody watch the Super Bowl last night?  Mr. Page,

14  Mr. Murray, okay.  We've got to take into account all these

15  Saints fans, right?  There were commercials.

16         So for those of you -- I saw on your

17  questionnaires some of you knew T-Mobile, some of you

18  didn't know T-Mobile, but we had some -- commercials on

19  last night, so for those of you that watched, you may know

20  a little bit more about us - - --

21         They've actually been in the telecommunications

22  industry for almost 30 years.  And what you're going to --

23  how you'll get to know them more in this case, though, is

24  what you need to know about them is that they're really

25  Ericsson's customer.  That's the role they're going to play

1   in this case.

2          And that brings us to Ericsson.  Ericsson is a

3   technology company that actually goes back to the 1800s,

4   believe it or not.  Not a household name, so many of you

5   might not have known them.

6          I studied your questionnaires, and I saw that on

7   the questionnaires.  But when you hear 1G, 2G, 3G, 4G, I

8   see some shaking heads -- Ms. Pyle -- that's actually

9   probably services you use, and that's Ericsson technology.

10          And so you may be using our products and not

11   actually realize it.

12          Now, Judge Gilstrap gives us just a few minutes to

13   tell you what to look forward to if you're lucky enough to

14   be chosen, and he held up some patents, and he talked about

15   trespass.

16          What I will tell you is this:  This is what you

17   need to know from T-MO and Ericsson.  Our position is that

18   Ericsson came up with the products -- the base stations are

19   what are accused in this case -- and that we came up with

20   those products on our own, and we use new, advanced 4G

21   technology, not old 2G technology.

22          And what you'll find, if you're lucky enough to be

23   chosen, is that Ericsson's products operate very, very

24   differently than Plaintiff says they do.

25          Now, it's my turn to ask a few questions.  So --

1   and I'm going to start with probably people that we haven't

2   heard from as much this morning.

3          Let's see, who's ever watched CSI, any type of

4   crime show?

5          Ms. Rambin, let's start with you.

6          All right.  Now, I've often had -- let me give you

7   some time to get over there.

8          I've often had an experience -- good morning.

9          JUROR RAMBIN:  Good morning.

10         MS. SMITH:  When I'm watching and I'm watching for

11  about five or ten minutes, and I think, well, I know -- I

12  know who done it.

13         Have you had that similar experience?

14         JUROR RAMBIN:  Yes.

15         MS. SMITH:  Do you turn the TV off and stop

16  watching?

17         JUROR RAMBIN:  No.

18         MS. SMITH:  Why?

19         JUROR WILLEFORD:  Because I want to make sure I'm

20  right.

21         MS. SMITH:  Are you always right?

22         JUROR RAMBIN:  No.

23         MS. SMITH:  Why?

24         JUROR RAMBIN:  I don't know all the facts yet.

25         MS. SMITH:  Okay.  You have to listen to all the

```
 1   facts to know how it ends; is that right?

 2            JUROR RAMBIN:  Yes.

 3            MS. SMITH:  Thank you, ma'am.

 4            I saw some other hands.  Who are my other CSI

 5   watchers?

 6            Mr. Marion, have you had that same experience?

 7            JUROR MARION:  More so my wife than myself, but I

 8   hear a lot.

 9            MS. SMITH:  All right.  So --

10            JUROR MARION:  I'm always in the dark.

11            MS. SMITH:  Fair enough.

12            But you agree you have to hear -- and they're set

13   up to the point where you have to hear all the evidence

14   before you make up your mind.

15            JUROR MARION:  Yes.

16            MS. SMITH:  Okay.  Thank you, sir.

17            Most of you probably see where I'm going with

18   this, and it's played out already in the courtroom today.

19            Mr. Ward and his team will get up, and they get to

20   go first because their burden -- it's their burden of proof

21   in this case.

22            Can I have a commitment from Mr. Swilley,

23   Mr. Moss, Ms. Howell, Mr. Crabb, Ms. Page --

24            JUROR PYLE:  Pyle.

25            MS. SMITH:  -- Mr. Page and Ms. Pyle -- can I have
```

```
 1    a commitment that you guys will wait for all the evidence

 2    before making up your mind?  Hands raised.

 3           And I see Mr. Maxie and Mr. Young are already

 4    raising their hand.

 5           Ms. Vollmer, can I have that commitment from the

 6    back row as well?

 7           Mr. Shirley, thank you.

 8           Ms. Strutton and Ms. Thornton?

 9           Ms. Trammell, any problem with that?  I'm going to

10    go to the second.  You're going to wait to hear from my

11    team before you make up your mind in this case?

12           JUROR TRAMMELL:  Yes.

13           MS. SMITH:  Thank you, ma'am.

14           All right.  Another thing I hear when I'm often

15    visiting with jurors -- and I'll start with Mr. Turner on

16    this one.  And I don't like to hear this, but I need to --

17    I need to visit with you about it.

18           Sometimes people say, well, the Defendants are

19    here; there's a bunch of documents; there's a bunch of

20    lawyers; so kind of where there's smoke, there's fire.

21    They must have done something wrong because they're all

22    gathered here in court.

23           How do you feel about that?

24           JUROR TURNER:  Neutral.

25           MS. SMITH:  Neutral?  Okay.  Thank you, sir.
```

1          Ms. Scaff, can you talk to me about that same

2     question?  I think, we're all gathered here; where there's

3     smoke, there's fire; the Defendants must have done

4     something wrong.

5          JUROR SCAFF:  No, ma'am.  I do not agree with

6     that.

7          MS. SMITH:  Okay.  Thank you, ma'am.  Appreciate

8     that.

9          Mr. Murray, how do you feel about that?

10         JUROR MURRAY:  I don't have a problem with that.

11         MS. SMITH:  Thank you, sir.

12         Now, I mentioned -- I mentioned the T-Mobile

13    commercials, and -- and some of you, I think, have actually

14    had some experience with T-MO.

15         Let's see.  Ms. Vollmer, did I read that you had

16    some experience with T-Mobile in your questionnaire?

17         JUROR VOLLMER:  I -- I've never used them as a

18    cell phone provider, but we do have representatives in the

19    store that I work at in the electronics department, and I

20    talk to them a lot, and they tried to persuade me, but I

21    stick with AT&T.

22         MS. SMITH:  Okay.  Well, and it's not a problem

23    that we haven't persuaded you yet, but anything about that

24    experience, as an overbearing salesman, or anything I

25    should know because I'm standing here today representing

 1   T-Mobile?

 2          JUROR VOLLMER:  No, ma'am.

 3          MS. SMITH:  Okay.  Thank you, ma'am.

 4          And, Ms. Rambin, I want to visit with you again.

 5   Did you have some T-MO experience?

 6          JUROR RAMBIN:  I just know people that have used

 7   it before.

 8          MS. SMITH:  Okay.  On your sheet, I want to say I

 9   remember you putting a 2 out by T-MO?  Any reason for that?

10          JUROR RAMBIN:  I just heard negative, like the

11   service wasn't good, stuff like that.

12          MS. SMITH:  You know my next question, right?

13          I'm representing T-MO, and all I ask -- I don't

14   want the advantage, but all I ask is for that flat playing

15   field.  Am I starting out where Mr. Ward in this case?

16          JUROR RAMBIN:  Yeah, y'all are level.

17          MS. SMITH:  Thank you, ma'am.  I appreciate that.

18          Ericsson, I don't believe -- I think Mr. Shirley

19   has some Ericsson experience; is that correct?

20          JUROR SHIRLEY:  Uh-huh.

21          MS. SMITH:  Is that something you wanted to talk

22   about at the bench or --

23          JUROR SHIRLEY:  That was the -- that was the

24   question I was going to ask at the bench, and we can take

25   it care of that.

1          MS. SMITH:  I -- I -- if you're more comfortable

2   at the bench, I'd be happy to visit --

3          JUROR SHIRLEY:  That experience was -- I just

4   wanted to make sure that that was not overlooked, you know,

5   and didn't -- you know, it got addressed.  That's all I

6   wanted to make sure of.

7          MS. SMITH:  Okay.

8          JUROR SHIRLEY:  That's it.

9          MS. SMITH:  I appreciate that, sir.  Thank you.

10         All right.  Let's talk a little bit about the

11  burden of proof.

12         Judge Gilstrap spoke with you briefly about the

13  burden of proof, and what we're going to see in this case,

14  as he said, is that the Plaintiff has a burden of proof by

15  a preponderance of the evidence.  And this is on

16  infringement.

17         What that means on the defense side, though, that

18  means they have to pile up their evidence to try to tip

19  those scales on the Plaintiff's side.

20         What that means on the defense side is that we can

21  do absolutely nothing.  And it will probably come as no

22  surprise that that's not what's going to happen in this

23  courtroom, but we can do absolutely nothing, and we win if

24  they don't come up with enough evidence to tip the scales.

25         I'm going to start with Ms. Howell on this

1  question.

2          Were you expecting that, Ms. Howell?

3          JUROR HOWELL:  No.

4          JUROR WILLEFORD:  All right.  How do you feel

5  about that?  Fair?  Unfair?

6          JUROR HOWELL:  It's an even playing field right

7  now.

8          MS. SMITH:  Okay.  I want to visit you -- I'm

9  going to switch -- switch topics with you.

10         When you were speaking earlier, I thought, man,

11 I've got a little bit of this in me, but she's a champion

12 of the underdog.  Is that how you kind of describe

13 yourself?

14         JUROR HOWELL:  I guess.

15         MS. SMITH:  Well, you said you always favored the

16 little guy.  Did you go for the Rams last night?

17         JUROR HOWELL:  No.  Cowboys all the way.

18         MS. SMITH:   Well, okay.  All right.

19         Well, here, we have -- I mean, we have two

20 companies suing one another.  You heard Mr. Ward talk about

21 tens of thousands of patents and dozens of lawsuits.

22         In your mind -- and I mean, T-MO, I'm not -- you

23 know, we're big companies.  Ericsson is a large company.

24 Are we starting out on a level playing field, though, in

25 your mind?

```
 1              JUROR HOWELL:  Yes.
 2              MS. SMITH:  Okay.  Thank you, ma'am.
 3              Ms. Thornton, I haven't heard from you.  Good
 4    morning.
 5              JUROR THORNTON:  Good morning.
 6              MS. SMITH:  Same kind of question for you.  If
 7    Plaintiff doesn't meet its burden, we can sit on our hands.
 8    That's one of my favorite sayings, is we can sit on our
 9    hands and do nothing, and we win if Plaintiff doesn't meet
10    its burden.  Is that fair if that's how the Judge instructs
11    you?
12              JUROR THORNTON:  That's fair if that's his
13    instruction to me, yes.
14              MS. SMITH:  No hesitation.  Thank you, ma'am.
15              All right.  You heard Mr. Ward say that the
16    Plaintiff is asking for $77 million.  And I'll tell you,
17    what you're going to hear from T-MO and Ericsson is not
18    only that we do not infringe but that we think the
19    Plaintiff is owed zero.
20              Mr. Maxie.
21              JUROR MAXIE:  Yes, ma'am.
22              MS. SMITH:  I haven't talked to you.
23              What I can assure you because I -- I've been
24    practicing here for a long time, and I know these lawyers.
25    They're good lawyers.  They're going to have a polished
```

1  presentation.  They're going to give it a hundred percent.

2          If they don't prove their case, though, are you

3  comfortable -- and you haven't heard any of the evidence

4  yet -- are you comfortable saying the Plaintiff gets zero?

5          JUROR MAXIE:  If they don't prove their case, yes.

6          MS. SMITH:  Thank you, sir.

7          What about you, Ms. Vollmer?  Any hesitation with

8  giving the Plaintiff zero?  You don't feel like, well,

9  gosh, they worked so hard, and they put up a good fight.

10  They deserve something.

11          JUROR VOLLMER:  I'm -- honestly, I'm not sure how

12  to answer that question to be honest.

13          MS. SMITH:  It's probably because my question is

14  bad.  I apologize.

15          JUROR VOLLMER:  I'm just unsure of how I would

16  answer that.  I don't -- I don't know, honestly.

17          MS. SMITH:  Okay.  Anything that you've heard

18  today so far that causes you to lean towards either the

19  defense or the Plaintiff's side of the case?

20          JUROR VOLLMER:  No, ma'am.

21          MS. SMITH:  Thank you.

22          Mr. Turner's row, I haven't spent enough time with

23  y'all.  Is there anyone that would hesitate, if the

24  Plaintiff doesn't prove their case by a preponderance --

25  preponderance of the evidence, in -- in awarding Plaintiff

1  zero?

2        Ms. Scaff?

3        JUROR SCAFF:  No, ma'am.

4        Ms. Rambin?

5        Mr. Murray?

6        Starting with Mr. Turner.

7        JUROR TURNER:  I have no problem with that.

8        MS. SMITH:  Pardon me?

9        JUROR TURNER:  I have no problem with that.

10        MS. SMITH:  Thank you.  Thank you, Mr. Turner.

11        And I -- I'll tell you, your chances of getting on

12  the panel are much greater the closer you move over.

13        I don't mean to ignore the third and fourth rows.

14  Anyone that has thoughts on that question on the third and

15  fourth rows?  Any hesitation in awarding the Plaintiff

16  zero.

17        Thank you all.

18        All right.  In this case is -- patent cases are

19  super complicated at times, and they're just really

20  complex.  But in some ways, they're not any different than

21  any other case.

22        So we've got -- let's say we've got McDonald's hot

23  coffee.  Somebody spills hot coffee.  They say, the coffee

24  is too hot.  And then they say, the coffee is too hot, and

25  I have $20 million in damages.  Everyone remember that

1  case?

2          See some shakes of heads.

3          Okay.  So McDonald's says, well, you know what?

4  First, the coffee wasn't too hot.  But, second, even if the

5  coffee was too hot, we don't owe you $20 million, fair?

6          So what's going to happen in this case is T-MO and

7  Ericsson are going to say, we absolutely don't infringe,

8  and we will bring a mountain of evidence to show that.

9          But we also don't agree that this Plaintiff should

10  get $77 million, even if we did infringe.

11          So we're going to call a damage expert.  My

12  question for you, Mr. Young, is, because the Defendants are

13  bringing a damage expert and they're going to talk about

14  money, does that cause you to think, gosh, they think they

15  -- they think they owe something, or they must have done

16  something wrong?

17          JUROR MICHAEL YOUNG:  I would expect, since we're

18  here in court, everybody is going to bring all their big

19  guns and present it to where they want to win, so...

20          MS. SMITH:  Thank you, sir.

21          What about you, Mr. Page?  What do you think about

22  that?  Do you agree or disagree with Mr. Young?

23          JUROR PAGE:  I agree with him.  All of lawyers,

24  I'm sure, are confident, and we'll hear what -- you know,

25  what the evidence is, and we'll make our decisions on that.

1          MS. SMITH:  Thank you, sir.

2          Mr. Ward talked to some of you that had some

3     experience in litigation.

4          Is there anyone on the panel that even though you

5     haven't been involved as maybe a plaintiff or a defendant

6     in a suit, is there anyone that says, gosh, I wish I would

7     have filed a suit?  Has anyone ever have that thought.

8          Mr. Page's row?

9          Ms. Vollmer's row?

10          Mr. Turner's row?

11          Back?

12          Okay.  I'm going to change up the question a

13     little bit.

14          Mr. Swilley, we haven't talked in a while.  If

15     someone accused you of doing something that you didn't do,

16     would you hesitate to come into court and defend yourself?

17          JUROR SWILLEY:  No, ma'am.

18          MS. SMITH:  Okay.  Now, does it change anything

19     because these are big companies?

20          JUROR SWILLEY:  No, ma'am.

21          MS. SMITH:  Do you think companies have every

22     right to defend themselves just like you would if you were

23     wrongfully accused?

24          JUROR SWILLEY:  Yes, ma'am.

25          MS. SMITH:  Okay.  Thank you, sir.

1          Mr. Moss, there's a case that lawyers like to talk

2    about, and it's called Pearson versus Chung.  It's a case

3    where someone dropped some pants off to be altered, and

4    alterations kind of cost about $10.00, and there's a

5    satisfaction guaranteed sign in the window, and the person

6    isn't satisfied with the alterations and sues for a million

7    dollars.

8          And believe it or not, people got aggravated with

9    the dry cleaner for defending that suit because they could

10   pay it and wouldn't waste anyone's time in court.

11         Do you think that a company that's been wrongfully

12   accused has every right to come to court and defend

13   themselves?

14         MR. WARD:  Your Honor, I'm going to object.  This

15   is getting argumentative, talking about wrongly accused.

16   It's bringing in other cases.  It's argumentative.

17         THE COURT:  Well, I'll overrule the objection.

18   The questions need to focus on gathering information.

19         MS. SMITH:  Understood, Your Honor.

20         THE COURT:  Let's proceed.

21         Go ahead and answer the question, sir.

22         MS. SMITH:  Thank you, sir.

23         JUROR MOSS:  Can you ask it again?

24         MS. SMITH:   You know what?  I'll move on for you.

25         THE COURT:  All right.  Let's do that.

```
 1            MS. SMITH:  Thank you.

 2            All right.  I think I've got an easy one.  Who

 3      thinks the government can make mistakes?

 4            I'm going to ask it a different way then.  Who

 5      thinks the government cannot make a mistake?

 6            All right.  Now, you watched the patent video

 7      earlier today.  Was anyone surprised that as jurors, you

 8      have every ability to take away a patent?  Did you all know

 9      that as jurors you could do that?

10            Mr. Swilley, did you understand the patent system

11      before coming in today to know that you could do that?

12            JUROR SWILLEY:  Not really, no, ma'am.

13            MS. SMITH:  Are you comfortable in that role as a

14      juror deciding whether or not a patent is valid?

15            JUROR SWILLEY:  Yes, ma'am.

16            MS. SMITH:  What about you, Mr. Moss?

17            JUROR MOSS:  Yes, ma'am.

18            MS. SMITH:  And I'm going to go down the row.  If

19      the evidence supports invalidating a patent, are you

20      comfortable in that role, Ms. Howell?

21            JUROR HOWELL:  Yes.

22            MS. SMITH:  Mr. Crabb?

23            JUROR CRABB:  Yes.

24            MS. SMITH:  Mr. Marion?

25            JUROR MARION:  Yes.
```

1          MS. SMITH:  Thank you, sir.

2          JUROR PYLE:  Yes.

3          MS. SMITH:  Mr. Page?

4          JUROR PAGE:  No.

5          MS. SMITH:  Okay.  If you don't mind standing up.

6     Tell me a little bit about why you say no.

7          JUROR PAGE:  Well, the people that do patents, I'm

8     sure they do a lot of work.  You know, if I come up with an

9     idea and I go through all the paperwork that we saw up

10    earlier in the thing, I don't think it should be so easy to

11    take away something -- my ideas.

12         MS. SMITH:  Okay.  And because -- because this is

13    a case where you would -- you would be the one having to

14    make that decision, do you think maybe you'd be a better

15    fit for a different type of case?

16         JUROR PAGE:  Yes.

17         MS. SMITH:  Not comfortable serving in the role

18    where you have to decide if a patent is valid or not?

19         JUROR PAGE:  Well, I mean, I'm comfortable, but I

20    just don't -- I'd have to have a lot more information.

21         MS. SMITH:  And for that reason, you'd certainly

22    start out leaning a little towards the company that owns

23    the patent, which is IV?

24         JUROR PAGE:  No.

25         MS. SMITH:  Okay.  Thank you, sir.

```
 1              Now, my question is going to change a little bit.
 2    On Ms. Vollmer's row, does anybody agree with Mr. Page?
 3              Ms. Strutton, I haven't heard anything from you.
 4    I apologize for that.  One way or another, how do you feel
 5    about your role as determining whether a patent is valid or
 6    not?
 7              JUROR STRUTTON:  I would really just have to hear
 8    all the information before I can make my decision.
 9              MS. SMITH:  Did you have any experience with the
10    Patent Office or --
11              JUROR STRUTTON:  No --
12              MS. SMITH:  -- anything of that nature before
13    coming in today?
14              JUROR STRUTTON:  No.
15              MS. SMITH:  Thank you, ma'am.
16              JUROR JOHNSON:  I have a question.
17              MS. SMITH:  Ms. Johnson.
18              JUROR JOHNSON:  I thought when you did a patent,
19    it's in your name.
20              MS. SMITH:  Yes.  Yes, ma'am.
21              JUROR JOHNSON:  Because, you know, the word out
22    here is, well, if you invent something, be sure you get it
23    patented.
24              So how can somebody say it's not yours if you've
25    got it patented in your name or -- you know...
```

1          MS. SMITH:  I think the answer to your question,

2    and it's a good one -- you're spot on that the inventor's

3    name is on the patent.  But patents are like other -- other

4    property.  They can be bought and sold.

5          JUROR JOHNSON:  Oh, okay.

6          MS. SMITH:  So a company like IV can purchase

7    patents, and they're -- and that's what's happened in this

8    case I think you'll find.

9          JUROR JOHNSON:  Okay.  Thank you.

10         MS. SMITH:  Well, Ms. Johnson, I'll take it a step

11   further.  How do you feel about that?  Is that a fair

12   system where you can buy a patent?

13         JUROR JOHNSON:  Well, if -- if I invented

14   something and -- and I had my name on it or whatever you

15   do, I wouldn't want someone to steal it -- steal my ideas,

16   I guess, and, you know, but I don't know all the facts.

17   But just briefly, you know, I could answer it that way.

18         MS. SMITH:  But did I answer your question

19   sufficiently?

20         JUROR JOHNSON:  Yes.

21         MS. SMITH:  Okay.  Thank you, ma'am.

22         Now, some people think that coming up with an idea

23   for something without figuring out the details is more

24   important than maybe the person that can make the idea

25   work.  So you have the big idea here or you have the person

1   that can actually make something work.

2        Let me go -- let me visit -- Mr. Willeford, if I

3   make you pick a side, either the side of just a person who

4   has a big idea or the person who can actually make the idea

5   work or put it in practice, which is more important in your

6   mind?

7        JUROR WILLEFORD:  I think putting it in practice.

8        MS. SMITH:  Thank you.

9        Mr. Wilgus, we haven't heard from you.  Which one

10  is more important in your mind, if I make you pick a side?

11       JUROR WILGUS:  Can you repeat the question?

12       MS. SMITH:  Sure.  Some people have big ideas, and

13  others are able to actually implement and make something of

14  those ideas.  If you -- if you were asked to choose which

15  side is more important in your mind, what would you choose?

16       JUROR WILGUS:  The people implement -- people that

17  implement.

18       MS. SMITH:  That implement.

19       I thought when Mr. Ward was -- was visiting with

20  people, he was talking about people that had been involved

21  in lawsuits in one way or another, and I think I saw you

22  raised your hand, but then I saw you take it down.  Did you

23  have any follow-up on that for me?

24       JUROR WILGUS:  It was a minor lawsuit involving a

25  car accident --

1        MS. SMITH:  Okay.

2        JUROR WILGUS:  -- that I was in -- the Plaintiff

3  in.

4        MS. SMITH:  Okay.  And -- and how did that turn

5  out?

6        JUROR WILGUS:  It was ruled in my favor.

7        MS. SMITH:  Okay.  And because -- because you've

8  been a Plaintiff in a court case before, should that cause

9  me on the defense side to worry for any reason?

10        JUROR WILGUS:  No, ma'am.

11        MS. SMITH:  Everyone starting out on the same

12  level playing field here?

13        JUROR WILGUS:  Yes, ma'am.

14        MS. SMITH:  Thank you, Mr. Wilgus.

15        JUROR PYLE?  I do have something I thought of.

16        MS. SMITH:  All right.

17        THE COURT:  Let me just say this, ladies and

18  gentlemen.  The process is for the lawyers to ask questions

19  of the panel, and the panel to respond.  It's really not

20  appropriate for members of the panel to ask questions.  So

21  let's go forward on that basis.

22        MS. SMITH:  May I -- may I ask Ms. Pyle if she has

23  additional comments, Your Honor?

24        THE COURT:  You can ask her a question.

25        MS. SMITH:  Thank you, Your Honor.

1          THE COURT:  She can't ask you a question.

2          MS. SMITH:  Understood, Your Honor.

3          THE COUR:  Okay.

4          MS. SMITH:  Ms. Pyle --

5          THE COURT:  And you have five minutes left,

6    Ms. Smith.

7          MS. SMITH:  Thank you, Your Honor.

8          JUROR PYLE:  My husband has recently been

9    diagnosed with a rare illness -- that is, he was part of a

10   medical, you know -- it was a drug that he was taking that

11   actually is supposed to -- it hadn't been approved at the

12   time.  It's been approved now, but what we're learning is

13   there's a company who has had their -- the rights to that

14   this whole time, but there is another company that's much

15   bigger that is trying to take over that company and charge

16   patients a large amount of money for that drug.

17         Well, right now, you know, we're not having to pay

18   anything because we're part of that study.  Anyway, you

19   know, that he could -- you know, just hearing more and more

20   about it, you know, I don't -- I do have some concerns for

21   myself being in that situation that I could -- may -- I

22   might have a problem with, you know, just counting on what

23   the situation is.  And like I said, I haven't heard it yet.

24         MS. SMITH:  Okay.

25         JUROR PYLE:  But, you know, I mean, I do have a

1  problem with a company -- you know, they have been given

2  it -- making this drug and giving it to people for free,

3  and it costs them hardly nothing, but yet there's this big

4  company that's trying to, you know, come in and take the

5  rights to that company.

6        I don't know how they're doing it.  But that's

7  what they're doing.  And, you know, trying to make the big

8  bucks and charge it to, you know, people like us.

9        So, you know, I don't -- I don't really know.

10 I just -- I just had that concern at the time when you were

11 just talking, so I just wanted to voice that.

12       MS. SMITH:  Well, I -- I appreciate that.  And

13 first, I'm very sorry about your husband.

14       JUROR PYLE:  Thank you.

15       MS. SMITH:  I am -- I'm having trouble -- and I --

16 I completely understand your concerns with the pharma

17 company that's kind of -- that's really going to impact

18 your lives if things --

19       JUROR PYLE:  It could.

20       MS. SMITH:  I've heard tales of things like prices

21 quadrupling and things of that nature.

22       JUROR PYLE:  Exactly.

23       MS. SMITH:  How -- applied to the two parties in

24 this case, how would that cause you to lean in one

25 direction or another in this case?

```
 1              JUROR PYLE:  Well, that's what I say.  I have

 2   concerns, you know, because I do feel that the company that

 3   invented it should be the one that gets the money, not the

 4   one that, you know, has pushed it along quicker than the

 5   other one, you know, because -- I don't know.  I just

 6   don't -- I don't know.  I may have some concern there --

 7              MS. SMITH:  Thank you.

 8              JUROR PYLE:  -- as far as the -- you know --

 9              MS. SMITH:  I appreciate your honesty.

10              JUROR PYLE:  Okay.  Thank you.

11              MS. SMITH:  Thank you.

12              Mr. Crabb?

13              JUROR CRABB:  Yes, ma'am.

14              MS. SMITH:  I -- when I was studying your

15   questionnaire, I think you said that your mother is a legal

16   secretary, is that correct, or was a legal secretary?

17              JUROR CRABB:  She used to be.

18              MS. SMITH:  What type of law did they practice?

19              JUROR CRABB:  Mainly civil.

20              MS. SMITH:  Civil.  Any -- anything like what

21   we're here talking about today?

22              JUROR CRABB:  Some cases, yes.

23              MS. SMITH:  Do you know if she --

24              THE COURT:  Mr. Crabb, you're going to have to

25   speak up, or hold the microphone, please.
```

1              MS. SMITH:  You have a chance to talk to her

2    occasionally about her work?

3              JUROR CRABB:  Yes.

4              MS. SMITH:  And did she do work mostly on the

5    Plaintiff's side of cases or on the defense side?

6              JUROR CRABB:  As the Plaintiff.

7              MS. SMITH:  Okay.  And what firm was she with?

8              JUROR CRABB:  Jimmy White.

9              MS. SMITH:  And where was he -- in Mt. Pleasant?

10             JUROR CRABB:  Mt. Pleasant.

11             MS. SMITH:  Thank you, sir.

12             Mr. Ward introduced me and my firm.  Has

13   anybody -- prior to coming to court today, had you heard of

14   the Ward Smith & Hill firm, Mr. Ward, Ms. Henry, Ms. Fair,

15   or sitting on in the back row over there, Mr. Hill?  And I

16   say heard of, just by reputation, know any of their

17   children, anything like that?

18             Let's see, Ms. Trammell, we didn't give you enough

19   time to fill out your questionnaire, and I apologize for

20   that.  Have you had any experience with -- with T-MO before

21   coming to --

22             JUROR TRAMMELL:  No.

23             MS. SMITH:  -- court today?  Okay.  Had you had

24   any experience -- did you know anyone that had ever

25   invented anything, anything of that nature?

1          JUROR TRAMMELL:  No, ma'am.

2          MS. SMITH:  Okay.  Have -- have you been involved

3    in any type of court activity on a Plaintiff's or a

4    Defendant's side?

5          JUROR TRAMMELL:  No.

6          MS. SMITH:  I was just asking the questions from

7    the second page that you didn't quite get to.  Thank you,

8    ma'am.

9          THE COURT:  You've got about 15 seconds, counsel.

10         MS. SMITH:  Thank you, Your Honor.

11         The last question, the same as Mr. Ward.  When I

12   walk into these -- these conversations, I try to think of

13   every question I can, but I obviously don't get them all

14   right.

15         Is there anybody sitting there right now that

16   thinks, gosh, if she would have just asked me this

17   question, I'd be able to tell her that I'm not the best fit

18   for this panel?

19         All right.  Thank you all.  On behalf of T-MO and

20   Ericsson, thank you for your time this morning.

21         THE COURT:  All right.  Counsel, approach the

22   bench, please.

23            (Bench conference.)

24         THE COURT:  All right.  I have Mr. Swilley having

25   a potential scheduling problem.  And I have Mr. Murray

```
 1   having a potential scheduling problem.  And Ms. Young,

 2   No. 24, having a potential scheduling problem.

 3           Does Plaintiff have any challenges for cause?

 4           MR. WARD:  We do, Your Honor.  Juror No. 2.

 5           THE COURT:  Okay.  Ms. Pyle?

 6           MR. WARD:  Yes, sir.  She said --

 7           THE COURT:  Anyone else?

 8           MR. WARD:  No.  Jurors No. 11 and 20 indicated

 9   there's something they wanted to talk about at the bench.

10           THE COURT:  Well, I think Mr. Shirley, No. 11,

11   just wanted to make sure that his experience with Ericsson

12   was noted, but I'll bring him up here and confirm that.

13   I'm not sure --

14           MR. WARD:  Yeah, I don't know what he wanted to

15   say about Ericsson.  That's why I didn't ask him in

16   front -- and then 20, just -- he said he had something that

17   he wanted to take up at the bench.

18           THE COURT:  I'm aware of that.  But you have the

19   one challenge for cause?

20           MR. WARD:  Yes, sir.

21           THE COURT:  Do Defendants have any challenges for

22   cause?

23           MS. SMITH:  You challenged Pyle; is that's

24   correct, Mr. Ward?

25           MR. WARD:  Yes.
```

1          MS. SMITH:  We don't object to that challenge.

2          THE COURT:  All right.

3          MS. SMITH:  And then we have Mr. Page and

4    Mr. Shirley.

5          MR. WARD:  Mr. Page and Shirley for cause?

6          MS. SMITH:  I didn't object to Ms. Pyle.

7          MR. WARD:  I'm saying are you challenging?

8          MS. SMITH:  Yeah.

9          MR. WARD:  One?

10         MS. SMITH:  Ms. Page.

11         THE COURT:  One and 11 is what I have, Defendants

12   being challenged for cause.

13         MR. WARD:  We have no objection.

14         MS. SMITH:  Okay.

15         THE COURT:  You don't object to those challenges?

16         MR. WARD:  We don't object to those challenges.

17         THE COURT:  So without objection, one is excused,

18   2 is excused, and 11 is excused.  And since he's excused,

19   there's really no need to bring him up here.

20         MR. WARD:  Correct.

21         THE COURT:  Now, let me ask you this, counsel.

22   No. 14, Ms. Trammell or Trammell, she slept through most of

23   your examination, and I listened to her snore for over five

24   minutes.

25         MS. SMITH:  I agree.

1          THE COURT:  I have some concerns about her ability

2    to serve.

3          MS. SMITH:  I agree.

4          THE COURT:  My intention was to bring her to the

5    bench and ask her about her ability to be alert and stay

6    awake.

7          MR. WARD:  I think we'd like to at least question

8    her, see if there's something going on.

9          THE COURT:  Anybody have a problem with me

10   bringing her to the bench?

11         MS. SMITH:  No, Your Honor.

12         MR. WARD:  No.

13         THE COURT:  Okay.  Then I'll bring her up.

14         So I have four people that need to come to the

15   bench and visit with the Court and with the parties No. 7,

16   Mr. Swilley, about his schedule; No. 14, Ms. Trammell;

17   No. 18, Mr. Murray; No. 20, Mr. Wilgus; and No. 24,

18   Ms. Young.

19         Does anybody have anybody else that I've not

20   mentioned?

21         MR. WARD:  No.

22         MS. SMITH:  No, Your Honor.

23         THE COURT:  Okay.  All right.  If you all will

24   return to your seats, I'll excuse the rest of the panel,

25   and then we'll bring these up one at a time.

1        MS. SMITH:  Thank you.

2        (Bench conference concluded.)

3        THE COURT:  Ladies and gentlemen, I'm about to

4    excuse most of you for a break -- for a short recess.

5        There are a few of you that I'm going to ask to

6    stay in your seats, and then when the rest of the panel is

7    outside the courtroom on recess, I'm going to ask each of

8    you to come up one at a time, and visit with me here at the

9    bench.

10        Those members of the panel that I'm going to ask

11    to stay behind -- and if you'll just let those close to you

12    slip out and go around you and stay at your respective seat

13    where you are -- those are No. 7, Mr. Swilley; No. 14,

14    Ms. Trammell; No. 18, Mr. Murray; No. 20, Mr. Wilgus; and

15    No. 24, Ms. Young.

16        Everyone else I'm going to excuse for a recess.

17    And before you leave, ladies and gentlemen, let me mention

18    this to you.  I'm going to ask that you exit through the

19    double doors in the back of the courtroom, and if you take

20    a left going out those doors, you'll find two very

21    important things:  The water fountains and the restrooms.

22        I'm going to ask you to stay in the building.

23    I ask that you not leave the courthouse.  I don't expect

24    that this will be a lengthy recess, but I'd like to keep

25    you close at hand.

```
 1              Also, ladies and gentlemen, while you're on

 2     recess, do not discuss anything that's happened in the

 3     courtroom this morning.

 4              Let me remind all of you, you have heard no

 5     evidence in this case.  What the lawyers tell the members

 6     of the panel and tell the jury that's actually selected is

 7     not evidence in this case.

 8              So talk about the Super Bowl if you can't think of

 9     anything else better to talk about or talk about the

10     weather or your grandchildren or anything else you'd like

11     to, but don't talk about, while you're on recess, anything

12     that's happened in the courtroom this morning.

13              So with that, except for those individual members

14     I asked to stay behind, the remainder of the panel is

15     excused at this time.

16              COURT SECURITY OFFICER:  All rise.

17              THE COURT:  Mr. Moss, if you'll just kind of lead

18     the way, please.

19              (Venire panel out.)

20              THE COURT:  All right.  Please be seated.

21              Counsel, approach the bench, please.

22              (Bench conference.)

23              THE COURT:  Before I bring Mr. Swilley up, I want

24     to confirm again for clarity on the record, Defendants

25     challenged No. 1, Mr. Page, and No. 11, Mr. Swilley, for
```

1  cause, and Plaintiff did not object to that challenge.

2        MR. WARD:  That's correct.

3        THE COURT:  And Defendant -- excuse me --

4  Plaintiff challenged No. 2, Ms. Pyle, for cause, and

5  Defendant did not object to that challenge.

6        MS. SMITH:  That's correct, Your Honor.

7        THE COURT:  So by agreement of the parties, those

8  three members of the panel are excused.

9        All right.  I'll bring up Mr. Swilley, and we'll

10  see what his scheduling issue is.

11        (Open court.)

12        THE COURT:  Mr. Swilley, would you come up,

13  please, sir?

14        (Bench conference continued.)

15        THE COURT:  Morning, sir.

16        JUROR SWILLEY:  Morning.

17        THE COURT:  How are you?

18        JUROR SWILLEY:  Good.

19        THE COURT:  You -- this is a microphone.  You and

20  I are just going to talk quietly here.

21        You indicated that you might have difficulty being

22  here all week if you were selected to serve.  Tell me about

23  that.

24        JUROR SWILLEY:  I just -- I'm a small oil and gas

25  business, and I live off my phone, and I work -- I answer

1   my phone -- like this morning, it started at 1:00, phone

2   calls, and I just never know -- I mean, day-by-day,

3   hour-by-hour and --

4           THE COURT:  And remind me, are you self-employed

5   or --

6           JUROR SWILLEY:  Yes, sir.

7           THE COURT:  You work for yourself?

8           JUROR SWILLEY:  Yes, sir.

9           THE COURT:  And do you have people that work with

10  you that could cover the business while you're not there?

11          JUROR SWILLEY:  I've just got three guys, and like

12  two of them are out today, and we just never know.

13          And then I can't hardly transfer my phone because

14  like today they're down there south of Mansfield and don't

15  have good phone service.

16          So I would love -- I mean, this is a pretty

17  interesting case, I believe, but that's just my biggest

18  problem.

19          THE COURT:  All right.

20          JUROR SWILLEY:  Small business owner.

21          THE COURT:  Mr. Ward, do you have any questions of

22  Mr. Swilley?

23          MR. WARD:  I do not.

24          THE COURT:  Ms. Smith?

25          MS. SMITH:  No, Your Honor.

1          THE COURT:  Mr. Swilley, I'm going to let you join

2     the rest of the panel outside for recess.  Just don't talk

3     about anything we talked about in here.

4          JUROR SWILLEY:  Okay.

5          THE COURT:  Thank you, sir.

6          (Juror Swilley leaves the courtroom.)

7          THE COURT:  Mr. Swilley's situation is one that

8     comes up regularly, and I'm sympathetic to self-employed

9     individuals, but they also are citizens of our country, and

10    they owe a duty to serve just like somebody that's employed

11    by somebody else.

12          I didn't hear anything from him that makes me

13    believe he must be excused.  Do either Plaintiff or

14    Defendant have anything to add with regard to Mr. Swilley?

15          MR. WARD:  Nothing from the Plaintiff.

16          MS. SMITH:  No, Your Honor.

17          THE COURT:  All right.  I'm not going to excuse

18    Mr. Swilley.

19          (Open court.)

20          THE COURT:  Ms. Trammell, would you come up,

21    please?

22          (Bench conference continued.)

23          THE COURT:  Good morning, ma'am.

24          JUROR TRAMMELL:  Good morning.

25          THE COURT:  This is our microphone.  You and I are

1  just going to talk quietly up here.

2       JUROR TRAMMELL:  Okay.

3       THE COURT:  Ms. Trammell, during the questioning

4  of the panel today, you may not know this, but you, at

5  least twice, went to sleep.  One of the times I heard you

6  snore for about five minutes.

7       Is there something about your physical condition

8  that would make it hard for you to be alert and awake

9  throughout a long trial?

10      JUROR TRAMMELL:  I know when I sit for a long

11 period of time or if I'm a passenger in someone's car --

12      THE COURT:  Yes, ma'am.

13      JUROR TRAMMELL:  -- I doze off to sleep, but I

14 don't be trying to.

15      THE COURT:  Oh, I know that.

16      JUROR TRAMMELL:  But I think it's some of the

17 medicine that's I be taking that makes me do this.

18      THE COURT:  Let me ask you this:  If you were

19 selected to serve on this jury, there are going to be

20 periods of time of up to an hour and a half, sometimes as

21 long as two hours without taking a break.

22      Do you think, if you were required to sit still in

23 a chair and listen for as long as two hours at a time, that

24 you could stay awake and be alert?

25      JUROR TRAMMELL:  No, sir.

```
 1              THE COURT:  Okay.  Well, there's nothing to be
 2   ashamed about.  We all have our challenges.
 3               I just observed that while these questions were
 4   going on.  And it doesn't do either the Plaintiff or the
 5   Defendant or the Court any good if we've got folks on the
 6   jury that aren't able to be alert and listen and take in
 7   all the evidence.
 8              JUROR TRAMMELL:  Yes, sir.
 9              THE COURT:  Okay.  Do either the Plaintiff or
10   Defendant have any questions of Ms. Trammell?
11              Mr. Ward?
12              MR. WARD:  Nothing from the Plaintiff.
13              THE COURT:  Ms. Smith?
14              MS. SMITH:  No, Your Honor.
15              THE COURT:  Well, Ms. Trammell, based on what
16   you've told me about your physical condition, I'm going to
17   excuse you from service on the jury.
18              Now, I want you to go out and be with the rest of
19   the group on recess, and I don't want you to mention
20   anything about it, but when the jury is called, your name
21   won't be called, and I'll release you after that's done,
22   okay?
23              JUROR TRAMMELL:  Yes, sir.
24              THE COURT:  Okay.  Thank you, ma'am.
25              JUROR TRAMMELL:  Thank you.
```

```
 1              (Juror Trammell leaves the courtroom.)

 2              THE COURT:  I'm going to excuse Ms. Trammell based

 3    on her physical limitations to stay alert throughout the

 4    jury trial process.

 5              (Open court.)

 6              THE COURT:  Mr. Murray, would you come up, please?

 7              (Bench conference continued.)

 8              THE COURT:  Good morning, sir.

 9         JUROR MURRAY:  Good morning.

10              THE COURT:  This is our microphone.  You and I are

11    just going to talk quietly here.

12         JUROR MURRAY:  Okay.

13              THE COURT:  You indicated you might have a

14    difficult time being present all week if you were selected.

15    Can you tell me about that.

16         JUROR MURRAY:  My wife had surgery on her shoulder

17    Thursday and complications Friday.  We were in Dallas.

18              Anyway, I got her back home, but she needs my

19    assistance to get dressed and fix things to eat, and I've

20    got to take her back to Dallas Thursday.

21              THE COURT:  She has a follow-up appointment on

22    Thursday?

23         JUROR MURRAY:  With the surgeon, yes, sir.

24              THE COURT:  Okay.  And I assume there's nobody

25    else living in the home who can take care of that for you?
```

1          JUROR MURRAY:  No.  All my kids are in South

2    Louisiana.  My stepdaughter is in Dallas.  And there's one

3    here, but she's in school right now.

4          THE COURT:  Okay.  So there's nobody that could

5    step in and fill in for you if you were on the jury.

6    That's what you're telling me.

7          JUROR MURRAY:  Not full time, no, sir.

8          THE COURT:  And not anybody that could take her

9    back to Dallas for her follow-up?

10         JUROR MURRAY:  Not that I know of right now.

11         THE COURT:  Okay.

12         JUROR MURRAY:  It's mainly getting her dressed and

13   feeding her.

14         THE COURT:  All right.  Mr. Ward, do you have any

15   questions of Mr. Murray?

16         MR. WARD:  No questions.

17         THE COURT:  Ms. Smith?

18         MS. SMITH:  No, Your Honor.

19         THE COURT:  Okay.  Mr. Murray, I'm going to let

20   you join the rest of the group outside.  Just don't discuss

21   anything we've talked about here.

22         JUROR MURRAY:  Okay.

23         THE COURT:  Thank you, sir.

24         (Juror Murray leaves the courtroom.)

25         THE COURT:  I'm going to excuse Mr. Murray.

```
 1              MR. WARD:  You did?

 2              THE COURT:  I am going to excuse Mr. Murray.

 3              MR. WARD:  Okay.

 4              THE COURT:  Particularly, because his wife has a

 5    follow-up appointment, and there's nobody else to get her

 6    back to Dallas, and they live alone.  I think those are

 7    extenuating enough circumstances.

 8              MR. WARD:  I agree.  I just didn't hear you.  I'm

 9    sorry, Your Honor.

10              THE COURT:  All right.  Next is Mr. Wilgus.

11              (Open court.)

12              THE COURT:  Mr. Wilgus, would you come up, please?

13              (Bench conference continued.)

14              THE COURT:  Good morning, Mr. Wilgus.

15              JUROR WILGUS:  Good morning.

16              THE COURT:  This is our microphone.  You and I are

17    just going to talk quietly here.

18              During the process of the lawyers addressing the

19    panel this morning, you indicated there might be something

20    you wanted to visit with me at the bench about.

21              JUROR WILGUS:  Yes, sir.

22              THE COURT:  I have no idea what that is, but I'm

23    happy to hear from you.

24              JUROR WILGUS:  A few years back, there was an

25    instance where I had purchased a T-Mobile device, and it
```

1   stated it was a 30-day guarantee.  I returned the device

2   within 30 days and did not receive my money back.

3         So being that -- that said, I don't know that I

4   could render a fair or impartial judgment --

5         THE COURT:  Is that --

6         JUROR WILGUS:  -- for T-Mobile.

7         THE COURT:  Is that experience something that

8   you're concerned might keep you from being fair and

9   impartial?

10        JUROR WILGUS:  Yes, sir, it is.

11        THE COURT:  I assume you bought that from a

12   T-Mobile store?

13        JUROR WILGUS:  Yes, sir, that's correct.

14        THE COURT:  Okay.  Well, only you, Mr. Wilgus,

15   know if you can put that or any other experience out of

16   your mind and treat both of these parties fairly, and if

17   you can't do it, now is the time.

18        Mr. Ward, do you have any questions of Mr. Wilgus?

19        MR. WARD:  Yeah.  My question is:  Do you start

20   out leaning one way or the other before you've heard any of

21   the evidence?

22        This case is obviously not about guarantees on

23   phones, but if that's something that's going to cause

24   you --

25        JUROR WILGUS:  I understand.

1          MR. WARD:  -- if that's going to cause you to

2    lean, this is the time to tell us or tell us if you can set

3    it aside.

4          JUROR WILGUS:  Being that T-Mobile is being

5    represented here and I think they still owe me money for

6    abiding by their contracts, I don't feel that I can render

7    a fair and impartial judgment.

8          THE COURT:  Okay.  All right.  Ms. Smith, do you

9    have any questions?

10          MS. SMITH:  No, Your Honor.

11          THE COURT:  Okay.  Mr. Wilgus, I appreciate your

12    candor.  I'm going to let you join the rest of the panel

13    outside.

14          JUROR WILGUS:  Okay.

15          THE COURT:  Just don't discuss anything that we've

16    talked about here.

17          JUROR WILGUS:  Yes, sir.

18          THE COURT:  Thank you.

19          (Juror Wilgus leaves the courtroom.)

20          THE COURT:  I'm going to excuse Mr. Wilgus.

21          (Open court.)

22          THE COURT:  Ms. Young, would you come up, please?

23          (Bench conference continued.)

24          THE COURT:  Are we going to get to her?  We may

25    not.  Well, we may.

1          Good morning, ma'am.  This is our microphone.

2          JUROR AMY YOUNG:  Okay.

3          THE COURT:  And you and I are just going to talk

4    quietly here.

5          When we started this morning, I asked if anyone

6    might have a difficult time being present all week if they

7    were selected.  You raised your hand.

8          JUROR AMY YOUNG:  Yes.

9          THE COURT:  Tell me about that.

10         JUROR AMY YOUNG:  My youngest son is scheduled to

11   have surgery on Monday of next week, so we have pre-op and

12   follow-up doctor appointments and things at the end of this

13   week.

14         THE COURT:  Okay.  Where are all those pre-op and

15   follow-up appointments going to be?

16         JUROR AMY YOUNG:  In Mount Pleasant.

17         THE COURT:  All right.  And am I correct you live

18   in Pittsburg?

19         JUROR AMY YOUNG:  Yes.

20         THE COURT:  Okay.  And where is the surgery

21   scheduled for Monday of next week?

22         JUROR AMY YOUNG:  Mount Pleasant.

23         THE COURT:  Okay.  And how old is he?

24         JUROR AMY YOUNG:  12.

25         THE COURT:  Okay.  Mr. Ward, do you have any

1    questions of Ms. Young?

2            MR. WARD:  I do not.

3            THE COURT:  Ms. Smith?

4            MS. SMITH:  No, Your Honor.

5            THE COURT:  I gather, Ms. Young -- I understand

6    you're his mother --

7            JUROR AMY YOUNG:  Yes.

8            THE COURT:  -- but I just have to ask, I assume

9    there's not someone else, a parent or a grandparent that

10   could step in and do those things if you were here on jury

11   duty?

12           JUROR AMY YOUNG:  His daddy and I are having to

13   take turns taking off work.  He's been out of school a

14   lot --

15           THE COURT:  Okay.

16           JUROR AMY YOUNG:  -- for being sick.

17           THE COURT:  And I assume this is not cosmetic or

18   minor surgery?

19           JUROR AMY YOUNG:  No, no.

20           THE COURT:  I'm going to let you join the rest of

21   the group outside.  Just don't discuss anything we've

22   talked about in here.

23           JUROR AMY YOUNG:  Okay.

24           THE COURT:  Thank you.

25           (Juror excused from courtroom.)

1          THE COURT:  All right.  I'm going to excuse

2   Ms. Young.

3          That means No. 1 has been excused for cause

4   without objection.

5          No. 2 has been excused for cause without

6   objection.

7          No. 11 has been excused for cause without

8   objection.

9          No. 14 has been excused by the Court based on her

10  physical limitations.

11         No. 18 has been excused based on personal

12  scheduling issues.

13         No. 20 has been excused based on his professed

14  inability to be fair and impartial between the parties.

15         And No. 24 has been excused by the Court based on

16  her son's surgery and her scheduling challenges.

17         That means one, two, three, four, five, six, seven

18  have been excused.

19         Eight jurors will be seated.  Each side has four

20  challenges.  Eight and 16 is 24.  So does that get us to

21  No. 25 or through 25?

22         MR. WARD:  I misunderstood.  Did you say that you

23  did excuse Juror No. 7, or you did not?

24         THE COURT:  I did not.

25         MR. WARD:  You did not, okay.

1          THE COURT:  No.  I'm sympathetic to his situation,

2     but his obligations as a citizen are no different than

3     someone who is not self-employed.

4          MR. WARD:  Yes, sir.

5          THE COURT:  And I can't allow that to be a

6     controlling reason.

7          So 1 is excused, 2 is excused, 11 is excused, 14

8     is excused, 18 is excused, 20 and 24 are excused.

9          So from those are -- are left, each side will

10    exercise four challenges, and the first eight remaining

11    will be our jury.

12         MR. WARD:  Okay.  Thank you, Your Honor.

13         THE COURT:  How long do y'all need to strike your

14    lists?

15         MS. SMITH:  15 minutes.

16         MR. WARD:  15 minutes.

17         THE COURT:  All right.  25 minutes until 12:00.

18    Please have your back --- your strike lists back to the

19    courtroom deputy.

20         MR. WARD:  Thank you.

21         MS. SMITH:  Thank you.

22         (Bench conference concluded.)

23         THE COURT:  All right.  While counsel exercise

24    their peremptory challenges, the Court will stand in

25    recess.

111

1           COURT SECURITY OFFICER:  All rise.

2           (Recess.)

3           COURT SECURITY OFFICER:  All rise.

4           THE COURT:  Be seated, please.

5           All right.  Ladies and gentlemen, if you will

6    listen carefully, when your name is called, come forward

7    and take your place in the jury box.

8           Before the names are actually called, I'd like to

9    cover one thing with you.  We're going to seat eight jurors

10   in this case, and I'd like the first four positioned on the

11   front of row of the jury box and the second four of our

12   jurors, four, five -- no, five, six, seven, and eight, on

13   the second row of the jury box.

14          If the first person called will walk down the

15   aisle in the front row, the first row of the jury box and

16   stand in front of the chair that leaves two empty chairs

17   beyond you.

18          The third chair from the end is where Juror No. 1

19   should stand.  That will leave two empty chairs beyond

20   them.  That will basically put the first four jurors in the

21   middle of that row, and the second four jurors will stack

22   up on the second row behind the jurors on the front row.

23   That will leave our eight member jury centered in the jury

24   box for purposes of the trial.

25          And if all eight members of the jury will stand

1   until everyone is in place, then I'll seat the jury at

2   once.

3         So with those instructions, I'll ask our courtroom

4   deputy, Ms. Lockhart, to call the names of the eight

5   members of the panel that have been selected as jurors in

6   this case.

7         COURTROOM DEPUTY:  Martin Crabb, John Moss,

8   Shannon Swilley, Amber Vollmer, Michael Young, Melissa

9   Strutton, Susan Thornton, and Mary Rambin.

10        THE COURT:  Please be seated, ladies and

11  gentlemen.

12        All of you on the panel that were not selected to

13  serve as members of the jury in this case, I'm about to

14  excuse you, but I want to excuse you with the thanks and

15  appreciation of the Court, the Court staff, and I'm quite

16  confident the lawyers and the parties in this case also

17  appreciate your presence here this morning.

18        Ladies and gentlemen, let me say this.  Every one

19  of you had other places you needed to be this morning,

20  other things you needed to do, and you set those other

21  responsibilities and obligations aside, and you appeared

22  for jury service in this case.

23        You presented yourself as you were summoned to do

24  by the Court, and you participated fully.  Even though you

25  weren't selected to serve on the jury, each of you have

1  performed very real and important public service.

2       The Court could not do what it's obligated and

3  charged to do under our Constitution without ordinary

4  citizens being willing to make the sacrifice -- and that's

5  what you've done -- to be here this morning, to present

6  yourself for jury duty, and to serve when selected.  Though

7  you weren't selected, you have done something very

8  significant and very important today.

9       The Court recognizes it, the Court thanks you for

10 it, and I'm confident that everyone on this side of the bar

11 out there joins me in thanking you for being here.

12      When you get ready to leave or when you leave in

13 just a moment, if you will make sure that you see that the

14 clerk's office recovers from you those very expensive juror

15 labels and those high-dollar numbers that you have clipped

16 on your clothing.  Don't take those home with you.

17      If you need anything as far as a written

18 acknowledgement for your employer where you've been today,

19 the clerk's office and their staff will be more than happy

20 to accommodate you.  If you have any questions about your

21 service this morning, the clerk's office will handle those

22 for you.

23      Ladies and gentlemen, thank you for being here.

24 Thank you for the service that you've rendered.  And with

25 that, those not selected on the jury are excused at this

1  time and are free to leave.

2          COURT SECURITY OFFICER:  All rise.

3          (Jury panel out.)

4          THE COURT:  All right.  Be seated -- everyone but

5  the jury.  If the jury will remain standing.  I'm going to

6  ask our courtroom deputy, Ms. Lockhart, to administer the

7  oath to the jury at this time.

8          (Jurors sworn.)

9          THE COURT:  Now, be seated.  Thank you.

10         Ladies and gentlemen of the jury, I'm about to

11 excuse you in a moment for lunch.

12         Now that you are our jury in this case, the

13 government will provide your lunch each day.  You do not

14 need to worry about bringing lunch or finding a place to

15 eat or leaving the courthouse.

16         It will be brought to you in the jury room each

17 day while you're serving here on jury duty.

18         Also, so you'll know, it's my practice to start

19 each morning about 8:30, so I'm going to ask you beginning

20 tomorrow morning, try to be in the jury room and assembled

21 to go not later than about 8:15 or 8:20, and we'll try to

22 start here in the courtroom as close to 8:30 as possible.

23         While I'm giving you some guidelines on

24 scheduling, it's difficult to tell you when we'll stop each

25 day.

1            Some of the witnesses that you're going to hear in

2    this case will probably be on the witness stand 10 minutes.

3            Some of them are going to be on the witness stand

4    an hour and a half or two hours, it just depends.  And the

5    Court likes to avoid stopping a witness in the middle of

6    their testimony if at all possible.

7            I try every way I can to make the information

8    that's going to be presented to you as unbroken and as

9    straightforward as possible because I think it's important

10   for you to do what you're required to do.

11           So when we get toward the end of the day, 5:00 or

12   5:30, you will probably still be going.  It's going to

13   depend on where we are.

14           If we have just finished a long witness and

15   there's another one to start, that will probably be a good

16   place to stop for the day.

17           If we still have 30 minutes to go to get this

18   particular witness off the witness stand, we may stay and

19   get that witness finished.  So it's much more of an

20   estimate as far as when we may end for the end of the day.

21           I rarely stop by 5:00 o'clock.  So somewhere

22   between 5:00 and 6:00 is a good guess for your travel plans

23   going to your homes and being there at night.  But we will

24   do our best to start about 8:30 in the morning.

25           I'll also try to take a 10 or sometimes up to

 1   15-minute break in the morning before lunch.  And I usually

 2   try to take two such recesses in the afternoon.

 3         So I will try to see that you're not required to

 4   sit still and listen more than about an hour and a half at

 5   a time if at all possible.  It may go over that a little

 6   bit, but that's what I target to try and look for a good

 7   time to recess during the course of the trial.

 8         That's just for your information.

 9         Also, ladies and gentlemen, I'm going to ask you,

10   when you come back from lunch, to make sure that any cell

11   phones or electronic devices that you have stay in the jury

12   room.  Don't bring them back in the courtroom.

13         And I'm going to ask, starting tomorrow morning,

14   either leave your cell phones and electronic devices at

15   home or leave them in your automobiles.

16         If you need to check a phone for business purposes

17   during the lunch break, you'll have an opportunity to go to

18   your vehicle if you need to do that, but it's important

19   that you not bring those devices back into the courtroom.

20         The lawyers in the case are entitled to use

21   electronic devices.  Nowadays, it's part of the tools of

22   the trade, but they're required to keep them on silent.

23         And they understand that the Court will take it

24   very seriously if any of their devices ring or interrupt or

25   disrupt the trial process.

1          So we don't have that risk with you, I'm going to

2   ask that you not bring them.

3          Also, ladies and gentlemen, one of the things I'm

4   going to tell you about is that I have several instructions

5   for you.  One of the instructions is that you're not

6   supposed to do any research about this case from any

7   source.

8          And cell phones are just a small computer you

9   carry in your pocket or in your purse.  And if it's in the

10  jury room with you, there's a temptation to Google this or

11  check that, and that's not what's supposed to happen.

12         So just to remove any temptation, either leave

13  your electronic devices at home, or leave them in your

14  automobiles when you come tomorrow.  And for this

15  afternoon, if you've got them with you, leave them in the

16  jury room, please.

17         Also, ladies and gentlemen, included in these

18  instructions I need to give you is this.  Do not

19  communicate with anybody about this case.

20         It's an absolutely fundamental -- fundamental

21  principle that when all the evidence is presented in a

22  trial like this, at that point, I will give you my final

23  instructions on the law, the lawyers will present their

24  closing arguments, and at that point, I will direct you to

25  retire to the jury room and to deliberate on your verdict.

118

```
 1              The verdict is a form that I will give you, and it
 2    will contain several questions in it that the jury has to
 3    answer.  And those answers to the questions from the jury
 4    will have to be unanimous.
 5              It is essential that when you get to that point of
 6    going to the jury room and deliberating on your verdict,
 7    after you've heard all the evidence, that the only
 8    information that you have to draw on to answer those
 9    questions are the sworn testimony of the witnesses that
10    have been heard in open court under oath subject to
11    cross-examination and the documents that the Court has
12    scrutinized for their admissibility and which have been
13    admitted as exhibits in the trial.
14              Those two things are the only evidence in this
15    case.  And it is essential that when you make your
16    unanimous decisions about the questions in the verdict
17    form, that all you have before you and all you have to draw
18    upon is that evidence, sworn testimony in open court and
19    the exhibits that have been admitted through the trial
20    process.
21              Therefore, it is absolutely essential that you not
22    communicate with anyone in any way about this case.  And
23    when I say don't communicate, I mean that in the broadest
24    sense of the word.
25              If any of you are users of social media, that
```

1  means don't post something on Facebook, don't tweet or

2  Twitter, don't use Instagram or any of the other myriad of

3  social media platforms that are out there.

4         Also, I can tell you this.  When we're through

5  today and you go home, unless you live alone, when you walk

6  through the door, wherever that is, the first thing whoever

7  lives there with you is going to say is, well, tell me what

8  happened in federal court in Marshall today.

9         Don't even try to answer that question because if

10  you even try to answer it, you almost assuredly violate the

11  instruction that I'm giving you.  Just blame it on me.  Say

12  that very stern Federal Judge told me not to talk about the

13  case, and he told me after the jury trial was over and I

14  had been released, I could talk about it then, but before

15  then, I can't talk about it at all.  Just blame it on me.

16         Also, when I say don't communicate, that means

17  between the eight of you.  Until you've heard all the

18  evidence and until I've directed you to retire to the jury

19  room and consider and deliberate on your verdict, you must

20  not discuss the case even among the eight of you.

21         Now, at the point when you've heard all the

22  evidence and at the point when you retire to the jury room

23  to consider and deliberate on the verdict and reach

24  unanimous answers to the questions in that verdict form,

25  then it becomes your duty to discuss the evidence and the

1  case among the eight of yourselves.

2          But until that time, you must not discuss the case

3  with anyone, including the eight of you, and you must not

4  communicate about the case in any way.

5          Also, you're -- you're not to do any research

6  about this case.  And that's the reason I'm going to ask

7  you to leave your electronic devices outside the courtroom

8  starting tomorrow.

9          You're not to Google anything.  You're not to

10  check on any of these lawyers.  You're not to pull up

11  anything on any of these parties.  You're not to do any

12  research of any kind.

13          Also, ladies and gentlemen, one other thing I need

14  to mention to you, and I don't think it's likely, but this

15  is an important case, and there's a lot at stake.  And

16  there are no unimportant, insignificant cases that make it

17  to a jury trial in federal court.

18          Consequently, it's within the realm of possibility

19  that some third party may try to approach you while you're

20  serving as jurors and influence you about your decision in

21  this case.  I don't think that's likely, but I can't tell

22  you that it's outside the realm of possibility.

23          If at any point before I discharged you as jurors

24  you feel that you've been inappropriately contacted or

25  communicated with by anybody, then you should immediately

1   inform Ms. Clendening, the clerk.  She will let me know,

2   and the Court will deal with it.  Again, it's not likely,

3   but this is an important case, and you need to know that it

4   is at least possible.

5          Finally, ladies and gentlemen, during the course

6   of this trial, you'll be coming in in the mornings and

7   leaving in the evenings, you'll have breaks and recesses

8   and lunch breaks.

9          This is a small building, as federal courthouses

10  go.  And there's a likelihood, probably a good likelihood

11  that at some point, either on the front steps or in the

12  hall way, somewhere, you will pass one or more of these

13  lawyers, you will pass one or more of the witnesses, you

14  will pass some of the support team that's here to support

15  one side or the other in this case.

16         None of those people are going to talk to you.  If

17  they walk right by you and you smile at them, they're not

18  going to say good morning.  They're not going to say how

19  are you today?  They're not going to be friendly and

20  outgoing and gregarious, as is the usual manner here in

21  East Texas.

22         That, again, is because the only information, the

23  only communication, the only universe of things for you to

24  draw upon in answering the ultimate questions in this case

25  must only come from the sworn testimony given in this trial

1    and the admitted exhibits in this trial.

2           So the lawyers and all those other parties are not

3    going to talk with you.  And when that happens and you

4    smile at them and they walk right by you, don't think

5    they're being rude or unfriendly or mean.  Don't hold it

6    against them.

7           Understand they are doing what the Court requires

8    of them, and it's for that purpose.  And it's important

9    that you understand that.

10          Now, with those instructions, ladies and

11   gentlemen, I'm going to excuse you so that you may go to

12   the jury room and have your lunch.  It's almost 10 minutes

13   after 12:00.  There are a couple matters I need to take up

14   with the lawyers outside of your presence before we

15   continue after lunch.

16          So I'm going to attempt to bring you back in and

17   start again approximately at 1:15.  And it may be -- you

18   may be flexible -- you may have to be flexible me.  It may

19   be a little one way or the other, but I'm going to shoot

20   for approximately 1:15 to have you back from lunch and

21   begin again.

22          With those instructions, ladies and gentlemen,

23   including the one not to communicate with anybody about

24   this case -- and let me just, by the way, tell you right

25   now.

1            You're going to hear that from me just about every

2     time you get up out of those chairs.  It's so essential and

3     so fundamental, and we risk the entirety of this whole

4     process if that were to be violated.

5            So because of that reason, just about every time

6     you stand up and leave the jury box, you're going to hear

7     me say, remember, ladies and gentlemen, don't communicate

8     or discuss the case with anyone.  You're going to be tired

9     of hearing that from me by the time this trial is over, but

10    I'm going to repeat it over and over again because it is so

11    fundamental and essential, and I want to remind you of it

12    every chance I get.

13           So with all those instructions, your lunch should

14    be waiting for you in the jury room.  And with that, the

15    jury is excused for lunch at this time.

16           COURT SECURITY OFFICER:  All rise.

17           (Jury out.)

18           THE COURT:  Be seated, please.

19           As counsel is well aware, there was a question

20    raised during the last day of pre-trial in this case about

21    the issue related to patentability and Section 101.

22    I indicated I would give you direction on that

23    subsequently.

24           I issued an order yesterday directing additional

25    briefing on that issue.  I've received and reviewed that

1   briefing that the parties have filed.

2         And at this point, I will afford each side a very

3   short argument in support of their briefing if they care to

4   make it before I take up the 101 issue.

5         This is the moving Defendants that would urge the

6   101 issue, so let me ask Defendants, do you have any brief

7   argument in support of your briefing on this matter?

8         MR. KUBEHL:  We do, Your Honor.  Mr. Harrison Rich

9   will argue for the Defendants.

10        THE COURT:  All right.  Mr. Rich, you may proceed

11  with your argument.

12        MR. RICH:  Good afternoon, Your Honor.

13        THE COURT:  Good afternoon.

14        MR. RICH:  May I approach with a few short slides?

15        THE COURT:  You may, and I hope the slides are

16  short.

17        MR. RICH:  I'll make them short.

18        THE COURT:  I don't have -- I don't have more than

19  about 10 or 12 minutes a side to do this.

20        MR. RICH:  All right.  I'll be very brief.

21        THE COURT:  Let me hear from you.  Go ahead.

22        MR. RICH:  So, Your Honor, Harrison Rich on behalf

23  of the T-Mobile Defendants.  I'll be presenting the

24  arguments of patent eligibility of two patents -- two of

25  the three patents in this case, the '206 patent and the

1    '629 patent.

2         And I'll start with the '206 patent where we're

3    challenging all six of IV's asserted claims.  Those claims

4    include Claims 109 -- it's an independent claim -- and

5    Dependent Claims 112, 118, 140, 144, and 146.

6         And I'll briefly give a little procedural

7    background.  We originally moved to dismiss Claim 109 at

8    the Rule 12 stage.

9         THE COURT:  And the Court's ruled on that.

10        MR. RICH:  The Court denied that motion.  And at

11   that point there were two procedural safeguards in place.

12        The Court had to accept the patent specification

13   statements as true and couldn't consider evidence outside

14   the pleadings.

15        So in applying those safeguards, the Court

16   reasoned that Claim 109 provided a technological solution

17   to a technical problem and cited to the specification.

18        With those safeguards no longer in play, the Court

19   can now consider evidence outside of the pleading that

20   we've collected through discovery.

21        THE COURT:  Let me ask you this, Mr. Rich.  The

22   Defendant raised the 101 issue.  The Defendant moved under

23   Rule 12 to dismiss Claim 109 of the '206 patent.  The

24   Defendant never moved on any of the other claims at the

25   motion to dismiss stage, and the Plaintiff -- excuse me,

1  the Defendant -- the Defendant never moved on any of the

2  other claims at the motion to dismiss stage, and the

3  Defendant never moved at the summary judgment stage on the

4  101 issue regarding any of these claims.

5       I'm curious as to why we're now at trial with the

6  jury in the box, and this has not been raised at either the

7  summary judgment stage or the motion to dismiss stage.

8       99 percent of the 101 challenges that I see come

9  to the Court for disposition either at the dismissal stage

10  or the summary judgment stage.

11       I'm curious as to why Defendant felt it was in

12  their best interest to handle it without moving for a

13  decision by the Court at any of those two junctures.

14       MR. RICH:  Yes, Your Honor.

15       We -- first off, we preserved the 101 defense as

16  to all claims.  And the answer -- we've collected

17  additional evidence through discovery and thought that

18  should there be factual questions, it would be best

19  resolved through a bench trial, so that's why we're

20  bringing it now.

21       And Your Honor's Packet Intelligence case, I

22  believe from 2017, presented a similar factual scenario

23  where the Defendant preserved the defense in its answer,

24  did not move at 12(b)(6) or the summary judgment stage, and

25  there was a subsequent bench trial.

1          THE COURT:  I think that one and this one are the

2    only two times I've had that happen, so that's why I asked.

3    Go ahead.  Let me hear your argument.

4          MR. RICH:  All right.  So we'll start with

5    Claim 109 of the '206 patent.  It recites two broad steps,

6    classifying and scheduling.

7          And with respect to the classifying step, it's

8    classifying a plurality of packets according to end-user

9    QoS requirements of the packets and scheduling the packets

10   for the ultimate purpose of communicating the packets over

11   a wired -- wireless bandwidth according to an undefined

12   scheduling algorithm.

13         I think the focus of this claim is the abstract

14   idea of classifying information according to end-user

15   service requirements and scheduling the information.

16         And if Your Honor will turn to Slide 3, I'll

17   briefly show you why this claim is abstract.  There's an

18   abstract category known as mental processes, and this claim

19   reads right on a mental process and will practice it

20   briefly.

21         On the left side of the slide, you'll see a sticky

22   note with end-user QoS requirements.  QoS 5 and QoS 7 are

23   the examples.  And in the middle of the slide we see the

24   claim language.  And right under that, we see two packets

25   and two groups, Packet 1 and Packet 2.

1          We can classify those packets according to their

2    QoS requirements simply by drawing it on a piece of paper

3    under the group for which the QoS corresponds to.  That's

4    the classifying step.

5          Now, the scheduling step is just under that.  And

6    we can practice that step by simply writing out a schedule,

7    Packet 1, scheduled at Time 1.  Packet 2, we'll schedule

8    that at Time 2.  So just by doing that, I think we've --

9    we've practiced this claim in our minds.

10          And I think that's a hallmark of abstract ideas.

11          Now, turning to Slide 4, Your Honor, when the

12    Court denied the original motion to dismiss, the Court

13    cited to some statements in the patent that describe

14    problems in wireless communications like high bit error

15    rate, and the Court -- the Court found that the '206 patent

16    solved those problems by classifying on a packet level what

17    the ideal quality of service characteristics are for each

18    type of data.

19          Since then, we've taken the deposition of IV's

20    expert, Dr. Williams, and I think that his deposition

21    testimony tells us that this isn't involving a

22    technological problem or technological solution, but he's

23    confirming that the underlying solution of Claim 109 is

24    practiced outside the context of telecommunication

25    networks.

1        And we see here, we asked him about whether postal

2   services would classify packets based on service

3   requirements like priority overnight or ground, and then

4   they get priority overnight mail out quicker?  That's

5   scheduling.

6        And he said:  Yes.

7        And on the next slide we're -- we're illustrating

8   this concept where we have two end-users, two postal

9   customers on Slide 5, and we see that they have envelopes

10  with different delivery requirements.

11       Those are the end-user service requirements,

12  overnight delivery and two-day transportation.  And the

13  postal workers -- workers will take those and classify them

14  based on how fast those things need to go out.

15       So that's the classifying and scheduling in the

16  context of a postal system.

17       So we think this is a fundamental concept that has

18  long existed outside the context of telecommunication

19  networks.

20       And we've -- we've provided arguments on the

21  dependent claims, and I can briefly spend about 30 seconds

22  on each slide.

23       Turning to Slide 6, we're addressing Claim 112.

24  The claim limits the classifying and scheduling steps of

25  Claim 109 to performance by a packet scheduler at a base

1   station or CPE station.

2          Now, what that's doing is simply limiting the

3   claim to a technological environment, and the Federal

4   Circuit has told us that's not enough.  That's the In re

5   TLI case.

6          Turning to Slide 7, Claim 118, communicating said

7   end-user QoS requirements.  That amounts to sending

8   information between generic points.

9           And, again, the Federal Circuit has said that

10  sending and receiving information, regardless of the type

11  of information, is not even arguably inventive.  And that's

12  the buySAFE case.

13         And briefly on Claim 140 on Slide 8, that claim

14  recites coordinating and controlling access.  They're very

15  similar steps to a wireless resource.  Those steps are

16  functionally recited.  They don't say how you coordinate or

17  control access.

18         And, again, the Federal Circuit tells us when you

19  have claims like that where it doesn't tell you how to do

20  it, that's not enough.

21         And then we see just below that the claim

22  receiving reservation request and sending grants, and

23  that's sending and receiving information, not enough at

24  Step 1.

25         THE COURT:  What about the other dependent claims.

1          MR. RICH:  Claim 144, Slide 9 recites ensuring

2    high priority packets are provided appropriate bandwidth.

3    And, again, that's a functionally recited claim.  It

4    recites a goal and doesn't tell you how to do it.

5          And I can cite Your Honor to the Two-Way Media

6    case from the Federal Circuit that involved a similar

7    scenario where they found abstractness.

8          THE COURT:  I've got your briefing.

9          MR. RICH:  Okay.  Lastly, Claim 146, it limits

10   Claim 109 scheduling step to allocating in oversubscribed

11   environments.

12         Your Honor, that, again, is limiting a claim to a

13   technological environment, and it's right there in the

14   claim.  It's not enough at Step 1.

15         THE COURT:  Let me hear about the '629 patent on

16   this issue.

17         MR. RICH:  Yes, Your Honor.  All right.

18         So there's two challenged claims here, Claims 1

19   and 4.  We'll start by orienting you with Claim 1 on Slide

20   12.  Four -- four steps here.  Applying a reservation

21   algorithm, Step A on the slide.  That's a generic step.  It

22   doesn't say how you do the reservation algorithm.

23         Steps B and C can be talked about together.

24   Reserving slots and future frames.

25         And Step D, placing the packets in an isochronous

1  manner.

2          Now, that's -- the focus of this claim is making

3  future reservations in a consistent time interval.

4          Now, turning to Slide 13, I'll briefly explain why

5  that's abstract.  Again, this is just a mental process.  We

6  see here it's analogous to a calendar.  With the current --

7  current week being the week of February 4th, the next week

8  is starting February 10th.  That's the future frame in the

9  claim.

10          Two weeks from now is the next -- Step C, two

11  future frames in the future.  So this is a mental process

12  because let's say we need to schedule a meeting for the

13  next three weeks.  We do that today.  And what I do is I

14  write my meeting there on February 12th, 19th, and 26th.

15  Those are the future reservations.

16          And, finally, turning to Slide 14, this is

17  Dependent Claim 4, recites the reservation algorithm

18  determines whether said IP-flow is jitter-sensitive.

19          That does not alter the abstractness of Claim 1

20  but merely involves categorizing the IP-flow.  It's

21  characterizing it as jitter-sensitive.  And, again, that's

22  a quintessential abstract idea, according to the Federal

23  Circuit.

24          THE COURT:  All right, Mr. Rich.  Thank you for

25  your argument.

1      Let me hear a response from the Plaintiff.

2      MR. BLACK:  Martin Black for Plaintiff.  Thank

3  you, Your Honor.

4      Let me just address procedurally where I think we

5  are.  We had a 12(b)(6) motion.  Your Honor ruled on the

6  motion with respect to Claim 109 of the '206 patent,

7  concluding that it passed muster under Alice Step 1.

8      Determining whether something is an abstract idea

9  or not is a question for the Court.  They have not

10  identified any facts which would bear on that particular

11  question today.

12      We believe that Your Honor's ruling on that point

13  should be law of the case, and that what we have just heard

14  is essentially an out of time motion for reconsideration.

15      If follows from the fact that Claim 109 meets

16  Step 1, that all dependent claims in the '206 patent also

17  meet Step 1.  And it follows from that that there is

18  nothing to try on the '206 patent because we don't get to

19  Step 2, and the more complicated question of how to handle

20  fact questions which arise at Step 2.

21      I will also note that the experts in this case did

22  not present the Defendants any 101 opinions.  So they have

23  not asked for a jury instruction on 101.

24      The pre-trial order requests a bench trial, and

25  Mr. Kubehl called it an equitable issue.  I don't know that

1    there's any support for that.

2          But the main point is with respect to Claim 109,

3    the issue has been decided.

4          When we look at the '629 patent, it is similar to

5    the '206 patent.  It adds several additional elements,

6    however, a reservation algorithm and the isochronous

7    treatment of packets, points which will be a matter of

8    explanation and debate during the trial.

9          Plainly, the '629 patent resides in the very

10   similar technological environment as the '206 and only

11   extends and narrows and, more particularly, describes a

12   feature of the inventions of Dr. Jorgenson.

13         On that basis, we believe that neither of these

14   claims -- independent claims or the dependent claims that

15   depend upon them are abstract.

16         All of these claims relate to the solutions to

17   these particular technological problems and meet Alice

18   Step 1.

19         THE COURT:  Anything further, Mr. Black?

20         MR. BLACK:  No, Your Honor.

21         THE COURT:  Okay.  Let me say this.  The Court is

22   persuaded and has previously held that Claim 109 of the

23   '206 patent is not directed to an abstract concept.

24         The '206 patent and Claim 109, in particular, are

25   tethered to technical problems related to data congestion

1   within wireless networks.

2        While the Defendants urge the Court to consider

3   10 -- Claim 109 to be analogous to a postal system, the

4   Court finds that wireless networks contain technological

5   problems not found in the brick and mortar world, such as

6   high bit error rates and jitter which affect network

7   congestion behavior in a way that does not exist within the

8   postal system.

9        Claim 109, through its use of end-user quality of

10  service requirements to aid in scheduling packet

11  transmission, sets forth a solution that is rooted in

12  computer -- computer technology in order to overcome a

13  problem specifically arising in the realm of computer

14  networks and is not directed to an abstract idea, as

15  Defendants urge.

16       For these reasons, the Court -- for these very

17  same reasons, the Court finds that Claim 109 is not

18  abstract, and the Court also finds that the dependent

19  claims that depend from Claim 109 are not abstract.

20       The Court is also persuaded that Claim 1 of the

21  '629 patent is not directed to an abstract concept.  The

22  '629 patent describes the same technical problems in the

23  art as the '206 patent.

24        Claim 1 describes a technical solution to those

25  problems by introducing the reservation algorithm and

1  scheduler to provide an improved method of transmitting

2  packets from various types of IP flows.

3       Accordingly, Claim 1 also sets forth a solution

4  that is rooted in computer technology in order to overcome

5  a problem specifically arising in the realm of computer

6  networks, and the Court finds it's not directed to an

7  abstract idea.

8       For the same reasons the Court finds that Claim 1

9  is not abstract, the Court also finds that the dependent

10  claims from it -- that depend from it in the '629 patent

11  are not abstract.

12       Consequently, the Court disposes of the 101 issue

13  by finding that none of the asserted claims are abstract,

14  and, consequently, there is no requirement or need to move

15  to Step 2 of the Mayo/Alice analysis.

16       With that ruling, counsel, I also want to mention

17  to you that in the last pre-trial hearing before the Court

18  last week, there was a question from Defendants about the

19  issue of claim preclusion.

20       The Defendants also assert that the Plaintiff's

21  claims are barred by claim preclusion for accusing the same

22  products of infringing a related patent to the patents

23  asserted in this case but failing to assert these patents

24  in the earlier Delaware litigation.

25       Let me be clear, the Court intends to rule on this

1    issue following the jury's verdict.

2           The parties should present any appropriate

3    evidence related to this matter during the course of the

4    trial that will begin later today.  And that way, the Court

5    will already have the benefit of such when the verdict is

6    returned and it then looks to and gives you a decision on

7    the issue of claim preclusion.

8           I think that's guidance as requested during the

9    last pre-trial hearing.

10          It is 12:30.  I told the jury we would start back

11   at 1:15.  So with that, we will recess until 1:15.

12          COURT SECURITY OFFICER:  All rise.

13          (Recess.)

14

15

16

17

18

19

20

21

22

23

24

25

138

1                         CERTIFICATION

2

3           I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    /S/ Shelly Holmes_____          2/4/19
     SHELLY HOLMES, CSR, TCRR              Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25