1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF TEXAS

3                    MARSHALL DIVISION

4   INTELLECTUAL VENTURES I LLC, )(

5        PLAINTIFF              )(   CIVIL ACTION NO.

6   VS.                        )(   2:17-CV-577-JRG

7                              )(    MARSHALL, TEXAS

8   T-MOBILE USA, INC., T-MOBILE )(

9   US, INC., ERICSSON INC., AND )(

10  TELEFONAKTIEBOLAGET LM        )(

11  ERICSSON,                  )(   FEBRUARY 4, 2019

12       DEFENDANTS            )(    1:19  P.M.

13                TRANSCRIPT OF JURY TRIAL

14        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

15           UNITED STATES CHIEF DISTRICT JUDGE

16  APPEARANCES:

17  FOR THE PLAINTIFF:     Mr. T. John Ward, Jr.
                           Ms. Claire A. Henry
18                         Ms. Andrea L. Fair
                           Mr. Wesley Hill
19                         WARD, SMITH & HILL, PLLC
                           1507 Bill Owens Parkway
20                         Longview, Texas 75604

21  COURT REPORTER:        Ms. Shelly Holmes, CSR, TCRR
                           Official Reporter
22                         United States District Court
                           Eastern District of Texas
23                         Marshall Division
                           100 E. Houston Street
24                         Marshall, Texas 75670

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)

```
 1   FOR THE PLAINTIFF:      Mr. Martin J. Black
                             Mr. Kevin M. Flannery
 2                           DECHERT LLP
                             Cira Centre
 3                           2929 Arch Street
                             Philadelphia, Pennsylvania 19104
 4
                             Mr. Joseph M. Abraham
 5                           Mr. Timothy F. Dewberry
                             Mr. Joshua J. Yi
 6                           Mr. Jacob R. Porter
                             DECHERT LLP
 7                           300 West Sixth Street
                             Suite 2010
 8                           Austin, Texas 78701

 9                           Ms. Nisha N. Patel
                             Mr. Ryan T. Banks
10                           DECHERT LLP
                             2440 W. El Camino Real
11                           Suite 700
                             Mountain View, California 94040
12
13   FOR THE DEFENDANTS:     Mr. Douglas M. Kubehl
                             Mr. Jonathan B. Rubenstein
14                           Mr. Jeffery S. Becker
                             BAKER BOTTS LLP
15                           2001 Ross Avenue
                             Dallas, Texas 75201
16
                             Ms. Melissa R. Smith
17                           GILLAM & SMITH LLP
                             303 South Washington Avenue
18                           Marshall, Texas 75670

19                           Mr. Asim M. Bhansali
                             KWUN BHANSALI LAZARUS LLP
20                           555 Montgomery Street
                             Suite 750
21                           San Francisco, California 94111

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (Jury out.)
 3         COURT SECURITY OFFICER:  All rise.
 4         THE COURT:  Be seated, please.
 5         All right.  Are either Plaintiff or Defendant
 6   aware of anything that should be taken up with the Court
 7   before I bring the jury in and proceed with my preliminary
 8   instructions?
 9         Are you aware of anything, Mr. Ward?
10         MR. WARD:  I am not, Your Honor.
11         THE COURT:  Are you aware of anything, Mr. Kubehl?
12         MR. KUBEHL:  I am not, Your Honor.
13         THE COURT:  All right.  Let's bring in the jury,
14   please.
15         COURT SECURITY OFFICER:  All rise.
16         (Jury in.)
17         THE COURT:  Welcome back, ladies and gentlemen.
18   Please have a seat.
19         Ladies and gentlemen of the jury, I now have some
20   preliminary instructions that I need to give you before we
21   begin with the opening statements from the lawyers and then
22   get on to the evidence.
23         You have now been sworn as the jurors in this
24   case, and as the jury, you are the sole judges of the
25   facts, and as such, you will decide and determine what all
```

1    the facts are in this case.

2         As the judge, I will give you instructions on the

3    law, I will decide questions of law that might arise during

4    the trial, I'll handle any matters of evidence and

5    procedure, and I'll oversee the flow of the evidence and

6    maintain the decorum of the courtroom.

7         At the end of the evidence, I'll give you detailed

8    instructions about the law that you are apply -- are to

9    apply in deciding this case.  And I'll give you a list of

10   questions that you are then to answer.

11        This list of questions is called the verdict form,

12   and your answers to those questions need to be unanimous,

13   and those unanimous answers to those questions will

14   constitute the jury's verdict in this case.

15        Now, let me briefly tell you what this case is

16   about.  This involves a dispute regarding three separate

17   United States patents.

18        I know that you saw the patent video film earlier

19   today, but I need to give you these instructions here and

20   now and on the record about a patent and how one is

21   obtained.

22        Patents are either granted or denied by the United

23   States Patent and Trademark Office, sometimes called for

24   short simply the PTO.  The United States Patent and

25   Trademark Office is an agency of the United States

1    Government.

2         A valid United States patent gives the holder of

3    the patent the right, for up to 20 years from the date the

4    patent application is filed, to prevent others from making,

5    using, offering to sell, or selling the patented invention

6    within the United States or from importing it into the

7    United States without the patentholder's permission.

8         A patent is a form of property called intellectual

9    property, and like all other forms of property, a patent

10   can be bought and sold.

11        A violation of a patentholder's rights is called

12   infringement.  The patentholder may try to enforce a patent

13   against persons it believes to be infringers by filing a

14   lawsuit in federal court, and that's what we have in this

15   case.

16        The process of obtaining a patent is called patent

17   prosecution.  To obtain a patent, one must first file an

18   application with the PTO.

19         As I mentioned, the PTO is an agency of the

20   United States Government, and it employs trained examiners

21   who review applications for patents.

22        The application that is submitted to the PTO

23   includes what is called a specification.  The specification

24   contains a written description of the claimed invention

25   telling what the invention is, how it works, how to make

1    it, and how to use it.

2           The specification concludes or ends with one or

3    more numbered sentences.  These numbered sentences are

4    called the patent claims.

5           When a patent is granted by the PTO, it's the

6    claims in the patent that define the boundaries of its

7    protection and give notice to the public of those

8    boundaries.

9           Patent claims may exist in two forms referred to

10   as independent claims and dependent claims.

11          An independent claim does not refer to any other

12   claim in the patent.  It's independent.  It's not necessary

13   to look at any other claim to determine what an independent

14   claim covers.

15          On the other hand, a dependent claim refers to at

16   least one other claim in the patent.  A dependent claim

17   includes each of the limitations or elements of that other

18   claim or claims from which it depends or to which it

19   refers, as well as those additional limitations recited

20   within the dependent claim itself.

21          Accordingly, to determine what an independent

22   claim covers, it's necessary to look at both the dependent

23   claim itself and the independent claim or claims from which

24   it refers, or as we sometimes say, from which it depends.

25          The claims of the patents-in-suit use the are word

comprising.   Comprising means including or containing.

A claim that includes the word comprising is not limited to the methods or devices having only the elements recited in the claim but also covers methods or devices that add additional elements.

Take, for example, a claim that covers a table. If a claim recites a table comprising a tabletop, legs, and glue, then the claim will cover any table that contains these three structures, even if the table also includes other structures, such as a leaf to go on the tabletop or wheels to go on the ends of the legs.

Now, that's a very simple example using the word comprising and what it means.   In other words, ladies and gentlemen, it can have other features in addition to those that are covered by the patent.

Now, after the applicant files the application with the PTO, an examiner reviews the application to determine whether or not the claims are patentable, that is to say appropriate for patent protection, and whether or not the specification adequately describes the invention that is claimed.

In examining a patent application, the examiner reviews certain information about the state of the technology at the time the application was filed.

The PTO searches for and reviews this type of

1    information that is publicly available or is submitted to

2    the PTO by the applicant.

3              This type of information is called prior art.  The

4    examiner reviews this prior art to determine whether or not

5    the invention is truly an advance over the state of the art

6    at the time.

7              Prior art is defined by law, and at a later time,

8    I'll give you specific instructions as to what constitutes

9    prior art.

10              But in general, prior art includes information

11   that demonstrates the state of the technology that existed

12   before the claimed invention was made or before the

13   application for a patent was filed.

14              A patent contains a list of certain prior art that

15   the examiner has examined.  The items in this list are

16   called the cited references.

17              After the prior art search and examination of the

18   application, the examiner at the PTO informs the applicant

19   in writing of what the examiner has found and whether the

20   examiner considers any claim to be patentable.  And if so,

21   it would be allowed.  This writing from the examiner is

22   called an Office Action.

23              Now, if the examiner rejects the claims, the

24   applicant has an opportunity to respond to the examiner, to

25   try to persuade the examiner to allow the claims.  The

1    applicant also has a chance to change or amend the claims

2    or to submit new claims.

3          Now, the papers generated during these

4    communications back and forth between the examiner and the

5    applicant are called the prosecution history.

6          And this process may go back and forth between the

7    examiner and the applicant for some time until the examiner

8    is ultimately satisfied that the application meets the

9    requirements for a patent.  And in that case, the

10   application issues as a United States patent.  Or in the

11   alternative, if the app -- if the examiner, rather,

12   ultimately concludes that the application should be

13   rejected, and in that case no patent is issued.

14         Sometimes patents are issued after appeals within

15   the PTO or to a Court.

16         Now, the fact that the Patent and Trademark Office

17   grants a patent does not necessarily mean that any

18   invention claimed in the patent, in fact, deserves the

19   protection of a patent.

20         While an issued United States patent is presumed

21   valid under the law, a person accused of infringement has

22   the right to argue here in federal court that a claimed

23   invention in a patent is invalid.

24         It's your job as the jury to consider the evidence

25   presented by the parties and determine independently and

1    for yourselves whether or not the Defendants have proven

2    that a patent at issue is invalid.

3         Now, to help you follow the evidence, I'm going to

4    give you a brief summary of the positions of the two

5    parties.

6         As you all know, the party that brings the lawsuit

7    is called the Plaintiff.

8         Here the Plaintiff in this case is Intellectual

9    Ventures I LLC, who I'll refer to and you'll hear referred

10   to throughout the case as either the Plaintiff,

11   Intellectual Ventures, or sometimes you'll hear it just

12   called IV.

13        Now, the party against a lawsuit -- against whom a

14   lawsuit is brought, as you all know, is called the

15   Defendant.

16        The Defendants, and there are more than one in

17   this case, are T-Mobile USA, Inc. and T-Mobile US, Inc.,

18   who will be referred to jointly throughout the trial as

19   called T-Mobile.  You may hear them called T-MO.

20        And the other Defendants are Ericsson, Inc., and

21   its Swedish parent company, Ericsson in Sweden, who you'll

22   hear referred to collectively or jointly together as

23   Ericsson.

24        And when I refer to T-Mobile and Ericsson

25   together, I'll simply call them the Defendants, which will

1   cover all the Defendants.

2            Now, as I told you during jury selection, this is

3   a case of alleged patent infringement.  There are three

4   separate United States patents that have been asserted in

5   this case.

6            The first is United States Patent No. 6,628,629.

7            Now, ladies and gentlemen, patents are commonly

8   referred to by the last three digits of their number.

9            So in this case, Patent 6,628,629 will simply be

10  referred to as the '629 patent.  You may hear it called the

11  '629 patent.

12           The second United States patent at issue in this

13  case is United States Patent 7,412,517, which you will

14  hear -- here referred to -- you will hear it referred to as

15  the '517 patent.

16           And then the third and final United States patent

17  at issue in this case is United States Patent

18  No. RE46,206, which you'll hear referred to simply as the

19  '206 patent.

20           These three patents may be referred to

21  collectively at various times in the case as the

22  patents-in-suit or as the asserted patents.  And those

23  terms will refer to all three of the patents at issue.

24           These patents generally relate to the managing and

25  conserving of resources on mobile devices.

1          Now, the Plaintiff in this case, Intellectual

2    Ventures, contends that the Defendants in this case,

3    T-Mobile and Ericsson, are willfully infringing certain

4    claims of the patents-in-suit by importing, making, or

5    selling products that include their patented technology.

6          Intellectual Ventures also contends that it's

7    entitled to money damages as a result of this infringement.

8          Now, the Defendants, T-Mobile and Ericsson, deny

9    that they infringe any of the Plaintiff's patents in this

10   suit, and they contend that the asserted claims of the

11   patents-in-suit are invalid as being either anticipated or

12   obvious in light of the prior art.

13         Now, ladies and gentlemen, I know there are many

14   new words and concepts that have been thrown at you today,

15   and I'm going to define a lot of those words and concepts

16   for you as we go through these instructions.

17         The attorneys in this case are going to discuss

18   them in their opening statements, and the witnesses are

19   going to help you go -- by going through their testimony to

20   understand these words and concepts.

21         So, please, do not feel overwhelmed at this point.

22   I promise you, it will all come together as we go through

23   the trial.

24         Now, one of your jobs in this case is to decide

25   whether or not the asserted claims of the patents-in-suit

1  have been infringed and whether they are invalid.

2          If you decide that any claim of the

3  patents-in-suit has been infringed by the Defendants and is

4  not invalid, then you'll need to decide whether or not that

5  infringement by the Defendants has been willful.

6          And you will also need to decide at that point the

7  amount of money damages that should be awarded to the

8  Plaintiff as compensation for that infringement.

9          Now, as I mentioned, my job as the Judge is to

10 tell you what the law is, to handle rulings on evidence and

11 procedure, and to oversee the conduct of the trial and

12 maintain the decorum of the court.

13         In determining the law, it is specifically my job

14 to determine the meaning of any claim language from within

15 the asserted patents that needs to be interpreted.

16         And I've already determined the meanings of

17 certain language from the claims of the patents-in-suit.

18         And you must accept those meanings that I give

19 you, and you must use those meanings and apply them when

20 you decide whether any patent claim has or has not been

21 infringed and whether or not any claim is or is not

22 invalid.

23         You'll be given in a doc -- you'll be given a

24 document in a few minutes which will identify those

25 meanings that I am giving you.

1          Now, for any claim for which I have not provided

2     you with a definition or a construction, you should apply

3     the plain and ordinary meaning.

4          But if I have supplied you with a definition or a

5     construction relating to language from any of the claims of

6     the patents-in-suit, you are to apply my definitions and my

7     constructions to those terms throughout the case.

8          However, my interpretation of the language from

9     within the claims should not be taken by you as an

10    indication that I have a personal opinion regarding any of

11    the issues in this case, such as infringement and

12    invalidity, because those issues, ladies and gentlemen, are

13    yours to decide alone.

14         I'll give you more detailed instructions on the

15    meaning of the claims before you retire and deliberate on

16    your verdict.

17         In deciding the issues that are before you, you'll

18    be asked to consider specific legal rules, and I'll give

19    you an overview of those rules now.  And then at the

20    conclusion of the case, I'll give you much more detailed

21    instructions.

22         The first issue that you're asked to decide is

23    whether the Defendants have infringed any of the asserted

24    claims of the patents-in-suit.

25         Infringement is assessed on a claim-by-claim

1  basis, and Intellectual Ventures, the Plaintiff, must show

2  by a preponderance of the evidence that a claim has been

3  infringed.

4       Therefore, there may be infringement as to one

5  claim but no infringement as to another claim.

6       Also, there are a few different ways that a patent

7  can be infringed, and I'll explain the requirements for

8  each of these types of infringement in detail at the

9  conclusion of the case.

10       But, in general, a Defendant may infringe the

11  asserted patents by making, using, selling, or offering for

12  sale in the United States or importing into the United

13  States a product meeting all the requirements of a claim

14  from the asserted patents.

15       And I'll provide you with more detailed

16  instructions regarding infringement at the conclusion of

17  the case.

18       Now, the second issue that you're going to be

19  asked to decide is whether any of the asserted patents are

20  invalid.  Invalidity is a defense to infringement.

21       Therefore, even though the United States Patent

22  and Trademark Office has allowed the asserted claims and

23  even though a patent issued by that office is presumed to

24  be valid, you, the jury, must decide whether those claims

25  are invalid after hearing the evidence presented during

1    this case.

2          You may find that a patent claim is invalid for a

3    number of reasons, including because it claims subject

4    matter that is not new or it is obvious.

5          For a patent claim to be invalid because it is not

6    new, the Defendants must show by clear and convincing

7    evidence that all the elements of the claim are

8    sufficiently described in a single previous printed

9    publication or patent, and we call these items prior art.

10         If a claim is not new, ladies and gentlemen, it is

11   said to be anticipated by the prior art.

12         Another way that a claim can be found to be

13   invalid is that it may have been obvious.

14         Even though a claim is not anticipated because

15   every element of the claim is not shown or sufficiently

16   described in a single piece of prior art, the claim may

17   still be invalid if it would have been obvious to a person

18   of ordinary skill in the field of technology of the patent

19   at the relevant time.

20         Now, you're going to need to consider a number of

21   questions in deciding whether the claim -- the invention

22   claimed in the asserted patents is obvious.  And I'll

23   provide you with more detailed instructions on these

24   questions at the conclusion of the trial.

25         If, however, you decide any claim of the

1  patents-in-suit has been infringed and is not invalid, then

2  you'll need to decide whether the infringement by the

3  Defendants has been willful, and you will also need to

4  decide what amount of money damages should be awarded to

5  the Plaintiff to compensate it for that infringement.

6          A damages award, ladies and gentlemen, must be

7  adequate to compensate the patentholder for the

8  infringement, and in no event may a damage award be less

9  than what the patentholder would have received had it been

10  paid a reasonable royalty for the use of its patent.

11         However, any damages that you award are meant to

12  compensate the patentholder, and they are not meant to

13  punish the Defendants.

14         You may not include in any damages award an

15  additional amount as a fine or a penalty above what is

16  necessary to fully compensate the patentholder for the

17  infringement.

18         Additionally, damages cannot be speculative, and

19  the Plaintiff must prove the amount of its damages for the

20  alleged infringement by a preponderance of the evidence.

21         I'll give you more detailed instructions on the

22  calculation of damages at the conclusion of the trial,

23  including giving you specific instructions with regard to

24  the calculation of a reasonable royalty.

25          However, the fact that I'm instructing you on

damages now does not mean that the Plaintiff is or is not entitled to recover damages.

Now, ladies and gentlemen, you're going to be hearing from a number of witnesses in this case, and I want you to keep an open mind while you're listening to the evidence and not decide any of the facts until you've heard all the evidence.

Also, this is important:  While the witnesses are testifying, remember, ladies and gentlemen, that you, the jury, will have to decide the degree of credibility and believability to allocate to all the witnesses and to all the evidence in this case.

So while the witnesses are testifying, you should be asking yourselves things like this:  Does the witness impress you as being truthful?  Does he or she have a reason not to tell the truth?

Does he or she have any personal interest in the outcome of the case?  Does the witness seem to have a good memory?  Did he or she have an opportunity and ability to observe accurately the things that they've testified about?

Did the witness appear to understand the questions clearly and answer them directly?  And, of course, does the witness's testimony differ from the testimony of other witnesses, and if it does, how does it differ?

These are some of the things that you should be

1   thinking about while you're listening to each and every

2   witness over the course of the trial.

3          Also, ladies and gentlemen, I want to talk to you

4   briefly about expert witnesses.

5          When knowledge of a technical subject may be

6   helpful to you, the jury, a person who has special training

7   and experience in that particular field -- we call them an

8   expert witness -- is permitted to testify to you about his

9   or her opinions on those technical matters.

10          However, you're not required to accept an expert

11   or any other witness's opinions at all.  It's up to you to

12   decide if you believe that an expert witness or any witness

13   for that matter is correct or incorrect and whether or not

14   you want to believe what they say.

15          Now, I anticipate that there will be expert

16   witnesses testifying in support of each side in this case,

17   and it will be up to you to listen to their qualifications

18   when they're called to testify, and when they give an

19   opinion and explain their basis for it, you'll have to

20   evaluate what they say, whether you believe it, and if you

21   do, to what degree, and do you want to give it weight of

22   any matter -- any manner.

23          Remember, ladies and gentlemen, judging and

24   evaluating the credibility and believability of each and

25   every witness is an important part of your job as jurors.

1          Now, during the trial, it's possible that there

2   will be testimony from one or more witnesses that are going

3   to be presented to you through what's called a deposition.

4          In trials such as this, it's very difficult, if

5   not impossible, to have every witness appear live in the

6   courtroom when they're called to testify.  So the lawyers

7   for each side, prior to the trial, take the depositions of

8   the witnesses.

9          In a deposition, a court reporter is present, the

10  witness is present and is sworn and placed under oath, just

11  as if he or she were personally in court.

12         Then the parties, through their lawyers, ask the

13  witness questions, and the witness's answers to those

14  questions, along with the questions themselves, are

15  recorded and taken down.

16         Most of those depositions are commonly done with a

17  video recording made as well.  Portions of those

18  depositions and the video recordings of them reflecting the

19  questions that were asked and the answers that were given

20  can be played back to you as a part of this trial so that

21  you can see those witnesses and hear their testimony, even

22  though they're not physically present in the courtroom.

23         That deposition testimony is entitled to the same

24  consideration, insofar as possible, and is to be judged as

25  to its credibility, weight, and otherwise considered by

1   you, the jury, in the same way as if the witness had been

2   present in the courtroom and testified live from the

3   witness stand.

4          Now, during the course of the trial, it's possible

5   the lawyers are going to make objections, and when they do,

6   I'll issue rulings on those objections.

7           It's the duty of an attorney for each side in the

8   case to object when the other side offers evidence that the

9   attorney believes is not proper under the rules of the

10  Court and the rules of civil procedure.

11         Upon allowing the testimony or other evidence to

12  be introduced over the objection of an attorney, the Court

13  does not, unless otherwise expressly stated, indicate an

14  opinion about the weight or effect of such evidence.

15         As I've said before, you, the jury, are the sole

16  judges of the credibility and believability of all the

17  witnesses and the weight and effect to give to all of the

18  evidence.

19         Now, ladies and gentlemen, I want to compliment

20  both the Plaintiff and Defendant in this case -- the

21  Defendants in this case, because up until today, outside of

22  your presence, along with the Court, they've all worked

23  very diligently with the Court to review and consider a

24  great many exhibits that would be presented during this

25  trial.

1          And through those pretrial procedures with the

2   Court, they have presented the proposed exhibits, any

3   objections to them, and the Court's heard their arguments

4   regarding admissibility, and I've already issued rulings on

5   those disputes so that we already know which exhibits are

6   going to be admitted in this trial.

7          And that has saved you.  You may not realize this,

8   but that has saved you a lot of time.  It's also saved you

9   from sitting there and listening over and over and over

10  again to very similar objections to exhibits.

11         All that's already been handled by the Court and

12  the parties through their counsel.

13         And that means, when they show you an exhibit,

14  either Plaintiff or Defendants, during the course of the

15  trial, it's already been admitted.

16         They can ask what questions that they think are

17  appropriate to put it in context, but they don't have to go

18  through the formal offer, objection, argument, and ruling

19  process that the Court's already considered at length in

20  advance of the trial.

21         So I want you to know, both sides have worked hard

22  to streamline those issues with the Court, and even though

23  you may not realize it, it has saved you a lot of time as

24  you serve as jurors in this case.

25         But it's still possible that over the course of

1  the trial, objections will be made.

2        If I should sustain an objection to a question

3  addressed to a witness, then you must disregard that

4  question entirely, and you may draw no inference from its

5  wording or speculate about what the witness would have said

6  if I had allowed them to answer the question.

7        If, on the other hand, I overrule an objection to

8  a question addressed to a witness, then you should consider

9  the question and the answer just as if no objection had

10  been made.

11        You should also know, ladies and gentlemen, that

12  the law in the United States permits a United States

13  District Judge such as myself to comment to the jury

14  regarding the evidence in a case, but those comments are

15  only an expression of the judge's opinions, and they may be

16  disregarded by the jury.

17        Even though I might be permitted under the law to

18  make those kinds of comments to you, as I said earlier, I'm

19  going to work very hard not to comment on any of the

20  evidence and not to do anything that you should consider or

21  take into account in deciding the ultimate facts in this

22  case.

23        Also, ladies and gentlemen, as I mentioned earlier

24  during jury selection, the court reporter is in front of

25  me.

```
1              She will take down everything that's said in the
2    courtroom, if I can keep people from talking at the same
3    time anyway, but the transcription of what she takes down
4    everything that's said during the course of the trial is
5    not going to be available to you to consider or review
6    during your deliberations in this case.
7              The transcript is prepared in the event there's an
8    appeal to an appellate -- to an appellate court that will
9    review this trial.  That means you're going to have to rely
10   on your own individual memories of the evidence that's
11   presented over the course of the trial.
12             Now, in a moment, each of you are going to be
13   given a juror notebook, and in the back of that notebook,
14   you're going to find a brand new legal pad that you can
15   use, with blank pages, to take notes throughout the trial,
16   if you desire to.
17             It's up to each of you to decide whether or not
18   you want to take notes during the course of the trial, and
19   if you do, how detailed you want those nettle to be.
20             But, remember, if you decide to take notes, those
21   notes are for your own personal use alone.  You're going to
22   have to rely on your memory of the evidence, which is why
23   you should pay close attention to the testimony of each and
24   every witness.
25             You should not abandon your own recollection of
```

1   the evidence because some other juror's notes indicate

2   something different.  Your notes are to refresh your

3   recollection, and that's the only reason you should be

4   keeping them.

5        All right.  At this time, I'm going to ask our

6   Court Security Officer to hand out to each member of the

7   jury the jury notebooks.

8        (Pause.)

9        THE COURT:  All right.  Ladies and gentlemen, if

10  you'll look inside those notebooks, you'll see that you

11  each have a complete copy of the three patents at issue in

12  this case.

13       You'll also find that there's a section with

14  individual tabbed pages for each potential witness in the

15  case.

16       And on each of those witness pages, there should

17  be a head-and-shoulders photograph of the witness at the

18  top of the page with their name underneath.

19       The Court's often found that it's beneficial to

20  the jury, when you try to remember the witness over a

21  lengthy -- try to remember the evidence over a lengthy

22  trial, that you can look back and see a picture of who it

23  was that testified about those things during the course of

24  the trial.

25       The remainder of those witness pages are just

1  simply ruled lines that you can use for note-taking, as

2  well as any note-taking that you want to take on the legal

3  pad that you'll find in the back of those notebooks.

4       You'll also find in there a table or a list of the

5  terms from the claim language of the patents-in-suit that

6  the Court has already construed and defined for you.

7       Those are the constructions or definitions

8  relating to that language that you must apply throughout

9  the case and your service in the case.

10      Now, these notebooks should either be in your

11 possession, or they should be closed on the table in the

12 jury room.

13      There may be times during the trial, probably

14 there will be, when we are going to take a short recess,

15 and rather than me have you take them back to the jury room

16 with you, I'll just say, ladies and gentlemen, you may

17 leave your notebooks closed and in your chairs, in which

18 case you can just do that and leave them there over that

19 short recess.

20      But if you're going to be out of the courtroom for

21 any length of time, whether it's overnight or through the

22 lunch break, I'll have you take those notebooks with you.

23 They should be in your possession and control at all times.

24      And when you leave each day, you should leave them

25 closed on the table in the jury room so that you can pick

1    them up the next morning.

2           Now, in a moment, we're going to hear opening

3    statements from the lawyers, and those opening statements

4    are designed to give you a roadmap about what each side

5    expects to offer by way of the evidence in the case.

6           And you should remember throughout the trial, that

7    what the lawyers tell you is not evidence.

8           The evidence is the sworn testimony that you're

9    going to hear, whether presented by a live witness or by a

10   deposition witness, and the exhibits that the Court has

11   already examined and found applicable and admitted in the

12   case.  That, ladies and gentlemen, is the sole source of

13   the evidence in this case.

14          Now, what the lawyers -- lawyers tell you is what

15   their impression is of the evidence that they hope will be

16   presented over the course of the trial.  And they have a

17   duty to point out to you what they believe the evidence is.

18   But, remember, what they tell you is not evidence.

19          Now, after the lawyers give their opening

20   statements, the Plaintiff will have an opportunity to call

21   its witnesses and put on its evidence.

22          After the Plaintiff has presented all of its

23   witnesses, then the Plaintiff will rest its case-in-chief.

24          And at that point, the Defendants will have an

25   opportunity to call their witnesses and to present their

1    evidence.

2           And when the Defendants have presented all of

3    their witnesses and their evidence, the Defendants will

4    rest their case-in-chief.

5           At that point, the Plaintiff will have an

6    opportunity to call any rebuttal witnesses that it wishes

7    to -- to rebut what may have been presented by the

8    Defendants during the trial.

9           When the Plaintiff's rebuttal case is finished,

10   then you will have heard all the evidence in this case.

11           And at that time, I'll give you written

12   instructions on the law, and also, ladies and gentlemen,

13   when I come to that point and give you my written -- give

14   you my instructions on the law, my final instructions to

15   the jury, I'm going to reduce those to writing, and I'm

16   going to have a separate copy of those printed for each one

17   of you so that you'll be able to take that copy of those

18   instructions back to the jury room with you.

19           And that way, when I give them to you orally,

20   you'll be free simply to listen rather than to worry about

21   taking notes on those instructions.

22           But I'll give you my final instructions at that

23   time.  After I've given my final instruction to the jury on

24   the law, then the attorneys for each side will present

25   their closing arguments.

1          After the closing arguments have been presented by

2    the attorneys for each side, then I will instruct you to

3    retire to the jury room and to deliberate on the verdict

4    that I will also send back with you.

5          As I've said, you are not to discuss the case

6    among yourselves, and you are not to discuss the case with

7    anyone or communicate about it in any way.

8          But at the point when you've heard all the

9    evidence, I've given you my final instructions on the law,

10   counsel have given you and presented their closing

11   arguments, and I have directed that you should retire and

12   deliberate on the verdict, then at that point it becomes

13   your duty to talk among the eight of you about the case and

14   the evidence and try as best you can to come to unanimous

15   answers to the questions that will be set forth in the

16   verdict form.

17         I also want to remind you again that over the

18   course of this week's trial, when you pass one or more of

19   the lawyers or the witnesses or anybody associated with

20   either side, they're not going to visit, they're not going

21   to talk, they're not going to enter into conversation with

22   you.  Don't think that's rude or unfriendly.  Just

23   remember, it's what the Court requires of them, and that's

24   why they're doing that.

25         All right.  With those instructions, we're now

1   going to hear opening statements from the counsel for both

2   sides.

3          The Plaintiff may now present its opening

4   statement on behalf of Intellectual Ventures.

5          Would you like a warning on your time, Mr. Ward?

6          MR. WARD:  I would, Your Honor, three minutes.

7          THE COURT:  All right.  You may proceed with your

8   opening statement.

9          MR. WARD:  May it please the Court.

10         THE COURT:  Proceed.

11         MR. WARD:  Counsel.

12         The un-carrier.  That's T-Mobile's trademark

13  slogan.  They're the un-carrier because they're unlike the

14  other carriers, unlike AT&T and Verizon.  And it's a slogan

15  that has served them well.  They've got a good business.

16  They've got good employees.  They've got a good network.

17  And like Ericsson, they've got good products.

18         They've even got some strong patents.  But they're

19  not the only company with strong patents and good ideas.

20  They don't have the market cornered on that.

21         The evidence in this case is going to show you

22  that they are unwilling to respect the patents of IV.

23         They're unwilling to pay for the use of that

24  property.  And you're going to learn that this is not just

25  something that's happened in this case.  You're going to

1  learn that this is -- goes all the way to the top of

2  T-Mobile.

3          This is a presentation.  It's a document that

4  you'll see during the course of this trial, and it relates

5  something to the release of VoLTE, and that's Voice over

6  LTE, in the Dallas area.  And it was called Un-wrap Dallas.

7          You'll see -- they refer to themselves with

8  un-carrier throughout, and you'll see this play on words

9  "un" throughout the course of the case.

10          Page 8 of that presentation, they stated:

11  Un-carrier is our response to a stupid, broken, and

12  arrogant industry.

13          We're tearing down the rules of wireless,

14  challenging the norm, the status quo.  And we'll present

15  evidence that this wasn't just the words of some low-level

16  employee.  The CEO of T-Mobile, a gentleman named John

17  Ledger, is the one who refers to AT&T and Verizon as the

18  stupid, broken, and arrogant industry.

19          In fact, you'll learn he refers to AT&T and

20  Verizon as the dumb and dumber of the industry.

21          Fortunately for IV, we have laws that dictate what

22  happens when someone trespasses on intellectual property --

23  when someone trespasses, infringes on patents, and that's

24  why we're here before you.

25          Because we're going to prove to you during the

1   course of this case that T-Mobile and Ericsson are

2   trespassing.

3         They're infringing on our patents.  They're going

4   to deny that.  They're going to say we don't infringe.  We

5   don't trespass.

6         And you might have already picked up on this

7   because they've got another defense.  It's their burden of

8   proof, but they're going to change horses and say, well,

9   maybe we do infringe, but your patents are all invalid,

10  they're no good.

11        And they've got a couple of reasons why they say

12  that's the -- the case.  And that's their burden, and we'll

13  let them try and prove that.

14        But then they're going to change horses again, and

15  they're going to say maybe we do trespass, maybe we do --

16  maybe your patents are valid, and in that case, we owe you

17  $158,000.00, not the 77 million that we say that they owe.

18        In the next 30 minutes, I'm going to tell you more

19  about the inventor in this case, IV, a little about the

20  technology, and how we're going to prove that the

21  Defendants are infringing on that technology.

22        Let me introduce you to Dr. Jacob Jorgensen.  He's

23  the inventor.  Dr. Jorgenson, are you in the courtroom?

24        Dr. Jorgenson will be our first witness in this

25  case.  He's the inventor on these patents.  But he didn't

1   start out in the field of telecommunications.

2          You'll learn that he has a degree in physics from

3   MIT, that he went to medical school, graduated from medical

4   school, and went into his residency and fellowship in

5   surgery.

6          And it was while he was performing surgeries that

7   he became interested in the field of telecommunications.

8   And after he worked as a doctor at night, he would go to

9   the library.  And he started studying about

10  telecommunications while he was in his fellowship.

11         And he became so interested in this field, that he

12  left the practice of medicine and devoted his life to the

13  field of telecommunications.

14         He was involved in several start-up businesses,

15  ultimately founding a company called Malibu Networks.  He

16  was a co-founder, and he had -- he was the chief technology

17  officer.  And it was while he was at Malibu Networks that

18  he came up with these inventions and applied for and was

19  issued patents.

20         We'll spend more time in a minute talking about

21  these inventions, but as I told you during voir dire, it --

22  the inventions deal with intelligent base stations that

23  provide high quality of service in wireless networks.

24         And we'll talk more about that, and I hope to give

25  you a better understanding of exactly what these inventions

1    dealt with.

2            Let me tell you about Intellectual Ventures.

3    Intellectual Ventures, during this case, will be

4    represented by Mr. John Paschke.  Mr. Paschke is a

5    licensing executive.

6            Thank you, Mr. Paschke.

7            He's a licensing executive at Intellectual

8    Ventures.  He will testify.  He'll be our second witness,

9    and he'll tell you about their business and how they came

10   to acquire the patents that we're going to talk about.

11           He'll also tell you about Intellectual Ventures.

12   It was founded by a gentleman named Nathan Myhrvold.

13           Mr. Myhrvold would -- was the first technology

14   officer at Microsoft, has over 800 patents to his own name.

15           He is a prolific inventor.  And you'll learn about

16   the business that Mr. Myhrvold started.  You'll learn about

17   the different areas of business that Intellectual Ventures

18   is in, and you're going to learn about this area of

19   business, which is the acquisition of patents.

20           You'll hear that IV sometimes buys patents, like

21   they did in this case, and they identify potential

22   trespassers.

23           There's a number of companies that have invested

24   in Intellectual Ventures, some early investors, companies

25   you're going to know, Apple, Microsoft, Nokia, Sony, Cisco,

1    and Verizon.

2          We heard during voir dire about the McDonald's

3    lawsuits and some lawsuit about missing trousers.  This is

4    not that case.

5          These companies have invested a lot of money in

6    intelligent -- Intellectual Ventures.

7          In fact, you're going to learn that Verizon took a

8    license to the portfolio of patents, including -- including

9    these three patents, and they paid over a hundred million

10   dollars for those rights.

11         In addition to that, they committed to -- this is

12   Verizon -- to investing another $250 million in

13   Intellectual Ventures.  And they've invested a large chunk

14   of that, as well, acquiring rights to other patents that

15   Intellectual Ventures has.

16         There's another licensee to the portfolio of

17   patents that IV has, including these three patents, a

18   company called AT&T.

19         And I can't say the amount in open court that AT&T

20   paid, but you'll hear it from Mr. Paschke.  We'll seal the

21   courtroom, and I can promise you, it's not $158,000.00.

22         To understand this technology, we've got to go

23   back to the late 1990s, because that's when Dr. Jorgenson

24   came up with these inventions.

25         We've got to remember what the technology was

1    like.   There were land lines.   There were cell phones, as

2    well.   But I'm going to explain voice and data using land

3    lines.

4         You remember when you had an Internet connection,

5    if you plugged into the -- the Internet with your land

6    line, you couldn't talk on the phone, right, unless you had

7    a separate line.   You got that nasty noise if you picked

8    up.

9         Similarly, if you were on the Internet, you

10   couldn't make phone calls.   Sometimes you had -- people had

11   two lines, but voice was on one line, and data was on

12   another.

13        And that's what I'm representing here with these

14   two pipes.   Think about wireless transmissions as pipes.

15        They're in the air, but voice is being transmitted

16   in one pipe and data is being transmitted in another.

17        And you'll learn that in that voice pipe there are

18   packets.   And think of packets as containers of

19   information.   And those packets, delay is not really

20   acceptable.

21        There can be some errors, but they pretty much got

22   to be sent at the same interval.   Otherwise, the person on

23   the other end of the line won't understand if those data

24   packets aren't transmitted that way.

25        Now, data packets are a little bit different.

1   They're much larger.  Think of data as the information

2   that's put together if you're looking at a web page -- and

3   that's what's shown here is a web page of the Dallas

4   Morning News.

5        There can be some delay, but errors aren't

6   acceptable.  If there's errors, then you're going to get a

7   messed up picture, and it's not going to look right when

8   the web page gets displayed.

9        What Dr. Jorgenson foresaw was com -- combining

10  the voice and data into one pipe and doing it wirelessly

11  and transmitting it.  But he foresaw problems when you do

12  that.  And that -- the problems that he foresaw is what

13  ultimately led to the patents in this case.

14       The problems would be that if you've got voice and

15  data in there, you've got to have a way to recognize which

16  packet is which because if you don't, you're going to be

17  dropping data, or you might be dropping calls.  And what he

18  came up with was a way to do -- to do this all in one pipe.

19       And that led to the issuance of these patents, the

20  '629, the '206, and the '517 patents.

21       Now, remember, this was 10 years at least before

22  LTE came out, and he didn't invent LTE.  He didn't invent

23  Voice over LTE.

24       But when LTE went to Voice over LTE, these

25  Defendants used his invention because it doesn't work

without it.  Doesn't work nearly as efficiently as T-Mobile
needed -- needed it to.

          And you're going to learn they desperately needed
this invention.  And I'm going to show you the documents to
back that up in a minute.

          But he didn't just stop with filing patents.  He
had a company that employed over a hundred scientists.

          Malibu Networks at its peak employed over a
hundred scientists, had up to 150 employees, and they
developed prototypes.  And he showed these prototypes, and
people saw the prototypes and said that can't be.  You
can't be transmitting wirelessly.  They looked for the
wires.  And there were no wires.  And he'll tell you that
story.

          So you've got to think how did a -- a surgeon
figure this out when you've got all these
telecommunications companies?

          He'll tell you that story.  He was an outsider,
because the industry wanted to solve this problem, and they
looked at it, and they said let's use ATM, not ATMs like we
think, not automated teller machines, but a different type
of network.

          And Dr. Jorgenson said that's not ever going to
work.  He was an outsider.  He came at it from a different
perspective, and ultimately was issued the patents that

 1    we're going to talk to you about in this case.

 2            So if this was such a great invention, how did it

 3    end up in the hands of IV?  Because you're going to learn

 4    that Dr. Jorgensen's company, Malibu Networks, didn't make

 5    it.  It failed.  It went into bankruptcy.

 6            This was right around 2001, 2002 when the dot com

 7    burst happened, and they weren't able to secure

 8    investments.

 9            And Intellectual Ventures bought these patents for

10    $900,000.00 -- actually not these patents, one of the

11    patents.  Two of the patents were applications.  They

12    didn't exist.  And that was in 2004, at least six years

13    before LTE networks were released, nine years before

14    T-Mobile had even gone to VoLTE, Voice over LTE.

15            And so I have a feeling the Defendants will try to

16    argue to you and present evidence that, well, these things

17    weren't really valuable if the company went bankrupt,

18    right?

19            But think about how far ahead of time his

20    inventions were, years before, in the late '90s.  Two of

21    the patents hadn't even issued.

22            And they say, well, maybe he's got something, but

23    it can't be that valuable, right?  They paid $900,000.00,

24    and they want $77 million.

25            I want you to think about the licenses that we'll

1   present to you, the evidence of the licenses to AT&T and

2   Verizon.

3        And think about their argument when we're

4   presenting evidence.  They want to say, well, you didn't

5   pay that much for them.  And it's like if I were to go out

6   and buy oil and gas interests in an area where oil had not

7   been discovered -- say I spent $10,000.00 on those mineral

8   interests.  10 years go by.  Oil starts being discovered

9   around my property.

10       And a company comes -- I used Exxon in my voir

11  dire.  I'll stick with picking on Exxon.  Exxon drills a

12  well, and they hit a gusher.  They find a lot of oil.

13  Millions of dollars.  You think they could tell me, well,

14  you only spent $10,000.00 on those interests, we'll just

15  give you a multiple of that.  No, I'd want to get paid for

16  how much they used my property, what they took.  And that's

17  what we'll ask you to focus on.  How much have the

18  Defendants used Dr. Jorgensen's inventions?

19       So let's talk a little bit about the technology.

20  We heard a little about 1G, 2G, 3G, and 4G networks, and

21  I've told you a little about VoLTE.  And I think Ms. Smith

22  might have misspoke in her voir dire, because she said

23  Ericsson invented 1G, 2G, 3G, and 4G.

24       I don't think they'll say that during the course

25  of this trial because Ericsson certainly did not invent 2G,

1   3G, 4G, or Voice over LTE.

2        They might have contributed to some of that

3   technology, but you're going to have to watch them because

4   they will claim Dr. Jorgensen's inventions during the

5   course of this trial.  I think she misspoke when she said

6   they invented these things.

7        Dr. Jorgensen patented his ideas, though, in the

8   late '90s.  That's when he filed these patent applications.

9   And you see VoLTE coming much later.

10       So let's talk about what we accuse.  Why do we

11  accuse the Defendants of infringing on these patents?

12  We're going to focus on LTE networks and the first

13  evolution of LTE.

14       There were two pipes -- remember I talked about

15  there was voice and data.  There were two pipes in LTE.

16  And I didn't know this before we started this case.  I

17  thought everything was happening over LTE.

18       But in the first launch of that technology, you'll

19  learn that voice was transmitted on 3G, and data was

20  actually transmitted on LTE.

21       Something else you'll learn are these pipes are

22  called spectrum, and spectrum is incredibly expensive,

23  billions of dollars, billions and billions and billions of

24  dollars to get spectrum.  It's very precious, and it's a

25  limited resource, and companies are always looking for more

1    of it.

2            And that's what happened when they went Voice over

3    LTE.  They were able to move that voice and data into one

4    pipe, and that freed up spectrum.

5            And this is what we say the Defendants have done

6    that infringe on this property.  The '517 and '206 patents

7    accuse a feature called QoS Aware Scheduling, and it was

8    present in the first evolution of LTE and in LTE with

9    voice, this VoLTE.

10           Then when they put everything in one pipe, they

11   started infringing the '629 patent with DBS-SABE.

12           That's the feature that they call in their own

13   products -- it's called DBS-SABE.  And it was a

14   combination.  When they went Voice over LTE, they were

15   infringing the '517, the '207 [sic], and the '629.

16           I know I've thrown a lot of terms at you, and I

17   don't mean to confuse you.  I'm trying to keep it as high

18   level as I can.  The good news is, we'll have Dr. Tim

19   Williams --

20           Dr. Williams, are you here in the courtroom?

21           DR. WILLIAMS:  Yes.

22           MR. WARD:  Dr. Williams will come and testify --

23   thank you, sir.

24           Dr. Williams has a bachelor's degree in electrical

25   engineering.  He has his master's and his Ph.D. from the

1    University of Texas in electrical engineering, and he is

2    going to come, and he's going to walk you through the

3    claims of each one of these patents.

4           And he'll compare the claims of the patent to the

5    features that we say infringe, and he will match up

6    element-by-element.  It will take a long time.  It's --

7    it's a very technical analysis, but he'll do it for you.

8    And he's going to teach you about T-Mobile's networks.

9           This is a cell tower in the middle of the screen

10   there, and at the bottom of it, you see something called an

11   eNodeB.  An eNodeB is that box you see on cell towers.

12          It's called a base station.  And that cell tower

13   transmit out to -- transmits out to phones, and in this

14   case, you'll hear them refer to UEs, user equipment, or

15   CPE, customer premises equipment.

16          I haven't talked much about Ericsson.  Ericsson is

17   actually the company that manufactures these base stations,

18   these eNodeBs.

19          We've also accused them of infringement, but we

20   accuse them of indirect infringement.  It's a little

21   different than the direct infringement that T-Mobile is

22   doing, and Dr. Williams will talk to you about that.

23          Now, I've told you about this limited resource

24   called spectrum.  We've talked a little bit about

25   competition in the industry and how each carrier has its

1    own allotment.

2         We're going to present evidence to you from

3    various sources, different documents from within T-Mobile,

4    from within Ericsson, and from industry publications, and I

5    want to show you one of those.

6         It's called IBISWorld.  And this is Plaintiff's

7    Exhibit 184.  And this is something that the industry

8    receives and reviews, and let's look at what the industry

9    was saying back in 2017.

10        Wireless providers have struggled to keep up with

11   demand, devoting a significant amount of resources to

12   expand network capacity.

13        The battle for wireless spectrum has been a large

14   source of competition, and the struggle for new subscribers

15   in this saturated market has been challenging.

16        Carriers' appetite for both more spectrum and

17   subscribers has played out in a series of competitive

18   auctions and merger and acquisition attempts.

19        So I've told you about spectrum.  I've told you

20   about competition.  You might say, where are the documents

21   from T-Mobile that say this is a problem?  We'll bring you

22   Plaintiff's Exhibit 1387.

23        You see there, they're calling themselves the

24   un-carrier network capacity strategy, and this is from June

25   of 2014.  This is what they're telling themselves

1   internally.

2         Un-carrier success has increased network demand to

3   the point where it will exceed current capacity starting in

4   2015.  Planned spectrum purchases insufficient to close

5   demand/capacity imbalance.

6         They had a problem.  They knew they had a problem.

7   They had limited spectrum.  And it wasn't just internally

8   that they were saying they had a problem.

9         We're going to show you documents that they filed

10  with the Securities and Exchange Commission.  This was one

11  from December 31 of 2014.

12        The SEC is that governmental agency that regulates

13  publicly traded companies, and T-Mobile is obligated to

14  disclose to its shareholders in the outside world what

15  challenges it might face.

16        And from Pages 9, 11, and 14 of Plaintiff's

17  Exhibit 76, we'll take a look at what they were telling the

18  world.

19        Under competition, they said:  AT&T and Verizon

20  are significantly larger than us and may enjoy greater

21  resources and scale advantages as compared to us.

22  Competitive factors within the wireless telecommunications

23  industry include -- one of the things they talk about --

24  availability of additional spectrum licenses.

25        They then talk about the risks related to their

1    industry, the scarcity and cost of additional wireless

2    spectrum and regulations relating to spectrum use may

3    adversely affect our business strategy and financial

4    planning.

5          If we are unable to take advantage of

6    technological developments on a timely basis, then we may

7    experience a decline in demand for our services or face

8    challenges in implementing or evolving our business

9    strategy.

10         They needed to take advantage of technological

11   developments.  They're telling the world that.  And they're

12   busy acquiring spectrum, but they need an answer to this

13   problem of how do we get more bandwidth?

14         Guess what they did?  They launched VoLTE, Voice

15   over LTE.  They called it innovation in growth.  And what

16   do they call it?  Technically and economically superior.

17   VoLTE only voice technology for 700 megahertz -- that's the

18   spectrum that they're transmitting in -- and critical for

19   us getting to 300 million covered pops in 2015.  Pops is

20   population.

21         Remember the commercials with the map wars; people

22   were talking about how many people they could cover in the

23   U.S.?

24         They'll refer to this as the end of the map wars

25   because they were able to maximize the use of that limited

1  spectrum, and it worked for them.

2        You're going to -- you're going to get to see

3  documents, and you're going to see how their profits

4  exploded.  They became much more profitable.  They reached

5  lots more customers.

6        And guess what they did in 2017?  They had to tell

7  the world about it in their SEC filings, Securities and

8  Exchange Commission.

9        They filed under penalty of perjury.  They swear

10  that the information contained in those documents is

11  accurate because, if you don't, you can go to jail.

12        And what did they swear to then?

13        We continue to expand our capacity through the

14  re-farming of existing spectrum and implementation of new

15  technologies, including Voice over LTE, VoLTE.

16        Remember that.  They called this a new technology

17  when they were swearing things out in their SEC filing.

18        What else do they say?

19        Moving voice traffic to VoLTE frees up spectrum.

20  We are leading the U.S. wireless industry in the rate of

21  VoLTE adoption.

22        They took Dr. Jorgensen's inventions, they

23  employed them in this Voice over LTE network, and they

24  experienced the benefits that Dr. Jorgensen will tell you

25  he envisioned, that he applied for patents for and that he

1  received patents on.  He'll take that stand in probably

2  about 45 minutes, and you'll get to hear that testimony.

3       We think the evidence of infringement will be

4  pretty compelling.  That's why the Defendants are going to

5  change horses, and they're going to say, yeah, we said that

6  was new technology, but, actually, it's old technology.

7       And you're going to hear Ericsson claim it.

8  Ericsson's going to -- Ericsson will tell you:  We invented

9  it first.  And maybe we didn't invent it first, but it

10  would have been obvious.  That's another defense they have.

11       They're going to say that for the '206 patent,

12  which we say has a priority date of July 10th, 1998, and

13  they're going to say there were things that came before it,

14  prior art.

15       And, listen, there are patents that come before

16  it.  There are lots of publications.  The key that you'll

17  have to be watching for are:  Do those prior publications,

18  prior patents disclose all the elements that are present in

19  the '206 patent?  That's the inquiry.

20       Because they're going to say the same thing about

21  the '517 and the '629 patents, that they're all -- all

22  invalid.

23       They'll say that all three of these patents,

24  examined by different examiners at different times, were

25  issued in error and that they're worthless.

1          Because, if you find these patents invalid, you're

2     finding them worthless.

3          You tear them up for all time.  It's not just for

4     this case.  That's why the law says they've got to prove

5     those things to you by clear and convincing evidence, and

6     we're going to hold them to that burden, and I hope you all

7     will, too.  I know you will.

8          Because then we're going to turn to damages, and

9     we're going to bring you Mr. Walt Bratic.

10         Mr. Bratic, are you in the courtroom?

11         There's Mr. Bratic.  Mr. Bratic has got his degree

12    in economics and a master's in business from the University

13    of Pennsylvania.  He is a partner at a firm called Whitley

14    Penn.

15         You're going to learn he's got lots of

16    certifications.  He's certified -- he's a certified public

17    accountant, a certified fraud examiner, a certified

18    licensing professional, and he is certified in financial

19    forensics.

20         He's been doing this for over 30 years.  He's

21    negotiated real-world licenses, and he does something

22    interesting in this case.

23         THE COURT:  Three minutes remaining.

24         MR. WARD:  Thank you, Your Honor.

25         Ericsson's going to tell you about all their

1    patents, how great they are.  And they've got some strong

2    patents, and we're going to acknowledge that they've got

3    some strong patents.

4            In fact, Mr. Bratic looks at Ericsson's licenses

5    to see how much they're getting paid for their use of

6    technology.

7            Their experts are not going to look at any

8    licenses.  They say, oh, let's just look at what you

9    invested, and we'll give you a return on that and we'll

10   call it good.

11           We're going to look at the use of the technology

12   because you're going to learn that these Defendants,

13   especially T-Mobile, has used it a lot.

14           And he's going to calculate a royalty rate of 6.3

15   cents, and he'll explain that to you, times the number of

16   months that their users have been using this technology,

17   and you'll learn it's 1.2 billion user months.  We've got

18   tens of millions of users.  How many minutes they use it on

19   a monthly basis over the years that they've been

20   trespassing on this property, and it's up to $77 million

21   that T-Mobile owes for using this property.

22           We think it's unfair what the un-carrier has been

23   doing.  We think it's unreasonable.  And at the conclusion

24   of this case, once we've presented all the evidence to you,

25   I will unapologetically ask you to find that these

```
 1   Defendants have trespassed on Dr. Jorgensen's inventions,
 2   IV's property, that they infringe, that these claims are
 3   invalid, and that they owe for using IV's patented
 4   property.
 5            Thank you for your time.
 6            THE COURT:  All right.  Defendants may now present
 7   their opening statement to the jury.
 8            Would you like a warning on your time, Mr. Kubehl?
 9            MR. KUBEHL:  Yes, Your Honor, five minutes,
10   please.
11            THE COURT:  All right.
12            MR. KUBEHL:  I've got a couple of demonstrative
13   components of a base station I'd like to place on the table
14   if the Court would allow.  They're just back here --
15            THE COURT:  On the table in front of the courtroom
16   deputy?
17            MR. KUBEHL:  Yes, Your Honor.
18            THE COURT:  All right.  All right.  Proceed with
19   your opening statement.
20            MR. KUBEHL:  Thank you, Your Honor.
21            Good afternoon, ladies and gentlemen.  My name is
22   Doug Kubehl, and I am very privileged to represent Ericsson
23   and T-Mobile in this case.
24            I'm going to start by giving you a little bit more
25   background about Ericsson, in particular, because you're
```

1    not hearing much about Ericsson.

2            What I've put on the table here are some

3    components that live inside of the base station.

4            So the base station, you heard, is this box that

5    sits maybe on top of a building, and it connects to

6    antennas.  And what the base station does is it serves as

7    sort of a middle man between our phones on one side and the

8    Internet on the other side.

9            So the base station talks wirelessly to our

10   phones, and on the other side, it gets information from the

11   Internet, and it lets it flow in between.

12           So these boxes on the top of the buildings are the

13   base stations.  And what I've put here are some of the

14   components from the base station.

15           Most of us will never get a chance in our life to

16   see those things.  We're going to hear from some Ericsson

17   witnesses about what those do, how they're put together,

18   and specifically how they work.

19           But Ericsson is the one who designed that.

20   Ericsson built it.  Ericsson sold it to T-Mobile.  And

21   Ericsson stands behind it.  Ericsson is here today to

22   defend itself and its customers because it does not use

23   those three patents.  And we'll show that to you.

24           You wouldn't -- you wouldn't know that Ericsson

25   was really a Defendant in this case if the Judge hadn't

 1    told you.

 2           If you looked at all of the slides that we saw

 3    from IV, it was all focused on T-Mobile.  T-Mobile is a

 4    customer of Ericsson.  Ericsson is the one that has the

 5    knowledge and built those things, and Ericsson will show

 6    you why they don't infringe.

 7           So let me tell you just a little bit about

 8    Ericsson.  It's a worldwide company, and its headquarters

 9    are in Sweden, but the U.S. headquarters are down the road

10    in Plano, Texas.  They employ about 3,000 people there.

11           I'm going to show you here the Ericsson logo.

12           May I have the next slide, please?

13           So when I first saw this, I thought it was just an

14    E, and it turns out it's -- it's a representation of an

15    electrical component called a transformer.  And it

16    represents what Ericsson hopes to be, and that's a

17    transformer of technology, an inventor.

18           You're hearing -- next slide, please.

19           You're hearing a lot about LTE.  That's stands for

20    long-term evolution.  And sometimes it's called 4G.  And I

21    know you all know that if there's a 4G, there was probably

22    a 1G, a 2G, and a 3G.

23           We saw a little bit of that on the slides this

24    morning.  There have been multiple generations of this

25    technology.

1          Next slide, please.

2          What I'm showing here are some milestones that

3    you'll hear from the Ericsson witnesses about -- about some

4    good work they did in the 1G, 2G, and 3G technologies.

5           And counsel is right, no -- there's no one

6    company out there that's inventing everything in a

7    generation of technologies.  There's no doubt about that.

8          And we're going to hear about some of the

9    particular things that Ericsson accomplished in -- in these

10   earlier generations of technology, but the point that I

11   want you to take away from this slide is change.

12         The 2G systems that were in the '90s, those were

13   improvements over the 1G systems from the 80s.  And just

14   like the 3G systems in the early 2000s, were big

15   improvements over the 2G systems.  That's why they're

16   called generations of technologies because there are

17   differences.  There are significant differences between

18   these technologies.

19         The patents in this case, as you saw from the

20   slide from the Plaintiff, were filed back about at the end

21   of the second generation of wireless technologies.

22         By the time Ericsson was developing the fourth

23   generation -- two generations later of technology, you're

24   going to hear evidence that the old ideas from the 2G

25   networks just didn't translate to what was needed in the 4G

1  networks.

2          So what Ericsson did is they came up with new ways

3  of doing it.  It came up with its own inventions, different

4  from those three patents, and it created successful LG --

5  LTE technology.

6          And you don't have to take Ericsson's word for

7  that.

8          Next slide, please.

9          What I'm showing you here is an exhibit you'll see

10  in the case, and that's a document that the European Patent

11  Office put out.

12          So the European Patent Office is Europe's version

13  of our United States Patent Office.  And so this is an

14  agency whose job it is, is to receive patent applications

15  and review everybody's applications for the inventions they

16  might have, for all kinds of different technologies.

17          And what the European Patent Office did in the

18  year 2014, which not coincidentally, is the year that the

19  technology that they're accusing of infringement was first

20  put out.

21          In that year 2014, the European Patent Office

22  recognized Ericsson for -- a finalist as the inventor of

23  the year for Ericsson's contributions in LTE technology.

24          And Ericsson wasn't -- wasn't one of several

25  companies that were recognized for this.  They were the

1   company in LTE that was recognized for this.

2           And the -- and the Patent Office recognizes what

3   Plaintiff's counsel and what I'm recognizing, that LTE

4   technology consists of thousands of individually patented

5   inventions.

6           There's no one patent or two patents or three

7   patents or a hundred patents that you can say that's really

8   what's driving LTE.  There are thousands of patents.  And,

9   in fact, you're going to hear evidence that Ericsson itself

10  has thousands of LTE patents.

11          This will become an issue in the case because when

12  it comes to damages, the Plaintiff wants to compare the

13  three patents of Malibu Networks to the hundreds of U.S.

14  patents -- LTE U.S. patents that Ericsson has.  And their

15  theory is that if you look at these three patents from

16  Malibu Networks, those would be worth one-third of the

17  amount of all of Ericsson's LTE patents.  That's part of

18  how they get way up to $77 million.  And we're going to

19  show you that that's just not right.

20          Next slide, please.

21          So you've -- you've heard a lot about T-Mobile.

22  What I have to say about T-Mobile is I -- I am proud to

23  represent them, but they're Ericsson's customer.

24          They buy base stations.  I heard no less than

25  three times today that this case is about that.  This case

1    is about that base station.

2         And T-Mobile doesn't make base stations.  You

3    heard a reference to, well, here's -- here's their product.

4    Here's their product.  It's Ericsson's product.  Ericsson

5    is in the case.  Yet they refuse to acknowledge us, and

6    I'll tell you why that is later when we talk a little bit

7    more about damages.

8         A little bit about the Plaintiff.  You hear

9    general references to the company IV.  He says IV, oh, we

10   do a lot of things.  And one of the things we do is we buy

11   some patents, and we try to make a return on investment.

12        And let's just be clear that the Plaintiff in this

13   case, the Plaintiff in this case is not IV.  The

14   Plaintiff -- and this is the complaint that they filed --

15   is Intellectual Ventures I LLC.

16        That I stands for Fund No. I, and what Fund No. I

17   does is it buys patents, sells patents, tries to license

18   patents, and it sues people.  That's what they do, period.

19   There's no -- there's some other things that we do.  That's

20   what they do.

21        I think they'll admit to us that they've never

22   made or sold any products, that they didn't invent anything

23   in this case.

24        They're in this case because in 2004, they bought

25   a collection of 22 -- 22 patents from Malibu Networks for

1    $900,000.00.

2          And today, they're asking for damages of 77

3    million.  And that number, it's said with such ease, right?

4    $77 million, that's what we're entitled to.  That's a lot

5    of money.

6          And let's just be clear here, here's a slide that

7    came from the -- the presentation that you saw from

8    Plaintiff.  And he said, look, these three patents,

9    $900,000.00.

10         I'm not sure what he's trying to show here, but

11   the evidence will show there were 22 patents that were sold

12   in that transaction.

13         In this case, you're going to hear from Ericsson's

14   witnesses.  You're going to hear from Mr. Johan Norrby.

15   Mr. Norrby is on the business side of Ericsson.

16         Thank you, Mr. Norrby.  He's in charge of the

17   financials for the hardware that goes inside of the base

18   station.  He's the corporate representative.  He's flown

19   here from Sweden.  He's going to be here all week for this

20   important case for Ericsson.

21         I want to introduce you to Mr. Stephen McGrath.

22   Mr. McGrath is the principal corporate counsel of

23   intellectual property for T-Mobile.  He's been in charge of

24   this case since its inception.  And he's going to be here

25   all week with us, as well.

```
 1            Okay.  I want to turn to the job that we all have
 2   ahead of us this week, and that's really these patents,
 3   analyzing these patents, determining whether there's
 4   infringement, determining whether they're valid, and there
 5   is -- there is quite a bit of work to do.
 6            And I certainly can appreciate the eight of you
 7   and how you must feel, how I would definitely feel if I had
 8   to come in here and think I have to make decisions.
 9            I mean, his presentation was, I think, intended to
10   be like really high level, and I'll just show you some
11   concepts, and we'll get into the details later.  But I
12   looked at that and thought, wow, that -- that -- that seems
13   really complicated.
14            So we've got some folks to help you learn the
15   technology, as well.  One of the folks you'll hear from is
16   Dr. Stephen Wicker.
17            Dr. Wicker?
18            Dr. Wicker is a Ph.D. in electrical engineering,
19   and he's a professor at Cornell University.  He's been in
20   the wireless industry for over 30 years.  He's given talks
21   to Congress and the White House on cellular technology.
22   He's been studying LTE since there was an LTE.  He teaches
23   courses on it.  He writes books on it.  He does papers on
24   it.
25            What he's going to do is he's going to help us
```

```
 1   understand LTE.  He's going to help us understand these
 2   base stations.  And he's going to compare those base
 3   stations to the patents, and you'll hear that in his
 4   opinion, he believes that there is no infringement of any
 5   of these patents.
 6        The other person that will help us will be
 7   Dr. Tony Acampora.  Dr. Acampora also has a Ph.D. in
 8   electrical engineering.  He's got over 50 years experience
 9   in the industry.  He's the director of the University of
10   San Diego's Center For Wireless Communications.  He was at
11   Bell Labs for what most people might consider a career.
12   He's been awarded over 40 patents.
13        And what his job was, was to analyze whether the
14   patents that were issued to Malibu, whether there was prior
15   art that actually was the same as the Malibu patents.
16        So something that came before the Malibu patents
17   that makes it so that they shouldn't have got the patent
18   because the same idea was out there already.  So he's
19   analyzed that, and he's going to tell us all about that.
20        Okay.  You haven't seen this yet.
21        Sorry about that.
22        I doubt nobody's seen one of these yet.  This is
23   what the Court was talking about.  It's a patent claim.
24        So the patent -- you heard in the video and you
25   heard from the Court, the patent has drawings, and it has
```

1    descriptions, and at the end of it are these numbered

2    paragraphs called claims.  And we look at the claim, and

3    that will be what we measure infringement on, and that will

4    be what we measure invalidity on.

5           So here's what I mean by that:  You look at

6    this -- this text here -- and there's a lot of it -- and

7    it's paragraph after paragraph after paragraph, and each

8    paragraph has a whole bunch of concepts in it.

9           And what IV has to do to prove infringement is

10   they have to show you that each and every element of this

11   entire claim is in the Ericsson base station.

12          So your job will be to say, at the end of the

13   case, has IV proven to me that every one of the elements in

14   this claim is in that base station?

15          And not like most of the elements or, gee, it kind

16   of looks like it's kind of the same, but every single

17   element of the claim, that's what they have to prove to

18   show infringement.  If there's even one element that's

19   missing, the Judge will tell you you have to find

20   non-infringement.

21          So I'm not going to try to explain this whole

22   claim to you today.  There are differences, for sure,

23   between this and the Ericsson base station, but I'll focus

24   on one that I think was easy for me to understand, at

25   least.

1          So this claim is called -- it's called a method

2     claim.  So it's a process of doing a bunch of steps.  And

3     when you look at infringement, you're going to have to

4     decide, are all of these steps done in just the way it

5     says.

6          And one of the steps that has to happen -- and

7     I've highlighted it in yellow at the bottom -- is this --

8     communication has to be made from that -- from a base

9     station to what's called a CPE device.

10         Now, when Plaintiff was going through this, he

11    said -- he showed you a picture of a mobile phone.  He

12    said, yeah, they call these things CPE devices.  I don't

13    know if any of you have ever called your cell phone a CPE

14    device, but I'll tell you what the Court will tell us we

15    have to use as the definition of what a CPE device is.

16         So the Court was telling us, I've construed some

17    claims, and we all have to apply these definitions for

18    these claim terms.

19          So in this one particular word in this claim in

20    this patent, this term CPE station:  Devices residing on

21    the premises of a customer and used to connect to telephone

22    networks, including ordinary telephones, key telephone

23    systems, PBXs, videoconferences devices and modems.

24         So everybody knows what an ordinary telephone is.

25    A lot of us don't have them anymore.  We just have our

1   mobile phones.  The one thing that you'll hear from

2   Dr. Wicker is what all these things have in common is they

3   sit in one place.

4        You'll hear that Malibu Networks was in the

5   business of what was called fixed wireless.  So it was a

6   wireless signal that would go from a base station, but then

7   it would go to something bolted to your house, and then

8   from there, you could get some signals inside the house.

9   But the CPE equipment, customer premises equipment, is

10  something that resides on the premise.

11       So Dr. Wicker will explain to us his opinion, but

12  I bet a lot of you already have some inklings that your

13  phones, your cell phones, those are not devices residing on

14  the premise.

15       So that's one example of something that's missing

16  from this patent.  We'll show you more examples, but I did

17  want to show you the claims and not just kind of show you

18  today's technology, hold up three patents, and say, see, we

19  invented it.  When we get into the claims, you see there's

20  big differences.

21       Next slide, please.

22       Okay.  This is the second patent, and I'm going

23  to -- I'm going to show you one difference in each one of

24  these patents, and I think this week we'll probably talk

25  about several differences in each of them.

1          This one he called the '206 patent, and it has

2     this term called end-user quality of service requirements.

3     And all you really heard from Plaintiff's counsel was some

4     talk about quality of service.

5           We want some good quality of service.  But this

6     patent requires a particular thing:  End-user quality of

7     service requirements.

8          So if you've ever, on your phone or on a tablet or

9     your TV, tried to stream something, stream a movie or a

10    show, and then sometimes the video will kind of stop, and

11    then maybe it will start going again, and that could be

12    because the network is just not providing us enough

13    bandwidth.

14         So what I would like -- I'm the end-user; you're

15    the end-users.  What we would like, we sure would like to

16    have the network provide us enough bandwidth -- guarantee

17    us enough bandwidth so that I get to see it like I should

18    see it.  That would be my end-user quality of service

19    requirements.

20         Okay.  Well, that sounds pretty good.  So what

21    would be the problem, though, if every one of us could set

22    our own end-user quality of service requirements and then a

23    network like T-Mobile would have to satisfy them?  And

24    every one of us wants everything the best.  And T-Mobile

25    would not have the resources to be able to satisfy that.

```
1            So the way it actually works is a network provider

2    like T-Mobile uses network quality of service requirements.

3            T-Mobile is the one who decides which different

4    applications get which kind of quality of service so that,

5    as a company, it can balance the needs of all the different

6    traffic types and provide the best service to everybody.

7            So this patent, end-user quality of service

8    requirements, in reality, what happens in the world, it's

9    network quality of service requirements.

10           Dr. Wicker will tell us there's no infringement

11   here for this and for other reasons on this patent.

12           Okay.  Last patent, last patent claim that you'll

13   have to look at from me today probably.  The '629 patent.

14           So this '629 patent is about -- this base station

15   has got lots of phones that want to talk to it, and the

16   base station has to decide who gets to talk to me next.

17   And oftentimes, there's more phones than resources

18   available, so you've got to figure out who gets what.

19           What this '629 patent was about was, well, I have

20   a good idea.  For this given phone call, why don't I look

21   out into the future and reserve resources, not one time in

22   the future but two times out into the future, and then that

23   way, as this guy needs resources, he's got them waiting for

24   him.  They're reserved for him.

25           Let me see if I can make it a little more
```

1    understandable.

2          The patent is like a restaurant that requires you

3    to have reservations.  It would say you have to make a

4    reservation one week out in advance and then make another

5    reservation two weeks out in advance.

6          And when Dr. Wicker goes through the claim with

7    you, you'll see where that comes from in the claim, but the

8    concept is that I'm going to allow my phones to have

9    resources by looking out into the future and reserving

10   these spots for them.

11         Okay.  That -- that sounds kind of like, okay,

12   wouldn't everybody do that?  Not necessarily.  One thing

13   that's really, really cool about that box over there is

14   it's making a thousand decisions a second.  Every single

15   second it's figuring out which phones get which resources a

16   thousand times.

17         Next slide, please.

18         And so the way it works in the Ericsson base

19   station is, instead of reserving these spots in the future,

20   Ericsson works more like a restaurant that doesn't take

21   reservations.  It has phones show up when they need

22   resources, and it has a competition between the phones.

23         And much like a restaurant that doesn't take

24   reservations, whether you win this competition kind of

25   depends on how long you've been waiting.  The longer you've

1   been waiting to get the right to transmit, the better

2   chance you have of getting a right.

3          And so Dr. Wicker will tell you that this concept

4   of having a competition for these resources, that's the

5   opposite of reserving resources in the first place.  So for

6   that reason, Dr. Wicker will explain there's no

7   infringement of this patent.

8          The bottom line in all these patents is that they

9   relate to ideas that maybe at one time had their time, but

10  at least in Ericsson's version of the LTE network, they

11  weren't the right choice.

12         And we'll show you documents from Ericsson,

13  internal design documents where Ericsson actually looked at

14  processes like, hmm, should we look future reservations?

15         And they found out that actually causes some

16  technical problems, and they decided we're not going to do

17  that.  We're going to, instead, go the way that we ended up

18  today.

19         We'll see in the LTE network discussions that

20  there were actually some discussions, should end-user QoS's

21  be used, or should the network decide it?  And Ericsson

22  said the network should decide it.  And that -- that

23  actually is the way LTE went.  It's certainly the way

24  Ericsson went.

25         So we'll actually see documents that will -- that

1  will back up that these are -- these are -- the patents are

2  real techniques, but they were really rejected.  Ericsson

3  doesn't use them.

4       Okay.  Let's go two slides forward, please.

5       All right.  The issue of invalidity.  I was -- I

6  was kind of hoping that at least we'd get some sort of

7  high-level description of the '206 patent from the

8  Plaintiff's counsel, but we really didn't hear much.

9       The -- there's not much to that claim.  Basically,

10  when you see that patent claim -- and I showed it to you on

11  the infringement, but it's basically a concept of

12  classifying these things called packets based on what's

13  called end-user quality of service requirements, and then

14  scheduling those packets, figuring out what order they

15  should go in.

16       That -- that's kind of paraphrasing, but -- and

17  the experts will certainly get down into every single word

18  of the claim, and that's their job on invalidity.  We've

19  got the same job that they have on infringement.

20       On invalidity, the tables are turned.  We've got

21  to show you that all those elements are shown in any prior

22  art that we show you.  And it is a clear and convincing

23  standard, not a preponderance standard, that is true.

24       THE COURT:  Five minutes remaining.

25       MR. KUBEHL:  Thank you, Your Honor.

1        But what we're going to see, what I'm showing you

2   on this slide, this is to Mr. Jan Forslow, this is an

3   Ericsson patent, May 1998.  It's a United States patent.

4        And we're going to show you that Mr. Forslow

5   invented the concept that we see here, classifying and

6   scheduling packets corresponding to each application flow

7   from the external network to the mobile radio host over the

8   bearer in accordance with the quality of service

9   corresponding to the application packet stream.

10       And I -- I sort of made a big deal out of this

11  end-user quality of service, and that's in here.  That's in

12  here.  You're going to see it verbatim in there.

13       All right.  So we're -- we are going to show you

14  that with respect to that '206 patent, that it is invalid.

15       You've got Ericsson coming up with exactly the

16  same idea and doing it first, and they have a United States

17  patent to prove it, and Dr. Acampora will show you that.

18       All right.  I'll -- I'll close just by making a

19  couple of comments about their damages case.  And in his

20  opening, when he said that we had some particular number

21  that we agreed we'd pay, the number is zero.  Unfortunately

22  for them, the number is zero.

23       We don't use these patents.  The patents are

24  invalid.  And that's not an either/or.  This isn't a, well,

25  if you don't believe us here, then how about this?  We

1   don't infringe these patents, and these patents are

2   invalid.  The number is zero.

3          Now, one thing I'd like you to ask yourself as you

4   consider the evidence in the case and especially on this

5   damage's side, $77 million, that's their number.

6          Okay.  You've heard base station, base station,

7   base station.  Everybody agrees.  That's what the case is

8   about.

9          You'll see that even Mr. Bratic, who stood up back

10  there, he's going to have to admit that to get to

11  $77 million, even under his analysis, he didn't use any

12  licenses that were about base stations.  He used licenses

13  that are about phones.  So ask yourself, why?  Why is he

14  doing that?

15         Well, the answer will become pretty clear that

16  when you see that he also did an analysis of license --

17  licenses that cover a base station.  What do you think

18  happened to that $77 million number, even in his own

19  report?

20         It went from 77, dropped almost 90 percent down to

21  $9 million.  And that's on his best day.

22         He says, yes, if I'm looking at Ericsson is the

23  infringer, which that's what they say in this case, and I'm

24  looking at a base station and a base station license, which

25  that's what we have, he says, on the best day, it's

1    $9 million.

2         Now, Dr. Becker will show you why that $9 million

3    is unreasonable, as well.  And we look forward to walking

4    through that with you.

5         This will be my last chance to talk to you before

6    our closing arguments, and so I just want to take this

7    moment to thank you on behalf of Ericsson and T-Mobile for

8    what I know is going to be a hard week, a lot of attention

9    required, and we just thank you so much for the

10   consideration you're going to give.

11        THE COURT:  All right.  Ladies and gentlemen,

12   before Plaintiff calls their first witness, we're going to

13   take a short recess.

14        I'm simply going to allow you to close and leave

15   your notebooks in your chairs.  I don't expect this to be

16   very long.  Follow all the instructions over the recess

17   that I've given you, including, of course, not to talk

18   about the case among each other or with anyone.  And we'll

19   be back in here shortly to continue with Plaintiff's first

20   witness.

21        The jury is excused for recess.

22        COURT SECURITY OFFICER:  All rise.

23        (Jury out.)

24        THE COURT:  Be seated, please.

25        I now am under the impression that Plaintiffs have

1    dropped their willfulness claim; is that correct?

2           MR. WARD:  That is correct, Your Honor.

3           THE COURT:  And did that happen overnight,

4    Mr. Ward?

5           MR. WARD:  It did, and we failed to bring it to

6    the Court's attention.

7           THE COURT:  You sure did, until the middle of my

8    instructions when I was instructing them about willfulness

9    is when my staff got the email.

10          MR. WARD:  Yes, sir.

11          THE COURT:  There's no reason to not tell the

12   Court when you're telling the other party.

13          MR. WARD:  I agree with you, Your Honor.  It was

14   an oversight, and I apologize.

15          THE COURT:  All right.  I trust it won't happen

16   again.

17          We're going to take a short recess.  When we come

18   back, I'll -- I'll inquire as to whether either side wishes

19   to invoke the rule.  Do you know what your preferences are

20   in that regard?

21          MR. WARD:  It is our preference to invoke the

22   rule, Your Honor.

23          THE COURT:  I assume that excludes expert

24   witnesses?

25          MR. WARD:  It does.

```
 1            THE COURT:  Does that comport with the Defendants'
 2   posture, Mr. Kubehl?
 3            MR. KUBEHL:  It does, Your Honor.
 4            THE COURT:  All right.  Well, we'll do that on the
 5   record before I bring the jury back in -- or, excuse me,
 6   after I bring the jury back in.
 7            In the meantime, we'll take a short recess.  The
 8   Court stands in recess.
 9            COURT SECURITY OFFICER:  All rise.
10            (Recess.)
11            COURT SECURITY OFFICER:  All rise.
12            THE COURT:  Be seated, please.
13            All right.  Plaintiffs, are you prepared to call
14   your first witness?
15            MR. FLANNERY:  Yes, Your Honor.
16            THE COURT:  All right.  Let's bring in the jury,
17   please.
18            (Jury in.)
19            THE COURT:  Please be seated, ladies and
20   gentlemen.
21            Does either party wish to invoke the rule?
22            MR. WARD:  We do, Your Honor.
23            THE COURT:  All right.  Do I understand that it's
24   your request that the rule exclude expert witnesses?
25            MR. WARD:  And corporate representatives, yes,
```

1    Your Honor.

2         THE COURT:  All right.  The rule has been invoked,

3    which means if you expect to testify in this case and you

4    are not an expert witness or a corporate representative,

5    then you must remain outside the courtroom until such time

6    as you are called to the witness stand.

7         So any fact witnesses that would be covered by the

8    rule that are present in the courtroom should exit at this

9    time.

10        MR. WARD:  Our first witness is a fact witness, so

11   that's who we'll be calling.  But other than that, there's

12   no one else for the Plaintiff.

13        THE COURT:  Well, no reason to take him out and

14   then bring him back in.

15        MR. WARD:  Thank you.

16        THE COURT:  All right.  The rule has been invoked.

17        Plaintiff, call your first witness.

18        MR. FLANNERY:  Your Honor, Intellectual Ventures

19   calls Dr. Jacob Jorgensen.

20        THE COURT:  All right.  If you'll come forward,

21   Dr. Jorgensen.

22        If you'll come around, our courtroom deputy will

23   administer the oath to you.

24        (Witness sworn.)

25        THE COURT:  All right.  Now if you'll come around

1  and have a seat here at the witness stand.

2          All right.  Counsel, you may proceed.

3          MR. FLANNERY:  Your Honor, may I show the slides?

4  May I demonstrate slides?

5          THE COURT:  Are these a demonstrative, or are they

6  a pre-admitted exhibit?

7          MR. FLANNERY:  Yes, just slides -- slides he's

8  going to use to guide his testimony.

9          THE COURT:  All right.  Let's proceed -- proceed

10  with your direct examination.

11          MR. FLANNERY:  Thank you, Your Honor.

12       JACOB JORGENSEN, PH.D., PLAINTIFF'S WITNESS, SWORN

13                     DIRECT EXAMINATION

14  BY MR. FLANNERY:

15  Q.  Good afternoon, Dr. Jorgensen.

16  A.  Good afternoon.

17  Q.  Tell the jury a little bit about yourself.  Where did

18  you grow up?

19  A.  I grew up in Seattle and Sacramento.

20  Q.  And where do you live now?

21  A.  Small town just outside of Sacramento called Folsom.

22  Q.  And is -- is that the Folsom where Johnny Cash went to

23  prison and recorded that famous concert while he was an

24  inmate?

25  A.  I'm afraid so.  That's how we're known.

```
 1  Q.  Okay.  And do you have a family?
 2  A.  Yes, I do.  I have three grown children and eight
 3  grandchildren.
 4  Q.  Tell the jury about your education.  Where did you go
 5  to college?
 6  A.  MIT.
 7  Q.  And what was your focus at MIT?
 8  A.  Theoretical physics, specializing in quantum theory.
 9  Q.  So that's Massachusetts Institute of Technology.  Was
10  MIT considered one of the leading scientific universities
11  in the world?
12  A.  I believe so, yes.
13  Q.  And did you intend to work in the field of physic after
14  graduating from MIT?
15  A.  I did.  I intended to pursue my Ph.D. in physics and
16  spend my life practicing in physics.
17  Q.  Did you, in fact, work in the field after MIT?
18  A.  No, I didn't.
19  Q.  What were you going to do?
20  A.  I, instead, went to medical school.
21  Q.  Okay.  Did you know you were going to go to med school
22  before you graduate -- before you graduated from MIT?
23  A.  Yes, but only in my last year, so I had to pick up some
24  prerequisites.
25  Q.  And what did -- what did you do?
```

1    A.  So I had to go to summer school at Harvard to pick up a

2    year's worth of organic chemistry.

3    Q.  And where were you going to go to Columbia -- medical

4    school?

5    A.  Columbia Medical School --

6    Q.  Okay.

7    A.  -- New York City.

8    Q.  Thank you.  So you're at MIT, then you took classes at

9    Harvard, and now you're off to Columbia for medical school.

10   Did you do anything before that?

11   A.  Yes, I -- summer between I worked on a medical device

12   that measured intravenous fluids in patient care.

13   Q.  And was that your first invention?

14   A.  Sort of.  I'd always been tinkering with devices, you

15   know, since high school.  I invented a new kind of particle

16   accelerator, which I built.

17   Q.  Did you graduate Columbia eventually and become a

18   doctor?

19   A.  Yes, I did.

20   Q.  And tell the jury what you did after medical school,

21   please.

22   A.  Well, the standard thing that all med school graduates

23   did, I did an internship for a year, residency, training

24   for three years, and then a fellowship for two years after

25   that.

```
 1   Q.  Did you perform surgeries?
 2   A.  Yes, I did.
 3   Q.  Did you do research?
 4   A.  Yes.
 5   Q.  And did you work on any more inventions during your
 6   medical training?
 7   A.  I worked on a couple more medical devices involved in
 8   patient care.
 9   Q.  Okay.
10         MR. FLANNERY:  Next slide, please.
11   Q.  (By Mr. Flannery)  So let's talk a little bit more
12   about your background.  The -- the technology in this case,
13   as the jury has heard, is telecommunications.  How and why
14   did you go from being a surgeon to working on
15   telecommunications systems?
16   A.  Well, I really loved patient care.  I really loved
17   taking care of patients.  But I also still felt really tied
18   into science and technology.  And so I kept reading about
19   what was going on in the science and technology world, and
20   I read about what was going on in the 1980s with the break
21   up of AT&T in telecommunications.  It seemed like there
22   were all sorts of new opportunities opening up.
23   Q.  Okay.  So you went to MIT, then you were a doctor, and
24   now you saw opportunities in telecommunications.  Were you
25   going back to science?
```

1    A.  Well, a little bit.  I -- at MIT, I picked up the

2    electronic hardware design and computer software

3    programming.  But I didn't really learn anything about

4    telecommunications.

5    Q.  So did you have to teach yourself telecommunications?

6    A.  Yes, I did.  And, of course, I had a full-time job, so

7    I went at night.  After my time in the hospital, I would go

8    to the library and study textbooks and articles about

9    telecommunications theory for two to four hours, whenever I

10   had the opportunity at night.

11   Q.  So you were working all day in the hospital, and then

12   teaching yourself telecommunications at night?

13   A.  That's correct.

14   Q.  And how long did you do that for?

15   A.  About two years.

16   Q.  After teaching yourself telecommunications, did you

17   start to work on a business?

18   A.  Yes.  Along the way, I noticed that -- you know,

19   with -- even with the break up of AT&T, long distance calls

20   were very expensive.  And -- and I thought, gee, there must

21   be a way to reduce the costs, so I had an idea about how I

22   might do that.

23   Q.  And why were the costs of long distance calls so

24   expensive?

25   A.  Well, I think because the telephone network was

```
 1   controlled by just a few carriers, and so there wasn't a

 2   lot of competitive pressure, but they had these very

 3   complex rate price programs or rate sheets that people and

 4   businesses had trouble finding the best rates for.

 5          So I realized if I built a computer system that

 6   attached to the network and helped determine what the least

 7   cost for a particular call was, I'd be able to help people

 8   save a lot of money.

 9   Q.  Did you start a company around these ideas?

10   A.  Yes.  That was Televector.

11   Q.  And were you still a surgeon at this time?

12   A.  I was.

13   Q.  Tell the jury a little bit about Televector.  What did

14   you do to start?

15   A.  So this was a -- sort of a typical start-up thing.  I

16   had an extra bedroom in my apartment in New York City that

17   was not being used, so I used that for my prototype lab.

18          I built my circuit boards there, and it got to the

19   point where I needed to build more than I could do, because

20   I had my job during the day.

21          So I hired some technicians to come in during the

22   day and -- actually four technicians would work there in my

23   apartment.

24   Q.  And did you move the company out of your house

25   eventually?
```

```
 1  A.  Yeah.  I really ran out of room because I realized I
 2  had to hire more people.  I had to hire some people that
 3  knew financing and marketing and sales, which, you know, I
 4  didn't know about.
 5          So I found a loft in -- in downtown Manhattan and
 6  hired more people.  And we continued to produce the -- the
 7  system.
 8          And I would come in at night after hours, and
 9  people were staying late at night because they were very
10  devoted people.  And we would talk about changes and
11  improvements.
12  Q.  So describe the culture at Televector.
13  A.  So it was a real start-up.  It was very tight-knit.
14  You know, there were -- there was no hierarchy, no titles.
15  Everybody did everything.  And it was just a very -- a
16  wonder of experience for me.
17  Q.  And did you eventually stop practicing medicine during
18  the time you were running Televector?
19  A.  Yes.  I decided to let my medical career complete at
20  the end of my fellowship.  And then I spent a hundred
21  percent of my time devoted to Televector.
22  Q.  And what happened to Televector?
23  A.  Well, Televector continued to do very well.  We sold
24  many of these computer systems.
25          And by this time, there was starting to be some
```

1   competition.  So we needed to invest some more money.  And,

2   unfortunately, my business partner did not want to take in

3   more outside money.

4        So, eventually, we just let the company shut down.

5   Q.  And approximately what time frame are we in now?

6   A.  I think that was about 1989.

7   Q.  And after Televector, did you start another company to

8   integrate computers into telecommunications?

9   A.  Yes, I did.  That was EIS.

10  Q.  And did you figure out something about the way telecom

11  companies operate that you wanted to explore with EIS?

12  A.  Yeah.  Of course, I had learned a lot about the network

13  and how it operated with Televector.  And so I thought that

14  I could improve the way telephone -- long distance calls

15  were handled by customer support call centers.

16       And that involved getting information from a

17  telephone network through the use of a computer that was

18  attached to the network, which I had done already, and

19  letting a computer database know where the call came from.

20       So a sales representative or a customer service

21  representative would then know who was making the call and

22  say, oh, hello, Mr. Jones, we talked to you yesterday, I

23  see.  How can I help you today?  So it made the customer

24  relationship experience much better.

25  Q.  And so before your -- your technology, companies

 1  couldn't do that, they would just have to answer the call

 2  and say hello?

 3  A.  That's correct.  They had no idea who they were -- who

 4  was calling them.

 5  Q.  Okay.  And what kind of companies used this technology?

 6  Did people buy it from you?

 7  A.  Yes.  We had one of -- very large customers.  We had

 8  American Express as a customer.  And AT&T was a customer.

 9  Q.  And you sold them computer systems?

10  A.  Yes.  In fact, American Express, I think we sold over

11  5,000 workstations to.

12  Q.  Was EIS successful?

13  A.  Very successful.  And so much so that we went public

14  and continued to grow.

15  Q.  And you started this company?

16  A.  Yes.  I and a few other people.

17  Q.  Okay.  What happened with your involvement in EIS?

18  A.  Well, I -- I think this is around mid to late '90s,

19  '97, maybe, I was starting to learn about something new

20  called Voice over Internet Protocol, Voice over IP.

21         And up to this point, all telephone calls had to

22  go on copper wire.  It was analog, and you had to have a

23  set -- you know, a telecommunications network for that.

24         But now, with this new VoIP technology, you could

25  send voice on packets on the Internet.

1          And I thought, wow, if you could combine voice and

2    data like Internet on this same network, you could do some

3    really cool things.

4          So I wanted the company, EIS, to make that their

5    next generation computer system was to combine the two.

6    Q.  And did you eventually leave EIS?

7    A.  Yeah.  Well, unfortunately, EIS was so successful in

8    selling its present computer system, they didn't want to do

9    something new.  So I left the company.

10   Q.  Okay.  So after you left EIS, you saw a future for

11   combining voice and data packets?

12   A.  Yes.  I thought this is the wave of the future, that

13   everything is going to be accessible through the Internet,

14   through the use of these packets.

15   Q.  Okay.  And how did you want to combine and

16   transmit these voice and data packets?

17   A.  Well, I wanted to get into and out of the network, but,

18   you know, it was still very expensive to transmit on the

19   telephone network, and I thought there has to be a better

20   way.

21         So I started thinking about a different type of

22   access, and I started thinking about wireless.  Maybe

23   wireless would be able to lower the cost for people, not

24   just for phone calls with this Voice over IP technology,

25   but wireless for -- for data.

1  Q.  And what users were you initially focused on?

2  A.  Well, I was thinking both home -- home -- people at

3  home and offices and businesses.

4  Q.  Okay.

5       MR. FLANNERY:  Next slide, please.

6  Q.  (By Mr. Flannery)  So tell the jury a little bit about

7  why you wanted to go wirelessly.  What was going on at the

8  time?

9  A.  Well, of course, since the beginning of telephones,

10  there was a huge investment over many, many decades into

11  the network, lots of cables and wires and computers and

12  servers, and companies like AT&T and others controlled it,

13  and it was hard -- it was expensive to get access to it.

14       And as I think we heard before, you can only do

15  one thing at a time.

16       You could either connect to the network to send a

17  voice signal or connect, you know, a computer with a

18  dial-up modem to get data.  And I wanted to be able to do

19  both simultaneously.  And seemed like I could figure out a

20  way to do that with wireless.

21  Q.  Why did you think you could do that?

22  A.  Well, I -- I was thinking that with packets, there

23  would be a way to transmit everything cost effectively, and

24  I would have to create some new technology in terms of

25  software to be able to handle the packets intelligently.

1  Q.  So you indicated you were initially focused on users,

2  homes, and offices.  Did you have a name for their devices?

3  A.  For what -- I'm sorry?

4  Q.  The users in their homes and offices, did you have a

5  name for their devices?

6  A.  Well, at the time, I think that the terminology was

7  CPE.

8  Q.  And what does that stand for?

9  A.  Customer premises equipment.  I think it's now --

10  people usually say UE.

11  Q.  Okay.  Were you -- were you working on cell phones at

12  the time?

13  A.  Not necessarily, but I thought that the ideas I had for

14  wireless access into homes and businesses could work

15  equally well someday for mobile also, but --

16  Q.  And do you -- do you know what term the industry uses

17  today to refer to mobile phones?

18  A.  I think it's user equipment.

19  Q.  Okay.  So you call something customer premises

20  equipment, and today they call things user equipment.  To

21  you, was it just equipment?

22       THE COURT:  Just a minute.  Just a minute.  Just a

23  minute.

24       Mr. Kubehl.

25       MR. KUBEHL:  Objection, leading.

1          THE COURT:  Sustained.

2    Q.  (By Mr. Flannery)  How did you -- how did you relate

3    customer premises equipment to the devices that you were

4    working on?

5    A.  Well, I -- the technology that I was thinking of would

6    work for homes and businesses and other applications,

7    regardless of whether it was actually in the home or

8    business or transported or, you know, had a mobile nature

9    to it.

10   Q.  Okay.  We'll get -- we'll get to that in a little bit.

11          So with reference to Slide 5, please explain

12   further the system that you envisioned.

13   A.  So this is what I called a wireless point to

14   multi-point system.  So it's this big -- you see an antenna

15   there, but the important thing is the base station,

16   connecting to, and the diagram shows, businesses and homes

17   and other devices.

18          And the idea was that in order to do this, both

19   voice and data, this base station had to be pretty darn

20   smart.  And I was going to have to design some software

21   algorithms that would be able to handle that data and make

22   sure that everything didn't get all mixed up.  And that was

23   one of the things I had to do.

24          And the other thing I had to do was make sure I

25   was using the wireless spectrum efficiently because

```
 1  wireless spectrum is extremely precious and expensive.
 2          And I thought that with all of that intelligence,
 3  I could be sure to use all of that spectrum and thereby
 4  make it less expensive to operate.
 5  Q.  And are these ideas that led to your inventions and the
 6  patents that bring us here today?
 7  A.  Yes.
 8  Q.  Okay.  So you --
 9          MR. FLANNERY:  Let's look at the next slide,
10  please, Slide 6.
11  Q.  (By Mr. Flannery)  You talked about what you wanted to
12  do.  With reference to Slide 6, could you explain to the
13  jury some of the problems that you faced?
14  A.  Right.
15  Q.  Is it -- is it easy to combine and control these mixed
16  streams of information, like voice, Internet, and video in
17  a wireless environment?
18  A.  Well, I think this was the big challenge.  They are
19  very, very different -- voice streams, data streams are
20  very different in nature from Internet or video or email or
21  file columns.  They all have different things that you need
22  to pay attention to.
23          And as an example for voice, if you send them in
24  these packets, they have to be sent at the same constant
25  rate; whereas, for Internet, they don't have to be sent at
```

1    the same constant rate, but you have to worry about being

2    very accurate, if they're all errors.  Once in a while, if

3    there's an error in the voice packet, it's not that

4    important.

5         So each type of data had its own requirements for

6    quality.  So that's what I was referring to when I said

7    quality of service.

8    Q.  And what does this have to do with packets?  Are there

9    a lot of them?

10   A.  There are billions of packets.  And what I realized how

11   many packets I'd have to deal with, I thought, oh, my gosh.

12   This is going to have to be a very fast problem.

13        And so that was another challenge, was I had to

14   touch every single packet because I had to understand, for

15   every packet, oh, is this a voice packet, or is this an

16   email packet?  And then I had to categorize that packet.

17   Okay.  This is an email packet.  Oh, this is a voice

18   packet.

19        And then -- so that was the classification

20   process.  So the program had to do that very fast, and

21   every single packet had to be touched and analyzed.

22        And then the system had to be able to take that

23   information and then figure out exactly where to send each

24   packet, depending on what type it was.

25        And -- and this is a very complicated process to

1  do in realtime to keep up with everything and not lose

2  it -- lose track of things.

3        And if you don't do that, what happens is voice

4  quality -- what happens is sometimes you can't hear the

5  voice at all or there -- it will certainly drop, or it will

6  be so distorted that you won't able to understand the other

7  person, or you'll have a file download that will have

8  errors, so we have to send it multiple times until we get

9  it right.  So it would be a total mess without that

10  intelligence.

11  Q.  Okay.  And the jury is going to hear about and heard a

12  little bit already about bandwidth.  How did that fit into

13  what you were doing?

14  A.  Well, the easy way to do it is to allocate just a lot

15  of bandwidth and just use what you need and then maybe

16  things wouldn't bump into each other.

17        But I wanted it to be cost effective, and

18  wireless, as I said, the spectrum is very expensive.

19        So you have to be very parsimonious in usage of

20  that -- of spectrum.

21        So the intelligence would allow us to be very,

22  very efficient with the use of that radio and radio

23  spectrum.

24  Q.  Did you start a company to design and develop these

25  ideas?

1   A.  Yes, I did.

2   Q.  And what was the name of that company?

3   A.  That was Malibu Networks.

4        MR. FLANNERY:  Okay.  Let's look at the next

5   slide, please.

6   Q.  (By Mr. Flannery)  Would you please summarize for the

7   jury what you set to do with Malibu.

8   A.  So we wanted to build an entire system, wireless point

9   to multi-point system, with a base station -- highly

10  intelligent base station, and receivers that would receive

11  the signal and communicate with the base station and would

12  be able to handle all of these different types of data,

13  which I mentioned, voice and email and all of that, at the

14  same time and nonetheless provide a really high quality of

15  service, so it would seem to the user that it was only that

16  data stream that was being sent because there was no

17  evidence of anything else interfering with it.

18        So very high-quality service from end-to-end, from

19  one end of the conversation or the server to the -- to the

20  user.  And --

21  Q.  There's a reference there to maximize efficient use of

22  bandwidth.  Could you just elaborate on that a little bit.

23  A.  Sure.  And I think I mentioned that it's -- it's the

24  real challenge to do it while minimizing the amount of

25  bandwidth that you're using.

1          So every spare bit of spectrum is utilized.  So

2   every split second when, you know, the radio could go out

3   without any data, you need to find a way for data to get

4   into there -- into that spot so you're using it all while

5   still maintaining that quality.

6   Q.  Okay.  Let's talk about how you did it.

7          MR. FLANNERY:  Next slide, please.

8   Q.  (By Mr. Flannery)  Did you need to work with the

9   existing telephone network technology?

10  A.  Yes.

11  Q.  Could you explain to the jury about that, please.

12  A.  So our base stations would be located -- would be --

13  would communicate with each other over the core network, as

14  illustrated here, and that -- I think we've heard the ATM

15  doesn't mean automatic teller machine.

16          It's a specialized kind of computer that's used

17  by telephone network carriers, and it's called asynchronous

18  transfer mode.  That's why they abbreviated it ATM.

19          So that's in the middle.  And it does its job by

20  sending out what I call pipes from one end to the another.

21          And it doesn't really see what's in the pipes,

22  doesn't care what's in the pipes, but packets can flow

23  through the pipes, and that's all I needed, packets from

24  one base station to the other as an example.

25          MR. FLANNERY:  Okay.  Let's go to the next slide,

1    please.

2    Q.   (By Mr. Flannery)   Now, could you explain a little bit

3    more about the packets and how it was your ideas to use

4    packets.

5    A.   Okay.  So I think we heard that -- you know, what the

6    packets were all about, but they're actually divided into

7    two sections.

8            There's one section where the actual data is

9    carried.  That's where the email or the files or the

10   website part of it is in there.

11           And -- and then there's another part of the packet

12   called a header.  And the header just tells where it's

13   going, where it's from, and some information about the

14   application.

15           And that's -- all of that information would have

16   to be analyzed by my computer algorithms and used to

17   classify the packet.

18           So every single packet had to get its header

19   analyzed.  And -- and it can't fall behind.  It has to do

20   it very, very quickly.

21           So as a result, as we found, you get very clear

22   voice, just like on the telephone network, regular

23   telephone network, and web pages populate on your monitor

24   very quickly, no delays, and it works great.

25   Q.   Now, there's a reference there to packet-centric

1   scheduler.  What is that?

2   A.  So in order for the scheduler to do its job, it -- it

3   all focuses on that packet, the packet information.  I've

4   got to be able to analyze the packet headers.

5          So that's central to the whole operation of the

6   system.  If I can't get access to the packet headers, this

7   system won't work this way.

8   Q.  Okay.

9          MR. FLANNERY:  Let's go back for a minute to that

10  term ATM.

11  Q.  (By Mr. Flannery)  Did you consider using the

12  asynchronous mode?

13  A.  I did at first.  I think I was a little naive, not

14  understanding completely what ATM's limitations were, but I

15  -- I realized that with those pipes, ATM didn't have --

16  didn't see the -- the packet headers.

17         Instead, it produces something called cells, ATM

18  cells.  And whatever packets come into one of its pipes, it

19  just chops them up into 53-byte segments, and it doesn't

20  know what's in there.

21         In fact, one packet that's coming in could get

22  chopped into many different cells, or in one cell, you

23  could have contents from two different packets.

24         So I reluctantly said, finally, I can't use ATM.

25  That's not going to be for me.  I'm going to have to do

1  something different.

2        MR. FLANNERY:  Okay.  Let's go to the next slide,

3  please, and talk about some of your ideas.

4  Q.  (By Mr. Flannery)  So you mentioned earlier this term

5  quality of service.  Could you explain that further with

6  reference to this slide.

7  A.  Well, again, quality of service is ultimately judged at

8  the end-user -- you know, what the end-user experiences,

9  and carriers want end-users to have good experience, so

10  carriers want to set up the system so that it's providing

11  clear voice and web -- web pages that have all the

12  photographs, all the pictures intact, and video -- YouTube

13  doesn't exactly -- doesn't stutter around.  So those are --

14  would be indications that we're doing a good job of

15  providing quality.

16        So we're analyzing the packets, classifying them,

17  and then figuring out the best schedule.

18        So what we do is we say, okay, I've got all of

19  these different types, three or four or five or seven

20  different types of traffic that have to be transmitted, and

21  I know there are constraints for each one.  Now, how do I

22  schedule them over the airwaves.

23        So the algorithm -- the computer software program

24  will figure out, okay, these are the things to send right

25  now, but in addition, we're going to also figure out what

```
 1   needs to be sent with the next transmission and the next
 2   transmission and the next transmission.
 3          So we're doing this -- the algorithm is figuring
 4   out things not just now but in the future also about how to
 5   send things.  And that's what the packet scheduling is all
 6   about.
 7   Q.  And what did you do to maximize bandwidth?
 8   A.  Well, we maximized bandwidth by packing everything very
 9   efficiently.
10   Q.  And would that save companies using your ideas lots of
11   money?
12   A.  Huge amounts of money.  We were thinking that without
13   this, we might have to have a lot of extra bandwidth.
14          And also, our intent was not to send radio waves
15   over an extensive spectrum because we thought maybe our
16   customers would -- wouldn't -- would or would not have to
17   have it.
18          So we're -- we're thinking about unlicensed
19   bandwidth, also, which there wasn't much of.
20   Q.  Okay.  Did you seek patents for these ideas?
21   A.  Yes, I did.
22          MR. FLANNERY:  If you could go to the next slide,
23   please.
24   Q.  (By Mr. Flannery)  And is that the patents that are at
25   issue here PTX-1, 2, and 3?
```

1    A.   Yes.

2    Q.   And could you hold those up for the jury?

3    A.   Yes.

4    Q.   Now, could you please explain to the jury what you did

5    to get those patents?

6    A.   Well, I worked for many months.  I came up with my

7    design ideas and then worked with a patent attorney to

8    figure out how to boil those ideas down into patent

9    language.

10           And, of course, a patent attorney knows how to do

11   that.  So we would take my invention concepts and put them

12   into the patents, and it took a few months.  And then we

13   made the applications.

14   Q.   Okay.  Now, you were a doctor, and then you were

15   awarded these telecommunications patents by the United

16   States Patent Office.  How are you able to figure all this

17   out?

18   A.   Well, I think in lots of things I do, I'm sort of an

19   outsider, sort of a maverick.  I come from the outside.

20           So for the telecommunication stuff, since I was in

21   the library and I was learning from textbooks and from some

22   experts I had talked to, I -- I had a different

23   perspective.

24           I wasn't working for a large corporate entity

25   like -- you know, like AT&T or Ericsson.  So I -- I didn't

 1  need to follow their conventions about how to solve things

 2  or how to use prior things that they'd been working on.

 3        I had a fresh start.  I didn't have anything.  So

 4  I just decided, well, what's necessary, and -- and just

 5  think about it without being worried about what people

 6  expect.

 7        MR. FLANNERY:  Okay.  Let's go to the next slide.

 8  Q.  (By Mr. Flannery)  If you could start to -- sort to

 9  wrap up here.  If you could tell the jury a little about

10  Malibu as a company.

11  A.  So we did develop the wireless point to multi-point

12  system.  We built the intelligent base stations and the

13  transceivers, the -- the radios that were used by users.

14        We had over a hundred scientists working on our

15  staff.  And we got to the point of building working

16  prototypes.

17  Q.  And did you show the prototype to anyone in the

18  industry?

19  A.  Yes, we did.  We showed -- well, first of all, to our

20  board of directors, and they were very happy.  But we -- we

21  also went to a -- an industry trade show in Atlanta in the

22  year 2000 called Supercomm, and there was a big floor --

23  all the engineers go to these shows.

24        They're kind of boring, but -- so we set up our

25  system with the antennas, and we set up workstations with

1    our user stations out on the floor.  And we had people make

2    phone calls and access the Internet and do their email.

3            And they were all transmitting from the user

4    stations -- transmitting and receiving from the user

5    stations through our base station.  And perfect quality.

6            And so it was great.  We felt really great about

7    that grouping.

8    Q.  And what was the reaction of some that saw your working

9    model?

10   A.  Well, we had some skeptical engineers who came by, and

11   they said -- and they started using it.  And they said:

12   This is over wireless?  How can you do that?  And I had to

13   explain, well, you know, we worked on these algorithms in

14   the -- in the base station that do this, this, and this.

15           And they said:  How is that possible?  And they

16   seemed skeptical, and I saw them looking at the ground.  I

17   said:  What are you doing?  They said:  We're looking for

18   hidden wires.  You must be cheating.

19   Q.  And did you --

20   A.  But I wasn't.

21   Q.  -- did you show use of and application of your ideas in

22   any other environment?

23   A.  Yeah.  Actually for fun, we took one of our user

24   stations and hooked it up to a battery, and we put it into

25   the car of one of my engineers.  And we drove around

```
 1   town -- drove around Folsom actually with our base station

 2   transmitting, and we could send and receive voice and email

 3   and -- and Internet.  And it was great.

 4   Q.  So you showed working of your system in a mobile

 5   environment?

 6   A.  Yes, it was mobile.

 7          MR. KUBEHL:  Objection, leading.

 8   Q.  (By Mr. Flannery)  Did you meet with any?

 9          THE COURT:  Wait a minute.

10          MR. FLANNERY:  I'm sorry.

11          THE COURT:  That's sustained.  That's a leading

12   question.

13          MR. FLANNERY:  Okay.

14          THE COURT:  You need to ask the questions for this

15   witness in a non-leading form.

16          MR. FLANNERY:  Okay.  I'm sorry, Your Honor.  I'll

17   move on.  Thank you.

18          THE COURT:  Okay.

19   Q.  (By Mr. Flannery)  Did you meet with any telecom

20   companies about your technology to try to generate interest

21   from Malibu?

22   A.  Yes.  We met with many, including AT&T and Sprint.

23   Q.  And what was the future for Malibu?

24   A.  Well, it was looking very good.  We were just finishing

25   the prototype phase, and we were looking at how to
```

 1   re-engineer everything for manufacturing.

 2          And that's a very costly and lengthy process.  So

 3   we were prepared to invest a lot of money in manufacturing

 4   this in volume.  Unfortunately, we never got there.

 5   Q.  What happened?

 6   A.  Well, there was something called the dot com telecom

 7   prices in 2001/2002.  It was nothing to do with us.  It was

 8   an independent financial event, but, unfortunately, our

 9   venture capital -- capitalists, the people who funded our

10   company, kind of got into a panic, and they stopped funding

11   all of their start-ups, not just Malibu.  And, oh, my gosh,

12   we had so many employees with no revenue now.

13          So I, unfortunately, had to let everybody go.  And

14   we shut the company down a couple years later.

15   Q.  And what happened to your patents?

16   A.  The investors sold them to Intellectual Ventures.

17   Q.  And what do you think about Intellectual Ventures?

18   A.  Wow, I was -- I had known about Intellectual Ventures

19   before and what they were doing.  I was very excited.  I'm

20   very excited about what's going on.

21          As a lone inventor who is not working for a large

22   company, sometimes I feel like our work -- my work is

23   overlooked and undervalued.

24          And with Intellectual Ventures, I see the means

25   to expose the value of these patents and these efforts to

1   the world.  So I'm -- I'm really thrilled.

2   Q.  And do you get any financial reward if Intellectual

3   Ventures is successful in this litigation?

4   A.  No.

5   Q.  Have you been -- have you done work for Intellectual

6   Ventures with respect to this case and have you been

7   compensated for your time?

8   A.  I've been doing a lot of work in supporting depositions

9   and -- and -- and, of course, that takes a lot of prep

10  time, so I've been compensated on an hourly basis for that

11  time.

12  Q.  And what is your compensation rate?

13  A.  $300.00 an hour.

14  Q.  Now, were you ever aware of the telecommunications

15  industry using what you considered to be your ideas for

16  high quality service in a packet-centric wireless network?

17  A.  No.  After Malibu, I was kind of sad and didn't really

18  pay a lot of attention to the telecom world.

19          So I wasn't paying attention, but one day I did

20  start reading about VoLTE.  VoLTE.  How can they do that

21  without my inventions?

22  Q.  Okay.  Let's sum up.  Just tell the jury a little bit

23  about what you're doing now.

24  A.  So I'm semi-retired now.  I -- through all of this, I

25  had maintained my medical license, although I don't think

1    I'll go back to practice.

2         But I'm still an inventor, and I'm interested in

3    applying physics to some more medical devices, kind of

4    combine my medical and physics careers.  So I have a

5    notebook, and I'm writing down all my ideas.

6    Q.  Thank you very much, Dr. Jorgensen.

7    A.  Thank you.

8         THE COURT:  You pass the witness, counsel?

9         MR. FLANNERY:  Yes, Your Honor.

10        THE COURT:  All right.  Cross-examination by

11   Defendants?

12        MR. KUBEHL:  May I approach, Your Honor?

13        THE COURT:  Approach the bench.

14        (Bench conference.)

15        MR. KUBEHL:  Your Honor, the door has been opened

16   to using the exhibits that talk about his system.

17        He talked extensively about CPE devices, what he

18   thought they were, how his system worked, how it used

19   reservations.  The door has been opened, and I do plan to

20   question him on that with Your Honor's permission.

21        THE COURT:  Response?

22        MR. FLANNERY:  Your Honor, I don't think it's been

23   anywhere near proportional to the level of discussion that

24   Dr. Jorgensen just provided.

25        As you know, they -- they showed that figure from

```
 1  a PowerPoint presentation.  That's very detailed.  He
 2  didn't talk anything about that.
 3        He talked very generally.  He used certain words
 4  just to describe the ideas that he was working on as
 5  background, but nowhere near the level of detail.
 6        And Your Honor mentioned the -- the presentation
 7  should be proportional to his presentation.  And I believe
 8  that it's not, Your Honor.
 9        MR. KUBEHL:  Your Honor, with respect to the CPE
10  device, he's made representations to the jury that he was
11  specifically contemplating mobile devices.
12        There are no such documents that support that, and
13  the document that I will show will refute that.
14        With respect to the -- with the diagram he's
15  talking about, I can do my questioning from the patent on
16  that.
17        MR. FLANNERY:  I think the patent is not
18  proportional to the level that the witness just described,
19  but I think --
20        THE COURT:  Well, the patents are pre-admitted, so
21  there's certainly no problem with you using the patents.
22        MR. KUBEHL:  Okay.
23        THE COURT:  I'm going to reserve judgment on the
24  other document.  Before you finish your cross, if you want
25  to reurge it, you can.  But at this point I'm not prepared
```

1    to grant you leave, all right?

2         Let's go forward.

3         MR. KUBEHL:  Thank you.

4         (Bench conference concluded.)

5         THE COURT:  Let's proceed with cross-examination.

6         MR. KUBEHL:  May I approach the witness with a

7    binder, Your Honor?

8         THE COURT:  You may.

9         You may proceed.

10        MR. KUBEHL:  Thank you, Your Honor.

11                    CROSS-EXAMINATION

12   BY MR. KUBEHL:

13   Q.  Dr. Jorgensen, hello.

14   A.  Hello.

15   Q.  You're well aware that Ericsson and T-Mobile are being

16   accused of patent infringement in this case, correct?

17   A.  Yes.

18   Q.  And you understand that Ericsson and T-Mobile have

19   stated that they believe they don't infringe these patents.

20   You understand that?

21   A.  Yes, I do.

22   Q.  And you understand that Ericsson and T-Mobile have

23   maintained that position through this entire case?

24   A.  Okay.

25   Q.  Dr. Jorgensen, you talked about your work at a company

1    called EIS?

2    A.  That's correct.

3    Q.  You said you started that company; is that right?

4    A.  Yes.

5    Q.  And at EIS, that company that you started, that company

6    was accused of patent infringement, wasn't it?

7    A.  Yes, it was.

8    Q.  And you believed that they were wrongfully accused,

9    didn't you?

10   A.  Yes, I -- I did believe that.

11   Q.  And you and your company, EIS, stood up for yourself,

12   didn't you?

13   A.  Yes, we did.

14   Q.  You defended yourself in court because you believed you

15   were wrongfully accused of patent infringement, right?

16   A.  That's correct.

17   Q.  And you challenged the validity of the patents, didn't

18   you?

19   A.  It's reaching back, but I believe that's probably what

20   we did.

21   Q.  In this case, you don't think there's anything wrong at

22   all with Ericsson and T-Mobile standing up for themselves

23   where they think they're being wrongfully accused of patent

24   infringement; is that right?

25   A.  No, not at all.

1   Q.  You'd agree with me that when your company is accused

2   of patent infringement and you think it's a wrong

3   accusation, the right thing to do is to stand up for

4   yourself, right?

5   A.  Sure.

6   Q.  Dr. Jorgensen, you don't believe that Ericsson or

7   T-Mobile owe you anything personally for use of your

8   patents, correct?

9   A.  No, of course, not.

10  Q.  You don't have any basis to believe that T-Mobile's

11  network infringes any claim of your patents, do you?

12  A.  It's not for me to decide.

13  Q.  Dr. Jorgensen, you don't have any basis to believe that

14  T-Mobile's network infringes any claim of any of your

15  patents in this case; is that right?

16  A.  I personally am not in a position to make that

17  judgment.

18          MR. KUBEHL:  May I play the impeachment clip, Your

19  Honor?

20          THE COURT:  You may proceed to attempt to impeach

21  the witness.

22          MR. KUBEHL:  Could we have JJ32, please?

23          (Videoclip played.)

24          QUESTION:  You don't have any basis to believe

25  that T-Mobile's network infringes any claim of any of the

1  patents in this case, do you?

2          ANSWER:  No.

3          (Videoclip ends.)

4  Q.  (By Mr. Kubehl)  Dr. Jorgensen, I took your deposition

5  last August, correct?

6  A.  Yes.

7  Q.  And in that deposition, did I ask that question, and

8  did you give that answer?

9  A.  Yes.

10  Q.  Dr. Jorgensen, you don't own any interest in any of the

11  patents involved in this lawsuit, correct?

12  A.  No, I do not.

13  Q.  So this is not a case where IV is suing on your behalf

14  to try to collect any money that you believe you're owed?

15  A.  That's correct.

16  Q.  IV -- you said how much you admired IV and that they --

17  as I understood, you were telling the jury maybe you

18  thought they were sort of looking out for you and helping

19  you sort of vindicate yourself; is that fair?

20  A.  No, that's not correct.

21  Q.  Yeah.  IV, in this case, is not trying to help

22  you personally reap any personal rewards for your

23  innovations, is it?

24  A.  That's correct.

25  Q.  In fact, no one at IV had anything to do with any of

1    the inventions in this lawsuit, correct?

2    A.   They purchased the inventions.

3    Q.   Did anyone at IV have anything to do with conceiving

4    any of the inventions involved in this case?

5    A.   I personally was involved in all three of these

6    patents.

7    Q.   I'll make sure you heard my question.

8              Did anyone at IV have anything to do with

9    conceiving any of the inventions in this case.

10   A.   No.

11   Q.   If I -- if IV wins any money in this lawsuit, you won't

12   get any of it, will you?

13   A.   That's correct.

14   Q.   To the extent that -- withdrawn.

15             Dr. Jorgensen, you're not an expert witness, are

16   you?

17   A.   No, I don't believe I am.

18   Q.   You're not offering any expert opinions today, are you?

19   A.   No, I'm not.

20   Q.   You're just a fact witness telling it like it is,

21   aren't you?

22   A.   Correct.

23   Q.   You're not on anybody's side, are you?

24   A.   I'm here to tell the truth.

25   Q.   Were you here earlier today when one of our jurors in

1    the pool talked about an experience they had of being a

2    witness to an accident?

3    A.  Witness to an accident?

4    Q.  Yes, sir.

5    A.  No.  I'm not -- I'm not recalling that.

6    Q.  Okay.  Have you ever witnessed, like a car crash or

7    anything like that?

8    A.  Personally, yes.

9    Q.  And so in that case, let's hypothetically go back to

10   that time, and let's say you -- you see two cars hit each

11   other, and you're the only witness, okay?

12   A.  Yes.

13   Q.  And let's say that the two folks can't figure out whose

14   fault it was, and a lawsuit starts, right?

15   A.  Okay.

16   Q.  Okay.  You're supposed -- you would -- you'd be --

17   supposed to be an independent fact witness in that case,

18   right?

19   A.  Yes.

20   Q.  Not on anybody's side, right?

21   A.  Correct.

22   Q.  But let's say the lawyer for the plaintiff car called

23   you up and -- and said, hey, I bet somebody is going to

24   want to ask you for documents, and they're going to want to

25   take your deposition.  How about if I pay you to be your

1  lawyer?  Would that sound a little weird to you?

2  A.  I'm not sure how to answer that question.

3  Q.  Do you think it would be strange at all if you, as an

4  independent fact witness, if the Plaintiff's lawyer called

5  you up and said, hey, I'll be your lawyer for free, and

6  just want to -- just want to get your factual account, but

7  I'll be your lawyer for free?

8  A.  It's a hypothetical situation.  I'm not sure how to

9  answer that.

10  Q.  Okay.  Well, let's say the lawyer says, hey, I don't

11  want you working for free here.  I'd like to pay you for

12  your time.  So like what's your hourly rate?  And you say,

13  $140.00 an hour.

14        But then you think, well, I don't really want to

15  take my time doing this, so if you want my honest fact

16  testimony, you're going to have to pay me double that, more

17  than double that, 300 bucks an hour.  Would that sound a

18  little strange?

19  A.  No.

20  Q.  That'd be okay with you?

21  A.  To request more money than was offered the first time?

22  Is that what you're asking?

23  Q.  No, no.  The -- the lawyers asks you, sir, what's your

24  hourly rate?  What would you normally charge?  And you tell

25  them, $140 an hour is my normal rate.  That's what I would

1    usually make.

2         But then you yourself decide, aah, if I'm going to

3    get involved in this, if he wants my fact testimony, I'm

4    going to charge you more than double than that.  I'm going

5    to say 300 bucks an hour.  Would that be right?

6    A.  I really don't know how to answer that question.  I'm

7    not understanding the context or the situation.

8    Q.  So that could be okay?

9    A.  It depends.

10   Q.  Double your rate just to give the truth?

11   A.  No, no.  I would -- I'd feel obligated to tell the

12   truth.

13   Q.  Yeah.  And you wouldn't charge double your rate to do

14   it, would you?

15   A.  Again, it's a hypothetical situation.  I don't know.

16   Q.  Okay.  Well, let's say the lawyer says, that's a really

17   good idea.  Let's -- let's sign an engagement letter, okay?

18   And he says, don't worry about paying any legal bills.

19   We're going to pay all those for you.

20        Are you with me?

21   A.  Okay.

22   Q.  And the lawyer says, hey, if the driver of the other

23   car wants to talk to you or wants any of your help, you

24   tell them no.  Does that sound okay?

25   A.  I don't know what the conventional -- what the

1  requirements of law are in this situation, so --

2  Q.  I'm just saying as a human being, just as an ethical

3  human being, do you think that would be okay?

4  A.  I'd have to think about it.  I don't know.  I don't

5  understand the entire context.

6  Q.  So -- so far we're up to a lawyer for free, double your

7  hourly rate, and don't help anybody else, and you're not

8  sure if that's okay or not?

9  A.  It's a hypothetical situation.

10  Q.  But do you know if it's -- if you'd consider it okay if

11  it was you?

12  A.  I don't know.

13  Q.  Hmm.  So that scenario doesn't sound familiar to you at

14  all?

15  A.  No, it does not.

16  Q.  In this case, IV's lawyers are your lawyers, right?

17  A.  I'm not sure what that means, my lawyers.

18  Q.  Well, you're personally represented by the Dechert Law

19  Firm, aren't you?

20  A.  I don't know.  Is that -- whether that's a correct

21  characterization or not.

22  Q.  You don't pay the Dechert firm anything, do you?

23  A.  No.

24  Q.  You have an engagement letter with the -- with IV's

25  lawyers and IV, don't you?

```
 1   A.  Yes.
 2           MR. KUBEHL:  Could we have Defendants' Exhibit
 3   129, please?
 4   Q.  (By Mr. Kubehl)  Are we looking at a copy of an August
 5   27 -- I'm sorry -- August 17th, 2017 agreement between you
 6   and the Dechert Law Firm?
 7   A.  Yes.
 8   Q.  And in that agreement, in the first line here, do you
 9   agree to testify for them?
10   A.  Yes.
11   Q.  Now, under testimony, it says that you're not supposed
12   to be for or against anybody; is that right?
13   A.  Correct.
14   Q.  Was that your idea to put that in there or their idea?
15   A.  It was a letter from them, I believe.
16   Q.  Hmm.  That -- that really isn't the way it worked,
17   though, you not being for or against anybody, right?
18   A.  My understanding is that I'm here to speak the truth.
19   Whether that ends up for or against anybody, I don't really
20   understand that.
21   Q.  Your agreement with IV includes you having confidential
22   meetings with IV's lawyers where you answer any questions
23   they have about your patents; is that right?
24   A.  I'm not sure that's correct.  We talked about
25   background information.  We talked about what the industry
```

1    was doing at the time.

2    Q.  Was part of your agreement with IV's lawyers that you

3    would agree to answer any questions they had about the

4    patents that list you as an inventor?

5    A.  That may be so.

6    Q.  It is so, isn't it?

7    A.  I don't know.

8            MR. KUBEHL:  Could we please have Clip JJ11?

9    Q.  (By Mr. Kubehl)  In that deposition, did I ask you the

10   question:  Part of the work that you've done in this -- in

11   the past for IV has been to answer questions that IV's

12   lawyers have about the patents that list you as an

13   inventor; is that right?

14           And did you answer:  Yes?

15   A.  Okay.

16   Q.  Is that a yes, sir?

17   A.  I see it, yes.

18   Q.  Another thing you did for them was to search for

19   documents and review those documents, correct?

20   A.  That's correct.

21   Q.  And then another thing you did with them is to spend

22   time with them making sure you were prepared to give

23   testimony for them, correct?

24   A.  Yes.

25   Q.  Now, Mr. Jorgensen, in that deposition last August, I

1   asked you:  Hey, would you be willing to enter into an

2   agreement with me or my client and give me or the

3   Defendants the same kind of assistance in this case that

4   you're giving to Plaintiff?

5          I asked you that, didn't I?

6   A.  Yes, I remember that.

7   Q.  What did you say?

8   A.  I don't recall my answer.

9          MR. KUBEHL:  Could we have Clip JJ14, please?

10         MR. FLANNERY:  Your Honor, may I have the courtesy

11  of the page and line number before the video is displayed?

12         THE COURT:  You're entitled to that.

13         MR. KUBEHL:  Sure.  That's from the August 22nd,

14  2018 deposition.  It is Page 54, Lines 6 through 10.

15         THE COURT:  All right.  Proceed with your clip.

16         (Videoclip played.)

17         QUESTION:  At least as of today, you're not

18  willing to enter an agreement to give the same assistance

19  to the Defendants that you're giving to the -- to IV; is

20  that right?

21         ANSWER:  I would say yes.

22         (Videoclip ends.)

23  Q.  (By Mr. Kubehl)  Did I ask you that question, and did

24  you give me that answer?

25  A.  Yes.

1    Q.  That deposition in August was not the first time that

2    you'd been deposed about your patents, correct?

3    A.  Correct.

4    Q.  You had testified several times before about your

5    patents, correct?

6    A.  Yes.

7    Q.  So when I took your deposition, you knew the types of

8    questions I'd be asking you about your inventions, right?

9    A.  No, not necessarily.

10   Q.  Really, through those prior -- those prior depositions,

11   they asked you about your patents, right?

12   A.  Yes.

13   Q.  And they always asked you about whether you'd read

14   your patents, right?

15   A.  I don't remember.

16   Q.  They asked you questions about your inventions, didn't

17   they?

18   A.  Yes.

19   Q.  And you knew I'd be asking those kind of questions,

20   right?

21   A.  About the patents in general, yes.

22   Q.  In fact, we gave you two months' advanced notice before

23   that deposition before we took it, didn't we?

24   A.  I don't remember the amount of time.

25            MR. KUBEHL:  The clip I'll show is at the same

1   deposition transcript, Page 30, Lines 22 through 31, Line

2   2.

3          THE COURT:  Is this to impeach the answer that he

4   doesn't know?  Is that what you're doing?

5          MR. KUBEHL:  I thought he said he didn't remember,

6   Your Honor.

7          THE COURT:  But this is for impeachment?

8          MR. KUBEHL:  This is to refresh recollection.

9          THE COURT:  All right.

10  Q.  (By Mr. Kubehl)  In that deposition, did I ask the

11  question:  In the two months or so since we've asked for

12  this deposition, can you tell me what, if anything, you've

13  done to prepare for the deposition?

14         And did you answer:  I searched my electronic

15  folders and had conversations with the attorneys at Dechert

16  and met with Dechert this week on Monday and Tuesday?

17  A.  Yes.

18  Q.  So we gave you about two months' notice before that

19  deposition, didn't we?

20  A.  Okay.

21  Q.  And in preparing for that deposition, you met with the

22  Dechert attorneys, the same attorneys for IV, right?

23  A.  Yes.

24  Q.  Now, in your testimony that we heard on your direct

25  examination, you were answering IV's lawyers' questions,

```
 1   and you gave some explanation about what your inventions
 2   were, didn't you?
 3   A.  Yes.
 4   Q.  In August, I asked you:  With respect to your '206
 5   patent, one of the ones you've talked about today, if you
 6   were asked to tell the jury, Dr. Jorgensen, what's your
 7   '206 patent generally about, how would you answer?
 8           Do you remember what you said?
 9   A.  No, I don't.
10           MR. KUBEHL:  This is at the same transcript, 226,
11   Line 3, 226, Line 9.
12           (Videoclip played.)
13           QUESTION:  With respect to your '206 patent, if
14   you were asked to tell the jury, Dr. Jorgensen, what's
15   your -- what's your '206 patent generally about, how would
16   you answer that question?
17           ANSWER:  I would provide the title of the patent
18   as my answer.
19           (Videoclip ends.)
20   Q.  (By Mr. Kubehl)  And I asked you:  Other than reading
21   the title to the jury, could you give them anything else
22   about the patent?
23           And do you remember what you told me?
24   A.  No, I don't.
25           MR. KUBEHL:  This clip is the same transcript,
```

 1  226, 15, through 19.

 2          (Videoclip played.)

 3          QUESTION:  And other than reading the title to the

 4  jury, could you tell them anything else about that patent?

 5          ANSWER:  No.

 6          (Videoclip ends.)

 7  Q.  (By Mr. Kubehl)  I asked you:  Dr. Jorgensen, could you

 8  tell them anything else about the invention underlying the

 9  '206 patent?

10          And do you recall what you said?

11  A.  No.

12          MR. KUBEHL:  This clip is 226, 20 through 24.

13          (Videoclip played.)

14          QUESTION:  Could you tell them anything else about

15  the invention underlying that patent?

16          ANSWER:  No.

17          (Videoclip ends.)

18  Q.  (By Mr. Kubehl)  Did I ask those questions, and did you

19  give those answers?

20  A.  Yes.

21  Q.  You also talked about your '629 patent today to the

22  jury.  When I asked you in August if you were asked to

23  explain to the jury, Dr. Jorgensen, what's your '629 patent

24  about, did you say all you could do is read the title?

25  A.  I don't remember.

1          MR. KUBEHL:  This clip is the same transcript,

2   224, Line 25, through 225, Line 5.

3          (Videoclip played.)

4          QUESTION:  If you were asked to explain to the

5   jury in Marshall, Dr. Jorgensen, what's your '629 patent

6   about, how would you answer that question?

7          ANSWER:  In a similar way, I would recite the

8   title.

9          (Videoclip ends.)

10  Q.  (By Mr. Kubehl)  And when I followed up and asked,

11  could you give them any more information about the '629

12  patent, do you remember what you told me?

13  A.  No, I don't.

14         MR. KUBEHL:  That clip is 225, 6 through 11.

15         (Videoclip played.)

16         QUESTION:  Could you give them any more

17  information than that?

18         ANSWER:  Not without the risk of making errors,

19  and that's why I would not want to do that.

20         (Videoclip ends.)

21  Q.  (By Mr. Kubehl)  And then with respect to the third

22  patent that you talked about to the jury today, this '517

23  patent, I asked you the question:  Dr. Jorgensen, what's

24  your '517 patent about?  And did you say that all you could

25  do is read the -- read the title and use that as a summary

1  of the subject matter?

2  A.  I don't recall.

3       MR. KUBEHL:  This clip is 224, 2, through 224,

4  10 -- I'm sorry, 224, 11.

5       (Videoclip played.)

6       QUESTION:  So I'm not asking you to tell me

7  exactly what's inside and outside of the patent, but if I

8  just wanted to say, Dr. Jorgensen, your '517 patent, what's

9  that about?

10      (Videoclip ends.)

11      MR. KUBEHL:  I'm sorry for interrupting.  I

12 thought he had the wrong clip there.  Sorry for

13 interrupting.

14      (Videoclip played.)

15      QUESTION:  '517?

16      ANSWER:  '517.  Which one is that?  What I could

17 do is read the title and use that as a summary for what the

18 patent subject matter is.

19      (Videoclip ends.)

20 Q.  (By Mr. Kubehl)  And then, Dr. Jorgensen, when I asked

21 whether you could give the jury any more information about

22 what that '517 patent is about, do you remember what you

23 told me?

24 A.  No, I don't.

25      MR. KUBEHL:  That clip is 224, 17 through 24.

 1          (Videoclip played.)

 2          QUESTION:  And could you give any more information

 3   to the jury about what that patent is about?

 4          ANSWER:  I --

 5          QUESTION:  You can answer the question.

 6          ANSWER:  No.

 7   Q.  (By Mr. Kubehl)  Dr. Jorgensen, did I ask those

 8   questions, and did you give those answers with respect to

 9   the '517 patent?

10   A.  Yes.

11   Q.  Dr. Jorgensen, to the extent that you gave testimony on

12   your direct examination today about what your invention

13   was, you weren't trying to suggest to the jury that

14   anything that you said had anything to do with what the

15   patents in this case actually cover, were you?

16   A.  No.  I described the prototype system, that's correct.

17   Q.  Is it your testimony today that you don't know how

18   to -- you don't understand the claims of these patents?

19   A.  That's not correct.

20   Q.  So in August of this last year, six months ago, when I

21   asked you about each of these three patents and you told me

22   you couldn't do anything but read the title of the patent

23   and then today, suddenly you can say a whole bunch of

24   things to the jury, where -- where did you get all that

25   information?

1   A.  As I said before, I was talking about the prototype

2   system.

3   Q.  Oh, so you weren't talking about the inventions in the

4   patent; is that right?

5   A.  Not directly, no.

6   Q.  Not at all, right?

7   A.  No.

8   Q.  Is that a correct --

9   A.  That is correct.

10  Q.  And, Dr. Jorgensen, I think you mentioned on direct

11  that IV is paying for your services in this case; is that

12  right?

13  A.  That's correct.

14  Q.  And for the work you've done for IV, you've charged

15  them between 300 and $350.00 for every hour that you've

16  spent, right?

17  A.  That's correct.

18  Q.  And that's for all of the different cases that you've

19  worked on for them, right?

20  A.  I believe so.

21  Q.  You've done work for IV on cases in every one of the

22  last -- past seven years, haven't you?

23  A.  I don't know the answer to that question.

24  Q.  You don't dispute that, do you?

25  A.  I'd have to go back and look at my records.  I don't

1    remember.

2    Q.  We'll save some -- save the jury some time on that.

3          Are you representing to the folks on the jury that

4    $350.00 an hour is the equivalent -- equivalent amount that

5    you make for each hour that you work at your other job?

6    A.  I'm retired.

7    Q.  In 2016, you were not retired, correct?

8    A.  Correct.

9    Q.  You were working for the WiFi Alliance, correct?

10   A.  Correct.

11   Q.  In that job, you worked 40 to 60 hours per week, right?

12   A.  That's correct.

13   Q.  And you took three weeks vacation, right?

14   A.  That's about correct -- about right.

15   Q.  And that's about the same thing you did in 2017,

16   correct?

17   A.  Approximately.

18   Q.  And then the same thing in 2018?

19   A.  Yes.

20   Q.  So if we took the -- sort of give you the benefit of

21   the doubt, if we take the low end of the hours, only 40

22   hours a week so that that hourly rate gets as high as we

23   can get it, 40 hours a week for the year and taking three

24   weeks off comes out to -- well, I've got to establish --

25   about $280,000.00 a year is what you were making those

1    years, does that sound about right?

2    A.  Approximately.

3    Q.  Okay.  And if we take that number and we divide it by

4    the number of hours that you were working, if we assume the

5    low end of your 40 to 60 hours per week, that comes out to

6    $140.00 an hour, doesn't it?

7    A.  I trust your calculation.

8    Q.  But IV's been paying you 300 to $350.00 an hour, right?

9    A.  That's correct.

10        MR. KUBEHL:  Could we bring back up DX-129,

11   please?  Could I have Page 2, please, Paragraph 3?

12   Q.  (By Mr. Kubehl)  So in this engagement letter you have

13   with the IV lawyers, I'm looking at -- about halfway down,

14   it says:  You have informed us that a reasonable hourly

15   rate for compensation of your time is $300.00 an hour.

16        Do you see that?

17   A.  Yes, I do.

18   Q.  So were you lying to IV when you said that, or did they

19   make it up in the document, or is there some other

20   explanation?

21        MR. FLANNERY:  Your Honor, object, argumentative.

22        THE COURT:  Sustained.  There's no need to go that

23   far with this, counsel.  That's across the line, and you

24   know it.

25        MR. KUBEHL:  Apologies, Your Honor.

1          THE COURT:  Restate your question.

2    Q.  (By Mr. Kubehl)  Where did the information come from in

3    this document that says your -- your normal reasonable

4    hourly rate is $300.00 an hour?

5    A.  I don't remember.

6    Q.  Okay.  This was not a situation where the Dechert firm

7    just kind of went off on their own and did this without

8    IV's knowledge, is it?

9    A.  I don't believe so.

10   Q.  IV specifically approved of this, didn't they?

11   A.  I assume.

12   Q.  Well, you know they did, didn't -- don't you?

13   A.  Okay.

14   Q.  Is that a yes?

15   A.  That's a yes.

16   Q.  If we look at the bottom of the paragraph, do you see

17   that the Dechert firm confirms that it has approval from

18   Intellectual Ventures for making this agreement?

19   A.  Yes.

20   Q.  So IV specifically approved of paying you $300.00 an

21   hour and having you agree to testify for them and do all

22   the work that we've talked about, right?

23   A.  Yes.

24   Q.  And they asked you not to talk to us, right?

25   A.  I don't recall.

1  Q.  We can see the bottom of the document.  That is your

2  signature on the bottom, right?

3  A.  Yes, it is.

4  Q.  I want to talk to you briefly about your '629 patent,

5  if we can do that.

6       MR. KUBEHL:  Could we have Defendants' Exhibit No.

7  1?

8  Q.  (By Mr. Kubehl)  This is one of the patents that you

9  were telling the jury about; is that right?

10  A.  I was not addressing -- no, that's not correct.

11  Q.  You didn't show the face of this patent to the jury in

12  your slide?

13  A.  This is what I showed.

14       MR. KUBEHL:  Let's look at Figure 14.

15  Q.  (By Mr. Kubehl)  You've seen this figure before,

16  haven't you, sir?

17  A.  Yes, I have.

18  Q.  It's sort of a complicated looking figure, but if you

19  ignore all of the kind of lines coming down that look like

20  a bird cage and if I just look at the grid that's shown, is

21  it accurate that what this is showing is a series of

22  transmission frames?

23  A.  It appears so, yes.

24  Q.  And so maybe we can put a highlight on the top one that

25  says "N" going across the top row?

1  A.  Yes.

2  Q.  So in your patent, that was -- that's -- that's called

3  a transmission frame, correct?

4  A.  Yes.

5  Q.  And the letter "N" represented the current transmission

6  frame, right?

7  A.  Yes.

8  Q.  And that would be the transmission frame that the next

9  allocation of resources would go to, right?

10  A.  The next or the present, yes, I agree.

11  Q.  And then below that, it says in N + 1.  Do you see

12  that?

13  A.  Yes.

14  Q.  And so the idea here is that N + 1 is a frame that's

15  out into the future, compared to Frame N; is that right?

16  A.  Yes.

17  Q.  So the top row is one transmission frame, and

18  information can be put into that and sent wirelessly,

19  right?

20  A.  Yes.

21  Q.  And then the next frame, that hasn't happened yet, that

22  will be coming in the future, right?

23  A.  Correct.

24  Q.  And then Frame N + 2, that would be what you called a

25  frame that's subsequent in time to the future Frame N + 1;

```
 1    is that right?
 2    A.   Correct.
 3              MR. FLANNERY:   Objection, may we approach?
 4              THE COURT:   Approach the bench.
 5              (Bench conference.)
 6              MR. FLANNERY:   Your Honor, this goes directly to
 7    the meaning of claim terms, not -- not to plain and
 8    ordinary meaning.   He's trying to get the inventor to
 9    construe claim terms.
10              MR. KUBEHL:   These are non-construed terms.   These
11    are plain and ordinary meaning terms.
12              MR. FLANNERY:   No, Your Honor.   He's not asking
13    him what was the plain and ordinary meaning.   He's trying
14    to take him through the embodiment and ask him to interpret
15    the claims that Your Honor has already interpreted.
16              THE COURT:   Well, I gather -- and correct me if
17    I'm wrong -- but this is not an attempt to have the witness
18    give a different opinion as to the meaning or construction
19    of terms the Court has explicitly construed, correct?
20              MR. KUBEHL:   Absolutely it's not.
21              MR. FLANNERY:   I don't think he has -- I don't
22    think he has any basis for testifying about these things.
23    I didn't ask him anything about this on direct.   He hasn't
24    studied the patent --
25              THE COURT:   Okay.   That's a different matter,
```

1    Mr. --

2            MR. FLANNERY:  -- things that experts --

3            THE COURT:  -- that's a different matter,

4    Mr. Flannery.

5            My question to you is:  Are you telling me that

6    defense counsel is asking the witness to construe terms the

7    Court has interpreted?

8            MR. FLANNERY:  I don't know what he's going to do.

9    But all I know is he's getting into areas of claim

10   construction and the application -- the application.

11           THE COURT:  Well, Mr. Kubehl, plain and ordinary

12   meaning is a person of ordinary skill in the art, and

13   inventors are not an ordinary -- person of ordinary skill

14   in the art.  This is the inventor here.  It's not

15   appropriate to get him to go into plain and ordinary

16   meaning because he is not a POSITA.

17           And you are beyond the scope of the direct.

18           So tell me where you're headed so I'll know if

19   it's permissible.

20           MR. KUBEHL:  I want to explore what he said on

21   direct about his invention.  I can leave this figure.  But

22   I want to --

23           THE COURT:  As long as you're exploring with him

24   what he -- what he discussed on direct, I have no problem

25   with that, but he's not -- he's not an expert.  He's not to

```
 1   attempt to opine on any term the Court has construed.  And
 2   he's not a person of ordinary skill in the art.  So he's
 3   not in a position to testify as to what plain and ordinary
 4   meaning would be, all right?
 5           MR. KUBEHL:  Understood.  As far as the -- within
 6   the scope of direct, we specifically have an agreement so
 7   that we didn't have to recall him in our case, that we
 8   could exceed the scope of direct.
 9           THE COURT:  Is that correct, Mr. Flannery?
10           MR. FLANNERY:  I don't recall that.  But I don't
11   think it's about the scope of direct.  I think it's about
12   just going into things that aren't proportional to the
13   direct.  He's asking him about plain and ordinary meaning
14   of claim terms.  He's asking him about --
15           THE COURT:  Just a minute.  Just a minute.  If --
16   if you have an agreement to exceed the scope of the direct,
17   you need to tell me.  Otherwise, I'll hold the
18   cross-examination to the scope of the direct.
19           But in either case, I'm telling defense counsel
20   he's not to question this witness about plain and ordinary
21   meaning because this is the inventor.  He's not a person of
22   ordinary skill, all right?
23           MR. FLANNERY:  Yes.  I think that's the way we
24   should proceed, Your Honor.
25           THE COURT:  Let's go forward.
```

```
 1              (Bench conference concluded.)
 2              THE COURT:  Let's proceed.
 3   Q.  (By Mr. Kubehl)  Okay.  Let's move on from that figure.
 4              Dr. Jorgensen, in your system, you talked about
 5   how you wanted to put voice and data on the same channel,
 6   right?
 7   A.  Yes.
 8   Q.  You also talked about how voice needed to be at these
 9   regular intervals; is that right?
10   A.  Correct.
11   Q.  And in your -- in your idea, was it your idea that
12   rather than waiting until you have a packet that's just
13   about to be transmitted, that you'd look out into the
14   future, and you'd reserve spots in the frames multiple
15   frames out, instead of just waiting until you have the data
16   to send?
17   A.  Not exactly.
18              MR. KUBEHL:  Could we have Clip JJ42, please?
19              MR. FLANNERY:  Your Honor, may I have the page and
20   line once again?
21              MR. KUBEHL:  I'm sorry.  193, 1, through 193, 6
22   from the same transcript.
23              (Videoclip played.)
24   Q.  So rather than waiting until you have A packet just
25   about to be transmitted, you'll look out into the future,
```

1  and you'll reserve spots in the frames, multiple frames

2  out, instead of just waiting until you have data to send?

3  A.  That's roughly what I'm saying, yes.

4       (Videoclip ends.)

5  Q.  (By Mr. Kubehl)  Now, Dr. Jorgensen, rather than

6  reserving slots in future frames, a different way to design

7  the system would have been to keep track of when that

8  device was likely to need a packet and to elevate the

9  priority of the device when it needed that packet; is that

10  fair?

11  A.  I don't know.

12       MR. KUBEHL:  Could we have clip JJ43.  It's at

13  250, 23, to 251, 9.

14       (Videoclip played.)

15  Q.  So without asking you to draw conclusions as to which

16  is better or worse, would you agree that at least as an

17  alternative to the way you designed it, which was reserving

18  future slots, an alternative would be to keep track of when

19  a device was likely to need a packet and to elevate the

20  priority of that device when it needed a packet?

21  A.  It's a -- I guess it's a -- it sounds like a different

22  way to do it.

23       There are probably a dozen other ways to do it

24  also.  I don't know.  I haven't thought about it in 20

25  years.

```
 1              (Videoclip ends.)

 2   Q.  (By Mr. Kubehl)  Dr. Jorgensen, by the time you were at

 3   Malibu, there were already systems in the industry called

 4   TDMA systems that would assign devices particular time

 5   slots in each frame, correct?

 6   A.  That's correct.

 7   Q.  So systems were well-known at that time, were they?

 8   A.  Would you repeat the question, please?  I didn't hear

 9   you.

10   Q.  Were those systems well-known at that time?

11   A.  I can't say.

12   Q.  You gave the jury some testimony about CPE devices.

13   When -- before we took your deposition in this case, we

14   asked you -- we sent a subpoena to you, a Court order, for

15   you to produce documents, correct?

16   A.  Yes.

17   Q.  And you did a full search for any documents you could

18   find related to your invention, right?

19   A.  Yes.

20   Q.  And you produced those documents, right?

21   A.  Correct.

22   Q.  And you didn't show the jury a single document today

23   showing that what you meant by CPE device was actually a

24   mobile phone; is that right?

25   A.  I didn't show the jury a single -- could you repeat
```

1  that, please?

2  Q.  Sure.  You talked about how you thought CPE devices

3  back in the day that you had envisioned mobile devices, but

4  it's true, isn't it, that you didn't show the jury a single

5  document to back that up?

6  A.  That's correct.

7       MR. KUBEHL:  I'd like to use the CPE document if I

8  may.

9       THE COURT:  Approach the bench.

10      (Bench conference.)

11      THE COURT:  What's your request?

12      MR. KUBEHL:  This document will simply be used to

13  show that the only document he produced to us is a CPE that

14  is a -- bolted to a house device.  It contradicts his --

15  his direct testimony that he was using it with mobile

16  devices.

17      MR. FLANNERY:  I don't think he testified that he

18  was using it with multiple devices, Your Honor.

19      He testified that he made a prototype.  I don't

20  want to -- if the document has anything to do with defining

21  claim --

22      THE COURT:  He testified he put the base station

23  in a car with a battery, and they drove around, and it

24  worked remotely from the automobile.

25      Here's my concern, Mr. Kubehl.  I don't want this

```
 1    prototype used as some embodiment at which you're then

 2    going to say he's -- you know, I don't want an improper

 3    comparison to a prototype, and that's what I'm worried

 4    about.

 5              MR. FLANNERY:  That's exactly what they're doing,

 6    Your Honor.

 7              THE COURT:  So tell me again how you intend to use

 8    it.

 9              MR. KUBEHL:  We will not be making a comparison of

10    that to -- to our products.  I want to show that the

11    document that he produced contradicts his testimony that he

12    was using it with mobile devices.

13              MR. FLANNERY:  He's comparing to -- he's not

14    comparing it to their product, Your Honor --

15              THE COURT:  Just a minute, gentlemen.  One at a

16    time.

17              MR. FLANNERY:  He's comparing -- he's pairing it

18    to a preferred embodiment, and he's trying to draw and say

19    you didn't do -- you didn't describe mobile environment in

20    your -- in this document or whatever.

21              That all goes to claim construction, Your Honor.

22    And he's trying to compare something to either a preferred

23    embodiment or the prototype that he worked on.  And all of

24    this is improper under the MILs.  It's all comparisons.

25              MR. KUBEHL:  We can check the transcript.  He
```

1  testified that he was -- that CPE device included mobile

2  devices.  He specifically testified to that,and this

3  document contradicts that.  It's -- it's all he's produced.

4  He's not produced any document showing any mobile devices.

5          MR. FLANNERY:  He described --

6          THE COURT:  All right.  Hang on.  I'll allow you,

7  Mr. Kubehl, to refresh him as to that testimony.

8          And you can certainly ask him if the documents he

9  produced did not support mobile usage.  And if he disagrees

10 with that, then I'll let you impeach him with this

11 document, but only for that sole purpose.

12         MR. KUBEHL:  I understand.

13         THE COURT:  All right?

14         MR. KUBEHL:  Thank you, Your Honor.

15         MR. FLANNERY:  Thank you, Your Honor.

16         THE COURT:  Let's proceed.

17         (Bench conference concluded.)

18         THE COURT:  Let's proceed.

19 Q.  (By Mr. Kubehl)  Dr. Jorgensen, would you agree that

20 the documents you produced in response to our subpoena do

21 not support the idea that a CPE device was a mobile device?

22 A.  I don't know.

23         MR. KUBEHL:  May I refresh his recollection?

24         THE COURT:  Yes.

25         MR. KUBEHL:  Can we have Exhibit DX-137.

1    Q.  (By Mr. Kubehl)  This is one of the documents you

2    produced, correct?

3    A.  It was a document that my company produced.

4    Q.  This is one of the documents that you produced in

5    response to my subpoena, sir, was it?

6    A.  My mistake.  Yes.

7    Q.  Thank you, sir.

8            MR. KUBEHL:  If we go to the next page, please.

9    If we can blow up the lower quarter.  There we go.

10   Q.  (By Mr. Kubehl)  On this page, it talks about the

11   Malibu Networks' solution that it would be a complete

12   system of wireless broadband products, including all the

13   wireless equipment and software the operator would need; is

14   that right?

15   A.  Yes.

16           MR. KUBEHL:  Then if we go to the next page.

17   Let's go to Jorgensen 31, please.

18           THE COURT:  Counsel, I gave you leave to refresh

19   his recollection.  You're going beyond that now.

20           MR. KUBEHL:  This is the last question.

21           THE COURT:  Ask your question.

22           MR. KUBEHL:  Thank you, Your Honor.

23   Q.  (By Mr. Kubehl)  Dr. Jorgensen, how is the CPE device

24   described in this document that you produced?

25   A.  I'm sorry, I don't understand your question.  Do you

1    want me to --

2    Q.  Would you read it, please?

3    A.  A CP -- it's hard to read it, I'm sorry.  A CPE

4    customer premises equipment with something --

5    Q.  Would you like me to read it, sir?

6    A.  I can't read that last word on the first line.

7    Q.  A CPE, customer premises equipment, with two

8    components.  The IDU is a small enclosure that sits on a

9    desk, in a rack, or on a wall, and includes the connections

10   to the subscriber's PC, LAN switch, IP telephone, and so

11   on.

12           Did I get that right so far?

13   A.  Yes.

14   Q.  The second part would be this ODU mounted on the side

15   of a building and includes the radio and antenna.

16           Did I read that right?

17   A.  Yes, you did.

18   Q.  Thank you, sir.

19           THE COURT:  Let's move on.

20   Q.  (By Mr. Kubehl)  Dr. Jorgensen, did you use the term

21   packet-centric?  Is that a term that you created for your

22   invention to describe a protocol for packet switching based

23   on QoS characteristics?

24   A.  It's a phrase I used.

25   Q.  Is it a -- is it a term that you created for your

 1  invention to describe a protocol for packet switching based

 2  on QoS characteristics?

 3  A.  I -- yes.

 4  Q.  And, Dr. Jorgensen, have you in the past described the

 5  term packet as it's used in your Malibu patents as a small

 6  unit of information that has two parts, one is actual

 7  payload, the actual data that's being sent, the other part

 8  at the top is called a header, which describes some details

 9  about the data that's in the payload?

10          MR. FLANNERY:  Your Honor, objection.  May we

11  approach.

12          THE COURT:  Approach the bench, counsel.

13          (Bench conference.)

14          MR. FLANNERY:  Your Honor, again, this is going

15  into plain and ordinary meaning of claim terms.

16          MR. KUBEHL:  He has specifically testified on

17  direct about packets and how he used packets and headers of

18  packets.  He has -- he has discussed in depth packets.

19          This is prior testimony about he has -- how he has

20  explained in federal court what a packet is.

21          MR. FLANNERY:  And he referred to what he did, but

22  now, he's going to ask him in the context of his patents

23  and his patent claims.

24          MR. BLACK:  I'm sorry, Your Honor.  Packet-centric

25  is a claim term.  Mr. Kubehl is asking him whether he

 1  defined the term which isn't for the Court to do -- or the

 2  experts in this case and not for this witness.  He's way --

 3        MR. KUBEHL:  He's given testimony in federal court

 4  about patents in the same family with the same

 5  specification about what -- what the packet is.

 6        THE COURT:  Well, I made it clear earlier at the

 7  bench, this is not a person of ordinary skill in the art.

 8        He's not in a position to testify about plain and

 9  ordinary meaning.  And if it's a term this Court has

10  expressly construed, then it's totally off bounds for him

11  to try and construe it or define it.

12        MR. KUBEHL:  This is not a construed term.

13        MR. FLANNERY:  It's plain and ordinary meaning.

14        THE COURT:  It's one or the other though.

15        MR. KUBEHL:  I understand.

16        MR. BLACK:  It's inventor testimony.

17        THE COURT:  We need to move on, all right?

18        MR. KUBEHL:  Yes, sir.

19        (Bench conference concluded.)

20        THE COURT:  Let's move on.

21        MR. KUBEHL:  Yes, Your Honor.

22  Q.  (By Mr. Kubehl)  Dr. Jorgensen, did you spend seven

23  years at a company call Velocity Venture Capital?

24  A.  Six or seven years, yes.

25  Q.  And as part of your responsibilities there, did it

1  involve evaluating patents for new start-ups?

2  A.  No.

3  Q.  Dr. Jorgensen, you didn't invent the concept of

4  bandwidth allocation; is that right?

5  A.  No, I did not.

6  Q.  Before any of your inventions, there was a system

7  called PRMA; is that right?

8  A.  I don't know what that refers to.

9  Q.  By 1997, was there a company called Packeteer that had

10  a product that was classifying individual IP-flows based on

11  quality of service of the flow?

12  A.  Yes, I remember.

13  Q.  And they were selling that product by February 1997; is

14  that right?

15  A.  I don't remember the date.

16        MR. KUBEHL:  This is from the same transcript,

17  266, 17 through 21.

18  Q.  (By Mr. Kubehl)  Dr. Jorgensen, does that refresh your

19  recollection that Packeteer was selling that system you

20  described by February of 1997?

21  A.  Yes.

22  Q.  That was before you started at Malibu, right?

23  A.  That's correct.

24  Q.  You didn't start at Malibu until January 1998, right?

25  A.  Correct.

1   Q.  And that was before you'd even started thinking about

2   the technology you developed at Malibu, right?

3   A.  No, I'm not sure that's correct.  Part of -- it's more

4   complicated than that.

5   Q.  Before you worked at Malibu, did you work at a company

6   called Pacific Access?

7   A.  Yes.

8   Q.  And is it accurate that you didn't start thinking about

9   the issues that resulted in the Malibu Networks technology

10  until after you had already left Pacific Access?

11  A.  That's correct.

12  Q.  And you left Pacific Access in 1998?

13  A.  That's probably right, yes.

14        MR. KUBEHL:  Pass the witness, Your Honor -- oh,

15  I -- one more issue if I can -- may retract.

16        THE COURT:  All right.

17        MR. KUBEHL:  I apologize.

18        THE COURT:  Ask your next question.

19        MR. KUBEHL:  Yes, sir.

20        Could we have DX-55, please?

21  Q.  (By Mr. Kubehl)  Dr. Jorgensen, DX-55 appears to be a

22  PCT application of -- of the '206 patent family.  Does that

23  look right to you?

24  A.  Yes.

25  Q.  And did you believe that the -- the claims in the '206

1  patent -- when they were filed, did you believe that each

2  and every element of those claims was disclosed by the

3  original patent application?

4  A.  By this patent application?

5  Q.  By the '206 patent's patent application?

6  A.  I'm sorry, could you repeat the question?

7  Q.  Sure.

8  A.  I'm not sure I understood that.

9  Q.  Sure.  Sorry, sir.  If we went back to the '206 patent

10  when that was filed, did you believe that the claims of the

11  '206 patent, that those are fully supported, each and every

12  element by the written description of that patent?

13          MR. FLANNERY:  Your Honor, may we approach again?

14  A.  I don't really understand.

15          THE COURT:  Just -- just a minute, Dr. Jorgensen.

16          What is it, Mr. Flannery?

17          MR. FLANNERY:  I have an objection.  May we

18  approach again?

19          THE COURT:  State your objection.

20          MR. FLANNERY:  He's asking Dr. Jorgensen --

21          THE COURT:  If not, we're going to wear out the

22  carpet between counsel table and the bench.

23          MR. FLANNERY:  I'm trying, Your Honor.

24          But he's asking Dr. Jorgensen to basically provide

25  interpretation of patent claims and whether they're covered

```
 1   by a specification, which is clearly the subject of expert
 2   testimony.
 3            THE COURT:  Do you have a response, Mr. Kubehl?
 4            MR. KUBEHL:  I'll move on.
 5            THE COURT:  Let's move on.  Or I'll sustain the
 6   objection, one of the two.  And you passed the witness.
 7            I thought you were coming back for one question.
 8   Do you have more than that?
 9            MR. KUBEHL:  I did have two more, but I'll --
10            THE COURT:  I just didn't know what the scope of
11   your retraction was.
12            Two more questions.  Let's go.
13   Q.  (By Mr. Kubehl)  Dr. Jorgensen, is it accurate that
14   you're not an expert in LTE?
15   A.  That's correct.
16   Q.  It's accurate that you have very little knowledge about
17   how LTE works?
18   A.  That's correct.
19   Q.  And that you have very little knowledge about how base
20   stations in LTE work?
21   A.  That's correct.
22   Q.  Okay.
23            MR. KUBEHL:  Pass the witness, Your Honor.
24            THE COURT:  All right.  Redirect.
25                      REDIRECT EXAMINATION
```

```
 1   BY MR. FLANNERY:
 2   Q.  Dr. Jorgensen, on direct, we talked about -- you told a
 3   story of how you developed your inventions.  Did we discuss
 4   any particular patent claims compared to the '206 versus
 5   the '629 versus the '517 patent?
 6   A.  No.
 7   Q.  Okay.  Now, you were asked some questions and shown
 8   some of your video deposition about whether you understood
 9   what was in any particular patent, one versus the other
10   versus the other.
11          Now, you're not a patent lawyer, right?
12   A.  Of course not.
13   Q.  And you weren't asked to interpret the patent claims or
14   provide any expert analysis of the patent claims in this
15   case, right?
16   A.  No.
17   Q.  Okay.  Now, when you were being asked questions about,
18   well, what's the difference between the invention, can you
19   explain the invention in the '206 versus the invention in
20   the '517 versus the invention in the '629?  Were you not
21   able to explain the differences of those because you
22   thought you were talking about the patent?  The questions
23   were going to --
24          THE COURT:  Slow down, Mr. Flannery.
25          MR. FLANNERY:  I'm sorry, Your Honor.  I've been
```

 1  waiting to get to this for a while.

 2          THE COURT:  You can do it, just talk slowly.

 3          MR. FLANNERY:  Thank you, Your Honor.

 4  Q.  (By Mr. Flannery)  Was it -- so you were being asked

 5  these questions about, well, do you know what that

 6  invention is, do you know what that invention is, and the

 7  reason you couldn't provide the difference between those

 8  inventions is because you didn't study the claims, one

 9  invention -- one -- one patent compared to the other

10  compared to the other?

11          THE COURT:  Mr. Kubehl.

12          MR. KUBEHL:  Objection, leading.

13          THE COURT:  Sustained.

14  Q.  (By Mr. Flannery)  Could you explain why you weren't

15  able to provide significant detail as to the invention of

16  the '206 versus the '517 versus the '629 patents?

17  A.  As an inventor, I spend my time and energy focusing on

18  creating new ideas.  What I am not an expert in is

19  translating those new ideas into specific language, and the

20  writing of the language and the interpretation of that

21  language I now understand is very technical, is very --

22  it's a very specific kind of knowledge that one needs to be

23  trained for that I am not trained for.  And I am afraid of

24  misrepresenting the contents of the patents by making

25  statements about what they are.

1   Q.  And when you -- you're referring to the patent claims,

2   you're not an expert in drafting patent claims?

3   A.  That's what I mean.

4   Q.  Okay.  Thank you.

5        Now, counsel gave you a book.  Can you just flip

6   through that?  Does most of that look like it's depositions

7   that you've given in this case towards the back end?

8   A.  Yes.

9   Q.  So essentially, from here on back, this is

10  double-sided, and this is recording all of your testimony?

11  A.  Yes.

12  Q.  And was this all testimony where you felt that lawyers

13  for opponents of your patents were essentially trying to

14  say that your patents were worthless?

15        MR. KUBEHL:  Objection, leading.

16        THE COURT:  Sustained.

17        MR. FLANNERY:  I'll withdraw, Your Honor.

18        THE COURT:  Ask your next question.

19        MR. FLANNERY:  Okay.  Thank you.

20  Q.  (By Mr. Flannery)  You're -- you were asked questions

21  about whether you know if the -- Ericsson or T-Mobile's

22  technology here infringes your patents.  Do you remember

23  that?

24  A.  Yes.

25  Q.  And you didn't have any -- you didn't do any analysis

1  of that, right?

2  A.  No.

3  Q.  But you didn't have any access to any confidential

4  information from either T-Mobile or Ericsson, right?

5       MR. KUBEHL:  Objection, leading.

6       THE COURT:  Sustained.

7  Q.  (By Mr. Flannery)  Did you have access to confidential

8  information of Ericsson or T-Mobile?

9  A.  No.

10 Q.  And were you asked to provide any expert analysis of

11 any device of T-Mobile or Ericsson in this -- in any

12 context?

13 A.  No.

14 Q.  Now, you testified that you heard -- when you heard

15 about VoLTE, you wondered how they could do this without

16 your patents.  And why did you think that?

17 A.  Because I knew that sending voice and data over one

18 wireless channel is a very challenging thing, and I knew

19 that from my own work.  And I thought that my solution was

20 the one that was required.

21      MR. FLANNERY:  Nothing further, Your Honor.  Pass

22 the witness.

23      THE COURT:  Further cross-examination.

24      MR. KUBEHL:  Just briefly, Your Honor.  May I

25 proceed?

1              THE COURT:  You may.

2                   RECROSS-EXAMINATION

3  BY MR. KUBEHL:

4  Q.  Dr. Jorgensen, that -- like about that much testimony,

5  that was all you working with IV's lawyers; is that right?

6  A.  I'm not sure what you're indicating.

7  Q.  He showed you like that thick of testimony of

8  testimony -- testimony you had given about patents, patent

9  cases, prior litigations.  That was all you working with

10 IV's lawyers?

11 A.  I see, yes.

12 Q.  And is it your testimony today that you don't

13 understand the claims in your patent?

14 A.  That is oversimplified.

15 Q.  Have you represented to the United States Patent Office

16 that you've fully read and understood the claims in each of

17 these three patents?

18 A.  Yes.

19              MR. KUBEHL:  Nothing further.

20              THE COURT:  Redirect?

21              MR. FLANNERY:  Nothing, Your Honor.

22              THE COURT:  All right.  You may step down,

23 Dr. Jorgensen.

24              THE WITNESS:  Thank you.

25              MR. FLANNERY:  Your Honor, may Dr. Jorgensen be

```
 1   excused from the rule?

 2         THE COURT:  Is there a need to retain this

 3   witness?

 4         MR. KUBEHL:  No, Your Honor.

 5         THE COURT:  Dr. Jorgensen, you are released and

 6   excused.  You're free to stay with us.  You're also free to

 7   leave.

 8         THE WITNESS:  Thank you.

 9         THE COURT:  Counsel, approach the bench, please.

10         (Bench conference.)

11         THE COURT:  Y'all know what I'm going to ask.

12   Who's next and how long are they going to take?

13         MR. BLACK:  John Paschke for IV.  It's probably

14   30, 40 minutes on direct.

15         THE COURT:  All right.

16         MR. BLACK:  A long cross?

17         MS. SMITH:  Possibly.

18         THE COURT:  You're going to cross him, Ms. Smith?

19         MS. SMITH:  Yes, sir.

20         THE COURT:  Well, let's see if we can't at least

21   get the direct done.

22         Let's proceed.

23         MR. BLACK:  Your Honor, can I raise one issue?

24         Mr. Kubehl asked a question of the witness about

25   seven years of depositions making -- trying -- he's talking
```

1    about prior lawsuits.  And for us to -- going back into on

2    redirect on that appropriately would have led us down the

3    rabbit hole into the other lawsuits.

4         The fact is his firm and other firms and his

5    client and prior clients have been deposing and trying to

6    kill Dr. Jorgensen's patents for years.  For us to get into

7    that, though, we would have had to break the rule and

8    explain these other lawsuits, and we've got to keep a lid

9    on this.  I think Mr. Kubehl crossed the line, and we've

10   got to keep a lid on it.

11        THE COURT:  Well, I may be mistaken, but my

12   recollection of the limine rulings is we're not to talk

13   about other litigation.  And there were very clear and

14   direct efforts by Defendant to lead the jury to the

15   conclusion that this is just one of multiple lawsuits.

16        MR. KUBEHL:  Your Honor, I responded -- my

17   response was to Mr. Flannery's question holding up the

18   document and about all the litigations there have been and

19   all the testimony --

20        THE COURT:  Well, Mr. Kubehl, in all honestly,

21   that was just one of several times you did it.  And we're

22   going to have to -- we're going to have to go forward

23   recognizing that limine ruling, or else I'm going to have

24   to make some accommodation to the other side to cure it

25   without putting themselves in a damaged position.

1           Let me just be clear, without leave of the Court,

2   I don't want anybody on either side to be talking about or

3   implying anything about other lawsuits in other litigation

4   in other places at other times.  If you're going to do

5   that, whether it's a direct question or a thinly-veiled

6   implication, which is what we just saw, you better come get

7   leave from me before you do it, all right?

8           MR. KUBEHL:  Yes, Your Honor.

9           MR. BLACK:  Yes, Your Honor.

10          THE COURT:  All right.  Let's proceed with the

11  witness.

12          (Bench conference concluded.)

13          THE COURT:  All right.  Plaintiffs, call your next

14  witness.

15          MR. BLACK:  Plaintiffs call John Paschke.

16          THE COURT:  Is he subject -- come forward, please,

17  sir.

18          (Witness sworn.)

19          THE COURT:  Please come around, sir, have a seat

20  on the witness stand.

21          All right.  Let's proceed with direct examination.

22          MR. BLACK:  Thank you, Your Honor.

23          JOHN PASCHKE, PLAINTIFF'S WITNESS, SWORN

24                    DIRECT EXAMINATION

25  BY MR. BLACK:

1    Q.  Would you please state your full name for the record?

2    A.  Yes.  John Frederick Paschke.

3    Q.  And where are you employed, Mr. Paschke?

4    A.  I'm employed -- I'm employed at Intellectual Ventures

5    through the company Intellectual Ventures Management.

6    Q.  Have you ever testified to a jury before?

7    A.  No, I have not.

8    Q.  All right.  Well, if you can remember to do so, please

9    try to look over at the jury when you're answering the

10   questions and not over at me.  They want to hear from you.

11        What's the relationship between Intellectual

12   Ventures Management and the Plaintiff in this case,

13   Intellectual Ventures I LLC?

14   A.  Intellectual Ventures is actually a family of

15   companies, family of funds.  And my company, Intellectual

16   Ventures Management, provides management services for all

17   of the companies within Intellectual Ventures.

18   Q.  And what specifically is your position?  What do you do

19   for them?

20   A.  My -- my position is called licensing executive,

21   perhaps a fancy way of saying I'm a salesman.  What I sell

22   is a very technical product called a patent license.  I fly

23   all around the world talking with different companies and

24   seeing whether they want to take a license to the

25   inventions covered by our patents.

1   Q.  Give us a little information about yourself.  Where are

2   you from?

3   A.  From Boise, Idaho.  I live there with my wife and four

4   children.

5   Q.  Do you have any scientific training?

6   A.  I do.  I have an engineering degree from the University

7   of Illinois.

8   Q.  And tell us how you first became interested in

9   engineering.

10  A.  So I'm from a small town in Northwestern Illinois,

11  Mount Carroll.  It has about 1,400 people.  It's farm

12  country.  My parents own the local lumberyard and hardware

13  store.  It's a family business.  Over the summers, as I was

14  a teenager, I would load lumber, make deliveries, and then

15  help my mom out every month as she would send out

16  statements.  It was a manual process.  She would have to

17  literally handwrite these statements, and it'd take a

18  couple of days.

19          One -- one day I said, you know, maybe I can help

20  you out.  And so I wrote a database program that automated

21  the whole system and shaved a whole bunch of time off of

22  it.  That planted the seed for engineering and technology

23  and eventually led me to college.

24  Q.  Now, when you entered the University of

25  Illinois, did you expect to go to school and train

1  to become a licensing executive?

2  A.  No, no.  My ambitions were much similar going to the

3  University of Illinois.  Survival, quite honestly.  Neither

4  of my parents had graduated from college, and so I was

5  going there.

6          The first class I entered had over 1400 people, so

7  it was -- my class was bigger than my entire town.  And I

8  was just hoping -- straight Ds, I could not face my parents

9  going back and flunking out of a university.

10 Q.  It turned out okay.  What happened next?

11 A.  It did.  It did.  I studied extremely hard.  Managed to

12 graduate with straight As and a number of engineering

13 awards.  That took me on to law school at Harvard.

14 Q.  Did you spend any time practicing law after you left

15 law school?

16 A.  For a short time I did.  I spent a couple of years at a

17 law firm in Chicago.  We did a case -- a patent

18 infringement case for a company called Micron Technology.

19 Micron is a memory chip company located in Boise, Idaho.

20         At the end of the case, they gave me an offer to

21 come work for them in-house and moved the family and headed

22 out to Boise, Idaho.

23 Q.  Now, what kind of technology company is located in

24 Boise, Idaho?

25 A.  Yeah.  Boise -- I don't know if people know where Boise

1   is, but it's in the middle of nowhere.  It's a small city

2   now at this point.

3          Micron, though, is the one of the most

4   cutting-edge technologies on the planet.  It makes computer

5   memory chips, and the technology to make those chips so

6   small and to pack so much information is just incredible.

7   Q.  And how did you become a licensing executive?

8   A.  So at Micron, I started out working in the legal

9   department and helping with patent litigations.

10          Eventually, my interests turned towards licensing.

11   Because of all the technology that Micron developed, they

12   had a huge patent portfolio and some incredibly smart

13   engineers.

14          The problem was every time Micron engineers would

15   develop a new product, foreign competitors would take those

16   ideas.  Micron -- I say foreign because Micron was the last

17   remaining DRAM manufacturer.  All others had gone out of

18   business.  Last computer memory chip manufacturer.

19          And this was frustrating to me because these

20   engineers were coming up with great ideas.

21          I went to management, and I -- Micron management,

22   and I asked them if I could try to take our patents and our

23   inventions and instead try something different.

24          Go overseas and talk with these companies, and see

25   if I could convince them to take a license to our

1  technology as opposed to just putting it in their products.

2  Q.  And how did that work out?

3  A.  It worked out great.  I was able to license Micron's

4  patent portfolio out to a number of companies for over

5  $500 million.

6          This money just dropped straight to the bottom

7  line at Micron, and the -- the margins in the memory

8  industry are so incredibly competitive, that this was an

9  advantage to Micron for doing this.

10 Q.  When did you first start work for Intellectual

11 Ventures?

12 A.  Shortly after some of this licensing success, I had a

13 friend from law school, and he was at Intellectual

14 Ventures.

15         He knew -- we keep in contact, and he knew that I

16 was doing licensing at Micron.  He indicated that IV itself

17 had a very large patent portfolio, and they were interested

18 in licensing that technology.

19         So he invited me in.  It became a series of

20 interviews, and eventually I decided to join up at IV.

21 Q.  And during the course of the last almost eight years at

22 IV, how many licenses have you negotiated?

23 A.  At IV, I've negotiated over 30 licenses to conclusion

24 all across the world.

25 Q.  Is there a relationship between licensing and

1   litigation?

2   A.   There -- there is, or at least there can be.   In an

3   ideal world, you go and you try negotiate a license, and

4   like at Micron, sometimes you are successful in achieving a

5   license from the other side without litigation.

6           Sometimes, though, you feel strongly in your

7   inventions, and the other side is unwilling to take a

8   license.   At that point in time, litigation is -- is often

9   the only option you have.

10  Q.   Who are some of the other parties that you've

11  negotiated licenses with?

12  A.   I've negotiated licenses with companies like Samsung.

13          In the digital camera space, companies like Canon

14  or Nikon, Olympus.   Printer companies like Sharp, and then

15  telecommunications companies like AT&T, as well as

16  handset-makers like HNB, a smaller one you may not have

17  heard of.

18  Q.   And roughly what percentage of IV's revenues are

19  obtained outside of litigation?

20  A.   Outside of litigation, I'd estimate about -- about 75

21  to 80 percent of our revenue is done on matters outside of

22  litigation.

23  Q.   And roughly, what is the total value of licensing deals

24  you've negotiated over the years?

25  A.   Personally, including my time at Micron, as well as at

1   IV, I'd say it's right under $1.5 billion.

2   Q.  Let's talk a little bit about Intellectual Ventures.

3   Could you tell us something about the history of the

4   company.

5   A.  Yes.  It was founded by a gentleman named Nathan

6   Myhrvold.  Technically, it's Dr. Nathan Myhrvold, or

7   Dr.-Dr. Nathan Myhrvold.  He has a couple of Ph.D.s.  A

8   prolific inventor in his own right.  He owns over 800

9   patents, and that number continues to grow.

10          He was formerly the chief technology officer at

11  Microsoft and was one of the early employees at Microsoft

12  with Paul Allen and Bill Gates.

13          One of the things he did was he was responsible --

14  his team was responsible for the Windows operating system

15  and for moving Windows forward at Microsoft.

16  Q.  So you've mentioned two Intellectual Ventures companies

17  already, Intellectual Ventures Management and Intellectual

18  Ventures I LLC.  Could you describe whether there's a

19  single overarching theme to IV's business?

20  A.  There is.  And Dr. Myhrvold kind of had an idea that

21  invention is valuable, right?  Innovations are valuable.

22  And he wanted to unlock that in a number of different ways.

23          So he set up Intellectual Ventures, which has

24  different companies within it, each of which tries to get

25  at the value of inventions in different ways.

1          In one company, we have some of the world's best

2     minds come in -- into Intellectual Ventures, and we do our

3     own inventing, whether it's nuclear power reactors or new

4     types of antenna technologies.  And we spin those ideas out

5     as new companies that develop these products.

6          Another part of Intellectual Ventures tries to

7     unlock value in innovation to help problems in the third

8     world, so kind of doing good through inventing and doing

9     things like finding new ways of transporting vaccines to

10    help cure Ebola or malaria in the third world.

11    Q.  You have a book in front of you there with just a

12    couple of exhibits in it.  The first three should be PTX-1,

13    2, and 3.

14         Do you see that?

15    A.  Yes, I do.

16    Q.  And what are those?

17    A.  These are the patents that have been asserted in this

18    litigation.

19    Q.  And who owns those patents today?

20    A.  Those companies -- those patents are owned by

21    Intellectual Ventures I LLC.  Intellectual Ventures I, or

22    we always call it our IIF, all sort of acronyms, is another

23    part of our Intellectual Ventures family of companies where

24    they invest in other people's inventions and purchase

25    patents and license those patents.

```
 1          THE COURT:  Let me interrupt for a minute.

 2          Ladies and gentlemen, we're going to take a short

 3  recess at this juncture.  This will probably be the last

 4  one for the day, and you may simply close and leave your

 5  notebooks in your chairs.

 6          Follow all the instructions I've given you,

 7  including not to discuss the case among yourselves.  And

 8  I'll try to keep this to 10 minutes or less, but we'll make

 9  a short recess at this point.

10          The jury's excused for recess.

11          COURT SECURITY OFFICER:  All rise.

12          (Jury out.)

13          THE COURT:   The Court stands in recess.

14          COURT SECURITY OFFICER:  All rise.

15          (Recess.)

16          COURT SECURITY OFFICER:  All rise.

17          THE COURT:  Be seated, please.

18          All right.  Let's bring in the jury.

19          COURT SECURITY OFFICER:  All rise.

20          (Jury in.)

21          THE COURT:  Please be seated, ladies and

22  gentlemen.

23          Mr. Black, please continue with your examination.

24          MR. BLACK:  Thank you, Your Honor.

25  Q.  (By Mr. Black)  Mr. Paschke, before we went on the
```

1  break, we were about to start talking about IV's business

2  model.

3      Could you describe to me how IV goes about

4  acquiring patents?

5  A.  Sure.  When we -- when we purchase patents and

6  inventions that those patents represent, what we have done

7  is we've established a company that collected investment

8  money from a number of sources, companies, individuals, big

9  institutions.

10      They've all invested in this company.  We take

11  that money, and we go out, and we try and identify

12  inventions and the patents that back those inventions out

13  in the world that we think would make a good investment,

14  something that we can buy at a low price and license

15  hopefully at some point in the future at a very attractive

16  price for our investors.

17  Q.  (By Mr. Black)  Now, we've got a slide, I think, with

18  some of those investors on it.  What do we see here?

19  A.  These are some of the investors in the Intellectual

20  Ventures patent investment funds.

21  Q.  And if you just read off some of the -- some of the

22  names here that are more familiar?

23  A.  Sure.  Some of the large companies that have invested

24  include Microsoft, Cisco, Amazon, eBay, Nokia, Sony,

25  Verizon.

1          Then there are other, you know, universities and

2    pension funds that have also invested -- simply invested

3    money trying to get a return on their investment, just like

4    investing in a stock market fund or investing in a real

5    estate fund.

6    Q.  And how about the -- so the money comes in from the

7    investors, and then you buy patents with it?

8    A.  That's right.  We have a team -- probably at its

9    height, there was hundreds of engineers, scientists,

10   technologists, patent attorneys that go out and scour the

11   world trying to find diamonds in the rough, if you will,

12   ideas and patents that we can find that we think some day

13   are going to have tremendous promise and be, quite frankly,

14   very valuable.

15          That's our business model.  We want to find those

16   valuable patents out in the world.

17   Q.  Okay.  Let's talk about telecommunications industry.

18          Have you been active in licensing in that space?

19   A.  We have, yes.

20   Q.  So let's just define a few terms.  What's a carrier?

21   A.  A carrier is a company that most people think about

22   when they buy their phone, companies like AT&T or Verizon,

23   T-Mobile, Sprint.

24          These are the companies that actually provide

25   the cell phone service to someone, an end-user, who has a

1    cell phone.

2    Q.  So how many major cellular carriers are there right

3    now?

4    A.  I think of it as three.  There's really four, so there

5    is AT&T, Verizon, and then there's T-Mobile and Sprint.

6              They are in discussions as -- to merge into one

7    company.  That's why I think of them as one.  But there's

8    technically four companies.

9              MR. BLACK:  Your Honor, may I approach?

10             THE COURT:  You may.

11             MR. BLACK:  Does anyone want to join me?

12             MS. SMITH:  I thought you were approaching the

13   witness.

14             (Bench conference.)

15             THE COURT:  Why don't we say from now on:  May I

16   approach the bench --

17             MS. SMITH:  I apologize for the confusion and

18   didn't --

19             THE COURT:  -- or the witness, that way we'll

20   know.

21             MR. BLACK:  I was ambiguous.

22             THE COURT:  Whoa, one at a time.

23             Mr. Black?

24             MR. BLACK:  We need to put up the AT&T agreement

25   which is confidential, so we request to seal the courtroom.

1          THE COURT:  All right.

2          MR. BLACK:  That's at the end of his testimony.

3    I've arranged it so we'll go through the agreements that

4    are confidential through the end.  It should be 10 minutes.

5    It's confidential agreement.  I think it meets the standard

6    for --

7          THE COURT:  I gather there's no problem?

8          MS. SMITH:  No, Your Honor.

9          THE COURT:  Let's proceed.

10         (Bench conference concluded.)

11         THE COURT:  All right.  At counsel's request, I'm

12   going to order the courtroom sealed at this time.

13         If you are present in the courtroom and not

14   subject to the protective order that's been entered in this

15   case, you should exit the courtroom, and remain outside

16   until the courtroom is unsealed and you're invited to

17   return.

18         (Courtroom sealed.)

19         (Sealed Portion No. 1 saved in separate sealed

20   transcript.)

21         (Courtroom unsealed.)

22         THE COURT:  While I'm doing that, counsel,

23   approach the bench, please.

24         (Bench conference.)

25         THE COURT:  What's your cross going to be,

 1   Ms. Smith?

 2          MS. SMITH:  I can't guarantee I'm not going to go

 3   past 6:00, depending how smoothly it comes in.  I mean, I

 4   anticipate I may be playing some video.

 5          THE COURT:  All right.  And do I understand, we

 6   have deposition witnesses after this one?

 7          MR. BLACK:  Correct.

 8          THE COURT:  Do you have any idea how long those

 9   depositions are in total?

10          MR. BLACK:  About 30 minutes.

11          MR. WARD:  30 to 40 minutes.

12          THE COURT:  Total?

13          MR. WARD:  Total.

14          THE COURT:  Okay.  Let's pick up with your cross

15   first thing in the morning.

16          MS. SMITH:  Thank you, Your Honor.

17          Your Honor, I had one other issue.  The witness

18   suggested that litigation only happens when licensing

19   breaks down.

20          I think that opens the door under the MIL because

21   they had no prior contact with Ericsson prior to filing

22   this suit.

23          THE COURT:  Which MIL, Ms. Smith?

24          MS. SMITH:  I don't recall what the number is.

25          THE COURT:  Let's take it up first thing in the

1   morning.

2          MS. SMITH:  Thank you.  I appreciate it, Your

3   Honor.

4          (Bench conference concluded.)

5          THE COURT:  Ladies and gentlemen, given the

6   cross-examination that's necessary of this witness, we're

7   going to stop for the evening at this juncture.

8          I'm going to ask you to take your notebooks with

9   you, leave them in the jury room closed and on the table in

10  the jury room.

11         I'll also remind you what I told you earlier.

12  Unless you live alone, somebody's going to ask you about

13  what's happened today in federal court when you get home.

14  Don't try to answer that.  Don't discuss the case with

15  anyone in any way.

16         Follow all the instructions I've given you.  I'd

17  like you back so that we can start promptly at 8:30 in the

18  morning.  Travel safely to your homes.  And with that,

19  you're excused for the evening.

20         COURT SECURITY OFFICER:  All rise.

21         (Jury out.)

22         THE COURT:  All right.  Be seated, please.

23         Mr. Paschke, you can step down.

24         THE WITNESS:  Thank you, Your Honor.

25         THE COURT:  Counsel, I remind you that before I

1    bring the jury in in the morning, I'm going to ask a

2    representative of each side to read into the record those

3    items from the list of pre-admitted exhibits used during

4    today's portion of the trial.  Be prepared to do that.  We

5    will do that before 8:30 in the morning.

6            Also, I remind you of your continuing efforts to

7    thoroughly and candidly meet and confer on any issues

8    regarding demonstratives or other issues.

9            If there are disputes that are not resolved

10   through that process, we'll follow the same procedure this

11   evening and tomorrow morning that we followed yesterday

12   evening and this morning.

13           And I'll be in chambers by or before 7:30 in the

14   event you need guidance from me on anything that survives

15   that meet and confer process.

16           All right.  With that, are there any questions

17   that need to be raised from either Plaintiff or Defendant

18   before we recess for the evening?

19           MR. WARD:  Nothing from the Plaintiff.

20           THE COURT:  Anything from Defendants?

21           MR. KUBEHL:  Nothing from Defendants.

22           THE COURT:  We stand in recess until tomorrow

23   morning.

24           COURT SECURITY OFFICER:  All rise.

25           (Recess.)



1                    CERTIFICATION

2

3         I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    /S/ Shelly Holmes                      2/4/19
     SHELLY HOLMES, CSR, TCRR                Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25