```
1               IN THE UNITED STATES DISTRICT COURT

2                FOR THE EASTERN DISTRICT OF TEXAS

3                         MARSHALL DIVISION

4   INTELLECTUAL VENTURES I LLC, )(

5        PLAINTIFF              )(    CIVIL ACTION NO.

6   VS.                        )(    2:17-CV-577-JRG

7                              )(     MARSHALL, TEXAS

8   T-MOBILE USA, INC., T-MOBILE )(

9   US, INC., ERICSSON INC., AND )(

10  TELEFONAKTIEBOLAGET LM       )(

11  ERICSSON,                   )(    FEBRUARY 5, 2019

12       DEFENDANTS            )(    8:22  A.M.

13                 TRANSCRIPT OF JURY TRIAL

14        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

15           UNITED STATES CHIEF DISTRICT JUDGE

16  APPEARANCES:

17  FOR THE PLAINTIFF:      Mr. T. John Ward, Jr.
                            Ms. Claire A. Henry
18                          Ms. Andrea L. Fair
                            Mr. Wesley Hill
19                          WARD, SMITH & HILL, PLLC
                            1507 Bill Owens Parkway
20                          Longview, Texas 75604

21  COURT REPORTER:         Ms. Shelly Holmes, CSR, TCRR
                            Official Reporter
22                          United States District Court
                            Eastern District of Texas
23                          Marshall Division
                            100 E. Houston Street
24                          Marshall, Texas 75670

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)
```

```
 1   FOR THE PLAINTIFF:        Mr. Martin J. Black
                               Mr. Kevin M. Flannery
 2                             DECHERT LLP
                               Cira Centre
 3                             2929 Arch Street
                               Philadelphia, Pennsylvania 19104
 4
                               Mr. Joseph M. Abraham
 5                             Mr. Timothy F. Dewberry
                               Mr. Joshua J. Yi
 6                             Mr. Jacob R. Porter
                               DECHERT LLP
 7                             300 West Sixth Street
                               Suite 2010
 8                             Austin, Texas 78701

 9                             Ms. Nisha N. Patel
                               Mr. Ryan T. Banks
10                             DECHERT LLP
                               2440 W. El Camino Real
11                             Suite 700
                               Mountain View, California 94040
12

13   FOR THE DEFENDANTS:       Mr. Douglas M. Kubehl
                               Mr. Jonathan B. Rubenstein
14                             Mr. Jeffery S. Becker
                               BAKER BOTTS LLP
15                             2001 Ross Avenue
                               Dallas, Texas 75201
16
                               Ms. Melissa R. Smith
17                             GILLAM & SMITH LLP
                               303 South Washington Avenue
18                             Marshall, Texas 75670

19                             Mr. Asim M. Bhansali
                               KWUN BHANSALI LAZARUS LLP
20                             555 Montgomery Street
                               Suite 750
21                             San Francisco, California 94111

22

23

24

25
```

```
 1                   P R O C E E D I N G S
 2           (Jury out.)
 3           COURT SECURITY OFFICER:  All rise.
 4           THE COURT:  Be seated, please.
 5           All right.  Are the parties ready to read into the
 6  record from the podium those items from the list of
 7  pre-admitted exhibits used during yesterday's portion of
 8  the trial?
 9           MS. HENRY:  We are, Your Honor.
10           THE COURT:  All right.  Please proceed.
11           MS. HENRY:  Good morning.  Plaintiff reads into
12  the record PTX-1, PTX-2, PTX-3, PTX-260, PTX-261, PTX-262,
13  and PTX-328.
14           THE COURT:  All right.  Any objections from
15  Defendants, Ms. Smith?
16           MS. SMITH:  No, Your Honor.
17           THE COURT:  Do Defendants have a similar
18  rendition?
19           MS. SMITH:  We do, Your Honor.
20           THE COURT:  Please proceed.
21           MS. SMITH:  DX-129, DX-1, and DX-55.
22           THE COURT:  All right.  Any objection, Ms. Henry?
23           MS. HENRY:  No, Your Honor.
24           THE COURT:  All right.  Thank you, counsel.
25           And we recessed yesterday with Plaintiffs having
```

```
 1   passed the witness, Mr. Paschke.
 2          Are Defendants prepared to begin
 3   cross-examination?
 4          MS. SMITH:  Yes, Your Honor.
 5          THE COURT:  All right.  Mr. Paschke, you need to
 6   return to the witness stand, please.  And I remind you,
 7   sir, you remain under oath.
 8          THE WITNESS:  Yes, Your Honor.
 9          THE COURT:  Once he's in place, Mr. Johnston,
10   please bring in the jury.
11          MS. SMITH:  Your Honor, may I approach to pass up
12   some binders?
13          THE COURT:  Yes, you may.  You may.
14          Ms. Smith, is this binder for the witness's
15   benefit?
16          MS. SMITH:  Yes, it is.
17          THE COURT:  All right.
18          MS. SMITH:  I was missing a marshal over there,
19   but --
20          THE COURT:  As soon as he's back, why don't you
21   ask, and then you can hand it to him, and he'll give it to
22   the witness.
23          MS. SMITH:  I will, Your Honor.
24          COURT SECURITY OFFICER:  All rise.
25          (Jury in.)
```

```
 1              THE COURT:  Good morning, ladies and gentlemen of
 2   the jury.  Welcome back.  Please have a seat.
 3              You'll recall when we recessed for the day
 4   yesterday, Mr. John Paschke was on the witness stand.
 5              He had been examined by the Plaintiffs.  They had
 6   passed the witness, and we'll begin with cross-examination
 7   of the witness by the Defendants.
 8              Ms. Smith, you may proceed.
 9              MS. SMITH:  Your Honor, may I approach to provide
10   the witness a notebook?
11              THE COURT:  You may.
12              MS. SMITH:  Thank you.
13        JOHN PASCHKE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
14                       CROSS-EXAMINATION
15   BY MS. SMITH:
16   Q.  Good morning, sir.
17   A.  Good morning.
18   Q.  I don't think we've met before.  My name is Melissa
19   Smith, and I represent T-MO and Ericsson.
20              Now, you went to law school, sir?
21   A.  I did.
22   Q.  And you went to engineering school.
23   A.  I did.
24   Q.  But today your role is to be the spokesperson for IV,
25   and the only IV employee that will testify live here at
```

1  trial; is that correct?

2  A.  That's correct.

3  Q.  Now, Mr. Paschke, you spent a fair amount of time

4  yesterday talking about how -- how you've been successful,

5  and IV has been successful flying around the world

6  licensing for Intellectual Ventures; is that correct?

7  A.  I recall the testimony.

8  Q.  And you said, when you're out trying to license IV

9  patents and someone is unwilling to take a license, that

10  litigation is the only option you have.

11        Do you recall that testimony?

12  A.  I believe I said it's often the only option, but yes.

13  Q.  I apologize.  Often the only option you have.

14        Now, did IV ever offer a license to the patents in

15  this case to Ericsson before filing a lawsuit?

16  A.  No.

17  Q.  You also mentioned the 1.5 billion, give or take, I

18  think you said, dollars that IV's brought in through its

19  licensing program.

20  A.  No, ma'am.

21  Q.  What was the 1.5 billion that you mentioned?

22  A.  That was what I have licensed personally in my career.

23  Q.  And you told the jury that $77 million is a reasonable

24  number for the jury to award in this case; is that correct?

25  A.  Yes, I believe it is.

1  Q.  But you understand the jury may never get that far,

2  sir.

3  A.  Well, that's correct.

4  Q.  You understand -- you have a law degree.

5  A.  I do.

6  Q.  And you heard -- you were in the courtroom when Judge

7  Gilstrap gave the jurors some instructions, were you not?

8  A.  Yes, I was.

9  Q.  So you understand from Judge Gilstrap's instructions

10 that the first question the jury is going to be asked when

11 Judge Gilstrap sends them back there to deliberate is

12 whether or not the Defendants have infringed the T-MO --

13 the Malibu patents.  Excuse me.

14 A.  Yes, ma'am.

15 Q.  Okay.  But you're not here to testify about whether

16 Ericsson or T-MO infringed the three patents being asserted

17 here, are you?

18 A.  Not me personally, no.

19 Q.  Because you have no understanding at any level how the

20 items in T-MO's network are accused to infringe the

21 patents, do you?

22 A.  That is correct.  The information was confidential, and

23 I was not able to.

24 Q.  And, in fact, no employee of IV is going to come in

25 here live and testify at any level as to how T-MO and

1   Ericsson infringe any of the patents, correct?

2   A.  No, ma'am.  We have technical experts that will be

3   testifying as to that infringement issue.

4   Q.  And nobody from Malibu is going to come in here and

5   talk about whether or not Ericsson or T-MO infringed the

6   Malibu patents; is that correct?

7   A.  Yes, that's correct.

8   Q.  And we certainly didn't hear anything yesterday from

9   IV's paid fact witness, Mr. Jorgensen about infringement,

10  did we?

11  A.  Not the legal question of infringement, no.

12  Q.  Well, Mr. Jorgensen's evidence that he provided --

13          THE COURT:  Dr. Jorgensen.

14          MS. SMITH:  I apologize, Your Honor.

15  Dr. Jorgensen.

16  Q.  (By Ms. Smith)  Dr. Jorgensen provided evidence about

17  the titles of each of the three patents, did he not?

18  A.  He did.

19  Q.  And it's Plaintiff's burden to prove that Defendants

20  practice each step of the claims in the patents; is that

21  correct?

22  A.  Yes, that is our burden to prove.

23  Q.  And you heard -- you were here, and you were present

24  for Mr. Ward's opening.

25  A.  Yes, ma'am.

1    Q.  And Mr. Ward didn't even put up the claims, did he?

2    A.  No, ma'am, not in opening.

3    Q.  And IV has a paid expert witness that's going to do

4    that as well, correct?

5    A.  That is correct.

6    Q.  Now, sir, you mentioned that Samsung -- Samsung makes

7    base stations.

8    A.  Yes, ma'am.

9    Q.  And Nokia makes base stations.

10   A.  Yes.

11   Q.  And those folks are licensed.

12   A.  They are.

13   Q.  Okay.  You're not telling this jury that Ericsson base

14   stations work like all other base stations, are you?

15   A.  No, ma'am, I'm not.

16   Q.  Because base stations aren't one size fits all, are

17   they?

18   A.  No, ma'am, they're not.

19   Q.  Okay.  And you have an engineering degree, correct?

20   A.  I do.

21   Q.  But the closest you've ever come to looking at what's

22   -- opening up the hood and looking up under the hood and

23   seeing the component parts of a base station was when

24   Mr. Kubehl set one up on the table there the other day;

25   isn't that right?

1  A.  Probably, with respect to actual base stations, yes.

2  Q.  You understand the second question that Judge Gilstrap

3  is going to ask the jury has got to do with whether or not

4  the Malibu patents are even valid; is that correct?

5  A.  Yes, ma'am.

6  Q.  Okay.  You're not here to provide any testimony to this

7  jury about whether or not the patents are valid, are you?

8  A.  I am not personally, no.

9  Q.  And your job, your analysis of the validity is you

10  license as much as you can until somebody tells you that

11  the patents are invalid and can't be license -- licensed

12  anymore; is that correct?

13  A.  No, ma'am.  Our analysis of validity for these patents

14  is based both on the Patent Office issuing these patents,

15  as well as the expert testimony that our expert will

16  provide today with respect to the validity question.

17  Q.  And you mentioned your expert.  Again, you're the only

18  witness -- live witness for IV in this entire five-day

19  trial; is that correct?

20  A.  When you say IV, I'm the only full-time employee of IV.

21       The expert that is working with us will be

22  testifying on our behalf.

23  Q.  You're the only full-time employee of IV.

24  A.  Yes, that's correct.

25  Q.  And no other IV employee will be here to testify as to

1  the validity of the Malibu patents, correct?

2  A.  That is correct.

3  Q.  IV hired an expert for that?

4  A.  Yes, ma'am, we did.

5  Q.  As to the purchase of the Malibu portfolio, you didn't

6  even have a hand in that, did you?

7  A.  Me personally?  No.  That happened, I think, seven

8  years before I joined the company.

9  Q.  And that's -- and that's also because acquiring patents

10 is not among your primary responsibilities.

11 A.  That is correct.

12 Q.  And the Malibu deal was hired by Mr. Detkin, correct,

13 seven years before you joined the company?

14 A.  I believe that's correct.  Mr. Detkin at least was

15 certainly involved in the Malibu purchase.

16 Q.  And he would certainly know more than you would about

17 the Malibu purchase, correct?

18 A.  I would believe he would, yes.

19 Q.  But Mr. Detkin isn't coming to visit with these jurors

20 at trial, is he?

21 A.  No.

22 Q.  Now, just to clarify, the company that's the Plaintiff

23 in this lawsuit is Intellectual Ventures I LLC, right?

24 A.  That is correct.

25 Q.  And that's a business under what's called -- I think

1    you said the Invention Investment Fund, that umbrella; is

2    that correct?

3    A.   That' correct.   Technically, it's Invention Investment

4    Fund I.

5    Q.   And that Invention Investment Fund allows IV, the

6    Plaintiff in this case, to invest in patents?

7    A.   Yes, ma'am.

8    Q.   And to monetize patents?

9    A.   Yes, ma'am.

10   Q.   And that's the primary business model of IV I or the

11   Plaintiff in this case?

12   A.   Yes, ma'am.

13   Q.   Now, you understand that -- as a lawyer, you understand

14   that a complaint in a case includes Plaintiff's allegations

15   against a Defendant, like T-MO and Ericsson?

16   A.   Yes, I do.

17   Q.   Have you had an opportunity to look at the complaint in

18   this case?

19   A.   I have.

20   Q.   Sir, I'll direct your attention to Defendants'

21   Exhibit 560, please.

22        MS. SMITH:   If I could see Paragraph 20.   Thank

23   you.

24   Q.   (By Ms. Smith)   Now, we're looking at the complaint,

25   and if you'll read with me, it says -- let's see where I

1    am.  Intellectual -- Intellectual Ventures develops its own

2    inventions, has a staff of scientists and engineers who

3    develop ideas in a broad range of fields.  We see

4    agriculture, life sciences, medical devices.  Do you see

5    that, sir?

6    A.  Yes, ma'am I do.

7    Q.  But the Plaintiff in this case, it doesn't have a staff

8    of scientists, does it, sir?

9    A.  No, ma'am.  But this is referring to -- if you look

10   back to Paragraph 18, Intellectual Ventures Management,

11   which is the overarching management company that provides

12   management services to all of the IV companies, including

13   the development companies and the philanthropic global good

14   companies.

15          MS. SMITH:  I'll object, nonresponsive, Your

16   Honor.

17          THE COURT:  Sustained after "no, ma'am."  That

18   part is responsive.  The rest is nonresponsive.

19          MS. SMITH:  Thank you, Your Honor.

20          THE COURT:  I'll strike the portion of the answer

21   after "no, ma'am."

22          Let's continue.

23   Q.  (By Ms. Smith)  And the Plaintiff in this case, not

24   some other Intellectual Ventures company, the Plaintiff in

25   this case, they don't have a bunch of engineers developing

1  things, do they?

2  A.  That is correct.

3  Q.  And the Plaintiff -- excuse me, sir.

4  A.  Excuse me.  With respect to developing new inventions,

5  that's correct.  The engineers identify inventions.

6  Q.  Now, the Plaintiff in this case doesn't sell

7  telecommunications products, does it?

8  A.  No.  No, we do not.

9  Q.  In fact, the Plaintiff in this case doesn't make any

10  products, does it?

11  A.  No, not -- not the specific Plaintiff in this case.

12  Q.  And these engineers and these scientists that you talk

13  about in the complaint against T-MO and Ericsson in this

14  case, they're completely irrelevant to the facts in this

15  case, aren't they?

16  A.  They -- they are not involved with Malibu Networks.

17  They are not involved with the patents in this case, that

18  is correct.

19  Q.  And the Plaintiff in this case, not these engineers and

20  scientists, would stand to profit from the $77 million,

21  wouldn't it?

22  A.  Yes, that is correct.  More specifically -- excuse

23  me -- the investors and the Plaintiff, but correct.

24  Q.  All right, sir.  You've heard of standing -- standard

25  setting organizations, have you not?

 1  A.  Yes, ma'am, I have.

 2  Q.  For example, LTE is a technical standard?

 3  A.  Yes.

 4  Q.  And there's actually an organization that was dedicated

 5  to industry collaboration, if you will, in order to develop

 6  the technology that ultimately becomes part of the LTE

 7  standard?

 8  A.  Yes, ma'am, that's correct.

 9  Q.  And the Plaintiff didn't participate in the development

10  of the LTE -- LTE standard, did it?

11  A.  No, ma'am, we did not.

12  Q.  Plaintiff didn't contribute any manpower to helping out

13  with that standard?

14  A.  No, ma'am, we did not.

15  Q.  And the Plaintiff didn't contribute any of its

16  expertise from any of its -- or IV, excuse me, IV didn't

17  contribute to the standard, did it?

18  A.  No, ma'am, we did not.

19  Q.  All those engineers and scientists didn't contribute

20  any expertise to the standard?

21  A.  Not while at IV, no.

22  Q.  Who's the largest contributor to the LTE standard?

23  A.  It varies.  There are certainly a number of significant

24  contributors.  To say the largest, don't know.  It really

25  kind of depends on how you quantify largest.

1   Q.  Would it surprise you to learn that it's Ericsson?

2   A.  No.  Ericsson is certainly a great contributor to the

3   LTE standards.

4   Q.  When you say Ericsson is a great contributor to this

5   standard, did you know that Ericsson's actually been

6   awarded 400 U.S. patents that are actually standard

7   essential?

8   A.  I don't know the number.

9               MR. BLACK:  Objection.  May I approach?

10              THE COURT:  Approach the bench.

11              (Bench conference.)

12              THE COURT:  All right.

13              MR. BLACK:  So --

14              THE COURT:  Just a moment.

15              MR. BLACK:  -- saying --

16              THE COURT:  Just a moment.  I'll tell you when.

17  All right.  Go ahead.

18              MR. BLACK:  So saying the patents are standard

19  essential is a problem because she's just said they have

20  400 patents that cover the LTE standard.

21              The only way to establish that would be to get

22  somebody up and do an infringement analysis to say so.  And

23  that's unfair to us.

24              We've got to go through excruciating detail of

25  infringement, and they want to argue that they have 400

```
 1  standard essential patents, and that, therefore, our
 2  patents can't be worth very much.
 3          But the reality is that many patents that people
 4  claim are standard essential are not essential.  We all
 5  know that.  So it is -- it's improper to suggest or state
 6  because they can't prove Ericsson actually has patents that
 7  are essential to the standard, and it's highly prejudicial
 8  to us.
 9          THE COURT:  What's your response, Ms. Smith?
10          MS. SMITH:  I don't even understand the objection,
11  Your Honor.  The question is would it surprise you to know
12  that Ericsson has 400 standard essential patents?  They
13  have all kinds patents in the telecom industry --
14          THE COURT:  Let me check the record.  Just a
15  minute.
16          MS. SMITH:  And, Your Honor, for what it's worth,
17  that's my last question on this model on that point.
18          THE COURT:  Well, I'm going to sustain the
19  objection.  I want you, Ms. Smith, to ask the same question
20  again without preference to standards essential.
21          MS. SMITH:  Okay.
22          THE COURT:  I'm going to sustain the objection.
23          MS. SMITH:  Understood, Your Honor.
24          THE COURT:  Then we'll move on.
25          (Bench conference concluded.)
```

```
 1              THE COURT:  All right.  I'm going to sustain that
 2    objection.  The jury should disregard the last question and
 3    answer.
 4              Ms. Smith, please restate that question.
 5              MS. SMITH:  Thank you, Your Honor.
 6    Q.  (By Ms. Smith)  Sir, did you know that Ericsson has
 7    been awarded 400 U.S. patents?
 8    A.  I would assume they've been awarded a lot more than 400
 9    U.S. patents, quite honestly.
10    Q.  Thank you, sir.
11              Sir, the Plaintiff is an entity that -- that holds
12    patents that the Intellectual Ventures Management owns; is
13    that correct?
14    A.  Not technically.  Intellectual Ventures Management
15    is -- the overarching management company manages the
16    different companies.  The companies themselves own the
17    patents.  So Invention Investment Fund I technically is the
18    entity that owns the patents.  Intellectual Ventures
19    Management provides management services.
20              MS. SMITH:  May I see Defendants' Exhibit 558?
21    I'm looking for the org chart, sir.  537, I apologize.
22    Q.  (By Ms. Smith)  All right.  Sir, if you will -- I'll
23    direct your attention to the bottom left-hand corner where
24    it says Intellectual Ventures I LLC.  You see that?
25    A.  Yes, ma'am, I do.
```

1    Q.  It's the Plaintiff in this case?

2    A.  Yes, ma'am.

3    Q.  Will you read what it says underneath that?

4    A.  It says:  Patent holding company.

5    Q.  All right.  So the Plaintiff is an entity that holds

6    patents that IV owns, right?

7    A.  Yes, ma'am.

8    Q.  Thank you.

9            And when it comes time for IV to have to sue

10   someone on a patent, the Plaintiff in this case is the

11   entity that does the suing, right?

12   A.  Yes, ma'am, that is correct.

13   Q.  And you said earlier that IV has investors?

14   A.  Yes.

15   Q.  And that Plaintiff is one of the entities in which IV's

16   investors invest?

17   A.  Yes, through its -- through Investment Invention Fund

18   I.

19   Q.  And the goal here, the overall goal here is to buy low

20   and sell high; is that correct?

21   A.  Yes, ma'am, that's correct.

22   Q.  Now, all of the patents that are owned by Plaintiff,

23   they're purchased from other people or entities, correct?

24   A.  Yes.

25   Q.  And IV actually represents --

```
1              MS. SMITH:  You can take that down, sir.  Thank
2   you.
3   Q.  (By Ms. Smith)  IV actually represents that -- and I
4   believe this is a quote, I'll tell you, from your website.
5   Are you familiar with your website, your IV website?
6   A.  Generally, yes.
7   Q.  All right.  IV represents that its success in licensing
8   comes from a commitment to only working with the best, the
9   top -- top inventors from around the globe.
10             Does that ring a bell?
11  A.  I haven't seen that particular quote, but that sounds
12  consistent with what we like to do.
13  Q.  But IV actually buys patents from auctions, doesn't it.
14  A.  Absolutely.
15  Q.  And IV buys patents from bankruptcies?
16  A.  Yes, ma'am.
17  Q.  That's one way to try to buy low and try to sell high,
18  isn't it?
19  A.  Yes.  It's a source of patents.
20  Q.  And we learned from Mr. Jorgensen yesterday that's
21  exactly how IV came to buy the Malibu patents, isn't it?
22  A.  Yes, ma'am, that's correct.
23  Q.  And IV even buys patents on eBay, doesn't it?
24  A.  We buy patents where -- if they're -- if we think
25  they're good patents, wherever and however we can possibly
```

1  find them.

2  Q.  And the purpose of those -- buying those patents is

3  making a profit; is that correct?

4  A.  Yes, ma'am, that's correct.

5  Q.  Okay.  Now, you told us earlier that IV has bought tens

6  of thousands of patents.

7  A.  Yes, ma'am, that's correct.

8  Q.  And you understand that Ericsson has been awarded

9  45,000 patents.

10  A.  I don't know the exact number, but that number does not

11  surprise me in the least.

12  Q.  Does it surprise you that substantially all of those

13  patents are what I would call homegrown?

14        Ericsson didn't buy them, but instead the folks at

15  Ericsson were awarded those patents for their own

16  inventions.

17  A.  No, ma'am.  I would expect that's where they came from.

18  Q.  Now, when IV goes to license its patents, it does so

19  for its entirely -- entire portfolio of patents held in one

20  fund or another.

21  A.  Sometimes.  We are flexible, and we will license -- set

22  the scope of the license to whatever the -- frankly, the

23  request is of the company taking the license.

24  Q.  Well, as an example, IV doesn't have any licenses to

25  just the three patents in this case, does it?

1   A.  Not to just the three patents in this case.

2   Q.  And IV doesn't actually have any licenses to just the

3   patents it bought from Malibu, does it?

4   A.  No, ma'am.

5   Q.  Prior to this case, IV -- IV has never even discussed

6   the benefits of these patents in the case with any of its

7   potential licensees or licensees.

8   A.  That is correct.

9           MS. SMITH:  Now, Your Honor, I believe I need to

10  seal the courtroom at this time.

11          THE COURT:  All right.  Based on counsel's

12  request, I'll order the courtroom sealed.  Those present

13  who are not subject to the protective order that's been

14  entered in this case should excuse themselves until such

15  time as the courtroom is unsealed and the public is invited

16  to return.

17          MR. BLACK:  Your Honor, may the IV folks who are

18  here remain?

19          MS. SMITH:  Yes.  It's IV confidential information

20  I'm about to discuss, Your Honor.

21          THE COURT:  Then they'll be outside of this

22  ruling.

23          MR. BLACK:  Thank you.

24          (Courtroom sealed.)

25          (Sealed Portion No. 2 saved in separate sealed

1  transcript.)

2          (Courtroom unsealed.)

3          THE COURT:  All right.  Plaintiffs, call your next

4  witness.

5          MS. HENRY:  Your Honor, at this time, Plaintiff

6  will read into the record certain stipulations and

7  uncontested facts agreed to by the parties before we call

8  our next deposition witness if that's acceptable.

9          THE COURT:  That's agreeable to both sides?

10         MR. KUBEHL:  Yes, Your Honor.

11         THE COURT:  All right.  Proceed, Ms. Henry.

12         MS. HENRY:  Thank you, Your Honor.

13         The stipulations and uncontested facts of the

14  parties are that IV filed its complaint against Defendants

15  on August 9th, 2017.

16         The application leading to issuance of the '629

17  patent was filed on July 9th, 1999.

18         The application leading to issuance of the '517

19  patent was filed on August 10th, 2006.

20         For purposes of this case, the '629 patent is

21  entitled to a priority date of July 9th, 1999.

22         For purposes of this case, the '517 patent is

23  entitled to a priority date of July 9th, 1999.

24         The patents-in-suit expire on July 9th, 2019.

25         The named inventor of each of the patents-in-suit

 1   is Jacob W. Jorgensen.

 2          IV currently holds all rights, title, and interest

 3   to each of the patents-in-suit and has standing to bring

 4   this lawsuit.

 5          IV possesses all rights of recovery under each of

 6   the patents-in-suit.

 7          And the date of the hypothetical negotiation in

 8   this case is February 2013.

 9          That concludes the stipulations, Your Honor.

10          I'm ready to call IV's next witness by deposition

11   if that's acceptable.

12          THE COURT:  Proceed to call your next witness by

13   deposition.

14          MS. HENRY:  Thank you.  IV calls by deposition

15   Mr. Ramesh Josyula.  Included in this deposition excerpt,

16   there's a reference to Josyula Deposition Exhibit No. 5.

17   That's PTX-1087.

18          THE COURT:  All right.  Proceed with the witness

19   by deposition.

20          MS. HENRY:  Thank you, Your Honor.

21          (Videoclip played.)

22          QUESTION:  Good morning.

23          ANSWER:  Good morning.

24          QUESTION:  Can you for the record please state

25   your full name?

1          ANSWER:  Ramesh Josyula.

2          QUESTION:  And where do you currently work?

3          ANSWER:  I work at T-Mobile USA.

4          QUESTION:  And what is your position at T-Mobile?

5          ANSWER:  Senior manager system design

6     architecture.

7          QUESTION:  Did shifting voice traffic from 3G to

8     VoLTE enable T-Mobile to redeploy spectrum resources?

9          ANSWER:  Yes.  It's important, as you -- as you

10    bring all the services to LTE, and also it's a long-term

11    strategy is to refarm the spectrum that's available on UMTS

12    as we get more free space to LTE and employed also for

13    voice.

14         QUESTION:  Do you know what the document is?

15         ANSWER:  This is one of the appendices for part of

16    the Ericsson RAN contract, I -- I think, so...

17         QUESTION:  Do you know what the purpose of this

18    document is?

19         ANSWER:  My understanding of the purpose of the

20    document is that when -- when T-Mobile and Ericsson in this

21    case, I believe, right, so when they go through contract

22    negotiations as a part of the high-level element there is

23    going to be a bunch of FNBCs which we'll prepare.

24         And I believe this is going to be -- this is one

25    of the appendices related to the RAN features that Ericsson

1    is to be providing as a part of their roadmap.

2         QUESTION:  Could you please turn to Page 4 of this

3    document, Section 1.3?

4         ANSWER:  Yes.

5         QUESTION:  If you could take a moment and just

6    read that section for me.

7         ANSWER:  Yeah, I read Section 1.3.

8         QUESTION:  Thank you.  And is it your

9    understanding that Ericsson committed to provide to

10   T-Mobile base stations with software that complied with

11   3GPP Release 9?

12        ANSWER:  Yes.  Ericsson -- Ericsson has an online

13   portal, as well, which is called by their customer

14   documentation portal.

15        The customer documentation portal also states what

16   release at the high level complies to what 3GPP

17   specifications.

18        So, for example, Release XYZ is compliant to 3GPP

19   Release ABCD.  It's -- it's at that high level we get an

20   understanding of the Ericsson software release compliances

21   to 3GPP.

22        QUESTION:  So T-Mobile expects that whatever

23   standard compliance is noted in the customer documentation

24   is, in fact, what Ericsson is providing in their base

25   stations?

1          ANSWER:  That's correct.

2          QUESTION:  So we discussed earlier this customer

3    documentation portal; is that right?

4          ANSWER:  That's correct.

5          QUESTION:  Is that provided by Ericsson?

6          ANSWER:  That's correct.

7          QUESTION:  So Ericsson maintains the portal?

8          ANSWER:  That's right.  Ericsson maintains the

9    portal, and the T-Mobile employees who need to have access

10   to the documentation can go to the online portal and then

11   get the related release information.

12         QUESTION:  Does the portal have various different

13   documents?

14         ANSWER:  Yes.  Portal has various different

15   documents.

16         QUESTION:  And, in general, what are the types of

17   documents that you find in the portal?

18         ANSWER:  You'll find the technical information

19   about the products which we use in our network, and you

20   find there's some operating documentation and some

21   alarm-related information, performance -- performance

22   counter-related information, and so on.

23         QUESTION:  Does Ericsson provide a recommended

24   value for every parameter?

25         ANSWER:  Yes.  That's my understanding, yes.

1   Ericsson does provide a recommended parameter value for

2   every parameter.

3           QUESTION:  And, generally speaking, how often does

4   T-Mobile take Ericsson's recommendation for a parameter

5   value?

6           ANSWER:  If you see the recommended parameter set,

7   it's hundreds and thousands of parameters which you can

8   configure and tweak, so, right.

9           And there's a lot of parameters which we go with

10  the default.  There's very -- very few parameters which we

11  are to change for obvious reasons.  For example, cell ID.

12  Cell ID is unique for each base station in the network, so

13  we have to change it.

14          QUESTION:  So the manager object model is

15  maintained by Ericsson; is that right?

16          ANSWER:  That's right.

17          QUESTION:  Does T-Mobile make any modifications to

18  the manager object model?

19          ANSWER:  It's a part and parcel of the software.

20  Since we do not modify software, we cannot change it.

21          QUESTION:  Does T-Mobile work with its eNodeB

22  vendors during the testing of the software?

23          ANSWER:  It's a case-by-case basis, actually.  In

24  some cases, yes, T-Mobile do look into some of the testing

25  aspects, actually, when we test in T-Mobile lab.

1          QUESTION:  Does T-Mobile ever conduct testing on

2    behalf of an eNodeB vendor at an eNodeB vendor's request,

3    for example?

4          ANSWER:  The majority of the cases -- in most of

5    the cases in the T-Mobile lab, we do have the expert --

6    experts from the vendor, okay?

7          So since the vendors have a better knowledge of

8    how to operate the product, so we take vendor's help to

9    validate the product in the lab.

10          QUESTION:  Does T-Mobile test its eNodeB's

11    compatibility with handsets that are connected to

12    T-Mobile's network?

13          ANSWER:  I'm not a -- like I said previously, I'm

14    more expert on -- I manage -- I manage more on the radio

15    access network, so...

16          QUESTION:  Is it T-Mobile's expectation that

17    handsets that communicate with T-Mobile's network are

18    3GPP-compliant?

19          ANSWER:  Yes.  But, again -- yes.

20          QUESTION:  Does T-Mobile's network deploy various

21    QCI values?

22          ANSWER:  Yes.

23          QUESTION:  And those QCI values are associated

24    with different types of services?

25          ANSWER:  Yes.  You can see -- you can see them in

```
 1   the parameter dictionary, understanding like, there's a
 2   different type of service -- different types of QCI values
 3   mapped to different types of services.
 4            (Videoclip ends.)
 5            THE COURT:  That completes this witness by
 6   deposition?
 7            MS. HENRY:  Yes, Your Honor.  And I failed to
 8   mention earlier that Mr. Josyula is a principal engineer at
 9   T-Mobile USA, Inc.
10            THE COURT:  Call your next witness.
11            MS. HENRY:  Thank you, Your Honor.  Plaintiff now
12   calls by designation, Dr. -- Mr. Hussein Helmy who is also
13   a principal engineer at T-Mobile USA, Inc.
14            The Helmy deposition Exhibit 11 is PTX-1376.
15   Helmy Deposition 13, which is also referred to as
16   Exhibit 12, is PTX-1377.
17            THE COURT:  Proceed.
18            (Videoclip played.)
19            QUESTION:  So to start off with, if we could get
20   your full name for the record, if you don't mind.
21            ANSWER:  Sure.  My full name is Hussein Helmy.
22            QUESTION:  And is that your current title,
23   principal engineer?
24            ANSWER:  Correct.
25            QUESTION:  What division of T-Mobile do you work
```

1  in?

2          ANSWER:  I work in the radio.

3          QUESTION:  That's the name of the division is

4  radio?

5          ANSWER:  So it is the design department looking

6  after radio.

7          QUESTION:  Does T-Mobile use QCI-6 for T-Mobile

8  user traffic and enterprise user traffic?

9          ANSWER:  Yes, it does.

10         QUESTION:  Does T-Mobile use QCI-7 for MetroPCS

11 users and MVNO users?

12         ANSWER:  Yes, it does.

13         QUESTION:  Does T-Mobile use QCI-8 for inbound

14 roamers?

15         ANSWER:  No.

16         QUESTION:  And what QCI value does T-Mobile use

17 for inbound roamers?

18         ANSWER:  QCI-7.

19         QUESTION:  Does T-Mobile use QCI-9 for network

20 extreme users?

21         ANSWER:  Yes.

22         QUESTION:  What does T-Mobile use QCI-8 for?

23         ANSWER:  Nothing.

24         QUESTION:  Are the network extreme users also

25 known as, quote, heavy users?

1          ANSWER:  Yes, that's another term you can refer to

2    them as.

3          QUESTION:  Would a heavy user be a user that

4    exceeds their data plan limit?

5          ANSWER:  That's one way of referring to them.

6          QUESTION:  Would a heavy user be a user that

7    exceeds 50 gigabytes of data in a given month?

8          ANSWER:  Yes, but not exclusive to that.

9    Depending on their plan.

10          QUESTION:  Let's move on.  Cell G2, Priority.

11          Are you familiar with this parameter?

12          ANSWER:  Yes.

13          QUESTION:  What does it refer to?

14          ANSWER:  Priority of the given application or

15    service.

16          QUESTION:  And what is your understanding of what

17    priority is?

18          ANSWER:  So the priority in surveying a specific

19    application over the other.

20          QUESTION:  And is this parameter currently

21    implemented?

22          ANSWER:  Yes.

23          QUESTION:  And has it been implemented since the

24    launch of LTE?

25          ANSWER:  Yes.

```
1              QUESTION:  And are the values as listed the

2    current values?

3              ANSWER:  Yes.

4              QUESTION:  Exhibit 12, I believe -- and this was

5    Bates No. TMO-CV577-00021082.  And we were on Tab QOS.  If

6    you can go back there.

7              And the next cell that I'd like you to look at is

8    Cell M2, Parameter Scheduling Algorithm.

9              ANSWER:  Yes.

10             QUESTION:  Are you familiar with this parameter?

11             ANSWER:  Yes.

12             QUESTION:  And what does it do?

13             ANSWER:  We're specifying this column will be the

14   scheduling algorithm that we would like to engage per QCI.

15             QUESTION:  You're specifying the scheduling

16   algorithm.  Can you explain what that means by specifying

17   scheduling algorithm?

18             ANSWER:  As we went over yesterday, Ericsson

19   offers in their portfolio of products a number of

20   scheduling algorithms, and we choose which scheduling

21   algorithm to engage per QCI.

22             QUESTION:  And is this parameter currently

23   implemented on T-Mobile's Ericsson LTE eNodeBs?

24             ANSWER:  Yes, it is.

25             QUESTION:  And do you know when it was first
```

 1   implemented?

 2          ANSWER:  It was first implemented since the

 3   inception of LTE and T-Mobile.

 4          QUESTION:  And is it currently implemented on all

 5   of T-Mobile's Ericsson LTE eNodeBs?

 6          ANSWER:  Yes, it is.

 7          QUESTION:  And has it been implemented on all of

 8   T-Mobile's Ericsson L -- LTE eNodeBs since it was first

 9   implemented?

10          ANSWER:  Yes.

11          QUESTION:  And are the values as listed the

12   current values of this parameter?

13          ANSWER:  Yes, they are.

14          (Videoclip ends.)

15          THE COURT:  Does that complete -- complete this

16   witness by deposition?

17          MS. HENRY:  Yes, Your Honor.

18          THE COURT:  Call your next witness.

19          MS. HENRY:  Plaintiff calls by deposition

20   Mr. Saad Naveed Ahmed.  Mr. Ahmed is a system engineer at

21   Ericsson.  Ahmed Deposition Exhibit No. 1 is PTX-1132.

22          THE COURT:  Proceed.

23          (Videoclip played.)

24          QUESTION:  Good morning, Mr. Ahmed.

25          ANSWER:  Good morning.

1          QUESTION:  When did you start working at Ericsson?

2          ANSWER:  I started in November 2011.

3          QUESTION:  And what is your current job title?

4          ANSWER:  I'm a systems engineer, 4G and 5G.

5          QUESTION:  And the current TTI is the next one

6    that is being scheduled?

7          ANSWER:  The current TTI is the TTI that is being

8    scheduled.

9          QUESTION:  Being scheduled.  TTIs before that,

10   then you consider as past TTIs?

11         ANSWER:  I would say so.

12         QUESTION:  Anything following that current TTI,

13   you would then consider a future TTI?

14         ANSWER:  Yeah.

15         QUESTION:  Going back to Exhibit 1, let's just

16   look at that document again.  So for these, the results in

17   Exhibit 1, those are run on an actual eNodeB; is that

18   correct?

19         ANSWER:  That is correct.

20         QUESTION:  And what software release were these --

21   did that -- those eNodeB use?

22         ANSWER:  They were run on 18Q4 software.

23         QUESTION:  And that's the latest release?

24         ANSWER:  That is the latest.

25         QUESTION:  And between 18Q4, going all the way

1    back to, let's say, 13 -- Release 13A -- let me start over.

2             Between 18Q4 and Release -- let's say --

3             ANSWER:  14A.

4             QUESTION: -- 14A, were there any significant

5    differences in the functionality for SABE or DBS?

6             ANSWER:  Not any changes of fundamental nature

7    that change how the delays are calculated or the buffers

8    are estimated.

9             QUESTION:  So you would expect that if you use

10   Release 14A instead of Release 18Q4, you would get very

11   similar results?

12            ANSWER:  Yeah.

13            QUESTION:  So with respect to the uplink

14   scheduler, does the Ericsson uplink scheduler allocate

15   resources in any future TTIs?

16            ANSWER:  No.

17            QUESTION:  Does it allocate resources in any

18   future frames?

19            ANSWER:  No.

20            QUESTION:  What TTI does it allocate for?

21            ANSWER:  It allocates only for the current TTI.

22            (Videoclip ends.)

23            THE COURT:  That complete this is witness by

24   deposition?

25            MS. HENRY:  Yes, Your Honor.

```
 1              THE COURT:  Call your next witness.

 2              MS. HENRY:  And, finally, Your Honor, Plaintiff

 3  calls by deposition Mr. Alexander Langereis.  Mr. Langereis

 4  is a system engineer at Ericsson.  Langereis Deposition

 5  Exhibit No. 7 is PTX-338.

 6              THE COURT:  And this is your last witness by

 7  deposition?

 8              MS. HENRY:  At this time, Your Honor.

 9              THE COURT:  All right.  Let's proceed.

10              (Videoclip played.)

11              QUESTION:  Good morning, Mr. Langereis.

12              ANSWER:  Good morning.

13              QUESTION:  Could you please state your full name

14  for the record?

15              ANSWER:  My full name is Alexander Langereis.

16              QUESTION:  How long have you been at Ericsson?

17              ANSWER:  A little bit more than 18 years.

18              QUESTION:  And what time did you start in LTE?

19              ANSWER:  Approximately 2 -- 2006.

20              QUESTION:  And what kind of work have you done on

21  LTE?

22              ANSWER:  I have been working as a system engineer

23  during all that time until two years ago.

24              I started off developing features.  Usually, I've

25  been working as a team leader for and a feature responsible
```

1  for developing new features.

2          QUESTION:  If you could turn to Exhibit 7,

3  Page 4770.

4          Given your last response, does the -- do the

5  grants shown in this picture represent what would happen in

6  practice?

7          ANSWER:  No.

8          QUESTION:  What would be different?

9          ANSWER:  In reality, it would not be approximately

10  40 milliseconds in between.  Assuming a normal situations

11  where UE is not alone in a cell and is not experiencing

12  perfect radio conditions, this U -- this data of this UE

13  would need to compete with other data and other users.

14          We can in no way guarantee that the -- that the

15  data, which is connected to VoIP, is scheduled every 40

16  milliseconds.

17          QUESTION:  Well, then do you -- are -- now sitting

18  now here, do you -- are -- does the uplink scheduler

19  schedule RL -- RLC SDU's?

20           ANSWER:  Yes, it does.

21          QUESTION:  And are -- are VoIP packets a type of

22  IP packet?

23          ANSWER:  Yes.

24          QUESTION:  And is there a one-to-one

25  correspondence between VoIP packets and RLC SDU's?

```
 1            ANSWER:  Yes.
 2            QUESTION:  Do you know the details of how data
 3    gets packed into an RLC SDU?
 4            ANSWER:  No.
 5            QUESTION:  Do you know whether partial packets may
 6    be packed into an RLC SDU?
 7            ANSWER:  No.
 8            QUESTION:  Do you know whether more than one IP
 9    packet could be included in an RLC SDU?
10            ANSWER:  No.
11            QUESTION:  If you wanted to know those answers,
12    who would you ask?
13            ANSWER:  I would ask Christien Skarby.
14            (Videoclip ends.)
15            THE COURT:  That completes this witness by
16    deposition?
17            MS. HENRY:  Yes, Your Honor.
18            THE COURT:  Counsel, approach the bench, please.
19            (Bench conference.)
20            THE COURT:  Who do you have next, Mr. Black?
21            MR. BLACK:  We have Dr. Williams, our infringement
22    expert.
23            THE COURT:  I assume he's going to take some time?
24            MR. BLACK:  Yes.
25            THE COURT:  All right.  Then we'll use this
```

 1   juncture for a recess.

 2          (Bench conference concluded.)

 3          THE COURT:  Ladies and gentlemen of the jury, this

 4   looks like an appropriate time to take a morning recess.

 5          I'm going to ask you simply to close and leave

 6   your juror notebooks in your chairs.

 7          I'll remind you to follow all my instructions,

 8   including, of course, not to discuss the case among

 9   yourselves.  Take a few minutes, stretch your legs, get a

10   drink of water, and we'll be back in here shortly to

11   continue with the next Plaintiff's witness.

12          The jury is excused for recess.

13          COURT SECURITY OFFICER:  All rise.

14          (Jury out.)

15          THE COURT:  The Court stands in recess.

16          (Recess.)

17          COURT SECURITY OFFICER:  All rise.

18          THE COURT:  Be seated, please.

19          Plaintiffs, are you prepared to call your next

20   witness?

21          MR. BLACK:  Yes, Your Honor.  Dr. Tim Williams.

22          THE COURT:  All right.  You may go to the podium,

23   Mr. Black, assuming you're going to do the direct.

24          And I'll direct the Court Security Officer to

25   bring in the jury, please.

```
 1          MR. BLACK:  Your Honor, I've arranged the first 30
 2   slides or so as non-confidential --
 3          THE COURT:  Let me know.
 4          COURT SECURITY OFFICER:  All rise.
 5          (Jury in.)
 6          THE COURT:  Be seated, please.
 7          Plaintiffs, call your next witness.
 8          MR. BLACK:  Plaintiff calls Dr. Tim Williams.
 9          THE COURT:  If you'll come forward, Dr. Williams,
10   and be sworn.
11          (Witness sworn.)
12          THE COURT:  Please come around, have a seat on the
13   witness stand.
14          All right.  Mr. Black, you may proceed.
15          MR. BLACK:  Thank you, Your Honor.
16       TIM WILLIAMS, PH.D., PLAINTIFFS' WITNESS, SWORN
17                    DIRECT EXAMINATION
18   BY MR. BLACK:
19   Q.  Good morning, Dr. Williams.
20   A.  Good morning.
21   Q.  Would you tell the jury what you are here to testify
22   about today?
23   A.  My name is Tim Williams.  I'm here to provide an expert
24   opinion regarding the infringement of the patents-in-suit
25   by the asserted -- for the asserted patents-in-suit against
```

1  the -- the services and technology of Ericsson and

2  T-Mobile.

3  Q.  Could you give us a little background about your

4  education and experience?

5  A.  I grew up in a small town in Michigan and went to

6  undergraduate school for electrical engineering in

7  Houghton, Michigan, which is six hours north of Green Bay,

8  Wisconsin.  Came down after that to Chicago to work for

9  Motorola, building wireless systems, wireless digital data

10  systems.  And then in 1979, I moved to Austin with

11  Motorola, still designing communication systems.  And while

12  in Austin, I did my Master's and Ph.D. in electrical

13  engineering.

14  Q.  And where did you get your Ph.D. in electrical

15  engineering?

16  A.  At UT Austin.

17  Q.  Do you hold any patents?

18  A.  Yes, I have 26 issued U.S. patents, all in the field of

19  communications.

20  Q.  And you mentioned Motorola.  Could you give us a little

21  more detail about your experience in the industry?

22  A.  Yes.  I started working at Motorola building two-way

23  radios -- encrypted two-way radios for police and fire

24  departments and military.  And then moved to Austin and

25  started designing chipsets for cellular communications.

```
 1            So I believe you've seen first generation, second
 2   generation, third generation chart before in this trial.
 3   I built the chipsets for first and second generation
 4   cellular systems while at Motorola.
 5   Q.  Let's talk about the basics of telecommunications
 6   networks.
 7            All right.  What do we see on Slide 5?
 8   A.  On this slide, you see how a cellular network works.
 9   So a cellular network divides a geographical area up into
10   cells.
11            So a city the size of Marshall might have 10
12   cells.  And those cells each have an antenna, and they have
13   a base station that services that antenna.  And that base
14   station provides a transmitter and receiver for the
15   transmitter and receiver for the cell phone that you carry
16   around in your pocket.
17   Q.  Is there a convention in the industry with respect to
18   what folks call the direction of traffic?
19   A.  Yes.  Information that's flowing from the network to
20   the cell phone is called the downlink direction.
21            Information that's flowing from the cell phone
22   into the network is called the uplink direction.
23   Q.  As -- as you've mentioned, we've heard discussion about
24   2G, 3G, 4G.  Could you give us some background on the
25   evolution of cellular communications?
```

A.   So on the first generation, this was an analog system.
So the -- it only carried voice, and the voice was carried
as an analog signal.  And the first generation systems had
very low user density.  So a carrier can only get a certain
number of people in a geographic area on the network.

       And then in the late '80s and early '90s, the
desire for the carriers was to increase the number of users
in the network.  And in order to do that, we converted the
voice to a digital voice and increased the density of the
users on the network.

       And as the '90s progressed, digital data became
more and more important.  And the Internet started to
explode.  So people wanted their Internet information on
their cell phones.

       So as the second generation went along, there was
more and more demand for data services on the second
generation cell phones.

       And the service providers provided that by adding
on systems to second generation cell phones to service that
data need.

       And, finally, in 2000s and third generation, those
two, the voice and data aspects came together in a single
system which served us throughout the 2000s.

       And then in 2010s, the fourth generation or what
is called LTE came along, and that provided even faster

1  data, even more efficient data.

2          And following that was a service called VoLTE,

3  which actually put the voice on the same data traffic as

4  the Internet data.

5  Q.  And when did Dr. Jorgensen do the work that led to his

6  patented ideas?

7  A.  Dr. Jorgensen's work was done at the very end of the

8  second generation, so before the voice and data paths came

9  together, and the high speed data was serviced.

10          So the multiple types of service aspects that a --

11  a carrier would like to provide were just starting to form

12  when Dr. Jorgensen did his work.

13  Q.  And just so we can orient the jury, when did the iPhone

14  come into -- come on to the market?

15  A.  2008.

16  Q.  Okay.  Did 2G phones have the ability to receive voice

17  and data?

18  A.  Yes, but on separate -- separate pipes or separate

19  services.

20          So as I mentioned initially, 2G was all about the

21  voice, and then as -- as the Internet became more and more

22  popular, the service providers added data on to 2G.  So you

23  could either have a voice call or a data call with a 2G

24  system.

25  Q.  And what are these little rectangles and squares we see

1  here?

2  A.  So that's a representation of a packet, and the packet

3  is being communicated between the base station and your

4  cell phone.

5  Q.  And how did that work in 3G?

6  A.  In 3G, we could have both voice and data

7  simultaneously, but they still resided on different

8  circuits or different paths.

9       And then in 4G, eventually -- especially with

10  VoLTE, they came together into a single path.

11  Q.  Going back to the 2G time frame when Dr. Jorgensen

12  was -- was doing his work, what problems did carriers have

13  in providing service to their customers?

14  A.  The problem has been constant since the beginning of

15  the industry, to increase user density.  So because the

16  equipment and the spectrum was very expensive, the more

17  users a service provider can put on to the network, the

18  better their economics work.

19       So it's a constant demand to put more and more

20  people on the network.

21  Q.  You mentioned voice Internet traffic.  Were there

22  any issues in these networks in providing multiple

23  types of services to the same phone?

24  A.  The need to provide voice, web browsing, video

25  streaming, watching YouTube, for example, all those

services have different types of demands on them in terms

of their quality of service, their -- their characteristics

of that type of service.

        And so in order to provide for those types of

services, you have to take into account what the needs of

each of those services are.

Q.  You mentioned spectrum a moment ago.  Could you explain

that?

A.  So the way we carry information from the transmitter to

the receiver is on a -- on a radio frequency wave.  So we

actually modulate the wave, we change the characteristics

of the wave, and that wave propagates from the transmitter

to the receiver.

        And the federal government controls all the radio

spectrum in the United States, and there's an organization

called the Federal Communications Commission that controls

access to those radio waves.

        And the U.S. Government auctions off or sells off

pieces of the radio spectrum, and -- from the -- and

receives payments from the carriers for their right to use

those pieces of the spectrum.

        So these cost the carriers hundreds of millions to

billions of dollars in order to -- just to gain the access

to -- just to gain the right to access that spectrum.

        And then on top of that, the carrier has to build

1  out a network, add equipment, service it, sell -- sell

2  subscriber devices, things like that.

3  Q.  With respect to the equipment that is in a standard

4  telecommunications network, I'd like to run through with

5  you the different components that the jury is going to hear

6  about during your testimony.

7        So starting on the left with the phone, what's the

8  first piece of equipment?

9  A.  So if we're going to place a phone call, if you're --

10  if you're going to call your mother, for example, you're

11  going to have your cell phone, and you're going to dial the

12  telephone number for your number, that communication is

13  going to go between your cell phone and the cell tower.

14        And the cell tower is on the earth.  It's part of

15  the cell.  It's connected to a base station, and that base

16  station is going to interpret your radio waves and derive

17  your voice from that radio wave and enter your voice into

18  the core network, into the switching network of the

19  communications provider.

20        Now, that switching network is going to direct

21  your call to Poughkeepsie, for example.

22        And in Poughkeepsie, it's going to drop your call

23  into the public telephone network, and it's going to cause

24  the public telephone network to ring your mother's phone.

25  And that's how a telephone call is placed.

1   Q.  Did there come a time when carriers decided they would

2   like to send Internet traffic to phones?

3   A.  Yes.  As I mentioned, as the Internet grew up and --

4   and became more important, there was more and more demand

5   by users to be able to access web pages and YouTube, things

6   like that.

7   Q.  And what -- what was the general architecture that

8   carriers used to provide that new service?

9   A.  Carriers added a parallel core network that carried the

10  data traffic all the way down to the base station, and --

11  and this dealt with Internet Protocol packets or IP

12  packets.

13       And so you could either be on the IP network, or

14  you could be on the voice network in second generation.

15  And you could -- it was either/or.

16  Q.  All right.  Let's take a deeper dive.

17       Could you tell us what a virtual circuit is.

18  A.  A virtual circuit is a dedicated circuit from the

19  source to the destination.

20       So in my example, there would be a dedicated

21  circuit from Marshall to Poughkeepsie to carry your voice

22  over to the telephone network in Poughkeepsie.

23       And in this example, if there -- if the network

24  has a capability of a hundred simultaneous phone calls, if

25  there's a hundred and first phone call that's entered into

1  the network that's offered, that hundred and first phone

2  call will get rejected, and you'll get a busy signal.

3  Q.  Is there any difficulty in using virtual circuits with

4  speech?

5  A.  When a virtual circuit is established, it guarantees a

6  chat for the voice.  It guarantees a bit rate or a

7  bandwidth for that voice.

8       And what we found out through research over the

9  years is that speech is about 50 percent silence.  So when

10  you and I are talking, about half of what we're talking

11  about is silence.

12       And so because I'm not -- because there's silence,

13  I'm not actually sending any information across this --

14  this virtual circuit.  So you would think that you could be

15  able to reuse that capacity.  But with a virtual circuit,

16  it's dedicated that capacity to a single phone call.

17       So even, though, only half of speech is -- is

18  actual active talking, that hundred and first circuit would

19  still be dropped in a virtual circuit because of the

20  guaranteed bandwidth.

21  Q.  And is use of bandwidth important to telecommunications

22  carriers like T-Mobile?

23  A.  Yes.  For example, in this case, if you didn't have a

24  virtual circuit, you could get twice as many people talking

25  on that same hundred-circuit-capacity equipment.

1    Q.  Now, inside the network, the -- let's talk about the

2    core network.  How does traffic move around within that

3    network?

4    A.  So inside the core network, there was a technology

5    called ATM.  You've heard some of that yesterday and today.

6          And ATM used virtual circuits to carry voice

7    packets and to -- to carry data packets throughout the

8    network, and it dedicated bandwidth just like we saw in the

9    last slide.

10   Q.  Okay.  Dr. Jorgensen mentioned the ATM systems that he

11   had rejected.  Could you just generally give us an overview

12   of his solution to the problems of the time, and then we'll

13   go deeper into the technology.

14   A.  So at the time, the carriers had invested a lot of

15   money in ATM capabilities, and so their natural inclination

16   was -- when it came to communicating over a wireless

17   circuit, was to just bring ATM out all the way to the cell

18   phone to be able to use ATM over the wireless network.

19          However, Dr. Jorgensen, we heard yesterday that he

20   tried that and it didn't work and he moved to IP packets.

21          He used -- he moved to the technology used in the

22   Internet in order to facilitate that communication.

23          So if we look at Dr. Jorgensen's invention, he

24   uses IP, and he invented -- he uses two technologies, a

25   classification technology that he talked about yesterday

1 and a scheduling technology that he talked about yesterday

2 in order to be able to provide multiple types of services,

3 voice, video, Internet browsing, over to the cell phone.

4 Q.  And just so we can try to show the jury what's going on

5 here, can you circle the IP packets?  We'll try out the

6 technology here and see if it works.

7 A.  So IP is used here in this interface, and IP packets

8 are broadcast to the cell phone, and the two technologies

9 that Dr. Jorgensen used to provide this service for

10 multiple types of service offerings were classification and

11 scheduling.

12 Q.  Okay.  All right.  Did he obtain three patents on those

13 inventions?

14 A.  Three patents were issued, yes.

15 Q.  And what were the numbers of those patents?

16 A.  The '629 patent, the '206 patent, and the '517 patent.

17          MR. BLACK:  And if we could call up the '629

18 patent, PTX-1, and just show the jury what the face of the

19 patent looks like.

20 Q.  (By Mr. Black)  They have it in the jury book, but why

21 don't we explain a little about what information appears on

22 the face of a patent.

23 A.  So U.S. patents have a particular structure that makes

24 them easy to read.  You see the patent number up here, and

25 you see the date that the U.S. Patent Office issued the

1   patent here.  You see the name of the inventor here.  You

2   see the assignee, which was Malibu Networks at the time,

3   here.  You see the date that the patent was filed, July

4   9th, 1999, which happens to be my birthday.  You see an

5   abstract that describes the -- in general, what the patent

6   is about.

7          MR. BLACK:  And then let's go to the -- let's go

8   to the next page.

9   Q.  (By Mr. Black)  You see some of the figures.  Just give

10  the jury a sense of what they look like and what their

11  function is.

12         MR. BLACK:  Actually, I'll tell you what.  We're

13  on Page 1.  Let's just blow up the figure at the bottom

14  there.

15  Q.  (By Mr. Black)  Now, do patents come along with

16  diagrams to assist the reader?

17  A.  Typically, they -- there's a diagram that shows what

18  the patent is discussing.

19  Q.  And what follows the figures -- the diagrams in a

20  patent, typically?

21  A.  The written description.

22  Q.  And what does that consist of?

23  A.  That -- that talks about the background of the

24  invention.  It sets up the problem that's going to be

25  solved by the invention, and then describes the -- the

1   details of the invention to one of ordinary skill in the

2   art so that the goal is that anybody who understands the

3   technology should be able to read this and actually

4   implement the invention.

5          MR. BLACK:  And if we could go to the end of the

6   patent and look at the claims.

7   Q.  (By Mr. Black)  And what do we see here?

8   A.  Here you see a statement that says what is claimed is,

9   and then a single sentence that describes the boundaries of

10  the invention that the inventor created.

11         It describes essentially the -- the metes and

12  bounds of the invention.  It describes the -- the border of

13  the invention that that inventor created.

14  Q.  And are inventions typically comprised of some things

15  that were in the prior art, as they say, and some things

16  that are new?

17  A.  Well, everyone stands on the shoulders of the people

18  who came before them.  So the invention was determined

19  by -- before it's issued, was determined by the U.S. Patent

20  Office to be new and novel.

21         MR. BLACK:  Let's go to Slide 18.

22  Q.  (By Mr. Black)  Okay.  We're going to hear some

23  building block terms during the course of the rest of your

24  testimony.

25         Let's start with the concept of a packet.

A.  So a packet in general has two pieces, a header and a

payload.  And a simple analogy is if we're going to send a

toy through UPS, we're going to take that toy -- that's the

payload.  We're going to take that toy and put in a box --

in a UPS box, and we're going to use the UPS label as the

header which describes where that toy is from and where

it's going to and the priority of the -- of the box.

        And so we pack that -- we pack the toy in the box,

we put the label top of the box, and then we place that box

into a packet stream with other packets, and it gets routed

to the appropriate destination, just like a FedEx box.  So

it's a simple analogy -- a packet as a FedEx box.

Q.  We've just got to run through that again.  Our graphics

people are real proud of this.

        Okay.  Is there a -- a name for the -- the thing

in which the packets are traveling that engineers sometimes

use to describe this?

A.  Some people call it a pipe.

Q.  All right.  Let's talk about voice packets and the

voice pipe.  Tell us about the characteristics of voice

packets.

A.  So voice, if you want it to sound proper and not have a

bunch of effects and drop-outs and things like that, the

voice -- once you digitize it, the voice needs to arrive at

the other end -- communicate from the transmitter to the

 1   receiver on time.  It needs to get there on time.

 2         And so the primary need is for the -- the voice to

 3   arrive on time.  So delay is unacceptable.  Some tolerance

 4   to errors are okay because your ear doesn't hear every

 5   single thing.

 6         And then jitter -- too much jitter is

 7   unacceptable, so it will sound like bird calls in the

 8   background if it's too jittery.

 9         So these are the characteristics of a voice-type

10   service that we have to accommodate in any design for a

11   communication system.

12   Q.  And do data packets differ in any way for voice

13   packets?

14   A.  Data packets are quite different.

15         For example, if we're going to call up a web page

16   for the Dallas Morning News, the packets must all receive

17   -- every packet must be received, but not necessarily in

18   order.  It doesn't really matter if they come out of order.

19   Delay is more acceptable for data packets.  There's no

20   tolerance for error.

21         If you have a picture, for example, that you want

22   to see and it gets errors in it, you're not going to be

23   able to see the whole picture.

24         And jitter is more acceptable.  So different

25   characteristics for different types of service.

1  Q.  And could you just go over again why it is that the

2  Dallas News site here has X'd out pictures?

3  A.  Because the communication path had errors in it, so

4  there was no -- so the complete information did not arrive

5  at the receiver.

6  Q.  And is that the sort of thing people would see when

7  they're sitting in front of their computer waiting for the

8  Internet to load and it just doesn't happen or you just get

9  the text but not the picture?

10  A.  Unfortunately, yes.

11  Q.  Okay.  All right.  Now, if you're trying to build a

12  system with all these different types of information in

13  them with different characteristics and requirements that

14  you describe, what kinds of problems do you run into?

15  A.  Well, as I mentioned, if we're going to service in this

16  communication system voice, Internet, and video-type

17  services, they all have different types of demands on the

18  service.

19          So as we just looked at, voice has some tolerance

20  to air but has an important tolerance to delay.

21          So there's different characteristics for each type

22  of service that you can see here.  And so we have to take

23  that into account when we design the system.

24          And the shorthand version of that is -- we call it

25  quality of service or QoS.

1   Q.  Could you describe Dr. Jorgensen's invention at a high

2   level?

3   A.  So what -- what did Dr. Jorgensen do?  He -- he came up

4   with a system that actually used IP packets and classified

5   those packets initially.

6           So as they were coming into the base station, he

7   would look at the packet, and say, oh, this is a voice

8   packet, we're going to put it over here.  And, oh, this is

9   an Internet web browsing packet, we're going to put it over

10  here.  And this is a video packet, we're going to stick

11  that over there.

12          So this classifier just sorts through the incoming

13  data quickly and places the data into queues or into bins,

14  and these bins are all a common type of traffic.

15  Q.  Let's walk through step-by-step how this works.

16  A.  And -- yes, go ahead.

17  Q.  So what do we see here?

18  A.  So here we see the core network, which we looked at

19  before, and it's going to be sending the base station

20  different -- packets of different type.  And the classifier

21  is going to look at these packets and sort them out into

22  different bins or different queues.

23          And so you see all the voice packets go into one

24  queue, all the Internet packets go into another queue, and

25  the video go into another queue.

1    Q.  And then the -- just go back.

2    A.  So once you get these queues --

3    Q.  All right.  So that was the classification process, and

4    then the next one on the right is the scheduler.

5    A.  So the scheduler here is going to look at these bins or

6    look at these queues and figure out, well, I've got so much

7    of -- of voice traffic, I've got so much of data traffic,

8    I'm going to schedule that to -- to be transported in this

9    order.

10          So it -- it creates a schedule for when those

11   packets are going to -- going to go over the air to the

12   receiver.  And that's in the resource grid here.

13          And you'll see -- in this animation, you'll see

14   the incoming -- different types of services come in and be

15   placed into the resource grid for communication over to the

16   individual cell phones.

17   Q.  Now, just so we understand where we are here, where is

18   the scheduler?

19   A.  So the scheduler is in the base station.  You can see

20   that here.

21   Q.  And we've got a little out of scale because that tower

22   is maybe a hundred feet high or it could be at the top of a

23   building or something; is that right?

24   A.  Yes.

25   Q.  And the base station is a small -- relatively small

```
 1  piece of equipment compared to the tower; is that right?
 2  A.  We saw some of the pieces yesterday.
 3  Q.  Okay.  So the schedule's in the base station.
 4        Now, you -- we have the resource grid.  Where is
 5  the resource grid?
 6  A.  The resource grid is the -- the capability in the air
 7  to -- to communicate that information.  So it's just like
 8  a -- you can think of it as a FedEx truck.  You know, which
 9  FedEx truck is this package going to go on?  Is it going to
10  go to Houston?  Is it going to go to Poughkeepsie?  Is it
11  going to go to Dallas?
12  Q.  All right.  That resource grid is filled up, and then
13  what happens from there?
14  A.  So once the resource grid is determined by the
15  scheduler, then the radio network broadcasts that
16  information over the air.  And each of the individual cell
17  phones picks up the appropriate piece of information, and
18  you get to watch your YouTube video.
19  Q.  What are the blocks in the resource grid, and why
20  are they colored differently?
21  A.  So they're colored differently because they're
22  different types of services, and these blocks -- we have
23  two types of resources in communications.  We have time,
24  and we have frequency.
25        And so we can use time and frequency to our
```

1    advantage to put multiple types of pieces of information

2    together in order to communicate those over the air,

3    ultimately to get more people on the network.

4    Q.  And what are the red, the green, and the blue box?

5    A.  Voice, Internet traffic, and video service.

6    Q.  Is the traffic in this example in separate -- in a

7    consolidated pipe?

8    A.  Yes.  So it's all in one set of transmissions.

9    Q.  Could you tell us what a control channel is?

10   A.  So a control channel is not user data; it's data that's

11   used to control the network.  So it makes sure that both

12   ends -- both the transmitter and the receiver understand

13   their state, understand what -- what they're about to

14   receive, understand the commands that are coming to -- to

15   the mobile phone as to what it needs to do.  So the control

16   channel is -- is the organizer; it's the controller.

17   Q.  Are there benefits to combining all this data in one

18   pipe?

19   A.  Yes.  The '206 patent gives the user QoS aware

20   scheduling, gives the user intelligence in the base station

21   and phone control.

22        The '517 gives the user allocation of bandwidth

23   based on QoS classifications.

24        And the '629 gives the user isochronous placement

25   of data.

```
 1   Q.  And we're going to go over those in more detail, but at
 2   this point, at a high level, what are the real-world
 3   benefits to a carrier like T-Mobile for using these
 4   inventions?
 5   A.  So someone who uses the inventions of these patents
 6   derives the benefits of more subscribers; they can offer
 7   more services, voice, video, and data, for example; they
 8   can lower their operating costs; they can reduce the number
 9   of dropped telephone calls; they can provide faster data to
10   their users; and they can provide improved voice quality.
11   Q.  We've heard a lot about VoLTE, Voice over LTE, during
12   the trial.  What are the benefits and importance of these
13   patents to VoLTE?
14   A.  So as I've described, when we move from second
15   generation to third generation to fourth generation, we've
16   consolidated the voice and the data channels onto one pipe
17   or one transport mechanism, and VoLTE allows voice and data
18   on the same channel and allows for savings in spectrum,
19   which, as we've looked at, are very expensive.  And, of
20   course, the need for the carrier to increase the number of
21   people they can serve with a given amount of spectrum is
22   ever present.
23          And also the '629 provides a better quality of
24   voice for the user.
25          MR. BLACK:  At this time, Your Honor, we are at
```

```
 1   the point where I have confidential information, and we
 2   need to seal the courtroom from here on.
 3           THE COURT:  All right.  Based on counsel's
 4   request, I'll order the courtroom sealed at this time.
 5   Those present, not subject to the protective order that's
 6   been imposed in this case should exclude themselves and
 7   remain outside the courtroom until it's reopened and
 8   unsealed.
 9           MR. KUBEHL:  Your Honor, may the Ericsson
10   personnel stay since he's going to be talking about their
11   information?
12           THE COURT:  Any objection, Mr. Black?
13           MR. BLACK:  I don't have an objection.  There's
14   T-Mobile confidential information in here that came
15   directly from their files.  So as long as T-Mobile and
16   Ericsson are joined at the hip on this, that's fine.
17           MR. KUBEHL:  That's fine, Your Honor.
18           THE COURT:  All right.  Then we'll proceed on that
19   basis.
20             (Courtroom sealed.)
21             (Sealed Portion No. 3 saved in separate sealed
22   transcript.)
23             (Courtroom unsealed.)
24           THE COURT:  And, ladies and gentlemen, we'll use
25   this opportunity to break for lunch.  We'll return after
```

1    lunch and begin with the Defendants' cross-examination of

2    Dr. Williams.

3          I'm going to ask you to take your notebooks with

4    you.  I'm told by the clerk that your lunch is waiting for

5    you in the jury room.

6          Follow all the instructions I've given you,

7    including, of course, not to discuss case among yourselves.

8          It is 10 minutes until 12:00 by my clock.  We'll

9    try to reconvene about 12:35.  That should be about 45

10   minutes from now.

11         All right.  With those instructions, the jury is

12   excused for lunch.

13         COURT SECURITY OFFICER:  All rise.

14         (Jury out.)

15         THE COURT:  The Court stands in recess for lunch.

16         (Recess.)

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                        2/5/19
     SHELLY HOLMES, CSR, TCRR                  Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25