```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4   INTELLECTUAL VENTURES I LLC, )(

 5        PLAINTIFF              )(    CIVIL ACTION NO.

 6   VS.                        )(    2:17-CV-577-JRG

 7                              )(    MARSHALL, TEXAS

 8   T-MOBILE USA, INC., T-MOBILE )(

 9   US, INC., ERICSSON INC., AND )(

10   TELEFONAKTIEBOLAGET LM      )(

11   ERICSSON,                   )(    FEBRUARY 6, 2019

12        DEFENDANTS            )(     8:30  A.M.

13                  TRANSCRIPT OF JURY TRIAL

14          BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

15              UNITED STATES CHIEF DISTRICT JUDGE

16   APPEARANCES:

17   FOR THE PLAINTIFF:     Mr. T. John Ward, Jr.
                            Ms. Claire A. Henry
18                          Ms. Andrea L. Fair
                            Mr. Wesley Hill
19                          WARD, SMITH & HILL, PLLC
                            1507 Bill Owens Parkway
20                          Longview, Texas 75604

21   COURT REPORTER:        Ms. Shelly Holmes, CSR, TCRR
                            Official Reporter
22                          United States District Court
                            Eastern District of Texas
23                          Marshall Division
                            100 E. Houston Street
24                          Marshall, Texas 75670

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

```
 1   FOR THE PLAINTIFF:       Mr. Martin J. Black
                              Mr. Kevin M. Flannery
 2                            DECHERT LLP
                              Cira Centre
 3                            2929 Arch Street
                              Philadelphia, Pennsylvania 19104
 4
                              Mr. Joseph M. Abraham
 5                            Mr. Timothy F. Dewberry
                              Mr. Joshua J. Yi
 6                            Mr. Jacob R. Porter
                              DECHERT LLP
 7                            300 West Sixth Street
                              Suite 2010
 8                            Austin, Texas 78701

 9                            Ms. Nisha N. Patel
                              Mr. Ryan T. Banks
10                            DECHERT LLP
                              2440 W. El Camino Real
11                            Suite 700
                              Mountain View, California 94040
12
13   FOR THE DEFENDANTS:      Mr. Douglas M. Kubehl
                              Mr. Jonathan B. Rubenstein
14                            Mr. Jeffery S. Becker
                              BAKER BOTTS LLP
15                            2001 Ross Avenue
                              Dallas, Texas 75201
16
                              Ms. Melissa R. Smith
17                            GILLAM & SMITH LLP
                              303 South Washington Avenue
18                            Marshall, Texas 75670

19                            Mr. Asim M. Bhansali
                              KWUN BHANSALI LAZARUS LLP
20                            555 Montgomery Street
                              Suite 750
21                            San Francisco, California 94111

22

23

24

25
```

```
 1                P R O C E E D I N G S
 2          (Jury out.)
 3          COURT SECURITY OFFICER:  All rise.
 4          THE COURT:  All right.  All right.  Are the
 5   parties prepared to read into the record those items from
 6   the list of pre-admitted exhibits used during yesterday's
 7   portion of the trial?
 8          MS. HENRY:  We are, Your Honor.
 9          THE COURT:  All right.  Why don't you start,
10   Ms. Henry, for Plaintiff.
11          MS. HENRY:  Plaintiffs read into the record
12   DX-529, PTX-42, PTX-52 through 57, PTX-328, PTX-347,
13   PTX-352, PTX-366 through 370, PTX-896, PTX-997, PTX-1009,
14   PTX-1019, PTX-1087, PX-1326 through 1328, PTX-1362,
15   PTX-1371, PTX-1384, PTX-1395, PTX-1464, DX-536, PTX-44,
16   PTX-261, PTX-335, PTX-349, PTX-356, PTX-372, PTX-916,
17   PTX-1000, PTX-1013, PTX-1024 through 1025, PTX-1114,
18   PTX-1346, PTX-1366, PTX-1376, PTX-1387, PTX-1396, PTX-1466,
19   PTX-1 through PTX-3, PTX-48 through PTX-50, PTX-324,
20   PTX-342, PTX-351, PTX-358 through 364, PTX-868 through 893,
21   PTX-924 through 931, PTX-1003, PTX-1017, PTX-1076,
22   PTX-1132, PTX-1352, PTX-1367, PTX-1377, PTX-1391, PTX-1401,
23   and PTX-58.
24          THE COURT:  All right.  Do Defendants have any
25   objection to that rendition?
```

1          MS. SMITH:  No, Your Honor.

2          THE COURT:  Do Defendants have a similar offer to

3 make?

4          MS. SMITH:  We do, Your Honor.

5          THE COURT:  Please proceed, Ms. Smith.

6          MS. SMITH:  We offer Defendants' 405, DX-405,

7 DX-520, DX-529, DX-533, DX-536, DX-537, and DX-560.

8          THE COURT:  All right.

9          MS. HENRY:  Your Honor, may we make a quick check?

10 There were two that I wasn't aware of that I would like to

11 confer with co-counsel --

12          THE COURT:  All right.

13          MS. HENRY:  -- to make sure we don't have

14 objections.

15          THE COURT:  Are there any objections from

16 Plaintiff?

17          MS. HENRY:  No, Your Honor.

18          THE COURT:  Okay.  Before I bring the jury in and

19 we proceed with Plaintiff's next witness, I understand,

20 Mr. Kubehl, that you are interested in using a whiteboard

21 as a demonstrative with a witness.

22           Can you tell me what you have in mind?  I'd much

23 rather get the details worked out now than when the jury is

24 in the box.

25          MR. KUBEHL:  Thank you, Your Honor.

1          What we've got with Mr. Skarby, we've got poster

2    boards -- a couple of poster boards that he wanted to be

3    able to point some things out and help the jury understand

4    what he was talking about.

5          And so I wanted to approach, Your Honor, to see

6    what the best placement of the easel might be so that we

7    could put the poster board on that and allow him to do

8    that.

9          THE COURT:  Okay.  Is he going to be drawing or

10   writing on these or just pointing to what's already there?

11         MR. KUBEHL:  He'll be pointing.  Dr. -- Dr. Wicker

12   had just a plain white whiteboard that he wanted to do some

13   drawing on later, but Skarby will only be pointing.

14         THE COURT:  Well, the Court has a laser pointer

15   that he can use from the witness stand --

16         MR. KUBEHL:  Okay.

17         THE COURT:  -- which I'd rather do than have

18   people up and around walking.  If -- if that becomes

19   necessary -- as a matter of fact, I'll put it -- I'll put

20   it on the -- I'll put it on the witness stand.

21         And if you'll just be sure that from wherever you

22   put the board and wherever he's seated, he's got a straight

23   line that he can use that point.

24         Will that work?

25         MR. KUBEHL:  That will work.

1          And then with Dr. Wicker, to the extent he needs
2    to do any drawing, would that be --
3          THE COURT:  Well, to the extent he needs to do
4    some drawing, he's going to obviously have to get out of
5    his seat on the witness stand and move to wherever the
6    board is.
7          We're not going to -- I don't think we can set it
8    up next to the witness stand.  And certainly it's going to
9    have to be positioned so opposing counsel and the Court
10   preferably have an idea of what's going to be put on it.
11         I have allowed -- with some hesitancy in the past,
12   but I have allowed a board to be placed just on this side
13   of that partition and allow the witness to come down as far
14   as necessary to mark on that board.
15         The problem is, even though they're close to the
16   jury, you end up with the witness facing the board when
17   they're talking, and we end up having a handheld microphone
18   to be used, and then we've got a witness with one hand with
19   a microphone and one hand on a marker.  It can get -- it
20   can get out of hand if it's not done carefully and
21   professionally.
22         But I'm -- I'm open to that possibility if -- if
23   your intention is to use a demonstrative with Dr. Wicker on
24   which you'll want him to make marks or drawings.
25         MR. KUBEHL:  Thank you, Your Honor.

1          THE COURT:  Now, that will be a board -- I mean,

2     that will be a poster or something?  We're not talking

3     about a whiteboard or --

4          MR. KUBEHL:  No.  We're just talking about that

5     poster board, which is just white, and he would just draw

6     on that with permanent marker.

7          THE COURT:  All right.  That's fine.  The problem

8     with whiteboards are what the witness marks sometimes get

9     erased, and then the other side can't see them to

10    cross-examine.  So as long as what is put on there stays on

11    there, we'll try to work through it on that basis.

12         MR. KUBEHL:  Thank you, Your Honor.

13         THE COURT:  Okay.  Mr. Black?

14         MR. BLACK:  Well, I just want to make sure we have

15    all these protections in place to make sure that the

16    demonstratives are things that are in the actual expert

17    report, and I don't know --

18         THE COURT:  Well --

19         MR. KUBEHL:  I don't think it's going to be

20    controversial, Your Honor.  It's background that's in his

21    report.

22         MR. BLACK:  It might be fine.  I just don't

23    know -- I did have one trial in this courtroom where

24    someone drew a piece of prior art on the board and told the

25    Federal Circuit it was invalidating.  The Federal Circuit

1    didn't like that during argument because it wasn't in

2    evidence.

3          But the problem with someone drawing a

4    demonstrative is why for one thing.  It's not being

5    disclosed to us ahead of the examination.

6          THE COURT:  Well, demonstratives are supposed to

7    be -- now, obviously, you can't disclose a hard copy of

8    what a witness might draw in realtime.

9          MR. BLACK:  Yes, Your Honor.

10         THE COURT:  But you can -- you can disclose what

11   you anticipate the witness is going to do.  You can

12   identify it.  Has that happened here?

13         MR. KUBEHL:  Well, certainly --

14         THE COURT:  Do the Plaintiffs know what you intend

15   to do with Dr. Wicker as far as the white -- or as far as

16   the poster board is concerned?

17         MR. KUBEHL:  We have not had that discussion.

18         THE COURT:  Well, you need to have that discussion

19   before Dr. Wicker takes the stand.

20         MR. KUBEHL:  Absolutely.

21         THE COURT:  Okay.  Ms. Fair, are you cold this

22   morning?  I see you wrapped in a blanket.

23         MS. FAIR:  Yes, Your Honor.  I am cold.

24         THE COURT:  I will have to admit that temperature

25   is in the purview of the general services administration,

1  and it's set in Tyler, not in Marshall, and there's not

2  much I can do about it.

3          MS. FAIR:  Yes, Your Honor.  I know you can't.

4          THE COURT:  But I can't have counsel wrapped in

5  blankets at counsel table.

6          MS. FAIR:  Yes, Your Honor.

7          THE COURT:  Okay.  The jury may get jealous.

8          All right.

9          MS. SMITH:  Your Honor?

10         THE COURT:  Yes, Ms. Smith.

11         MS. SMITH:  Excuse me, Your Honor.

12         With the Court's permission, the second witness

13 today is Mr. Johan Norrby.  We would like to allow

14 Mr. Norrby to utilize the base station that you saw earlier

15 in opening statement over here in the corner, the white

16 piece of equipment, during his testimony.

17         I just wanted to ask the Court if possibly prior

18 to the time he takes the stand, if I could put it on the

19 table in front of Your Honor and then ask the court

20 personnel to help me kind of --

21         THE COURT:  These were the items that were placed

22 here during either voir dire or opening?

23         MS. SMITH:  Yes, Your Honor.

24         And then ask the court personnel to perhaps hand

25 it to Mr. Norrby.  It's something that's manageable enough

```
 1   that he can work with it on the stand.
 2           THE COURT:  I assume it's not something with
 3   excessive weight to it, something that can easily be
 4   carried?
 5           MS. SMITH:  Not for me.
 6           THE WITNESS:  It's easy to be carried.
 7           MS. SMITH:  It's pretty light, Your Honor, yeah.
 8           THE COURT:  Okay.  It's easy for -- it's easy to
 9   be carried.
10           MS. SMITH:  Yes, Your Honor.
11           THE COURT:  Well, why don't you just position them
12   at counsel table, and then when the witness is on the
13   stand, if you want to ask leave to approach with that, then
14   you can walk it over, hand it to the Court Security
15   Officer, and he'll give it to the witness.
16           MS. SMITH:  I'll do it, Your Honor.  Thank you.
17           THE COURT:  Okay.  Is there anything else of a
18   similar nature we need to address before I bring in the
19   jury?
20           All right.  Mr. Johnston, bring in the jury,
21   please.
22           COURT SECURITY OFFICER:  All rise.
23           (Jury in.)
24           THE COURT:  Good morning, ladies and gentlemen.
25   Welcome back.  Please have a seat.
```

```
1              Plaintiff, call your next witness.

2              MR. WARD:  Your Honor, the Plaintiff calls

3    T-Mobile's corporate representative, Mr. Stephen McGrath.

4              THE COURT:  All right.  Mr. McGrath, if you'll

5    come forward and be sworn, please.

6              (Witness sworn.)

7              THE COURT:  Please come around, sir, and have a

8    seat on the witness stand.

9              All right.  Mr. Ward, you may proceed with your

10   direct examination.

11             MR. WARD:  Thank you, Your Honor.

12             STEPHEN MCGRATH, PLAINTIFF'S WITNESS, SWORN

13                        DIRECT EXAMINATION

14   BY MR. WARD:

15   Q.  Good morning.

16   A.  Good morning.

17   Q.  Would you please introduce yourself to the jury?

18   A.  My name is Stephen McGrath.  I'm principal corporate

19   counsel at T-Mobile.

20   Q.  And, Mr. McGrath, you and I met this morning for the

21   first time; is that correct?

22   A.  We did.

23   Q.  We've been seeing each other in the courtroom, but I

24   introduced myself to you this morning and let you know that

25   I'd be questioning you.
```

1    A.   That's correct.

2    Q.   Now, you said you're senior corporate counsel at

3    T-Mobile; is that correct?

4    A.   Principal corporate counsel is actually my title.

5    Q.   Principal.

6              And so you're an attorney.

7    A.   That's correct.

8    Q.   And a licensed attorney?

9    A.   Yes.

10   Q.   And how long have you been practicing law?

11   A.   I have been practicing law about 25 years.

12   Q.   And you're here -- T-Mobile selected you to be here to

13   monitor what's going on in the trial and speak on behalf of

14   the company, if necessary.

15   A.   That's correct.

16   Q.   Where did you grow up?

17   A.   I grew up in Seattle, Washington.

18   Q.   And when you were growing up, if you made a mess, were

19   you taught that you cleaned up your own mess?

20   A.   Yes.

21   Q.   You were present during the cross-examination of

22   Dr. Jorgensen, were you not?

23   A.   I -- I was, yes.

24   Q.   And Mr. Kubehl is the attorney representing not just

25   Ericsson, but he also represents T-Mobile, correct?

1   A.  That's correct.

2   Q.  And did you hear Mr. Kubehl ask Dr. Jorgensen if he was

3   lying?

4   A.  I don't recall that testimony specifically.

5   Q.  All right.

6        MR. WARD:  Your Honor, can I approach the witness

7   and hand him a transcript of that testimony and let him

8   refresh his recollection?

9        THE COURT:  You may approach.

10        THE WITNESS:  Thank you.

11   Q.  (By Mr. Ward)  Now, the testimony is there on Page 126.

12   You can read Lines 10 down through 25.

13   A.  I see the testimony you're referring to.

14   Q.  Am I correct, he asked Dr. Jorgensen if he was lying.

15   Do you see that?

16   A.  He said -- yes.  He said:  So you were lying to IV when

17   you said that, or did they make it up in the document, or

18   is there some other explanation?

19   Q.  Right.  And then there was an objection that got

20   sustained, and Mr. Kubehl apologized to the Court, correct?

21   A.  That's correct.

22   Q.  Did -- did he ever apologize to Dr. Jorgensen?

23   A.  I have no idea.

24   Q.  Well, have you heard him apologize to Dr. Jorgensen?

25   A.  I have not.

1   Q.  You've been practicing law for 25 years.  You been in

2   courtrooms?

3   A.  Yes, I have.

4   Q.  Have you seen lawyers ask witnesses if they're lying on

5   the stand in open court in those 25 years?

6   A.  Yes.

7   Q.  That's something you see?

8   A.  From time to time.

9   Q.  You understand that the members of our jury are the

10   ones who are going to determine the credibility of the

11   witnesses in this case, correct?

12   A.  I do, yes.

13   Q.  Solely their job?

14   A.  That's correct.

15   Q.  Not the lawyers' job to tell them who is lying and

16   telling the truth, is it?

17   A.  Yes.  That is the jury's job.

18   Q.  Let's talk about what brought that about.

19         You remember there was some questions about

20   Dr. Jorgensen being paid as a consultant for IV, $300.00 an

21   hour.

22   A.  Yes.

23   Q.  Do you recall that?

24   A.  I remember the questions.  Well, not all the questions.

25   I remember the line.

1   Q.  Are you down here for free, or are you being paid by

2   T-Mobile?

3   A.  I work at T-Mobile, so this is part of my ordinary job.

4   Q.  Part of your job?

5   A.  I'm being paid.

6   Q.  They pay for your plane tickets to get here?

7   A.  Yes.

8   Q.  Paying for your hotel, lodging, meals?

9   A.  Yes, they are.

10  Q.  All the lawyers sitting at these tables, you think

11  they're being paid for their time?

12  A.  Yes, they are.

13  Q.  Are the expert witnesses in this case being paid for

14  their time?

15  A.  I would assume they are, yes.

16          MR. WARD:  May I have the ELMO, Ms. Lockhart?

17  Q.  (By Mr. Ward)  So Dr. Jorgensen is being paid $300.00

18  an hour.  We learned that Dr. Chrissan is being paid

19  $225.00 an hour.  Do you recall that?

20  A.  Yes.

21  Q.  And they didn't ask Dr. Williams.  I'll tell you, he's

22  being paid by the hour.  And we'll find out what Dr. Wicker

23  and Dr. Acampora are being paid by the hour during their

24  testimony, won't we?

25  A.  I would assume you might ask that question.

```
 1   Q.  To the extent the jury finds it's relevant?

 2   A.  Right.

 3   Q.  Nothing unusual about any of that, is there?

 4   A.  There's nothing unusual about experts and lawyers being

 5   paid.

 6   Q.  Well, what about an inventor, such as Dr. Jorgensen,

 7   being compensated for his time?

 8   A.  I'd say that really depends, from case-to-case.

 9   Q.  You worked at Microsoft as a lawyer, didn't you?

10   A.  Yes, for 14 years.

11   Q.  And during those 14 years that you worked at Microsoft,

12   did you ever have to pay inventors for the time that they

13   might spend consulting with Microsoft inside counsel or

14   outside counsel about their inventions?

15   A.  I don't recall specifically.  But that may have

16   occurred.

17   Q.  You think if you had an inventor come to trial, a

18   gentleman with a degree in physics, a medical -- a medical

19   degree, a gentleman who practiced as a surgeon, who had

20   started up private businesses going public, over 30 years

21   of experience, that you might need to pay him for his time?

22   A.  Yes, it's possible that it would make sense to

23   compensate somebody for their time.

24   Q.  It's possible, or it's probable?

25   A.  Well, it's -- it's probable, I guess.  The question is
```

1   just how much and what -- what their time is worth, all

2   that sort of stuff.  I can't really speak to that.

3   Q.  And are you telling the jury that you think $300.00 an

4   hour for Dr. Jorgensen time -- Dr. Jorgensen's time sounds

5   unreasonable?

6   A.  No, I'm not telling the jury that.  I -- I really don't

7   know enough about the underlying facts.

8   Q.  All right.  Thank you.

9        MR. WARD:  I'm through with that, Ms. Lockhart.

10  Q.  (By Mr. Ward)  Now, I assume that this case is

11  important to T-Mobile?

12  A.  Yes, it is.

13  Q.  And that's why they sent you here as the corporate

14  representative?

15  A.  That's correct.

16  Q.  So that they have a representative at trial?

17  A.  That's correct.

18  Q.  You've been monitoring this case during its pendency?

19  A.  I have been monitoring this case since the day it came

20  in.

21  Q.  All right.  And so they would send someone here who's

22  knowledgeable about the facts of the case and who could

23  assist the jury with answering the questions they've got to

24  answer?

25  A.  That's correct.

1   Q.   And you're that guy?

2   A.   I'm that guy.

3   Q.   What's a Rule 26 disclosure, Mr. McGrath?

4   A.   Well, it's a -- a process where the parties exchange

5   information about who the sort of relevant people and

6   information might be in the case.

7   Q.   And do you have a responsibility for reviewing that

8   after it's drafted and -- and disclosed, or before it's

9   disclosed?

10   A.   Yes, I review documents of that nature on my cases.

11   Q.   Okay.  And so you know that T-Mobile served initial

12   disclosures on Intellectual Ventures in this case, don't

13   you?

14   A.   Yes.

15   Q.   And in that document, T-Mobile's got to identify the

16   name, address, and telephone number of persons having

17   knowledge of relevant facts, a brief statement of each

18   identified person's connection with the case, and a brief

19   fair summary of the substance of the information known by

20   such persons, right?

21   A.   That's correct.

22   Q.   Your name is not in there, is it?

23   A.   I don't recall, but I would assume the answer is no.

24   Q.   Would you like to review it?

25   A.   No, that's -- that's fine.

1  Q.  So you know your name is not in there, don't you?

2  A.  Well, I -- I doubt it is, but I don't recall for sure.

3          MR. WARD:  All right.  May I approach the witness,

4  Your Honor?

5          THE COURT:  You may approach.

6  Q.  (By Mr. Ward)  Can you confirm that you're not

7  disclosed as an individual with knowledge of relevant

8  facts?

9  A.  My -- my name is not on the list.

10 Q.  There's only two names of T-Mobile employees on that

11 list, are there not?

12 A.  I think -- that's correct.

13 Q.  All right.  And there might have been some sub --

14 subsequent amendments, but you'd agree with me that you've

15 never been disclosed as an individual with knowledge --

16 knowledge of relevant facts, have you?

17 A.  I haven't been dis -- disclosed in this process.

18 I think I've been disclosed as the corporate representative

19 for purposes of the trial.

20 Q.  I agree, you have been.  We knew you were going to be

21 the witness here.

22          But during the discovery of this case, you were

23 never disclosed as -- as an individual with knowledge of

24 relevant facts, were you, sir?

25 A.  That's correct.

1  Q.  And you know why that happens during discovery, don't

2  you?

3  A.  Yes, I do.

4  Q.  That's -- that's so that the attorneys have an

5  opportunity to go sit down and talk to the folks that they

6  want to and ask them what they know about the case?

7  A.  That's correct.

8  Q.  You were present for opening statements, obviously,

9  weren't you, sir?

10  A.  Yes, I was.  I've been here during the entire trial.

11  Q.  And do you recall Mr. Kubehl, during his opening, maybe

12  being a little critical of me for not discussing Ericsson

13  enough in my opening?

14  A.  I recall some form of that, yes.

15  Q.  That we refused to acknowledge Ericsson, that this was

16  Ericsson's product, not T-Mobile's product, the base

17  station?

18  A.  Again, yes, some form of that.

19  Q.  And you know enough about patents to know that there

20  are apparatus claims, and there are method claims, correct?

21  A.  Yes.

22  Q.  And this case involves a method claim, does it not?

23  A.  It involves method claims, yes.

24  Q.  Method claims, correct.

25          And he told the jury that Ericsson was here to

1   stand behind its product?

2   A.   I believe that's correct, yes.

3   Q.   And that T-Mobile's just the innocent customer here,

4   right?  Y'all are just using a product manufactured by

5   somebody else?

6   A.   Again, I don't recall the exact words, but probably

7   some form of that, yes.

8   Q.   Something like that?

9   A.   Right.

10  Q.   But it's T-Mobile who chooses how it configures its

11  network, correct?

12  A.   We choose the configuration settings for the network,

13  yes.

14  Q.   Ericsson didn't decide that T-Mobile should activate

15  VoLTE, did it?

16  A.   Ericsson did not decide -- that's correct.

17  Q.   That was a -- that was a T-Mobile decision, correct?

18  A.   Yes, we decided to enable VoLTE in our network.

19  Q.   And that's because you all saw advantages to doing

20  that, correct?

21  A.   That's correct.

22  Q.   And one of the advantages to doing that was that you

23  were able to save spectrum?

24  A.   That's one of the benefits of -- of using VoLTE for us.

25  Q.   And you heard me represent to the jury during opening

1  statement that spectrum costs billions and billions of

2  dollars.  Did you hear me say that?

3  A.  I did.

4  Q.  And was I dead accurate about that?

5  A.  Yeah, spectrum is very expensive.  It really depends on

6  the -- on what you're buying, how much, and all that, but

7  it's expensive stuff.

8  Q.  And -- and T-Mobile spends billions of dollars to

9  acquire it, doesn't it?

10  A.  Yes.

11  Q.  It's a limited resource, isn't it?

12  A.  It is.

13  Q.  And then T-Mobile charges its subscribers on a

14  monthly basis for the services it provides?

15  A.  That -- that's correct.

16  Q.  Now, you were present during Mr. Bratic's testimony

17  yesterday?

18  A.  I was, yes.

19  Q.  And you recall there was some questions about what the

20  damages would be if he used his infrastructure analysis?

21  A.  Yes, I do.

22  Q.  Difference from 77 million to 9 million.

23  A.  Yes.

24  Q.  Roughly.

25  A.  Something around --

1   Q.  In that ballpark.

2   A.  Yes.

3   Q.  Isn't that why you all want to make this case about

4   Ericsson; because if you were to just look at the -- if

5   Ericsson was the only party and we were just looking at

6   base stations, that damages would be much lower?

7   A.  I don't think that's why we want to make it about base

8   stations, but we do believe that that's the appropriate

9   measure of damages.

10  Q.  And when you say we believe, you mean T-Mobile and

11  Ericsson.

12  A.  That's correct.

13  Q.  But there's something else going on between T-Mobile

14  and Ericsson that we haven't talked about at all during

15  this case, isn't there?

16  A.  I'm not sure what you're referring to specifically.

17  Q.  You're an attorney, right?  What is indemnity?

18  A.  Indemnity is when -- well, it can be complicated, but

19  in a situation like this, it's when you purchase

20  somebody -- or something from somebody, a supplier in this

21  instance, and they agree to -- to back up their product,

22  the product that you bought from them.

23  Q.  And -- and that's going on here, isn't it?

24  A.  Yes.  Ericsson has -- has come here to defend its

25  products.

1  Q.  And indemnity means security or protection against a

2  loss or further financial burden.  Does that sound like a

3  reasonable definition?

4  A.  Yes.

5  Q.  And in this case, it means Ericsson's paying the

6  attorneys' fees for T-Mobile, correct?

7  A.  Some of them, yes.

8  Q.  For Baker Botts.  They're -- they've got that tab,

9  right?

10  A.  That's correct.

11  Q.  And Baker Botts represents both Ericsson and T-Mobile?

12  A.  That's correct.

13  Q.  And so Ericsson really wants this case to be about base

14  stations and not about T-Mobile's network, don't they?

15  A.  Ericsson believes this case is about base stations, and

16  so does T-Mobile.

17  Q.  They've got about 77 million reasons to make it about

18  their base stations and not about T-Mobile's network, don't

19  they?

20  A.  I -- I believe that we're here because we believe we

21  don't infringe these patents, as opposed to all the

22  indemnity issues and things like that.

23  Q.  And you're the only fact witness from T-Mobile who's

24  coming to testify, right?

25  A.  I'm the only fact witness who's here to testify live.

1    We've seen some of our engineers already by video

2    deposition -- or video testimony.  I'm sorry.

3    Q.  Right.  A fact witness not disclosed as an individual

4    with knowledge of relevant facts during the discovery

5    period in this case.  That's who T-Mobile chose to send,

6    right?

7    A.  I am not only person that fits in that category, yes.

8    Q.  Right.  You're the only person that fits in the

9    category of someone with knowledge of relevant facts who

10   wasn't disclosed during the discovery period?

11   A.  No.  I -- oh, I'm sorry.  No.  I meant the description

12   that you provided about not being disclosed.

13   Q.  Okay.

14   A.  I think our other witnesses are mostly on this list.

15   Q.  But they're not coming to answer questions, right?

16   A.  Not live.

17   Q.  T-Mobile chose to send you.

18   A.  That's correct.

19   Q.  When you worked at Microsoft, did you ever have

20   occasion to license or take a license from an inventor

21   outside of Microsoft on behalf of Microsoft?

22   A.  You mean -- I'm sorry.  Could you repeat the question?

23   Q.  Yeah.  That was a bad question.

24         Did you ever negotiate a license on behalf of

25   Microsoft where Microsoft was a licensee?

1   A.   Yes.  Yes, I have.

2   Q.   That was something within your job duties, was it not?

3   A.   That's correct.

4   Q.   And when an individual, an inventor, or a company with

5   patents would approach Microsoft, would it present claim

6   charts to it?

7   A.   Occasionally.

8   Q.   Occasionally?

9   A.   Sometimes yes; sometimes no.

10  Q.   Okay.  And would you ever reach deals outside of

11  litigation where you did take a license on behalf of

12  Microsoft?

13  A.   That -- occasionally, yes.

14  Q.   And when you made those deals, did Microsoft ever say,

15  you know what, we're going to make this deal, and we're

16  going to put in writing that these patents are valid, and

17  they're infringed?

18  A.   I -- I don't recall specifically.  I know that wouldn't

19  have been our normal practice.

20  Q.   That's unusual, correct?

21  A.   I would -- I would say so for us.

22  Q.   Right.  In the real world, that typically doesn't

23  happen in licensing negotiations, does it, Mr. McGrath?

24  A.   Again, my experience at Microsoft?

25  Q.   Yes.

1   A.   No, I can't say.

2   Q.   Okay.  In any event, when you negotiate a license,

3   would you just take a license to whatever you were

4   presented with, or would you ask for a license to

5   everything that the individual or company had?

6   A.   Are you -- are we still talking about Microsoft?

7   Q.   Yes, sir.

8   A.   Okay.  We would -- our practice at Microsoft was to

9   essentially do one deal one time and not have to, you know,

10  do kind of onesy/twosy licensing.  So it would be our

11  normal portfolio nature.

12  Q.   Even if you were only presented with one or two, you'd

13  get a license to everything, wouldn't you?

14  A.   If we thought that was warranted, yes.

15  Q.   Because, if you didn't, they might be knocking at your

16  door again in a year or two when you released another

17  product that they thought might be covered by another

18  patent, right?

19  A.   That's correct.

20  Q.   And you might be get a phone call from your boss

21  saying, why didn't you get a license to the entire

22  portfolio?

23  A.   Could be.

24  Q.   That's why you get a license to the portfolio, right?

25  A.   Right.  The -- the point would be to -- I would refer

1  to it sort of loosely as one and done.

2  Q.  And you know that these cases are very expensive, don't

3  you?

4  A.  Yes, they certainly can be.

5  Q.  They take juries away from their families.

6  A.  That's correct.

7  Q.  They take up judicial resources.

8  A.  That's correct.

9  Q.  And they cost a lot of money for both sides, don't

10 they?

11 A.  That is correct.

12        MR. WARD:  Mr. Horseman, could we look at

13 Plaintiff's Exhibit 1376?

14 Q.  (By Mr. Ward)  Have you ever seen this document before,

15 Mr. McGrath?

16 A.  I have probably seen some version of it, yes, I would

17 assume so.

18 Q.  All right.  And that's a T-Mobile document.  It says:

19 Ericsson RAND, UMTS, and LTE Advanced Branded QoS Evolution

20 Lab Validation Report.

21        Do you see that?

22 A.  Correct.

23        MR. WARD:  And, Mr. Horseman, can we zoom in on

24 that little graph that has the date?

25 Q.  (By Mr. Ward)  It looks like it was initiated and

1   revised, same date, May 21, 2014.

2          Do you see that?

3   A.  Yes, I do.

4          MR. WARD:  Can you go to the next page, please,

5   Mr. Horseman?  And let's look at the revision history at

6   the bottom.

7   Q.  (By Mr. Ward)  Do you know Mr. Mark Kilimov?

8   A.  I do not.

9   Q.  Okay.

10         MR. WARD:  Let's go do Page 4 of that document,

11  Mr. Horseman.  And we'll zoom in on the top half --

12  perfect.

13  Q.  (By Mr. Ward)  And you see where it's talking about the

14  purpose of this document is validating a request that's

15  part of AAV QoS Evolution validations?

16  A.  I see those words, yes.

17  Q.  And do you know what the -- this document is -- is

18  directed at, just from looking at it?

19  A.  At a very high level, yes.

20  Q.  Can you tell us at a high level what it's directed at?

21  A.  Well, I think it's -- it's talking about various, you

22  know, QoS specifications, parameters.

23         There's lots of different ways to refer to them,

24  but it appears to be an internal engineering document at

25  T-Mobile.

1    Q.  Okay.  And -- and it's talking about three additional

2    queues being assigned.  It's got T-Mobile user traffic and

3    enterprise user traffic.  Do you see that first bullet

4    point?

5    A.  Yes.

6    Q.  And it says map with QCI 6?

7    A.  Yes.

8    Q.  And is -- is that -- is QCI 6 one of these levels in

9    the quality of service ranking?

10   A.  Yes.

11   Q.  All right.  And then it's got second brand users get

12   mapped with a QCI of 7.  Do you see that?

13   A.  Yes.

14   Q.  And second brand users, examples are MetroPCS, Simple,

15   and then Walmart, Straight Talk, et cetera.  Do you see

16   that?

17   A.  Yes.

18   Q.  MetroPCS, that's a company that T-Mobile owns, correct?

19   A.  That's correct.

20   Q.  And they're getting a -- this quality of service of 7,

21   a lower level than T-Mobile users, according this document?

22   A.  According to this document.

23   Q.  And then we've got inbound roamers with a level of 8,

24   and then network extreme user traffic gets a level of 9.

25   Do you see that?

1    A.   I do.

2    Q.   And what do you -- what are network extreme users?

3    A.   I don't recall the exact definition, but I think we

4    heard a little bit about that, perhaps yesterday, about

5    people who are consuming a -- a huge amount of data or --

6    or just traffic generally on their phone.

7    Q.   They're using a lot of data?

8    A.   A lot more than an ordinary person.

9    Q.   And is the -- the deal with T-Mobile unlimited data and

10   voice calls for monthly subscribers?

11   A.   Yes, that's certainly -- it all depends on the plan,

12   but that's certainly the majority of our plans nowadays.

13   Q.   That's kind of part of being the un-carrier, right?

14   You're unlike Verizon and AT&T.  Y'all give unlimited text

15   and talking, right?

16   A.   That's right.  Again, it depends on the plan.

17   I don't -- I don't know the specifics.

18   Q.   Well, when you sell those plans, do you tell the folks

19   that are buying them it's not really unlimited because if

20   you use it a lot, we're going to slow you down?

21   A.   I -- I really don't know what the disclosures are

22   there, but -- and, so I'm not sure.  But, in general, it's

23   unlimited data, unlimited voice.

24   Q.   But if you use it a lot, we're going to move you to the

25   end of the line?

1    A.  If you -- if you're an extreme user, it appears that's

2    how it was set up, at least as of this document.

3            MR. WARD:  And go to Page 5, please, Mr. Horseman,

4    and zoom in on "certain benefits will be added."

5    Q.  (By Mr. Ward)  And so this document, it's talking about

6    benefits from using these different levels of quality of

7    service, correct?

8    A.  It -- that appears to be the case.

9    Q.  And one of which we just discussed is the protection of

10   user experience from network abusers, right?

11   A.  Correct.  I think that's the extreme user scenario,

12   perhaps.

13   Q.  And then right below it, it says:  Gains in build ahead

14   for spectrum exhaustion.

15           Did I read that correctly?

16   A.  Yes, you did.

17   Q.  And that spectrum is what we were talking about that

18   costs billions of dollars, right?

19   A.  Yeah, I think that's the same spectrum you were talking

20   about, in general.

21           MR. WARD:  Thank you, Mr. Horseman.  Let's look at

22   1395.

23   Q.  (By Mr. Ward)  And the jury saw this document yesterday

24   during the testimony of Mr. Baker.  Do you recall that?

25   A.  I do.

1   Q.  And I'm not going to harp on it, but --

2          MR. WARD:   Let's go to Page 6.

3   Q.  (By Mr. Ward)   They saw this in opening, and they saw

4   it during the deposition, as well, these comments at the

5   bottom of the document about the un-carrier is our response

6   to a stupid, broken, and arrogant industry.   You recall

7   that testimony?

8   A.  Yes.

9   Q.  And you recall Mr. Baker saying that that wasn't just

10  his -- those -- those weren't his words, that's Mr. John

11  Legere who has said that publicly, has he not?

12  A.  I'm -- I'm sure he has, yes.   I don't know recall

13  exactly what Mr. Baker said, whether it was John Legere or

14  somebody else, but, yes.

15  Q.  Mr. Legere has a Twitter account, he's on YouTube, and

16  he's said that a number of times, has he not?

17  A.  That's correct.

18  Q.  And talking about how T-Mobile is changing the rules

19  and breaking the -- the status quo?

20  A.  Yes.

21  Q.  And he also refers to Verizon and AT&T as the dumb and

22  dumber of the industry, doesn't he?

23  A.  I'm -- John -- our CEO had been known to use those

24  terms for those two companies.

25  Q.  Repeatedly, right?

1   A.   Yeah.

2   Q.   And that's part of the philosophy at T-MO -- T-MO?

3   A.   The un-carrier is the philosophy at T-Mobile.

4   Q.   Yeah, and that --

5   A.   Not necessarily following the leaders, following AT&T

6   and Verizon, just because they're the big guys.

7   Q.   Yeah, they're stupid.  They don't know what they're

8   doing, do they?

9   A.   We don't believe that they're -- that they've been

10  doing things that are in the best interest of wireless

11  customers.

12          MR. WARD:  Let's look at Plaintiff's Exhibit 184.

13  Q.   (By Mr. Ward)  You recall me showing this exhibit, the

14  cover of it, during opening?

15  A.   I'll -- I'll take your word that you did.

16  Q.   Okay.

17  A.   I couldn't see the monitor during the opening --

18  Q.   I got you.

19  A.   -- based on where I was sitting.

20  Q.   I'll represent to you that I showed this cover page

21  during the opening.

22          THE COURT:  Gentlemen, let's be sure you talk one

23  at a time.  Don't talk over each other.

24          Let's continue.

25          MR. WARD:  And let's go to Page 6 of that

1  document, and zoom in where it says "wireless providers."

2  Q.  (By Mr. Ward)  And I'll represent to you that this is

3  an industry publication.  Have you seen the IBISWorld

4  publication before?

5  A.  Yes, in general.  Not necessarily this specific

6  document, but --

7  Q.  All right.  It says here that wireless providers have

8  struggled to keep up with demand, devoting a significant

9  amount of resources to expand network capacity.

10        You see that?

11  A.  Yes.

12  Q.  That the battle for wireless spectrum has been a large

13  source of competition, and the struggle for new subscribers

14  in this saturated market has been challenging.

15        You see that?

16  A.  Yes, I do.

17  Q.  And then carriers' appetite for both more spectrum and

18  subscribers for -- has played out in a series of

19  competitive auctions and merger -- merger and acquisition

20  attempts.

21        Do you see that?

22  A.  I do.

23        MR. WARD:  And let's go to Page 25 of this

24  document.  Yeah, right there at the top.

25  Q.  (By Mr. Ward)  And on Page 25 of the document, it talks

1    about spectrum availability and regulatory conditions are

2    the most formidable barriers to entry in the wireless

3    industry.

4              Right?

5    A.  I see that.

6    Q.  So if you want to become a -- a carrier, you've got to

7    be able to access this spectrum, don't you?

8    A.  That's correct.

9    Q.  And you've got to have the financial ability to get it,

10   right?

11   A.  That's correct.

12   Q.  And so it wouldn't surprise you that an individual

13   inventor might not be able to design an entire system,

14   purchase spectrum, and become a wireless carrier overnight,

15   correct?

16   A.  Correct.

17   Q.  It takes time and a lot of resources?

18   A.  I think it's a capital-intense industry, for sure.

19   Q.  And it's not like there's spectrum coming online

20   every month or every year, is there?

21   A.  I don't believe so.

22   Q.  It can take up to 13 years for the government to bring

23   new spectrum to market, can't it?

24   A.  Yes.  It can be long gaps between these types of sales

25   and things like that.

1    Q.  And I'll show you that.

2           MR. WARD:  It's on Page 38 of the document, the

3    paragraph starting in 2016.

4    Q.  (By Mr. Ward)  Do you see where it says:  In 2016, the

5    FCC undertook an auction for 600 megahertz spectrum?

6    A.  I do.

7    Q.  And it says:  But bringing more spectrum to the market

8    takes an average of 13 years.

9           Correct?

10   A.  I see that.

11   Q.  And it costs billions of dollars, tens of billions of

12   dollars, does it not?

13   A.  I -- yes.  It all depends on how much you're buying and

14   what it is.

15          MR. WARD:  Let's look at Plaintiff's Exhibit 1387.

16   Q.  (By Mr. Ward)  I'll represent to you this is a document

17   that we showed in opening that was also addressed during

18   Mr. Baker's deposition yesterday.  Did you see it then?

19   A.  Again -- oh, I'm sorry.  This is Baker.

20   Q.  Yes.

21   A.  Yes, I did see those exhibits.

22   Q.  And I believe it was.  It's this un-carrier network

23   capacity strategy from June of 2014?

24   A.  Yes.

25   Q.  And we've seen --

```
 1              MR. WARD:  Page -- Page 3, that second full
 2   paragraph.
 3   Q.  (By Mr. Ward)  You recall the testimony about
 4   un-carrier, that T-Mobile had success in an increased
 5   network demand to the point where it will exceed current
 6   capacity starting in 2015?
 7   A.  I'm sorry.  Are you asking whether I recall -- whether
 8   Mr. Baker said this?
 9   Q.  No, sir.  Do you see the document?
10   A.  Yes, I do.
11   Q.  And I read that correctly, correct?
12   A.  Yes.
13   Q.  And it talks about running out in 2015.
14   A.  Where it will exceed capacity starting in 2015, yes.
15   Q.  Yes.
16              And that planned spectrum purchases were
17   insufficient to close demand/capacity imbalance.
18              Do you see that?
19   A.  I see that.
20   Q.  And so T-Mobile had to come up with a way to address
21   this problem, did they not?
22   A.  Yes.
23   Q.  And T-Mobile identified this problem as well in its
24   filings with the Securities and Exchange Commission, did it
25   not?
```

```
1   A.  I think there were some SEC documents that were
2   mentioned earlier in the trial.  I don't remember
3   exactly --
4   Q.  Well, let's look at them.
5   A.  Yeah.
6           MR. WARD:  Plaintiff's Exhibit 76.
7   Q.  (By Mr. Ward)  And who is the Securities and Exchange
8   Commission?
9   A.  They're the federal regulatory body that makes sure
10  that -- just to --
11  Q.  Very general.
12  A.  Yeah.  Make sure everything is up and up for investors
13  and that companies are disclosing information to --
14  relating to publicly traded companies.
15  Q.  And you've got to make sure that the information that
16  you put in these documents is accurate, don't you?
17  A.  Yes.
18  Q.  And am I correct that they're signed under penalty of
19  perjury?
20  A.  That's correct.
21  Q.  And folks go to jail if they falsify these documents,
22  don't they?
23  A.  Yes.
24  Q.  Very --
25  A.  They're certainly very important.
```

1    Q.  They're very important.  They can go to jail.

2         December 31, 2014 is the date on this document,

3    correct?

4    A.  That's correct.

5    Q.  Right at the top?

6    A.  Uh-huh.

7    Q.  And that's after the un-carrier document that we just

8    looked at from June of '14, correct?

9    A.  Correct.

10        MR. WARD:  And let's go to Page 9 of that filing,

11   under Competition.

12   Q.  (By Mr. Ward)  And in that document under the section

13   of Competition, it says:  AT&T and Verizon are

14   significantly larger than us and may enjoy greater

15   resources and scale advantages as compared to us.

16        Is that what it says?

17   A.  Yes.

18   Q.  And it says:  Competitive factors within the wireless

19   telecommunications industry include -- it's got a number of

20   competitive factors.  One of them is the availability of

21   additional spectrum.

22        Correct?

23   A.  That's right.  That's one of the multiple factors that

24   are mentioned here.

25   Q.  One of -- one of multiple factors, I agree.

1          MR. WARD:  Let's look at Page 11 of the document

2    under Risks Related.

3    Q.  (By Mr. Ward)  Now, this is T-Mobile identifying the

4    risks related to their business, correct?

5    A.  That's the heading, yes.

6    Q.  And it says:  The scarcity and cost of additional

7    wireless spectrum and regulations relating to spectrum use

8    may adversely affect our business strategy and financial

9    planning.

10          Is that what document says?

11   A.  That's what the document says.

12          MR. WARD:  And let's go to Page 14.  "If we are

13   unable."

14   Q.  (By Mr. Ward)  And did T-Mobile tell the world back in

15   December of 2014 that:  If we are unable to take advantage

16   of technological developments on a timely basis, then we

17   may experience a decline in demand for our services or face

18   challenges in implementing or evolving our business

19   strategy?

20   A.  That's what we said.

21   Q.  Was that true?

22   A.  That's in the document, yes.

23          MR. WARD:  Let's look at Plaintiff's Exhibit 1396.

24   Q.  (By Mr. Ward)  And have you seen this document before,

25   Mr. McGrath?

1    A.  I don't recall off the top of my head with this very

2    generic title.

3    Q.  Okay.

4           MR. WARD:  Let's -- let's flip through this

5    document, please, Mr. Horseman.

6           Next page.  Next page.

7    Q.  (By Mr. Ward)  And so we've got there the 2015 network

8    technology priorities.  It says:  LTE leadership, 300

9    million LTE covered pops.

10          Do you see that?

11   A.  Yes, I do.

12   Q.  And L700 coverage, that's the spectrum we've heard

13   about?

14   A.  Yes.  We've -- I know we've discussed that.

15   Q.  And then VoLTE quality.  Do you see that?

16   A.  Yes, I do.

17          MR. WARD:  Let's go to Page 9 of that document.

18   Q.  (By Mr. Ward)  And so -- and this is an internal

19   T-Mobile document, correct?

20   A.  I think that's correct.  I think this was one of the

21   Baker exhibits.

22   Q.  Yes, sir.

23   A.  Mr. Baker's exhibits?

24   Q.  Yes, sir.

25          And the document says:  "Why VoLTE?"  So that's a

1  question that T-Mobile is posing to itself in this

2  document, right?

3  A.  I believe -- I believe -- again, I'd have to -- I'd

4  defer to Mr. Baker's testimony on this, but I believe he

5  said it was an internal presentation to some network folks.

6  Q.  And it's "Why VoLTE?," question mark, correct?

7  A.  Yes.

8  Q.  And Innovation and Growth is one of the -- the -- the

9  headings there, correct?

10  A.  That's correct.

11  Q.  And then on the right-hand side, it says:  Technically

12  and economically superior.

13          Correct?

14  A.  That's what it says, yes.

15  Q.  And then this -- we've seen this, that VoLTE is the

16  only technology for 700 megahertz and critical for us

17  getting to 300 million covered pops in 2015.

18  A.  That's what it says.

19  Q.  And Ericsson didn't say, you've got to go to VoLTE.

20  You've got to get more customers.  You've got to save your

21  spectrum.  Ericsson wasn't telling you to do that, were

22  they?

23  A.  I don't think Ericsson had anything to do with this

24  document, no.

25  Q.  Well, they didn't have anything to do with T-Mobile's

1    decision to implement VoLTE, did they?

2    A.  Oh, I'm sorry.  I thought were you were talking about

3    the deployment.  So you're saying Ericsson didn't tell us

4    to go to VoLTE?

5    Q.  Correct.

6    A.  I don't believe so, no.

7    Q.  That would be a T-Mobile decision.

8    A.  That's correct.

9    Q.  And Ericsson is not the only base station in the world,

10   is it?  There's other people that manufacture and sell base

11   stations, aren't there?

12   A.  That's correct.  They're not the only base station

13   supplier.

14   Q.  You've got options, right?

15   A.  We do.

16   Q.  And you think Ericsson knows that?

17   A.  I'm sure they do.  That's their business.

18   Q.  And since you're T-Mobile, you get to tell the folks

19   you buy equipment from, you sell that to us, we'll

20   implement it, and if we get sued for patent infringement,

21   you pay the damages.

22   A.  Roughly.  I mean, you're getting back to the indemnity

23   point.

24   Q.  Yes, sir.

25   A.  It's a lot more complicated than that, but at -- at a

1   very high level, yes.

2   Q.  That's not a bad position to be in, is it?

3   A.  Again, it depends.  I mean, we -- that's -- we go to

4   great lengths to -- to do business with people we think are

5   reputable suppliers, so we'll back up their products.

6   Q.  You have that agreement in -- indemnity agreement with

7   all your suppliers?

8   A.  I don't know if I can say all of our suppliers,

9   certainly all of our major infrastructure suppliers and --

10  and all of our base station suppliers.

11  Q.  So let's finish by looking at what you told the world,

12  you being T-Mobile, in your Securities and Exchange filings

13  in 2017.

14        MR. WARD:  Plaintiff's Exhibit 276.

15  Q.  (By Mr. Ward)  You see the date there at the top,

16  December 31, 2017?

17  A.  I do.

18  Q.  Same deal with -- with filing this document, serious

19  document, just like the last one?

20  A.  That's correct.

21        MR. WARD:  And let's look at Page 8.  Up --

22  network capacity growth, and get the first bullet point.

23  Q.  (By Mr. Ward)  And so in December of 2017, this is

24  after, obviously, the document that we looked at for

25  "Why VoLTE?"

1          Right?

2  A.  I'm sorry, could you repeat the question?

3  Q.  Yeah.

4  A.  I was reading.

5  Q.  I just wanted to clarify, this is, what, two years

6  after the document that we saw about "Why VoLTE?," and

7  the -- the benefits of VoLTE technology?

8  A.  Roughly, yes.

9  Q.  And what T-Mobile told its investors and the rest of

10 the world under network capacity growth is that we continue

11 to expand our capacity through the re-farming of existing

12 spectrum, right?

13 A.  Yes, yes.

14 Q.  And re-farming existing spectrum, you know what that

15 means, don't you?

16 A.  I do.

17 Q.  You were able to move the voice calls off of 3G onto

18 your 4G network, correct?

19 A.  That's perhaps a part of it, but I -- I think this

20 document -- I think re-farming really refers a lot more to

21 just moving to the next generations of technologies and

22 freeing up spectrum on older generations, but that may be a

23 part of it.

24 Q.  Did you free up spectrum when you moved voice calls off

25 of that older 3G network and moved it on to your 4G LTE

```
 1   network?
 2   A.  We -- it had some benefits that may have included the
 3   spectrum-related benefits you're talking about.
 4   Q.  And then -- then T-Mobile says:  And implementation of
 5   new technologies, including Voice over LTE, VoLTE.
 6            Correct?
 7   A.  That's right.
 8   Q.  And then you note there that VoLTE comprised almost 80
 9   percent of total voice calls as of December 31, 2017?
10   A.  That's certainly what the document says, yes.
11   Q.  Up from 64 percent as of December 31, 2016?
12   A.  Correct.
13   Q.  And then you say -- I say you, T-Mobile says:  Moving
14   voice traffic to VoLTE frees up spectrum and allows for the
15   transition of spectrum currently used for 2G and 3G to 4G
16   LTE.
17   A.  That's --
18   Q.  That's at least what --
19   A.  Oh, I'm sorry.
20   Q.  My apologies.  Go ahead and finish your answer.
21   A.  That's what it says, yes.
22   Q.  You don't dispute that, do you?
23   A.  No, not at all.
24   Q.  All right.
25            MR. WARD:  That's all I have.  I'll pass the
```

1    witness.

2         THE COURT:  Cross-examination by the Defendants.

3         Proceed when you're ready, Ms. Smith.

4         MS. SMITH:  May it please the Court.

5                   CROSS-EXAMINATION

6    BY MS. SMITH:

7    Q.  Good morning, sir.

8    A.  Good morning.

9    Q.  Now, we've been sitting next to each other this week

10   at -- at counsel table, so -- so we've met?

11   A.  Yes, we have met.

12   Q.  And you understand that in addition to representing

13   Ericsson, I also represent T-Mobile because Ericsson's

14   standing up for its customer and defending it in this case?

15   A.  That's correct.

16   Q.  Now, the reason T-MO is in this courtroom is because

17   the Plaintiff sued them, correct?

18   A.  That's right.

19   Q.  Is there any way in the world to come to court and

20   defend yourself without lawyers and experts and such?

21   A.  No.  That'd be a bad plan, but...

22   Q.  Mr. Ward asked you about the fact that you're being

23   paid to come here and speak to the jurors, correct?

24   A.  That's correct.

25   Q.  And like Mr. Jorgensen, did you demand from T-MO that

1  you'd be paid two to three times your salary to do so?

2  A.  No.  I don't get anything extra for being here.  It's

3  just part of my job.

4  Q.  And Mr. Ward said that cases are really expensive.  You

5  agreed with that?

6  A.  I do.

7  Q.  And they're even more expensive when your witnesses

8  demand to be paid two or three times their normal rate,

9  wouldn't you think?

10  A.  That's true.

11  Q.  Were you here when Judge Gilstrap instructed the jury

12  on the -- you've been here every day of trial, have you

13  not?

14  A.  I've been here every day, yes.

15  Q.  Okay.  And Judge Gilstrap gave the jurors some

16  instructions on the first day about zealous advocacy.

17          Do you remember that?

18  A.  I recall something like that, yes.

19  Q.  Okay.  And that's actually a little bit of what we saw

20  when we saw Mr. Kubehl cross-examine Mr. Jorgensen; is that

21  correct?

22          MR. WARD:  Objection, leading.

23          THE COURT:  Sustained.  This is an adverse witness

24  to the Plaintiff.

25  Q.  (By Ms. Smith)  In your opinion --

1          THE COURT:  And he's Dr. Jorgensen, Ms. Smith.

2          MS. SMITH:  I apologize, Your Honor.

3    Q.  (By Ms. Smith)  In your opinion, what did we see in the

4    courtroom when Mr. Kubehl cross-examined Dr. Jorgensen?

5    A.  I think he was trying to bring out a question about

6    some -- something that had been disclosed about -- about

7    Dr. Jorgensen, asking him a question.

8    Q.  Mr. Ward talked about cleaning up your mess.  Out in

9    the real world, outside of this courtroom, who does

10   T-Mobile, as Ericsson's customer, look to in the real world

11   when they want to know how an Ericsson base station works?

12   A.  Ericsson.

13   Q.  As a customer, who does T-Mobile look to when something

14   goes wrong with an Ericsson base station?

15   A.  We would look to Ericsson.

16   Q.  Who's going to come to court today and explain to the

17   jurors how Ericsson base stations work?

18   A.  Ericsson and its witnesses.

19   Q.  Whether you buy a product -- if I go on down and buy a

20   product at Walmart or if I'm buying products in the telecom

21   industry, what is your expectation as a consumer as to

22   whether or not the product maker should stand up for the

23   product?

24   A.  Well, I would think -- certainly in this case, and even

25   in the context of, you know, ordinary consumer products in

1    my life, I would expect that if there are infringement --

2    patent infringement allegations against those products,

3    that whoever I bought it from would stand up to defend

4    their products.  And I think that's what Ericsson is doing

5    in this case for T-Mobile.

6    Q.  All right.  Mr. McGrath, how did you come to be -- I

7    believe it was senior corporate counsel at T-MO?

8    A.  It's principal corporate counsel.

9    Q.  I apologize.

10   A.  It doesn't really matter that much.

11   Q.  Principal corporate counsel?

12   A.  It's -- I -- you mean how did I -- well...

13   Q.  You can start with your education.

14   A.  Yeah, I -- I went to college and law school, and when I

15   came out of law school, I took a job at a law firm.

16         I was an outside lawyer, like many of the lawyers

17   here in this courtroom.  And then at one point in time

18   after practicing for several years, I was interested in

19   going back to Seattle where I'm originally from.

20         And I was approached about an opportunity to take

21   an in-house position being the -- the lawyer who works

22   inside at the corporation for Microsoft, which was a

23   company from my hometown that was doing a lot of good

24   things, and so I went there.

25         As I think I mentioned earlier in my testimony, I

1   practiced at Microsoft for 14 years.  And then fast forward

2   to -- at a point in time about four years ago, I decided to

3   make a switch to T-Mobile to take a kind of similar job at

4   T-Mobile to what I had been doing at Microsoft.  And that's

5   how I ended up here.

6   Q.  Is -- is what you're doing today a little bit out of

7   the ordinary from your day-to-day job?

8   A.  Yes, I'd say so.

9   Q.  Why are you the person representing T-Mobile here

10  today in court?

11  A.  Because I am the person at T-Mobile who knows most

12  about the overall set of facts that are relevant to what

13  we're talking about here in court.

14  Q.  And why is that?

15  A.  Because this is my case.  I've -- I've managed it since

16  the day it came in the door and, so I've been involved from

17  the very beginning when we first received the complaint and

18  -- and the analysis in contacting Ericsson and in trying to

19  figure out what T-Mobile's views are about this overall

20  dispute.

21  Q.  How would things be different if we paraded 10 T-Mobile

22  engineers into this courtroom for trial?

23  A.  They wouldn't be any different.  I think we'd still be

24  looking to the Ericsson witnesses for the details in this

25  case.

1   Q.   Does T-Mobile respect patents?

2   A.   Absolutely.

3   Q.   What's T-Mobile do to make sure that it's respecting

4   other company's intellectual property rights?

5   A.   Well, I think we do a number of different things, but

6   principally, for purposes of this case, as I mentioned

7   earlier, we go to great lengths to enter into contracts and

8   deal with entities, companies who believe in the respect

9   for intellectual property rights and who are also making

10  representations about their products and backing them up,

11  that they're, you know, free of infringement of other

12  people's intellectual property rights.

13  Q.   In this particular case, T-Mobile -- T-Mobile has been

14  sued?

15  A.   That's correct.

16  Q.   And T-Mobile received a complaint at some point?

17  A.   We did.

18  Q.   What are the steps that -- first steps that T-Mobile

19  took when it received the complaint?

20  A.   When -- when the complaint came in the door, I took a

21  look at the complaint and the patents and products that

22  were referenced in that complaint -- well, when I say that,

23  I mean, I looked at the patents, and I saw the references

24  to the -- the products.

25           And from my review of those, I could tell that

1  what we were talking about in this case was functionality

2  in the Ericsson base stations.

3          So I basically picked up the phone and contacted

4  Ericsson to get their help on this matter.

5  Q.  Well, why not just reach out -- you have engineers at

6  T-Mobile, do you not?

7  A.  We do.  We have lots of engineers.

8  Q.  Why not reach out to the T-MO engineers and get their

9  views?

10  A.  Because I can tell from the allegations in this case

11  that -- again, they're about kind of deep details in the

12  operation of the Ericsson base stations, and I know from

13  past experience on my cases, if I would ask my folks about

14  that, they would tell me to talk to the Ericsson engineers

15  or the Ericsson personnel.

16  Q.  Now, when you buy a base station from Ericsson, they

17  don't just give you -- give you a base station and nothing

18  more, do they?

19  A.  No.  There's -- there's lots -- there are -- they

20  provide the products with a lot of documentation and

21  associated support from Ericsson personnel, but it's at a

22  level that's appropriate for what we need to use the

23  products in our network.

24  Q.  Do you believe, in this instance, that T-Mobile has

25  handled the patent infringement claim appropriately?

1   A.   Absolutely.

2   Q.   Now, we heard a little bit -- well, strike that.

3        Where does T-Mobile rank in the pecking order as

4   far as market share with the carriers?

5   A.   I believe now we are the No. 3 carrier in the United

6   States.

7   Q.   And how long have you been No. 3?

8   A.   Maybe a year or two, something -- I don't remember the

9   exact date where we -- where we passed Sprint as -- went

10  from 4 to 3.

11  Q.   Do you have any plans to try to move up in the ranks?

12  A.   We are always trying to improve and get better and

13  compete in the marketplace.

14  Q.   And what's the plan for doing that?

15  A.   I'd say, principally, it's our overall un-carrier

16  strategy about making our services different and better for

17  customers so that wireless customers will want to use

18  T-Mobile as opposed to the services of our competitors.

19  Q.   And if your CEO got in front of everyone down in Dallas

20  and said, you know, our motto is going to be go along and

21  get along or follow the herd, would that work?

22  A.   I can't imagine him saying that to start, and I don't

23  believe it would work.

24  Q.   And how would that work out for the consumers?

25  A.   I -- I don't think it would be a value add for the

 1    consumers at all.  I think we're -- we're on the forefront

 2    of change in this industry to make it better for consumers.

 3    Q.  And, specifically, how is T-MO doing that?

 4    A.  They're -- we have a lot of different kind of what I

 5    think we would refer to internally and externally as

 6    un-carrier moves, but examples of that would be no

 7    contracts, you know, flat rate plans, no data overages.

 8              There are multiple of these moves that we've made

 9    in the wireless industry that essentially the rest of the

10    carriers have been forced to adopt because it sounds pretty

11    appealing to customers.

12    Q.  And we've heard in this lawsuit that other -- some

13    other carriers may have license to these patents.  Is that

14    another way in which T-MO is unwilling to follow the herd?

15    A.  Perhaps in that we are not going to take a license to

16    these patents simply because the two major wireless

17    carriers happen to -- for whatever reasons, they did.

18              MS. SMITH:  I'll pass the witness.

19              Thank you, sir.

20              THE COURT:  Is there redirect, Mr. Ward?

21              MR. WARD:  Yes, Your Honor.

22                       REDIRECT EXAMINATION

23    BY MR. WARD:

24    Q.  I think we can agree it'd be a bad idea to show up

25    without a lawyer --

1   A.   Yeah.   Sorry.

2   Q.   -- with all these lawyers around, correct?

3   A.   I think that's right, yes.

4   Q.   So you don't fault Dr. Jorgensen for showing up at

5   depositions, and in this case, with lawyers that IV paid to

6   represent him, do you?

7   A.   I certainly don't fault Dr. Jorgensen for showing up at

8   a deposition with a lawyer of some sort.

9   Q.   You think it's surprising that IV was paying for his

10  counsel?

11  A.   I think -- I think there's some questions about whether

12  Mr. Jorgensen might have been represented individually by

13  different lawyers personally, but you can handle cases in

14  different ways.

15          THE COURT:   And, Mr. McGrath, it's Dr. Jorgensen.

16          THE WITNESS:   I'm sorry.   Dr. Jorgensen.

17  Q.   (By Mr. Ward)   Dr. Jorgensen, right?

18  A.   Yeah.

19  Q.   And let's talk about this allegation of him charging

20  two to three times his normal rate.   You heard Ms. Smith

21  just say that, correct?

22  A.   Yes, I did.

23  Q.   Now, when you started out as a lawyer and you went to a

24  law firm, what law firm did you go to?

25  A.   I worked at a couple of different law firms, but

1    Latham & Watkins.

2    Q.  That's a big law firm, isn't it?

3    A.  It is.

4    Q.  And did you go in as a partner, or did you go in as an

5    associate?

6    A.  I started out as an associate.

7    Q.  Okay.  So did Latham & Watkins bill you out at one

8    rate?

9    A.  Did they bill -- I'm sorry.  Can you we repeat the

10   question?

11   Q.  Sure.  Did you have an hourly rate at which

12   Latham & Watkins billed you out to its clients?

13   A.  Yes.

14   Q.  And what was that rate?

15   A.  I have -- I honestly don't remember.

16   Q.  Just -- was it $300.00?

17   A.  I -- I wouldn't be surprised if it was more than that,

18   but it depended on the year --

19   Q.  Okay.

20   A.  -- all that sort of stuff.

21   Q.  Let's assume it's $300.00, okay?  And let's just use a

22   hypothetical lawyer at a law firm.  His billing rate or her

23   billing rate is $300.00 an hour.

24           Are you with me?

25   A.  Yeah.

```
 1   Q.  If you multiply the number of hours that an associate
 2   might work -- and let's do it reasonable -- 2,000 hours a
 3   year.  That'd be kind of low for a first-year associate,
 4   wouldn't it?
 5   A.  Maybe at Latham --
 6   Q.  Yeah.
 7   A.  -- it's possible.
 8   Q.  Let's say 2,000 hours.  That'd be $600,000.00, wouldn't
 9   it?
10   A.  I'll -- I'll go with you on the math.
11   Q.  Okay.  And do you think then that you look at that
12   associate's tax return at the end of the year, and he or
13   she would have been paid $600,000.00?
14   A.  No.
15   Q.  It'd be a lot less than that, wouldn't it?
16   A.  Yeah.  If you're getting at -- I wouldn't make what the
17   firm makes.
18   Q.  Correct.  Right?
19   A.  Yeah.
20   Q.  But if you got hired as an independent consultant and
21   you were working for someone outside the firm and the firm
22   said, go work for them, you might still be billed at
23   $300.00 an hour, mightn't you?
24   A.  Perhaps.
25   Q.  So would it be unfair to say, well, you're billing
```

1    $300.00 an hour for your independent consulting, but if we

2    look at your W-2 from last year, you only made $100,000.00.

3         That'd be an unfair comparison, wouldn't it,

4    Mr. McGrath?

5    A.  I think -- I think those two are different things, your

6    W-2 and your hourly rate.

7    Q.  What you were making the year before might be totally

8    unrelated to what you're charging for consulting in the

9    next year, might'n it?

10   A.  Could be.

11   Q.  All right.  Now, you worked at Microsoft for many

12   years?

13   A.  14, about.

14   Q.  Smart people there?

15   A.  Very.

16   Q.  Knew what they were doing?

17   A.  They certainly are leaders in their field.

18   Q.  Good scientists, good technologists, good in-house

19   lawyers?

20   A.  Yes.

21   Q.  Know how to evaluate patents?

22   A.  Yes.

23   Q.  Do you know how much money they've invested in

24   Intellectual Ventures?

25   A.  I have a rough sense of that.

1  Q.  What's your rough sense of that?

2  A.  Well, I mean, I don't know the -- the specific dollars,

3  but I'm -- I know they're one of the original investors in

4  the -- in the company.

5  Q.  It's a bunch of money, isn't it?

6  A.  Probably, yes.

7  Q.  We've talked a lot about competition between AT&T,

8  Verizon, and T-Mobile, right?

9  A.  Yes.

10  Q.  And Verizon, AT&T are paying for rights to these

11  patents and a portfolio of other patents, aren't they?

12  A.  I understand that they have portfolio licenses to IV's

13  portfolio.

14  Q.  And the un-carrier has decided not to do that, right?

15  They don't want a license to these patents because they say

16  they're no good?

17  A.  We don't believe we infringe these patents, and so we

18  haven't taken a license.

19  Q.  All right.

20       MR. WARD:  Pass the witness.

21       THE COURT:  Further cross, Ms. Smith?

22       MS. SMITH:  No, Your Honor.  May the witness be

23  excused?

24       THE COURT:  You may step down, Mr. McGrath.

25       THE WITNESS:  Thank you.

```
 1              THE COURT:  And since you're T-Mobile's corporate
 2    representative, you're not excused.  You need to go back,
 3    and sit at the table.
 4              MS. SMITH:  You're correct, Your Honor.
 5              I apologize.
 6              THE COURT:  All right.  Plaintiff, call your next
 7    witness.
 8              MR. WARD:  Your Honor, the Plaintiff rests.
 9              THE COURT:  All right.  Plaintiff having rested
10    its case-in-chief, before we proceed with the Defendants'
11    first witness, ladies and gentlemen, we're going to take a
12    short recess.
13              You may close and leave your notebooks in your
14    chairs.
15              Follow all the instructions I've given you,
16    including, as you would expect me to remind you, not to
17    discuss the case among each other, and we'll be back
18    shortly to continue with the Defendants' first witness.
19              The jury is excused for recess.
20              COURT SECURITY OFFICER:  All rise.
21              (Jury out.)
22              THE COURT:  The Court stands in recess.
23              (Recess.)
24              COURT SECURITY OFFICER:  All rise.
25              THE COURT:  Be seated, please.
```

1          All right.  This morning, before we began the

2     trial and before I brought the jury in, I met with counsel

3     in chambers.  We took up certain disputes regarding

4     demonstratives and other matters.

5          I've had the benefit of additional time to

6     consider some of those.  I gave direct guidance on some

7     issues in chambers, but I did not give ultimate or direct

8     guidance on other matters.

9          With regard to Defendants' proposed Slide 48 that

10    references and has a picture of the front cover of DX-10,

11    I'm going to grant the objection to that slide by

12    Plaintiffs and exclude that slide.

13         I'm persuaded it's an attempt to reopen the claim

14    construction process.  That would be improper.

15         Also, we had a lengthy discussion about Mr. Skarby

16    as a witness for the Defendants.  I reminded counsel

17    explicitly that Mr. Skarby is a fact witness and is not

18    designated as an expert, although he has a technical

19    position with Ericsson.

20         And because he is a fact witness and not an expert

21    witness, he is not entitled to give expert analysis or

22    opinions.

23         He's entitled only to testify as to facts within

24    his personal knowledge.  The characterization of those

25    facts, opinions, subjective values and judgments are

1   outside the purview of a fact witness.  And I tried to

2   remind counsel for both parties that that would not be

3   permissible with this witness.

4          Also, I've checked Dr. Wicker's expert report, and

5   he references Mr. Skarby for a very limited purpose of only

6   addressing induced infringement.  There's no other reliance

7   by Dr. Wicker in his report on Mr. Skarby.

8          I will not permit Mr. Skarby to testify and then

9   Dr. Wicker expand the scope of his report or add additional

10  support for his existing conclusions because of the live

11  testimony of Dr. -- of Mr. Skarby that may touch on items

12  beyond induced infringement.

13         It would be an improper attempt to supplement an

14  expert's report if that were to happen.

15         So I want to put the Defendants on notice they do

16  not need to and should not use Dr. Wicker as a way to

17  verify or readdress anything Mr. Skarby testified to

18  outside of the one limited issue in which Dr. Wicker relies

19  on Mr. Skarby.

20         Are those instructions clear?

21         MR. KUBEHL:  May I approach, Your Honor?

22         THE COURT:  You may.

23         MR. KUBEHL:  Those -- those instructions are

24  clear.

25  Dr. Wicker does have support in his report to independently

1  evaluate documents that were discussed this morning,

2  specifically Exhibits 277 --

3          THE COURT:  I'm not talking about documents.

4          MR. KUBEHL:  Okay.

5          THE COURT:  I'm talking about the oral testimony

6  of Mr. Skarby as a late-breaking and prejudicial way to

7  supplement and strengthen the conclusions that are already

8  set forth in Dr. Wicker's report where he does not rely on

9  Mr. Skarby.

10          MR. KUBEHL:  Understood.  I'll just point out one

11  thing to Your Honor that it will not be my intent at all to

12  represent Mr. Skarby as an expert in this case.

13          However, his title at Ericsson is expert in

14  resource -- radio resource management.  That's just his

15  title.  I would --

16          THE COURT:  Then --

17          MR. KUBEHL:  I would ask him what his title is --

18          THE COURT:  Then when he answers what his title

19  is, then you need to clarify for the benefit of the jury,

20  you are not here as an expert witness, you are here as a

21  fact witness only, correct?

22          MR. KUBEHL:  Yes.

23          THE COURT:  And let him confirm that.  That will

24  avoid any confusion.

25          MR. KUBEHL:  Thank you, Your Honor.

```
 1              THE COURT:  Okay.  Thank you.
 2              All right.  Is there anything else that needs to
 3    be addressed before we bring the jury?
 4              Is there a question, Mr. Kubehl, about the easel
 5    and the board and Mr. Skarby's examination?  Did we cover
 6    that to your satisfaction, or do you still have some
 7    questions?
 8              MR. KUBEHL:  No.  I think he can use the -- the
 9    pointer, if that's to Your Honor's liking.
10              THE COURT:  And then on Dr. --
11              MR. KUBEHL:  It will just be a matter of where we
12    set it up.
13              THE COURT:  Then on Dr. Wicker, you intend to put
14    the easel here at the partition?
15              MR. KUBEHL:  That would be our preference if we
16    could do that.
17              THE COURT:  All right.  And do you have in mind to
18    stand on one side of the easel with him on the other side,
19    or do you want to question him from the podium?  Let's talk
20    about how we do that.
21              MR. KUBEHL:  If it worked for Your Honor, I could
22    stand off behind so I'm not blocking anyone's view and
23    question from over there just so I can see what he's doing.
24    It's not going to be a long examination at the easel.
25              THE COURT:  Well, what's most commonly done is
```

1    that you would stand beside the easel on the opposite side

2    of it from the witness where you could easily lean your

3    head forward and see what he writes without getting into

4    the jury's space on the other side of the partition, and

5    that's what I'd prefer.

6           MR. KUBEHL:  Very good.

7           THE COURT:  Okay.  Let's bring in the jury,

8    please, Mr. Johnston.

9           COURT SECURITY OFFICER:  All rise for the jury.

10          (Jury in.)

11          THE COURT:  Please be seated.

12          Defendants, call your first witness.

13          MS. SMITH:  Your Honor, Defendants call Mr. Johan

14   Norrby.

15          THE COURT:  If you'll come forward and be sworn,

16   sir.

17          (Witness sworn.)

18          THE COURT:  Please come around, sir.  Have a seat

19   on the witness stand.

20          Ms. Smith, you may proceed when you're ready with

21   your direct examination.

22          MS. SMITH:  Thank you, Your Honor.

23          JOHAN NORRBY, DEFENDANTS' WITNESS, SWORN

24                    DIRECT EXAMINATION

25   BY MS. SMITH:

1  Q.  Good morning, Mr. Norrby.

2  A.  Good morning.

3  Q.  If you would, please introduce yourself to the Court

4  and the jurors.

5  A.  Yes.  My name is Johan Gunnar Norrby.

6  Q.  Now, Mr. Norrby, you're not from around these parts,

7  are you?

8  A.  No, I live in Stockholm in Sweden.

9  Q.  Mr. Norrby, how big is Sweden?

10  A.  Sweden is not a very big country.  We have 10 million

11  inhabitants.  To be compared with Texas, it's -- it's a

12  very small town.

13        THE COURT:  Sir, would you pull the microphone a

14  little closer to you, please?

15        THE WITNESS:  Sure.

16        THE COURT:  Thank you.  Continue.

17        MS. SMITH:  Thank you, Your Honor.

18  Q.  (By Ms. Smith)  Is English your first language?

19  A.  No.  My mother tongue is Swedish, but my first words

20  were very much in English.

21  Q.  How were your first words in English?

22  A.  Well, that is because my family moved to -- to Atlanta

23  in the U.S. when I was two months old, and I lived there

24  until I was six years old.  And my stay in -- in U.S. had a

25  profound impact on what I've been doing in -- in my later

1  part of life.

2       And that is because when I was around six years

3  old, living in U.S., the Apollo program was very -- a very

4  big thing here.  And I was totally fascinated by rockets

5  and already then I decided that I wanted to be an engineer.

6  Q.  And you wanted -- you chose to testify in English

7  today; is that correct?

8  A.  That is correct.

9  Q.  Have you ever testified before to an American jury?

10  A.  No, I haven't.

11  Q.  Sir, do you have some family back in Sweden?

12  A.  Yes.  I'm married, and I have two daughters, 18 and 21

13  years old.

14  Q.  And what do you all enjoy doing in your time away from

15  work?

16  A.  First of all, I -- I work a lot, but during my spare

17  time, I prefer to spend it with family.  And I also like to

18  do outdoor activities like running and biking.  And once in

19  a while, my wife drags me to a lot of cultural events.

20  Q.  I heard someone mention that you actually bike to work.

21  Is there any truth to that?

22  A.  Yes.  It's only 15 miles back and forth, so it's not

23  much.

24  Q.  Would you describe your educational background to the

25  jurors?

 1   A.   Sure.   I have a university degree in Master of

 2   Engineering, specialized in computer architecture.   I also

 3   have Bachelor of Science degree in business administration

 4   and economics.   Both degrees are from Lund University.

 5           Lund University is one of the biggest universities

 6   in Sweden, founded in the 17th century, and it is about the

 7   same size as Texas University.

 8   Q.   I think we have a picture up on the screen.   Is that

 9   Lund University?

10   A.   It's not the university.   It's a church in the

11   university town.

12   Q.   At the university?

13   A.   Yeah.

14   Q.   Okay.

15           MS. SMITH:   I apologize.   There -- there we go.

16   The clicker is a little slower.   I apologize.

17   Q.   (By Ms. Smith)   Mr. Norrby, who do you work for?

18   A.   I work for Ericsson.

19   Q.   And how long have you been at Ericsson?

20   A.   I started working in Ericsson in 1996, so slightly more

21   than 20 years.

22   Q.   What's your current position at Ericsson?

23   A.   My current position is business controller at product

24   area networks.

25           Product area networks is a part of Ericsson who is

1    responsible for all products related to radio networks,

2    base station hardware, and base station software primarily.

3           So I look into the financials for -- for product

4    area networks.  That means revenues, cost of sales,

5    research and development costs, financial plan, et cetera.

6    Q.  And how long have you held that position?

7    A.  I've had that position since June 2018.

8    Q.  Is that an executive management position?

9    A.  Yes, it is.  I'm part of the leadership team of product

10   area networks.

11   Q.  What other positions have you held at Ericsson?

12   A.  I've had several positions since I started in Ericsson.

13          In 1996, when I started, I was working in sales.

14   Ericsson and their radio network industry at that time was

15   very much an untapped market, so I was out hunting new

16   contracts for Ericsson, very much in Latin America, but

17   also in other places in the world.

18          Then in 2000, I moved and worked with business

19   contracts, mainly for the U.S. market when the big

20   operators here in U.S. went from a technology called TDMA

21   to another technology called GSM.

22          And the operators I worked with were AT&T and

23   Cingular, who was an operator at that time but is now AT&T.

24   But also to Canadian operators, like Rogers, and Mexican

25   operators, like Telecomm Mexico.

1           After that, in 2002, I worked for one year with

2   T-Mobile U.S. in sales.

3           And after that, I moved to product management,

4   working with design and development of base stations.

5           I was working in second generation base stations

6   with the RBS 2000 family that supports GSM.  I worked there

7   for five years.

8           And then after that, I have been working with

9   RBS 6000 base stations which is the latest base station

10  family for -- for Ericsson, and I worked there for about

11  six years before I went into the financial part of

12  Ericsson.

13  Q.  Mr. Norrby, if you could tell us a little bit about the

14  history of Ericsson as a company.

15  A.   Sure.  Ericsson is a company founded in late 1800.  And

16  we have been making telephones and -- and network

17  infrastructure for operators for a long time.

18          It started off by -- by making simple fixed line

19  telephones.  And you see some pictures of how they could

20  look like before.  They were actually quite beautiful in

21  the beginning, wooden -- wooden phone and very artistically

22  designed.

23          And then we had some attempts to make some early

24  cellular systems in the 1950s, and one of the pictures here

25  shows a big bulky item.  That is actually one of the first

1  mobile phones that was intended for cars.

2  Q.  And that's that third picture on the top?

3  A.  That is correct.

4       Then the fourth picture to the top you have some

5  early mobile phones from Ericsson in the GSM days.

6       And on the bottom, you see some pictures on how it

7  looks like now.  So you have a manufacturing facility to

8  the -- to the left, and the -- also some testing facilities

9  to the right.

10 Q.  Where does the name Ericsson come from?

11 A.  The name Ericsson comes from the founder of the

12 company, Lars Magnus Ericsson.  So it's his surname that is

13 the company name.  Lars Magnus Ericsson founded the company

14 in 1876.

15      And just to give a reference on -- on the age of

16 the company, it is younger than Smith Wesson, but it's

17 older than Coca-Cola and Ford Motor Company.

18 Q.  Where was the company founded?

19 A.  It was founded in Stockholm, Sweden.

20 Q.  I have a slide up here.  What are we seeing on this

21 slide as far as the Ericsson logo?

22 A.  So this is a slide trying to show why we have the

23 Ericsson logo.  And the reason for the logo comes from a

24 transformer, which was a very common component for making

25 fixed line systems.

```
 1            And a transformer is basically a transformer core
 2   where you have electrical windings on one side and
 3   electrical windings on another side.  And you see the blue
 4   electrical windings on the secondary side here.  The logo
 5   is a simplification of the secondary windings.
 6            But also nowadays, since we don't use transformers
 7   anymore in our electronics, we can also have the
 8   transformer as a metaphor for what Ericsson represents.  We
 9   have to transform our business, our technology every day,
10   otherwise, we won't survive.
11   Q.  Where -- does the company operate only in Sweden?
12   A.  No, we don't.  We sell radio networks and core networks
13   to some 180 countries throughout the world.
14   Q.  And is the United States included in that 180
15   countries?
16   A.  Yes, it is.  We have quite a big representation here in
17   U.S.  Our headquarters is in Plano, Texas.  We have about
18   3,000 employees there.
19            We also have a research facility in Austin where
20   we make processors for our equipment.  And outside Texas,
21   we have a lot of representation in U.S.  We have a lot of
22   research and design facilities in California, and we have a
23   lot of sales representations throughout the country.
24   Q.  If you would, Mr. Norrby, describe for the jury, what's
25   Ericsson do?
```

1  A.  Okay.  Ericsson is maybe not that famous.  Most of you

2  who -- who have to deal with the mobile systems in everyday

3  life, you're familiar with Apple and Samsung mobile phones.

4      But Ericsson and Nokia, we are what Apple and

5  Samsung are on mobile phones but on the infrastructure

6  side.

7      So everything that you need to -- to make

8  telephony work, except the phones, Ericsson does.

9      So it's networks.  We design and develop networks.

10 We manufacture networks and sell them to big operators

11 throughout the world.

12     And we also provide services related to this.  We

13 help the operators if they want to install and optimize the

14 radio networks.  And sometimes we also run the operator --

15 the networks for the operators.

16 Q.  Now, moving away from the era where we saw the

17 beautiful wooden -- wooden phones of the 1800s, what are

18 some examples of Ericsson's contributions to modern day

19 communication technology out of that research and

20 development division you mentioned?

21 A.  Sure.  So a couple of the milestones that can be worth

22 mentioning is we made the first international phone call

23 over an exchange in 1950.  Before that, it was handled with

24 manual help.

25     And then in 1981, it was when we had the first 1st

1    generation mobile systems being deployed.  We used a

2    technology called NMT.  The 1st generation radio system was

3    voice centric, and it was analog, so it provided some basic

4    capacity.

5    Q.  And that's what we call 1G?

6    A.  That is what we call 1G.

7            Then in 1991, we were first with the 2nd

8    generation radio networks that we refer to as -- as GSM.

9    That was a digital voice radio network that provided more

10   capacity than the 1st generation.

11   Q.  And that's what we call 2G?

12   A.  That is what we call 2G.

13   Q.  What comes next?

14   A.  Then if we move on, in 2001, we -- we have to move on.

15   Q.  I'm -- I'm trying, sir.  Thank you.

16   A.  In 2001, we made the first 3G call, so the first 3rd

17   generation mobile system.  What distinguished us from a 3rd

18   generation system and a 2nd generation system is here you

19   can run both voice and data, and we were first with that.

20           And then going on, we introduced the 4th

21   generation mobile systems in 2009.  And the first call was

22   here in U.S. with an operator called Verizon.

23           And what characterizes the 4th generation mobile

24   systems is high data rates.  It's significantly better than

25   the 3rd generation system.

1          And where we stand today is that in 2000 -- late

2    2018, we actually started to -- to deploy the 5th

3    generation mobile systems, both for Verizon and AT&T.

4          What characterizes the 5th generation mobile

5    systems is that it's even higher data rates, but it's also

6    aiming for man/machine communication and machine/machine

7    communication.  So it's very much what we call the Internet

8    of Things.

9    Q.  So, Mr. Norrby, when we talk about 1G, 2G, 3G, 4G, LTE,

10   and soon to be 5G, we're talking about things that involve

11   Ericsson's technology?

12   A.  Yes.  So we have been delivering mobile systems for

13   40 years now.

14   Q.  Now, you mentioned the first -- and we see up on the

15   slide, the first 4G LTE call in 2009.  Who was the first

16   base station vendor to provide LTE equipment?

17   A.  That was Ericsson, and it was towards Verizon as an

18   operator.

19   Q.  There's more to Ericsson than just research and

20   development; is that right?

21   A.  It certainly is.  Although research and development is

22   a very important part of -- of designing radio networks and

23   phone networks, we have a significant manufacturing

24   facilities to do this, and we have a large sales

25   organizations to sell the networks to the operators, and we

```
 1  have also large service operations where we provide
 2  services to the operators when they want to use them.
 3  Q.  Who are some of Ericsson's customers?
 4  A.  So we basically deliver to all major operators
 5  throughout the world.  And to go into specifics, in the
 6  U.S. market, we deliver to Verizon, we deliver to AT&T, we
 7  deliver to T-Mobile, and we deliver to Sprint.  We also
 8  deliver to a lot of the second tier operators in the U.S.
 9          And going outside the U.S., we basically deliver
10  to almost every single major operator on the planet.
11          So we start with some examples, KDDI and SoftBank
12  in Japan, China Mobile in China, and in Europe, you have
13  Vodafone, Deutsche Telekom, and France Telecom.  And you
14  have America Movil in Mexico for being -- just mentioning a
15  few of the most significant operators.
16  Q.  And I think I read somewhere that Ericsson actually has
17  a presence on every continent; is that correct?
18  A.  Yes, that -- that is actually correct.  We even have
19  deployed a radio network in Antarctica.  And, well, the
20  pictures of it is deceiving.
21          We don't provide network services to penguins;
22  it's scientists working there.
23  Q.  Mr. Norrby, if you could share with the jurors, who are
24  the people or the employees behind Ericsson?
25  A.   The people behind Ericsson are very much technology
```

1    oriented.  It's a high-tech industry, and success from the
2    past is not sufficient for us to go forward.  We have to be
3    on the toes of technology development, so we're very
4    research and development oriented in our organization.
5    Having the latest technologies helps having the cutting
6    edge towards our competition.
7    Q.  And can you give us a feel for what it's like to work
8    at Ericsson from your own experience.
9    A.  I think it's great fun to work in Ericsson, but you
10   need to appreciate working in a highly international
11   market.  We operate in 180 countries.  You have to like
12   working with technology, and I really do that.
13          And many people like to work there for a long
14   time.  I've been working in Ericsson for some 22 years, and
15   I'm probably below average in -- in my time in Ericsson.
16   There have been many working more than I have.
17          And to give one final example is that people who
18   have been working in Ericsson for 30 years, they get a
19   special award.
20          Then you're invited to Stockholm City Hall for a
21   big festive dinner with top management.  And the fun thing
22   with Stockholm City Hall is that that's the venue for the
23   Nobel Prize.  That is the big science prize in the world.
24   Q.  So you've got about eight more years before you might
25   be invited?

1    A.  Yes.  I can't wait.

2    Q.  Mr. Norrby, why are patents important to Ericsson?

3    A.  We put a lot of R&D efforts to develop our -- our

4    networks.

5         We have some 24,000 engineers working in -- in

6    R&D.  And we've spent some 40 years making radio networks.

7    So we have a significant stake in research and development.

8         So we patent our best ideas, and we have some

9    45,000 patents.  So we have a very strong patent portfolio.

10   And the reason for why we patent is because we want to

11   protect our ideas.

12   Q.  Mr. Norrby, are you familiar with -- and we see one on

13   the table here in front of me -- with the base stations

14   being accused of infringement in this case?

15   A.  Yes, I am.  I've been working with that for a long

16   time.

17   Q.  Is that an RBS 6000 base station?

18   A.  The items you see on the desk, they're our RBS 6000

19   products.

20   Q.  Okay.  What is the RBS 6000 family of base stations?

21   A.  RBS 6000 is our latest base station family.  It is a

22   family that is multi-standard, so you can run basically any

23   technology on it.  You can run 2G.  You can run 3G.  You

24   can run 4G on it, and you can also run 5G on it by software

25   upgrade.

1   Q.  Now, you mentioned when we were going through the

2   timeline of your work history at Ericsson that you were --

3   you're a member of the original RBS 6000 team.  Can you

4   tell the jurors a little bit about that?

5   A.  Yes, that's correct.  When I started working in product

6   management, I was working for the second generation base

7   station family for GSM.  And we had another product line in

8   Ericsson working with the third generation technology,

9   WCDMA, or RBS 3000.

10          And upper management, they were not happy to have

11  two different base station families in the company.  So

12  they sent us away, a small group of people, and said do not

13  come back until you have harmonized base stations within

14  Ericsson.

15          So we were away outside Stockholm for a few days.

16  And after that, we came back and had defined the RBS 6000

17  family.  And we were not many at that time.  We were some

18  10 to 15 persons.  And you see some of the people working

19  in that workshop.  I'm in that picture, as well.

20  Q.  And, now, this is the original team that came up with

21  the RBS 6000.  Has that team grown today?

22  A.  It has grown significantly.  Our team here, we defined

23  the base station family on how to merge from 2000 to 3000

24  products to RBS 6000.  But then we rapidly expanded the --

25  the development on this.

1          So nowadays we are some 14,000 people working with

2     base stations and -- and related to some software to

3     that -- sorry.

4          So since 2007, I made a rough estimate on how much

5     work we've spent on RBS 6000.  And it is somewhere around

6     100,000 man years.  Not man hours.  Man years.  So it's a

7     significant effort we put into this.

8     Q.  And what does RBS stand for, and what does it do?

9     A.  RBS stands for radio base station.  And a radio base

10    station is a key component for building a radio network.

11    You need a number of radio base stations to provide a radio

12    network.

13    Q.  Can you give the jurors an example of where they

14    themselves might -- might see one of these base stations

15    outside of the courtroom?

16    A.  Sure.  Normally, operators try to be fairly discreet

17    on -- on where -- where they put the radio base stations.

18          But if you just walk outside the court here and

19    look to the left behind the Chase Manhattan Bank Building,

20    you actually see a radio base station tower.  And you see

21    that on the picture here.  And you see some big wide things

22    on the tower.  Those are the radio antennas.  They don't

23    seem to be very big, but they are somewhere between 10 to

24    15 meters long.

25          Behind these antennas, we mount radio equipment.

1    And then we have cables to -- to the ground.

2          And on the ground, we have the basic equipment to

3    support the radio.  So we have the digital units there, and

4    we have the power and backup and transmission equipment

5    there, as well, in a shelter.

6    Q.  Does the RBS 6000 family function with LTE?

7    A.  Yes, it does.

8          MS. SMITH:  Your Honor, may I have permission to

9    approach the witness with the base station on the table?

10         THE COURT:  You may.  Co-counsel -- or you can

11   hand it to the Court Security Officer.

12         MR. KUBEHL:  Yes, Your Honor.

13   Q.  (By Ms. Smith)  Okay.  Mr. Norrby, let's take a look at

14   the base station.  Is this a -- is this an indoor or an

15   outdoor model?

16   A.  What we see here are components for an outdoor model

17   base station.

18   Q.  And how can you tell?

19   A.  You see that with this -- that is a radio unit, and

20   it's designed for being put in an outdoor environment.

21         This is what you put close to the antennas at the

22   tower.  And it works throughout the minus 32 plus 50

23   degrees Centigrade, which is basically covering all the

24   temperatures you can find on the planet.

25   Q.  While you're up --

1          MS. SMITH:  With the Court's permission, if he

2   could remain standing, Your Honor?

3          THE COURT:  He may.

4          MS. SMITH:  Thank you, Your Honor.

5   Q.  (By Ms. Smith)  If you could explain to the jury what

6   the main component parts are of the base station?

7   A.  Sure.  There are two main components of a base station.

8   And I would like to start with the digital unit, and it's

9   this piece of equipment.  This is basically a really

10  capable computer that is specially designed for radio

11  networks.

12         And inside these, we have several very powerful

13  processors designed by Ericsson.  And if we were to compare

14  it with a normal PC, this is about 40 times as powerful as

15  a normal PC.  So it's a massive computer -- computer power

16  in this one.

17         This one does all the intelligence in the radio

18  network.  So it handles all the -- the mobiles in -- at the

19  base station.

20         It decides if this base station or another base

21  station -- sorry -- should handle the -- the mobile.  It

22  does all the traffic, and it handles all the mobiles

23  connected to the base station.

24         And it can be as much as 8,000 mobiles connected

25  to this base station.  So it's a lot of computing --

1  computing power.

2        Then going forward -- so that was the intelligence

3  in the base station.

4        Then to speak with the mobiles, you need a radio

5  unit.  So this is doing all the talking to the mobiles and

6  also all the listening.

7        And this one is connected to the digital unit, and

8  it's also connected to the antennas.  So it can do all the

9  conversation needed.

10        And to give some reference on how flexible the

11  products are, the digital units come in some five to 10

12  different versions.  But the radio units, they come in some

13  200 different versions, depending on frequency and

14  applications.

15        So you can either run it in outdoor environment or

16  indoor environment.  We can also provide small indoor cells

17  for airports and shopping malls, for instance.  So it's a

18  lot of different flavors of the equipment.

19  Q.  Now, you can stay seated, sir.

20  A.  Thank you.

21  Q.  Now, are these base stations customizable?

22  A.  Yes, they are.  They're highly customizable.  As I

23  mentioned before, you have many different variance of

24  these, so you can basically tailor it to every customer we

25  can find.

1   Q.  But what you showed us, those are just the basics?

2   A.  These are just the basics.  It's two key components of

3   a base station.

4   Q.  How long has Ericsson been making base stations?

5   A.  We've been delivering base stations since 1981.

6   Q.  And what is your experience with them?

7   A.  I've been working with base stations ever since I

8   started at Ericsson and also with the radio networks that

9   we build with the base stations.  So that's the core

10  business of Ericsson.

11  Q.  Is there anyone better at Ericsson -- than Ericsson at

12  making base stations?

13  A.  From my perspective, no.  We were first on both 2G and

14  3G and 4G, so I believe we are the best in the industry.

15  Q.  Now, Mr. Norrby, you mentioned wireless standards

16  earlier.  What's a standard?

17  A.  A standard is a set of rules that all players in the

18  industry have to follow.

19          So if we talk of wireless standard, all the

20  infrastructure players, the handset manufacturers have to

21  follow the rules.  There are some very good ideas behind

22  having these rules.

23          You can compare it with power sockets in your

24  households.  It would be quite awkward if there were

25  different power sockets with different voltages and

1    different frequencies wherever you go.  So there's a clear

2    benefit to have a standard.

3           So the standards we have, they set the rules for

4    how networks shall be defined.  They also set the rules for

5    how networks shall talk with mobiles.  And by doing so,

6    operators can buy networks from any network vendor, and

7    customers can buy mobiles from any mobile vendor, and

8    customers can choose any operator they want.

9           And by doing so, we increase the market size, and

10   that's good for the whole industry.  And by also increasing

11   the market size and having standards, we enable suppliers

12   to be motivated to help us in doing products for us.

13   Q.  Does Ericsson actively participate in the telecom

14   standard setting organization?

15   A.  Yes.  We are a very active in the standardization and

16   been in that for a long time.  We have a lot of our

17   sharpest engineers participating in the standards, and it's

18   a big effort to put in there.

19   Q.  And the jury's heard a lot about the 4G LTE standard.

20   Was Ericsson involved in the development of the 4G LTE

21   standards?

22   A.  Yes, we were very active in the standardization of 4G.

23   Q.  And you -- you said earlier that Ericsson was an active

24   participant and very involved.  What does that mean?

25   A.  It involves being part of all the technical

1  specifications in the standard, both on -- on the

2  infrastructure side and on the handset side, and driving

3  the work -- the work on that, making sure that the standard

4  becomes as good as possible, and you get the major

5  improvement from the previous standard.  And we played a

6  very active role that would -- with our best ideas.

7  Q.  Now, you said earlier that Ericsson had been awarded

8  how many patents?

9  A.  We have, in total, some 45,000 patents, and almost all

10 of them were related to networks.

11 Q.  Does Ericsson respect the patent rights of others?

12 A.  Yes, we do.  We -- we pay a lot of R&D efforts to

13 design our products, and we patent our best ideas to

14 protect our rights.  And it goes both ways.  We respect

15 other organization's patents.

16 Q.  By coming into court and defending itself, does it mean

17 that Ericsson has no respect for patents?

18 A.  Absolutely not.  We -- we pay a lot of attention to

19 patents, and we have extensive cross-licensing with all the

20 major network providers and all the major handset

21 providers.

22         MS. SMITH:  I'll pass the witness.

23         THE COURT:  All right.  Cross-examination by the

24 Plaintiff.

25         MS. FAIR:  Yes, Your Honor.

```
 1          THE COURT:  You may proceed with cross-examination
 2   when you're ready, Ms. Fair.
 3          MS. FAIR:  Thank you, Your Honor.
 4                    CROSS-EXAMINATION
 5   BY MS. FAIR:
 6   Q.  Good morning, Mr. Norrby.
 7   A.  Good morning.
 8   Q.  I understand English isn't your first language, and I
 9   have a tendency sometimes to speak quickly and jumble my
10   words.  So let me know if you don't understand my
11   questions, please.
12   A.  Sure.  Please speak slowly.
13   Q.  Yes, sir.  I'll do my best.
14   A.  Yes.
15          THE COURT:  Good suggestion.
16   Q.  (By Ms. Fair)  Mr. Norrby, you just told this jury that
17   the base stations that Ericsson provides are highly
18   customizable, right?
19   A.  That is correct.
20   Q.  It's not just something that you go buy off the shelf
21   and it's a one size fits all, right?
22   A.  That is correct.
23   Q.  And so the -- the customer, like T-Mobile, they specify
24   their configuration when they're placing an order, right?
25   A.  That is correct.
```

1  Q.  They work with Ericsson, you work together, and you

2  figure out what's the right customized product for the use

3  of the carrier, right?

4  A.  That is correct.

5  Q.  You pick the number -- the customer picks the number of

6  radio units?

7  A.  They pick the number of radio units, which types of

8  radio units, which digital units, and what software to run

9  on the base station.

10  Q.  And they choose how to -- the hardware activation for

11  them?

12  A.  Yes, they do.

13  Q.  And that's talking about connected users, the

14  throughput of the unit, right?

15  A.  That is correct.

16  Q.  They pick the power options?

17  A.  That is correct.

18  Q.  So it's not really true that -- that the carrier is

19  just somebody who picks a random product off the shelf,

20  like I might go pick a laptop out at Walmart, right?

21  A.  That is correct.

22  Q.  Now, Mr. Norrby, Ericsson has told this jury that

23  they're here to stand behind their product, right?

24  A.  That is correct.

25  Q.  And we heard questions and testimony about, well, if

1    somebody's product goes wrong, you'd expect the person who

2    provided that product to stand up for it, right?

3    A.   Yes.

4    Q.   Well, you understand that this case isn't about a

5    product malfunctioning, right?

6    A.   Correct.

7    Q.   This case is about patent infringement, right?

8    A.   That is correct.

9    Q.   And Mr. McGrath explained to us that a method claim is

10   about a process, right?

11   A.   That is correct.

12   Q.   And that's the type of claims that are at issue in this

13   case, right?

14   A.   Yes.

15   Q.   It's not a claim specifically on the product itself.

16   A.   Yes.

17   Q.   It's how it's used.

18   A.   Yes.

19   Q.   And T-Mobile is the one that -- that executes those

20   processes; they use the product?

21   A.   Yes.

22   Q.   So we can't say that if a drilling bit breaks or goes

23   wrong, that really Halliburton should be standing up here,

24   right?  I mean, this is about Exxon pulling the oil and gas

25   using the drilling bit, right?

1  A.  Well, we have designed the product so we have a

2  significant responsibility to them.

3  Q.  As does T-Mobile, right?  As we just talked about, all

4  the different things that they customize.

5  A.  Yes.

6  Q.  And their decision on what to turn on and what not to

7  turn on.

8  A.  Yes.

9  Q.  They are the ones that actually use the process that's

10  accused in this case.

11  A.  Yes.

12  Q.  I want to shift gears a little bit.

13       We've heard about the Turina patent in this trial,

14  right?

15  A.  Yes.

16  Q.  Do you know Mr. Dalibor Turina?

17  A.  No, I don't know him.

18  Q.  Do you know if he's employed by Ericsson currently?

19  A.  I don't know.

20  Q.  So you don't know if he's the director of patent

21  portfolio management?

22  A.  I can't answer that.

23  Q.  Do you understand that Ericsson is telling this jury

24  that Mr. Turina's patent is one of the reasons that

25  Dr. Jorgensen's patents should be torn up and thrown away,

1  right?

2  A.  Yes.

3  Q.  And Mr. Turina isn't going to come and tell this jury

4  about his invention, is he?

5  A.  That is correct.

6  Q.  We've heard a lot this week about Ericsson's being an

7  inventive company, right?

8  A.  Yes.

9  Q.  Seems like Ericsson's worked really hard to show this

10  jury how much they've invented over the last 40 years,

11  right?

12  A.  Well, that's the truth.

13  Q.  Right.  You were involved in 1G and 2G?

14  A.  And 3G and 4G and 5G.

15  Q.  And we even heard about some awards from the European

16  Patent Office, right?

17  A.  Yes.

18  Q.  I mean, you know, IV has awards from the U.S. Patent

19  Office, right?

20  A.  Yes.  You have a lot of patents.

21  Q.  You know they've won an award as well, right?

22  A.  I was not aware of that, but I hold that very likely.

23  Q.  I mean, being an inventive company doesn't mean

24  Ericsson's invented everything, right?

25  A.  No.  I haven't said that.

1  Q.  You haven't cornered the market on good ideas?

2  A.  No, we have not.

3  Q.  Even the standards themselves that we've been talking

4  about, Ericsson wasn't the only company involved in those,

5  right?

6  A.  No.  Doing standardization is a large teamwork with all

7  the network providers and the major handset manufacturers

8  and some major operators.  So it's a major teamwork to do

9  standards.

10  Q.  And it takes a long time to come up with the best way

11  to do things, right?

12  A.  Yes.

13  Q.  And that's what you try to do with the standards.

14  A.  Yes.

15  Q.  You try to implement the best technology you can.

16  A.  Yes.

17  Q.  And you think that's what VoLTE is, right?

18  A.  VoLTE it our key component.

19  Q.  And Ericsson uses LTE and VoLTE even though some of the

20  ideas in that may have come from other people, right?

21  A.  Yes.

22  Q.  And so the fact that Ericsson has a bunch of other

23  patents and has some awards for being an inventive company,

24  that doesn't mean that Dr. Jorgensen didn't invent

25  anything, right?

1   A.   That is correct.

2   Q.   You don't get a free pass to trespass just because you

3   own some of your own property, right?

4   A.   Absolutely.

5   Q.   We can agree, then, that if this jury decides that

6   Ericsson and T-Mobile are infringing, that they should pay

7   for that use, right?

8   A.   Yes.

9   Q.   Because patents have value, right?

10   A.   They certainly have.

11   Q.   They're property rights, and they should be respected?

12   A.   Yes.

13         MS. FAIR:  I'll pass the witness, Your Honor.

14         THE COURT:  Redirect, Ms. Smith?

15         MS. SMITH:  Briefly, Your Honor.

16                    REDIRECT EXAMINATION

17   BY MS. SMITH:

18   Q.   Mr. Norrby, you absolutely agreed with Ms. Fair when

19   she said, base stations are not one size fits all, didn't

20   you?

21   A.   That is correct.

22   Q.   And Ericsson base stations are not the same as Samsung

23   and Nokia base stations?

24   A.   That is correct.

25   Q.   And Plaintiff can't go to the base station-getting

1  store and buy a Nokia base station and assumes it works

2  like an Ericsson base station, can it?

3  A.  That's correct, they are very different.

4  Q.  But Plaintiff sued Ericsson, didn't it?

5  A.  Yes.

6          MS. SMITH:  Thank you, Your Honor.

7          THE COURT:  Further cross, Ms. Fair?

8          MS. FAIR:  Yes, Your Honor, briefly.

9                    RECROSS-EXAMINATION

10 BY MS. FAIR:

11 Q.  AT&T buys Ericsson's base stations, right?

12 A.  Yes.

13 Q.  As does Verizon?

14 A.  Yes.

15         MS. FAIR:  I'll pass the witness, Your Honor.

16         THE COURT:  Redirect?

17         MS. SMITH:  No, Your Honor.

18         THE COURT:  All right.  You may step down,

19 Mr. Norrby.

20         THE WITNESS:  Thank you.

21         THE COURT:  Mr. Johnston, let's also get that

22 other demonstrative device, and return it back to the

23 Defendants, so we can clear the table.

24         All right.  Defendants, call your next witness.

25         MR. KUBEHL:  Plaintiffs call Christian Skarby.

```
1              THE COURT:  All right.  If you'll bring the
2    witness in so that he can be sworn.
3              If you'll come forward, sir, the courtroom deputy
4    in front of me will administer the oath to you.  Over here.
5              (Witness sworn.)
6              THE COURT:  Now, if you'll come around where you
7    were, have a seat over here on the witness stand.
8              MR. KUBEHL:  Your Honor, for placement of the
9    easel, would Your Honor prefer it to be out here?
10             THE COURT:  Probably in front of the podium.
11   That's about right.
12             MR. KUBEHL:  Mr. Skarby, can you see this?
13             THE WITNESS:  I can.
14             THE COURT:  Who's going to cross-examine this
15   witness?
16             MR. FLANNERY:  I am, Your Honor.
17             THE COURT:  All right.  Can you see the easel from
18   where you're seated?
19             MR. FLANNERY:  I can see the easel, but I'm going
20   to wait to see when he puts the board on there.
21             I can see it, Your Honor.
22             THE COURT:  All right.  Then let's --
23             MR. KUBEHL:  I think you've got a pointer up
24   there.
25             THE WITNESS:  Is it one of these?
```

```
 1          THE COURT:  No, it's by the -- it's by the --
 2          THE WITNESS:  Yes, it looks like a pen.
 3          THE COURT:  Turn it the other way.
 4          THE WITNESS:  Thank you, Your Honor.
 5          THE COURT:  All right.  Defendants, you may
 6  proceed with direct examination of this witness.
 7          MR. KUBEHL:  Thank you, Your Honor.
 8          CHRISTIAN SKARBY, DEFENDANTS' WITNESS, SWORN
 9                    DIRECT EXAMINATION
10  BY MR. KUBEHL:
11  Q.  Mr. Skarby, could you please introduce yourself to the
12  jury?
13  A.  Hi.  My name is Christian Skarby.
14  Q.  Where do you live, Mr. Skarby?
15  A.  I live in Stockholm, Sweden.
16  Q.  Do you have a family there?
17  A.  Yes, I have a wife and a five-year-old son.
18  Q.  Who do you work for?
19  A.  I work for Ericsson.
20  Q.  And what do you do at Ericsson?
21  A.  I'm an expert in radio resource management.
22  Q.  Is that your title -- you said expert in radio resource
23  management.  Is that an official title at Ericsson?
24  A.  Yes, it is.
25  Q.  Okay.  And you're not -- you're not here to give expert
```

1    testimony.  You're going to give factual testimony about

2    the way the base station works?

3    A.  Yes.  Expert is my title at Ericsson.

4    Q.  Okay.  What does it -- what does it take to be an

5    expert in radio resource management at Ericsson?

6    A.  It's a quite involved process, but it involves senior

7    management identifying that there's a strategic need to

8    have an expert in that area.

9          It also requires that senior management identifies

10   and acknowledges a candidate that has the required set of

11   skills, the required contacts, is visible enough in the

12   organization to actually be, you know, worthy of such a

13   position.

14   Q.  So I want to take a step back to sort of know how you

15   got to be an expert.  First of all, where did you grow up?

16   A.  I grew up in Stockholm, Sweden, as well.

17   Q.  Okay.  And is English your first language?

18   A.  No.

19   Q.  How did you learn English?

20   A.  I mean, we learn English in school, starting at 4

21   grade -- 4th grade.

22   Q.  Okay.

23          THE COURT:  Mr. Kubehl, you need to remove the

24   demonstrative until you're ready to question the witness

25   about it, and then put it up on the easel.

```
 1              MR. KUBEHL:  Yes, Your Honor.
 2              THE COURT:  Thank you.  Proceed, please.
 3              MR. KUBEHL:  Thank you, Your Honor.
 4   Q.  (By Mr. Kubehl)  So how long have you been at Ericsson?
 5   A.  I've been there for -- since 2005 now, so maybe 13
 6   years, 14.
 7   Q.  And how long have you been around wireless networking,
 8   generally?
 9   A.  It's hard to say.  My father was also wireless engineer
10   working for Ericsson, so I got kind of exposed to it
11   through him, I guess.  I also used to work for Ericsson in
12   a laboratory during the summers when I was in high school.
13   Q.  Did you earn a degree?
14   A.  Yes, I earned a Master's degree.
15   Q.  And what was that in?
16   A.  In electrical engineering with a direction toward
17   signal processing and systems.
18   Q.  What kind of work were you doing when you started at
19   Ericsson in 2005?
20   A.  At that time, I was working doing signal processing for
21   the uplink for the 3G, for third generation, the one that
22   came before 4G or LTE.
23   Q.  Okay.  What was your next project?
24   A.  After that, in 2007, I moved on to do radio resource
25   management for LTE.
```

1    Q.  What does LTE stand for?

2    A.  It stands for long-term evolution.

3    Q.  And what does the -- the evolution mean in that -- in

4    the phrase?

5    A.  It's basically the evolution of the wireless

6    technology.

7    Q.  And so when you started working on LTE in 2007 at --

8    you know, what was going on in the industry as far as LTE

9    goes?

10   A.  LTE was about to be standardized -- the first version

11   of the technology sort of being standardized.  Companies

12   agreeing on, you know, how shall things work, what shall --

13   I mean, their interface, what does the UE do, and so on.

14   Q.  So you just said UE.  What are you referring to?

15   A.  Yes, it's not --

16   Q.  Slow down a little bit.

17   A.  Thank you.  UE means user equipment.  And that is

18   basically the mobile phone.  It's the 3GPP name of it.  I'm

19   so used to saying it, it slips out of my mind without --

20   Q.  Okay.  So UE is the same as the mobile phone?

21   A.  Yes.

22   Q.  Okay.  So tell us when you then got involved -- when

23   LTE was just sort of getting its roots, what were you doing

24   at Ericsson, what kind of work on LTE were you doing?

25   A.  As I said, I was working with radio resource management

1  at that time.  And, in particular, I was doing the initial

2  specifications for the software for the schedulers.

3  Q.  Let's take one step back.  Radio resource management,

4  can you help the jury understand what you mean by that?

5  A.  Yeah.  I will try.

6       So the base station is responsible for handling

7  the transmissions over the air, and it needs to access

8  certain resources.

9       So an example of a resource, that could be

10  transmit power.  You determine how much transmit power you

11  should use when you transmit.

12       You also have the frequencies that you can use to

13  transmit.  Those are all resources and can determine which

14  frequent -- which frequencies are used when you make a

15  transmission.  That is all part of radio resource

16  management.

17  Q.  You mentioned the schedulers.  What -- what work on the

18  Ericsson schedulers have you done?

19  A.  As I tried to say before, I was involved in writing the

20  initial software specifications -- specifications telling

21  you how do you do this part, how do you do this step of

22  scheduling, so how -- how do you make this happen?  And I

23  also worked with them for -- basically since then.

24  Q.  And give us a time frame when you started working on

25  that, when -- that was when?

1   A.   That was in the time frame of 2007 to 2009.

2   Q.   So starting from there and coming up to where we

3   are now in the base station that we've seen in the

4   courtroom here, tell us what kind of effort has gone

5   into -- at least on the scheduling functionality that

6   you've worked on, what kind of effort has gone into

7   that?

8   A.   I can try to explain a little bit how it has come to be

9   and how we work, but it's not really a formal process.  So

10  it's a bit hard to describe.  But it involves a research

11  department.

12          They're doing the standardization.  They

13  understand how the technology works, but they also

14  investigate things, you know, how can this work, can we do

15  this in a certain way, versus little schemes and

16  algorithms, how to solve the different problems that

17  appear.

18          And we take their input, see, you know, how -- how

19  can we solve certain problems.  We also talk to customers

20  and our project management and get requirements from the

21  customers.

22          The customers might say, we want a knob to tune

23  this part of how the performance works, or we want you to

24  implement the standard in this way because that would help

25  us fulfill our needs.

1        We try to, in the team, brainstorm about this,

2   think about pick and choose, you know, how do we put all of

3   this together in one piece of software.  And those

4   thoughts, they are kind of materialized into this software

5   specification I was talking about.

6        We hand this specification over to our design

7   department.  We help them understand that, because the

8   design department, they're the ones doing the coding of the

9   software.

10       They might discuss with us also maybe we can

11  improve the spec, maybe we can make it a little bit better

12  given their knowledge of the hardware and software and --

13  yeah -- generally support throughout the process.

14  Q.  As far as the way the --

15       THE COURT:  Mr. Kubehl, I'm going to ask

16  Mr. Skarby to try and slow down a little bit with your

17  answers.

18       THE WITNESS:  Thank you, Your Honor.

19       THE COURT:  And, Mr. Kubehl, given that this is a

20  fact witness, you don't need and shouldn't ask for

21  questions that call for a lengthy narrative.  You need to

22  ask precise questions.

23       MR. KUBEHL:  Yes, Your Honor.

24       THE COURT:  Let's proceed.

25  Q.  (By Mr. Kubehl)  So, Mr. Skarby, just to finish up your

1   background, have you been awarded any United States

2   patents?

3   A.  Yes.  I think I have 21 United States patents.

4   Q.  And do they relate to the scheduling functionality that

5   we'll be talking about?

6   A.  Most of them do.

7   Q.  So in your job, with the title at Ericsson, expert in

8   radio resource management, do people at Ericsson look to

9   you for guidance on how to solve the technology problems in

10  that area?

11  A.  Yes.  That is part of the sort of job description for

12  an expert.

13  Q.  Okay.

14          MR. KUBEHL:  With permission, I'd like to put the

15  exhibit on the easel?

16          THE COURT:  You may put the demonstrative on the

17  easel.

18  Q.  (By Mr. Kubehl)  Mr. Skarby, have you created this

19  drawing to help the jury understand some of the concepts

20  you'll be talking about today?

21  A.  Yes.

22  Q.  Show us -- if you can reach the pointer, could you

23  please show the jury the part of the drawing that you work

24  on.

25  A.  That would be -- let's see if I can hit it.  There.

1    The base station here.

2    Q.  And what does the base station do?

3    A.  The base station is the one that transmits to the

4    mobile phone and receives transmissions from the mobile

5    phone.

6    Q.  Okay.  And the mobile phone is where?

7    A.  That would be this pad-looking thing over here.

8    Q.  Okay.  And that's a wireless communication to the

9    phone?

10   A.  Yes.  The base station communicates wirelessly to the

11   mobile phone.

12   Q.  So you've -- you've got the mobile phone on one side

13   communicating wirelessly, and then what else does the base

14   station communicate with?

15   A.  On the other end -- sorry -- over here, you have the

16   core network to which the base station communicates to the

17   Internet, which has the contents that its purpose is to

18   deliver to the phone.

19          MR. KUBEHL:  Your Honor, would it be all right if

20   I stood next to the easel so I could point to something?

21          THE COURT:  As long as you speak up and as long as

22   you don't get hit with the laser.

23          MR. KUBEHL:  Thank you.

24          THE WITNESS:  I'll be careful.

25   Q.  (By Mr. Kubehl)  All right.  So you've got labeled

1    uplink and downlink here.  Can you tell us about that.
2    A.  Yes.
3          Uplink, that is the blue arrow here, that refers
4    to direction of transmission.  So when the mobile phone is
5    transmitting to the base station, that is transmitting in
6    the uplink direction.
7          And the pink arrow here, that represents the
8    downlink direction, which is then the opposite direction.
9    So when the base station is transmitting to the mobile
10   phone, that means that they're transmitting in the
11   downlink.
12   Q.  You've got labeled within the base station these two
13   blocks, uplink scheduler and downlink scheduler.  Is that
14   all the base station does, is just have a scheduler?
15   A.  No.  It's not really all it does.
16   Q.  Okay.  Is that what you work on, the scheduler part?
17   A.  Yes.  That's what I've been working most of my career
18   at Ericsson with.
19   Q.  Okay.  Please explain what you're showing here with the
20   uplink scheduler and then the separate downlink scheduler.
21   A.  So the uplink scheduler, that represents in this
22   picture the functionality within the base station that
23   decides which phone gets to transmit on what resources in
24   the uplink direction.
25          The downlink scheduler, conversely, it's a

```
 1  separate set of functionality that decides to which phone
 2  the base station shall transmit on using what resources.
 3  Q.  You've got some color coordination here between your
 4  schedulers, and then down here you've got downlink
 5  frequencies and uplink frequencies labeled.  Let me start
 6  with the uplink scheduler.
 7          What's the pool of resources that are available to
 8  the uplink scheduler to do its scheduling?
 9          MR. FLANNERY:  Your Honor, I have an objection.
10  May we approach?
11          THE COURT:  Approach the bench.
12          (Bench conference.)
13          MR. FLANNERY:  Your Honor, I believe it would be
14  appropriate --
15          THE COURT:  All right.  Go ahead.
16          MR. FLANNERY:  I believe it would be appropriate
17  with this witness to do a general description of the
18  technology, but we're about to do a deep dive into this
19  technology with a fact witness.
20          I think this would be more appropriate with an
21  expert.  We're going to spend a lot of time going through
22  the details of how it works, and I suppose they're going to
23  come back and do it all over again with Dr. Wicker.
24          MR. KUBEHL:  We do not plan to be repetitive
25  between Dr. Wicker and Mr. Skarby, but he needs to explain
```

1 the technology he's working on so the jury can understand

2 the context of his testimony.

3          MR. FLANNERY:  Well, his testimony is fact

4 testimony.  He's going to go through the gory details of

5 how this all works.

6          THE COURT:  Well, that's a matter of degree,

7 Mr. Flannery, and I agree he's entitled to give a

8 reasonable overview of the technology.  But he's not an

9 expert, and he's not going to give an expert analysis of

10 everything.

11          And at this point, I'm going to let him continue.

12 You certainly have the right to reurge this objection.

13          Also, when we were in chambers, there was a

14 discussion about the fact that having to come to the bench

15 repetitively puts the Plaintiffs in a bad light.

16          With regard to whether this is an expert -- excuse

17 me -- with regard to this is a question or an examination

18 by the Defendant properly addressed to a fact witness or an

19 expert witness, I'll hear those objections from the floor

20 and rule on them so that the jury is not in the dark as to

21 what we're doing up here.

22          MR. FLANNERY:  Thank you, Your Honor.

23          THE COURT:  Okay?

24          MR. FLANNERY:  Thank you, Your Honor.

25          THE COURT:  Let's continue.

```
 1              (Bench conference concluded.)
 2              THE COURT:  Let's continue.
 3   Q.  (By Mr. Kubehl)  Mr. Skarby, can you explain to us,
 4   this uplink scheduler that you've got shown here, what --
 5   what is the pool of -- of bandwidth that the uplink
 6   scheduler has available to it?
 7   A.  So the uplink scheduler, it deals with some frequencies
 8   that are asserted or dedicated for uplink transmissions, as
 9   you see here in the bottom of the screen.
10              See if I can point to this again.  There you go.
11   Sorry about that.  A little bit too much caffeine.
12   Q.  And how about the downlink scheduler?  What are --
13   what's the bandwidth available to the downlink scheduler?
14   A.  So the downlink scheduler uses a separate range of
15   frequencies that are distinct from the uplink frequencies
16   which are only managed by the downlink scheduler.
17   Q.  So the -- the uplink scheduler that you -- that you
18   work on at Ericsson, does that have any access to the
19   downlink bandwidth?
20   A.  No.
21   Q.  Does the downlink scheduler have any access to the
22   uplink bandwidth?
23   A.  No.
24   Q.  You're showing white space in between the downlink the
25   uplink frequencies.  Why is that?
```

1   A.   There is a guard band between them so they don't

2   interfere with each others.  Because these boxes, they look

3   really nice and confined, but the reality, a little bit of

4   the energy leaks outside of them.

5           So they need to be quite far apart so that they

6   don't interfere the uplink and the downlink and vice versa.

7   That will harm the transmission so that they cannot be

8   received.

9   Q.   So when -- when that phone needs to make a transmission

10  to the base station, what bandwidth will the uplink

11  scheduler use for that?

12  A.   So when the phone is transmitting in the uplink

13  direction, it is transmitting using the uplink frequencies.

14  Q.   And then if the base station needs to transmit in the

15  downlink, what bandwidth will the downlink scheduler use

16  for that?

17  A.   In that case, it will use the downlink frequencies.

18  Q.   Thank you.

19          MR. KUBEHL:  Your Honor, I can remove this.

20          THE COURT:  All right.  If you will, and return

21  the easel to its earlier position, please.

22          MR. KUBEHL:  I do -- I do --

23          THE COURT:  When you have more --

24          MR. KUBEHL:   -- have one more poster board.

25          THE COURT:  That's fine.  Then leave it.

```
 1   Q.  (By Mr. Kubehl)  And so why -- why -- why do --
 2   withdrawn.
 3           Why does the Ericsson base station use separate
 4   bandwidths for uplink and downlink transmissions in a -- in
 5   a network like T-Mobile?
 6   A.  So that comes from the 3GPP specification.  It's the
 7   standard of LTE.  It tells you which frequencies can you
 8   use for downlink and which frequencies can you use for
 9   uplink transmissions.
10           And those specifications, they are, in turn,
11   written due to, you know, laws or -- or regulatory
12   agencies, determining in each individual country what can
13   be transmitted in what frequencies.
14           So, for example, in the U.S., there is an agency
15   that says --
16           THE COURT:  Mr. Skarby -- Mr. Skarby, he didn't
17   ask you about agencies or laws or regulations.  He asked
18   you a question that you've already answered.  You need to
19   limit your answers to the questions that are asked, okay?
20           THE WITNESS:  Thank you, Your Honor.  Sorry.
21           THE COURT:  That's all right.
22           Continue, counsel.
23           MR. KUBEHL:  Thank you, Your Honor.
24   Q.  (By Mr. Kubehl)  In the United States, are there any
25   regulations that prevent a network like T-Mobile's from
```

1    using the same bandwidth for uplink and downlink?

2         MR. FLANNERY:  Objection, Your Honor.  We're

3    getting into areas of expert testimony.

4         THE COURT:  I'll sustain that.  It also appears to

5    be getting very close to looking for legal conclusions as

6    to applicable laws and regulations.  I'll sustain the

7    objection.

8         MR. KUBEHL:  Thank you, Your Honor.  May I

9    proceed?

10        THE COURT:  You may proceed.

11        MR. KUBEHL:  Thank you.

12   Q.  (By Mr. Kubehl)  I want to talk more about the uplink

13   scheduler that you helped design.  How many phones

14   typically are trying to talk to the base station in

15   T-Mobile's network at the same time?

16   A.  That can be up to hundreds, maybe even thousands in

17   extreme cases.

18   Q.  And does the Ericsson base station have enough

19   bandwidth available to it -- if we're just talking about

20   one Ericsson base station in T-Mobile's network, does that

21   base station have enough bandwidth to be able to always

22   serve every single phone that wants to talk at the same

23   time?

24   A.  In the general case, no.

25   Q.  So how does the uplink scheduler decide which phone

1   gets to transmit at a particular time?

2         MR. FLANNERY:  Objection, Your Honor.  We're

3   getting into expert testimony again.

4         THE COURT:  I -- I sustain that.

5   Q.  (By Mr. Kubehl)  Did you design the uplink scheduler

6   for the Ericsson base station?

7   A.  Yes, I was part of that.

8   Q.  And in -- in the Ericsson base station that -- in

9   the -- in the uplink scheduler that you designed for the

10  Ericsson base station, how did you design it to make a

11  decision as far as which phone gets which -- which turn?

12  A.  We designed it so that in every time slot, there will

13  be a scheduling competition.  The base station's

14  representation of each phone will compute a scheduling

15  metric that tells how important is this particular phone

16  right now.

17        It ranks them according to this metric and takes

18  the ones that have the highest metric.

19        So one phone might have a 5 as a metric, another

20  one could have 10, and then the one that has 10 is more

21  important than the one has a 5 and will be selected before.

22  Q.  How often --

23        MR. FLANNERY:  Objection, Your Honor.  That was

24  expert testimony.  We move to strike.

25        THE COURT:  Well, the answer has already been

1    given, Mr. Flannery.  I think the objection is untimely.

2    I'll overrule your objection.

3           But I'll remind Defendants' counsel, this is a

4    fact witness.  He is not designated as an expert, and he's

5    not entitled to offer analytical opinions or opinions that

6    would be typically given by an expert who's been so

7    designated.

8           Let's continue on that basis.

9    Q.  (By Mr. Kubehl)  Mr. Skarby, how often did you design

10   your uplink scheduler to make the scheduling competition

11   decisions?

12          MR. FLANNERY:  Objection, Your Honor.  This is

13   going into expert testimony again.

14          THE COURT:  I'll sustain it.

15          How -- how the scheduler makes the scheduling

16   competition decisions is certainly beyond a mere factual

17   inquiry.

18   Q.  (By Mr. Kubehl)  Mr. Skarby, were you personally

19   involved in designing the uplink scheduler for the Ericsson

20   base station?

21   A.  Yes, I was.

22   Q.  Do you have personal knowledge of how it works?

23   A.  I do.

24   Q.  Do you have personal knowledge of how often it makes

25   scheduling decisions?

```
 1   A.  I have.
 2   Q.  How often does the Ericsson base station and the uplink
 3   scheduler make a scheduling decision?
 4           MR. FLANNERY:  Object, Your Honor.  We're getting
 5   into expert testimony.
 6           THE COURT:  I'll allow this question.  Overruled.
 7   A.  So the uplink scheduler makes a thousand such
 8   scheduling decisions or scheduling competitions every
 9   second, so once every millisecond.
10           MR. KUBEHL:  Could I have Slide 4, please?
11   Q.  (By Mr. Kubehl)  In your -- in your work at Ericsson,
12   do you work with concepts called transmission frames?
13   A.  Yes.
14   Q.  And do you work with concepts called TTI's?
15   A.  Yes.
16   Q.  What is a TTI?
17   A.  It stands for transmission time interval.
18   Q.  What's the relationship between a transmission frame
19   that you work with and a TTI?
20   A.  So there are 10 TTI's within one frame.
21   Q.  What are you -- what are we showing on this figure?
22   A.  This looks like a schematic of the LTE frame with the
23   TTI's drawn out there as the smaller boxes.
24   Q.  I think if you touch the screen, it will make a mark.
25   Can you identify one of these frames for us?
```

1  A.  Let me try this -- this -- whoops, I need to push

2  harder.  There we go.

3  Q.  And what's the red box in the frame?

4  A.  I think the red box is pointing towards a current TTI,

5  the one for which the scheduling competition is being held

6  at the moment.

7  Q.  So in the -- in the base stations that you work on in

8  Ericsson that use these transmission frames, do the

9  transmission frames repeat one after another?

10  A.  Yes.  They flow in time as a -- you know, just taking

11  the seconds, it could take frames, as well, in the base

12  station.

13  Q.  And so what are you -- what are you showing with

14  respect to the rows below the one you circled?

15  A.  Those will be future frames.

16  Q.  In the uplink scheduler that you designed for Ericsson,

17  which of the frames does it schedule?

18      MR. FLANNERY:  Object, Your Honor.  We're getting

19  into expert testimony again.

20      THE COURT:  Sustained.

21  Q.  (By Mr. Kubehl)  Do you have personal knowledge of

22  which transmission frame is operated on by the uplink

23  scheduler that you designed?

24      MR. FLANNERY:  Same objection, Your Honor.  It

25  doesn't matter.  He's still getting into expert testimony.

1    THE COURT:  That's -- that's sustained.  Whether

2  he knows about it or not doesn't change the character of

3  the testimony, counsel.

4    MR. KUBEHL:  We can take this down.

5  Q.  (By Mr. Kubehl)  So going back to the -- the scheduler

6  that you designed, you talked about the priority values

7  that you give to phones to help decide who wins the

8  competition.  Do you recall that?

9  A.  Yes.

10  Q.  Did you design something called a delay base scheduler?

11  A.  Yes, we did.

12  Q.  And can you tell me how those priority values work in

13  the delay base scheduler that you designed?

14    MR. FLANNERY:  Objection, Your Honor.  Getting

15  into expert testimony again.

16    THE COURT:  Sustained.

17  Q.  (By Mr. Kubehl)  Mr. Skarby, what is the general

18  concept of the delay base scheduler that you designed?

19    MR. FLANNERY:  Objection, Your Honor.  We're

20  getting into expert testimony again.

21    THE COURT:  Sustained.

22    MR. KUBEHL:  Could I have DX-282, please?

23  Q.  (By Mr. Kubehl)  Dr. -- or, Mr. Skarby, have you seen

24  this document before?

25  A.  Yes.

```
 1   Q.  What is this document?

 2   A.  This is an internal Ericsson document describing high

 3   level of -- overview of a feature that relates to the delay

 4   base scheduler.

 5   Q.  What's the feature called?

 6   A.  Battery saving for DBS-SABE.

 7   Q.  And is this a feature that you personally worked on?

 8   A.  I think I personally reviewed the work that was done

 9   here.

10   Q.  And do you understand how that feature works?

11   A.  Yes, I do.

12           MR. KUBEHL:  Could we have Page 10, please?

13   Q.  (By Mr. Kubehl)  Under Solution, what does it mean when

14   it says "no resource allocation for future TTI's"?

15           MR. FLANNERY:  Objection, Your Honor.  We're

16   getting into expert testimony again.

17           THE COURT:  Sustained.

18   Q.  (By Mr. Kubehl)  Mr. Skarby, do you have personal

19   knowledge of what that means?

20           MR. FLANNERY:  Again, Your Honor, it doesn't

21   matter.  We're getting into expert testimony again.

22           THE COURT:  Well, asking him whether he has

23   personal knowledge or not does not call for expert

24   testimony.  He can answer that question.

25           MR. FLANNERY:  Okay.  Thank you, Your Honor.
```

```
 1              THE COURT:  Overruled.
 2   A.  Yes, I have.
 3   Q.  (By Mr. Kubehl)  When you designed the Ericsson uplink
 4   scheduler, did you think it was a good idea or a bad idea
 5   to do resource allocation for future TTI's?
 6              MR. FLANNERY:  Objection, Your Honor, we're
 7   getting into expert testimony again.
 8              THE COURT:  I'll sustain that.
 9              I understand the way the question's worded, but
10   it's all pointed in the same direction, counsel.
11              Sustained.
12   Q.  (By Mr. Kubehl)  Did you make any design choices in
13   designing the DBS-SABE feature with respect to whether it
14   should allocate for future TTI's?
15              MR. FLANNERY:  Same objection, Your Honor.  We're
16   getting into expert testimony.
17              THE COURT:  I'll allow this question.  Overruled.
18   A.  Could you repeat the question?
19   Q.  (By Mr. Kubehl)  Did you make any design choices in
20   designing the DBS-SABE feature with respect to whether it
21   should use allocation for future TTI's?
22   A.  We decided against using that.
23   Q.  Why?
24              MR. FLANNERY:  Objection, Your Honor.  This is
25   going to go into expert testimony.
```

```
 1            THE COURT:  I sustain.
 2  Q.  (By Mr. Kubehl)  In your work at Ericsson, have you
 3  personally identified any technical problems with
 4  allocating for future TTI's?
 5            MR. FLANNERY:  Objection, Your Honor.  May we
 6  approach?
 7            THE COURT:  Approach the bench.
 8            (Bench conference.)
 9            MR. FLANNERY:  Your Honor, this is expert
10  testimony.  He can -- and I have to keep doing this over
11  and over again.  I mean, I'm happy to do it, but it gets to
12  the point where it looks like I'm obstructing the --
13            THE COURT:  Let me ask this question.  What is it
14  that you think you can ask this witness that's not expert
15  testimony that you haven't already asked him?
16            MR. KUBEHL:  I think his personal knowledge, being
17  the person who has designed this, to talk about how he
18  designed it, how it works, how he knows it works through
19  his every day work, that's not expert testimony.  That is
20  his factual account of what he works on every day.
21            MR. FLANNERY:  Your Honor, he's using terms like
22  "future frames" which is a claim term.  By the way --
23            MR. KUBEHL:  I didn't use future frames.  I was
24  using the term in the document.
25            MR. FLANNERY:  You -- you just said future.
```

1           Your Honor, it's -- it's clearly getting into --

2    it's expert testimony over and over and over again.

3    They've got an expert who is here.

4           THE COURT:  Well, we discussed this at length in

5    chambers, and as I told you there, this is a gentleman who

6    probably has a high enough level of knowledge and

7    understanding to be an expert, but he was not designated as

8    an expert.  And he's not going to testify as an expert

9    witness would.

10          Beyond a high level of the operation and

11   functionality, which seems to have been covered, we're

12   getting into a level of detail that involves concepts and

13   applications that a fact witness is not typically able to

14   explore.

15          And I told you all in chambers there was a line up

16   to which as a fact witness, not designated as an expert, he

17   could go.

18          And, quite honestly, I believe we've probably

19   reached and crossed that line where if we go further, he's

20   going to be giving the kind of conceptual description and

21   analysis and innerworking with parts that are a detailed

22   part of the operations.

23          They give rise to language in the claims that have

24   been construed.  And it's highly problematic for him to get

25   into the kind of level of granularity that only an expert

1   witness is qualified to do.

2          So we can continue this process, or Mr. Kubehl can

3   decide, in light of that guidance, where he wants to go

4   next.

5          You all control the questions and the objections.

6   But I'm trying to give you some guidance.

7          MR. WARD:  Your Honor, with respect to this

8   witness, it's this -- it was brought up in chambers that

9   he's asking questions that you told him are improper, and

10  we have to continue objecting in front of the jury.

11         I know he's got technical knowledge, but they've

12  got their technical expert coming up next to testify about

13  all these concepts.

14         MR. KUBEHL:  I disagree.  We specifically talked

15  in chambers.  I specifically said this is exactly what we

16  would be doing, and that I would not be comparing that to

17  the claims, I wouldn't be using any language -- I'll use

18  the terms in the documents that he uses every day.  It's

19  factual testimony about a system that he's designed.

20         MR. FLANNERY:  Your Honor, continuing to go in

21  this direction, we've already crossed the line, then we're

22  trying -- keep going way over it.

23         THE COURT:  Well, I think -- I think both sides

24  can see from the rulings where I'm trying to draw the line.

25         And you need to conform your examination both on

```
 1    direct and cross to where you see the Court drawing the
 2    line.  You can differ with it later if you want to, but I
 3    think you've got a pretty good idea of what my decisions
 4    are.
 5              MR. KUBEHL:  I would -- I would propose that --
 6    I've asked him whether he made design decisions.  He said
 7    he thought it was a bad thing.  I will bring up one more
 8    document.  I will ask him did -- did Ericsson memorialize
 9    those decisions in a document.  I'll bring the document up,
10    show it.  I won't ask him any questions about it.
11              THE COURT:  All right.
12              MR. KUBEHL:  Okay.
13              THE COURT:  Let's go.
14              (Bench conference concluded.)
15              THE COURT:  Proceed.
16    Q.  (By Mr. Kubehl)  Mr. Skarby, with respect to the
17    decision you said that you made that you thought that using
18    future TTI allocations was a bad idea, what -- did Ericsson
19    memorialize that in any document?
20    A.  Yes, there was a report from the research department.
21              MR. KUBEHL:  Could we have Exhibit 277?
22    Q.  (By Mr. Kubehl)  What are we looking at on 277?  You
23    don't have to give me any description of the contents of
24    it, just what is the document?
25    A.  This is the report I mentioned from the research
```

1    department.

2    Q.  And what's the date of that report?

3    A.  27th of August 2007.

4    Q.  Thank you.

5          MR. KUBEHL:  That's Exhibit 277.

6          You can take that down, Mr. Patterson.

7    Q.  (By Mr. Kubehl)  I'd like to move to the operation of

8    the downlink scheduler.  Is the downlink scheduler

9    something you personally worked on?

10   A.  Yes.

11   Q.  Do you have a personal understanding of how it works?

12   A.  I have.

13   Q.  Do you have an -- any understanding of the QoS aware

14   scheduler?

15   A.  I have.

16   Q.  Is that something you've worked on?

17   A.  Excuse me?

18   Q.  Is that something you have personal knowledge of how it

19   operates?

20   A.  Yes, I have.

21   Q.  The QoS aware scheduler, what type of QoS does that

22   scheduler use?

23   A.  Network side QoS set by the operator of the network.

24   Q.  Who would the operator of the network be in this case?

25   A.  That would be T-Mobile.

1    Q.  Why would a network operator want to specify QoS?

2            MR. FLANNERY:  Objection, Your Honor.  Getting

3    into expert testimony.

4            THE COURT:  Calls for an opinion.  Sustained.

5    Q.  (By Mr. Kubehl)  Did -- did Ericsson ever consider --

6    or was Ericsson ever involved in any discussions where

7    alternatives to using network QoS requirements were

8    involved?

9    A.  Yes.

10   Q.  And what alternative was proposed?

11           MR. FLANNERY:  Objection, Your Honor.  Getting

12   into expert testimony again.

13           THE COURT:  Sustained.

14   Q.  (By Mr. Kubehl)  Why did Ericsson design its downlink

15   scheduler to use network QoS requirements?

16           MR. FLANNERY:  Objection, Your Honor.  Getting

17   into expert testimony again.

18           THE COURT:  Sustained.

19           MR. KUBEHL:  May I put the first exhibit back

20   up -- the demonstrative back on the easel?

21           THE COURT:  The one you used earlier?

22           MR. KUBEHL:  Yes, sir.

23           THE COURT:  Certainly.

24   Q.  (By Mr. Kubehl)  Mr. Skarby, I just wanted to ask you

25   some questions about the sort of tube that you draw.  We

```
 1   never really got there.  Can you -- let me give you a
 2   concise question.
 3         First of all, what's shown on the far left of your
 4   diagram -- the far -- far right of your diagram?
 5   A.  On the right, there is this cloud thing that's supposed
 6   to represent the Internet, and in there are two servers
 7   drawn -- Facebook and YouTube, for examples.
 8   Q.  Okay.  And then what are the red blocks there?
 9   A.  They represent packets or data flowing from the servers
10   that this terminal wants to display on its screen.
11   Q.  What is the tunnel looking thing that they're going
12   into?
13   A.  That is called an E-RAB for radio access bearer.
14   Q.  And what -- what's that?
15         MR. FLANNERY:  Objection, Your Honor.  Getting
16   into expert testimony again.
17         THE COURT:  He can certainly describe what it is.
18   How it operates is a different matter.  Overruled.
19   A.  So that is like a logical tunnel through which
20   information flows from the operator's core network to the
21   mobile phone.
22   Q.  (By Mr. Kubehl)  You show packets coming out of the
23   Facebook server and packets coming out of the YouTube.  Are
24   they going into the same tunnel?
25   A.  Yes.
```

1    Q.  When the Ericsson downlink scheduler -- when the

2    packets go through the tunnel and they get to the Ericsson

3    downlink scheduler, what's the downlink -- downlink

4    scheduler do with them?

5         MR. FLANNERY:  Objection, Your Honor, expert

6    testimony.

7         THE COURT:  Let me hear the answer.  I mean, to

8    the extent he says it schedules them, that's okay.  To the

9    extent he begins to describe how the scheduling all works

10   and how it interacts with everything else, he's become an

11   expert witness which the Defendants did not designate him

12   as an expert witness in this case.  It depends on the

13   answer.

14        So, Mr. Skarby, if you will, answer the question

15   for me.

16   A.  When they arrive in the -- you know, the easel -- that

17   the downlink scheduler becomes aware of them, you can say

18   the competition starts and begins to schedule them.

19        MR. FLANNERY:  Your Honor --

20        THE COURT:  That's overruled.  That's -- that's a

21   permissible answer.

22        Next question, Mr. Kubehl.

23   Q.  (By Mr. Kubehl)  And with respect to the QoS aware

24   scheduler that you talked about, does the QoS aware

25   scheduler see the QoS associated with the individual

```
 1  packets from YouTube and Facebook?
 2  A.  No, it doesn't.
 3  Q.  Why not?
 4  A.  The system is not --
 5          MR. FLANNERY:  Objection, Your Honor.  It calls
 6  for expert testimony.
 7          THE COURT:  Sustained.
 8          MR. KUBEHL:  Okay.  We'll put this up.
 9          THE COURT:  If you're through with it, you may
10  take it down.
11          MR. KUBEHL:  May I replace the easel?
12          THE COURT:  If you're through using it, that'd be
13  fine.
14  Q.  (By Mr. Kubehl)  Mr. Skarby, you're -- you've flown
15  from Sweden to be here because of this lawsuit?
16  A.  Well, to be correct, I flew from Australia --
17  Australia, sorry.
18  Q.  To be here for this lawsuit?
19  A.  I did, yes.
20  Q.  Does Ericsson take this lawsuit seriously?
21  A.  Yes.
22  Q.  When Ericsson was sued for patent infringement in this
23  case, what did it do?
24  A.  Sorry, again?
25  Q.  What did Ericsson do when it was sued by IV for patent
```

```
 1  infringement?
 2  A.  I was contacted about this lawsuit in the fall of 2017,
 3  and then I grabbed the patent, I refreshed my knowledge of
 4  how the product worked, I contacted some of my colleagues
 5  to make sure I understood it, compared my knowledge to --
 6  of the product with the patent claims, and I had two days
 7  of depositions with Intellectual Ventures's legal team,
 8  and --
 9          THE COURT:  Mr. Skarby, the question was:  What
10  did Ericsson do?  Not what did you do personally.  Do you
11  know what the company did when the lawsuit was filed
12  against them?  You're not here as the representative of the
13  company, are you?
14          He's not the corporate rep?
15          MR. KUBEHL:  He's not corporate rep.
16          THE COURT:  He can't speak for the corporation.
17  You've already had the corporate representative testify.
18  Q.  (By Mr. Kubehl)  Mr. Skarby, do you know why Ericsson
19  turned to you to look at these patents?
20          MR. FLANNERY:  Objection, Your Honor.  As he
21  indicated, he's not the corporate representative, and he's
22  about to --
23          THE COURT:  He can't testify as to the thought
24  processes of the client or the parent, Ericsson.  Their
25  representative is here, and he can speak to what the
```

1  company's thought processes were, but not this fact

2  witness.

3          MR. KUBEHL:  Okay.

4          THE COURT:  Over -- sustained.

5  Q.  (By Mr. Kubehl)  What was your understanding of why you

6  were being asked to look at the patents?

7          MR. FLANNERY:  Objection, Your Honor.  It's the

8  same thing.

9          THE COURT:  Same ruling.  Sustained.

10  Q.  (By Mr. Kubehl)  After looking at the patents and

11  comparing them to the Ericsson products, did you think that

12  Ericsson infringed?

13          MR. FLANNERY:  Same objection, Your Honor.

14          THE COURT:  Sustained.

15          MR. KUBEHL:  Your Honor, this is -- this goes

16  to --

17          THE COURT:  This -- this witness is not going to

18  testify about an ultimate conclusion on infringement.  He's

19  not an expert on infringement.  He's not been named as an

20  expert witness.

21          If you want to elicit testimony about the state of

22  the mind of Ericsson, you're going to have to do it through

23  the corporate representative, who is entitled to speak for

24  the company.

25          MR. KUBEHL:  Yes, Your Honor.

1    Q.  (By Mr. Kubehl)  Mr. Skarby, are you proud to work at

2    Ericsson?

3    A.  Yes.

4    Q.  Are you proud of the work your team has done in putting

5    together this scheduling functionality?

6    A.  I'm very proud of it.  They have to go against the

7    stream in many cases, and we managed to beat the

8    competition with our new ideas.

9            MR. KUBEHL:  That's all I have.  Pass the witness.

10           THE COURT:  Cross-examination.

11           MR. FLANNERY:  Your Honor, may I approach?

12           THE COURT:  You may approach.

13           (Bench conference.)

14           MR. FLANNERY:  Your Honor, I'm not going to have

15   any cross-examination, but I think as a matter of fairness,

16   we request --

17           THE COURT:  Speak up just a little bit.

18           MR. FLANNERY:  I'm sorry.  I'm not going to have

19   any cross-examination, but as a matter of fairness, we

20   request that the Court instruct the jury about the

21   requirements that have to be made for an expert disclosure.

22           THE COURT:  I think the comments the Court's made

23   through the course of the direct examination and your

24   objections has been informative on that issue.  I think to

25   go further would be more than is necessary.  So that

1    request is overruled.

2              MR. FLANNERY:  Thank you, Your Honor.

3              MR. WARD:  Thank you, Your Honor.

4              (Bench conference concluded.)

5              THE COURT:  Does Plaintiff have cross-examination

6    of this witness?

7              MR. FLANNERY:  No, no cross-examination, Your

8    Honor.

9              THE COURT:  All right.  Then you may step down,

10   Mr. Skarby.

11             THE WITNESS:  Thank you.

12             MR. KUBEHL:  May the witness be excused?

13             THE COURT:  Any objection?  Mr. Flannery, any

14   objection?

15             MR. FLANNERY:  No objection.

16             THE COURT:  All right.  Mr. Skarby, you're

17   excused, which means you're free to stay.  You're also free

18   to leave, sir.

19             THE WITNESS:  Thank you.

20             THE COURT:  You're quite welcome.

21             Ladies and gentlemen, before we hear from the next

22   Defendants' witness, we're going to recess for lunch.

23             If you will take your notebooks with you to the

24   jury room, lunch should be there waiting for you.

25             Follow all the instructions I've given you,

1    including, of course, not to discuss the case among

2    yourselves.

3            It's a quarter until noon, according to the clock

4    I have.  We'll do our best to reconvene at 12:30.  The jury

5    is excused for lunch at this time.

6            COURT SECURITY OFFICER:  All rise.

7            (Jury out.)

8            THE COURT:  Counsel, I trust there are dedicated

9    and brilliant attorneys somewhere working on the jointly

10   revised charge and verdict form that I instructed you on

11   yesterday, and I will have it by 5:00 o'clock?

12           MS. HENRY:  Yes, Your Honor.

13           MS. SMITH:  Yes, Your Honor.

14           THE COURT:  All right.  We stand in recess for

15   lunch.

16           COURT SECURITY OFFICER:  All rise.

17           (Recess.)

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATION

 2

 3         I HEREBY CERTIFY that the foregoing is a true and

 4    correct transcript from the stenographic notes of the

 5    proceedings in the above-entitled matter to the best of my

 6    ability.

 7


 8

 9    /S/ Shelly Holmes                       2/6/19
      SHELLY HOLMES, CSR, TCRR                Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```