1                THE UNITED STATES DISTRICT COURT

2               FOR THE EASTERN DISTRICT OF TEXAS

3                      MARSHALL DIVISION

4    INTELLECTUAL VENTURES I LLC, )(

5         PLAINTIFF              )(    CIVIL ACTION NO.

6    VS.                        )(    2:17-CV-577-JRG

7                               )(    MARSHALL, TEXAS

8    T-MOBILE USA, INC., T-MOBILE )(

9    US, INC., ERICSSON INC., AND )(

10   TELEFONAKTIEBOLAGET LM       )(

11   ERICSSON,                   )(    FEBRUARY 6, 2019

12        DEFENDANTS             )(    12:35  P.M.

13                 TRANSCRIPT OF JURY TRIAL

14          BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

15             UNITED STATES CHIEF DISTRICT JUDGE

16   APPEARANCES:

17   FOR THE PLAINTIFF:      Mr. T. John Ward, Jr.
                             Ms. Claire A. Henry
18                           Ms. Andrea L. Fair
                             Mr. Wesley Hill
19                           WARD, SMITH & HILL, PLLC
                             1507 Bill Owens Parkway
20                           Longview, Texas 75604

21   COURT REPORTER:        Ms. Shelly Holmes, CSR, TCRR
                             Official Reporter
22                           United States District Court
                             Eastern District of Texas
23                           Marshall Division
                             100 E. Houston Street
24                           Marshall, Texas 75670

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)

```
 1   FOR THE PLAINTIFF:        Mr. Martin J. Black
                               Mr. Kevin M. Flannery
 2                             DECHERT LLP
                               Cira Centre
 3                             2929 Arch Street
                               Philadelphia, Pennsylvania 19104
 4
                               Mr. Joseph M. Abraham
 5                             Mr. Timothy F. Dewberry
                               Mr. Joshua J. Yi
 6                             Mr. Jacob R. Porter
                               DECHERT LLP
 7                             300 West Sixth Street
                               Suite 2010
 8                             Austin, Texas 78701

 9                             Ms. Nisha N. Patel
                               Mr. Ryan T. Banks
10                             DECHERT LLP
                               2440 W. El Camino Real
11                             Suite 700
                               Mountain View, California 94040
12
13   FOR THE DEFENDANTS:       Mr. Douglas M. Kubehl
                               Mr. Jonathan B. Rubenstein
14                             Mr. Jeffery S. Becker
                               BAKER BOTTS LLP
15                             2001 Ross Avenue
                               Dallas, Texas 75201
16
                               Ms. Melissa R. Smith
17                             GILLAM & SMITH LLP
                               303 South Washington Avenue
18                             Marshall, Texas 75670

19                             Mr. Asim M. Bhansali
                               KWUN BHANSALI LAZARUS LLP
20                             555 Montgomery Street
                               Suite 750
21                             San Francisco, California 94111

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2          (Jury out.)

 3          COURT SECURITY OFFICER:  All rise.

 4          THE COURT:  Be seated, please.

 5          Defendants, are you prepared to call your next

 6   witness?

 7          MR. KUBEHL:  We are, Your Honor.

 8          THE COURT:  All right.  Let's bring in the jury,

 9   please, Ms. Denton.

10          (Jury in.)

11          THE COURT:  Please be seated.

12          Defendants, call your next witness.

13          MR. KUBEHL:  Defendants call Dr. Stephen Wicker.

14          THE COURT:  All right.  If you'll come forward and

15   be sworn, Dr. Wicker.

16          (Witness sworn.)

17          THE COURT:  Please come around, and have a seat on

18   the witness stand.

19          THE WITNESS:  Thank you.

20          THE COURT:  All right, counsel.  You may proceed.

21          MR. KUBEHL:  Thank you, Your Honor.

22      STEPHEN WICKER, Ph.D., DEFENDANTS' WITNESS, SWORN

23                      DIRECT EXAMINATION

24   BY MR. KUBEHL:

25   Q.  Dr. Wicker, could you introduce yourself to the jury,
```

1  please.

2  A.  Yes.  My name is Steve Wicker.  I'm a professor of

3  electrical and computer engineering at Cornell University.

4  Q.  What subject matter will you be discussing today?

5  A.  Generally speaking, wireless technologies, but I'm

6  going to get into the details of LTE and base stations and

7  how they -- how they operate.

8  Q.  Did you -- did you prepare some slides to help aid in

9  your testimony?

10  A.  Yes, I did.

11        MR. KUBEHL:  Could we have Slide No. 1, please.

12  Q.  (By Mr. Kubehl)  Dr. Wicker, can you tell us about your

13  educational background.

14  A.  Okay.  I have a Bachelor of Science from the University

15  of Virginia, a Master of Science from Purdue University,

16  and a Ph.D. from the University of Southern California.

17  They're all in electrical engineering.

18  Q.  You mentioned you're a professor at Cornell University.

19  What do you teach there?

20  A.  That's correct.  Electrical and computer engineering

21  with an emphasis on wireless technologies.

22  Q.  How long have you done that?

23  A.  Well, I've been a professor for 32 years.  I started at

24  Georgia Tech and then went on to Cornell.

25  Q.  Do you teach courses in LTE?

1    A.  Yes, I do.

2    Q.  How many total years have you taught in the wireless

3    space?

4    A.  Well, I started teaching in 1987 when I got my Ph.D.

5    So going on 32 years.

6    Q.  Do you have duties at Cornell beyond your teaching

7    responsibilities?

8    A.  Yes, I do.  As a professor, we have lots of things we

9    have to do.  We have to do service.  Right now I'm on a

10   faculty search committee, for example.  But we also do

11   research.

12         In fact, research is a big part of what we do.

13   I've been conducting research in wireless longer than I've

14   been a professor.

15   Q.  As a result of the research and work that you've done,

16   have you been awarded any United States patents?

17   A.  Yes.  I have five U.S. patents and a number of foreign

18   patents.

19   Q.  Have you published any articles or written any books

20   that deal with wireless communications?

21   A.  Yes.

22   Q.  About how many?

23   A.  I haven't actually counted them, but I've got a total

24   number of roughly 250 journal articles and publications and

25   six books, and most of them deal with wireless or wireless

1    technologies.

2    Q.  Any of those deal with LTE technology?

3    A.  A lot of them deal with the specific technologies that

4    go into LTE.  My most recent book deals specifically with

5    LTE.

6    Q.  Have you done any work outside of the university

7    context in industry?

8    A.  Yes, I have.

9    Q.  Tell me about that, please.

10   A.  Okay.  So I've done a lot of consulting with various

11   industrial groups.

12           In particular, I worked with SkyTel.  There's a

13   couple of them here -- SkyTel, Motorola, Broadcom, Lockheed

14   Martin, and others, helping them to develop particular

15   technologies for their wired and wireless products.

16   Q.  Have you won any awards for your work in wireless

17   communications?

18   A.  Yes, I have.

19           MR. KUBEHL:  If we can go to the next slide, I

20   think I've listed some of those.

21   A.  There we go.  Okay.  So with regard to awards, I've had

22   a number of teaching awards over the years ago.  I'm also a

23   fellow of the IEEE.  I was appointed by the White House to

24   the U.S. Air Force Scientific Advisory Board in 2010, and

25   then I think the rest of these are teaching awards.

1    Q.   (By Mr. Kubehl)   What does it mean to be a fellow in

2    the IEEE?

3    A.   Well, the IEEE is the Institute of Electrical and

4    Electronic Engineers.   It is a professional organization.

5         I think it's one of the largest in the world.   It

6    is the professional organization for electrical engineers,

7    and there's a number of grades, member, senior member.   And

8    then fellow means you've been elected by the existing

9    fellows to join that group.   It's an honor.

10   Q.   So out of all these awards that I made you list here,

11   what are you most proud of?

12   A.   I'm actually most proud of the teaching awards.   I've

13   been teaching a long time, I do enjoy it, and being

14   recognized for it always feels good.

15   Q.   Have you done any work for the United States Government

16   related to communications?

17   A.   Yes, I have.

18   Q.   Can you tell the jury about that, please?

19   A.   Certainly.   I do a lot of consulting with the federal

20   government, various organizations.

21        In fact, I was doing a little bit yesterday.   I

22   test -- excuse me, I gave a briefing to the congressional

23   committee on science and technology at -- in Congress.

24   I met and talked to the White House National Economic

25   Council, a nice trip to the White House.

```
 1              And I have also served as a consultant to the
 2    Air Force Scientific Advisory Board and DARPA.  DARPA is
 3    the Defense Advanced Research Projects Agency.  They
 4    develop new technologies for our national defense.
 5    Q.  Have you been recognized in federal courts as an expert
 6    in wireless communication before?
 7    A.  Yes, I have.
 8    Q.  Do you have a rate that you ordinarily charge for your
 9    service?
10    A.  Yes, I do.
11    Q.  What is that rate?
12    A.  $750.00 an hour.
13    Q.  Is that what you're charging in this case?
14    A.  Yes.
15              MR. KUBEHL:  Your Honor, we tender Dr. Wicker as
16    an expert in wireless communications technology.
17              THE COURT:  Is there objection?
18              MR. BLACK:  No, Your Honor.  This witness has been
19    properly qualified.
20              THE COURT:  All right.  Then the Court will
21    recognize the witness as an expert in the designated field.
22              Continue, counsel.
23    Q.  (By Mr. Kubehl)  Dr. Wicker, when you start on a case
24    like this or when you're first considering a case, what's
25    the general process for how you address the issues?
```

A.   Okay.  What often happens is someone calls me, or I
receive an email, and we'll have a preliminary discussion.

I'll ask to look at the patents to see what the
technologies are.  Is it something that I'm really
comfortable with or something that's stretching it.

And then we'll discuss who the parties are and
whether or not I have a conflict, and then we'll talk about
what the issues are.

Q.   Do you take every case that is available to you?

A.   No.

Q.   About what percentage of cases do you take?

A.   I only take about 10 percent of the cases.

Q.   And why is that?

A.   A number of reasons.  Often there are conflicts with
regard to the parties.  There are conflicts with regard to
the law firms.

Often it's something, you know, I just don't feel
I'm comfortable with, or I disagree with the positions that
are being taken by the firm that's contacted me.

And finally, sometimes I'm just too busy.  I'm a
professor full time.  So there's only so much time in the
day.

Q.   When you do work on patent cases, do you always work
for the patentholder or the Defendant, or is it a mix?

A.   It's a mix.

1   Q.  Who are some of the companies that you've worked on who

2   are owners of patents that you've given expert opinions

3   for?

4   A.  Well, I've worked for Apple and Cisco, Motorola,

5   California Institute of Technology, a university in

6   California.

7   Q.  Today, you're -- you're here addressing issues that are

8   facing Ericsson and T-Mobile.  But other than those

9   companies, what other companies have you worked for on the

10  Defendants' side of a patent case?

11  A.  Okay.  Once again, Apple, but also AT&T wireless.  I've

12  worked for Sprint.  Actually I've worked for Sprint on both

13  sides, asserting Sprint patents and defending against other

14  patents, and a number of other similar companies.  Intel is

15  another one that comes to mind.

16  Q.  When it -- when it came to your work on this case, what

17  information did you consider?

18  A.  Okay.  So I considered quite a bit of information.

19  I started with the patents-in-suit, the three patents that

20  have been discussed over the last couple of days.

21       And then I looked at the file histories of those

22  patents.  That's the back and forth between the inventors

23  and the Patent Office.

24       And I then proceeded to look at the devices that

25  had been accused, the Ericsson base stations, and looked at

1    how they operated.

2            And, in particular, I looked at a lot of source

3    code.  The source code pretty much determines how the

4    system operates.

5            And I looked at a lot of documents dealing with

6    depositions, like the ones that were played on video here

7    in court, and other documents, as well.

8    Q.  I want to ask you a little bit more about the source

9    code.  What exactly is source code?

10   A.  Okay.  So source code is a series of instructions.

11   It's literally just a very long list of instructions that a

12   processor will follow.

13           So the processor goes instruction-by-instruction

14   to do whatever it is it's supposed to be doing.

15           So, for example, your cell phones have a lot of

16   software in them that dictate how that cell phone behaves.

17   So I study software systems like the accused base stations

18   so that I'll know exactly what they're doing.

19   Q.  Why not just let someone else look at the software and

20   tell you how it works?

21   A.  Well, I'm the one who has to form the final opinion, so

22   I'm the one who has to understand how the system works.  So

23   I'd like to look at the software myself.

24   Q.  Are you going to explain some background concepts to

25   help the jury understand the technology we're dealing with?

```
 1   A.  I'd be happy to.
 2           MR. KUBEHL:  Your Honor, if I could move the easel
 3   up.  This would be the point in his testimony where he'd do
 4   a brief tutorial.
 5           THE COURT:  All right.  You have leave to move the
 6   easel as previously discussed.
 7           MR. KUBEHL:  Thank you, Your Honor.
 8           THE COURT:  And, Mr. Black, depending on where
 9   Mr. Kubehl stands, if you need to move around to the far
10   side of the jury box so you have a better angle to view it,
11   you're free to do that.
12           MR. BLACK:  Thank you, Your Honor.  I'm okay so
13   far.
14           MR. KUBEHL:  Okay.  Your Honor, would -- would it
15   be all right for Dr. Wicker to approach the easel?
16           THE COURT:  Yes.  Dr. Wicker, you may walk down to
17   the easel.  We have a handheld microphone the Court
18   Security Officer will give you.
19           THE WITNESS:  Thank you, Your Honor.  Thank you.
20           MR. KUBEHL:  Your Honor, if I speak loudly, would
21   it be all right for me to ask my questions from behind so I
22   can see what he's drawing?
23           THE COURT:  Yes.
24           MR. KUBEHL:  Thank you.
25           THE COURT:  Yes.  We talked about that.  That's --
```

1    no, sir, I thought -- I thought you meant to the side of

2    the easel.

3              MR. KUBEHL:  Right here.

4              THE COURT:  Right there?

5              MR. KUBEHL:  Yes, sir.

6              THE COURT:  Okay.  That's why I told Mr. Black if

7    you were blocking him, he could move.

8              All right.  Let's proceed.

9              MR. KUBEHL:  Are you okay, Mr. Black?

10             MR. BLACK:  Yes.

11   Q.  (By Mr. Kubehl)  Dr. Wicker, could you start by giving

12   us a broad picture of the network we're going to be talking

13   about?

14   A.  Okay.  So I think -- let's see, we've heard a lot about

15   cell phones.  I'd like to start on the left with a cell

16   phone.

17             THE WITNESS:  If I may, I'll hold this with one

18   hand, if I can be heard -- display -- is that all right?

19             THE COURT:  Well, that's why we use the microphone

20   because ordinarily you're looking at the board with your

21   back to the jury when you're talking, but I'll -- I'll let

22   you try it.  If we don't hear you, I'll let you know.

23             THE WITNESS:  Thank you, Your Honor.  I'll do my

24   best to project.

25             THE COURT:  Just give it to the Court Security

1  Officer because it's going to roll off when you walk away

2  from it.

3  A.  Okay.  So returning to my answer, we've got a piece of

4  user equipment here, so I'll write UE.  That term's been

5  used a lot.

6       User equipment is the LTE term for cell phone.

7  Unfortunately, each generation seems to call it something

8  different, so you've heard mobile station or mobile

9  equipment.  But we'll use UE for LTE.

10  Q.  (By Mr. Kubehl)  Okay.  In the system we're talking

11  about, what is the mobile phone talking to?

12  A.  Okay.  So your cell phones talk to a base station.

13       Now, the base station consists of an antenna, and

14  I think we saw a picture of one earlier today, large

15  antenna.  I think it was behind a bank building right on

16  the square.

17       Now, associated with that antenna, there is a box,

18  and it's not a very big box.  It may look like a shed.  It

19  could be even smaller, but that contains the electronics

20  of -- which we saw an example earlier in the case.

21  Q.  Okay.  What's the job of that base station?

22  A.  Okay.  There are two things -- well, actually, there

23  are several jobs, but with regard to the user equipment,

24  there's two things going on.  There are uplink

25  communications -- and I'll write uplink, up as in up to the

1   antenna -- and downlink communications, so that goes like

2   that.

3   Q.  Okay.  And then what -- where do the communications go

4   from there?

5   A.  Okay.  So this part is wireless.  There is a lot that

6   goes on, though, that is wired.  Everything I'm going to

7   draw from here going this way is going to be wired.

8              Okay.  So from the base station, we're going into

9   the core network.  I'm going to write wired right here.

10             Now, the first stop in the core network is a box

11  called the serving gateway, and I'll write SGW for serving

12  gateway.  There's a lot of those.  There's probably several

13  dozen across the State of Texas, for example, that are

14  serving different base stations.

15  Q.  Okay.  And then where does it go from the serving

16  gateway?

17  A.  Okay.  From the serving gateway, we go to a packet

18  gateway.  There's not as many of those.  There are a

19  relatively small number of them.  They talk to a lot of

20  service -- serving gateway, which in turn talk to a base

21  station.

22  Q.  What's the purpose of that packet gateway?

23  A.  The packet gateway is the interface or the Internet.

24  I should note that at this point, we always draw networks

25  as clouds because they're easy to draw.

1          You may have heard the term core network or EPC.

2   It stands for evolved packet core.  That is that part of

3   the network.  This packet gateway is responsible for

4   connecting to the much larger world of the Internet.

5   Q.  So if I'm on my phone and I want to go to YouTube,

6   where is YouTube out on the Internet?  Can you show me

7   that?

8   A.  Okay.  So YouTube is going to be hosted by a server out

9   here on the Internet.  So I'll draw that server -- draw all

10  my servers as sort of garbage cans.  But that's a server,

11  and we'll write YouTube there.  So it's out in the world of

12  the Internet.

13  Q.  Okay.  And then let's say I wanted to go to Netflix.

14  Is that on the same server or a different server?

15  A.  Okay.  Netflix itself is really complicated.  It has

16  many, many servers.  But it will look similar.  It will be

17  another server -- or at actually a lot of servers that are

18  out on the Internet.  So we'll write Netflix.

19  Q.  In what form does the information come from the YouTube

20  servers to get toward my phone?

21  A.  Okay.  They come as packets.  The Internet works using

22  what are called IP packets.  IP stands for Internet

23  Protocol.  The entire Internet is a world of IP packets

24  going from network to network.

25  Q.  So if, for whatever reason, you had streaming going

1   from YouTube and Netflix -- well, tell me the path.  Let's

2   start with YouTube.  Path of packets from YouTube to my

3   phone.

4   A.   Okay.  So let's suppose you are streaming something

5   from YouTube, so what's going to happen is YouTube -- and

6   it is a big complicated network, so I'm simplifying it,

7   because it's going to cause packets to flow in through the

8   packet gateway.  The packet gateway sees the IP address,

9   routes it to the serving gateway to the base station.

10          Now, there is a special concept that's involved

11  here.  Once you hit the packet gateway, there is a tunnel

12  or a bearer associated with this connection.

13  Q.   Could you draw that tunnel?

14  A.   Certainly.  We can think of it as something that looks

15  like a real tunnel.  And it actually -- there's one each

16  for the downlink and uplink.  But, basically, the tunnel is

17  going to end at your cell phone.  So this bearer or

18  tunnel -- I'll write bearer.  That's the technical term.

19  They're both technical terms.

20          The bearer is a tunnel that connects the user

21  equipment to the packet gateway.  So you can think of it as

22  a conveyer belt.  You put packets on one end.  It comes

23  down to the other end.  In the case of your example,

24  YouTube packets are being put in the tunnel at the packet

25  gateway, and they come out at the user equipment.

1    Q.  And why does LTE use these tunnels?

2    A.  The tunnels simplify the connections.  And we have to

3    deal with a number of interesting problems.

4            For example, user equipment is mobile, right?  I'm

5    in Marshall today.  I'll be back home in Ithaca by the end

6    of the week, I hope.  So they have to keep track of the

7    movement of my phone.

8            So once I've settled down, for example, right here

9    in Marshall, the tunnel simplifies the connection.  The

10   network creates what's called a virtual circuit so that all

11   my phone has to do is put packets into the tunnel, and

12   they'll come out in the right direction, and vice versa,

13   coming the other direction.

14   Q.  Well, what, if anything, is beneficial about putting

15   packets in a tunnel with respect to a device like a base

16   station?

17   A.  Okay.  So it greatly simplifies what the base station

18   has to do.  It reduces the number of things that this base

19   station -- and let's try a different marker -- that this

20   base station has to keep track of.  Oh, that's much better.

21           By the way, you may have heard another term,

22   eNodeB.  So I'll write that in parentheses.  That is the

23   LTE version of base station.

24   Q.  Okay.  So how does it simplify things for a base

25   station to have these packets inside of a tunnel instead of

1   the base station looking at individual packets?

2   A.   Okay.   So what it does is it allows the base station to

3   simply route packets that come in to the appropriate

4   outgoing tunnel.   There's no need to inspect the packet.

5   It simply says, which tunnel does this packet go on, and it

6   sends it on its way in the appropriate tunnel.

7   Q.   The jury has heard -- has heard some about the term

8   bearer.   Is a bearer the same or different than a tunnel?

9   A.   The bearer is a tunnel.

10  Q.   So with respect to packets from Netflix -- or maybe

11  I've got a server that -- withdrawn.

12          Let's say there's email that needs to get to me.

13  A.   Okay.

14  Q.   Will there be something out on the Internet through

15  which email might come?

16  A.   Yes.   So email is yet another kind of server.   Email,

17  there's two pieces to it.   It moves from server to server,

18  and then you actually download it on to your phone or your

19  computer, however you read your email.

20          And so there will be yet another mail server.

21  Let's put it over here.

22          For example, it might be Gmail, and you will have

23  to access that to actually read your email and download it

24  to your phone.

25  Q.   Can packets from YouTube and packets from the mail

```
 1  server go into the same tunnel?
 2  A.  Yes.  So they all are treated the same because they're
 3  all data, and there's no voice here, for example, so
 4  YouTube, Netflix, email server packets from the Internet
 5  going through this tunnel to your phone.
 6  Q.  So if the packets are inside of the tunnel, how does
 7  the base station know whether it's a YouTube packet or a
 8  mail server packet or a Netflix packet?
 9  A.  It does not.  All it knows is that there's a particular
10  endpoint of the tunnel to which it's routing these packets.
11  In this case, the endpoint is here.
12  Q.  So is it possible -- we've heard the term quality of
13  service in this case.  Is it possible for YouTube to have
14  one quality of service and the mail to have another quality
15  of service?
16  A.  No.
17  Q.  Okay.  And is that because they'd both be on the same
18  tunnel?
19  A.  That's correct.
20  Q.  Okay.  If you had two streams that -- just treating
21  them as packets that might want a different quality of
22  service treatment, does the base station have any ability
23  to give a quality of service treatment on a
24  packet-by-packet level?
25  A.  No, it does not.
```

1          One piece that I didn't mention, there's a box

2    here in our core network, which has a rather opaque name.

3          It's PCRF, policy charging rules function.  PCRF

4    determines what the QoS is going to be for the bearer.  And

5    once that's done, we're through.  That bearer has an

6    associated QoS in the form of the QCI that you've heard

7    about, and the base station can't change that.

8    Q.  So whatever packets from any different applications go

9    into that same tunnel, they all get treated the same from a

10   quality of service perspective?

11   A.  So long as they are data packets, that's correct.

12   Q.  Okay.  Just a couple more technical concepts before you

13   sit down.  I wanted to talk about the concept of

14   transmission frames, and we've heard some testimony about

15   TTI's.  Can you tell us about what a transmission frame is

16   in LTE?

17   A.  Okay.  I'll start with a small piece, the TTI.  TTI is

18   transmission time interval.  It is the smallest chunk on

19   which scheduling decisions are made.

20          There are 10 TTI's per frame.  So we can draw a

21   frame like this, and time goes in this direction.  And we

22   have this divided up into 10 -- I think that's 10 -- 10

23   TTIs'.  So this one piece, that's a TTI, a transmission

24   time interval.  And there are 10 of them in a frame.

25   Q.  So when the Ericsson schedulers are making a scheduling

1    decision, at what time increment are they making those

2    decisions?

3    A.   The Ericsson schedulers make their decisions on a TTI

4    basis.  They're looking at the current TTI and determining

5    who's going to transmit and who's going to receive.

6    Q.   Do they look forward into the future past the current

7    TTI?

8    A.   No.

9    Q.   Okay.  You've drawn one frame.  How do these frames

10   work in the network?  Is there more than one frame?  Do

11   they follow each other?  What happens?

12   A.   Yes.  So the frames recur.  Every 10 slots we start a

13   new frame.  So we can call this the current frame.  And

14   then there are frames that will follow.  I'll draw two

15   more.

16   Q.   Okay.  So the top one is the current frame?

17   A.   That's correct.

18   Q.   And that -- that has the TTI that the scheduler is

19   currently operating on?

20   A.   That's right.

21   Q.   And then what are the -- what's the next lowest frame?

22   A.   So we can call this the current TTI.  We would call

23   this a future frame, the next frame.  Both of these are

24   future frames.

25   Q.   And does the Ericsson scheduler ever look out into the

```
 1   future to reserve any resources in any future frames?
 2   A.  It does not.
 3   Q.  Last technical concept I want to ask you about at the
 4   board here, and that's this concept of bandwidths that are
 5   available to the uplink and the downlink schedulers.
 6        I don't want to repeat Mr. Skarby's testimony that
 7   he gave about the downlink and uplink schedulers having
 8   separate bandwidths available.
 9        My question to you is:  Do you know why that is?
10   Why is it that the -- in a T-Mobile network, an FDD
11   network, why are there separate bandwidths for the
12   uplink --
13        THE COURT:  Mr. Black, you're on your feet.
14        MR. BLACK:  Objection.  He has a question that
15   doesn't refer to --
16        THE COURT:  Why don't you step to the microphone
17   at counsel table, so I can hear you.
18        MR. BLACK:  Objection.  If he'll just rephrase the
19   question without referring to Mr. Skarby to make clear what
20   the question is, I think that would be okay.
21        THE COURT:  You're willing to rephrase your
22   question, Mr. Kubehl?
23        MR. KUBEHL:  Of course.  Of course.
24        THE COURT:  Then let's do that.
25        MR. KUBEHL:  Okay.
```

1   Q.  (By Mr. Kubehl)  So I understand there's an uplink

2   scheduler and a downlink scheduler in the base station?

3   A.  That's correct.

4   Q.  Okay.  And is there a pool of bandwidth that is

5   available for the uplink scheduler's use?

6   A.  Yes.

7   Q.  Okay.  Can we draw however you'd represent that?

8   A.  Okay.  So, again, noting that this is the wireless

9   part -- it looks like a small piece, but it's actually

10  really important.  And as has been mentioned in court, very

11  expensive.

12          So what I will do is over here, I will note -- and

13  now we're going to change what's happening.  This is

14  frequency.  So it's the frequency spectrum of -- your radio

15  tracks across the frequency spectrum to bring in different

16  stations, for example.  Different points in the spectrum

17  are used for different things.

18          To answer your question, the uplink, I believe you

19  said -- the uplink is going to have a particular part of

20  the spectrum.  Let's put it over here.  In the United

21  States, this is allocated by the FCC.  We'll call that

22  uplink.

23  Q.  So you made an analogy to a radio station.  So if -- if

24  anybody remembers or has a car with an old dial where you

25  could dial across the frequencies so you could hear

1  different stations at -- transmitting at the same time, is

2  that the analogy you're drawing there?

3  A.  Exactly.  So within this block, there are different

4  frequencies.  And so different uplink allocations can be

5  made at different frequencies, but they have to be within

6  the block.  That block is what's allocated for

7  transmissions from UE's to the base station.

8  Q.  Okay.  And then what about the downlink scheduler, does

9  it have any pool of resources available?

10  A.  Now, in this country, the downlink would be a separate

11  block.  And, once again, these are particular frequencies,

12  and different frequencies within the block can be used for

13  downlink transmissions, but you can't go outside of the

14  block.  You have to stay within it.  And these blocks are

15  well separated.  There's a gap.

16  Q.  Why is there a gap there?

17  A.  The FCC determined that there had to be a certain

18  difference between uplink and downlink transmission so that

19  they wouldn't interfere with each other.  And this

20  distance, this amount of spectral gap has changed over the

21  years, but it's still there.

22  Q.  So do the uplink and downlink schedulers that you

23  looked at in T-Mobile's network, do they share a wireless

24  bandwidth?

25  A.  No, they do not.  The uplink and downlink schedulers

1    are working on independent chunks of spectrum.  Downlink is

2    working over here, and the uplink over here, and they have

3    nothing to share.

4    Q.  Okay.  You can return to your seat.

5          MR. KUBEHL:  If it's all right with the Court.

6          THE COURT:  It is.  And if you'll move that easel.

7          Ms. Denton, do you still have the handheld mic?

8    Why don't you put it back where it was?  That way you don't

9    have to sit there the rest of the day holding it.

10          All right.  Let's continue, Mr. Kubehl.

11   Q.  (By Mr. Kubehl)  Dr. Wicker, I want to turn to the work

12   that you did in this case regarding the three asserted

13   patents.  Did you review the patents?

14   A.  Yes, I did.

15   Q.  Did you compare the patents to the Ericsson products?

16   A.  Yes, I did.

17   Q.  And did you develop opinions as to whether or not there

18   were differences between the patents you looked at --

19   specifically the patent claims -- and the Ericsson

20   products?

21   A.  Yes, I did.

22   Q.  And did you find any differences?

23   A.  Yes, I did.

24   Q.  Are you going to talk about some of those today?

25   A.  Yes.

```
 1              MR. KUBEHL:  Could we have Slide 5, please?
 2   Q.  (By Mr. Kubehl)  What are we looking at here?
 3   A.  Okay.  So once again, this is that base station or
 4   eNodeB that I was talking about earlier.  There are uplink
 5   transmissions from the cell phone to the base station and
 6   downlink in the reverse direction.
 7   Q.  I'd like to turn first to the '629 patent.
 8   A.  Okay.
 9   Q.  If we're talking about the '629 patent, what is the
10   accused functionality in the Ericsson base station?
11   A.  Okay.  That would be -- let's see if we can go to the
12   next slide, please?
13              That would be the uplink scheduler, which I've
14   highlighted here.
15   Q.  All right.
16              MR. KUBEHL:  Let's look at the claim language,
17   please, the next slide.
18   Q.  (By Mr. Kubehl)  This is Claim 1 of the '629 patent?
19   A.  That's correct.
20   Q.  Okay.  Generally, with respect to your analysis of
21   infringement in this case, what are you asked to be -- I'm
22   sorry, what are you asked to determine when you're looking
23   at whether or not there's infringement of this Claim 1?
24   A.  Okay.  What I'm asked to do is to look at this claim
25   and understand what it would have meant to a person of
```

1   skill when this invention came about and then to determine

2   whether or not this language can be mapped on to the

3   accused product.

4          In this case, it's a method claim, so I was asked

5   to determine whether or not the accused devices actually

6   practice this method.

7   Q.  Now, you've -- you have some labels A, B, C, and D.

8   Those are referring to different claim elements?

9   A.  That's right.  And I should have noted that I added the

10  A, B, C, and D.  You won't see those in your patents.  But

11  you'll see all the rest of the language.  I added the A, B,

12  C, and D, so I can refer to these four steps.

13  Q.  So when it comes to the infringement analysis, how many

14  of Steps A, B, C, and D have to be practiced in order to

15  infringe the claim.

16  A.  They all have to be practiced.  For there to be

17  infringement, every single step must be practiced.

18          MR. KUBEHL:  All right.  Next slide, please.

19  Q.  (By Mr. Kubehl)  I guess before we go here, can you

20  give the jury just a quick walk-through of Claim 1 that you

21  analyzed?

22          MR. KUBEHL:  So if we could go back one slide.

23  A.  Certainly.  So this is a method claim once again, and I

24  know that because I see these words "a method for" at the

25  very beginning.  And it tells me it's a method for

1   assigning future slots of a transmission frame to a data

2   packet for transmission over a wireless medium.

3          Okay.  Now I've got my four steps.

4          The first step is applying a reservation

5   algorithm.

6          The second step is reserving a first slot for a

7   first data packet of an Internet Protocol flow, an IP flow,

8   and a future transmission frame based on that reservation

9   algorithm.

10         The third step is reserving yet again.  This time

11  we're reserving a second slot for a second data packet of

12  the IP flow subsequent in time to said future transmission

13  frame -- so a later transmission frame than was used for

14  the first reservation -- based on said reservation

15  algorithm.

16         And then, finally, wherein said second data

17  packet -- the one we talked about in Step C -- is placed in

18  said second slot in an isochronous manner to the placing of

19  the first data packet.

20  Q.  (By Mr. Kubehl) Okay.  And what did the Court tell us

21  about what an isochronous manner is?

22  A.  Isochronous means, according to the Court, consistent

23  placing in time.

24  Q.  Now, in this case, if --

25  A.  And I should note that that is a paraphrase.  I didn't

1   have the Court's claim construction in front of me.

2         The Court provided me with a very specific claim

3   construction -- construction.  I believe it's a consistent

4   time interval.

5   Q.  Consistent time intervals.

6   A.  Yes.

7   Q.  If -- if a system were to place packets isochronous --

8   isochronously just exactly like what is shown in

9   Element (d), and it did it every single time, would that

10  system infringe?

11  A.  Not necessarily.  That's just one step.  You've also

12  got Steps A, B, and C.  They have to be practiced as well

13  for there to be infringement.

14  Q.  Okay.  Is there a figure in the patent that illustrates

15  the claim?

16  A.  Yes.  If we'll go to the next slide, this is a figure

17  that we've seen before.  This is Figure 14 from the '629

18  patent.

19  Q.  All right.  And have you developed an

20  easier-on-the-eyes version of this figure?

21  A.  Yes, I have.  It's a little complicated because of all

22  of the -- the wire -- seemingly wireless connecting the

23  various pieces.

24         So what I did was I eliminated the wires in some

25  of the notations.  And if we can go to the next slide, this

1   actually shows the frames and the reservations.

2   Q.  Okay.  So you've got at the top -- the top row here,

3   you've got labeled as current frame.  What are you

4   referring to there?

5   A.  That's correct.  When I read the patent, it described

6   this claim in -- sorry -- this frame N as the current

7   frame.  So that's the frame we're looking at right now.

8   That's the frame from which we're transmitting data right

9   now.

10  Q.  All right.  And then you've got in blue, future frames.

11  What is that?

12  A.  That's right.  So these are later frames.  You can

13  think of time as running in two directions on this.  We've

14  got time -- it's a little harder to write there, but there

15  we go -- time going in that direction and time running in

16  this direction as well.

17          So when we go down the chart, what we see are

18  later frames with later slots.

19  Q.  So if -- if we were in a given frame, like this frame

20  N, the slots go forward in time from left to right?

21  A.  That's correct.

22  Q.  And then once that frame is transmitted, then you'd go

23  to the next frame, N + 1?

24  A.  That's correct.

25  Q.  And so on?

1    A.   You'd just keep working your way down, going all the

2    way across one frame and then going to the next frame and

3    going from left to right and so forth.

4    Q.   Okay.   Were you here yesterday when Dr. Williams

5    testified about this figure?

6    A.   Yes, I was.

7    Q.   Did you agree or disagree with his assessment of

8    whether this figure showed time in two dimensions?

9    A.   He didn't seem to agree that it shows time in two

10   dimensions.   I think it does, and I think that's the way

11   it's described in the '629 patent.

12   Q.   So what about the concept of reservations?   Is that

13   shown in this figure?

14   A.   Yes, it is.

15          So you noted that some of these slots -- all of

16   the slots in the current frame are dark.   That means

17   they've been reserved for someone's transmission.   Later in

18   time, we see there are reservations, for example, here.

19   This is a reservation in a future frame.   This is another

20   reservation in a future frame and so on.

21          So the darker blues, for example, correspond to

22   reservations in future frames.

23   Q.   Is this concept of successive frames and reservations

24   analogous to anything that we might be more familiar in our

25   lives?

A.  Yes.  I thought a good analogy would be a calendar

because a calendar has time also going in both directions.

Q.  So how would this be analogous to the frames in the

slots?

A.  Okay.  So we could think of, for example, the current

week as a frame.  And, of course, today is the 6th.  That's

our current slot.  And future weeks would be future frames.

So, for example, next week would be another frame,

another week, and two weeks from now, yet another frame and

so on.  So once again, we have time going in two

directions.  It goes this way, then it goes down.  I'll

just put a "T."

Q.  Okay.  Turning back to the '629 patent, what did the

'629 patent recognize about voice packets?

A.  Okay.  The '629 packet recognized that voice packets

arrive for transmission at a regular spacing, and there's a

reason for this.

If we take a device like this -- this iPhone, when

you talk into your iPhone, your voice is converted into 0s

and 1s.  It's digitized.  Now, those 0s and 1s are put into

packets, which are then generated every 20 milliseconds.

And to give you an idea, that's 50 times a second.

So when you're having a conversation on your

phone, your phone is generating 50 packets a second.  And

it's very predictable.  We know when those packets are

1  going to be generated.  It's like clockwork.

2  Q.  And so how does the '629 patent use that concept in

3  terms of where packets should be placed in frames?

4  A.  Okay.  So what the '629 patent recognized was we've got

5  consistent generation of packets, so we can plan ahead.

6        What we can do is reserve slots at a consistent

7  timing.  I can transmit a voice packet there in Slot 6, I

8  can transmit a voice packet in the next frame, Slot 6, and

9  then in the next frame Slot 6, and so on.

10        And so what I'm doing is I'm taking advantage of

11  my knowledge that these packets are going to be generated

12  every 20 milliseconds to plan ahead, to reserve slots in

13  the future.

14  Q.  And can packets be placed at regular intervals in

15  frames without using reservations?

16  A.  Certainly.

17  Q.  Does the '629 patent -- does that patent cover all ways

18  of placing packets at equal intervals?

19  A.  No.  As we saw in the claim, it's really specific.

20  It's got to have every step, which means you've got to

21  reserve a slot in a future frame and then a second slot in

22  a frame after that.  So that was Steps (b) and (c).

23  Q.  Okay.  If we go to our next slide, I think you've

24  already told us about what you've shown here, but you've

25  got an oval on this slide.  What is that showing?

```
 1   A.  Okay.  What that shows is reservations that are
 2   consistently spaced.  So this is the third slot in the
 3   current frame here, but in the next frame, N + 1, I've also
 4   reserved the third slot and in this frame and in this frame
 5   and so forth.
 6           I've got reservations for the next one, two,
 7   three, four, five, six, seven frames, and they are equally
 8   spaced.  They're consistently spaced.  So, again, spaced in
 9   an isochronous manner.
10   Q.  Now, you -- you told us that there's a way to end up
11   with packets that are equally spaced, and you don't
12   necessarily have to have a reservation.  Can you give us an
13   analogy of how that would work?
14   A.  Certainly.  So what we're seeing on the screen in
15   Figure 14 is reservations that are made ahead of time.
16           But a lot of time, we'll have consistent spacing,
17   even when there's no reservations at all, and so the
18   analogy I used was of a -- getting reservations at a
19   restaurant or not, as the case may be.
20   Q.  Okay.  So after analyzing the Ericsson base stations in
21   the T-Mobile network, have you come to a conclusion as to
22   whether or not those base stations perform each element of
23   Claim 1 of the '629 patent?
24   A.  They do not.  As -- as we've seen and as I'll describe,
25   the Ericsson base stations do not reserve slots in future
```

1  frames.  It just doesn't happen.

2  Q.  Okay.  Could you please relate that to the claim

3  language?

4       MR. KUBEHL:  Next slide.  Oh, we might have passed

5  by the slide.  There we go.

6  A.  So what I've just referred to is reserving a first slot

7  for a first data packet in a future transmission frame and

8  reserving a second slot for a second data packet in a

9  transmission frame subsequent in time to said future

10  transmission frame, an even later transmission frame.

11       So there has to be the reservation of two slots,

12  one in a future frame, and then one in a frame after that.

13  Q.  (By Mr. Kubehl)  Thank you.

14       And how does the Ericsson base station work?

15  A.  All it -- what it does is it looks at the current slot,

16  the current transmission time interval, and it has a

17  competition.  It decides who gets to transmit in this

18  current slot, and that's what it does.

19  Q.  How do you know that to be true?

20  A.  A couple of ways.  First, I studied the source code,

21  those instructions that determine how the system works.

22       And then I looked at a number of documents that

23  summarized what the Ericsson base station does.  There was

24  also deposition testimony from Ericsson engineers where

25  they described how the system works.

```
 1   Q.  Okay.
 2         MR. KUBEHL:  Let's go to the next slide, 17,
 3   please.
 4   Q.  (By Mr. Kubehl)  What are we looking at here?
 5   A.  Okay.  This is one of the documents that I mentioned.
 6   It's Defense Exhibit 282.  It's a document called Battery
 7   Saving for DBS/SABE.
 8   Q.  How does that relate to the accused product?
 9   A.  Okay.  So what this is doing is describing how
10   Ericsson's scheduler works.
11         This DBS-SABE is a rather hefty acronym, but it's
12   delay based scheduling with service aware buffer
13   estimation.  So that is the algorithm that Ericsson's base
14   stations use to do scheduling.
15   Q.  What did you find important in this document?
16   A.  Okay.  What this -- if we can go to the next slide.
17         What this showed me was that, quite simply,
18   scheduling is done by the delay based scheduler, no
19   resource allocation for future TTI's.  There's no
20   scheduling ahead.  We only look at the current TTI, and we
21   don't focus on future TTI's.
22         And so what this told me is quite simple.
23   Ericsson's accused products do not reserve future slots.
24   Q.  If the jury wanted to find this later, which exhibit is
25   it?
```

1    A.  It's DX -- which I think means defense exhibit -- 282.

2    Q.  So can you help us understand how this delay based

3    scheduling works?  If it doesn't use future reservations,

4    how does it work?

5    A.  Certainly.

6            If we can go to the next slide, please.

7            This is Ericsson's scheduler -- slightly

8    simplified, but it captures the important concepts.

9            We have a series of competing phones.  These

10   phones have data, and they're ready to transmit.

11           There is then a scheduling competition that's

12   held.

13           Now, this scheduling competition takes a number of

14   things into consideration, but, remember, it's a delay

15   based scheduler, DBS.

16           So one of the things it's focussed on is how long

17   has that data been waiting?  So based on the amount of time

18   the phones have been waiting, they're ranked.  And the top

19   phones become the competition winners.  And they now have

20   access to the current TTI.

21   Q.  Okay.  So is the -- the phone that wins the

22   competition, is that just selected at random?

23   A.  No.  No.  Once again, these phones have to satisfy a

24   number of criteria to begin with, but after that, they're

25   all ranked.  And they're ranked according to how long the

1  data that they have has been waiting for transmission.

2  Q.  Now, what was the date of the document that you looked

3  at that had this information you got in the bottom, no

4  resource allocation for future TTI's?

5  A.  Okay.  So this is the document here.  It was Defense

6  Exhibit 282, if I remember correctly -- yes.  So this is a

7  2012 document.

8  Q.  And why -- why, if at all, was that significant to you?

9  A.  That was significant because this lawsuit was started

10 in 2017.  So this document was prepared long before there

11 was any concern about a lawsuit.

12        And so what that tells me is that the details,

13 and, in particular, the comments about new future

14 reservations, those were done with -- just thinking about

15 the engineering of the system, as opposed to someone's

16 patent claims.

17 Q.  How does the Ericsson source code compare to what

18 you've described here?

19 A.  The Ericsson source code does exactly this.  There's a

20 lot more detail, but basically what we see in the code is

21 determining who's competing, holding the scheduling

22 competition, and then setting them up -- the winners up to

23 transmit in the current TTI.

24        Once again, no reservations in future slots, in

25 future TTI's.  The source code does not show any

1  reservations.

2  Q.  Now, you've -- you're using this term "scheduling

3  competition."  Is that a term that you made up for this

4  lawsuit?

5  A.  No.  In fact, I think Dr. Williams was the first person

6  to use the -- the phrase.

7         MR. KUBEHL:  Go to the next slide, please.

8  Q.  (By Mr. Kubehl)  Were you here yesterday when

9  Dr. Williams talked about that term, "scheduling

10  competition"?

11  A.  Yes, I was.

12  Q.  What did he have to say about it?

13  A.  Okay.  He was asked:  So for each slot, the accused

14  Ericsson uplink scheduler holds a scheduling competition

15  for receiving the uplink grant for resources?

16         That's right -- that's correct.

17         And the term "scheduling competition," that's a

18  term that you used in your own expert report, correct?

19         And he said:  Absolutely.

20         And you weren't responding to anyone's argument?

21         No, those were his words.

22  Q.  So how often does the Ericsson uplink scheduler hold

23  this scheduling competition?

24  A.  Okay.  It's every TTI, and a TTI is one millisecond, so

25  that's a thousand times a second.

1  Q.  So in the delay that I just took to ask that question,

2  there were about 4,000 scheduling decisions made?

3  A.  Yes.  At a base station like the one that's behind the

4  bank on the square.

5  Q.  How does the Ericsson uplink scheduler decide which

6  phone wins the competition?

7  A.  Okay.  So what it does is it ranks those phones,

8  including factors like how long they've been waiting.  And

9  once the ranking is determined, those who are at the top

10  have an opportunity to transmit.

11  Q.  Okay.  And will there be just one winner of the

12  competition?

13  A.  No, potentially there could be several because of the

14  way that LTE works -- I think there's been a little bit of

15  talk about that.

16        It uses something called orthogonal frequency

17  division multiplexing.  Because of the way that works, you

18  can have several people transmit at the same time.  So in

19  LTE, lot -- several people can use the same TTI at the same

20  time.

21  Q.  Okay.  So in -- in the parlance of the patent, if you

22  used the word "slot" -- let's call a TTI a slot for

23  purposes of this question -- would the Ericsson base

24  station even allocate -- sorry.

25        Would the Ericsson base station be limited to

1  allocating resources for only one phone to a given slot?
2  A.  No.
3      MR. KUBEHL:  Let's go to the next slide.
4  Q.  (By Mr. Kubehl)  So you talked about a restaurant
5  analogy you had made.  Can you tell us about that?
6  A.  Certainly.  The restaurant analogy is as follows.
7      If you've got a restaurant that doesn't take
8  reservations, what happens is you end up on busy nights
9  with a line of people.  And if there's a table available,
10 that table is going to go to whoever has been waiting the
11 longest.
12     So in many ways, this scheduling competition,
13 based on delay, is the opposite of a reservation.  You
14 don't have a reservation, so you're going to wait.  But
15 whoever is waiting the longest, these two, are going to get
16 the table that's available.
17 Q.  If you wanted the jury to take away one thing of what
18 we've talked about so far on the '629 patent, what would
19 that be?
20 A.  I think the one thing to remember is that the accused
21 base stations clearly do not reserve slots ahead in time.
22     It's always focused on the current transmission
23 time interval.  And so because of that, it cannot practice
24 these asserted claims.  It cannot reserve ahead of time.
25 It simply doesn't happen.

1    Q.  So look -- looking at the figure you've got here,

2    you've got a bunch of people in line.  Why isn't that a bad

3    thing?  I mean, do I really want delay on my phone if I

4    have to wait in these lines?  Why is that such a good

5    design?

6    A.  Okay.  It's a good design -- it does look like people

7    are waiting, and that doesn't sound good, but there are

8    situations in cellular in which if I try and give you an

9    assignment ahead of time, when your time comes to use that

10   resource, you might not be able to.

11        So, for example, if I reserved a phone several

12   slots ahead of time, by the time those slots came around,

13   that phone might have a really bad channel.  And so it

14   wouldn't be able to use this slot, and this would lead to

15   retransmission requests.  It would lead to inefficient use

16   of resources.

17        And so this attempt to plan ahead reserving slots

18   ahead of time would actually lead to worse performance

19   because we don't know what the channel is going to look

20   like in the next frame or the frame after that.

21        So we focus on the current frame and the current

22   channel, and then do it again and again and again a

23   thousand times a second.

24   Q.  Okay.  So that problem, you identified it, it

25   sounds like you're kind of locked into using that

1  future frame.  Is there any problem with being -- with

2  other phones being locked out?

3  A.  That is a problem as well.  If I have allowed people to

4  reserve ahead of time, if I reserve slots ahead of time,

5  and those people, because of a bad channel, can't use it,

6  well, the slot's already reserved.  Other people can't use

7  it.

8        And so what we have is a situation in which other

9  people aren't able to transmit, you can't transmit.  It's

10  just not efficient.

11  Q.  Are there sort of emergency level signals that need to

12  be communicated in LTE that's sort of a highest priority?

13  A.  There are higher priority signals.  I mentioned

14  retransmission requests.  Basically, what happens, if

15  you've got a bad transmission, you can ask to have it sent

16  again.

17        That's why, when you look at an image on the

18  Internet, it looks so good.  There may have been lots of

19  errors in transmission, but those packets were

20  retransmitted.  They were sent again until they were

21  received correctly.

22        That takes up resources, but it's important that

23  it be done.  So the requests for retransmission have very

24  high priority, higher priority than your voice, in fact.

25  Q.  So what's problematic for those super high priority

1    transmissions if you're using a system that reserves future

2    frames?

3    A.  Okay.  So one of the things that happens when you're

4    reserving slots ahead of time, the people may have a bad

5    channel, and they can't transmit.  They're going to have to

6    ask for a retransmission.

7          So you're going to have a lot more retransmission

8    requests if you're trying to schedule ahead of time, and

9    that further bogs down your channel, and you can't support

10   as many people.

11   Q.  Have you seen any evidence in this case that Ericsson

12   looked at the concept of future reservations?

13   A.  Yes, I did.

14   Q.  And what did Ericsson decide about that?

15   A.  Ericsson looked at it and considered it, this idea of

16   reserving ahead of time, and said, no, it's a bad idea, and

17   for the reasons that I've discussed.

18   Q.  And what time period was that?

19   A.  They looked at that actually going back into the 2000s.

20   I believe 2007/2009.

21          MR. KUBEHL:  Could we have DX-277, please.

22   Q.  (By Mr. Kubehl)  What is this document?

23   A.  Okay.  This is a document that describes uplink

24   scheduling for Voice over IP in LTE, and I'll note it's

25   2007.

1    Q.   Okay.  And what's discussed in this document?

2    A.   It's discussing various types of scheduling for voice

3    in LTE.

4    Q.   Is there a discussion of the idea of reserving future

5    slots?

6    A.   Yes, there is.

7    Q.   What do they say about that idea?

8    A.   They say it's a bad idea, because basically it will

9    lead to channel congestion from retransmission requests.

10        People that are reserving slots ahead of time may

11   have a bad channel, they can't transmit, or it's a bad

12   transmission, and that leads to retransmission requests.

13        MR. KUBEHL:  Can we go to Dr. Wicker's Slide 28,

14   please.

15   Q.   (By Mr. Kubehl)  What are you showing here?

16   A.   Okay.  This is from that document.  It's Defense

17   Exhibit 277.

18        And what it's saying is the main reason why the

19   capacity of reserving ahead is limited is that the high

20   HARQ, hybrid ARQ retransmission rate incomes the total

21   number of retransmissions and causes some cells to become

22   grant channel limited.  If there's too many transmissions,

23   it becomes bogged down.

24        And it goes on to say:  Because of these results,

25   it is not recommended to deploy reserving ahead of time for

1   the LTE uplink.

2   Q.  Dr. Wicker, did IV's experts conduct any testing of the

3   actual Ericsson system?

4   A.  No, they did not.

5   Q.  Did you ask that any testing be done?

6   A.  Yes, I did.

7   Q.  Why did you have that testing done?

8   A.  Well, I thought it would be helpful to show the actual

9   behavior of the system in a lot of different circumstances,

10  and I thought it would make it clear how the system

11  actually works.

12  Q.  Okay.

13          MR. KUBEHL:  Could we go to Slide 22, please.

14  Q.  (By Mr. Kubehl)  That's a lot of color.  What are you

15  showing here?

16  A.  Okay.  And I guess it's not as clear.  What it's

17  showing is the behavior of a lot of phones.  Each one of

18  these lines -- and I'll just pick one out here across the

19  bottom.  There's a line down there, okay?  Each one of

20  these lines corresponds to a particular cell phone that's

21  being tested.

22          Now, this axis tells us how long the phone has to

23  wait before its next grant of transmission.  So this tells

24  you what the transmission intervals look like over time.

25          This axis is likelihood, okay?  So it goes from

1  zero -- it's not going to happen -- to a hundred percent --

2  happen every time.  50 is a coin flip.

3          And so what we see is that the actual separation

4  between transmissions is literally all over the place.

5           We have some phones -- these phones up here,

6  these lines show a very high likelihood of being able to

7  transmit right away.

8          Let me just pick a point -- take this -- oops.

9  Let me start that over again.

10          I'll pick this point right here, and if we go

11  down, it corresponds to 10.  So there is a more than 90

12  percent likelihood that that particular phone only had to

13  wait 10 milliseconds before its next transmission, whereas

14  down here, this one is having to wait 40 milliseconds or

15  more before its next transmission.

16          So the point here is that phones are getting

17  grants at different times, and what that told me was there

18  are no reservations.

19          If people had reservations, they'd be locked into

20  a particular time, but instead, because of the way the

21  system works, we have allocations literally all over the

22  place.

23  Q.  What would the result look like if -- in a system that

24  actually reserves slots every 40 milliseconds so they were

25  guaranteed?

A.   Okay.  So instead of seeing all those different lines,
we would see zero percent likelihood of transmitting until
you got to 40 milliseconds, and then it would jump up to a
hundred percent likelihood of transmitting at 40
milliseconds.

       So if everyone was reserving slots ahead of time
and they were reserving them 40 milliseconds ahead,
everyone would be transmitting 40 milliseconds ahead.  If
you got a reservation, you're going to get your table at a
particular time.

Q.   Okay.  Dr. Wicker, you were here yesterday when
Dr. Williams testified about his theory on reservations,
and he presented a timing diagram?

A.   That's correct.

Q.   First of all, do you agree or disagree with him that
Ericsson makes any reservations of any future frames?

A.   I do not agree.  There are no reservations in future
frames.

Q.   Even if you accepted his theory that there was some
reservation made, would the Ericsson base station meet
his -- meet these claims under his theory?

A.   No.  In his theory, the reservation was for the current
frame.

       If we can go to the next slide, I think I showed
that.  No.  That's not what this says.  Okay.

1          MR. KUBEHL:  Oh, we can -- let's back up to that

2     slide.  24, please.

3     Q.  (By Mr. Kubehl)  Okay.  So you looked at Dr. Chrissan's

4     source code report, right?

5     A.  That's correct.

6     Q.  And you recall seeing that Dr. Chrissan put together

7     this timing diagram?

8     A.  That's right.  This is from his expert report.

9     Q.  And he was showing one sequence of events that he could

10    possibly happen?

11    A.  That's right.  This is quite a complicated diagram, but

12    basically what it's showing is that we can have -- this is

13    a grant -- oops.  It's a little offset there.  I'll make it

14    work.  That's a grant right there, and there's the actual

15    transmission.  Here's a grant.  There's a transmission --

16    there we go -- and so forth.

17          And so what he's showing is a lot of different

18    things that are happening in this scheduler that lead to

19    actual transmissions.  So, again, the dark blue, those are

20    actual transmissions.

21    Q.  Okay.  And this would be for if you -- this would be if

22    you took one particular phone that was actually getting

23    grants at the 40 milliseconds, and you sort of looked back

24    in time at what had happened to get you there?

25    A.  Yes, although with the phone they're showing here, the

1  grants aren't equally spaced.

2  Q.  Okay.

3  A.  They're not at 40 milliseconds.

4  Q.  I guess my question was, is this like all happening at

5  the same time, or is this kind of looking back in history

6  of what ended up happening to get you to the 80-millisecond

7  point?

8  A.  Oh, I see.  Yes.  So what this is showing in time is,

9  once again, going in this direction.  It's showing a lot of

10  things that can happen to bring us to this point of 80

11  milliseconds, which I believe is what Dr. Williams focused

12  on yesterday.

13  Q.  And did Dr. Chrissan, who reviewed the source code that

14  you reviewed, did he identify anything on here as a

15  reservation?

16  A.  No, he did not.

17  Q.  And then where did that concept come from?

18  A.  That was brought in by Dr. Williams.

19       MR. KUBEHL:  Could we go to the next slide?

20  Q.  (By Mr. Kubehl)  So is this Dr. Williams's slide adding

21  his concept of reservations?

22  A.  That's right.  If -- you know, you compare this to the

23  previous slide, you'll see that Dr. Williams added the

24  Reserve 3 and Reserve 4.

25  Q.  Okay.  And so if we sort of go -- play in this world

```
 1   that we agree with him that there's a reservation where he
 2   says there's a reservation, were you here yesterday when he
 3   testified as to under his theory where the reservation
 4   actually is made?
 5   A.  Yes.  He said and he looked at -- oh, there we go.
 6   That -- that's helpful.
 7          So what he said was the reservation is actually
 8   made right there where that blue line -- that light blue
 9   line.
10   Q.  And at what time was that?
11   A.  81 milliseconds.
12   Q.  Okay.  And then what did he testify would have been the
13   timing of the slot that that reservation would have
14   corresponded to?
15   A.  Okay.  That would have been right here.
16   Q.  Okay.
17   A.  With a 4-millisecond difference.
18          MR. KUBEHL:  And can you go to the next slide,
19   please?
20   Q.  (By Mr. Kubehl)  What are we looking at here?
21   A.  Okay.  This is Dr. Williams's testimony from yesterday.
22   And you -- you asked him:  Have I indicated correctly on
23   this slide where the timeline you contend the reservation
24   would be made for Claim Step 1(c)?
25          That's the second reservation step.
```

1        And he said:  As I just testified, in my

2   deposition, I said it -- that the reservation was made and

3   complete at 81.

4        Okay.  And that's what I showed in the previous

5   slide.

6        Question:  The slot that you believe has been

7   reserved is at Time 81, correct?

8        Yes.

9        And is that -- would you agree that that's not in

10  the future with respect to Time 81?

11       And he said:  Yes.

12       MR. KUBEHL:  So if we can go one slide back to 26.

13  Q.  (By Mr. Kubehl)  If you accept his testimony and his

14  theory that there was a reservation made at Time 81 for the

15  slot that occurs at Time 81, does that meet the claims?

16  A.  It does not because even if you take this as a

17  reservation, it's not.  But if you take it that way, the

18  corresponding transmission is in the same frame.  It's not

19  a reservation in a future frame.  It doesn't satisfy

20  Step 1 or Step -- or, sorry, Step B or Step C.  It is not a

21  reservation in a future frame or a reservation in a frame

22  even after that.

23       MR. KUBEHL:  Let's go to the claim language at

24  Slide 29, please.

25  Q.  (By Mr. Kubehl)  So you talked about Step B and Step C.

1  Summarize for the jury, if you could, your opinion as to

2  whether or not the Ericsson base station does or does not

3  meet Steps B and C.

4  A.  Okay.  What I've shown is that the Ericsson base

5  stations do not make reservations in the future.

6         They deal with the current transmission time

7  interval.  And because of that, they do not practice

8  reserving a first slot in a future transmission frame.

9         They do not practice reserving a second slot in a

10 transmission frame subsequent in time to the future

11 transmission frame, the previous one.  So Steps B and C are

12 not practiced.

13 Q.  So Step B requires a reservation one frame in the

14 future.

15        Step C requires a reservation two frames in the

16 future?

17 A.  That would be an example.  Step B simply says:  A

18 future frame.

19        And then Step C says:  After that.

20 Q.  Two or more frames in the future?

21 A.  Exactly.

22 Q.  And the reservation, if we accepted it as a reservation

23 that Dr. Williams identified, would have been how many

24 frames in the future?

25 A.  It would have been zero frames in the future.  It would

```
 1  have been the current frame.  And so it could not satisfy
 2  Step B or C because it's not in the future.
 3  Q.  There's -- there's an assertion that Claims 1 and 4 of
 4  the '629 patent are infringed.  Claim 1 is what we call an
 5  independent claim; is that right?
 6  A.  That's right.
 7  Q.  And what's Claim 4?
 8  A.  Claim 4 is a dependent claim which means that it
 9  includes everything in Claim 1, plus some additional steps.
10  Q.  And so if you don't infringe Claim 1, is there any need
11  to look at Claim 4 for infringement?
12  A.  No, because you can't practice everything in Claim 4 if
13  you don't practice everything in Claim 1.
14  Q.  What's your opinion as to whether or not the Ericsson
15  LTE base station, as used in the T-Mobile network, does or
16  does not infringe Claims 1 and 4 of the '629 patent?
17  A.  The accused Ericsson base stations do not practice
18  Claims 1 and 4.  They do not infringe.
19  Q.  Okay.  We'll move to the '206 patent.
20          Generally, what's the '206 patent about?
21  A.  Okay.  It's about quality of service, ways to apply
22  quality of service to packets.
23  Q.  This is the asserted Independent Claim 109, correct?
24  A.  That's right.
25  Q.  Is that the only independent claim that's asserted?
```

1   A.   Yes.

2   Q.   There are some dependent claims asserted off of 109,

3   correct?

4   A.   That's right.

5   Q.   If -- if the jury were to find that Claim 109 is not

6   infringed, can any of the dependent claims be infringed?

7   A.   No.   The same thing applies.   Those dependent claims,

8   the later claims, they include all of 109.   And so if 109

9   is not practiced, you can't practice the dependent claims.

10  Q.   Okay.   I don't want to get ahead of ourselves.   Please

11  explain to the jury what this claim requires.

12  A.   Okay.   So, once again, it's a method claim.   So it's

13  got a series of steps -- in this case two steps -- that

14  have to be practiced.   It's a method for scheduling packets

15  that includes classifying a plurality of packets according

16  to end-user quality of service requirements of those

17  packets.

18          And then scheduling the plurality of packets for

19  communication in either the upstream or the downstream

20  direction.

21  Q.   Dr. Wicker, have you analyzed the Ericsson LTE base

22  stations as they're used in the T-Mobile LTE network to

23  determine whether those base stations practice each element

24  of Claim 109?

25  A.   Yes, I have.

1    Q.   What did you conclude?

2    A.   They don't.   What I found first and foremost was that

3    the accused base stations do not implement end-user quality

4    of service requirements.   What they implement is network

5    quality of service requirements, which is different.

6    Q.   Okay.   Any other reasons that you're going to express

7    today?

8    A.   Yes.   There's one other reason.   This classifying a

9    plurality of packets, that's a packet-by-packet

10   classification.

11         As I've already shown, that doesn't happen.   The

12   quality of service is associated with the tunnel, not

13   packets.

14   Q.   All right.

15         MR. KUBEHL:   Next slide, please.

16   Q.   (By Mr. Kubehl)   Just to orient the jury, what

17   particular functionality in the base station is accused in

18   this patent?

19   A.   Okay.   In this case, we're focused on the downlink

20   scheduler.   Again, the downlink is the base station to the

21   user equipment.

22   Q.   And is the particular feature called the QoS aware

23   scheduler?

24   A.   Yes.

25   Q.   So I want to start with the claim element you

1    identified as end-user QoS requirements.  What are those?

2    A.  Okay.  End-user quality of service requirements are

3    quality of service requirements requested by the end-user,

4    what the end-user -- the end-user's equipment thinks would

5    be appropriate as a quality of service.

6    Q.  And can you generally give the jury a practical example

7    of how end-user quality of service might impact them?

8    A.  Certainly.  So quality of service is -- it's actually a

9    set of parameters that dictate how a packet is transmitted

10   and how it's processed.  And so it includes things like

11   delay.  How long does it take that packet to get from where

12   it's transmitted to -- to your phone?

13          It's also variations in delay, something called

14   jitter.  It's error rate -- how many errors occur during

15   that transmission and so forth.

16          So now, let's suppose that you are listening --

17   or, sorry, watching a movie on your cell phone, and you're

18   downloading it from Netflix.

19          Now, an end-user requirement might be I would like

20   to watch this movie, and I don't want any delays that are

21   so great that the screen freezes.  You may have watched a

22   movie over the Internet or over your phone where the screen

23   freezes.  Okay.  That means there's too much delay.  The

24   Internet could not keep up -- the system could not keep up

25   with your phone -- your movie.

1        And so that would be an example of something a

2   user might want to avoid.  So they might say, I want those

3   packets fast enough so the screen doesn't freeze during my

4   movie.

5   Q.  Does the Ericsson base station in T-Mobile's network

6   use end-user QoS requirements?

7   A.  No, it does not.

8   Q.  How do we know that?

9   A.  There are a number of reasons.  I studied a number of

10  documents.  I looked at standards, and I looked at, again,

11  software and related documents.

12  Q.  What does the LTE standard say about whether the

13  QoS requirements should be end-user QoS requirements or

14  network QoS requirements?

15  A.  Well, if you go to the next slide, this is part of the

16  LTE standard.  It's Plaintiff's Exhibit 1014.  The standard

17  is a big document.  It's got a lot of subparts to it.

18       This particular piece is from 36-300.  That's a

19  piece of the standard.  And what it says is QoS parameter

20  values are assigned by the network.  Not the user, they're

21  assigned by the network.

22       And further on, it reinforces the point.  QoS

23  parameter values are always assigned by the EPC.  We saw

24  the EPC when I was drawing the diagrams.  That's the

25  evolved packet core.

1   Q.   And in T-Mobile's network, who owns the EPC?

2   A.   The EPC is owned by T-Mobile.

3   Q.   What's the significance of the fact that the document

4   says the QoS parameter values are always assigned by the

5   EPC?

6   A.   Well, the "always" means that there will be no end-user

7   quality of service requirements.  And so that step in the

8   claim we just looked at is not practiced.

9   Q.   Did Ericsson, in the LTE standardization process,

10  express any views as to whether or not -- as to whether

11  end-user quality of service should be used or instead

12  network quality of service?

13  A.   Yes.  Ericsson actually submitted a proposal -- if we

14  can look at the next slide, this is an Ericsson LTE

15  proposal.  It's Defense Exhibit 236.

16          And what they proposed -- this diagram is

17  complicated.  What it's doing is it's describing initiating

18  a bearer.  We talked about bearers.  That was that tunnel

19  I showed you.

20          And what it shows is that in this request for

21  resources here, the QCI is part of the request coming from

22  the network.  It doesn't come from the user equipment,

23  which is over here, instead, the QCI, the quality of

24  service that's part of the requested resources comes from

25  the network.  And that was what Ericsson proposed for LTE.

1    Q.  And then how did the LTE network end up evolving?

2    A.  This is what was adopted.  The QCI is established by

3    the evolved packet core through something that we talked

4    about, the policy charging rules function.

5    Q.  So in the Ericsson base station, with respect to QoS,

6    is Ericsson using its own idea of network quality of

7    service or someone else's idea of end-user quality of

8    service?

9    A.  It's using its own idea.  It's using the -- the network

10   defined QoS that Ericsson suggested in this proposal.

11   Q.  Were you here yesterday when Dr. Williams testified

12   about what kind of QoS requirements are used in the

13   T-Mobile network?

14   A.  Yes.

15   Q.  And what did he have to say about that?

16   A.  Well, Dr. Williams was asked:  T-Mobile -- you asked

17   Dr. Williams:  T-Mobile uses its own network QoS

18   requirements, not end-user QoS requirements, correct?

19        And Dr. Williams said:  Yes.

20   Q.  Is there any dispute about this issue, as far as you

21   can tell?

22   A.  No.

23        MR. KUBEHL:  Slide 36.

24   Q.  (By Mr. Kubehl)  Please summarize, if you would, for

25   the jury your opinion as to whether or not the Ericsson

```
1    base station does or doesn't use end-user quality of
2    service requirements.
3    A.  Okay.  So the first step of Claim 109 calls for
4    classifying a plurality of packets according to end-user
5    quality of service requirements.
6           The accused base stations don't use end-user
7    quality of service requirements.  This step is not
8    practiced, so the claim is not infringed.
9    Q.  Do we need to go any further than this to find
10   non-infringement?
11   A.  No.  This step is not practiced, therefore, the claim
12   is not infringed.  That's it.
13   Q.  You did promise the jury you had a second argument.
14   Can you briefly tell them what the second basis would be
15   based on the classifying -- based on the QoS requirements
16   of the plurality of packets?
17   A.  Yes.  So this -- actually, if we can leave it where it
18   was, please.
19           What the claim calls for is classifying a
20   plurality of packets.  And those -- that plurality of
21   packets -- that classification is a packet-by-packet
22   classification.
23            So it calls for the base station to look at each
24   packet and say, ahh, this needs a certain quality of
25   service based on its contents.
```

1           And as we discussed, that doesn't happen.  The

2  quality of service is established by appointing it to the

3  bearer before any data even comes.  So when the data starts

4  to show up, quality of service is already determined, and

5  it's associated with that tunnel that I drew.

6  Q.  So looking at this claim language, end-user quality of

7  service requirements associated with what?  What does the

8  claim say?

9  A.  Can you ask that question again?

10  Q.  I'm sorry.  The end user quality of service

11  requirements are of what?

12  A.  Oh.  They're of said plurality of packets.

13  Q.  And the quality of service requirements that the

14  Ericsson base station uses are of what?

15  A.  They are of the bearer, the tunnel.

16  Q.  And do you have documents that would help us see that?

17  A.  Certainly.

18           If we can go to the next slide, please.

19           Okay.  This is an example -- we've already seen

20  it.  It's from Defense Exhibit 236.  And this is where I

21  showed you that the network determines the quality of

22  service.  But continuing on, this is a network-initiated

23  bearer establishment.  It's where that tunnel is set up,

24  and all those packets are going to flow through.

25           And so note that this bearer -- this IP bearer is

1    established with a quality of service before any data even

2    flows.  So the QoS is associated with the bearer, not the

3    packets.

4    Q.  Okay.  Can you please summarize for us your opinion as

5    to whether or not the Ericsson LTE base station, as it's

6    used in the T-Mobile network, would or would not infringe

7    Claim 109 of the '206 patent.

8    A.  Okay.  So the first step of Claim 109 calls for

9    end-user quality of service requirements, and so I've shown

10   you that Ericsson doesn't do that.  LTE doesn't do that.

11   It's always a network quality of service requirement.

12        Furthermore, the QoS isn't attached to individual

13   packets, it's instead tied to the bearer.  So there's no

14   classification of packets on a packet-by-packet basis to

15   apply QoS.  Instead, the QoS is associated with the tunnel.

16        And so since that first step is not practiced, I

17   put a big X there.  Claim 109 is not infringed.

18   Q.  And since, in your opinion, Claim 109 is not infringed,

19   can any of the dependent claims be infringed?

20   A.  No.

21   Q.  Okay.  Let's move to the last patent, the '517 patent.

22        Did you analyze whether the Ericsson base station

23   infringes or does not infringe the '517 patent?

24   A.  Yes, I did.

25   Q.  And what -- what was your conclusion?

1  A.  Okay.  So I concluded that this claim is not infringed

2  by the Ericsson base station.

3  Q.  All right.  Can you start by giving us one of the

4  reasons you found to be -- that there was a difference?

5  A.  The claim, once again, is a method, and it's a method

6  with several steps.  Every step calls for something called

7  customer premises equipment, CPE for short, CPE station,

8  CPE station, and so forth throughout the claim.

9           There are no CPE stations in the accused network,

10  or at least there are none accused in this case.  So these

11  steps can't be practiced.

12  Q.  What definition of CPE station did you use?

13  A.  The Court told me on how to interpret that.

14  Q.  And what is that definition?

15  A.  Okay.  The Court's construction was to -- for CPE was

16  for devices residing on the premises of a customer and used

17  to connect to a telephone network, including ordinary

18  telephones, key telephone systems, PBX's, videoconferencing

19  devices, and modems.

20  Q.  And what do these devices, including ordinary

21  telephones, key telephone system, PBX's, videoconferencing

22  devices, and modems look like?

23  A.  Okay.  They are all devices that reside on the premises

24  of a customer.

25           And if we can look at the next slide, what we see

1   is they take a number of different forms.  Here we have an

2   ordinary telephone that you would plug into the wall.  PBX,

3   that's private branch exchange.  You might have such a

4   thing, at least one of this size for a medium to small size

5   company.  And then other kinds of devices as well that are

6   associated with the premises.

7          In other words, they wouldn't be something that

8   you would carry around.  They would be something that you

9   would find, for example, in your home or in a small

10  business.

11  Q.  Does the use of the term "customer premise" -- or CPE

12  station associate this technology with any particular 1G,

13  2G, 3G, 4G technology?

14  A.  No, it does not.  The term actually emerged quite

15  early, actually before the world of cellular.  It was used

16  when I was at Bell Labs in 1981, 1982, and it had been in

17  use for a long time.

18  Q.  So it's -- it's old technology?

19  A.  Yes.

20  Q.  And, again, what are the -- what are the accused --

21  first of all, this is method claim, right?

22  A.  That's right.

23  Q.  Is it still about what the base station is doing?

24  A.  That's right.

25  Q.  In other words, are there any steps in the claim that

1   the CPE device is affirmatively supposed to do?

2   A.   The communication -- if we go back and look at the

3   claim, what we see is that the base station is

4   communicating with the CPE station.

5   Q.   Sending signals to it?

6   A.   That's right.  So, for example, we see analyzing

7   reservation requests for packets to be communicated in the

8   uplink direction from the CPE, elsewhere the at least one

9   CPE station transmitting in the uplink direction.  So it

10  does require some -- the presence of a CPE and for the CPE

11  to do certain things.

12  Q.   Okay.  What are the devices that are identified as the

13  CPE stations that would receive these signals?

14  A.   They're -- the accused devices are cell phones, LTE

15  user equipment.

16  Q.   Are those CPE devices, in your opinion?

17  A.   No, they're not.

18  Q.   Why not?

19  A.   They are not devices that reside on a customer

20  premises.  So if you're familiar with CPE, you would not

21  think of these cell phones as being CPE.  Cell phones are,

22  instead, something that are personal devices that one

23  carries with oneself.

24       MR. KUBEHL:  All right.  Slide 45, please.

25  Q.   (By Mr. Kubehl)  What are you showing on Slide 45?

1   A.  Okay.  So what this shows is that if the accused

2   devices are not CPE's, then they can't satisfy -- actually

3   they can't satisfy any of the steps.

4        But, for example, if we take a look at the first

5   step, analyzing contents of packets to be communicated over

6   the shared wireless bandwidth in a downlink direction from

7   a wireless base station to at least one customer premises

8   equipment station.  The handsets that are accused in this

9   case aren't CPE's, so this step can't be practiced, and the

10  infringe -- the claim is not infringed.

11  Q.  Have you identified additional differences between this

12  claim and the Ericsson base station?

13  A.  Well, I've already noted the other steps call for CPE,

14  as well, but there is yet another reason that involves the

15  allocation of shared wireless bandwidth.

16  Q.  Okay.  I think you've got a slide that focuses on that

17  claim language of Slide 47.

18        Okay.  Let's take one slide back and just orient

19  ourselves here.  What function -- or what components are

20  accused with respect to this patent?

21  A.  Okay.  For this patent, the third one we've been

22  talking about, now we're talking about both schedulers,

23  both uplink and downlink.

24  Q.  Okay.

25        MR. KUBEHL:  And let's go to Slide 47.

1   Q.   (By Mr. Kubehl)   And please tell me about the

2   highlighted claim language and what that's requiring.

3   A.   Okay.   So this step calls for an allocation allocating

4   the shared wireless bandwidth between the wireless base

5   station transmitting in the downlink direction and the at

6   least one CPE station transmitting in the uplink direction,

7   based on the analyzed contents and the analyzed reservation

8   requests.

9           So there's an allocation to be made.   It's an

10  allocation of bandwidth between -- between what?   The

11  uplink and the downlink.

12  Q.   Does the patent give us any description of that

13  concept?

14  A.   Yes, it does.

15  Q.   Please tell us about that.

16  A.   Go to the next slide.

17          Certainly.

18          Next slide, please.

19          There is --

20          MR. KUBEHL:   Slide 48, please.

21  A.   -- slide where I looked at -- I believe it's --

22          THE COURT:   One at a time, gentlemen.   One at a

23  time.

24          MR. KUBEHL:   Mr. Patterson, could we have Slide

25  48, please?

1          THE COURT:  Let's proceed.

2   Q.  (By Mr. Kubehl)  Dr. Wicker, please tell us about the

3   language in the patent and how it relates to your analysis.

4   A.  Okay.  So this is from the '517 patent, Defense Exhibit

5   2, and this is a particular part of the patent.

6          This means Column 53 -- I don't know if we've

7   looked at that.  All the columns in the patent are

8   numbered, at least most of them are.  And so this is

9   Column 53 of the '517 patent.  It's Line 17 through 29.

10          And what I noted here was that it talked about the

11   distribution of slots between the downlink and the uplink

12   is dynamically assigned.  And so what that told me was we

13   can think of our resources as being a collection of slots.

14   And sometimes I'm going to give more slots to the uplink,

15   and sometimes I'll give more to the downlink.  It depends

16   on what's needed.

17          But the key here is that we have dynamic

18   assignment of those slots between the downlink and the

19   uplink.

20   Q.  And do those -- does -- does the downlink and the

21   uplink have to be part of a shared wireless bandwidth?

22   A.  Yes, that's what the claim calls for.

23   Q.  And is that the way T-Mobile's network works?

24   A.  No.

25   Q.  Please explain it.

1   A.   Okay.   So T-Mobile's network has fixed assignments for

2   uplink and downlink.   We noted that T-Mobile's network has

3   an allocation from the FCC, we obtained at auction, and

4   what happens is a particular band will have a designated

5   uplink set of frequencies and a designated downlink set of

6   frequencies.   And they don't overlap.   They are separated

7   by a gap, as I drew earlier today.

8           And so as we see here, we have uplink frequencies

9   and downlink frequencies.   You can't take away some from

10  the uplink and give them to the downlink or vice versa.

11  It's fixed.

12  Q.   And which exhibit are you referring to?

13  A.   This is Defense Exhibit 250.

14          MR. KUBEHL:   Next slide.

15  Q.   (By Mr. Kubehl)   What are you showing us here?

16  A.   Okay.   I mentioned the FCC allocations.   That's Federal

17  Communications Commission, by the way.   These are the LTE

18  bands that are used by T-Mobile.   These bands have an

19  associated number, and what they do is they designate a

20  particular range of uplink frequencies, a particular range

21  of downlink frequencies.

22          So Band 2, for example, goes from 1850 to 1910

23  megahertz.   And the downlink goes from 1930 to 1990

24  megahertz.   So as I drew in that previous -- sorry,

25  actually I reproduced it from another document -- but those

1  separated blocks for the uplink and downlink, here we can

2  see this particular band has those blocks separated by 20

3  megahertz.

4       Other bands have different separations, but in all

5  cases, the uplink and downlink blocks are separated.  That

6  means that chunk of the spectrum is not shared.

7  Q.  If we go to the next slide, what are you showing us?

8  A.  Okay.  So once again, we've got an Ericsson base

9  station.  I've got an uplink scheduler and a downlink

10  scheduler.  These schedulers work independently.

11       The uplink frequencies are separate and distinct

12  from the downlink, and there's no ability of the uplink to

13  take some of those downlink frequencies -- or for the

14  downlink scheduler to take some of the uplink frequencies.

15  They've got a fixed allocation, and that's what they're

16  working with.

17  Q.  Can there be some communications between the uplink and

18  downlink scheduler?

19  A.  There may be, yes.

20  Q.  But do the uplink scheduler -- does the uplink

21  scheduler have any ability to allocate from a shared

22  wireless bandwidth between the uplink and downlink

23  frequencies?

24  A.  No.

25  Q.  What about the downlink scheduler?  Can that allocate

1  from a shared wireless bandwidth that's shared between the

2  uplink and downlink frequencies?

3  A.  No.

4          MR. KUBEHL:  Next slide.

5  Q.  (By Mr. Kubehl)  Without stating it twice, let's go to

6  the next slide, and can you please summarize your opinions

7  with respect to the '517 patent and whether the Ericsson

8  base station, as it's used in the T-Mobile network, would

9  infringe Claim 1?

10  A.  Okay.  What I've discussed today are two reasons why

11  this claim of the '517 patent is not infringed.

12          First off, all of the steps require CPE stations.

13  Those cell phones are not customer premises equipment.

14          Secondly, the one, two -- the third step calls for

15  allocating shared wireless bandwidth between the uplink and

16  the downlink.  And that's simply not possible.  In fact,

17  it's not even allowed by the FCC.

18  Q.  Okay.

19          MR. KUBEHL:  Next slide.

20  Q.  (By Mr. Kubehl)  On the '517 patent, there's a

21  dependent claim, and have you analyzed whether the

22  dependent claim is infringed?

23  A.  Yes.

24  Q.  Is it infringed or not?

25  A.  It's not because, as a dependent claim, it requires --

1   go back to the previous slide, please.

2         It requires -- actually, that was the slide

3   I wanted.

4         Claim 1 of the '517 is required for the dependent

5   claims that are asserted in this case.  And since Claim 1

6   is not infringed, the dependent claims can't be infringed.

7   Q.  So to summarize the infringement part of your opinions,

8   with respect to the -- going back to the '629 patent, what

9   are the -- what are the takeaways you want the jury to have

10  from your testimony?

11  A.  Okay.  So the '629 patent is the one we looked at

12  first.  That's the one that requires reserving a first slot

13  in a future transmission frame and reserving a second slot

14  in yet a later transmission frame subsequent in time to

15  said future frame.

16        The Ericsson scheduler does not reserve slots

17  ahead of time.  It does not reserve slots in future frames.

18  Q.  Okay.

19  A.  Those steps are not from practiced, and, therefore, the

20  claim is not infringed.

21  Q.  And then just briefly in the '206 patent?

22  A.  Okay.  In the '206 patent, first and foremost, the

23  accused Ericsson base stations do not use end-user QoS

24  requirements.  It's always network QoS requirements.  And

25  I showed that in several ways.

1          Furthermore, there's no classifying of a plurality

2     of packets in the accused devices.  Instead, QoS is

3     associated with the tunnel, with the bearer, instead of

4     being associated with individual packets.

5     Q.  Okay.  And I won't ask you to repeat the '517 patent

6     that we've -- we've just gone over.

7          MR. KUBEHL:  I've got just a little bit more

8     testimony to take from Dr. Wicker.

9     Q.  (By Mr. Kubehl)  I wanted to ask you about your

10    opinions regarding Dr. Chrissan's valuation analysis.

11         THE COURT:  Let's don't have a discussion.  Let's

12    ask him a question.

13         MR. KUBEHL:  Yes, Your Honor.

14    Q.  (By Mr. Kubehl)  Dr. Wicker, do you understand that

15    Dr. Chrissan provided an analysis in this case regarding

16    how he viewed the technical value of patents that were the

17    subject of Ericsson LTE patent license agreements?

18    A.  Yes.

19    Q.  What did you understand the context of that analysis to

20    be?

21    A.  Okay.  I understood Dr. Chrissan to be comparing

22    Ericsson's patent portfolio on the basis of 18 patents to

23    the asserted patents in this case, and he was trying to

24    somehow gauge where the value was in both cases.

25    Q.  And did you understand whether he was taking the

1    position that those 18 patents represented the entire value

2    of the portfolio?

3    A.   That was my understanding, yes.

4    Q.   Is that your view?

5    A.   No.

6    Q.   What's the basis for that opinion?

7    A.   Okay.  So what I did was I studied Dr. Chrissan's

8    expert report, and I was in court yesterday when he

9    testified.

10          And it was my understanding that he was comparing

11   18 of Ericsson's patents.  That was the only one he

12   analyzed for this purpose.  And on that basis, he was

13   trying to come up with a valuation -- technical valuation,

14   as he put it, for hundreds of Ericsson patents, patents

15   that are potentially LTE essential.

16   Q.   And are you familiar with Ericsson's position in

17   patents in the LTE space?

18   A.   Yes.

19   Q.   How would -- how do you characterize Ericsson's patent

20   holdings in LTE generally?

21   A.   Okay.  So Ericsson has lots of patents.  And that's

22   been discussed actually throughout the trial.  They have

23   hundreds of patents -- actually hundreds of families of

24   patents, groups of patents that are potentially essential

25   LTE patents.

1          So potentially essential means these could be

2    patents that you have to practice in order to be LTE

3    compatible.

4    Q.  You've been in court this week when there's been some

5    discussion of the EPO award that they were nominated for?

6    A.  That's right.

7    Q.  Did you think that that award was relevant to your

8    analysis?

9    A.  Yes, because what it did was it showed me that Ericsson

10   continues to be very prolific in inventing things and

11   making contributions to standards.

12          I cited from at least one contribution today.

13   I've been familiar with their work for a long time.  They

14   are a highly inventive company.

15   Q.  So how about Dr. Chrissan's analysis of the 18 patents?

16   What's your response generally to his analysis?

17   A.  My initial response was that it is overly negative, and

18   I was surprised by some of his valuations and conclusions,

19   but I further noted that he went through this process with

20   Ericsson's patents but did not go through this process with

21   the asserted patents.

22   Q.  What do you mean by "this process"?

23   A.  The process of saying, well, some of these are likely

24   invalid.  Some of these are of low value because they're

25   probably not used and things like that.  He did not take

1    that approach to the asserted patents.  He simply assumed

2    they were valid.

3    Q.  Did you find the asserted patents to be related to old

4    technology or new technology?

5    A.  Old technology.  The asserted patents actually relate

6    to something called TDMA, Time Division Multiple Access.

7         The slot language, for example, tells me that.

8    And that takes us back to 2nd generation cellular, and, of

9    course, LTE is 4th generation cellular.

10   Q.  Did you find that the concepts that were claimed, like,

11   for example, reserving slots was a 2nd generation concept?

12   A.  Yes.

13   Q.  What are the different ways that Dr. Chrissan degraded

14   the value of the Ericsson patents?

15   A.  Okay.  Well, he had a number of bases.  One of them was

16   whether or not it was likely to be invalid, whether or not

17   it was something that had been -- that appeared to him to

18   be -- when push came to shove, you know, it would be found

19   invalid.

20   Q.  And did you take a look at the 18 Ericsson patents?

21   A.  Yes, I did.

22   Q.  Did you take a look at more Ericsson patents than that?

23   A.  Yes, I did.  There are a lot of Ericsson patents.

24   Q.  What was your finding -- in looking beyond the 18

25   patents, what was your finding with respect to whether the

1   18 patents were representative of the value of the entire

2   Ericsson portfolio?

3   A.  They are a sampling.  So the 18 are a sampling from the

4   portfolio, but they can't possibly represent what amounts

5   to hundreds of potentially essential LTE families of

6   patents.

7           So there's lots of technologies that are involved

8   with Ericsson's work that weren't represented by those 18

9   patents.

10  Q.  One of the patents you looked at is Exhibit 49,

11  I believe?

12          MR. KUBEHL:  And you can actually just stick on

13  Slide 58.

14  Q.  (By Mr. Kubehl)  Tell me about this patent.

15  A.  Okay.  This is a patent -- it's an Ericsson patent, as

16  you can see here, and it is a patent to Turina.  It was

17  granted in 2000.  It was applied for in 1996.  So it takes

18  us back before the patents-in-suit in this case.

19          This is a patent that talks about improving

20  performance of a packet communication system.  And, in

21  particular, what it does is create something called a VIP

22  channel.  It's a way of reserving resources so that a given

23  channel is guaranteed for important voice communications.

24  Q.  Okay.  And what's the -- what's the invention in this

25  patent?

1    A.   Okay.  That would be the actual creation of three

2    channels and the use of those channels to reserve slots

3    ahead of time so that we guarantee the performance of a

4    particular VIP channel.

5    Q.   And does -- does LTE, in your opinion, use this concept

6    of creating three different channels for these control

7    purposes?

8    A.   For control purposes, yes.  LTE does use these three

9    channels.

10   Q.   And is that technology that's accused in this case?

11   A.   No, it's not.

12   Q.   What are you showing on Slide 59?

13   A.   Okay.  So this is Figure 6 from the Turina patent, and

14   this shows the three channels.  We've got the VIP channel

15   request using the reserved RA channel, and then we've got a

16   dedicated channel assignment, using a downlink channel, and

17   then we've got the actual packet transfer, so that's where

18   we see data or voice actually being transferred.

19   Q.   How does the Ericsson Turina patent accomplish the

20   creation of this reserved channel?

21   A.   It does it by actually reserving slots ahead of time.

22   There is a particular figure.

23           If we can go to the next slide, please.

24           What this shows is a sequence of TDMA frames, each

25   consisting of eight slots in this case.  And what we see

1    are reservations -- let me try that again.

2            So there's our TDMA frame.  And we see

3    reservations and future frames.  Those two slots are

4    reserved in future frames, so they'd be available for this

5    VIP channel.

6    Q.  Now, how do you know they're reserved?  Where do we see

7    that?

8    A.  Okay.  So down here, you see the language:  Time slots

9    reserved for VIP -- VIP mobile station.

10   Q.  So if you wanted to identify on this figure where the

11   current frame would be, which one would that be?

12   A.  That would be Frame 0.  So this is the current frame,

13   and these are future frames.

14   Q.  And those slots, are they at constant or not constant

15   time intervals?

16   A.  They are at constant intervals because we see that --

17   for example, here we have Slots 4 and 5 in Frame 0, the

18   current frame; 4 and 5 in and Frame 1, future frame --

19   Frame -- Slots 4 and 5, excuse me, and subsequent future

20   frames.

21           MR. KUBEHL:  If we go back to Slide No. 58.

22   Q.  (By Mr. Kubehl)  This is an Ericsson patent?

23   A.  Yes, it is.

24   Q.  And it was filed 1996; is that right?

25   A.  That's right.  You can see that.

1    Q.   Is it a United States patent?

2    A.   Yes, it is.

3    Q.   And this is Exhibit 49?

4    A.   That's correct.

5    Q.   And then what was Dr. Chrissan's opinion about whether

6    this patent was valid or invalid?

7    A.   It was his opinion that it was likely to be invalid.

8    Q.   And when was that filed relative to the '629 patent

9    that reserves future slots at equal intervals?

10   A.   The Turina patent was actually filed before the '629

11   patent.

12   Q.   Ericsson was first?

13   A.   Ericsson was first.

14          THE COURT:   Counsel, approach the bench, please.

15          (Bench conference.)

16          THE COURT:   Can you give me some idea of how much

17   longer you have?

18          MR. KUBEHL:   Five minutes, roughly.

19          THE COURT:   I figured you were getting close, but

20   it's almost two hours since we came back from lunch.   Okay.

21   Let's continue.

22          MR. KUBEHL:   Okay.

23          (Bench conference concluded.)

24          THE COURT:   Let's continue, please.

25   Q.   (By Mr. Kubehl)   Dr. Wicker, having looked at the

```
 1  asserted patents, do you have an opinion as to whether or
 2  not the inventor on the asserted patents invented LTE?
 3  A.  The -- the inventor on the asserted patents certainly
 4  did not invent LTE.  These patents were second generation
 5  technology, and LTE is fourth generation.
 6  Q.  How about VoLTE, did this inventor invent VoLTE?
 7  A.  No.
 8  Q.  Do you have an opinion as to whether or not these three
 9  patents would provide up to 25 percent efficiency in
10  systems that would use VoLTE?
11  A.  I see no basis for that at all.
12          MR. KUBEHL:  Done a little quicker than I thought.
13  I'll pass the witness.
14          THE COURT:  All right.  Counsel, before the
15  Plaintiff cross-examines Dr. Wicker, we're going to take a
16  short recess.
17          Just leave your notebooks, if you will, closed and
18  in your chairs.
19          Recall and remember all my instructions, including
20  not to discuss the case among yourselves, and we'll be back
21  shortly to continue, as I say, with the Plaintiff's
22  cross-examination of the witness.
23          The jury is excused for recess at this time.
24          COURT SECURITY OFFICER:  All rise.
25          (Jury out.)
```

1          THE COURT:  Counsel, it won't bother me if you

2    make a short bathroom break on the way, but shortly

3    thereafter, I want to see you in chambers.

4          The Court stands in recess.

5          COURT SECURITY OFFICER:  All rise.

6          (Recess.)

7          COURT SECURITY OFFICER:  All rise.

8          THE COURT:  Be seated, please.

9          All right.  Mr. Black, are you prepared to

10   cross-examine the witness?

11         MR. BLACK:  I am, Your Honor.

12         THE COURT:  You may go to the podium and prepare.

13         While you're doing that, Ms. Denton, please bring

14   in the jury.

15         COURT SECURITY OFFICER:  All rise.

16         (Jury in.)

17         THE COURT:  Please be seated.

18         Ladies and gentlemen, we'll continue with

19   Dr. Stephen Wicker, who will now be cross-examined by the

20   Plaintiff.

21         Mr. Black, you may proceed with cross-examination.

22                    CROSS-EXAMINATION

23   BY MR. BLACK:

24   Q.  Good afternoon, Dr. Wicker.

25   A.  Good afternoon.

1    Q.   Good to see you again.

2    A.   Thank you.

3    Q.   You are here as an expert witness, right?

4    A.   That's correct.

5    Q.   And you're familiar with the difference between expert

6    and fact witnesses, right?

7    A.   Generally speaking.  I'm not a lawyer, but I think I

8    understand the difference.

9    Q.   Well, you've testified in depositions or at trial in

10   the last five years alone, I think, 28 times, right?

11   A.   That's probably right.

12   Q.   That's what your report says, right?

13   A.   Okay.  Yes.

14   Q.   So let's talk about the expert process.

15        Fact witnesses give facts, right?

16   A.   Yes, sir.

17   Q.   And expert witnesses are permitted to give opinions,

18   right?

19   A.   That's correct.

20   Q.   And the Federal Rules of Civil Procedure, which are

21   enacted by the United States Supreme Court, provide rules

22   to ensure fairness in trials to avoid surprises in expert

23   opinions, correct?

24   A.   That's my understanding.

25   Q.   And as a result of that, when you provide expert

1  testimony in court, you are first required to provide an

2  expert report, correct?

3  A.  That's right.

4  Q.  Now, the jury hasn't seen expert reports because they

5  don't get admitted into evidence and go back in the jury

6  room, correct?

7  A.  That's been my experience, but I don't know if that's a

8  rule or not.

9  Q.  But they can be very long and detailed documents.

10  A.  That's correct.

11  Q.  And in this case, you had a very extensive report,

12  which was over 400 pages single spaced, correct?

13  A.  That's correct.

14  Q.  And that just covered infringement, right?

15  A.  That's right.

16  Q.  We'll hear from Dr. Acampora about validity.  I think

17  his was over a thousand pages, correct?  Have you seen

18  Dr. Acampora's report?

19  A.  No.  At least I haven't studied it in detail.  I don't

20  believe I've seen it.

21  Q.  Oh.  Have you seen it or not?  You don't know?

22  A.  I don't recall.

23  Q.  Did you see his commentary about Turina, that patent

24  that you discussed today during your testimony?

25  A.  I know that he talked about it.  I don't recall ever

1  seeing or reading his report.

2  Q.  Okay.  Now, the reports that get filed -- served really

3  to the other parties, have a number of traditional sections

4  in them.  Some are required by the United States Supreme

5  Court, and others are by convention, right?

6  A.  That's my understanding, yes.

7  Q.  And your report, which I'm holding up, has a cover.

8  It's got a caption on it of this case:  Jury trial

9  demanded.  Intellectual Ventures I LLC versus T-Mobile USA,

10  et cetera, right?

11  A.  That's correct.

12  Q.  And this is partly a legal document, right?

13  A.  I'd assume so.  It's certainly -- it's a document that

14  I've produced for purposes of putting you on notice as to

15  what I'm going to talk about.

16  Q.  And you work with the lawyers to help put it in the

17  right format and make sure it's going to be consistent with

18  the case that the lawyers are putting on, right?

19  A.  Well, I wouldn't say I work to make sure it's

20  consistent.  They certainly helped me with the format.

21  Q.  Well, you testified before that you -- people come to

22  you, and sometimes you say you turn them down because

23  you're -- you don't believe in the positions in the case.

24        But other times, you take the cases, and then you

25  work with the lawyers, and occasionally come to trials like

1    this, right.

2    A.   That's true.

3    Q.   So your report here has a table of contents that is

4    eight pages long, and it starts with an introduction of

5    your qualifications.   That's the first section, right?

6    A.   That's correct.

7    Q.   And then you have a section on materials and other

8    information considered, right?

9    A.   That's right.

10   Q.   And the purpose of that is to make sure that we can

11   have a full and complete understanding of the materials

12   that you reviewed during your process of forming your

13   opinions, right?

14   A.   That's correct.

15   Q.   And that's only fair, right?

16   A.   I think so.

17   Q.   It also provides a list of any prior testimony you've

18   had in the last five years by deposition or at trial,

19   correct?

20   A.   That's right.

21   Q.   And as I noted, you identified 28 cases in your expert

22   report just in the last five years, right?

23   A.   That's correct.

24   Q.   And the vast majority of them were for Defendants,

25   right?

1   A.  Certainly the majority.  I haven't counted, but the

2   majority would be for Defendants, and then there were

3   several for Plaintiffs.

4   Q.  So you had several for Plaintiffs, but the rest for

5   Defendants, right?

6   A.  That's right.

7          THE COURT:  Dr. Wicker, please make sure you speak

8   up and are heard.

9          THE WITNESS:  Yes, sir.

10          THE COURT:  You're getting a little soft now that

11   we've gotten to cross-examination, so either move the mic

12   or whatever.

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  All right.  Thank you.

15          Go ahead, counsel.

16          MR. BLACK:  Thank you, Your Honor.

17   Q.  (By Mr. Black)  Now, the next section of your report is

18   your compensation, right?

19   A.  That's correct.

20   Q.  And you told the jury that your rate was $750.00 an

21   hour, right?

22   A.  That's correct.

23          MR. BLACK:  And if I -- can I just go to the ELMO

24   for a second?

25   Q.  (By Mr. Black)  I want to use Mr. Ward's handy sheet

1    here and get that -- okay.  Got that right?

2    A.  Yes, sir.

3    Q.  All right.  You're a Cornell University professor,

4    right?

5    A.  That's correct.

6    Q.  You've had 28 depositions and trial appearances in the

7    last five years, right?

8    A.  That's roughly correct, yes.

9    Q.  That's almost six per year, right?

10   A.  That sounds about right.

11   Q.  That's every two months you're in court or at a

12   deposition, right?

13   A.  They're not so evenly spaced, unfortunately.  But

14   roughly speaking, that's right.

15   Q.  When -- when we met in Ithaca for your deposition, do

16   you remember that when I walked in the deposition room,

17   the -- the court reporter greeted you warmly because she

18   was so familiar with you?  We had a laugh about that.

19   A.  I do remember that.

20   Q.  As a university professor, you're paid a salary by the

21   university, of course?

22   A.  That's right.

23   Q.  And I don't want you to tell us how much you make.

24   I don't think it's right to ask people what they make for

25   living.  But if you could just in your head tell us sort of

1    if you had a 1500-hour year, a 2000-hour year, something

2    like that, what would your -- if you took your university

3    salary and tried to convert it into an hourly rate, what

4    would that rate be?  About a hundred, maybe, dollars an

5    hour, $75.00 an hour?

6    A.  No, it would be more than a hundred.

7    Q.  125?

8    A.  So if we assumed -- let's say, a 1500-hour year?

9    Q.  You assume whatever is fair to you.  I didn't want to

10   give you the same number as a law firm first year

11   associate, 2,000 hours.  That really didn't seem right.  A

12   university professor gets some time off in the summer and

13   whatever, but...

14   A.  Well, we get the whole summer off, but, yes, that's

15   correct.

16   Q.  Okay.  So about $125.00 an hour; is that fair?

17   A.  Probably closer to 175, 200.

18   Q.  175, 200.  I won't quibble with the math.  But any way

19   you cut it, the rate that you're getting paid by the

20   university to work is three -- one-third, one-quarter of

21   what you're getting for your expert witness services,

22   right?

23   A.  That's correct.

24   Q.  So the rest of your report consists of a section on

25   opinions as to the level of one of ordinary skill in the

1    art.  You have an opinion on that, right?

2    A.  That's correct.

3    Q.  And then we've got a technology background that's a

4    hundred -- it's 90 pages, right?

5    A.  That's correct.

6    Q.  And then we've got your opinions which run for, let's

7    see, it looks like all the way through Page 461?

8    A.  Okay.

9    Q.  And then a table of figures which runs from Figure A

10   through Figure RRRRR.  You ran out of letters, so you had

11   to start your letters over again?

12   A.  That's right.  There are a lot of figures.

13   Q.  Anyway, the kind of testimony that you're providing

14   today is very different from the kind of testimony that

15   Mr. Skarby tried to put on this morning, correct?

16   A.  That's correct.

17   Q.  That's because he's a fact witness for whom we had no

18   report, correct?

19   A.  I think that's true.  Actually I don't know the

20   details.

21   Q.  As far as you know, we had no expert report from

22   Mr. Skarby, correct?

23   A.  As far as I know, that's correct.

24   Q.  And, therefore, none of the protections that the United

25   States Supreme Court gives to folks involved in lawsuits

1    when expert witnesses testify?

2    A.  I assume that's correct.

3    Q.  And partly for that reason, I don't think I had more

4    than one objection during the two hours that you were on

5    the stand.  And that was very different from what we had in

6    the case of Mr. Skarby's testimony, correct?

7    A.  I did notice that, yes.

8    Q.  All right.  Let's get to your opinions.

9            You provided some initial background about

10   yourself, of course, the books that you've written, the

11   five patents that you've been awarded, some of your work

12   with an industry -- you mentioned AT&T.  You've done

13   litigation consulting for AT&T?

14   A.  Yes, I have.

15   Q.  Before I forget, you -- you've done prior litigation

16   consulting for both T-Mobile and Ericsson, haven't you?

17   A.  Yes, that's correct.

18   Q.  You didn't mention -- oh, I think you mentioned the

19   White House, too.  You said something about being in

20   Washington yesterday on a panel, and then you said the word

21   "White House."  You weren't in the White House yesterday,

22   were you, for the --

23   A.  No.  What I said was several years ago I was invited to

24   the White House to talk on cellular privacy and security.

25   Q.  Oh, I see.  Okay.  Just wanted to make sure.  It was a

1    little ambiguous.

2    A.   No, I definitely was -- was in here yesterday.

3    Q.   Okay.  Now, you put up a slide, Slide 3.

4           MR. BLACK:   Put that up from --

5    Q.   (By Mr. Black)  And Slide 3 had on it on one column

6    your honors and awards and on the other column your

7    consulting engagements.  You see that on the right?

8    A.   That's correct.

9    Q.   But you didn't mention your legal consulting business

10   which is consuming a very significant part of your time and

11   providing most of your income, correct?

12   A.   That's correct.  This -- these consulting engagements

13   were the ones for the United States Government.  I'm happy

14   to talk about my legal consulting, as well.

15   Q.   All right.  Your 462 single-spaced report took how long

16   to write?

17   A.   Several hundred hours.

18   Q.   Over what period of time?

19   A.   Some of it was tutorial material that I'd written in

20   the past.  So when I talk about wireless technology, I

21   typically say the same things about the various generations

22   of cellular.  So that was written over a year ago.

23          The rest of it, including my opinions specific to

24   the case, would have been written in the six months prior

25   to submission.

1   Q.   Okay.  Six months prior to submission.  Let's -- before

2   we forget, let's do the math.  A couple hundred hours.  Was

3   it 300, 500?

4   A.   On the order of 300.

5   Q.   Order of 300.  300 times 750 would be 225,000; is that

6   right?

7   A.   That's right.

8   Q.   You worked on your report for about six months.  Six

9   days before you had to serve the report, you had a phone

10  call with Mr. Ahmed from Ericsson who was performing the

11  testing in Sweden, correct?

12  A.   That's correct.

13  Q.   And that was first time you had spoken to him, right?

14  A.   Yes.

15  Q.   So you've written this long report, worked on it for

16  six months, it's 462 page single-spaced.  I guess you're

17  probably in final editing at that point, and all of a

18  sudden you have a call with the folks in Sweden about

19  running a new test; is that right?

20  A.   That's right.

21  Q.   Who arranged for that testing to be done?  Who arranged

22  for you to talk to Mr. Ahmed?

23  A.   It was counsel that arranged for me to talk to him.

24  Q.   Which counsel?

25  A.   Counsel for Ericsson, Baker Botts.

```
 1   Q.  Baker Botts.
 2          So they -- they called you up and said, look, we
 3   want you to get in touch with Mr. Ahmed?
 4   A.  No.  That's not how it worked.  What happened was I had
 5   looked at Plaintiff's infringement report, the report that
 6   was submitted by Dr. Williams, and I'd only had that for a
 7   couple weeks.
 8          In that report, it was asserted that certain
 9   things were happening, and I thought, well, that can't be
10   right.
11          The way to determine whether or not it's right is
12   for there to be testing.  So I asked that testing be done,
13   and so the call was set up.
14          MR. BLACK:  Your Honor, I'd ask that Dr. Wicker
15   answer the questions and not elaborate.
16          THE COURT:  Well, I'm not going to strike the
17   answer.  I think it was responsive to your question.  I
18   will instruct the witness to limit his answers to the
19   questions that are asked.
20          THE WITNESS:  Yes, Your Honor.
21          THE COURT:  And if, counsel, you believe the
22   witness is nonresponsive, raise it with the Court, and I'll
23   address it.
24          Let's proceed.
25          MR. BLACK:  Okay.
```

1    Q.  (By Mr. Black)   During those tests that were connected

2    in -- at Ericsson's labs in Sweden, no one from IV was at

3    the test, right?

4    A.  Not that I know of.

5    Q.  In fact, IV wasn't even told those tests were going on

6    until they received your report, correct?

7    A.  That's my understanding.

8    Q.  IV had no input into the parameters used in the testing

9    labs at Ericsson when the tests were run, correct?

10   A.  Not that I know of.

11   Q.  All right.  You had input into those parameters,

12   though, right?

13   A.  I did.  I picked them.

14   Q.  And some of the parameters you picked involved making

15   the phones in some instances, maybe a third of the

16   instances, have really bad service, right?

17   A.  Not exactly.

18   Q.  I'll rephrase it.

19        You set the system up so that, in some cases -- I

20   think it was about a third of the time -- it was simulating

21   really bad cell service, right?

22   A.  I specified parameters that were -- made the system

23   really busy.  And so since the system was busy, that

24   resulted in bad service.  I did not specify bad service.

25   Q.  Stand corrected.

```
 1              You specified parameters that you knew would
 2   result in a simulation of bad service.
 3   A.   I thought it would, yes.
 4   Q.   And one of the problems with having bad service is the
 5   phone, when it's talking to the cell or in the simulation,
 6   it's constantly -- I'll use a nontechnical term, sort of
 7   hiccupping.
 8              You have all these little 1 millisecond hiccups
 9   that result from the fact that the phone can't speak
10   correctly to the base station, right?
11   A.   Something like that.
12   Q.   And, therefore, you have intervals shown in your data
13   of 1 millisecond, right?
14   A.   There are intervals between transmissions that, in some
15   cases, were 1 millisecond, that's correct.
16   Q.   Right.
17   A.   Or a small number of milliseconds.
18   Q.   And in contrast, if you had done the tests in an ideal
19   system, in a system where there was a low level of
20   business, you'd get much better results, right?
21   A.   Certainly, if it's less busy, it would result in better
22   service.  I would not agree that that's necessarily ideal.
23   Q.   But it's true that overall, if you pick a -- as between
24   an environment where there are -- there's one phone talking
25   to a base station in the middle of the night, an
```

1   environment where the base station is completely crowded

2   and oversubscribed, you're going to get a lot more of those

3   40 millisecond intervals we've been talking about in the

4   base station that's not busy, right?

5   A.   That's certainly true.

6   Q.   All right.  But you picked tests in this case which

7   would show that a busy environment would reduce the number

8   of 40 millisecond intervals; isn't that right?

9   A.   No.  I picked a range of values that included both busy

10  and not so busy.

11  Q.   Now, IV doesn't have to prove that every single time

12  packets are sent in the Ericsson system that there are, in

13  fact, 40 millisecond intervals every time; isn't that

14  right?

15  A.   They have to prove a lot more than that.

16  Q.   On the isochronous point, we don't have to prove that

17  Ericsson uses that isochronous behavior every single time,

18  right?

19  A.   If I may, the step does not have to be satisfied at all

20  times to be satisfied.

21  Q.   In other words, IV wins if IV shows that there is some

22  isochronous behavior.  We don't have to show that the

23  packets are always isochronous, correct?

24  A.   It is correct the step has to be practiced.  It doesn't

25  have to be practiced all the time.

1   Q.  We actually only have to show it's practiced once to

2   get an infringement verdict; isn't that right?

3   A.  All the other steps have to be practiced as well, but

4   if all of the steps are practiced once, there is

5   infringement on that one practicing of all the steps.

6   Q.  Now, you would agree, would you not, that in a

7   situation where a packet is transmitted at time T equals to

8   20, a second packet at time T equals to 60, and a third

9   packet at times T equals to 100, that that's transmission

10  in an isochronous manner, correct?

11  A.  Yes.

12  Q.  Right.

13  A.  That would satisfy consistent time intervals, yes.

14  Q.  So, therefore, the target that IV has to hit on the

15  isochronous point is it's got to show a situation where

16  there are two 40 millisecond intervals in a row, correct?

17  A.  Well, they have to show consistent time intervals, and

18  if there are several that are 20 in a row or 40 in a row,

19  that would satisfy.

20  Q.  If there's 20 in a row or 40 in a row, that would

21  satisfy it?

22  A.  I think -- well --

23  Q.  I think you're --

24  A.  -- I misspoke.

25          The -- if the intervals are consistently 20

milliseconds or 40 milliseconds -- I thought you said 20 a

moment ago -- in either case, consistent time intervals

would satisfy the isochronous step?

Q.  And we only need two consistent time intervals, right?

A.  Two would be consistent.  You'd have one to compare to

the other.

Q.  Right.  Now, Dr. Williams showed a slide yesterday --

        MR. BLACK:  And let's get that up.  Williams 136,

it should be.

Q.  (By Mr. Black)  He showed a slide yesterday of the

grant intervals from the Ericsson test results.  Do you

recall that?

A.  Just so we're clear, this is the data that's taken from

one of the tests.  There were many tests.  So it's not of

the Ericsson data.  This is an example of the Ericsson data

that he picked.

Q.  It's an example of a -- it's a -- I'll be precise.

This is a graph which depicts the grant intervals observed

by Ericsson during the testing in Sweden that they set up

with your parameters without telling IV, correct?

A.  Of a single phone amongst many, many tests, that's

correct.

Q.  Of a single phone --

A.  That's right.

Q.  -- correct.

```
 1              And what we see in this phone is that almost
 2  80 percent of the grants are at 40 milliseconds, correct?
 3  A.  That's correct.
 4  Q.  And what we see is that virtually all of the remaining
 5  grants are at 160 milliseconds, correct?
 6  A.  Certainly a lot are over here at 160, but there's also
 7  quite a few that are distributed across that set of
 8  intervals.
 9  Q.  You consider that to be quite a few in your
10  professional opinion as an electrical engineer?
11  A.  Certainly.  What's hard to see here is that they're
12  very finely spaced, and so they actually do add up.  But
13  it's -- it's certainly not as many as -- as we see here.
14  Q.  Well, let's try it out.  It's got to be -- the graph
15  has got to add to a hundred, right?
16  A.  That's right.
17  Q.  So the line at 40 is 78, right?
18  A.  That's right.
19  Q.  And the line at 160 is -- it looks like 14 and a half
20  to me, but we'll call it 14.
21  A.  Okay.
22  Q.  So that's 92, right?
23  A.  That's right.
24  Q.  And the rest would be 8 percent, right?
25  A.  That's right.
```

1   Q.  Okay.  You didn't respond to this testimony from

2   Dr. Williams during your direct examination today, did you?

3   A.  Actually, I did.  I showed an example from the test and

4   showed that what he was claiming was, in fact, not the

5   case.

6   Q.  You didn't address this graph in your -- in your

7   testimony, did you?

8   A.  No, I didn't put this graph up.

9   Q.  Now, you would agree, would you not, that it is

10  impossible for a -- for this phone, in this condition, with

11  almost 80 percent grants, to not have the isochronous

12  behavior you described before, and that is, two packets

13  spaced 40 milliseconds apart; isn't that right?

14  A.  Yes.  If I understand your question correctly, the fact

15  that there's 78 percent here would indicate there's

16  probably a number of intervals -- consecutive intervals

17  that are at 40 milliseconds apart.

18  Q.  Did you review the data from the Ericsson tests?

19  A.  Yes.

20  Q.  Would it surprise you to know that there's at least one

21  instance where there were 89 consecutive 40-millisecond

22  intervals?

23  A.  I would not be surprised.

24  Q.  You would not be surprised by that, and you've admitted

25  that the claim language requires for the isochronous

1  element only two intervals, but yet you gave an opinion

2  that there was no isochronous treatment; is that right?

3  A.  I think you misunderstood what I said.  First off, I

4  said the isochronous spacing did not indicate the presence

5  of reservations.  And I showed clearly that the two

6  reservation steps were not satisfied.

7  Q.  We'll come to reservations.  We'll get to the tables.

8          But, first, I want to clear out isochronous.  You

9  would agree that in a phone like this which has 78 percent

10 of the grants at 40 milliseconds, there is going to be

11 numerous times when there are multiple 40-millisecond

12 intervals which meet your definition of isochronous, right?

13 A.  On this chart, that's correct.

14 Q.  And this chart is of a phone that Ericsson set up and

15 your testing that you did without IV, right?

16 A.  That's correct.

17         THE COURT:  What was your answer, Dr. Wicker?

18         THE WITNESS:  That's correct.

19         THE COURT:  Please try to speak up.

20         THE WITNESS:  Yes, Your Honor.

21 Q.  (By Mr. Black)  You told the jury that DBS-SABE doesn't

22 make reservations?

23 A.  That's correct.

24 Q.  And you described it as a scheduling competition,

25 right?

1   A.   I did not describe DBS-SABE as a scheduling

2   competition.   I said that the DBS portion was a scheduling

3   competition.

4   Q.   DBS portion is a scheduling competition.   I didn't

5   understand that.   But -- but the actual algorithm running

6   on the system is DBS -- DBS/SABE/DRX, right?

7   A.   That's correct.

8   Q.   And when you put all those things together, you end up

9   with the consistent behavior that we saw on the screen on

10  your phone from the test, right?

11  A.   No, that's not the case.

12  Q.   Okay.   You analogized this to a restaurant reservation,

13  right?

14  A.   That's true, yes.

15  Q.   We had that nice picture.   It was Wicker 15 --

16          MR. BLACK:   Excuse me, Dr. Wicker

17  Demonstrative 15, I think.   I think I've got a copy of it.

18  All right.   Let's just -- just put it on the ELMO, please.

19  Thank you.   Wait.   Hold on a second.   I want to get your

20  tables.

21  Q.   (By Mr. Black)   You had a number of people sitting

22  around a table, walking into a restaurant.   Do you recall

23  that?

24  A.   Yes, I do.

25  Q.   And your position was that because the people waiting

1  wouldn't know what table they would sit at, that they --

2  there could not be a reservation involved?

3  A.  That is not what I said.

4  Q.  Well, you said that the people would arrive at the

5  res -- arrive at the restaurant, and they're standing in

6  line.  And there was a series of tables.  And as the folks

7  in line would get sent to their seat, they'd go to a

8  different seat.

9        MR. BLACK:  There it is.  Thank you.

10  Q.  (By Mr. Black)  And that that showed -- because they

11  were getting seated at different tables, that there was no

12  reservation, right?

13  A.  The point was not that there were different tables.

14        The point is that if a lot of people arrived and

15  they don't have reservations, then they'll be expected to

16  wait.

17        And the person who's waited the longest will get

18  the next available table.  The scheduling competition

19  that's delay based is thus the opposite of making

20  reservations.

21  Q.  Right.

22  A.  If there was reservations, there would be a table held

23  for them.  They wouldn't have to stand in line.

24  Q.  Right.  The point of the slide is that a scheduling

25  competition is the opposite of a reservation, right?

1   A.   That's right.

2   Q.   Now, if somebody came to a restaurant every Thursday

3   morning for breakfast, a crowded restaurant, and 10 weeks

4   in a row they were assigned exactly the same table, would

5   you think that maybe the restaurant owner was keeping track

6   of where they were sitting and giving them the same table

7   every time?

8   A.   Well, let's see, so if the person came, and it was a

9   crowded restaurant, and they always had a table waiting for

10  them, that would be an indication that there may have been

11  a reservation.

12  Q.   Right.   The reservation can be kept, and as somebody

13  comes in or as a packet comes in, the system can be

14  designed to make sure that the person visiting the

15  restaurant gets to the same table every time, right?

16  A.   The system could be designed that way, yes.

17  Q.   And, in fact, DBS-SABE-DRX is designed to work that way

18  in the ordinary course; isn't that right?

19  A.   No.

20  Q.   Isn't it right that what DBS-SABE-DRX does is it

21  creates many, many, many isochronous reservations that when

22  there's a bad call, when you can't connect to the phone

23  easily, it will overrule the reservation and do something

24  else, but there's lots and lots of isochronous behavior in

25  the Ericsson systems; isn't that right?

1    A.  No, that's wrong.

2    Q.  You had another slide about someone making a

3    reservation on one day for two meals in the future.  Do you

4    remember that?

5    A.  Yes.

6    Q.  Have you ever -- and at that point, the reservation is

7    made, right?  When the call is made, the restaurant books

8    the table for next Saturday and for the following Saturday,

9    the reservation is made, right?

10   A.  That's correct.

11   Q.  Have you ever canceled a reservation?

12   A.  Yes, I have.

13   Q.  Does that mean you never made one in the first place?

14   A.  No, that does not mean that.  It means there was a

15   reservation, but I canceled it, and so the reservation

16   ceased at that point.

17   Q.  Have you ever been ready for your reservation and

18   gotten on the road but got caught in traffic and then were

19   a little late and had to call the restaurant?

20   A.  I live in a small town.  We don't have traffic, but I

21   can see how that would happen, yes.

22   Q.  Doesn't mean -- even though the reservation changed at

23   the last minute, that doesn't mean you didn't make the

24   reservation in the first place, right?

25   A.  That's right.  So you could have a reservation for a

```
 1   period of time and then change it.
 2          MR. BLACK:  Let's go back to the Williams
 3   Slide 136.
 4   Q.  (By Mr. Black)  Now, I'm sure that you warn your
 5   students that there's danger in using common analogies in
 6   describing complex software systems, right?
 7   A.  Yes.
 8   Q.  Could be a dangerous thing, right?
 9   A.  Analogies can be stretched to the point of breaking,
10   that's true.
11   Q.  Yes, they can.
12          In this case, the analogy is a scheduling
13   competition.  That's a word that we've heard many times
14   during this trial, correct?
15   A.  I wouldn't say that's an analogy.  I'd say it's a
16   description of what actually happens.
17   Q.  Well, we don't have packets putting on uniforms and
18   going out to compete on the football field or anything like
19   that, right?  I mean --
20   A.  No, it's not a full contact competition.  It's -- it's
21   a competition in which they -- everyone is ranked who is
22   eligible, and then those with the highest ranks, have an
23   opportunity to transmit.
24   Q.  Well, it's a -- let's go a little deeper.  It's a
25   software process running on the Ericsson base stations,
```

1  right?

2  A.  That's correct.

3  Q.  And the software process is underneath it all a series

4  of 0s and 1s that are being modified and manipulated and

5  computer registers and there's all sorts of complicated

6  stuff going on that you know a lot more than I do about,

7  right?

8  A.  Well, I don't know about that last bit, but, certainly,

9  if you looked at a processor and you looked at what was

10  happening on the pins of that processor, you would see lots

11  of 0s and 1s.  Some are instructions.  Some are data.  But

12  it's all 0s and 1s.

13  Q.  Right.  In the Ericsson system, I think we heard that

14  the processing power of an Ericsson base station is

15  something like 4 -- 40 personal computers or in one chip, I

16  think, 40 personal computers?

17  A.  It's a very powerful set of processors.

18  Q.  Right.  And they require very powerful, very

19  complicated software to run them, correct?

20  A.  The software certainly is complex, there's no doubt

21  about that.

22  Q.  And it's important for us to look at the -- the output

23  of the result of the, quote, competition as part of your

24  analysis in this claim?

25  A.  Well, that's right.  That's why I asked for the test.

1  Q.  Right.  And this is one of the results you got back,

2  correct?

3  A.  That's right.

4  Q.  And -- thank you.

5          It wouldn't be much of a competition if the same

6  competitor won every time, would it?

7  A.  There may be a football analogy there, but I think

8  that, no, it would not be much of a competition --

9  Q.  Right.

10  A.  -- if the same person or packet won every time.

11  Q.  So person or packet.  If we thought each of these

12  packets -- let's say each of these intervals from 1 to

13  170 was a person.  I guess Mr. 40 would have won 78

14  times, and Mr. 160 would have won 15 percent of the

15  time, right?

16  A.  That's not accurate.

17  Q.  Okay.  And with respect to the 160, that's -- that's

18  when -- what we heard from Dr. Williams, that's what

19  happens when there's silence on the line, right?  And

20  that's why we see so many out here at 160, right?

21  A.  Yes, that's right.  What he explained was that some

22  packets don't have any voice because there's silence, and

23  we don't transmit silence.

24  Q.  Right.  So when you don't transmit silence because

25  there's silence on the lineup, you actually get another

1  level of isochronous treatment because you have packets

2  that are arriving 160 milliseconds apart, right?

3  A.  That certainly could happen, yes.

4  Q.  Let's talk about the -- your opinions on the '517

5  patent.  That patent you called the CPE patent, right?

6  A.  Yes, that's correct.

7  Q.  Yes.  You called it -- you wrote a slide for the jury

8  that said:  Ericsson does not infringe the '517, left

9  paren, quote, CPE patent, unquote, right?

10  A.  That's right.

11  Q.  That was your decision, right?

12  A.  That actually was, yes.

13        MR. BLACK:  Can we pull the '517 patent up and

14  show the actual title of it?

15  Q.  (By Mr. Black)  The actual title is:  Method for

16  providing dynamic bandwidth allocation based on IP-flow

17  characteristics in a wireless point to multi-point PTMP

18  transmission system, right?

19  A.  That's right.

20  Q.  There's a lot more going on here than the CPE in this

21  claim, right?

22  A.  Well, first, CPE is easier to say than this title,

23  which I won't repeat, but I will note that this point to

24  multi-point transmission system is a CPE, hence, the title.

25        MR. BLACK:  Let's go to Slide 45 of Dr. Wicker's

1  presentation.

2  Q.  (By Mr. Black)  All right.  This is -- this is your

3  Slide 45.  And you quote the Court's construction of CPE:

4  Devices residing on the premises of a customer and used to

5  connect to a telephone network, including -- and then

6  there's some examples listed, correct?

7  A.  That's right.

8  Q.  Now, it says "including."  Those are just examples,

9  right?

10  A.  That's exactly right.

11  Q.  The definition that we have to hit is really in the

12  first part of the sentence:  Devices residing on the

13  premises of a customer, right?  And used to connect to a

14  telephone network, right?

15  A.  I don't agree.

16  Q.  You don't agree with that?

17       If there was a new device that did not exist at

18  the time of ordinary telephones, key telephone systems,

19  PBX's, et cetera, but that came into existence years later,

20  but it was, in fact, a device residing on the premise of a

21  customer, and it was, in fact, used to connect to a

22  telephone network, that would be met by the claim, wouldn't

23  it?

24  A.  What I wasn't agreeing with is that you seem to suggest

25  we don't need to look at this language, and I don't agree

1  with that.

2  Q.  But do you agree with my other statement, that if a new

3  device came along that did, in fact, reside on the premises

4  of a customer and is used to connect to a telephone

5  network, that device would be covered by the claim, right?

6  A.  If it satisfied the Court's construction, it would be

7  covered under the CPE language of the claim.

8  Q.  The Court's language right here, right?

9  A.  That's right.

10  Q.  Now, when we talk about residing for an electrical

11  device, there are many things that people have in their

12  homes which today are capable of connecting to a wireless

13  network, correct?

14  A.  Certainly, yes.

15  Q.  You have phones, you have tablets, you have LTE

16  hotspots, right?

17  A.  Now, just so I understand the question, these are

18  certainly capable of connection to a network.  I don't

19  agree that all of those are CPE.

20  Q.  You agree that those things connect to a telephone

21  network, right?

22  A.  Yes.

23  Q.  And that this claim in this patent covers wireless

24  connections from base stations to devices in the home,

25  correct?

1  A.  Wireless connections to CPE in the home, yes, that's

2  right.

3  Q.  So if someone has a LTE hotspot -- that's one of those

4  little boxes that doesn't have a screen on it or anything

5  but can receive wireless transmissions, and then you can

6  beam WiFi around your house -- and someone keeps it always

7  in their home, that would be a device residing on a

8  premises of a customer and used to connect to a telephone

9  network, wouldn't it?

10 A.  It's -- it's not something I've thought about, but if

11 one had a device that was kept in the home, used in the

12 home for connection to a telephone network and was not, for

13 example, useful while portable, for example, while in your

14 car or something, then that could be CPE.

15 Q.  So you think that if the device was always set in the

16 kitchen and never left the house until the day it died, it

17 would or wouldn't be a CPE -- I don't understand.  Is that

18 a CPE or not?

19 A.  If it's a device that resides on the premises, it's

20 always there, under your example, and used to connect to a

21 telephone network, then it would be CPE.

22 Q.  But you say if I decided one day, you know, I'm moving

23 to a new house, and I pick it up and take it with me, now

24 it's mobile, now it's not a CPE?

25 A.  That's not quite what I said.

```
 1          So if we take a look at the examples, ordinary
 2   telephones, key telephones, et cetera, they work while they
 3   are fixed in the residence.  They don't work while they're
 4   in transit to a new residence.
 5   Q.  Let's say I take my mobile phone, and I irritate my
 6   wife my gluing it to the kitchen counter.
 7          It's now affixed to the kitchen counter.  Does
 8   that meet the claim limitation?
 9   A.  That would be -- that would be headed toward CPE.  It's
10   not something I've considered, but it would cease to be a
11   mobile phone at that point.
12   Q.  Well, wait.  Are you -- are you stating that there's
13   a -- some language in here that says:  Devices residing on
14   the premises of a customer and used to connect to a
15   telephone network but are not mobile phones?  Is that how
16   you construe the claim?
17   A.  No.  I'm using this language right here --
18   Q.  Okay.
19   A.  -- devices residing on the premises.
20   Q.  Well, you agree there's no exception for mobile
21   devices, right?
22   A.  In this language, it doesn't say mobile devices are not
23   included.
24   Q.  That's right.
25          And you have to use this construction, not adding
```

1    language of your own, like an exception for mobile devices,

2    right?

3    A.   That's correct.

4    Q.   Now, let's say I had my phone, and I glued it to the

5    counter.  How long would it have to stay there for you to

6    consider it to be residing in my home?

7    A.   Its functionality would have to be tied to its

8    residence in the home.  So I haven't considered how long

9    it'd have to be there, but if that was its intent, to

10   remain glued to your kitchen table for the purpose of

11   providing connection to a telephone network, then I would

12   say yes, it's CPE.

13   Q.   I think you said "its intent."  Do you mean the phone's

14   intent?

15   A.   Your intent.  The phone can't have intent.

16   Q.   So you're interpreting the claim to be dependent upon

17   the -- the owner's intent with respect to how long the

18   owner intends to keep the phone in the house?

19   A.   No.

20   Q.   Okay.  How long must an owner keep the phone in the

21   house glued to the kitchen counter until it becomes the

22   CPE?

23   A.   It's not something I considered.

24   Q.   You had some opinions about end-user QoS.  Do you

25   recall that?

1   A.  Yes, I do.

2           MR. BLACK:  Let's pull up Williams Slide 61,

3   please.

4   Q.  (By Mr. Black)  Do you recall seeing this document?

5   A.  Yes, I do.

6   Q.  And this is a document from Ericsson called LTE

7   Scheduler Overview -- actually this is a page out of a

8   larger document?

9   A.  Yes, that's correct.

10  Q.  And this is talking about the quality of service,

11  right?

12  A.  That's right.

13  Q.  Quality of service provided by the schedulers accused

14  of infringement in this case, correct?

15  A.  I believe that is the scheduler here.  Yes, that's

16  right.

17  Q.  Well, my -- it says scheduler on the document, doesn't

18  it?  It's hard to read?  It might be a little hard to read.

19  A.  It does.  No, it's not hard to read, but I don't know

20  if they're talking about a different scheduler.  It's my

21  recollection that this is the accused scheduler.

22  Q.  This is actually from a -- from a presentation that has

23  different features and what the importance of the feature

24  is for customers, right?

25  A.  That's right.

```
 1   Q.  Customers like T-Mobile, right?
 2   A.  That's correct.
 3   Q.  And at the bottom, the thing in brackets, that's the
 4   thing that Ericsson's bragging about, what this thing can
 5   do, right?
 6   A.  That's right.
 7   Q.  And it says:  Optimize capacity while satisfying QoS
 8   for everyone.
 9           Correct?
10   A.  That's correct.
11   Q.  End-users, right?
12   A.  Right.  But the key language here is the optimize
13   capacity.  So it's under the control of the network, but
14   hopefully they'll make everyone happy.
15   Q.  Do carriers do tests to see how good the quality of
16   service is to their customers?
17   A.  Yes.
18   Q.  They -- they have testing protocols to make sure that
19   they don't have too many dropped calls, that the call
20   quality is acceptable, correct?
21   A.  That's right.
22   Q.  I think they even have a -- like a grading system for
23   the quality of voice.  I don't know how they -- they do
24   this, but they get people to listen, and then they have
25   some subjective evaluation, right?
```

1  A.  That's right.  In the old days it was called toll

2  quality, and the delay could not be more than a tenth of a

3  second.

4  Q.  And they derived the tenth of a second limitation by

5  doing tests on real people who -- and ask, hey, how does

6  this sound to you, right?

7  A.  That's right.  It's my recollection that it was done in

8  Illinois at Bell Laboratories, for example.

9  Q.  And one of the things we heard in this trial so far was

10 that in bringing out Voice over LTE, T-Mobile was, of

11 course, concerned -- initially had some difficulties in

12 getting the system to work well, they had dropped calls,

13 the kinds of things you have when you normally start a new

14 system, right?

15 A.  That's right.  I remember hearing that.

16 Q.  But they -- they ultimately settled on using the Voice

17 LTE -- over LTE technology, VoLTE, right?

18 A.  That's right.

19 Q.  And in order to make that technology work, they needed

20 to set voice as Priority No. 1, correct?

21 A.  That's right, QCI 1.

22 Q.  Right.  And it's important to T-Mobile because we heard

23 testimony today about how much they care about their

24 customers and the service they provide, right?

25 A.  That's certainly true.

1  Q.  You provided some testimony about the benefits, or, in

2  your view, lack thereof to telecommunications' carriers

3  like T-Mobile from using the invention in this case,

4  correct?

5  A.  That's correct.

6  Q.  In order to gather that information for your 462-page

7  report, you spoke to some folks at Ericsson, right?

8  A.  Yes.

9  Q.  But you didn't speak to anybody at T-Mobile, right?

10  A.  I don't think I did on that specific issue.

11  Q.  But the benefits at issue accrue to T-Mobile, right?

12  A.  The benefits involved with a solid functioning system,

13  if that's what you're asking, would accrue to Ericsson and

14  to T-Mobile and to the people using the system.

15  Q.  I mean, Ericsson sells equipment, right?

16  A.  That's right.

17  Q.  And then they install the equipment for T-Mobile,

18  right?

19  A.  Yes.

20  Q.  And they run tests and servicing from time to time,

21  correct?

22  A.  That's right.

23  Q.  And when they do that, they run the methods that have

24  been accused of infringement, but which you deny infringe,

25  correct?

1    A.  They certainly run tests on their equipment to make

2    sure it's working as it's supposed to.

3    Q.  But the benefit -- the financial, the economic benefit,

4    the big dollars really accrue to T-Mobile for use of the

5    VoIP technology if we're right?

6    A.  I don't agree.

7    Q.  Well, I know you disagree that Dr. Jorgensen invented

8    anything useful, that these patents don't cover anything in

9    this case, that we're all here for very little reason.

10           But if we're right that the patent is infringed

11   and the Defendants are wrong about the patents of validity

12   because they can't meet their clear and convincing evidence

13   burden, then you will have provided opinions on financial

14   benefits which would be an input to the economic experts'

15   opinions, correct?

16   A.  That is correct.

17   Q.  In order to do that, you had to give some thought to

18   the value to the Defendants in this case, right?

19   A.  I'm sorry, the value of what?

20   Q.  The value of the technology to the Defendants in this

21   case?

22   A.  That's correct.

23   Q.  And the Defendants in this case are T-Mobile and

24   Ericsson, right?

25   A.  That's right.

1    Q.  You spoke to Ericsson, right?

2    A.  That's right.

3    Q.  Whose position has been, we sold some equipment.

4    That's what the case is about, right?

5    A.  And they're standing behind it, yes.

6    Q.  Yes.  And -- but you didn't talk to T-Mobile even

7    though it should be -- isn't it fairly obvious that the

8    real benefits here would accrue to T-Mobile?

9    A.  I don't agree.  And the expertise as to how the base

10   station works resides with Ericsson, so it's natural

11   I would talk to them.

12   Q.  But the benefits accrue to T-Mobile, right?

13   A.  Certainly T-Mobile does get benefits from what they

14   purchase, but Ericsson benefits, as well as the customers.

15   Q.  Right.  But you didn't talk to or provide any opinions

16   about the benefits to T-Mobile that I heard?  You didn't

17   talk to anybody from T-Mobile?

18   A.  That's correct.

19   Q.  Now, we had some complicated testimony on the uplink

20   and downlink frequencies and allocations of bandwidth, and

21   do you recall that?

22   A.  Yes, I do.

23   Q.  And that was on the -- which patent was that?  That was

24   the '517 --

25   A.  '517 patent.

```
 1   Q.  -- Claim 1, right?

 2   A.  Yes, that's correct.

 3   Q.  So you were here when Dr. Williams went through a very

 4   detailed explanation of what happens in the base station

 5   and how the downlink scheduler and uplink scheduler talk to

 6   each other, right?

 7   A.  Yes.

 8           MR. BLACK:  And if I could just put that on the

 9   ELMO.  Thank you.

10   Q.  (By Mr. Black)  He had a number of slides on this

11   topic, right?

12   A.  Yes, he did.

13   Q.  And what he showed was that the downlink scheduler and

14   the uplink scheduler actually do have to coordinate with

15   each other in the course of transmitting and receiving

16   information, right?

17   A.  Right.  They both make use of this downlink control

18   channel.  So this PDCCH, this physical downlink control

19   channel.

20   Q.  Right.  They have a single channel that they compete

21   for, right?

22   A.  That's not true.

23   Q.  That channel is resource constrained, correct?

24   A.  That's correct.

25   Q.  That channel, therefore -- what that means, is that
```

1    it's resource constrained, is that sometimes either the

2    uplink scheduler or the downlink scheduler is not going to

3    get the bandwidth that it wants, right?

4    A.  That's not correct.

5    Q.  They -- if they can't send grants down the PDCCH,

6    either the uplink scheduler or the downlink scheduler will

7    not be able to fully service the calls that they are

8    responsible for; isn't that right?

9    A.  That's true, but there's no evidence that ever happens.

10   Q.  Dr. Williams testified that there's resource constraint

11   in the PDCCH, correct?

12   A.  Yes, he did.

13   Q.  You did not contradict him or provide any testimony on

14   that point in your direct examination, right?

15   A.  It -- it is true that it's a resource constrained

16   channel.  I did not address this because I didn't think it

17   was relevant.

18   Q.  He had -- he had four or five slides on this

19   correct?  Yes or no.

20   A.  He did, yes.

21   Q.  You haven't been involved in -- actually, I don't know

22   how many you were involved in.  You've testified in 28

23   cases in the last five years.  How many cases have you been

24   involved in where you haven't testified?

25   A.  I haven't counted them, but probably I've been involved

1    with a hundred cases in the last 20-something years.

2    Q.  Now, you also had some views about whether or not the

3    uplink and the downlink frequencies had to be sort of

4    swapped between each other, correct?

5    A.  That's right.

6    Q.  And your view was that they have to be allocated

7    dynamically between the uplink and the downlink, right?

8    A.  That's right.

9    Q.  Okay.

10          MR. BLACK:  I tell you what, why don't we do this:

11   Let's go to the '517, and please bracket Claim 1 and 2.

12   Q.  (By Mr. Black)  Okay.  So in your view, it has to be

13   dynamic scheduling, right?  You have to have dynamic uplink

14   and downlink control.  That's what you just said.  And that

15   element actually appears in Claim 2, correct?

16   A.  That's correct.

17   Q.  So this is a dependent claim, correct?

18   A.  That's right.

19   Q.  And you know what that is, right?

20   A.  Yes, I do.

21   Q.  Dependent claims are narrower than the independent

22   claims, right?

23   A.  Generally, yes.

24   Q.  So in order to establish infringement, IV absolutely

25   has to and has undertaken the burden of proving that

1    everything that in Claim 1 is in the Ericsson system,

2    correct?  We've undertaken that burden, right?

3    A.  That is your burden.  I don't agree that you've met it.

4    Q.  Understood.

5            But we do not have a burden to prove the things in

6    Claim 2, which has not been asserted, correct?

7    A.  That's correct.

8    Q.  And Claim 2 requires dynamically allocating between the

9    uplink and the downlink, correct?

10   A.  Yes, it does.

11   Q.  You also had some opinions about the analysis of

12   Dr. Chrissan, correct?

13   A.  That's correct.

14   Q.  You had a few things to say about Turina certainly,

15   that reference, but you didn't name any of the other

16   patents or provide any specific analysis of Dr. Chrissan's

17   big chart with the -- with the -- all the colors on it and

18   what he spent most of his examination on.

19   A.  Well, I talked about specific entries in that chart,

20   but I didn't talk about the whole chart, no.

21   Q.  Did you talk about any specific patent other than

22   Turina?

23   A.  I talked about Turina.  That was the specific patent.

24   Q.  Right.  That was the one patent out of the 18, right?

25   A.  That's right.

1    Q.  The other 17, you didn't provide any testimony on,

2    correct?

3    A.  I characterized his process generally, but I didn't

4    talk about those patents individually.

5    Q.  Absolutely.  You criticized his process, didn't you?

6    A.  That's right.

7    Q.  You thought it was an invalid process, correct?

8    A.  I thought it had flaws.  I thought it was biased.

9    Q.  And you thought it was biased, and you picked out one

10   patent that you criticized him on, and that was Turina,

11   correct?

12   A.  That's right.

13   Q.  And you elected not to give any opinions about the

14   other 17, correct?

15   A.  That's right.  I thought Turina was demonstrative of

16   the problem.

17   Q.  These are Ericsson patents, right?

18   A.  That's right.

19   Q.  You didn't make any effort to speak to people from

20   Ericsson, talk to Ericsson engineers, or do anything to

21   determine whether these Ericsson patents were any good,

22   right?

23   A.  I read the patents.  They were the patents that

24   Dr. Chrissan chose to analyze, and that's why I looked at

25   them.

1    Q.  So you did read the patents.

2    A.  The 18, yes.

3    Q.  Oh.  But you didn't provide any opinions in court on 17

4    of them, right?

5    A.  No.  I talked about one that I chose from the 18.

6    Q.  You also had some testimony about Ericsson -- we keep

7    hearing about the European Patent Office.  Is that relevant

8    to infringement?

9    A.  It can be indirectly, but the claims at issue are U.S.

10   patent claims, if that's what you're asking.

11   Q.  That the European Patent Office is giving a nomination

12   to some Ericsson folks could be relevant to whether

13   Dr. Jorgensen's patents are infringed in this case?

14   A.  No.

15   Q.  No.

16   A.  The European Patent Office's award to Ericsson shows

17   that Ericsson is a highly inventive company, and they're

18   very active in LTE technology development.

19          MR. BLACK:  If I could put --

20          THE COURT:  Dr. Wicker, you answered that when you

21   said no.  The question didn't call for an observation about

22   the impact of the awards to Ericsson.  You need to limit

23   your answers to the questions asked.

24          THE WITNESS:  Yes, Your Honor.

25          MR. BLACK:  Could we put up -- could we put the

1  ELMO up?  It would be easier this way.

2  Q.  (By Mr. Black)  Do you remember this slide that was

3  provided this morning by -- by -- in the testimony?

4  A.  Yes.

5  Q.  Single largest contributor of ideas to the LTE

6  standard, correct?

7  A.  That's correct.

8  Q.  And they've been trying -- Ericsson has been trying to

9  imply all along that they have all these patents that cover

10  the LTE standard, correct?

11  A.  Yes.  They have declared a number of patents essential.

12  Q.  But the patent standards bodies, they don't make

13  essentiality determinations on their own, correct?

14  A.  No, they do not.

15  Q.  In fact, all people do is they check a box on a form

16  and send it in that says, this might be essential to the

17  standard, and I, therefore, am willing to license it to

18  third parties, right?

19  A.  Well, they don't just check a box.  They determine

20  whether or not it's appropriate to check the box, and then

21  they do so or do not.

22  Q.  Right.  But that's an -- that's an Ericsson

23  determination, not a standards body determination, right?

24  A.  That's right.

25  Q.  And there's no evidence in this case from you that any

1  of the Ericsson patents actually would cover an LTE

2  standard, correct?

3  A.  That's right.  I did not do that analysis.

4  Q.  In fact, you were very careful in your report, and I --

5  which I would note stated, as you did on your slide --

6  you're very careful in your testimony, as well.  You said

7  that Ericsson has hundreds of potential LTE essential

8  patent families, correct?

9  A.  That's right.

10  Q.  Because the only way to know whether a patent really

11  covers a standard is to do the kind of infringement

12  analysis that we did in the check-the-box work that

13  Dr. Williams did yesterday, correct?

14  A.  Yes.  You have to do a complete analysis.

15  Q.  If you want to run around telling people patents are

16  infringed, you've got to do a complete analysis and check

17  all the boxes on all the claims, right?

18  A.  That's true, as well.

19  Q.  Did you talk to any of the Ericsson European Patent

20  Office finalists?

21  A.  I'm sorry.  Can you rephrase the question?

22  Q.  The finalists in the European Patent Office Patent of

23  the Year awards that we've been hearing so much about, have

24  you spoken to any of those folks?

25  A.  No.

```
 1   Q.  Have you seen any of them here today?

 2   A.  No.

 3   Q.  Are you sure?

 4   A.  No.  I'm not aware that any of those finalists are here

 5   today.

 6            MR. BLACK:  Pass the witness.

 7            THE COURT:  Approach the bench, counsel.

 8            (Bench conference.)

 9            THE COURT:  How long do you think your redirect is

10   going to be?

11            MR. KUBEHL:  Couple of minutes.

12            THE COURT:  Okay.  Thank you.

13            (Bench conference concluded.)

14            THE COURT:  Let's proceed with redirect

15   examination by the Defendant.

16                   REDIRECT EXAMINATION

17   BY MR. KUBEHL:

18   Q.  Dr. Wicker, you were asked some questions about

19   Mr. Skarby's testimony today, and there was some suggestion

20   of somehow things being sprung on the Plaintiff.

21            In your report, you identify some deposition

22   transcripts of Mr. Skarby.  So did Mr. Skarby get deposed

23   by IV for two full days in this case?

24   A.  Yes, he did.

25   Q.  You also identify about eight notices of deposition
```

1  that IV sent to Ericsson.  Those are called 30(b)(6)

2  notices, where they had particular topics they wanted to

3  talk about, right?

4  A.  That's correct.

5  Q.  And one of the topics that they wanted to talk to

6  Ericsson about was how the system worked, right?

7  A.  That's correct.

8  Q.  And one of the topics they wanted to talk about was the

9  reasons that Ericsson had for its claim that it does not

10  infringe this patent; is that right?

11  A.  That's correct.

12  Q.  And Mr. Skarby was the corporate representative for

13  Ericsson on that -- on those topics, wasn't he?

14  A.  That's correct.

15  Q.  And he was deposed for two full days by IV, wasn't he?

16  A.  That's right.

17  Q.  And how many questions did IV ask on cross-examination

18  today of Mr. Skarby?

19  A.  I don't think they asked any.

20  Q.  You were asked some questions about tests that you had

21  ordered, and it was suggested that maybe those were not

22  timely.  Did you explain your testing and your results and

23  your parameters in your report?

24  A.  Yes, I did.

25  Q.  Was that filed timely under the deadline that the Court

1    in this case ordered to produce that kind of information?

2    A.  Yes, my report was filed on time.

3    Q.  Did IV then go and take an entire deposition of you,

4    including on that subject matter?

5    A.  Yes, they did.

6    Q.  You were asked about the '629 patent and -- and the

7    test results.  And you were asked questions about if -- if

8    they can just show that just one time there's a

9    40-millisecond gap, followed by a 40-millisecond, IV wins.

10   Do you agree or disagree with that?

11   A.  I disagree with that.

12   Q.  Why?

13   A.  There are four steps in that particular claim, and you

14   have to practice all four steps.  Just because there are

15   consistent intervals, it does not follow that there are

16   reservations of a second -- sorry, of a first slot in a

17   future frame and a second slot in a subsequent frame to

18   that.

19        All they've shown is that there are, on occasion,

20   successive consistent intervals.  That's not all the claim

21   calls for.  So, no, they don't win just by showing

22   consistent intervals.

23   Q.  When the '517 patent was filed in 1999, that's the one

24   that in the title of the patent it says CPE, and I think

25   you got criticized for calling it the CPE patent?

1   A.  Yes, that's correct.

2   Q.  Did mobile phones exist in 1995 -- 1999 when that was

3   filed?

4   A.  In 1999, yes, they did.

5   Q.  And did Mr. Jorgensen claim in his invention mobile

6   phones?

7   A.  No, he did not mention mobile phones in his CPE patent.

8   Q.  What term did he use?

9   A.  CPE, customer premises equipment.

10  Q.  You were here when Dr. Jorgensen testified; is that

11  right?

12  A.  Yes, I was.

13  Q.  And on that day, I believe we saw the single document

14  in the case -- in this case where there's been a document

15  where someone has actually called something a CPE device.

16  Do you recall that?

17  A.  Yes, I do.

18  Q.  I think that was Defendant -- Defendants' Exhibits 137.

19          MR. KUBEHL:  You don't have to pull it up.

20  Q.  (By Mr. Kubehl)  If the jury wants to look at it, it's

21  Defendants' Exhibits 137.

22          How is the CPE device described in that document?

23  A.  It was not a mobile phone.

24  Q.  You were asked questions about standards essential

25  patents and declarations of that?

1    A.   Yes.

2    Q.   And so when a participant in a standards body declares

3    their patent to be essential or potentially essential,

4    I think -- I think potentially essential is perhaps the

5    language that the form is -- it says on the form for the

6    standards body; is that right?

7    A.   That's right.

8    Q.   And so when a company who is participating makes a

9    standard essential declaration of their patent, are they

10   supposed to have a good-faith belief that they really can

11   check that box, that this is potentially essential?

12   A.   Yes.   There is a requirement, for example, in the ETSI

13   rules -- that's a standardization body -- that this be a

14   good-faith declaration.

15   Q.   You were asked some questions about the PD, D as in

16   dog, CCH?

17   A.   That's right.

18   Q.   What does D stand for in that?

19   A.   Downlink.   That was the control channel that I pointed

20   to.   The PDCCH is the physical downlink control channel.

21   Q.   Is that a one-way channel or a two-way channel?

22   A.   It's a one-way channel.

23   Q.   Can the uplink -- can the uplink scheduler transmit on

24   the PDCCH?

25   A.   The PDCCH can only be used for downlink traffic.   You

```
 1   cannot make an uplink transmission on that channel.
 2   Q.  In the -- you were asked about a number of cases.  You
 3   said you had given testimony in 28 cases over the last five
 4   years or so?
 5   A.  Yes.
 6   Q.  Compared to other cases, is the infringement case in
 7   this case a close one?
 8   A.  No.
 9          MR. KUBEHL:  I'll pass the witness.
10          THE COURT:  Additional cross?
11          MR. BLACK:  Two points, Your Honor, quickly.
12                    RECROSS-EXAMINATION
13   BY MR. BLACK:
14   Q.  The -- the PDCCH is a downlink channel because it sends
15   control information to the phone, correct?
16   A.  That's right.
17   Q.  The data is actually sent on uplink and downlink radio
18   frequencies that, in your view, are separated by a guard
19   band, right?
20   A.  That's right, they're separate channels.
21   Q.  But the control information that governs how the
22   downlink and the uplink channel will be controlled is
23   transmitted to the phone over a single combined channel,
24   correct?
25   A.  I'm not sure what you mean by combined.  There is a
```

1  single downlink control channel in most cells that is used

2  for downlink control information.

3  Q.  You did -- you did not mean to suggest that information

4  about the uplink scheduler is not sent to the phone on the

5  downlink PDCCH channel, did you?

6  A.  No.

7  Q.  Would it surprise you to know that there are studies

8  that show that companies over declare patents to the

9  standards bodies and that many of the patents that are

10  claimed to cover the standards are -- or are claimed to be

11  potentially relevant to the standards actually don't cover

12  the standards?

13  A.  I'm familiar with those reports, yes.

14  Q.  Yes.  Thank you.

15          MR. WARD:  May we approach, Your Honor?

16          THE COURT:  Approach the bench, counsel.

17          (Bench conference.)

18          THE COURT:  Are you passing -- are you passing the

19  witness, Mr. Black?

20          MR. BLACK:  Close.  What am I supposed to do with

21  that, you know?

22          THE COURT:  You're supposed to stand up and

23  object.

24          MR. BLACK:  If I do that, it makes me look like

25  I'm afraid of it, Your Honor.  He keeps doing this

```
 1    throughout the trial.  If I stand up and object on a
 2    question like that -- I mean, I can't do that.
 3         THE COURT:  Where is that noise coming from?  It's
 4    about the fifth time I've heard that beep out there.  I'll
 5    deal with that later.
 6         MR. BLACK:  I can't --
 7         THE COURT:  I understand, but -- I mean --
 8         MR. WARD:  Mr. Black went to stand up.  It was so
 9    quick.  It was planned.  It was improper for him to say,
10    out of all the cases you've testified in, is this
11    infringement even close?  And it was planned for him to
12    say, no.  And that is improper.  This has happened
13    repeatedly with Mr. Kubehl.
14         MR. BLACK:  What's my choice?  I jump up, and then
15    the jury thinks I'm worried.
16         THE COURT:  Well, Mr. Black, I -- the Court
17    responds to objections.  I don't inject myself unilaterally
18    into a case.
19         MR. BLACK:  I understand, Your Honor, but the
20    system --
21         THE COURT:  I understand your frustration.
22         What's your response, Mr. Kubehl?
23         MR. KUBEHL:  It was not a planned response.  It's
24    insulting for you to say that.
25         THE COURT:  Do you think that was a relevant
```

1  question in this case, had anything to do with the issues

2  before this jury?

3        MR. KUBEHL:  I think it's -- I think it's proper

4  for him to express how strongly he feels about his

5  opinions.

6        MR. WARD:  That's unbelievable that a licensed

7  attorney would stand before you and say that he's comparing

8  infringement in this case to all his other -- experts to

9  all his other cases and this is the weakest infringement

10  case he's ever seen.

11        MR. KUBEHL:  That's not what he said.

12        MR. WARD:  That was --

13        MR. KUBEHL:  I said, based on your experience.

14        MR. WARD:  Your Honor, it doesn't matter.  That's

15  the implication that's improper.

16        THE COURT:  What are you suggesting?

17        MR. WARD:  That you instruct the jury that the

18  question and the answer from Mr. Kubehl about the strength

19  of this case compared to the others was totally improper,

20  and the jury is instructed to disregard it.

21        MR. BLACK:  The jury should decide this case based

22  on the evidence in this case.  Your Honor can do it.

23        THE COURT:  Well, quite honestly, it should have

24  been raised at the time, but I think that there's enough

25  substance behind your objection that I'll give the

1    instruction.

2         MR. WARD:  Thank you, Your Honor.

3         MR. BLACK:  Thank you, Your Honor.

4         (Bench conference concluded.)

5         MR. BLACK:  Sorry, Your Honor.  I hadn't formally

6    passed the witness.  One of the exhibits I used was PX-29.

7         Pass the witness.

8         THE COURT:  All right.

9         MR. KUBEHL:  May the witness be excused?

10        THE COURT:  Not yet.  Have a seat, Mr. Kubehl.

11        Ladies and gentlemen of the jury, at the end of

12   the last examination of Dr. Wicker by Mr. Kubehl for the

13   Defendants, the following was the concluding exchange.

14        The question was asked:  You were asked about the

15   number of cases you said you had given testimony in 28

16   cases over the last five years or so.

17        Dr. Wicker said:  Yes.

18        Then Mr. Kubehl asked:  Question:  Compared to

19   other cases is the infringement case in this case a close

20   one?

21        Dr. Wicker answered:  No.

22        This case is not about 28 other cases, it's

23   about this case and the facts of this case.  That's --

24   that's an irrelevant and improper question, and I'm

25   instructing you to disregard that exchange between

 1   Mr. Kubehl and Dr. Wicker that I've just recited to

 2   you, all right?

 3           Now, Mr. Kubehl, do you have redirect of the

 4   witness, given that the Plaintiff has passed.

 5           MR. KUBEHL:  We have no redirect, Your Honor.

 6           THE COURT:  All right.  Then in that case,

 7   Dr. Wicker, you may step down.

 8           THE WITNESS:  Thank you, Your Honor.

 9           MR. KUBEHL:  May the witness be excused, Your

10   Honor?

11           THE COURT:  Is there objection?

12           MR. BLACK:  No, Your Honor.

13           THE COURT:  Dr. Wicker, you are excused, which, as

14   I'm sure you know, means you're free to leave, or you're

15   free to stay.

16           THE WITNESS:  Thank you, Your Honor.

17           THE COURT:  All right.  Ladies and gentlemen,

18   before the next witness is called, we're going to take a

19   recess at this juncture.

20           Simply close your books, if you will, and leave

21   them in your notebooks and leave them there in your chairs.

22   Follow all my instructions, including not to discuss the

23   case among yourselves, and we'll be back to continue with

24   the Defendants' next witness shortly.

25           The jury is excused for recess.

```
 1              COURT SECURITY OFFICER:  All rise.
 2              (Jury out.)
 3              THE COURT:  All right.  Dr. Acampora is next; is
 4   that correct?
 5              MR. BECKER:  Yes, Your Honor.
 6              THE COURT:  Who -- do you have him on direct?
 7              MR. BECKER:  Yes, sir.
 8              THE COURT:  And you expect this to be
 9   approximately a two-hour direct examination?
10              MR. BECKER:  It should be two hours or less, Your
11   Honor.
12              THE COURT:  Two hours is your best estimate?
13              MR. BECKER:  I think so.
14              THE COURT:  I'm not trying to hold you to an exact
15   number.
16              MR. BECKER:  I'm trying -- I'm trying to get it in
17   in an hour and a half, but...
18              THE COURT:  Between the two.
19              MR. BECKER:  It kind of can vary, depending on the
20   questions and answers.
21              THE COURT:  All right.  That's fine.  That's what
22   I needed to know.
23              All right.  We will take a short recess.  I'll
24   return and then we'll have the Defendants call their next
25   witness.
```

```
 1              The Court stands in recess.

 2              COURT SECURITY OFFICER:  All rise.

 3              (Recess.)

 4              (Jury out.)

 5              COURT SECURITY OFFICER:  All rise.

 6              THE COURT:  Be seated, please.

 7              Do I understand, Defendants, we have two short --

 8    relatively short depositions next?

 9              MS. SMITH:  Yes, Your Honor.

10              THE COURT:  All right.  Let's bring in the jury,

11    please, Ms. Denton.

12              COURT SECURITY OFFICER:  All rise.

13              (Jury in.)

14              THE COURT:  Welcome back, ladies and gentlemen.

15    Please have a seat.

16              Defendants, call your next witness.

17              MS. SMITH:  Your Honor, Defendants call

18    Mr. Dean Munyon.  The run time on this video deposition --

19    Defendants' time is 4 minutes and 57 seconds.  Plaintiff's

20    time is zero.  Exhibits to be introduced are Plaintiff's

21    Exhibit 3, Defense Exhibit 6, and Defense Exhibit 159.

22              THE COURT:  Proceed with this witness by

23    deposition.

24              MS. SMITH:  Thank you, Your Honor.

25              (Videoclip played.)
```

```
 1              QUESTION:  Good afternoon.

 2              ANSWER:  Good afternoon.

 3              QUESTION:  Please state your name for the record.

 4              ANSWER:  Dean Munyon.

 5              QUESTION:  All right.  I believe we were talking

 6    about Exhibit 1, and you said that you recognized the

 7    document, correct?

 8              ANSWER:  Yes.

 9              QUESTION:  Okay.  And I wanted to direct your

10    attention to Page 9.  And I'll direct your attention to

11    Topic 4 with the numeral "4" beside it.  If you want to

12    take a moment to read that.

13              ANSWER:  Okay.

14              QUESTION:  The topic states, the prosecution of

15    the applications that issued and to each of the asserted

16    patents and any related patents and/or applications,

17    including without limitation the drafting of the

18    applications, all modifications and amendments to the

19    applications, including to their claim specification and

20    figures, the decision to disclose or not disclose any prior

21    art, all communications with the PTO relating to the

22    applications, and all documents relating to the foregoing.

23              Did I read that correctly?

24              ANSWER:  You did.

25              QUESTION:  Do you understand you're here today to
```

```
 1   testify as IV's corporate representative on this topic,

 2   subject to IV's objections?

 3            ANSWER:  Yes.  And then in addition to the -- the

 4   personal notice, as well, right?

 5            QUESTION:  If I refer to this patent as the '206

 6   patent, you'll understand that to mean the RE46,206?

 7            ANSWER:  I will.

 8            QUESTION:  If I refer to the '21 -- '218 patent,

 9   you'll understand that I'm referring to U.S. Patent

10   No. 7,251,218?

11            ANSWER:  I will.

12            QUESTION:  What's the application number of the

13   '218 patent?

14            ANSWER:  Reading from the face of the patent at

15   Item 21, the application number -- you asked for the

16   application number?

17            QUESTION:  Yes.

18            ANSWER:  Yes.  It's 10/241,454.

19            QUESTION:  If I refer to the '454 patent

20   application, you'll understand that to mean Application

21   No. 10/241,454?

22            ANSWER:  Yes, I will.

23            QUESTION:  On September 12th, 2002, prior counsel

24   filed Application No. 10/241,454 with the Patent Office,

25   correct?
```

1          ANSWER:  Yes.

2          QUESTION:  A copy of the specification for the

3   '454 patent application was not filed with the Patent

4   Office on September 12th, 2002.

5          ANSWER:  The first sentence says:  The document

6   submitted on September 12th, 2002, did not include a copy

7   of the specification.

8          QUESTION:  And that's correct, right?

9          ANSWER:  The -- yes, the -- the -- that's correct.

10          QUESTION:  A copy of the detailed description

11   of -- within the specification was not filed on

12   September 12th, 2002?

13          ANSWER:  Correct.

14          QUESTION:  When the '454 patent application was

15   filed without a copy of the specification on

16   September 12th, 2002, a copy of a description of the best

17   mode was also not filed on that date?

18          ANSWER:  I would say correct, but I don't want to

19   make that -- to have that be sort of any admission that

20   there is some best mode which I'm not aware.

21          QUESTION:  And when the '454 patent application

22   was filed without a copy of the specification on

23   September 12th, 2002, a copy of a description of how to

24   make and use the invention also was not filed?

25          ANSWER:  Because there was no specification that

1    was included, the answer would be yes.

2            QUESTION:  And the USPTO mailed a notice of

3    incomplete non-provisional application on

4    October 15th, 2002?

5            ANSWER:  That is what paragraph -- the first

6    sentence of Paragraph 6 states.

7            QUESTION:  Do you have any reason to doubt that

8    that's not true?

9            ANSWER:  I don't.

10           QUESTION:  The USPTO's notice of incomplete

11   non-provisional application indicated that a copy of the

12   specification for the '454 patent application was not filed

13   with the USPTO on September 12th, 2002?

14           ANSWER:  I don't have that document in front of

15   me, but Paragraph 6 of Exhibit 5 does state that the notice

16   indicated that the specification of the '454 application

17   was missing.

18           QUESTION:  Prior counsel filed a complete copy of

19   the specification for the '454 patent application on

20   October 24th, 2002?

21           ANSWER:  That's correct.

22           QUESTION:  Before October 24th, 2002, a complete

23   copy of the specification for the '454 patent application

24   had not been filed with the Patent Office?

25           ANSWER:  That is correct.

1          QUESTION:  October 24th, 2002, was the first time

2     when prior counsel filed a complete copy of the

3     specification for the '454 patent application?

4          ANSWER:  That is correct.

5          QUESTION:  And the '454 application issued as the

6     '218 patent?

7          ANSWER:  Yes.

8          QUESTION:  The '218 patent issued with a filing

9     date of October 24th, 2002?

10         ANSWER:  Correct.

11         As well as the -- the face of the patent, yes, at

12    Line Item 22 says:  Filed October 24th, 2002.

13         (Videoclip ends.)

14         THE COURT:  Does that complete this witness by

15    deposition?

16         MS. SMITH:  Yes, Your Honor.

17         THE COURT:  Call your next witness.

18         MS. SMITH:  Your Honor, Defendants call Mr. David

19    Paranchych.  Defendants's run time is 1 minute, 11 seconds,

20    and Plaintiff's run time is zero.

21         THE COURT:  All right.  Proceed with this witness

22    by deposition.

23         MS. SMITH:  Thank you, Your Honor.

24         (Videoclip played.)

25         QUESTION:  Dr. Paranchych, could you please state

```
 1  your full name for the record, please?

 2          ANSWER:  David Paranchych.

 3          QUESTION:  And do you understand that you're here

 4  to testify on behalf of Intellectual Ventures or IV?

 5          ANSWER:  Yes.

 6          QUESTION:  Okay.  Starting with your post high

 7  school/college education, what was -- what's your

 8  educational background?

 9          ANSWER:  I received a Bachelor of Science in

10  electrical engineering and -- at the University of Alberta

11  in Edmonton in Canada in 1990, and then I proceeded to

12  graduate studies in electrical and computer engineering at

13  Queens University in Kingston, Ontario, also in Canada, and

14  received my Ph.D. in 1997.

15          QUESTION:  Did you study ATM systems while working

16  on your Ph.D. or Bachelor's program?

17          ANSWER:  I do remember ATM, yes.

18          QUESTION:  What does ATM stand for?

19          ANSWER:  ATM stands for asynchronous transfer

20  mode.

21          QUESTION:  You stated that a packet is a sequence

22  of bits, correct?

23          ANSWER:  One definition could be a sequence of

24  bits, yes.

25          QUESTION:  And could -- that definition of ATM
```

```
 1   cell is a packet, correct?

 2          ANSWER:  Under that definition, an ATM cell would

 3   also be a packet.

 4          QUESTION:  So an ATM cell could be referred to as

 5   a packet, correct?

 6          ANSWER:  Some people might refer to it as a

 7   packet, yes.

 8          (Videoclip ends.)

 9          THE COURT:  That completes this witness by

10   deposition?

11          MS. SMITH:  Yes, Your Honor.

12          THE COURT:  All right.  Defendants, call your next

13   witness.

14          MR. BECKER:  Your Honor, defense calls Dr. Tony

15   Acampora.

16          THE COURT:  All right.  Dr. Acampora, if you'll

17   come forward and be sworn, please?

18          (Witness sworn.)

19          THE COURT:  Please come around, sir, and have a

20   seat on the witness stand.

21          MR. BECKER:  Your Honor, may I approach with the

22   witness binder?

23          THE COURT:  You may.

24          Mr. Becker, you may proceed.

25          MR. BECKER:  Thank you.
```

1        ANTHONY ACAMPORA, PH.D., DEFENDANTS' WITNESS, SWORN

2                        DIRECT EXAMINATION

3   BY MR. BECKER:

4   Q.  Good afternoon, Dr. Acampora.

5   A.  Good afternoon.

6   Q.  Could you state your full name for the jury?

7   A.  Anthony Acampora.

8   Q.  And just give a brief introduction to the concept that

9   you're going to be discussing today if you wouldn't mind.

10  A.  I'm going to be talking about my analysis concerning

11  the validity of three patents, the three patents-in-suit

12  that we've been hearing about all week.

13  Q.  What does it mean for a patent to be valid or invalid

14  for the purposes of your analysis?

15  A.  Okay.  So valid or invalid, I actually applied two

16  criteria, the same criteria that Judge Gilstrap had

17  mentioned when he provided instructions to the jury, one of

18  those being is the patent anticipated, meaning is it new?

19  Did somebody else come up with it first?  Is there one

20  publication, a patent -- something published in the old

21  literature, a system that discloses all the elements of the

22  asserted -- of any of the asserted claims or all of the

23  asserted claims?

24          The second criteria that I considered was whether

25  it was obvious.  Would a person of skill in the art reading

```
 1  the patent, understanding what the patent is about and

 2  understanding what the claims are about, would that

 3  person -- would it be obvious to a person that all the

 4  elements were disclosed in some combinable -- easily

 5  combinable fashion by the prior art?  And those are the two

 6  criteria that I considered.

 7          MR. BECKER:  Mr. Patterson, could you go to

 8  Slide 3, please?

 9  Q.  (By Mr. Becker)  Do you have a summary of your opinions

10  prepared to present to the jury?

11  A.  I do.

12  Q.  What is the summary of your opinions?

13  A.  Okay.  The '206 patent --

14          THE COURT:  Just a minute --

15  A.  -- it's my opinion --

16          THE COURT:  Just a minute.

17          Before the witness is going to give his ultimate

18  opinions, are you going to qualify him as an expert?

19          MR. BECKER:  Yes, sir.

20          THE COURT:  Let's -- let's get him qualified as an

21  expert and then we'll get him to say what his opinions are.

22          MR. BECKER:  Yes, sir.

23          THE COURT:  Thank you.

24          MR. BECKER:  Yes, Your Honor.

25  Q.  (By Mr. Becker)  Before we get into the -- the
```

154

1  presentation today, could you give the jury an introduction

2  to yourself?

3  A.  Well, okay.  On a personal level, I was born in

4  Brooklyn, New York, a long time ago.  I met my wife when we

5  were both in our early teens.  We got married.  We've been

6  married now for 50 years.  And we have two children.  We

7  raised them in suburban New Jersey, and eventually when the

8  children left home to go to school, they settled in

9  California a few years after that.  My wife and I followed

10  them out west, and we now live in sunny Southern

11  California.

12  Q.  Thank you.  Would you please give the jury a brief

13  overview of your professional career?

14  A.  Sure.  I received all my degrees, including my Ph.D.,

15  in electrical engineering from what was the Polytechnic

16  Institute of Brooklyn.  Now they call it New York

17  University.

18      I went to work at Bell Laboratories -- actually I

19  was working at Bell Laboratories while I was finishing up

20  my graduate studies at Brooklyn College.  From Bell Labs,

21  I went to Columbia University.

22      I was a professor of electrical engineering and

23  the director of the Center for Telecommunications Research.

24  It was a rather large engineering research center that was

25  sponsored by the telecommunications industry and by the

1   National Science Foundation, part of the federal

2   government.

3          I was then recruited by the University of

4   California in San Diego.  It didn't take much.  We were

5   looking to go to California.  And I was recruited, became a

6   professor there and the first director of a brand new

7   center, the Center For Wireless Communications.

8          I'm now professor emeritus of UCSD, and I'm a

9   fellow of the IEEE.

10  Q.  Thank you, Dr. Acampora.

11         Could you tell us a little bit more about your

12  time at Bell Labs?

13  A.  Yeah.  So at Bell Laboratories, I was in basic research

14  on a variety of topics in telecommunications, fiberoptic

15  communications, satellite communications, different types

16  of radio communications, cellular communications.

17         I eventually became a senior manager at Bell

18  Laboratories managing a group of probably about

19  60 professionals with advanced degrees and maybe 20 staff

20  people covering basically the same topics that I just

21  described, also some Internet technologies, network

22  management and control.  It was all in the field of

23  telecommunications.

24  Q.  Thank you, Dr. Acampora.

25         Can you tell us a little about the Center for

 1   Telecommunications Research?

 2   A.   Yeah.   Well, I already said a little bit.   This was

 3   funded by the National Science Foundation and by the

 4   telecommunications industry, and it was part of what was

 5   then a new program from the National Science Foundation.

 6          And it had been -- the National Science Foundation

 7   had been funding basic research in American universities

 8   and still does for quite some time.   And NSF was looking

 9   for a better bang for their bucks.

10          They were trying to come up with a mechanism to

11   couple academic research with commercial practice.

12          So this new concept was born and became known as

13   the Engineering Research Center Program.   Columbia

14   University was one of the first to be awarded such a grant.

15   It was the Center for Telecommunications Research.

16          The overall objective is to transfer technology

17   more quickly from the university to commercialization to

18   help the nation's economic competitiveness, and the program

19   has been pretty successful.

20   Q.   And it says here you're an IEEE fellow?

21   A.   I am.

22   Q.   And is that the same as Dr. Wicker explained?

23   A.   One and the same, yes.

24   Q.   What can you tell us about your publications?

25   A.   Well, I'm the inventor or co-inventor on 40 U.S.

```
 1   patents.  I have over 170 publications in the open
 2   literature, most of those -- maybe all of those
 3   peer-reviewed.  And about half of them are in the field of
 4   wireless communications, and the other half are in some
 5   other aspect of telecommunications, fiberoptic
 6   communications, Internet technologies, things of this type.
 7   Q.  And what are the general technologies of the -- of your
 8   patents?
 9   A.  As I said, half -- half of them were in wireless
10   communications; half of them are in other aspects of
11   telecommunications.
12   Q.  And it says here you're an author of a text titled
13   Broadband Networks.  What can you tell us about your book?
14   A.  Yeah.  So that book was published in 1994.  It was one
15   of the first books on what was, at that time, the new
16   topics in broadband networks.
17          And what I attempted to do is summarize what the
18   state of the art was at that point in time considering the
19   contributions that others had made and also some of my
20   other contributions.
21   Q.  And could you give the jury a little more detail about
22   what your book was about.
23   A.  Okay.  So this is the jacket cover from my book that
24   you see on the slide.  And as I said, it was one of the
25   first books on broadband networks.  What were these
```

```
 1  broadband networks?

 2          The world had advanced to the point where

 3  telecommunications was more than just plain old telephone

 4  service, and we were now considering how to improve the

 5  network or change the network so that it would support all

 6  forms of telecommunications, various combinations of, as it

 7  says here, data, image, full-motion video, along with

 8  voice.  For some reason, I can't get my finger to work.

 9          Well, voice, data, image, full-motion video.

10          And one of the problems that arises when you try

11  to take all of these different traffic types or have them

12  provide the service quality, different types of

13  telecommunications, you're going to demand.

14          So my book was focused primarily on these very

15  topics.  These topics are at the core of what we've been

16  discussing here over the past several days.  And as I

17  stated on the last line, these were hallmarks of what were

18  then emerging broadband networks, broadband meaning

19  multimedia.

20          We're going to capture all the traffic, not just

21  the plain old telephony.

22  Q.  So, Dr. Acampora, is it -- is it the case that your

23  book discussed how to combine voice, image, and video into

24  one data pipe with guaranteed service in 1994?

25  A.  I wouldn't say one data pipe.  I would say half of --
```

1   the intent was to carry these different types of traffic

2   you just mentioned, all in packet format, by the way,

3   through the network with guaranteed quality of service,

4   each -- each different traffic type.

5   Q.  What types of networks, in terms of the data units,

6   were -- was described in your book?

7   A.  This is -- this is -- this book is -- oh, I did

8   describe circuit switch networks, plain old telephone

9   networks.  That was just the backdrop.

10          The nature of the network that was being described

11  in this book throughout is a packet switch network.  It

12  carried packets, a packet being a bunch of data with 0s and

13  1s, understandable by computers.

14          A portion of that packet is called a payload.

15  That's the information the user wants to communicate.  A

16  portion of that packet is called a header.  That's the

17  information.  The information has been tagged on to the

18  packet in order so that it could process the packet as it's

19  finding its way through the network, determining what the

20  service quality needs are, determining where it needs to

21  go, determining where it came from.

22          It's all carried within the header of the packet

23  into two parts.  Header and payload make it a data packet.

24  Q.  Dr. Acampora, I believe earlier -- I believe yesterday

25  Dr. Williams included in his presentation of -- an analogy

1    of a packet to something like a box --

2    A.   Yes.

3    Q.   -- that you'd put an address on and a toy inside.

4         Do you remember that?

5    A.   I remember that, yes.

6    Q.   Is that a good analogy for the concept of a packet?

7    A.   A very good analogy.

8    Q.   So turning back to your publications, did you have

9    other works you had in the 1990s, besides this book, that

10   described cellular concepts and quality of service?

11   A.   I do.  Many of my publications will focus on wireless

12   communications, different aspects of wireless

13   communications, including wireless networks to integrate

14   voice, data, image, and video while maintaining quality of

15   service, multimedia wireless networks.

16        MR. BECKER:  Your Honor, we'd like to offer

17   Dr. Acampora as an expert in the field of wireless

18   telecommunications.

19        THE COURT:  Any objection?

20        MR. BLACK:  No objection, Your Honor.

21        THE COURT:  Without objection, the Court will

22   recognize the witness as expert in the designated field.

23        MR. BECKER:  Thank you, Your Honor.

24        THE COURT:  Now, if you want to ask him his

25   ultimate conclusion, it's perfectly fine.

1    Q.  (By Mr. Becker)  Let's get back to that.  I just want

2    to give the -- would you like to give the jury an idea

3    where you're going?

4    A.  Yeah.  So I was asked to -- as I said before, I was

5    asked to consider the validity of these patents in view of

6    the prior art, and I did, and I came to the conclusion

7    that -- and stated here, in my opinion, the '206 patent,

8    Claims 109, 112, 118, 140, 144, and 146, the asserted

9    claims are invalid.  They're disclosed in the prior art.

10          For the '629 patent, same conclusion, except here

11   we're limited to Claims 1 and 4.  Those are the only claims

12   that I considered, the asserted claims.  In my opinion,

13   they're invalid.

14          And for the '517 patent, Claims 1 and 4, the two

15   asserted claims, in my opinion, they're invalid.

16   Q.  Okay.  Dr. Acampora, have you prepared any

17   demonstrative slides to discuss some background concepts

18   that are relevant to your opinions?

19   A.  I have.  I would like to say that I will click through

20   them, but the -- the wireless mouse isn't working.

21   Q.  Sure.  And I know the jury's heard a lot this week.

22   You've been here.  Could you provide a brief overview of

23   what the jury is looking at here and maybe in the form of

24   an analogy?

25   A.  Yeah.

1          Okay.  So what's here is my simple rendition of a

2    broadband network.  This network contains four packet

3    switches -- those are the blue cylinders that you see in

4    the middle -- and a bunch of links.  These are

5    communication links connecting the switches.  Those

6    communication links carry data packets between the switches

7    where the switches will look at the header and make some

8    decisions and advance the packet toward the destination.

9          So surrounding the network -- the network is

10   what's inside of the green cloud -- surrounding the network

11   are the different types of data devices that would use the

12   service of the network.

13         Different types of computers, workstations,

14   digital telephones are capable of communicating in packet

15   format, those are the types of devices that connect to the

16   network -- or the network is inside of the green cloud.

17         THE COURT:  Counsel approach the bench, please.

18         (Bench conference.)

19         THE COURT:  Does he have some electronic mouse

20   that is not functioning?  Do you have a replacement?

21   There's not a mouse on the -- there's not a mouse on the

22   counsel -- on the witness stand.  I'm really not sure what

23   he's talking about.

24         MR. BLACK:  There's a wireless clicker.

25         MR. BECKER:  I think he's expecting to be able to

```
 1   click it himself.
 2           THE COURT:  If he's got something he anticipated
 3   using to assist his testimony and it's not functioning, I'm
 4   happy to afford you an opportunity to replace it.  That's
 5   what I'm asking about.
 6           MR. BLACK:  Your Honor, I think it's -- the issue
 7   is the wireless is not good enough to get that far away.
 8           MR. BECKER:  We need better QoS, Your Honor.
 9           THE COURT:  All right.  So there's not --
10           MR. BLACK:  Maybe if you take it, it'll be closer.
11   I didn't have any problems when I --
12           MR. BECKER:  I'm sorry.
13           MR. BLACK:  I've used -- I used it from the
14   podium, and if you -- you're closer, you might be able to
15   get your guy.  He's got one he was trying to use.  Oh, oh,
16   you think --
17           THE COURT:  Let you advance the slides.
18           MR. BECKER:  I can try to do that or --
19           THE COURT:  Just whatever will help.  I'm just
20   trying to be helpful with the witness, that's all.
21           MR. BECKER:  Okay.
22           THE COURT:  If you need to make a change, you have
23   latitude to do that.
24           MR. BECKER:  Okay.  Thank you, sir.
25           MR. BLACK:  Thank you, Your Honor.
```

1           (Bench conference concluded.)

2   Q.  (By Mr. Becker)  Dr. Acampora, is there a common

3   everyday analogy that you could use to help explain what's

4   going on with the packets in this network?

5   A.  I can.  So as packets flow into the network, the

6   routers deliver them to the destination.  What could

7   happen -- could we have the next slide?

8           What could happen is packets start flowing in real

9   quickly, and I tried to demonstrate -- this is sort of like

10  an unhappy network sort of bursting at the seams.  That

11  analogy.  In fact, it's an analogy that I often use with --

12  when I was teaching telecommunications, data networks,

13  wireless or wireline.  The analogy is to the U.S. mail.

14          A packet is like an envelope.  You put some

15  contents inside.  That's the payload.  You put an address

16  on it, a return address, as well, affix postage.  You drop

17  it into the mailbox.

18          In -- maybe in late spring, perhaps, there's not

19  too much mail.  The mail will go through kind of quickly.

20  The post office will look at the address, the header of the

21  packet, and it will determine where it needs to go, and

22  then it will forward the packet by plane or by truck or

23  however it does, and eventually the post person drops it

24  into your mailbox.

25          At Christmas time, not so good.  Now, there's a lot

1   of mail going through the postal service.  Things slow

2   down.  Some -- you may have experienced it.  You wind up

3   getting season greeting -- you get greeting cards after the

4   holiday.  The net -- the network -- or in this case, the

5   postal network just couldn't keep up with the demand.

6   There was no quality of service guaranteed.

7   Q.  Is this problem of network congestion described in your

8   '94 textbook?

9   A.  It's described and several solutions to this problem

10  that were known at the time are also described in great

11  detail.

12  Q.  Could you give us one example that's in your book that

13  is relevant to the concepts here and explain that?

14  A.  Sure.  So what I -- what I speak about at great length

15  is a concept known as admission control.

16         What's done here is before a new application flow

17  can be set up -- suppose I want to get mail from my email

18  server, so I might want to send a request to my server.

19  The server responds with my email.  I read some mail.  I

20  compose mail.  I send mail.  Maybe I receive some new mail.

21  Before I can do any of this process, I would have to go

22  through a process called admission control.

23         What the network can do at the time that the

24  session is being considered is make a determination.  If

25  I accept the new expected packet flow caused by this new

1    application, what will it do to the quality of service that

2    I've already guaranteed to existing application flows?

3           So they all went through the same process, and

4    they will make some guarantees.

5           The objective here is to give the network an

6    opportunity to do one of two things.  A, block the new

7    request for a connection.  It might do that if it can't

8    guarantee service quality to the existing connections

9    because now traffic will begin to go up to too high a

10   level, or it might admit the new connection but with the

11   understanding you're basically overflow traffic.

12          You're going to get lowest possible priority.

13   I'm going to preserve priority that's guaranteed to the

14   established connections.  I'll serve you if the network

15   happens to be unbusy when you present your packets.

16   Otherwise, your packet is going to be delayed or may not

17   even be delivered at all.

18          So that's a primary mechanism, just limit the

19   volume of traffic presented to the network so that the

20   network does not become overclogged.

21   Q.  Was there another concept in your book discussed?

22   A.  There is.

23   Q.  Do you have a slide prepared to show that?

24   A.  Yeah.  And this is a fairly straightforward process.

25   I have got a slide.  And this is known as classifying and

1   scheduling.

2          So in this situation, packets come in.  In this

3   case, I've shown three different types of traffic.  The

4   header of the packet would basically identify in some form

5   or other the nature of the traffic, either the quality of

6   service needed or might say it's a web application, but

7   there'd be some indication in the header telling the

8   network how the packets should be classified.

9          And I have -- I show three data queues.  These are

10  just memory locations that store data packets.  And on the

11  way in -- it went by kind of quickly, but on the way in,

12  the packets were classified into different -- different

13  classes of queues.

14          Then the scheduler -- now, the output side of the

15  queue, the scheduler, the bottom of the drawing, that's now

16  going to -- can you advance the slide.

17          So the scheduler just picked the voice queue

18  first.  It has the highest priority.  We've heard this a

19  few times.  The voice needs to be delivered in real-time so

20  that -- the scheduler is going to take that queue, and then

21  it's going to take -- begin taking voice packets out until

22  the queue is empty.  And then it will go to the next

23  highest priority queue.  I don't guess that's in the

24  animation.  And it will begin serving that.

25          So the scheduler is then going to pick the queue

1  that it's going to serve first and then it's going to empty

2  that queue out.  And there are different ways the queues

3  can be emptied out.  Then the scheduler would go to the

4  next queue and begin to empty that out.

5          So we've classified on the input side.  We've

6  scheduled on the output side.  And this was, again,

7  well-known.  And I -- I describe in my book, but it didn't

8  take much to describe it.

9  Q.  Is this concept of classifying and scheduling -- can

10 you explain -- does that relate to your post office

11 analogy?

12 A.  Yeah.  We can do an analogy of the post office once

13 again.

14         So the post office -- I don't know if it still

15 does, but one time it had different grades of service.  It

16 was -- was it Class A mail or priority mail?  Class A mail,

17 Class B mail.  It was different types of mail, and what --

18 and you paid accordingly.  And what the post office did

19 would give priority, based upon how much you paid and what

20 class of mail you fell into.

21         So when you dropped your mail off at the post

22 office, when the post person picks it up, the post office

23 is going to classify that based upon what type of mail it

24 is.  And then it will be -- it will be delivered based upon

25 that, as well.  Third class mail gets there last.

1  Q.  Thank you.  Before we get into the substance of your

2  opinions, I wanted to ask you just a few preliminary

3  questions.  Are you being paid for your work on this case?

4  A.  I am.

5  Q.  And we've heard the rates talked about a lot today with

6  different experts.  What is your standard hourly rate?

7  A.  $725.00 an hour.

8  Q.  Is it customary for experts like yourself and

9  Dr. Wicker and Dr. Williams to charge for their time in

10 connection with matters like this?

11 A.  Yes, it is.

12 Q.  Does your compensation or what you're being paid have

13 anything to do with the outcome of this case?

14 A.  No.

15 Q.  About how much time would you say you've spent on this

16 case?

17 A.  I just computed that earlier today.  And it looks like

18 it's somewhere -- ballpark figure, somewhere between 250

19 and 300 hours.

20 Q.  Okay.  I'd like to ask you some questions on the topic

21 of invalidity and to help the jurors understand the context

22 of your opinions.

23        You recall when Judge Gilstrap instructed the jury

24 that the fact that the Patent Office grants a patent does

25 not necessarily mean that any invention claimed in the

1  patent, in fact, deserves the protection of a patent.

2      Do you recall that?

3  A.  I was here when Judge Gilstrap provided those

4  instructions to the jury, yes.

5  Q.  Do you have an understanding of why that is?

6  A.  Yeah.  So as I heard Judge Gilstrap explain, the Patent

7  Office can make a mistake.  It's not infallible.  So in

8  this particular matter, it's up to the jury to decide

9  whether the patent is valid or not valid.

10      I basically did the same thing.  I looked at the

11  patents.  I compared it against the prior art, and I made a

12  determination as to whether the patentholder was entitled

13  to that patent.  Was it that patentholder's property or

14  not?

15  Q.  And you did that analysis independently of the work

16  the PTO did in deciding to issue the patent in the

17  first place?

18  A.  That's correct.

19  Q.  You heard Dr. Chrissan testify this week about how he

20  thinks maybe some Ericsson patents could be invalid.

21      Do you recall that?

22  A.  Yes, I do.

23  Q.  And he said -- I think he also acknowledged that the

24  Patent Office could have made a mistake with respect to

25  those Ericsson patents.

1          Do you recall that?

2   A.  I remember that, yes.

3   Q.  And that's -- that's normal, right?  People make

4   mistakes?

5   A.  Yeah.  And, again, I'm not going to cast judgment on

6   the work of the Patent Office, but mistakes could be made,

7   or it might even be a mistake that the Patent Office might

8   not have had access to the same information that somebody

9   else might have access to.

10          There are a bunch of -- there are a number of

11  reasons, I can imagine, why the Patent Office would have

12  issued a patent that is later found to be invalid,

13  including the possibility that a mistake was made.

14  Q.  Right.  And nobody is perfect, right?

15  A.  Nobody is perfect.

16  Q.  I think you mentioned the concept of anticipation when

17  you first introduced the concept of invalidity.  Can you

18  explain what that concept means in the context of the

19  analysis that you did?

20  A.  Okay.  I found it somewhat a curious legal word, and

21  I was provided with a great list of legal guidelines before

22  I began my -- my undertaking.

23          The word anticipation, this does not mean that

24  somebody somehow guesses in advance that somebody else

25  would file a patent.

1          No.  It's basically that somebody else did it

2    first.  There's one printed publication or a patent or a

3    system that discloses the limitations of an asserted claim.

4          And in that case, the lawyers say that claim was

5    anticipated.  I say it was not new.

6    Q.  And just to be clear, you're saying that it's

7    anticipated if it's all in one document?  Is that -- did I

8    hear you right?

9    A.  That's correct.

10   Q.  Is it a -- is it possible that a concept might still

11   not be valid even if it's not all in one document?

12   A.  Yes.  That's what I alluded to earlier.  That's the

13   obviousness criteria.

14   Q.  And can you explain that again, please --

15   A.  Yeah.

16   Q.  -- just briefly?

17   A.  So even though it may not be all in one place, a person

18   skilled in the art, somebody who's skilled in this field,

19   with the proper training, the proper education, the proper

20   experience with regard to the subject matter of a patent

21   who would be familiar all of the surrounding literature,

22   the papers, the publications, the systems, would be able to

23   say this publication and this publication, it would be

24   obvious to use the teachings of one inside of the other.

25          It would be natural to combine them.  To be a

1  suggestion to combine, one might elaborate further in terms

2  of what a particular aspect of the -- of the paper is, but

3  it would be obvious to that person that between the two of

4  them, all of the limitations are, in fact, disclosed, and,

5  therefore, the patent is not new -- it's not -- it was

6  obvious in view of the prior art.

7         THE COURT:  Dr. Acampora, would you try to slow

8  down with your presentation a little bit?

9         THE WITNESS:  Yes.  Thank you, Your Honor.  I

10  will.

11         THE COURT:  And -- and while I've interrupted

12  everything, "yeah," is probably not the best answer in a

13  United States District Court.  If you could say yes, I

14  would prefer that, just as a personal prerogative.

15         THE WITNESS:  I'll try my best, Your Honor.

16         THE COURT:  Thank you very much.

17         Let's go forward.

18  Q.  (By Mr. Becker)  So a patent can be obvious even if the

19  concepts are not all in the same document?

20  A.  That's correct.

21  Q.  Why is that again?

22  A.  Because to a person of skill in the art, looking at the

23  literature, it would be obvious that all of the limitations

24  are taught and not just randomly taught but taught in some

25  sort of cohesive fashion where it would be obvious to a

1   person of skill that when I combine these two elements or

2   these two publications, all of the elements of the claims

3   are, in fact, present, in the open literature.

4         The patentholder is not entitled to a patent.  It

5   may be owned by the public, it may be owned by somebody

6   else, but not owned by the patentholder.

7   Q.  So for the purposes of these asserted patents, do you

8   have an opinion about who that person of ordinary skill

9   would be?

10  A.  Yes.  I was asked to form such an opinion, and I did.

11  Q.  Could you please tell the jury what -- sorry -- what

12  skill level that person would have?

13  A.  Okay.  In my opinion, that person would have a

14  bachelor's degree in electrical or computer engineering or

15  a similar field and several years of experience, three to

16  five years of experience, on-the-job experience in the

17  field, or more education, a master's degree in this -- in

18  this case, and to offset the greater education or perhaps

19  less experience on the job would be needed.

20  Q.  Thank you.

21        You've -- you've heard some instructions this week

22  on the concept of burdens?

23  A.  I have.

24  Q.  And you understand the burden of showing invalidity is

25  a higher burden than showing infringement.

1   A.   That's what I understand, yes.

2   Q.   And what is that standard for invalidity?

3   A.   So I believe the standard is known as clear and

4   convincing evidence, as opposed to the lower standard for

5   infringement, which is a preponderance of the evidence,

6   more likely than not.

7           Clear and convincing evidence means -- yeah, I've

8   seen enough evidence that I'm convinced the patent is

9   invalid.  And that's a higher standard.  I understand

10  there's another standard.  It's beyond a reasonable doubt,

11  like in a criminal case.  Is there any lingering doubt

12  whatsoever?

13          It's not that high a standard.  It just has to

14  be -- the evidence has to be such that a person is

15  convinced that the patent is, in fact, invalid.

16          MR. BLACK:  Your Honor, objection.

17          THE COURT:  State your objection.

18          MR. BLACK:  Just that the standard should come

19  from the Court.

20          THE COURT:  In other words, the witness is giving

21  a legal conclusion?

22          MR. BLACK:  Yes, Your Honor.

23          THE COURT:  I'll sustain the objection on that

24  basis.

25  Q.   (By Mr. Becker)  Did you -- you applied the relevant

1    standards when forming your opinions, Dr. Acampora?

2    A.  Yes, among the legal guidelines that I was -- that I

3    asked for and was provided with for the standards I should

4    apply, and those are the standards I did apply.

5    Q.  All right.  Thank you.

6            Dr. Acampora, you mentioned on your background

7    slide that you have over 40 patents in your name.

8    A.  That's correct.

9    Q.  Did I get that right?

10   A.  That's correct.

11   Q.  So this task of considering whether a patent is valid

12   or invalid, is that something you take lightly?

13   A.  No, not at all.

14   Q.  And why is that?

15   A.  I wouldn't want my property taken away if, in fact, I

16   did own it.  So I want to be sure -- I'm glad that the

17   standard is such that someone would have to demonstrate by

18   clear and convincing evidence that it wasn't mine to be

19   taken away.  I would take that very seriously.

20   Q.  Right.  And if we looked on the other side of that

21   token, would it also be wrong to let somebody keep a patent

22   if that patent was, in fact, covering concepts that belong

23   to other people or to the public?

24   A.  Yes.  That's the flip side of the coin.  If somebody is

25   claiming ownership of property that isn't that person's,

 1  they shouldn't have the right to exclude.

 2       The property in that case should be taken in that

 3  case.  Perhaps it belongs to someone else or perhaps it

 4  belongs to the public.

 5       MR. BLACK:  Your Honor, objection.  These are not

 6  technical opinions that he's qualified -- I'm not sure if

 7  they're legal opinions.  It could be his personal opinions,

 8  how the patent system ought to work, and it's irrelevant.

 9       MR. BECKER:  Your Honor, I believe Dr. Chrissan

10  was asked the same question in the direct of his

11  examination.  So I thought it was fair to ask Dr. Acampora

12  the same question.

13       THE COURT:  Well, I'll overrule the objection,

14  although I want to make it clear that the Court will be the

15  sole source of instruction to the jury on what the law is

16  and what the law to be applied in this case will be, and I

17  think both sides understand that.

18       All right.  Let's go forward.

19       MR. BECKER:  Thank you, Your Honor.

20  Q.  (By Mr. Becker)  Dr. Acampora, which patent would you

21  like to begin your discussion with?

22  A.  The '206 patent, please.

23  Q.  Okay.  And I -- the jury's heard a lot about the '206

24  patent this week, but just to reorient them to -- to

25  this -- this patent, could you give them a brief overview

1   of the claim, the first claim in this patent?

2   A.   Sure.   Claim 1-0 -- Claim 109 includes two steps.

3        It's a method claim and includes two steps:

4   Classifying a plurality of packets and scheduling said

5   plurality of packets.   And then there was some criteria

6   concerning classification and scheduling, which I'll talk

7   about.

8   Q.   Okay.   And I want to make -- I want to ask you about

9   one element here.   It says:   Communication in at least one

10  of an upstream direction and a downstream direction.

11       Does that mean you have to show both of those or

12  is one enough?

13  A.   Okay.   So in the second limitation -- I believe that's

14  what you're referring to -- it does state at least one of

15  an upstream direction and a downstream direction.   So if

16  the prior art discloses one of these or both of these, then

17  that portion of the limitation will be found.   It's not

18  necessary for both the uplink and the downlink to be found,

19  at least one of them.   And that would mean one or the other

20  or both.   But you don't have to have both.   That's my

21  understanding of that language.

22  Q.   Thank you.   Dr. Acampora, in 1998, when this patent was

23  filed, was there anything new or not obvious about the

24  concept -- the general concept of classifying and

25  scheduling packets?

A.   In my opinion, there was nothing new in this claim that

wasn't in the prior art.  In fact, fairly well-known.

Q.   And is -- is the concept in this claim, is that a --

was that new in 4G?

A.   I'm sorry, one more time, please?

Q.   Was that new in 4G?

A.   No, no, this -- this is -- this well precedes 4G.

Q.   Does it precede 3G?

A.   It even precedes 3G.

Q.   What kind of prior art did you find these concepts in?

A.   Publications and patents.

Q.   What -- was there a particular generation system?

A.   Yeah.  In fact, I found these in second generation, or

if I might clarify, we heard earlier, second generation

GSM.  I'm not -- it's -- it's a French acronym.  I'm not

even sure I could pronounce what it stands for.  We just

use it backward -- mobile for global.  That was a second

generation standard upon which was layered what we call

GPRS, General Packet Radio Service.

        GPRS is not 3G, but it was not in the original

version of 2G.  Some people refer to it as being 2. --

Generation 2.5.  But the concepts go back at least as far

as GPRS.

        And if we excluded uplink and downlink direction

over wireless, then the concepts go back much further than

1    that.

2    Q.  Dr. Acampora, what prior art do you rely on to show

3    that that is, indeed, the case with respect to this claim?

4    A.  Next slide, please.

5         What I'm going to use is a U.S. patent I'll refer

6    to as being the Forslow patent.

7    Q.  Could you give us a little bit more information about

8    the patent?

9    A.  Yes.  So I excerpted -- on this slide are a few of the

10   lines appearing on the cover of the patent, the U.S. Patent

11   number, the date the patent issued, the inventor, and the

12   assignee, the assignee -- the inventor being Jan Forslow,

13   the assignee being Ericsson, the same Ericsson who is one

14   of the Defendants in this matter.  And the patent was filed

15   on May 29th, 1998.

16   Q.  So just to be clear, this is an Ericsson patent owned

17   by the Defendant that's here today?

18   A.  That's correct.

19   Q.  And --

20   A.  Well, it was assigned to Ericsson.  I -- I would assume

21   Ericsson owns it.  But maybe that's just an assumption.

22   Q.  Okay.  When was this patent filed?

23   A.  May 29th, 1998.

24   Q.  And what makes this Forslow patent prior art?

25   A.  Its filing date.

1          Next slide, please.

2          So the Forslow patent was filed on May 29th, 1998.

3   The alleged priority date of the '206 patent, the date the

4   invent -- the invention date of the '206 patent is July

5   10th, 1998.  So Forslow happened first.

6   Q.  Those dates seem close.  Does that matter?

7   A.  No.

8   Q.  So if someone else -- if Forslow, for example, had

9   these ideas in the '206 patent first, what does that mean?

10  A.  If Forslow had these ideas first, it means that the

11  '206 patent -- and I -- I applied this analysis only to the

12  asserted claims -- the asserted claims of the '206 patent

13  are -- are invalid.

14  Q.  And, Dr. Acampora, do you recall when Judge Gilstrap

15  instructed the jury and mentioned that there's a list of

16  certain prior art that the examiner has examined, and that

17  list appears on the patent?

18  A.  Yes.

19  Q.  Was Forslow listed on the face of this patent?

20  A.  Forslow was listed on the face of this patent.

21  Q.  Did that fact impact your analysis one way or the other

22  as to the invalidity of the '206 patent?

23  A.  Not at all.  It was just -- it appears on the face of

24  the patent, but the instructions, as I understand them, is

25  that I'm -- I'm to do an independent analysis without

```
 1   regard to whether it was considered -- not considered by
 2   the Patent Office without trying to determine the depth of
 3   consideration by the Patent Office, an independent analysis
 4   which is what I did.  So that doesn't affect my opinion at
 5   all.
 6   Q.  Okay.  Just give a -- could you please give a brief
 7   overview as to how you're going to use Forslow?
 8           MR. BLACK:  Your Honor, Your Honor, may I
 9   approach?
10           THE COURT:  Approach the bench.
11           (Bench conference.)
12           MR. BLACK:  Well, I think he's stepped on the MIL
13   twice.  There's nothing that can be done.  I think we can
14   talk about it tomorrow morning if -- open things up a
15   little bit.
16           MR. BECKER:  Your Honor, I --
17           THE COURT:  Which MIL are you -- which MIL are you
18   referring to?
19           MR. BLACK:  I don't remember the number.  It's the
20   one about referencing the -- the.
21           MR. BECKER:  The face of the patent?
22           MR. BLACK:  -- the face of the patent.
23           MR. BECKER:  Your Honor, my understanding was that
24   your instructions were that it could be mentioned that it
25   was on the face of the patent.
```

```
 1              MR. BLACK:  Could be mentioned.  The trouble is
 2   he -- previously he said that whether it was before the
 3   Patent Office and whether they considered it or didn't
 4   consider it was something that would be relevant.  And now
 5   he's come -- now he's offered the testimony that it's in
 6   the record -- that it was in the record at the Patent
 7   Office.  I may need a little bit more leeway on cross
 8   than --
 9              THE COURT:  Well --
10              MR. BLACK:  -- without completely opening it.
11              THE COURT:  -- this is -- this is the Court's
12   order in response to Plaintiff's Motion in Limine No. 2,
13   and there the Court said that certain prior art was not
14   before the PTO at the time the patents were issued and is
15   not in the cited references, is outside of the scope of
16   this limine order.
17              MR. BLACK:  Correct.  And --
18              MR. BECKER:  And my understanding was that Your
19   Honor clarified that, and you were going to permit
20   Plaintiff to ask about cited art and the fact that it was
21   actually listed there.  So, you know, I --
22              THE COURT:  Quite honestly, Mr. Black, I would
23   assume the Plaintiff wants the fact that it was cited by --
24   to the PTO and the PTO --
25              MR. BLACK:  Sorry --
```

1          THE COURT:  -- and the PTO issued these asserted

2    patents over it.

3          MR. BLACK:  Yes, Your Honor.  Let me clarify.

4          THE COURT:  Okay.

5          MR. BLACK:  We, of course, want to talk about that

6    a lot.  But they had made the objection that if we do that,

7    then they can start talking about the IPRs that are --

8    which we can't have happen.  And I need to be able to say

9    given this testimony, which I think is consistent with what

10   you said before, that it was referenced by the Patent

11   Office.  If there's something in the record --

12         MR. BECKER:  Your Honor, I think all he said

13   was that it was cited --

14         THE COURT:  I heard what he said.

15         MR. BECKER:  -- and that didn't impact his

16   analysis.

17         THE COURT:  I heard what he said.  The fact that

18   this prior art that he's talking about now was in the cited

19   references of the '206 patent has nothing to do with the

20   PTAB or IPRs.  And the fact that that's elaborated on or

21   touched on again in either the direct or the cross is not

22   going to open the door to the PTAB or the IPRs.

23         MR. BLACK:  Okay.  Thank you.  I just wanted to

24   raise it.

25         THE COURT:  All right.  Let's proceed.

```
 1              (Bench conference concluded.)

 2              THE COURT:  Let's proceed.

 3              MR. BECKER:  Thank you, Your Honor.

 4   Q.  (By Mr. Becker)  Dr. Acampora, could you give just a

 5   brief overview about how you believe Forslow invalidates

 6   these claims?

 7   A.  I believe that Forslow both anticipates and renders

 8   obvious Claims 109, 112, 115 [sic], and 146.  Furthermore,

 9   if --

10   Q.  I'm sorry.  I thought you were done.

11   A.  -- if Forslow is combined with the teachings of

12   Goodman, that's a published paper by Dave Goodman, a former

13   colleague of mine at Bell Labs, then I think that the

14   combination would render Claims 140 and 144 obvious.

15   Q.  And just to -- just for the record, the -- is the -- do

16   you have an understanding that the Forslow patent is DX-52?

17   A.  Yes.

18   Q.  Do you have an overview slide prepared to discuss the

19   overall system of Forslow?

20   A.  Yeah, Figure 2.  This is taken directly from the

21   Forslow patent.  The only thing I added was the color.  The

22   patent is in black and white.  Everything else -- what you

23   see in color, the red and yellow, I added that.

24              And this is a GPRS system.  We see that it's -- we

25   see the GPRS network right here.  And it has base stations.
```

```
 1    Those are here.  And it has mobile stations.  Those are
 2    here.  The link between the base station and mobile station
 3    is the radio.
 4          On the other side of the GPRS network is the IP
 5    data network.  That might be the Internet, or it might be
 6    any other network that's using the Internet Protocol --
 7    packets formatted in accordance with the Internet Protocol.
 8    Q.  And at a very high level, what was GPRS intended to do
 9    with respect to the Internet and cellular phones?
10    A.  What it was intended to do is extend data services from
11    the Internet to mobile devices so that if I'm on my laptop
12    computer, I can get my email, I can browse the web, things
13    of this type, things I would normally associate with
14    Internet, extend Internet out to the wireless user.
15    Q.  Now, we've heard a lot of discussion and mention of
16    ATM prior art or the concept of ATM.  Do you recall
17    those -- that --
18    A.  Yes.
19    Q.  -- happening this week?
20          Is Forslow an ATM system?
21    A.  Forslow is not an ATM system.  Forslow was an IP-based
22    system.  The packets were IP packets, not ATM cells or
23    packets.  ATM -- they're sometimes called cells.  They're
24    often called cells.  But one would know they're packets.
25    They're header and payload.  They're treated like packet
```

1    switching.  This uses the Internet Protocol.  Different

2    type of packet.

3    Q.  Thank you.

4         What -- what problem, if any, was Forslow directed

5    to?

6    A.  So can we have the next slide, please?

7         So Forslow was concerned about, it was one thing

8    to have the GPRS infrastructure and to accept different

9    types of traffic.  Now, we -- how are we going to provide

10   quality of service?

11        So Forslow actually, on the basis of GPRS, came up

12   with a scheme to classify and schedule packets for

13   individual application flows based on the flow's reserved

14   quality of service.

15   Q.  And just to clarify, Dr. Acampora, this citation and

16   this quote you have here, these are not your words, are

17   they?

18   A.  No.  Once again, this came from Forslow.  The cite is

19   at the bottom of the slide down here.  The only thing I

20   added was -- was the coloring.

21   Q.  So in 1990 -- in May of 1998, before Dr. Jorgensen

22   filed his patent on the '206 patent, this was what Ericsson

23   had filed in one of its patent applications; is that right?

24   A.  Yes.

25   Q.  These exact words?

1   A.   This is from the Forslow patent, yes.

2   Q.   And that's in DX-52.  And what is the cite to this, if

3   the jury would like to find that?

4   A.   Column 12, Lines 22 through 33, as noted at the bottom.

5   Q.   Thank you.

6            Now, you heard Dr. Williams testify earlier this

7   week that he thought that Dr. Jorgensen was the first to

8   think of the idea of putting voice and data all in one

9   Internet-based solution.

10           Do you recall that general testimony?

11  A.   Generally speaking, yes.

12  Q.   Was Dr. Jorgensen the first to think of doing that?

13  A.   No.  Others had done it before him.  In particular,

14  Forslow did it.

15  Q.   And what does this quote say?

16  A.   So here -- Forslow -- again, this is -- this is a cite

17  directly culled from the Forslow patent.

18           Forslow is thinking about multimedia sessions that

19  provide individual quality of service requirements

20  separately from voice, video, and data, all in one -- all

21  in one session but in plural screens.  It'd be one screen

22  associated with each data type.

23  Q.   And that's Voice over IP?

24  A.   Well, in this case, when -- when Forslow speaks about

25  voice, given that GPRS is an IP network, this is Voice over

1   IP, yes.

2   Q.  Let's talk about the claims.  Before we get into your

3   analysis, I'd just like to orient the jury to -- or would

4   you like to orient the jury to the format you have on your

5   slide here?

6   A.  Yeah.  So for my entire analysis, I'll adhere to this

7   format.  The claim will appear on the left side of the

8   screen, and the material that I've relied on, the evidence,

9   if you will, that I relied on from the records will appear

10   on the right side of the screen.

11   Q.  Thank you.

12          What is the first step -- or sorry -- the first

13   step is:  A method of scheduling packets comprising

14   classifying a plurality of packets according to end-user

15   quality of service requirements of said plurality of

16   packets.

17          Did you find that concept in Forslow?

18   A.  I did.

19   Q.  And is that the quote we actually just looked at?

20   A.  Yeah, same -- same quote.  So in order -- I'll just

21   re-read it.

22          In order to classify and schedule packets -- we'll

23   talk about the scheduling later, that's the next

24   limitation, but here Forslow was telling us:  In order to

25   classify packets in an individual flow, based on the flow's

1    reserved quality of service, and then he goes on to tell us

2    how he's going to do it.

3            So it's clearly performing the step of classifying

4    a plurality of packets based upon quality of service

5    requirements of the packets.

6    Q.  Thank you.

7            And do you have an illustrated example for that?

8    A.  I do.  This is also a drawing from the Forslow patents,

9    Figure 11.  I added the color, which means I added this

10   down here.  I added these lines over here.  That's mine.  I

11   added the color in the different queues.

12           But Forslow was teaching that inside the base

13   station -- that's this, that BSS, that's the base station

14   system -- is a box that is inspecting downstream packets.

15   These are coming from the network, and I colored them

16   differently to represent different flows and different

17   quality of service needs.

18           This box is separating the packets as they come in

19   and placing them each in a queue associated with the

20   service quality for that particular -- for that particular

21   flow.

22           So this is a blue queue -- that's quality of

23   service 4 -- all of the blue packets -- quality of service

24   blue packets coming from the network going to this lower

25   queue and so forth and so on for the three other queues.

1    Q.   And BSS, what does that stand for?

2    A.   Base station system.

3    Q.   So is it correct that all of this was happening at the

4    base station?

5    A.   Well, everything across this boundary, everything to

6    the left of this boundary is at the base station.

7    Q.   And just to be clear, is this Figure 11 from DX-52?

8    A.   Yes.

9    Q.   Now, we -- you -- I noticed on your prior slide, you

10   didn't have end-user highlighted here.  Is -- is it the

11   case -- or does Forslow disclose that concept of end-user

12   quality of service?

13   A.   It does.  And that's why I hadn't yet -- I hadn't yet

14   highlighted end-user in the prior slide.

15   Q.   Does Forslow have that concept, too?

16   A.   Yes, it does.

17        So what Forslow was relying on is a well-known

18   protocol.  It was part of the -- it's part of the protocols

19   associated with the Internet.  It was a reservation

20   protocol known as RSVP, and Forslow was employing this to

21   permit a mobile host -- that's the end device, the

22   end-user -- RSVP is being used to permit the mobile host or

23   end-user to request a certain quality of service for

24   transmission from the Internet user -- from an Internet

25   user at an ISP.

1  Q.  Does this --

2  A.  Again, I added the color of this slide, this up here.

3  It's just the same from Forslow down here.

4  Q.  And the quality of service requested here, how does

5  that relate to how the base station classifies the packets,

6  if at all?

7  A.  The base station is going to classify based upon the

8  quality of service requested by the mobile host.  So these

9  are the end-user quality of service objectives that the

10  base station is going to use when classifying the packet.

11  Q.  So, Dr. Acampora, is Claim 109, Step A, in Forslow?

12  A.  It is.

13  Q.  What about 109, Step B?

14  A.  Well, now we get into the second limitation,

15  scheduling.  Forslow was telling us:  In order to -- I'm

16  using the same quote that I used earlier.  In order to

17  classify and schedule.  Now, we're going to speak about the

18  scheduling of the packets.

19        And he goes on to tell us that in order to

20  schedule, various queues/buffers -- queue and buffer are

21  the same thing -- are going to be employed in the base

22  station to accomplish the -- to accomplish the

23  classification -- well, to accomplish the scheduling.  We

24  already spoke about the classification.  Let me correct

25  myself on that.

1    Q.   Thank you, Dr. Acampora.

2            Do you have any illustrated examples to show with

3    respect to this scheduling step?

4    A.   I do.  So looking at the bottom first -- so we already

5    classified the different packets by their quality of

6    service needs expressed by the end-user.

7            Now, Forslow's telling us that scheduling --

8    scheduling is now concerning how we take packets out of the

9    queue, how we're going to schedule them.  It will turn out

10   to be a three-step process.  I'll start down here first,

11   and this is similar to what I described earlier.

12           So prioritization of the packet scheduling

13   mechanism between quality of service classes is also

14   preferably controlled by the base station.

15           The first step:  Pick the queue with the highest

16   priority.

17           Second step:  Serve the packets that are in that

18   queue, schedule them for transmission on what's called the

19   first-in-first-out basis.  That's the scheduling algorithm

20   that's used, first-in-first-out.

21           That simply means, if you're the oldest packet,

22   you get served first.  It's header -- it's also known as

23   header fly serving.  Whoever gets there first gets served.

24   Somebody else go to the head of the line, then gets served,

25   first-in-first-out.

1  Q.  And for clarity, is this process happening at the base

2  station?

3  A.  Yes.  This is all being performed at the base station.

4  Q.  And is the base station -- is this scheduling being

5  performed for communication in at least a downstream

6  direction over a shared wireless medium?

7  A.  Yes, it is.  So the third step with scheduling is

8  actually assigning radio resources.  That's the highlighted

9  area down here.

10         Again, this drawing was taken from Forslow's

11  Figure 12.  I -- I took out portions of Figure 12 that

12  weren't needed for my analysis, but the RLC, R -- the R in

13  RLC is stands for radio.  It's a radio link control layer.

14  This is the layer in the base station that's actually

15  responsible for assigning radio resources existing between

16  the base station and the mobile station to the -- to the

17  individual packets.

18         So scheduling consists of pinging the highest

19  priority queue, taking the oldest packet in that queue, and

20  assigning it to the radio channel -- assigning radio

21  resources to transfer that packet.

22  Q.  So does Forslow disclose each of the limitations in

23  Claim 109?

24  A.  Yeah.  So this is -- the -- the assignment to the radio

25  is in a downlink direction.  We only need to show one of

```
 1   those -- or I need to show one of those.  And Limitation B
 2   is present, and Claim 109, in my opinion, is invalid.
 3   Q.  What is the next claim you'd like to discuss?
 4   A.  Next slide, please.  Claim 112.
 5   Q.  What does 112 add to Claim 109?
 6   A.  The additional limitation of -- of at least the
 7   classifying -- at least one of the classifying step and the
 8   scheduling step.  So one or the other or both is performed
 9   by a packet scheduler wherein the packet scheduler is
10   executed on at least one of the base station or the
11   customer premises equipment.  So it's either at the base
12   station or it's at the customer premises equipment.
13   Q.  So does the base station of Forslow have a packet
14   scheduler that meets this limitation?
15   A.  Yes, it does.  It's the base station or rather the
16   equipment within the base station that accomplishes the
17   scheduling steps that I just described.  So that -- that's
18   the scheduler.  It's at the base station.
19           And so the scheduling step, all we needed was one,
20   is performed by a packet scheduler at the base station.  So
21   this limitation is met.
22   Q.  What's your conclusion regarding Claim 112?
23   A.  Claim 112 is invalid.
24   Q.  What's the next claim that you're going to be
25   discussing?
```

1  A.  Claim 118.

2  Q.  What does Claim 118 add?

3  A.  Claim 118 refers back to Claim 9, and it requires that

4  the -- the add -- the additional step must perform the

5  communicating the end-user quality of service requirements

6  between a station and an access point.

7  Q.  Does that happen in Forslow?

8  A.  It does.  This is Figure 10A from Forslow.  I added the

9  coloring.  I didn't add the line, the red line.  I just

10  colored it red.  And what it's clearly showing is that the

11  mobile host -- that's the end-user -- is sending the RSVP

12  through the base station.  So it got to the base station

13  and is then sent further into the GPRS network.  And this

14  allows the mobile host, through the mechanism, whereby the

15  mobile host requests a certain quality of service.

16         I explained this RSVP usage a little bit earlier,

17  and that allows the mobile host to request.  And here it's

18  shown diagrammatically.  It's in an illustration.

19  Q.  And, Dr. Acampora, the access point here, where's that

20  in the figure?

21  A.  The access point is the base station.  So --

22  Q.  Thank you.

23  A.  -- within the field, it's very often substitutable.

24  Access point is the same as a base station.  Access point

25  is also used in WiFi, but in -- in the context of cellular,

1    an access point is a base station.

2    Q.  Thank you, Dr. Acampora.  Is -- what is your conclusion

3    regarding Claim 118?

4    A.  Claim 118 is invalid.

5    Q.  Thank you.  What is the next claim that you're going to

6    discuss?

7    A.  Let's talk about Claim 146.

8    Q.  Okay.  What does Claim 146 add to the equation?

9    A.  So the scheduling step comprises allocating shared

10   wireless bandwidth in an oversubscribed environment without

11   subsequent degradation of the high priority Voice over IP

12   and video applications.

13   Q.  At a high level, can you provide just a very brief

14   overview of what that means?

15   A.  Yeah.  So I actually referenced it a little bit earlier

16   when I spoke about admission control.  That's not what's

17   taught in Forslow.  But what I mentioned is that in some

18   types of data networks, there's an admission control

19   process which will tell a new flow, I'm sorry, I can't

20   accept you with quality of service guarantee.  You're free

21   to use the network, but you're going to get best effort

22   service.  You get basically whatever is left over.  That

23   would be an example of oversubscription.

24   Q.  Is this concept in Forslow?

25   A.  It is.

1  Q.  First of all, is Voice over -- high property Voice over

2  IP and video, is that in Forslow?

3  A.  Yes, it is.  So just looking at the highlighted section

4  of the excerpt, adhering to individual quality of service

5  requirements of voice and video.  Voice, as I already said,

6  would be Voice over IP.  GPRS network, which Forslow was

7  using, is an IP network.

8  Q.  Thank you.

9  A.  And image is going to be guaranteed, a predictable

10 delay.  So telephony is provided a guaranteed service.

11 Video has got a predicted delay.

12 Q.  Thank you.  What about the concept of oversubscription?

13 A.  Well, then another passage tells us that the estimates

14 may be used to evaluate if new reservations may be

15 accepted.  That was an admission process that I was

16 describing before.

17      So the RSVP can sort of be used as a -- a request

18 for admission with guaranteed quality of service.  And what

19 it's telling us is that the new reservations may be

20 accepted without affecting existing connections.

21      So it's really telling us two things.  Maybe I can

22 take a reservation with no affect on existing reservations,

23 and I can guarantee service quality to new reservation, or

24 maybe accepted -- maybe it won't be accepted.  It will just

25 be told, well, you can flow, but I'm not giving you any

```
 1  quality of service.  That's the oversubscription.  That's
 2  the oversubscription state.
 3          So the voice and video will still get their
 4  service quality needs met but not this new connection.  The
 5  new sub -- the new connection is an oversubscription.
 6  Q.  Thank you, Dr. Acampora.  What is your conclusion
 7  regarding Claim 146?
 8  A.  Claim 146 is invalid.
 9  Q.  What is the next claim you'd like to discuss?
10  A.  Claim 140.
11  Q.  Okay.  What is Claim 140 -- I guess if you could start
12  with just the first two limitations.  Can you explain those
13  at a high level?
14  A.  Okay.  So this is adding to Claim 9, and there has to
15  be some coordination by the access point.  And it has to be
16  controlling by the access point.
17          So we're talking about coordinating -- controlling
18  access to the wireless resource by one or more network
19  stations.  We'll get into the other two limitations in a
20  minute.
21  Q.  Thank you.  Are Steps A and B in Forslow?
22  A.  Yes.  That was -- that's performed by the radio link
23  control/MAC sublayer.  We spoke about that earlier, the RLS
24  radio.
25          So this is the process followed at the base
```

1   station to arbitrate who gets to use the shared physical

2   radio medium.  That's the responsibility of the RLC.  The

3   RLC is coordinating and controlling access to the radio.

4   Q.  What about the next two steps -- well, first of all,

5   are Steps A and B in Forslow?

6   A.  They are.

7   Q.  And what about the next two steps?

8   A.  Well, let's look at the next slide.

9         So next slide, receiving reservation request for

10  one or more of the wireless stations at the base station

11  and sending grants from the base station back to the

12  wireless network station.

13        So the -- the end-user is going to make a request

14  for radio resources, and the base station is going to

15  provide a grant telling the end station, here's your

16  turn -- here's how I want you to send.  The base station is

17  in control.

18  Q.  Does Forslow have the concept of uplink transmissions?

19  A.  Well, we saw the RSVP flow in the uplink direction, but

20  I'm -- I'm actually going to rely on something more

21  fundamental than that.

22  Q.  Okay.  Is this one of those situations where it's not

23  all in one document?

24  A.  Questionable.  Forslow mentions GPRS, and a person of

25  skill would understand what GPRS entails.

1    Q.  Did you --

2    A.  But there's another paper that provides the details

3    that aren't in Forslow.

4    Q.  Does GPRS have these details?

5    A.  The GPRS standard has these details.  The Goodman paper

6    basically summarized certain aspects of GPRS.

7    Q.  And what is the Goodman paper at a high level?

8    A.  It was a paper published by the IEEE titled General

9    Packet Radio Service and GSM.  So what Dave Goodman did

10   here is take this great big standard, took off all of the

11   details about how to form packets and what bit corresponds

12   to what and basically provided the operating principles of

13   GPRS.

14   Q.  So is the concept of receiving reservation requests and

15   sending grants in response to those requests in GPRS as

16   disclosed by Goodman?

17   A.  Yes.

18   Q.  So why are you relying on Goodman instead of the GPRS

19   standard itself?

20   A.  It's all -- in terms of finding the limitation, it's in

21   Goodman, and Goodman is providing a summary of the

22   principles upon which GPRS operates, sparing the reader the

23   details.  We don't need to know, like I said, what bit goes

24   in what position in what subframe of a header, anything

25   like that.  Those are details.

1        Goodman is giving us basic principles of

2   operation, more specificity of what's in Forslow.  Forslow

3   simply says GPRS.  So Dave is -- Dr. Goodman is providing

4   this one further level of detail.

5   Q.  And is Goodman consistent with what's described in

6   GPRS?

7   A.  Completely.

8   Q.  Okay.  Is -- and Goodman, is that a prior art article?

9   A.  Yes, it is.  It was published in May of '97, which is

10  before the invention date of the '206, which was July of

11  1998.

12  Q.  What -- what evidence from Goodman are you going to

13  rely on to show that this limitation is met?

14  A.  Next slide, please.

15        So this is a drawing taken from Goodman.  It's

16  Figure 9 from Goodman.  Here's the Goodman reference down

17  here.  It's DX-86.

18        THE COURT:  Dr. Acampora, again, try to slow down,

19  if you can, please.

20        THE WITNESS:  Yes, Your Honor.  Thank you.

21        THE COURT:  Please continue.

22  A.  So this drawing is showing some flows in a process

23  which ultimately results in the transmission of user data,

24  but I'm not relying on that.  What I'm relying on are these

25  first two steps.

1          The mobile station sends a packet channel request

2    to the base station.  The base station responds with the

3    assignment of what -- of the position -- it assigns to the

4    mobile station an access -- packet access control channel.

5    This is going to be the grant.

6          Request is the first step.  Grant, I'm granting

7    you permission to use the packet access control channel.

8    Q.  (By Mr. Becker)  You talked about Forslow describes

9    sending data in the uplink to the base station?

10   A.  Yes.

11   Q.  Would this -- would the steps shown in this figure be

12   required for that to happen in a system like Forslow?

13   A.  I'm not sure I understand the question.  Can you ask

14   that again, please?

15   Q.  In order to send data to the base station, packet data,

16   would the mobile stations and the base stations in Forslow

17   need to follow a procedure like this?

18   A.  Yes, they would.  The base station is in complete

19   control of access to the radio medium.

20          If the users could -- if remote users could simply

21   send uplink anytime they want, if two send packets at the

22   same time, they collide.  The information content is

23   destroyed.  The radio interference would make the contents

24   unreadable.

25          The only exception to that is exactly that case.

1   To make the initial request, what's being used is a random

2   access channel.  So before you can do anything in the

3   uplink direction, without control of the base station, you

4   have to make a request on the uplink random access channel.

5   That's basically saying, I want to start a procedure.

6          In response to that, the base station is now going

7   to assign uplink resources and the rest of what the base

8   station -- of what the user is asking for can now be

9   presented.  Those are the subsequent steps.

10          But I'm not relying on those as far as Elements

11  (c) and (d) are concerned.

12  Q.  So in terms of these specific details of GPRS, would it

13  be obvious or not obvious to use these details in a system

14  like Forslow?

15  A.  It would be obvious to use these because it's -- like I

16  said, it's telling us exactly how GPRS operates, which is

17  the network upon which the Forslow patent is based, GPRS.

18  Q.  So bottom line is, as the -- what's your opinion about

19  Claim 140?

20  A.  Claim 140 is invalid.

21  Q.  Are there any more claims to talk about with respect to

22  the '206?

23  A.  I believe there's one more.

24  Q.  This is the --

25  A.  Claim 144.

1  Q.  This is the last one?

2  A.  It is.

3  Q.  What's your opinion regarding Claim 144?

4  A.  I believe it is also obvious in light of the

5  Forslow/Goodman combination.

6  Q.  And what evidence do you rely on to show that?

7       Sorry -- before we get to that, what's -- can you

8  just provide an overview of what the Claim 144 is -- the

9  concept is?

10 A.  Yeah.  So here, the coordinating step comprises

11 ensuring high priority packets are provided appropriate

12 bandwidth needed to -- needed by said high priority

13 packets.

14      And I'll rely on, once again, the same passage

15 that I relied on earlier.  Goodman is telling us -- I'm

16 sorry -- Forslow is telling us that the Forslow invention

17 will adhere to individual quality of service requirements

18 of voice and video, for example, realtime application, like

19 telephony, guaranteed service, image, video, and these

20 predictable delays.  These are the high priority traffic

21 types.

22 Q.  Thank you, Dr. Acampora.

23      What's your conclusion regarding Claim 144?

24 A.  It's invalid.

25 Q.  Could you please provide a summary of your opinions

1   with respect to the '206 patent?

2   A.   Yeah.   I'll make it brief.   I believe the Forslow

3   patent anticipates and renders obvious the asserted claims

4   of the '206 patent.   Forslow, combined with Goodman, render

5   obvious Claims 140 -- Claims -- Claims 140 and 144.   Let me

6   restate what I said before.

7          Forslow by itself anticipates and renders obvious

8   Claims 109, 112, 118, and 146.   The other two asserted

9   claims, Goodman, combined with Forslow, would render those

10  obvious.

11  Q.   Thank you.

12         Any doubt in your mind that one way or the other,

13  the '206 patent is invalid?

14  A.   The '206 patent, the asserted claims -- I didn't look

15  at the other claims -- the asserted claims were invalid.

16  Q.   Thank you.

17         What patent do we discuss next?

18  A.   Next slide, please.

19         Let's talk about the '629 patent.

20  Q.   Okay.   And we've talked about this a lot.   Just at a

21  high level, what is this concept?   What is the concept in

22  this patent?

23  A.   Okay.   So the jury's heard about this several times

24  this week.   This -- Claim 1 involves a reservation

25  algorithm, which reserves a first slot in a future frame

```
 1   and reserves a second slot in a later frame, a
 2   subsequent -- subsequent in time, subsequent to the first
 3   frame, which is at some future point in time, and all this
 4   reservation must be done, so the second data packet is
 5   placed in the second slot in an isochronous manner.
 6   Q.  Okay.  What priority are you relying on?  Well, sorry.
 7   I asked the wrong question.
 8   A.  Okay.  So this is a simple --
 9   Q.  Let me ask the question.
10        Do you have a slide prepared to remind the
11   jurors -- I think you can go through this briefly,
12   Dr. Acampora, because the jurors have heard it already, but
13   just very briefly to remind them what this patent is about?
14   A.  Yes.  So let's consider a voice source that is
15   generating a data packet periodically.
16        So the frame -- the claim is basically saying let
17   there be frames.  Frame 0, 1, and 2 in this example.  And
18   what I want to do is have a voice packet, in this example,
19   reserve Slot 7 in Frame 0 or access Slot 7 in Frame 0.
20        Once that slot is accessed, it will be tabbed and
21   reserved in future frames.
22        That's basically what this -- and the claim will
23   also require that a data packet be placed here, and the
24   second data packet be placed here, here and here.
25   Q.  And just to be clear, are you marking on Slots 7 in
```

1  each of Frames 1 and 2 in this slide?

2  A.  Yeah.  My finger is not a very good stylus.

3  Q.  Do you have -- what prior art do you rely on for your

4  opinions for this -- with respect to the '629 patent?

5  A.  Next slide, please.

6       I'm going to rely here on another U.S. patent,

7  which I'll refer to as being the Turina patent.  The jury

8  has already heard about the Turina patent.

9  Q.  And the Turina patent, that's the same one that

10 Dr. Chrissan mentioned in his testimony and Dr. Wicker

11 mentioned in his testimony?

12 A.  Same patent.

13 Q.  And this is an Ericsson patent?

14 A.  This is an Ericsson patent.  This is what's excerpted

15 from the front of the patent.  We see it's a U.S. patent

16 granted in 2000.  We see the name of the inventor, and the

17 assignee is Eric -- once again, it's Ericsson, and it was

18 filed November 27th, 1996.

19 Q.  And what makes this patent prior art?

20 A.  Next slide.

21      So it was applied for in 1996.  Priority date of

22 the '629 patent is 1999.  Turina happened first.

23 Q.  Okay.  What are your opinions with respect to the '629

24 patent?

25 A.  I believe that the Turina will patent will render

1    Claims 1 and 6 [sic] obvious.

2    Q.  And do you have any slides prepared to show the jury

3    what Turina was about at a higher level?

4    A.  I do.  So this is just sort of the lay of the land.  We

5    see the base station.  We see a mobile phone.  In fact, we

6    see a couple of mobile phones and a couple of base

7    stations.

8           This is also a GPRS patent.  Not that -- that

9    Turina invented GPRS.  Turina is going to use GPRS.

10   Q.  Was this an IP-based network?

11   A.  Yes.  Once again, it's GPRS.  And GPRS is an IP-based

12   network.

13   Q.  And we heard the concept of a VIP mobile -- a VIP

14   mobile?

15   A.  We did.

16   Q.  Is -- is it -- can the system of Turina support more

17   than one VIP mobile for base stations?

18   A.  Yes, it can.  There's no requirement the number of VIP

19   mobiles be limited to one.

20   Q.  Well, would it -- would it make any sense for one --

21   for the base station to only allow one mobile to be VIP per

22   base station?

23   A.  That would make no sense at all.

24   Q.  Why is that?

25   A.  Well, as an example, so only one is allowed for base

1  station.  And suppose both of the mobile phones shown in

2  this drawing happened to be VIP stations.  Well, that would

3  be fine.  It would be one associated with each base

4  station, but these are mobile phones.

5       What happens when somebody gets in a car and

6  drives to the region served by the other base station?

7  Now, all of a sudden there are two VIP mobiles in one base

8  station.  Does one of them suddenly get kicked out?  It

9  would make no sense.

10 Q.  Thank you.  And which figure are you going to rely on

11 for the majority of your discussion?

12 A.  I believe it's Figure 3.

13      Next slide.

14 Q.  And Dr. Wicker already explained this, so maybe you can

15 give an abbreviated overview to remind the jury what this

16 figure is about?

17 A.  Yeah.  So, once again, I added the coloring.

18 Otherwise, this is directly from Turina.  And Turina is

19 describing TDMA frames, Time Division Multiple Access,

20 which is an acronym.  But these are frames, each containing

21 eight time slots numbered 0 through 8.  We see Frame 0.

22 That's the current frame.

23      Next slide.

24      So let me explain what just happened.  As Turina

25 explains, when that packet that we just saw lands in

1   Slots 4 and 5 of Frame 0, the current frame, what that does

2   is cause the same two slots in future frames to be

3   reserved.  The reservation is made back at this point in

4   time.  This is a fairly well-known process.

5           As it turns out, it was also created by Dave

6   Goodman, same Dave Goodman, different publication, known as

7   Packet Reservation Multiple Access.

8           So you first compete for, and in this case -- in

9   this example, these slots were 1.  That computation tags

10  the same two slots in subsequent frames as being reserved.

11  They cannot be seized by any other mobile station.

12          So that -- as time goes on -- if you could go to

13  the next slide -- one more.

14          So there's a first packet going into a future --

15  first future frame.  Second packet going into a subsequent

16  frame.  That's -- that's it.

17  Q.  So this is from DX-49; is that right?

18  A.  That's correct.

19  Q.  And this is -- is this Figure 3?

20  A.  This is Figure 3.

21  Q.  Is this concept of reserving slots in future frames, is

22  that a 4G concept?

23  A.  No.  This is a 2G concept.

24  Q.  Thank you.  What are your opinions with respect to

25  Claim 1?

1    A.   My opinion is Claim 1 is obvious in light of the Turina

2    patent.

3    Q.   Okay.   Does Turina patent -- the Turina patent disclose

4    a method for assigning future slots of a transmission frame

5    to a data packet in the transmission frame for transmission

6    over a wireless medium that includes applying a reservation

7    algorithm?

8    A.   Yes, it does, as I just explained.

9    Q.   Where is that in Turina?

10   A.   Column 4, Lines 57 through 61, and what -- again, I

11   need to remind the jury, and I put it on the slide, a

12   protocol is a sequence of steps.

13          It's a phrase that's used in data communications.

14   It's the same as an algorithm.   It's a set of steps to be

15   followed.   So when we see protocol in Turina, that's the

16   same as an algorithm.   And Turina is telling us that it's

17   using a packet reservation-type protocol.   That's Packet

18   Reservation Multiple Access -- multiple access packet

19   reservation-type protocol that I referenced a little

20   earlier.

21          Turina didn't invent that.   That was already prior

22   art at the time of Turina, but using Turina nonetheless is

23   disclosing that particular protocol as I just described it.

24   Q.   And this -- what you have inside the -- the bullets at

25   the top of this slide, those -- are those your words?

1   A.  The bullets at the top are my words, yes.

2   Q.  And inside the box here, is that the words that

3   Ericsson had in its patent in 1996?

4   A.  Except for the highlighting, yes.

5   Q.  Is the concept of applying a reservation algorithm

6   disclosed by Turina?

7   A.  Yes, it is.

8   Q.  Okay.  What about the next two steps, reserving a first

9   slot and a second slot in a future frame?

10  A.  Well, that happens exactly as I just described it

11  because the first slot, there's a slot being reserved in a

12  future frame.  There's a slot being reserved -- second

13  reserved slot in a subsequent frame.  It's in Frame 2.

14  Q.  Okay.  And just to be clear, what the -- with the jury,

15  the coloring on these slides, you've added?

16  A.  Yes.  If you see coloring on -- on a slide, unless I

17  created that slide from scratch, I added the coloring.

18          Typically I'll be using an excerpt from a patent

19  or a publication.  The patent or publication would be in

20  black.  The coloring, I added.

21  Q.  And the labels in red on the frames -- the current

22  frame, future frame, and subsequent frame, are those words

23  you added?

24  A.  I believe that I did, yes.

25  Q.  Okay.  But would that be how someone would

1  understand -- would have understood what this figure is

2  disclosing in 1996?

3  A.  Yes, it would.  This is a time diagram.  We see time

4  slots progressing from 0 to 7.  In Turina, originally was

5  Frame 0 -- TDMA Frame 0.  We can't see it here because it's

6  been colored out.  But that was in the original Turina.

7  Followed by Frame 1, followed by Frame 2, so it's a time

8  sequence from left to right.

9  Q.  So what about the fact that this -- these claims -- or,

10  sorry, Steps 1B and C say that it has to be a slot reserved

11  for a data packet.  Is that in Forslow?

12  A.  Yes, it is.  So Figure 2 from Forslow was showing us

13  the actual transfer of a data packet, and the excerpt is

14  telling us that the network in Forslow sends the packet

15  over the downlink and the -- the site goes on.  But it's

16  clearly talking about transferring packets.

17  Q.  And this -- would somebody of ordinary skill understand

18  this transfer in Figure 2 to be sending a packet in the

19  reserve slot?

20  A.  Yes.

21  Q.  Both of them?

22  A.  Yes, both -- both of them.

23  Q.  And is -- I think you said Turina is a GPRS and

24  IP-based reference, but does this confirm that?

25  A.  Well, this is how I know that Turina is GPRS and

1    IP-based.  This is a site from Turina.  It's clearly saying

2    GPRS, and it's using Internet Protocol.

3    Q.  Where is that site?

4    A.  Column 6, Lines 3 through 13 of DX-49.

5    Q.  Was there any doubt that this was reserving data

6    packets for IP-flows in these -- for these VIP mobile

7    stations?

8    A.  No, doubt.

9    Q.  So are -- is Steps B and C disclosed by Turina?

10   A.  Yes, both -- I -- I -- Step B is reserving the first

11   slot for an Internet packet flow in a future frame based on

12   a reservation algorithm.

13         Step C, reserving a second slot for a second data

14   packet of the same IP-flow in a later transmission frame.

15   I'm paraphrasing.  So as I just explained, B and C are

16   present in Turina.

17   Q.  And then this Step D, I think has been discussed a

18   lot.  Is -- is Figure 3 showing isochronous?

19   A.  Yes, it is.  Isochronous was construed by the Court to

20   mean:  According to a consistent time interval, and we see

21   the two red arrows that I superimposed on Figure 3 of

22   Turina.  There's the first arrow, second arrow.  This

23   placement of this position relative to this is the same as

24   the placement of this position relative to this.  So

25   they're clearly -- they're happening periodically.  That's

1    a constant time interval.

2    Q.  Okay.  I asked you this question with respect to

3    Forslow.  Was Turina cited on the face of the '629 patent?

4    A.  Turina was cited on the face of the '629 patent.  Thank

5    you.  I corrected a mistake that was in my original expert

6    report where I said it was not.  That was just a typo or

7    cut-and-paste error.  I knew it was on the cover of Turina

8    at that time.

9    Q.  Now, you --

10   A.  I'm sorry.  I knew it was on the cover of the '629.

11   Turina was on the cover of the '629.  I knew that.

12   Q.  And did -- did it impact -- would it -- did it impact

13   your opinions one way or the other that it was cited or not

14   cited?

15   A.  No.  As I explained earlier, I did an independent

16   assessment.  It didn't matter to me what was cited on the

17   face of the patent or what was not cited on the face of the

18   patent.

19   Q.  So going back to this isochronous step, is that met?

20   A.  Yes it is.

21   Q.  And does Turina disclose each and every element of

22   Claim 1 of the '629 patent?

23   A.  It does.

24   Q.  What is the next claim that you want to cover?

25   A.  Let's look at Claim 4.

1   Q.  And what is this idea in Claim 4?

2   A.  Okay.  So here, the method of Claim 1 requires that the

3   reservation algorithm determines whether the VIP flow is

4   jitter-sensitive.

5   Q.  And jitter-sensitive, I think that's been defined

6   today, but what does that mean just as a reminder?

7   A.  Well, that would mean that if there's any jitter in --

8   when the packet receives an allotment, that would not be

9   too good.  The flow is jitter-sensitive.  It needs to land

10  on target, not with some variation around that.

11  Q.  And is that disclosed by Turina?

12  A.  Yes, it does.

13       So it's telling us that the VIP mobile can be

14  guaranteed a constant delay.  Constant delay means there

15  will be no jitter whatsoever.  So the reservation algorithm

16  is taken into account that this VIP application needed

17  constant delay, therefore, no jitter.

18       And, in fact, we -- the VIP flow cannot tolerate

19  any jitter.  That's why, in fact, this VIP flow is

20  guaranteed periodic access to the channel in subsequent

21  frames.

22  Q.  Okay.  Could you just summarize your opinions with

23  respect to the asserted claims of the '629 patent?

24  A.  Both Claims 1 and 4 are invalid in my opinion.

25  Q.  And as between IV and Ericsson, who had this concept of

1    reserving slots in future frames first?

2    A.   Ericsson.

3    Q.   What is the next patent that we're going to discuss?

4    A.   The '517.

5    Q.   For the benefit of the jury -- well, I think that we --

6    the jury has an overview of '517 already, but just as a

7    reminder, can you give them the high points?

8    A.   Yeah.  So Claim 1 requires analyzing contents of

9    packets to be sent over a shared bandwidth in a downlink

10   direction, analyzing reservation requests for packets to be

11   communicated in the uplink direction from at least one CPE

12   and then allocating the shared wireless bandwidth between

13   the downlink and uplink directions.

14   Q.   And what is the summary of your opinions with respect

15   to this patent?

16   A.   There is a -- there's another IEEE publication, which

17   I'll refer to as being the Passas article, which, in my

18   opinion, renders obvious Claims 1 and 4 either by itself or

19   in combination with two patents, Lin and/or Sriram.  I'll

20   talk about those.

21   Q.   And this Passas article, was that written by anyone

22   related to Ericsson?

23   A.   Not to my knowledge.

24   Q.   So what is the publication that you're going to be

25   covering?

1  A.  IEEE Communications magazine.  Don't be fooled by the

2  word "magazine" in the title.  This is a well-respected

3  publication.  It's available to any member of the IEEE on a

4  subscription basis.  During the relative time frame, I --

5          THE COURT:  Dr. Acampora, he just asked you, what

6  is the publication that you're going to be covering, and

7  you identified it as an IEEE magazine.  He didn't ask for a

8  full discussion of what it is and how reliable it is and

9  whether you personally subscriber to it.  All of that is

10  beyond the scope of his question.  Try to limit your

11  answers to the scope of the question that's asked, please.

12          THE WITNESS:  I understand, Your Honor.  Thank

13  you.

14          THE COURT:  All right.  Let's continue,

15  Mr. Beck -- Mr. Becker.

16          MR. BECKER:  Thank you, Your Honor.

17  Q.  (By Mr. Becker)  Is this magazine something that you

18  personally subscribe to?

19  A.  In that time frame, yes.

20  Q.  And it would have been something you received by

21  something what we would call snail mail?

22  A.  That came in that era by U.S. mail.  Now, it's

23  distributed electronically.

24  Q.  Thank you.

25          Now, before we get into this patent -- or sorry --

1    this -- this publication, are there any concepts that you

2    think are important for the jury to understand with respect

3    to this claim?

4    A.  Yes.

5    Q.  And did Dr. Wicker explain those concepts?

6    A.  Yes.

7    Q.  What was that concept?

8    A.  Okay.  The concept is that of time division duplexing.

9    So in the cellular system, we have to accommodate two

10   directions of information flow, the uplink direction from

11   the mobile, the downlink direction to the mobile.

12           One way that it's done, the most common way that

13   it's done in cellular systems is by what's called frequency

14   division duplexing.  The two directions that flow each have

15   their own dedicated radio channel.  So I can't use the

16   uplink channel to meet a downlink need or vice versa.

17           The alternative to that -- or an alternative to

18   that is known as time division multiplexing.  Now, I'm

19   going to create one and only one radio channel, and I'm

20   going to time share it very quickly, ping-ponging back and

21   forth between the two directions, first the downlink flows,

22   then the uplink flows, then the downlink flows, then the

23   uplink flows.

24           So downlink is blue.  The uplink is pink.  This is

25   my drawing.  This didn't come from any publication.

1   Q.   Is TDD an example where you would have an allocation of

2   a shared bandwidth between the uplink transmissions and the

3   downlink transmissions?

4   A.   Yes.   There's only one radio channel that's being

5   shared between the two directions.

6   Q.   Is TDD a 4G LTE concept, or does it predate that?

7   A.   TDD?   TDD goes way back.

8   Q.   How far back?

9   A.   It might even have been -- well, I was going to say it

10  might have been pre-cellular, but that would not have been

11  created based on a cell phone.   So it went back to 2G for

12  sure.

13  Q.   It was well-known in 1998?

14  A.   It was well-known in 1998.

15  Q.   Okay.   So with respect to Passas, what makes Passas

16  prior art?

17  A.   Its publication date of November 1997.

18  Q.   And the fact that it's not an Ericsson publication, and

19  it's not a patent, can it still invalidate?

20  A.   Yes.

21  Q.   Why is that?

22  A.   It's prior art.   It was in a printed publication that

23  was available to the public.   Anyone could have subscribed

24  to it.

25  Q.   And is that -- is that because you can't read a

1  magazine article and then go file a patent on that concept

2  and -- and get a patent?

3  A.  Well, that's right.  So the intent is that you don't do

4  that.  You don't read the article and say, hmm, let me run

5  out and get a patent.

6  Q.  Okay.  What is the -- and that's because -- that's

7  because that would be somebody else's idea and not your

8  idea, right?

9  A.  Well, somebody else's idea, or it might have been

10 reported by somebody else -- it might have been reporting

11 something else.  I can't even claim that Passas -- I know

12 Passas did not invent TDD --

13 Q.  Right.

14 A.  -- or did not invent much more than we discussed.

15 Q.  Dr. Acampora, what's the name of the article you're

16 going to use?

17 A.  Quality of Service Oriented Medium Access Control for

18 Wireless ATM Networks.

19 Q.  What's the exhibit number?

20 A.  DX-95.

21 Q.  And we've heard this term this week, ATM.  What is that

22 again?

23 A.  Not an automatic teller machine.  It's -- it's an

24 acronym for a packet used in some types of communications

25 networks.  It stands for the asynchronous transfer mode.

1  It was well-described in --

2          THE COURT:  Slow -- slow down, Dr. Acampora,

3  please.

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  It's the third time I've asked you.

6  Please slow down.

7          THE WITNESS:  I understand.

8          THE COURT:  Let's continue.

9  Q.  (By Mr. Becker)  Do you have any -- is the concept of

10 ATM well-known?

11 A.  Yes.

12 Q.  Do you have -- are there any dictionaries that describe

13 what ATM is?

14 A.  Yes.

15 Q.  Is this an example -- well, is this a dictionary

16 definition on the screen?

17 A.  Yes.

18 Q.  What is the definition, according to this dictionary?

19 A.  Well, I'll describe only what I highlighted.  Packet

20 switching -- well, it's a packet switching communication

21 standard which uses packets of constant length called ATM

22 cells.  And I actually had explained this earlier.  It's

23 just a name.

24          These were smaller units of data, 48 by payload --

25 it was relatively small -- five by header, so 53 bytes in

1  total.  And since only that fixed-length packet could be

2  used in ATM, a term was coined.  It was called a cell.

3  It's a data packet.  It's a constant length data packet.

4  Q.  Does an ATM cell meet the definition that Dr. Williams

5  provided for packet in his slides?

6  A.  Yes.

7  Q.  Now, this mentions something called a virtual channel.

8  Does the fact that a system uses a virtual channel or a

9  virtual circuit mean that it does not use packets?

10  A.  No, not at all.  Virtual channel is a concept that's

11  tightly coupled with this notion of admission control that

12  I referenced earlier.

13         So before a new application flow was allowed into

14  the network with a guaranteed quality of service, the

15  admission controller must grant it permission to send

16  packets that will enjoy that service quality.  Otherwise,

17  the new connection is either blocked, or it's given lowest

18  priority traffic.  There's no real circuit associated with

19  that flow.  It's just the allowability of the flow with the

20  guaranteed service quality.  That's why it's called

21  virtual.

22  Q.  And I think we've heard it said in the presentation

23  today that -- or yesterday that Dr. Jorgensen rejected ATM.

24  Do you recall that?

25  A.  Yes.

1  Q.  Is the fact that -- if it's true that Dr. Jorgensen may

2  have decided not to use ATM at some point in his prototype

3  system, does that have any bearing on the scope of the

4  claims at -- at issue in this case?

5  A.  No.

6  Q.  And you've read the claims?

7  A.  I've read the claims.

8  Q.  Is there anything in the claims of the '517 patent that

9  exclude ATM?

10  A.  No.

11  Q.  Is there anything in the specification that excludes

12  ATM?

13  A.  No.

14  Q.  Could we provide -- could you please provide an

15  overview of the Passas system?

16  A.  Yes.  This is the lay of the land, once again.  I

17  colored Figure 1 of Passas only to show the mobile

18  terminals and the access point or base station.

19         And then Passas also includes one of these

20  packets, which is an ATM switch -- an ATM packet network,

21  but I'm focusing mostly on the access point in the mobile

22  terminal.

23  Q.  Okay.  And I -- I think you've -- you've been in the

24  court this -- this week, and you've heard arguments going

25  back and forth about mobile terminals and CPE.  It's -- if

1   IV is right and mobile terminals are CPE, does Passas have

2   those?

3   A.  I'm sorry, ask that one more time, please.

4   Q.  If IV is right and mobile terminals are CPE, does

5   Passas have those?

6   A.  Yes, right there.

7   Q.  Is a mobile terminal a CPE station under the Court's

8   construction?

9   A.  No, it's not.

10  Q.  And why is that?

11  A.  CPE station was construed by the Court to mean -- we've

12  heard this before -- devices residing on a premises of a

13  customer and used to connect the telephone network -- used

14  to connect to a telephone network, including ordinary

15  telephones, key telephone systems, PBXs, videoconferencing

16  devices, and modems.  So that's not an exhaustive list

17  of -- of devices residing in a premises, but those are

18  examples of what might be.  So the premises equipment would

19  include these devices and possibly others.

20  Q.  Okay.  Would it be obvious to use an actual CPE station

21  that meets the Court's construction in a system like

22  Passas?

23  A.  Yes, it would be because --

24  Q.  I'm sorry.

25  A.  It's actually easier to provide service to a fixed

1    point like a premises than it is to a mobile device, as in

2    Passas, because a mobile device is moving.  The channel --

3    the radio channel conditions can change.  There are a whole

4    bunch of issues in wireless communications that we have not

5    discussed affecting the quality of the radio channel.  And

6    if the mobile station is moving, it might also need to have

7    its connection handed off from one cell to another as you

8    travel from the footprint of one to another.  It's much

9    easier to provide service on a fixed point basis, so it

10   would be obvious to use customer premises equipment in

11   Passas.

12   Q.  Do you have any evidence to support your opinion that

13   CPE was well-known and obvious in 1998?

14   A.  I do.

15   Q.  What is that?

16   A.  Next slide, please.

17        So this is a U.S. patent filed in March of 1998

18   issued to a fellow named Lin.  I believe Lin was at Nortel

19   Networks, although it's not shown here.

20        But what's shown in this drawing from the Lin

21   patent is subscriber premises, and a wireless link from the

22   premises back to a base station, as it turns out.  So

23   what's included inside of the house is an antenna, and this

24   is some radio equipment in this box right here.  And these

25   are devices that will attach to the radio station using

1    wiring from within the house.  So this is an example of

2    customer premises equipment.

3    Q.  Now, this type of equipment shown in this figure, was

4    that common in 1998?

5    A.  It was quite common.  In fact, it was standards that

6    were developed by the IEEE to support so-called fixed point

7    service.  It was -- it was a way to avoid telephone wiring.

8    So you would deliver services to a premise by radio rather

9    than buried cable.

10   Q.  Is this type of equipment common today?

11   A.  I believe it is.

12   Q.  Is it common in 4G LTE systems to use this type of

13   equipment?

14   A.  Well, it could be used.  You're asking is it common.  I

15   don't know how common it would be.  4G systems typically

16   support laptops that you carry with you or tablet devices

17   or phones.

18   Q.  Thank you.

19         Is the -- I'm sorry.  Sorry.  Do you have an

20   overview of the -- how the shared -- how the wireless

21   bandwidth in Passas is shared?

22   A.  Yeah.  Could we have the next slide?

23         So this is just some detail.  We already spoke at

24   a high level about time division duplexing.  Passas is a

25   time division duplex system.  What's shown here is the

1    downlink portion of a frame and the uplink portion of a

2    frame.

3           During the downlink portion, the -- the base

4    station will send data to the mobile.  During the uplink

5    portion, mobiles will send data to the base station.

6           There are additional parts of the frame.  This one

7    we don't -- we won't discuss.  This one we'll discuss a

8    little bit later.  So it's time division duplex.  There's

9    an uplink portion and a downlink uplink portion, shared

10   wireless bandwidth.

11   Q.  Is this -- does this meet the concept of allocating a

12   shared wireless bandwidth between the uplink transmissions

13   and downlink transmissions?

14   A.  It does.

15   Q.  Okay.  Are you -- would you like to speak about the

16   claims now?

17   A.  If I might point out one more thing that I didn't

18   include in an answer to an earlier question.

19   Q.  Sure.

20   A.  Without going through these intermediate levels here,

21   this is sort of a -- a telescoping drawing, but what

22   ultimately happens is that ATM packets are placed in the

23   downlink period.  They're also placed in the uplink period.

24   Q.  Are you ready to begin the --

25   A.  Yes.

1    Q.   -- analysis of your -- of Claim 1?

2    A.   Yes.

3    Q.   What are your opinions with respect to -- well, first,

4    can you give an overview of Steps A through C in this

5    claim.   At a high level, what's the main concept here?

6    A.   Yeah.   We already discussed this.   So analyze contents

7    in the downlink direction, analyze reservation requests in

8    the uplink direction, allocating shared wireless bandwidth

9    between the base station and the CPE station.

10   Q.   Is that concept found in Passas?

11   A.   Yes, as I just described.   So here's an excerpt from

12   Passas telling us that the access point is going to

13   construct the next frame.   Here's the frame that's being

14   constructed by the access point.   The construction takes

15   place earlier in time, somewhere over here.

16        And what it does, it's using a scheduling

17   algorithm that will be described that takes into account

18   reservation requests sent by the mobiles, and it takes into

19   account arriving cells for each downlink connection.

20        So by taking into account, it's going to analyze

21   the contents of those packets.   And when you take those

22   into account to perform its downlink scheduling, it's going

23   to take reservation requests into account when performing

24   its uplink scheduling.

25   Q.   So at a high -- at a high level are the Concepts A

1   through C anything new?

2   A.  No.

3   Q.  Now, you said here that taking into account the

4   arriving cells reach downlink connection, how do we know

5   that involves analyzing the content of a packet?

6   A.  Well, Passas has told us that he's going to take into

7   account reservation requests.  Those are -- let's see what

8   the claim requires here, analyzing reservation requests.

9   Q.  I'm sorry, my question was about Step A, analyzing

10  contents of the packets that are to be sent in the

11  downlink?

12  A.  Yeah, so I already explained that there.  I'm sorry.

13          So Passas tells us that in preparing or

14  constructing the next frame, the access point, the base

15  station, will take into account arriving cells in a

16  downlink direction.  That's analyzing the contents in a

17  downlink direction.  The downlink cells will be taken into

18  account.  They'll be inspected to determine who gets to go

19  and when.

20  Q.  Thank you.  And how do we know what an ATM cell looks

21  like?  Do you have any evidence of how the ATM cell --

22  A.  Yeah, I -- there's another reference.  Again, the ATM

23  cell is well-known, but I have a reference.

24  Q.  What reference is that?

25  A.  This is the second patent that I referred to earlier, a

1    Sriram patent, that actually issued in 1995.  And what's

2    shown here -- this is from the Sriram patent.  What's shown

3    here is the ATM cell or packet.  This is 5 -- 5 header that

4    I -- 5 -- an octet is a byte.  I mentioned the 5 byte

5    header earlier.  I mentioned the 48 byte payload.  There's

6    the structure of the ATM packet.  And included in the

7    header is the virtual channel identifier.  That's what's

8    actually going to be inspected.  In ATM, that's the only

9    thing that the network will rely on, that virtual

10   connection number found in the header, to advise the

11   network where the packet came from, where it's to be

12   delivered, and what quality of service it should enjoy.

13   Q.  So in the system of Passas, would it have been obvious

14   to look in the packet cell header to identify what

15   connection it was for?

16   A.  Passas is an ATM reference.  The only place to learn

17   anything about the needs of this particular packet are in

18   the header, and in particular the virtual channel

19   identifier contained inside the header.

20   Q.  Okay.  I'd like to ask you another question about Claim

21   Steps A through C.  Will that be all right?

22   A.  Yeah, please.

23          THE COURT:  Counsel, you don't have to ask

24   permission to ask a question.  Just ask the next question.

25          MR. BECKER:  Okay.

1          THE COURT:  Let's move along.

2          MR. BECKER:  Thank you, Your Honor.

3    Q.  (By Mr. Becker)  Just for -- just to clarify the

4    record, the dictionary definition that we talked about, was

5    that DX-214?  Do you recall that?

6    A.  I don't recall it was 214.  But we have the slide.  If

7    you want to go back to that, I can confirm that.  There it

8    is.  Yeah, this is the dictionary definition, and it is

9    DX-214.

10   Q.  Okay.  Okay.  So going back to the -- the claims, I

11   want to ask you another question about Claims A through C.

12   A.  Okay.

13   Q.  It says here in Step B that the reservation request

14   comprises a subscriber identifier and at least one other

15   subscriber attribute.  Is that found in Passas?

16   A.  Yes, it is.  So Passas is telling us that the mobile

17   terminal will send reservation requests to the AP.  Those

18   reservation requests will identify the current needs of an

19   uplink connection, and they'll come from the specific

20   mobile terminal.  In other words, that reservation request

21   must identify who sent this request.  The mobile terminal

22   they identified, that would be the subscriber identifier in

23   the claim.

24          The current needs, those would be some subscriber

25   attributes, also carried in the reservation request.  What

1  service follower do I need, as an example.

2  Q.  Is there anything novel about including this kind of

3  information in a reservation request?

4  A.  No.

5  Q.  Is this analogous to any everyday example that you can

6  think of?

7  A.  Yeah.  I'll use a reservation at a restaurant, once

8  again, but a different example.  And like Dr. Wicker said,

9  analogies are good, but they can stretch to a certain

10  point.  This one, I think, is actually pretty good.

11         So if I want to make a reservation in a

12  restaurant, I'll call up and I'll identify who I am --

13  let's suppose I get a machine.  The restaurant is closed,

14  so I get an answering machine.  So I'd say, I'm Tony

15  Acampora, I need a reservation for a party of four at 8:00

16  o'clock.  I just identified who I am, and I've said

17  something about my needs.  8:00 o'clock, party of four.

18  Without that, I'd have no hope of getting a call back.  The

19  call back would be, yes, Mr. Acampora, I know you called,

20  you left your name, and I know what your needs are.  You're

21  in.  I've got your table for four at 8:00 o'clock.  So

22  that's what's going on here.

23  Q.  And is that the kind of information the Passas base

24  station uses to schedule packets in the uplink direction?

25  A.  Yes, that's what the -- that's what the site says.

```
 1   Q.  Okay.  So -- and -- and the reservation request and the
 2   contents of packets, those are used to allocate the
 3   bandwidth in Passas?
 4   A.  Yes.  That's what's used to allocate the bandwidth in
 5   Passas, exactly.
 6   Q.  Okay.  What about the last two steps?
 7   A.  Okay.  So the assigning step.  So assigning steps in a
 8   slot to one access station and communicating the assigned
 9   slots to at least one access station in a reservation
10   request acknowledgement section of a frame.  I said we
11   would talk about the frame header, and now we will.
12        So the frame header is actually telling each
13   mobile -- actually two things.  It's telling the mobile
14   whether it has any slot assigned in the downlink direction
15   that it should listen to, and also it's telling the mobile
16   station whether and if so, which time slot has been
17   assigned to that mobile station to communicate in the
18   uplink direction.  All that information is contained
19   mobile-by-mobile in the frame header period of the frame.
20   So that's what goes first.
21        The frame header is sent.  The mobiles now know
22   which slots, if any, in the downlink direction they
23   should listen to and which slots, if any, they should
24   transmit in in the uplink direction if they've been given
25   the grant.  That information is in the frame header, and
```

1    Passas tells us that frame construction.  What's carried in

2    the frame header is the position of the slots allocated to

3    each downlink and uplink direction, each mobile in the

4    downlink direction, each mobile in the uplink direction.

5            So D and E are both disclosed in Passas.

6    Q.  Okay.  Does that cover each and every element of Claim

7    1 of the '517 patent?

8    A.  It does.

9    Q.  Are all of these concepts in Passas?

10   A.  They are.

11   Q.  And if they're not in Passas, it would be obvious in

12   view of what someone would know about ATM cells?

13   A.  That's correct.  So it would be obvious to use -- well,

14   Passas tells us ATM, so what Sriram is telling us would

15   have been known to a person of skill, but you could always

16   look at Sriram to see.  It would be obvious in Passas that

17   a mobile station could be CPE.  And if not, then look at

18   the Lin reference.

19   Q.  And just for the record, the Passas article is DX-95?

20   A.  It is.

21           THE COURT:  Approach the bench, counsel.

22           (Bench conference.)

23           THE COURT:  How much more do you have?  We've been

24   over two hours.

25           MR. BECKER:  Five minutes.

1          THE COURT:  Five minutes you'll be done?

2          MR. BECKER:  Yes, sir.

3          THE COURT:  Let's finish up.

4          (Bench conference concluded.)

5          THE COURT:  Please continue.

6    Q.  (By Mr. Becker)  Do you have any opinions with respect

7    to Claim 4?

8    A.  I do.  I believe that it's anticipated and obvious in

9    light of Passas.

10   Q.  And before we go there, just to clarify the record, the

11   Lin patent, is that -- I'm sorry, I'll -- I'll do it at the

12   end.

13          Can you give us your opinions about Claim 4?

14   A.  Yes.  As I said, I believe Claim 4 is anticipated and

15   rendered obvious.

16   Q.  And what is required by Claim 4?

17   A.  Claim 4 requires that at least one of other subscriber

18   attribute comprises a quality of service classification.

19   Q.  Is that in Passas?

20   A.  It is.

21   Q.  Can you please explain?

22   A.  Yeah.  So Table 1 is, again, taken from Passas.  I

23   didn't even color this.  And it's telling us different

24   priority numbers and the different service classes.

25          So the virtual connection number would map to one

1    of these quality of service -- one of these priority

2    numbers, a specific quality of service class.

3           So this limitation is in Passas.  The other

4    subscriber attribute is the quality of service that it

5    need -- that it needs.  That's carried in the virtual

6    connection number.

7    Q.  Okay.  And just as a final summary, what are your

8    opinions with respect to the '517 patent?

9    A.  Claims 1 and 4, the -- the asserted claims are invalid

10   in view of the Passas article.

11   Q.  And one -- one final thing before I pass the witness

12   and then I'd like to also clarify the record with respect

13   to one exhibit, but one final thing, are you aware of a

14   concept called secondary considerations?

15   A.  I am.

16   Q.  And what does that mean?

17   A.  So as it was explained to me in my legal guidelines, a

18   patentholder could challenge the claim of obviousness.  The

19   patentholder can say, well, no, it wasn't obvious and there

20   are conclusive reasons why.  But here, as I understand it,

21   it's the patentholder's burden to prove that there was some

22   of these secondary considerations.

23          No -- was there industrial praise, long-felt need,

24   some commercial success, any commercial acquiescence?  And

25   I considered these, and in my opinion, none of these are

```
 1  present.
 2  Q.  And with respect to that last one, commercial
 3  acquiescence, is there any evidence that AT&T or Verizon
 4  took a license to these patents because of these patents?
 5  A.  No, I've heard about licenses that IV has made to AT&T
 6  and Verizon, but as I understand these secondary
 7  considerations, there must be a nexus.  The patentholder
 8  would have to show that it was -- as an example, industrial
 9  praise based on this patent.
10          I saw there were commercial licenses, but I
11  haven't seen any evidence that those licenses were tied to
12  these -- to these patents.  They were broad licenses.
13  Q.  Thank you.  Could you -- could you turn to DX-42 in
14  your -- in your notebook, please?
15  A.  I'm there.
16  Q.  Is that the Lin patent that you were discussing earlier
17  with respect to CPE stations?
18  A.  Yes, it is.
19          MR. BECKER:  Okay.  Pass the witness.
20          THE COURT:  All right.  Ladies and gentlemen,
21  we're going to break for the evening at this point.  We'll
22  pick up with cross-examination of the witness by Plaintiff
23  in the morning.
24          Please leave your notebooks closed and on the jury
25  room table.
```

1          Please follow all my instructions, of course, not

2    to talk with anyone about the case.  You would expect me to

3    remind you of that.  Please be back tomorrow morning at the

4    same time as you were the last couple of days, assembled

5    and ready to go around 8:30.

6          Travel safely.  Have a good night, and you're

7    excused for the evening at this time.

8          COURT SECURITY OFFICER:  All rise.

9          (Jury out.)

10         THE COURT:  Be seated, please.

11         Dr. Acampora -- Acampora, you may leave the

12   witness stand.

13         THE WITNESS:  Thank you, Your Honor.

14         THE COURT:  We'll have you back in the morning.

15         THE WITNESS:  Yes, sir.

16         THE COURT:  All right.  Are there any issues with

17   either Plaintiff or Defendant before we recess for the

18   evening?

19         MR. BLACK:  No, Your Honor, not from Plaintiff.

20         MR. KUBEHL:  No, Your Honor.

21         THE COURT:  All right.  Let me give you an update

22   on your time, just for your information.  We've used 7

23   hours and 48 minutes on the record today.

24         Plaintiff has a total 4 hours and 40 minutes

25   remaining.

1          Defendant has a total of 3 hours and 21 minutes

2    remaining.

3          I will be in chambers by 7:30, if there are issues

4    to take up that are not able to be resolved by candid and

5    strenuous effort to meet and confer overnight.

6          And, again, I remind you to be ready to read into

7    the record the items from the list of pre-admitted exhibits

8    that have been used during today's portion of the trial

9    before I bring the jury in in the morning.

10         Without anything further, we stand in recess until

11   tomorrow morning.

12         COURT SECURITY OFFICER:  All rise.

13         (Recess.)

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


     I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.



 /S/ Shelly Holmes                              2/6/19
SHELLY HOLMES, CSR, TCRR                         Date
OFFICIAL REPORTER
State of Texas No.: 7804
Expiration Date: 12/31/20