```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF TEXAS

3                      MARSHALL DIVISION

4    INTELLECTUAL VENTURES I LLC,  )(

5         PLAINTIFF                 )(    CIVIL ACTION NO.

6    VS.                           )(    2:17-CV-577-JRG

7                                   )(    MARSHALL, TEXAS

8    T-MOBILE USA, INC., T-MOBILE  )(

9    US, INC., ERICSSON INC., AND  )(

10   TELEFONAKTIEBOLAGET LM         )(

11   ERICSSON,                     )(    FEBRUARY 7, 2019

12        DEFENDANTS               )(    8:28  A.M.
```

13                  TRANSCRIPT OF JURY TRIAL

14        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

15           UNITED STATES CHIEF DISTRICT JUDGE

```
16   APPEARANCES:

17   FOR THE PLAINTIFF:      Mr. T. John Ward, Jr.
                             Ms. Claire A. Henry
18                           Ms. Andrea L. Fair
                             Mr. Wesley Hill
19                           WARD, SMITH & HILL, PLLC
                             1507 Bill Owens Parkway
20                           Longview, Texas 75604

21   COURT REPORTER:         Ms. Shelly Holmes, CSR, TCRR
                             Official Reporter
22                           United States District Court
                             Eastern District of Texas
23                           Marshall Division
                             100 E. Houston Street
24                           Marshall, Texas 75670

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

```
 1   FOR THE PLAINTIFF:        Mr. Martin J. Black
                               Mr. Kevin M. Flannery
 2                             DECHERT LLP
                               Cira Centre
 3                             2929 Arch Street
                               Philadelphia, Pennsylvania 19104
 4
                               Mr. Joseph M. Abraham
 5                             Mr. Timothy F. Dewberry
                               Mr. Joshua J. Yi
 6                             Mr. Jacob R. Porter
                               DECHERT LLP
 7                             300 West Sixth Street
                               Suite 2010
 8                             Austin, Texas 78701

 9                             Ms. Nisha N. Patel
                               Mr. Ryan T. Banks
10                             DECHERT LLP
                               2440 W. El Camino Real
11                             Suite 700
                               Mountain View, California 94040
12
13   FOR THE DEFENDANTS:       Mr. Douglas M. Kubehl
                               Mr. Jonathan B. Rubenstein
14                             Mr. Jeffery S. Becker
                               BAKER BOTTS LLP
15                             2001 Ross Avenue
                               Dallas, Texas 75201
16
                               Ms. Melissa R. Smith
17                             GILLAM & SMITH LLP
                               303 South Washington Avenue
18                             Marshall, Texas 75670

19                             Mr. Asim M. Bhansali
                               KWUN BHANSALI LAZARUS LLP
20                             555 Montgomery Street
                               Suite 750
21                             San Francisco, California 94111

22

23

24

25
```

```
 1              (Jury out.)

 2              COURT SECURITY OFFICER:  All rise.

 3              THE COURT:  Be seated, please.

 4              Are the parties prepared to read into the record

 5    the items from the list of pre-admitted exhibits used during

 6    yesterday's portion of the trial?

 7              MS. HENRY:  Yes, Your Honor.

 8              THE COURT:  Please proceed.

 9              MS. HENRY:  My list is a lot shorter today.  PX-29

10    and PTX-1469.

11              THE COURT:  All right.  Do Defendants have any

12    objection to that rendition by Plaintiff?

13              MS. SMITH:  No, Your Honor.

14              THE COURT:  Do Defendants have a similar rendition?

15              MS. SMITH:  Slightly longer, Your Honor.

16              THE COURT:  Please proceed.

17              MS. SMITH:  Thank you.

18              DX-1, DX-2, DX-3, DX-6, DX-18, DX-42, DX-49, DX-52,

19    DX-86, DX-95, DX-137, DX-159, DX-214, DX-236, DX-250,

20    DX-277, DX-282, PTX-3, and PTX-1014.

21              THE COURT:  All right.  Any objection from

22    Plaintiff?

23              MS. HENRY:  No, Your Honor.

24              THE COURT:  All right.  Thank you, counsel.

25              Are there any other matters we need to take up
```

1    before we bring in the jury, counsel?

2            MR. BLACK:  No, Your Honor.

3            THE COURT:  Anything from Defendants?

4            MS. SMITH:  No, Your Honor.

5            THE COURT:  All right.  Do we have Dr. Acampora in

6    the courtroom?

7            If you'll return to the witness stand, sir.  And I

8    remind you, you remain under oath.

9            And, Mr. Black, if you're going to cross, you may

10   go to the podium.

11           MR. BLACK:  Thank you, Your Honor.

12           THE COURT:  Let's bring in the jury, Mr. Johnston.

13           COURT SECURITY OFFICER:  All rise.

14           (Jury in.)

15           THE COURT:  Good morning, members of the jury.

16   Please have a seat.

17           We'll continue with the examination of Dr. Tony

18   Acampora, and Plaintiffs will proceed with cross-examination

19   of the witness.

20           Mr. Black, you may proceed.

21           MR. BLACK:  Thank you, Your Honor.

22    ANTHONY ACAMPORA, Ph.D., DEFENDANTS' WITNESS, PREVIOUSLY

23                    SWORN CROSS-EXAMINATION

24   BY BLACK:

25   Q.  Dr. Acampora, good morning.

1   A.  Good morning.

2   Q.  Let's get right to the heart of it.  You've come here

3   today to kill Dr. Jorgensen's patents; isn't that right?

4   A.  I came to offer opinions concerning the validity of

5   Dr. Jorgensen's patents.

6   Q.  And if the jury accepts your opinions and finds in favor

7   of the Defendants, there will be a federal court judgment

8   stating that these patents are invalid for all time; isn't

9   that right?

10  A.  That's correct.

11  Q.  Now, the burden is on the Defendants here, right?

12  A.  That's my understanding.

13  Q.  And the burden is by clear and convincing evidence,

14  right?

15  A.  That also is my understanding.

16  Q.  And there's two parts to that, right?  There's clear and

17  convincing, right?

18  A.  Yes.

19  Q.  So if the jury were to conclude that the presentation

20  that you did yesterday was not clear to them, they can stop

21  right there and check the box for validity on the jury

22  verdict form; isn't that right?

23  A.  No.  That's the jury's decision to make.  I'm not about

24  to tell them how to make that.

25  Q.  Well, you would agree, wouldn't you, that all issued

1    patents are accorded a presumption of validity based on the

2    presumption that the United States Patent and Trademark

3    Office acted correctly in issuing the patent.

4         You agree with that, don't you?

5    A.   That is my understanding, yes.

6    Q.   Okay.  Now, you're an expert in this case.  There's no

7    ambiguity about whether you're an expert or a fact witness,

8    right?

9    A.   Correct.

10   Q.   And your rate is $725.00 an hour.

11   A.   That's correct.

12   Q.   And you've expended something on the order of 250 to 300

13   hours so far on this case, right?

14   A.   That's correct.

15   Q.   So we have somewhere in the neighborhood of $200,000.00

16   for you and something in the neighborhood of $2,000.00 [sic]

17   for Dr. Wicker, who we heard from yesterday, so there's over

18   $400,000.00 that's been spent on the two of you alone in

19   preparing expert reports in this case.

20             THE COURT:  Slow down, Mr. Black, please.

21             MR. BLACK:  Yes, Your Honor.

22             THE COURT:  Please slow down.

23   A.   Can you repeat the question, please?

24   Q.   (By Mr. Black)  You spent over $200,000.00 of time on

25   this case so far, correct?

1    A.   Correct.

2    Q.   And we heard --

3    A.   Approximately 200,000.

4    Q.   And we've heard from Dr. Wicker that he spent over

5    $200,000.00 of time on the case, correct?

6    A.   Correct.

7    Q.   And that means that over $400,000.00 has been expended

8    by the Defendants simply in preparing the expert reports in

9    this case, correct?

10   A.   That's correct.

11   Q.   Now, it would be crazy to pay all that money if there

12   were no potential damages here; is that right?

13   A.   You'd have to ask the Defendants.

14   Q.   Let's talk about your report.   Yesterday, I held up

15   Dr. Wicker's report.   Do you remember that?

16   A.   I did.

17   Q.   It was about this thick.   Do you remember?

18   A.   Yes.

19   Q.   This is your report.   We had to put it in two binders;

20   is that right?

21   A.   Even thicker, yes.

22   Q.   Your report is 959 pages, correct?

23   A.   Yes.

24   Q.   3,498 individual paragraphs, correct?

25   A.   Correct.

1  Q.  Plus attachments, right?

2  A.  Correct.

3  Q.  Including the prior work that you've done in other cases

4  and other things like the materials that you considered,

5  correct?

6  A.  And my CV, yes.

7  Q.  And your CV.

8        How much time did you spend just in the

9  report-writing process?

10 A.  Can I ask a clarification on that?

11 Q.  Well --

12       THE COURT:  Tell him you either -- tell him you

13 don't understand the question, if you don't understand the

14 question.

15 A.  I don't understand the question.

16 Q.  (By Mr. Black)  Of the 250 hours that you spent,

17 excluding the time preparing for depositions from -- for

18 your testimony here, how many hours did you spend in the

19 process?

20 A.  As I understand the question, probably on the order of

21 approximately 150 hours.

22 Q.  Okay.  150 hours, 959 pages, that's 6 pages an hour,

23 right?

24 A.  Right.

25 Q.  And this report is pretty dense.  It's single spaced.

```
1   Lots of technical material in there, right?
2   A.  That is correct.
3   Q.  Now, your report-writing process does not involve you
4   doing the typing of your report on your own, correct?
5   A.  Partially.
6   Q.  You receive a report from the lawyers that you're
7   working with and then you edit it, correct?
8   A.  Partially.
9   Q.  You did not type all of your report, correct?
10  A.  That's correct.
11  Q.  Your report was prepared based on numerous telephone
12  calls in which you expressed what your opinions were, and
13  you asked someone -- you're not sure who that was -- to
14  capture as best they could the opinions -- what your
15  opinions were because you don't type very well, right?
16  A.  If I excise out the technical tutorial and the legal
17  guidelines, that's essentially correct.
18  Q.  And how much of the 959 pages would fall in that
19  category that you just mentioned?
20  A.  Oh, the majority of them for sure, but even there, as
21  part of the editing process, I could not tell you how much
22  of that I actually typed.
23  Q.  You asked someone to prepare a draft for you based on
24  your discussions, correct?
25  A.  That is correct.
```

1  Q.  Who?

2  A.  I asked attorneys at Baker and Botts.

3  Q.  So you worked closely with the attorneys in preparing

4  your report, correct?

5  A.  I expressed my opinions to them and asked them to

6  take -- to make an effort to capture my ideas in the report,

7  which I would then heavily edit, which I did, because, in

8  many cases, they didn't quite capture the thought that I had

9  expressed.

10 Q.  So someone at Baker Botts wrote almost all of the

11 959-page report, and then you edited it, right?

12 A.  Again, not quite.  Some of those -- some of that

13 material I wrote myself, first draft, and some of that

14 material was actually given to me that I didn't edit at all,

15 the legal guidelines.

16       For the rest of the report, by and large, your

17 characterization is correct.  Somebody else typed the first

18 draft, which I then heavily edited.

19 Q.  There are a lot of words and paragraphs and full

20 sentences in the report, which will have been written by

21 Baker Botts, but, of course, you read them and affirmed that

22 you agreed with them and signed the report, correct?

23 A.  No.  I edited them -- I have no -- there was some

24 sentences that did not require editing, if that's what

25 you're asking --

1    Q.   Yes.

2    A.   -- which I did read and eventually signed.  And this

3    didn't happen once.  This went through several iterations.

4    Q.   So it wasn't like you were getting on the phone and

5    dictating to someone on other end of the line, here are my

6    opinions, because it would take a quite a lot of time to

7    dictate 8- or 900 pages over the phone, wouldn't it?

8    A.   It wasn't dictation of something that I composed asking

9    for somebody to merely type.  I expressed my opinions, and

10   then I asked somebody to try to capture those opinions.

11   I did not dictate.

12   Q.   So you expressed your general opinions, and then someone

13   fleshed out the details, sent you hundreds of pages of

14   materials, which you then edited and signed your name to,

15   correct?

16   A.   No.

17   Q.   You signed your -- you signed the report, right?

18   A.   Eventually.

19   Q.   And when you gave your opinions, were they as detailed

20   as what you got back in the report, or was there additional

21   information in the report that you had not expressed in your

22   phone calls?

23   A.   Well, again, we -- excluding tutorial materials and

24   legal guidelines?

25   Q.   Yes.  The bulk of the report, the opinions in this case

```
 1  that you're -- that you are providing to try to kill
 2  Dr. Jorgensen's patents.
 3  A.  Well, the -- the opinions that I expressed in the report
 4  are my own.  You were asking, I think, about the level of
 5  detail of the conversations.  They were quite detailed.
 6  Q.  But they didn't include everything in the 900 pages of
 7  opinions in this report, correct?
 8  A.  Well, as part of the editing process, I believe I added
 9  some material, if that's what you're asking me.
10  Q.  It's normal in patent litigation for the lawyers to
11  coordinate closely with experts in drafting the report,
12  isn't it?
13  A.  I don't know if it's normal.  Many, if not most of them
14  that I've been involved in, that has been the case.
15  Q.  Well, in your case, you provided your general opinions
16  to the lawyers, who send you back the report with a fully
17  fleshed out written document, right?
18  A.  They were more than general opinions.  They were quite
19  specific opinions.
20  Q.  Specific opinions, but how long -- how long do you
21  suppose it would take to read all of this over the phone?
22  A.  I'm not sure I understand the question.
23  Q.  Well, it's not like you took -- you had a series of
24  phone calls where you told them all of your opinions in
25  here.  This is so detailed.  That's not possible, is it?
```

1  A.  Well, I didn't -- I didn't read from the script over the

2  phone.  We had discussions where I was explaining the prior

3  art to them, expressing where I believe the limitations were

4  found, expressing in detail what my opinions were concerning

5  a particular reference, and then somebody tried to capture

6  those lengthy phone calls in a manuscript.

7          I then received that manuscript and spent a couple

8  of days editing it.  It went back -- went back, was heavily

9  redlined, change this, change this, change this.  I got a

10  second draft, I went through that in detail, and this

11  process continued several times.

12  Q.  But in any case, you certainly don't believe there's

13  anything wrong in sharing drafts with the lawyers and making

14  comments in the editing process you just described, right?

15  A.  I don't see anything wrong with that.

16  Q.  And it will be wrong for anyone to suggest that an

17  expert for the Plaintiff who was involved in that kind of

18  process had done anything wrong.  Same process you followed,

19  right?

20  A.  Well, I can't comment on that.  I know the process I

21  followed.  I don't believe there's anything wrong.

22  Q.  Okay.

23  A.  I don't know the process that any other witness may have

24  followed.

25  Q.  Now, you know the process well because you've been an

1    expert witness many times, correct?

2    A.  I have been an expert witness many times.  The process

3    is not always the same, but I know the process that I

4    described to you well, yes.

5    Q.  You have 34 cases listed in which you've provided

6    deposition or trial testimony in your report, correct --

7    list in your report?

8    A.  Over the past seven years, that's correct.

9    Q.  34 cases over the last seven years, so it's about five

10   cases a year, right?

11   A.  That's the division, yes, not equally spread out.

12   Q.  Right.  So you're in deposition or trial testifying in

13   patent cases every two and a half months, something like

14   that?

15   A.  On average.

16   Q.  You generally represent Defendants, correct?

17   A.  Not exclusively, but most of the matters that -- listed

18   on that particular part of my CV were on behalf of

19   Defendants, that's correct.

20   Q.  Right.  And when you say the particular part of the CV,

21   that's the section that is required by the rules that you

22   must disclose, the work that you've done for at least the

23   last five years, correct?

24   A.  Yeah, list of prior testimony.  My list happens to go

25   back seven years.

1    Q.   Now, you testified yesterday that the task of

2    considering whether a patent is valid or invalid is not

3    something that you take lightly, correct?

4    A.   That's correct.

5    Q.   You said you wouldn't want your property taken away,

6    you'd want to be sure -- want to make sure that you've done

7    a thorough job before giving an invalidity opinion, right?

8    A.   I'm not sure I said it quite that way, but I -- but

9    some -- something to that effect, yes.

10   Q.   And you agree with that statement, right?

11   A.   Well, except for the use of the word "sure," as in

12   certainty.  I think you asked me earlier, the -- the

13   standard is clear and convincing evidence, not absolute

14   certainty.

15   Q.   Okay.  One of the things that you have to do in making

16   clear to yourself that the patent is invalid is to do a

17   thorough review of the file history, right?

18   A.   Well, I did review the file history, if that's what

19   you're asking.

20   Q.   I'm asking you whether it would be unfair to render an

21   opinion that a patent is invalid without first doing a

22   thorough review of the file history; isn't that right?

23   A.   Yes, at least the portion where there was some dialog

24   between the applicant for the patent and the Patent Office,

25   the so-called Office Actions.  Yes, I would like to -- I

1  would like to know what -- what the nature of that exchange

2  was --

3  Q.  And you'd also --

4  A.  -- what representations the inventor made, what

5  objections the Patent Office made.

6  Q.  And that's -- you'd also want to know what prior art the

7  Patent Office had before it at the time that it issued the

8  patent, right?

9  A.  Well, I'd want to know that, but as I testified

10  yesterday, that's not something that was paramount in my

11  mind because my understanding is I was to render an

12  independent judgment regardless of what the Patent Office

13  might have considered.  If the Patent Office had expressly

14  discussed a particular reference --

15       THE COURT:  Dr. Acampora, you're way past answering

16  the question.  Please wait until you hear the question,

17  answer the question, and limit your answer to the question

18  that's asked.

19       Defense counsel is going to get a chance to ask you

20  additional questions, as you know, after Mr. Black's

21  finished.  So limit your answers to his questions, okay.

22       THE WITNESS:  Yes, Your Honor.

23       THE COURT:  Let's proceed.

24  Q.  (By Mr. Black)  In rendering an invalidity opinion

25  before a jury, to ask a jury to overturn the decision of the

1  Patent Office to grant a United States patent, it is true

2  that it is important for an expert, giving such an opinion,

3  to thoroughly review the file history, correct?

4  A.  I believe that it's important to thoroughly review at

5  least portions of the file history.

6  Q.  And those portions would include the list of prior art

7  that was reviewed by the Patent Office, correct?

8  A.  I believe it's important to review that.

9  Q.  Yes.  And that list is printed right on the face of the

10  patent, correct?

11  A.  It is.

12  Q.  Now, you said that you did a review of the file history

13  of the '629 patent, correct?

14  A.  That's correct.

15  Q.  And in your report, at Paragraph 190, we have the sum

16  total of that analysis?

17          MR. BLACK:  Could we put that up on the screen?

18  That's on Page 66.

19  Q.  (By Mr. Black)  That was your analysis of the

20  prosecution history of the '629 patent, correct?

21  A.  Not completely.

22  Q.  That's all you said in your report, right?

23  A.  Well --

24  Q.  Correct?  Yes or no, Dr. Acampora?

25  A.  No.

1   Q.  Okay.  So your report was not complete?

2   A.  That's not what I said.

3   Q.  The '629 patent is one of the patents on which you've

4   rendered an opinion of invalidity, correct?

5   A.  That's correct.

6        MR. BLACK:  Let's go to the slides.

7   Q.  (By Mr. Black)  Okay.  This is -- this is -- on the '629

8   patent --

9        MR. BLACK:  Actually, I'm sorry, pull out the '629

10  patent.  It's the next slide.  Sorry.  It's the next slide,

11  Slide 4.  Go to Slide 4.

12  Q.  (By Mr. Black)  Okay.  This is the face of the '629

13  patent, correct?

14  A.  That's correct.

15  Q.  And right there on the face of the '629 patent is a

16  reference to Turina, Patent No. 6,031,832, correct?

17  A.  It -- it is, but I'm not sure that the cite that you

18  have enlarged is on the face or on the second page.

19  Q.  This is the section of the references cited, which

20  begins on the first page, flows over to the second page,

21  correct?

22  A.  Yes.  It was an extensive list on the second page.  The

23  cite here is part of that extensive list.

24        MR. BLACK:  Your Honor, move to strike.  It was a

25  yes or no question.

1          THE COURT:  He answered it yes, and that was the

2     complete answer.  The section of his answer beyond "yes,"

3     I'll strike as nonresponsive.

4          Again, Dr. Acampora, please limit your answers to

5     the questions that were asked, all right?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  Let's proceed.

8          MR. BLACK:  Yes, Your Honor.

9     Q.  (By Mr. Black)  Now, in your report you wrote in

10    Paragraph 171 --

11         MR. BLACK:  Let's go to the next slide.

12    Q.  (By Mr. Black)  -- I have reviewed the common

13    specification to all the asserted patents, as well as

14    selected portions of the file history of related patents.

15         Correct?

16    A.  Yes.

17    Q.  And that included the '629 patent, correct?

18    A.  Yes.

19    Q.  And you agree that for rendering an opinion in this case

20    on invalidity, you needed to do a thorough review of the

21    file history, right?

22    A.  Yes.

23         MR. BLACK:  Go to the next slide, please?

24    Q.  (By Mr. Black)  Now, Paragraph 200 of your report, you

25    describe the Turina patent, 6,031,832, correct?

1  A.  Yes.

2  Q.  And you said Turina is prior art because it was filed on

3  November 27th, 1996, correct?

4  A.  Correct.

5  Q.  And then you wrote:  Turina is not art of record during

6  prosecution, so I am not aware of any facts indicating the

7  examiner considered Turina during prosecution.

8          That's what you wrote in your original report,

9  right?

10  A.  Yes, it is.

11  Q.  Turina was right on the second page of the patent in the

12  references cited, correct?

13  A.  That's correct.

14  Q.  Now, on Tuesday of this week in the middle of trial, you

15  provided a supplemental report to us, correct?

16  A.  I did.

17          MR. BLACK:  Next slide, please.

18  Q.  (By Mr. Black)  And what you did is you gave us a

19  new Paragraph 200 where you struck out that provision

20  and now claim that you understand that Turina was

21  considered during prosecution by the Patent Office,

22  correct?

23  A.  That's correct.

24  Q.  Had you thoroughly reviewed the file history, you would

25  have seen that Turina was art of record before the patent

examiner, right?

A.   I did.

Q.   And your report, though, which you gave to us said that you didn't know.

A.   That was an error.

Q.   You made an error about whether the key prior art reference in the case, the only one asserted against the '629 patent as invalidating it, had been known to the Patent Office before they issued the patent, correct?

A.   The mistake is in my report, correct.

Q.   And the only -- and the point that you realized that was in the middle of this trial, right?

A.   Realized what?  I'm not sure -- I don't understand.

Q.   When did you realize that this Paragraph 200 was supposedly mistaken, that you had, in fact, known that Turina was before the office?

A.   Several days ago is when I realized that my report, as originally filed, had a mistake.

Q.   How many days ago?

A.   It was Sunday or Monday.

Q.   And then on Tuesday -- on Tuesday, your lawyers made an emergency supplemental expert report filing with us to -- to -- to correct this supposed error, correct?

A.   I don't know if I would characterize it that way.

Q.   But Tuesday afternoon in the middle of this trial was

1  when we first received this, right?

2  A.  I don't know when you received it, but that's probably

3  right.

4         MR. BLACK:  All right.  Now, let's go to Slide 13.

5  Q.  (By Mr. Black)  We had a lot of discussion yesterday

6  about Forslow.  Do you recall that?

7  A.  I do.

8  Q.  And Forslow was also art of record before the Patent

9  Office with respect to the '206 patent, correct?

10  A.  That's correct.

11  Q.  Now, when the Patent Office reviews art, there's a

12  process for doing that, right?

13  A.  I don't know.

14  Q.  How many file histories have you read?

15  A.  Oh, I've read many file histories.

16  Q.  You don't understand the -- the process for submitting

17  art to the Patent Office to have it reviewed, and the Patent

18  Office reviews the art?

19  A.  I understand the process of submitting art, yes.

20  Q.  Right.  And that's done through what's called an IDS,

21  right?

22  A.  I believe that's what it's known as.

23  Q.  It's an information disclosure statement, correct?

24  A.  Yes.

25  Q.  And what the Patent Office does is it requests -- or

```
 1   actually, the patentee is under an obligation to provide any
 2   prior art that it's aware of to the Patent Office, correct?
 3   A.  I don't know if that's correct.
 4   Q.  Okay.  But you do know that it's common for prior art to
 5   be submitted to the Patent Office, correct?
 6   A.  Yes.  I've submitted patents myself, including the
 7   closest art.
 8   Q.  Right.  And when that happens, the Patent Office keeps a
 9   record of it, and that art then gets printed on the face of
10   the patent, correct?
11   A.  That's my understanding, yes.
12   Q.  So with respect to the '206 patent, there was an
13   information disclosure statement, an IDS, correct?
14   A.  Yes.
15          MR. BLACK:  And I'm going to put up on the ELMO, if
16   I could?
17   Q.  (By Mr. Black)  Sorry.  I just want to point out that
18   the -- the prior art is before the Patent Office.  I'm just
19   establishing it's before the Patent Office.  We're not going
20   to go further into what the examiner may have done or not
21   done, right?
22   A.  Was that a question?
23   Q.  No.  I'm just telling you where -- where we're going
24   here.
25          So this is --
```

```
 1              THE COURT:  Well, it needs to be a question.
 2              MR. BLACK:  I -- I understand, Your Honor.
 3    Q.  (By Mr. Black)  This is an information disclosure
 4    statement, correct?
 5    A.  Yes.
 6    Q.  And this is in the file history for the '206 patent,
 7    correct?
 8    A.  I believe so.
 9    Q.  And right at the top, there's the Forslow reference,
10    right?
11    A.  Yes.
12    Q.  And then what the office does with that is they put the
13    information disclosure statement in the file, correct?
14    A.  Yes.
15    Q.  And it's in the file history for people to review later,
16    like you, right?
17    A.  Yes.
18    Q.  And they make it easy for everybody by printing these
19    numbers on the face of the patent, correct?
20    A.  Well, they appear on the face of the patent.
21    Q.  Right.  And both Forslow and Turina appear on the face
22    of the patents which you are asserting should be
23    invalidated, correct?
24    A.  I don't understand the question.
25    Q.  Both Turina and Forslow, the two references that
```

1  yesterday you said should invalidate the patents-in-suit,

2  were printed on the face or the second page of the patents

3  that Dr. Jorgensen obtained which you are now opining are

4  invalid, correct?

5  A.  Well, I recall Forslow on the face of the '206 and

6  Turina on the face of the '629, if that's what you're

7  asking.

8  Q.  Right.  Two out of the three patents you're asserting

9  are invalid, you're asserting that they are invalid over art

10  that is referenced on the face of the second page of the

11  patent, right?

12  A.  That's correct.

13  Q.  Okay.  You said that the error on the '629 patent with

14  respect to Turina was a cut-and-paste error; is that right?

15  A.  I don't know how the mistake was made.  It may have

16  been -- it may have been a cut-and-paste error.

17  Q.  Was it your cut-and-paste or someone else's

18  cut-and-paste?

19  A.  I don't know.

20  Q.  Well, you said cut and paste yesterday.  What -- what

21  was cut and paste?

22  A.  Can I explain?

23  Q.  On redirect, you can explain.

24         Do you think that it was your error, or do you

25  think that it was the lawyers who provided the content of

```
 1  the report to you who made the error?

 2  A.  I don't know.

 3  Q.  Okay.  Do you know who Mr. Turina is?

 4  A.  The inventor of the '629 patent.

 5  Q.  He's an employee of -- of Ericsson, right?

 6  A.  I don't know that today.  At the time, perhaps.

 7  Q.  Did you hear the testimony the other day about

 8  Mr. Turina?

 9  A.  I recall the Turina patent came up for discussion.

10  Q.  Okay.  Do you -- do you know one way or the other

11  whether Mr. Turina is at Ericsson now?

12  A.  I don't know.

13  Q.  He was identified as the inventor on the face of the

14  patent, and the patent was assigned to Ericsson, correct?

15  A.  That's correct.

16  Q.  So at least as of the time that the patent issued, he

17  was at Ericsson.

18  A.  It would appear to be the case.

19  Q.  Okay.  Have you made any attempts to contact him or

20  determine whether he was available to discuss his inventions

21  and work at Ericsson?

22  A.  No.

23  Q.  The Forslow reference has a filing date of May 29th,

24  1998, correct?

25  A.  That sounds right.
```

1  Q.  He was also a -- an Ericsson employee, at least at the

2  time that he did the work involved in the patent, correct?

3  A.  So it would appear.

4  Q.  Did you make any attempt to contact him about his

5  work --

6  A.  No.

7  Q.  -- for Ericsson?

8          May 29th, 1998, is shortly before -- about six

9  weeks before the filing of the first provisional application

10  by Dr. Jorgensen, right?

11  A.  Well, it was approximately six weeks before the priority

12  date of the -- what patent were you asking about?

13  Q.  I'm asking about Forslow.

14  A.  Yes.  So it was six weeks prior to the filing date --

15  the priority date of the -- I believe it was in the '206

16  patent.  I don't have the timeline in front of me.

17  Q.  Now, Forslow, you described as a 2.5G technology, I

18  believe?

19  A.  That's not what I -- that was not my testimony.

20  Q.  You referred to 2.5G yesterday, correct?

21  A.  GPRS is a 2.5G technology.

22  Q.  Right.  2G was just the voice technology, right?

23  A.  2G was intended primarily for plain old circuit switch

24  telephony.

25  Q.  Right.  Circuit switch not -- not packet switch, right?

1   A.  That's correct.

2   Q.  And then between 2G and 3G, they tried to add and did

3   add the first data service, which was called GPRS, right?

4   A.  That is correct.

5   Q.  And people commonly call that 2.5G, right?

6   A.  Some call it 2G, some call it 2.5G.

7   Q.  You had a diagram up yesterday of Forslow.  It looked

8   like this.  Remember that?

9   A.  I do.

10  Q.  And that's from Figure 11 of Forslow, right?

11  A.  As I annotated it, yes.

12  Q.  Right.  And under Figure 11, there's a couple of words

13  there, BSS, left paren, BSC-BTS's, right paren.  Do you see

14  that?

15  A.  Correct.

16  Q.  You called that a box yesterday, I think, right?

17  A.  I may have, but I would accept that as being a box, yes.

18  Q.  You didn't mean to imply that that was a single thing, a

19  box like the little base station that somebody put on the

20  table over here a couple times during the trial, right?

21  A.  That's correct.

22  Q.  Because a BSC and a BTS is a network, isn't it?

23  A.  It's the base station system, BSS.

24  Q.  And it consists of a base station controller, correct?

25  A.  The base station controller is part of the base station

1    system, correct?

2    Q.  Plus a large number of base stations usually, correct?

3    A.  No, not correct.

4    Q.  The base station controller controls numerous base

5    stations, right?

6    A.  Numerous base transceiver systems, the -- the towers

7    with different radios.

8    Q.  Do people call BTS's base stations?

9    A.  No.  The base station consists of the base transceiver

10   system, the radio equipment, and the antenna, plus the base

11   station controller.  Those are part of the base station.

12   Q.  How many BTS's does a base station controller control?

13   A.  I don't know the maximum, but the minimum is 1.

14   Q.  And the maximum is several hundred, if not 512, correct?

15   A.  I don't know if that's the case.

16   Q.  The typical configuration would be a base station

17   controller and dozens or even hundreds of base stations that

18   are controlled by it, correct?

19   A.  That might be the case.

20   Q.  How many base station controllers do you suppose there

21   are in the state of Texas -- not now -- let me rephrase.

22          During the 2G era, how many base station

23   controllers do you suppose there were in the state of Texas

24   for AT&T?

25   A.  I don't know if 2G -- if -- if GSM was even deployed in

1   the state of Texas.  There were two second generation

2   standards.

3   Q.  Let's assume for the sake of argument that 2G was

4   deployed in the state of Texas.  How many base station

5   controllers would you have expected to see covering the

6   state?

7   A.  I don't understand the question.

8   Q.  If someone wanted to implement 2G in the state of Texas

9   to provide 2G telephony, mobile telephony to customers, how

10  many base station controllers would they have to use?

11  A.  I don't understand the question.

12  Q.  A base station controller controls base stations, right?

13  A.  No.  A base station controller is a part of the base

14  station.

15  Q.  How many BTS's would it take to cover the state of Texas

16  in the 2G era?

17  A.  I don't understand that question.

18  Q.  What's the thing in 2G that communicates wireless voice

19  to the phone?

20  A.  The base station.

21  Q.  And is that different from the BTS?

22  A.  In GSM, the base -- the BTS is a part of the base

23  station system.  That's true in GSM.

24  Q.  In a 2G system, how many base stations would you need to

25  cover the state of Texas, 1, 5, 10, a hundred, 500?  You're

1  an expert.  What's your estimate?

2  A.  Which 2G system?

3  Q.  You pick one.  I tell you what, how about the one in the

4  Forslow patent?

5  A.  The GSM system?  I don't know.

6  Q.  Do you suppose it's more than one?

7  A.  I don't know.

8  Q.  You don't know whether you could cover the whole state

9  of Texas with one cell tower and base station?

10  A.  I don't know if GSM was deployed in Texas.

11  Q.  I'm asking you, let's say you were going to deploy a 2G

12  system according to Forslow in the state of Texas.  How many

13  base stations would it require?

14  A.  I don't know.

15  Q.  And -- more than a hundred, right?

16  A.  Towers?

17  Q.  Base stations.

18  A.  I don't -- I don't know.

19  Q.  You can't say whether it's more or less than a hundred

20  base stations to cover Texas?

21  A.  I don't know.

22         MR. BLACK:  Let's take a look at Slide 17.

23  Q.  (By Mr. Black)  This is a diagram from the patent,

24  right?

25  A.  Figure 2 from Forslow, that's correct.

1    Q.  And you produced a demonstrative with this diagram

2    during the course of preparing your testimony, correct?

3    A.  That's correct.

4    Q.  And you showed this to the jury yesterday, right?

5    A.  I did.

6              MR. BLACK:  Can we go back one slide, please?

7    Q.  (By Mr. Black)  Now, we've just cut off the -- some

8    things at the bottom, and I just want to confirm.  This is

9    the configuration that the patent described as being in the

10   prior art, right?

11   A.  That's correct.

12   Q.  And on the right, we have the PSTN, correct?

13   A.  Yes.

14   Q.  And that's the public switch telephone network, right?

15   A.  That's correct.

16   Q.  That's circuit switch, not packet switch, correct?

17   A.  That is correct.

18   Q.  And that is connected to an MSC.  Do you see that?

19   A.  I do.

20   Q.  And the MSC is connected to a BSC, correct?

21   A.  That's correct.

22   Q.  And the BSC is connected to five base stations, right?

23   A.  Base transceiver systems.

24   Q.  It says BS.  You don't think that's a base station?

25   A.  That's a base transceiver system.

```
 1   Q.  Also known as a base station?

 2   A.  No.  The combination BSC/BS -- BTS is known as a base

 3   station system.

 4   Q.  Just the cells that say -- I just want -- we have a box

 5   that says BSC on it, right?

 6   A.  We do.

 7   Q.  And then we have one, two, three, four, five things that

 8   look like cells, correct?

 9   A.  That's correct.

10   Q.  And each one of those cells has the word "BS" in it?

11   A.  That's correct.

12   Q.  Is it your testimony that BS doesn't mean base station?

13   A.  That's a base transceiver system, as we saw from the

14   prior slide that you showed me.

15   Q.  And -- and your testimony is that's not -- that wasn't

16   commonly referred to as the base station?

17   A.  That was the base transceiver system --

18   Q.  Okay.

19   A.  -- in -- in GSM.

20   Q.  They -- they left the T off the diagram.  I guess

21   they made an error there; is that right?

22   A.  Oh, I don't know why Forslow did that.  I'm not about to

23   comment on whether he made a mistake.

24   Q.  Okay.  So the BSC is shown here connecting to five

25   different BTS's, cell towers, right?
```

1  A.  Yes.

2  Q.  So the BSC is controlling in this example five cell

3  towers, correct?

4  A.  In this example, yes.

5  Q.  And these cell towers obviously are not right next to

6  each other, right?

7  A.  That's true.

8  Q.  How many cells do you suppose it would have taken to

9  cover the entire State of Texas during this time frame?

10  A.  Several thousand.

11  Q.  Several thousand.

12  A.  Maybe more --

13  Q.  And --

14  A.  -- to cover the entire state.

15  Q.  Several thousand.

16        And each one would have to be connected to a base

17  station controller to operate, correct?

18  A.  The cell is the footprint of the base transceiver

19  system.

20  Q.  If you wanted to --

21        THE COURT:  Gentlemen.  Gentlemen, one at a time,

22  please.  Be sure that the other one is finished before you

23  talk further.

24        Ask the next question, Mr. Black.

25  Q.  (By Mr. Black)  If you wanted to cover the State of

```
 1    Texas, it would have -- you would have needed several
 2    thousand cells and, therefore, several thousand cell towers,
 3    correct?
 4    A.  That's correct.
 5    Q.  And each of those cell towers would have needed to have
 6    a connection to a base station controller, correct?
 7    A.  One or more base station controllers.
 8    Q.  Right.  And the number of base station controllers is
 9    much smaller than the number of cell towers, correct?
10    A.  Well, smaller than.  I don't know much smaller than.
11    Q.  Well, isn't it true that the typical configuration for
12    something -- for a network like this, as shown in this
13    diagram, would have been to have one or two BSC's in Dallas,
14    one or two BSC's in Houston, at most?  Wouldn't you be able
15    to cover the entire State of Texas with all those thousands
16    of BS -- BTS's with three, four, five BSC's, right?
17    A.  Assuming that GSM even was deployed, then there would
18    have been some number of BSC's in Dallas.
19    Q.  How many would it have taken to cover the whole state in
20    our example you've given with several thousand BS [sic]
21    cells?
22    A.  I'm not sure I understand the question, but I can try if
23    you'd like.
24    Q.  I just --
25              THE COURT:  Either answer the question because you
```

1  understand it, or tell counsel you don't understand the

2  question.  If you're going to give an answer to the jury,

3  they're entitled to presume you understood the question, all

4  right?

5          THE WITNESS:  Yes, sir.

6  A.  I don't understand the question.

7  Q.  (By Mr. Black)  We have an exemplary network according

8  to the prior art shown in Forslow, Figure 2, correct?

9  A.  Yes.

10 Q.  It shows a BSC, correct?

11 A.  Yes.

12 Q.  And multiple BSs [sic] which are associated with cells,

13 correct?

14 A.  Base transceiver systems, yes.

15 Q.  The number of cells necessary to cover the entire State

16 of Texas, as you said, would have been several thousands,

17 correct?

18 A.  That's correct.

19 Q.  You would only have needed a handful of BSC's to control

20 all those base stations, right?

21 A.  I don't know.

22 Q.  The network is centralized so that you would have a BSC

23 in Dallas, which would control, for instance, a cell tower

24 here in Marshall, correct?

25 A.  It might have been deployed that way if it was deployed.

1    Q.  And also to the west, if you have a base station

2    controller in Dallas, you would have had the base station

3    controller controlling probably several hundred base

4    stations spread out around the geographic area of Texas,

5    right?

6    A.  That's possible.

7    Q.  And yet you told the jury yesterday that --

8           MR. BLACK:  If we go back to the slide.  I'm sorry.

9    Go back to the ELMO.

10   Q.  (By Mr. Black)  -- that this was just a box.

11   A.  In the drawing, correct.

12   Q.  Oh, in the drawing.  It's a box in the drawing, but it

13   actually covers a large part of the State of Texas in

14   reality, correct?

15   A.  Hypothetically speaking, possibly.

16          MR. BLACK:  So Slide 18.

17   Q.  (By Mr. Black)  So possibly speaking, the system that

18   was in that little box that you said was equivalent to the

19   Jorgensen inventions would look like this.

20   A.  Hypothetically speaking, perhaps.

21   Q.  Now, the Jorgensen inventions are focused on an

22   intelligent base station, right?

23   A.  I wouldn't characterize them that way.

24   Q.  You don't think that the inventions we've been hearing

25   about during the trial relate to putting intelligence in the

1   base station to allow it to classify packets of different

2   types and then schedule them over the airwaves?

3   A.   I agree with part of what you just said.

4   Q.   The base station that Dr. Jorgensen described included a

5   classifier, right?

6   A.   Yes.

7   Q.   And the base station that Dr. Jorgensen described

8   includes a scheduler, right?

9   A.   Yes.

10  Q.   And he uses reservation algorithm to schedule traffic so

11  that the different types of traffic can be mixed together

12  and sent out together over the airwaves, correct?

13  A.   Yes.

14  Q.   The intelligence in this system is actually in the base

15  station controller, isn't it?

16  A.   That part of the base station, yes.

17  Q.   I just want to be clear, the intelligence in the Forslow

18  system is in the base station controller, correct?

19  A.   Yes.

20  Q.   All right.   Now, you had two types of testimony

21  yesterday:   Anticipation and obviousness.   Do you remember

22  that?

23  A.   Yes.

24  Q.   And for anticipation, the assertion is that you found

25  all the elements of the claim in a single reference,

1    correct?

2    A.  Yes.

3    Q.  But for obviousness, that means that you have to combine

4    two references to find everything that Dr. Jorgensen

5    invented in the claims, correct?

6    A.  Partially.

7    Q.  Well, for anticipation, the task on invalidity is to

8    make sure, by clear and convincing evidence, that every

9    element in the claim is found in a single piece of art,

10   right?

11   A.  Yes.

12   Q.  So you've got to be -- if you want to show anticipation,

13   you've got to take a look at Forslow, and you've got to say,

14   I see in Forslow everything that's in the claim at issue in

15   the '206 patent, right?

16   A.  Yes.

17   Q.  And you -- you provided that testimony yesterday with

18   respect to a number of claims, that they were anticipated.

19            Everything in the claim was found in Forslow,

20   right?

21   A.  Yes.

22   Q.  But there were a couple of claims where you couldn't

23   find everything in Forslow.  Claim 140, for instance, right?

24   A.  Not true.

25   Q.  You ran an obviousness case against Forslow yesterday,

1    didn't you?

2    A.   Actually two.

3    Q.   Two claims, right.

4    A.   Two obviousness opinions.

5    Q.   Right.   Not an anticipation opinion, though?

6    A.   Correct.

7    Q.   And you didn't render an anticipation claim against

8    Claim 140 because you couldn't find -- even you couldn't

9    find everything in Forslow in Claim 140, right?

10   A.   That's correct.

11   Q.   Right.   I mean, if you could have found everything in

12   Forslow that's in Claim 140, you would have just told the

13   jury that, right?

14   A.   I would have.

15   Q.   Right.   So you -- there was something that was missing

16   from Forslow in Claim 140, right?

17   A.   For the purposes of my anticipation analysis, that's

18   true.

19   Q.   Right.   And so because you couldn't find everything in

20   Forslow that's in Claim 140, you had to combine Forslow with

21   something else, a reference you called Goodman, right?

22   A.   That's partially true.

23   Q.   Well, that was your opinion yesterday that 140 is

24   obvious over a combination of two different references,

25   right?

1   A.   That was one of my obviousness opinions regarding

2   Claim 140.

3   Q.   Okay.  You also felt that Forslow itself would render

4   the '206 patent obvious?  Is that your assertion?

5   A.   I believe that's the case.

6   Q.   You're not sure?

7   A.   No, I believe that's what I -- I testified -- I did

8   testify to that effect.

9   Q.   Yes or no, do you think Forslow was -- renders the

10  entire Jorgensen patent, including 140, obvious?

11  A.   Yes.

12  Q.   Okay.  But you agree that there are elements in

13  Claim 140 which are not found exclusively in Forslow, right?

14  A.   Yes.

15  Q.   And -- and the elements that are missing have to do with

16  what we call the air interface, the communication actually

17  of packets over the air, right?

18  A.   That's not correct.

19  Q.   What element was missing?

20  A.   Can I see the Forslow patent, please?

21  Q.   I'm not sure if we have -- do we have it up there for

22  you?  I'm not sure that we do.  Well, we'll -- we'll move

23  on.

24        MR. BLACK:  Okay.  Thanks.

25  A.   It's on the screen.

1  Q.  (By Mr. Black)  All right.  You don't recall.

2          All right.  Claim 140 -- I'll try to refresh your

3  rec -- Claim 140 of the patent refers to uplink -- the

4  uplink grant process and the reservation.  Do you recall

5  that now?

6  A.  Yeah, that's what I thought it did, but --

7  Q.  Right.

8  A.  -- I wasn't absolutely certain.

9  Q.  So Forslow doesn't explicitly -- Forslow describes

10 packets going to -- from -- from the BSC or the thing we

11 showed in Dallas out to the base stations all over Texas,

12 right?

13 A.  As you've characterized it, right.

14 Q.  Right.  Forslow doesn't actually show what happens to

15 the packets as they go from the base station to the phones,

16 right?

17 A.  That's not correct.

18 Q.  It doesn't describe the uplink grant process through

19 which the base station and the phone coordinate, right?

20 A.  Explicitly, correct.

21 Q.  Right.  And, therefore, you tried to add the Goodman

22 reference into the mix so that you could combine the two,

23 right?

24 A.  Well, I did that.

25 Q.  Yes.  And do you know Goodman, by the way?  You made

1    some comments about him yesterday.

2    A.   I do.   He's a former colleague at Bell Labs.

3    Q.   Okay.   So you took the Forslow reference, which the

4    Patent Office referenced and had in front of it, and you

5    combined it with a reference from a former colleague, and

6    then you said that equals the inventions of Dr. Jorgensen,

7    right?

8    A.   Claim 140.

9    Q.   Now, in the '517 patent, you discussed the CPE, correct?

10   A.   Yes.

11   Q.   And I wasn't clear from the testimony.   And if you

12   could tell us whether you assumed or did not assume that the

13   CPE could include a mobile phone, a tablet, an LTE hotspot,

14   and a notebook computer?   Which of those were CPE's as far

15   as -- part of your opinion?

16   A.   Can you -- can you repeat the question, please?

17   Q.   I -- I will -- I will break it up.   That was a -- that

18   was a long question.

19          You had testimony about CPE's yesterday, right?

20   A.   Yes.

21   Q.   For purposes of your opinions, did you assume or did you

22   not assume that the C -- that a notebook computer located in

23   the home was a CPE?

24   A.   I need to listen to that question one more time.

25   Q.   Yes.   It's a tough one.

```
 1            For purposes of your invalidity --
 2   A.  Yes.
 3            THE COURT:  Mr. Black, you don't need to say it's a
 4   tough one.
 5            MR. BLACK:  I'm sorry, I'm sorry.  I -- I
 6   apologize, Your Honor.
 7            THE COURT:  All right.  You're there to ask
 8   questions, not to testify.  And he's here to answer
 9   questions.
10            So let's proceed on that basis.
11            MR. BLACK:  Understood.
12   Q.  (By Mr. Black)  You testified yesterday about a CPE,
13   right?
14   A.  I did.
15   Q.  You heard the discussion that I had with Dr. Wicker
16   about a CPE, correct?
17   A.  I was here for that.
18   Q.  For purposes -- and you're aware that the same
19   interpretation of the claims has to be used on infringement
20   and invalidity, correct?
21   A.  Yes.
22   Q.  Okay.  Now, did you assume that a CPE would include --
23   or could include a notebook computer with a wireless
24   connection?
25   A.  In my testimony yesterday?
```

1    Q.  Not in your testimony.  Just tell me what you think.  If

2    a notebook computer is at someone's home and it's connected

3    to the -- a wireless system, is it a CPE?

4    A.  As IV has applied the claims, yes.

5    Q.  How about as you have applied the claims?  What is your

6    view, sir?

7    A.  I don't believe so.

8    Q.  You're not sure?

9    A.  As I've applied -- as I've applied the claims?  I -- a

10   proper interpretation of the claims, I don't believe so.

11   Q.  On Passas, you said during your direct examination --

12   I think you said:  Don't be fooled by it because it's an

13   article.

14          Right?

15   A.  Something like that.

16   Q.  And Passas is not, in fact, a patent, correct?

17   A.  Passas is a publication.

18   Q.  And by publication, you mean an eight-page article in an

19   industry journal, right?

20   A.  That's correct.

21          MR. BLACK:  If you'd pull up Slide 22, please.

22   Q.  (By Mr. Black)  So the name of Passas is Quality of

23   Service Oriented Medium Access Control for Wireless ATM

24   Networks, correct?

25   A.  Yes.

1    Q.  And we've referred to it as Passas -- the -- the authors

2    are Nikos Passas, Sarantis Paskalis, and Dimitra -- Dimitra

3    Vali, and Lazaros Merakos at the University of Athens,

4    right?

5    A.  Yes.

6    Q.  And this -- this is an article discussing ongoing

7    research in the area of wireless ATM networks, right?

8    A.  Summarizing research up to that point.

9    Q.  Right.  Were you here for Dr. Jorgensen's testimony that

10   he rejected ATM wireless as solution, that's what led him to

11   the inventions at issue in this case?

12   A.  I heard him say that.

13        MR. BLACK:  Go to the next slide, please.

14   Q.  (By Mr. Black)  Now, this was a -- this wireless ATM was

15   a research project ongoing in Europe, correct?

16   A.  That's correct.

17   Q.  And it was never commercially deployed in the United

18   States, right, as far as you know?

19   A.  That is correct.

20   Q.  In fact, they called it project Magic WAND, right?

21   A.  That's -- that's what it was known as, yes.

22   Q.  And it turned out that Dr. Jorgensen was right, that ATM

23   really was not suited for over-the-air transmission on a

24   commercial scale, correct?

25   A.  I would disagree with that.

1  Q.  Wireless ATM systems were not deployed as far as you

2  know, correct?

3  A.  That's correct.

4  Q.  And you do -- you did know that the name of the project

5  was the Magic WAND, right?

6  A.  Yes.  This was a well-known project.

7          MR. BLACK:  Next slide, please.

8  Q.  (By Mr. Black)  And this is a research -- this is a

9  paper really just describing for folks who read the journal

10 that there are open issues in the development of wireless

11 ATM, right?

12 A.  That's the setup for the Passas article, yes.

13 Q.  And that's true, there were a number of research

14 activities going on at the time, but the Magic WAND

15 hadn't been invented yet, right?

16 A.  I don't know if I would agree with that

17 characterization.  I would not agree with that

18 characterization.

19 Q.  Well, LTE doesn't use the Magic WAND, right?

20 A.  That's correct.

21 Q.  And T-Mobile doesn't use the Magic WAND, right?

22 A.  That's correct.

23 Q.  And Ericsson doesn't use the Magic WAND either, right?

24 A.  To the best of my knowledge, that's correct.

25 Q.  Thank you?

1          MR. BLACK:  Pass the witness.

2          THE COURT:  Is there redirect, Mr. Becker?

3          MR. BECKER:  Yes, Your Honor, briefly.

4          THE COURT:  Let's proceed with the redirect

5   examination.

6          MR. BECKER:  Thank you, Your Honor.

7                    REDIRECT EXAMINATION

8   BY MR. BECKER:

9   Q.  Dr. Acampora, Mr. Black suggested to you that if the

10  jury invalidates the six claims that are at issue here, that

11  that will kill the patent for all time.  Was that true --

12  was that suggestion true?

13  A.  No.

14  Q.  Why not?

15  A.  There were other claims in the patent.

16  Q.  Do you -- can you tell us off the top of your head about

17  how many claims are in the '206 patent?

18  A.  150.

19  Q.  And this is 6 of those 150 -- about 150 claims?

20  A.  That's correct.

21  Q.  Will an invalidity ruling by this jury invalidate the --

22  all of the other claims that are not asserted here?

23  A.  No.

24  Q.  And with respect to the '629 patent, the asserted claims

25  are 1 and 4, right?

1   A.  Correct.

2   Q.  Would an invalidity ruling by this jury invalidate

3   Claims 2 and 3?

4   A.  No.

5   Q.  Same question with the '517.  What -- do you know what

6   the asserted claims are for the '517 patent?

7   A.  Yes, I -- I -- same answer.

8   Q.  Okay.  And it -- it actually -- the '517 patent has more

9   than just the four claims, right?

10  A.  That's what I was hesitating over, yes.

11  Q.  Do you recall about how many claims that one has?

12  A.  I do not.

13  Q.  Is it more than four?

14  A.  It is.

15  Q.  You were asked a couple of questions about base station

16  deployments.  Could you give the jury an overview of what it

17  would take to actually deploy a system of base stations?

18  A.  I'll provide it -- I'll do that at a certain level of

19  detail.

20          When deploying base stations, the -- there are two

21  criteria that need to be satisfied.  Criteria 1, what we

22  call penetration.  The base stations need to be sited in

23  such locations that there would not be significant blockage

24  of the signal.  Otherwise, there's an effect called

25  shadowing.  The phone would drop out, even though you're

1  fairly close to the base station, if you're inside of a

2  building, for example, or the far side of an building.

3         So one needs to site the base stations, determine

4  the locations so that there's reasonable confidence that the

5  area intended to be served will be serviceable by at least

6  one of the base stations.  There won't be any blackout

7  zones.

8         Two, the base stations must be deployed with

9  sufficient density that there's enough capacity to serve the

10  expected demand.  So more base stations, more capacity.

11         So a combination of these two factors go into the

12  process of designing the physical deployment of the base

13  stations.  And that's an art in itself.

14  Q.  Is that something that someone could do just off the top

15  of their head?

16  A.  Oh, no.  There are companies that specialize in this.

17         In fact, I was board advisor back in the day, in

18  the 2G day, to a company that did this.  And at that time,

19  that company had been involved in the rollout of close to a

20  third of the nation's cellular service and international

21  rollouts as well.  That's -- that's not an easy thing to do.

22  Q.  You were asked some questions about Turina, and I think

23  you didn't get a chance to explain what the difference is

24  between a reference that the examiner has expressly

25  discussed and one that's just listed on the face of the

1  patent.

2        Could you explain what that -- what you were trying

3  to say there?

4  A.  Yes.  So when a reference is listed on the face of the

5  patent, there's an acknowledgment by the examiner that the

6  examiner was aware of this and considered it, but no

7  suggestion as to the depth of consideration.

8        As an example, I spent 20 hours reviewing Forslow.

9  I don't know how much time the examiner spent.

10        Now, within the prosecution history, there's very

11  often some dialogue between the examiner and the -- the

12  applicant where a specific reference is discussed.

13        The -- the examiner might say, I think your patent

14  is invalid because of this prior art.  And then the inventor

15  would respond and maybe modify the claims or convince the

16  examiner the examiner is wrong.

17        In such a case, there would be, in my opinion, much

18  more evidence that that particular reference was actually

19  examined by the patent examiner, much more so than -- in my

20  opinion, than it was merely listed on the face with no -- no

21  evidence that there was any greater consideration by the

22  examiner, other than an acknowledgment that it was there.

23        MR. BECKER:  Mr. Patterson, could you pull up the

24  '629 patent?

25  Q.  (By Mr. Becker)  Now, you weren't shown the complete

1    front page of the patent during your cross-examination.

2    Is Turina listed on this first page?

3    A.  No.

4    Q.  Is it listed on the second page?

5    A.  I'm looking it over very quickly.  I'm not sure that --

6    I believe it is on the second page, going from memory, but

7    I'd have -- I'd have to find it.  I recollect that it was on

8    the left column.  There it is.  Approximately 10 up from the

9    bottom, there's Turina.

10   Q.  About how many references are listed on this page?

11   Just --

12   A.  60 or 70.

13   Q.  You don't have to give an exact number.

14   A.  60 or 70.

15   Q.  When you looked at the Turina patent, how many times did

16   you read that patent?

17   A.  Two or three times, maybe more.

18   Q.  Did you read it closely?

19   A.  Very closely.

20   Q.  How many hours did you spend reviewing Forslow?

21   A.  Approximately 20 hours.

22   Q.  How many times did you read Forslow?

23   A.  At least three.

24   Q.  And did you read it closely?

25   A.  I did.

1        MR. BECKER:  Mr. Patterson, could you pull up the

2  '206 patent?

3        Could you show Page 2 of the patent?

4  Q.  (By Mr. Becker)  Is this a list of -- a partial list of

5  the references listed on the '206 patent?

6  A.  A partial list, yes.

7        MR. BECKER:  Can you go to the next page?

8  Q.  (By Mr. Becker)  Is this more of that list?

9  A.  Yes.

10        MR. BECKER:  Will you show the next page?

11  Q.  (By Mr. Becker)  Is this more of that list?

12  A.  Yes.

13        MR. BECKER:  Can you show the next page?

14  Q.  (By Mr. Becker)  Is that more of that list?

15  A.  Yes.

16        MR. BECKER:  Next page, please.

17  A.  Yes.

18  Q.  (By Mr. Becker)  Is that more of that list?

19  A.  I believe that's the conclusion of that list.

20  Q.  About how many references would you will say that is?

21  A.  Several hundred.

22  Q.  You were asked some questions about Claim 140 of the

23  '206 patent.

24  A.  Yes.

25  Q.  Does -- does Forslow disclose using GPRS system?

1   A.  Yes.

2   Q.  Does Goodman give the details of using that same GPRS

3   system?

4   A.  Yes.

5   Q.  Does an idea -- you were all asked some questions about

6   the WAND system.  Do you recall what that stands for?

7   A.  Wireless -- that was the W -- I -- I would be guessing

8   at the rest of it.  The system was widely known by its

9   acronym.

10          MR. BECKER:  It's DX-95.  I'm looking at Page 5 of

11  the exhibit.  Sorry, you're on the right page.  Could you

12  pull up the abstract?

13  Q.  (By Mr. Becker)  Does this refresh your recollection as

14  to what WAND stands for?

15  A.  Wireless ATM network demonstrator.  It's -- thank you.

16  It's here.

17  Q.  Thank you.  Dr. -- Dr. Acampora, with respect to the

18  '206 patent, this concept of scheduling and classifying

19  packets at a base station, did Dr. Jorgensen do that first?

20  A.  No.

21  Q.  With respect to the '629 patent, this concept of

22  reserving slots in future frames, did Dr. Jorgenson do that

23  first?

24  A.  No.

25  Q.  And with respect to the '517 patent, this idea of

```
 1   allocating a bandwidth between uplink and downlink based on

 2   contents of packets and reservation requests, did

 3   Dr. Jorgensen that first?

 4   A.  No.

 5           MR. BECKER:  Pass the witness.

 6           THE COURT:  Further cross-examination?

 7           MR. BLACK:  Yes, Your Honor.

 8           THE COURT:  Please proceed.

 9                       RECROSS-EXAMINATION

10   BY MR. BLACK:

11   Q.  So you -- you testified that if you're successful in

12   tearing up the claims in this case, that we could just come

13   back and do it again with some other claims?

14   A.  I didn't say that.

15   Q.  You're saying that the claims in this case, if they're

16   found invalid, that we can rely on the other claims in the

17   patent?  Do you have an understanding to that effect?

18   A.  I'm not -- I don't understand your question.

19   Q.  Do you know whether if there's a finding of invalidity

20   in this case with respect to the claims that the parties

21   have selected for trial, whether that would have any impact

22   on the ability to enforce other claims in the patent?

23   A.  I don't have any awareness of that, I'm sorry.

24   Q.  Right.  That's a legal issue, right?

25   A.  I don't even know that.  I just have no reason to
```

 1  believe that anything other than these claims are at issue.

 2  Q.  Right.  You're -- you're not an expert on the impact of

 3  an invalidity finding, correct?

 4  A.  I would not call myself an expert on that, no.

 5  Q.  Okay.  But we do know that it would tear up the ones

 6  that Ericsson and T-Mobile are using to make all the money

 7  that's at issue in this case, right?

 8  A.  I don't know that at all.

 9  Q.  You don't think if all the claims are invalid, that that

10  would end the case?

11  A.  That's a different question.  That -- that, the answer

12  is yes.

13  Q.  So there are three patents at issue in this case, right?

14  A.  Yes.

15  Q.  And one of them was examined by one examiner, one of

16  them was examined by two examiners, and the third was

17  examined by another examiner, right?

18  A.  That's my recollection.

19  Q.  So we have four different examiners that looked at these

20  patents, right?

21  A.  Not all of the patents.

22  Q.  Right.  There was one examiner on one patent, two

23  examiners on the second patent, and one examiner on the

24  third patent.  One plus two plus one equals four, right?

25  A.  Yes, on -- over the three patents, correct.

1  Q.  And you disagree with all of them, correct?

2  A.  In my opinion, the asserted claims were invalid, if

3  that's what you mean by disagree.

4  Q.  Let's take a look at Forslow.

5       MR. BLACK:  If I could just have the ELMO.

6  Q.  (By Mr. Black)  So we had a lengthy debate over this

7  diagram, Figure 2, about what was in the cell with the

8  letters BS.  Do you see that?

9  A.  Yes.

10  Q.  And -- and you contended that BS was not a base station

11  but a BTS, correct?

12  A.  That's a base transceiver system from GSM, yes.

13  Q.  Okay.  And you wouldn't call that a base station?

14  A.  That's part of a base station.

15  Q.  I have the text here from Forslow that my colleague

16  pulled.

17       MR. BLACK:  If we could -- maybe it'd be better to

18  pull it up on the -- on the main monitor.  It's Column 2 of

19  Forslow.  Right there.  Second paragraph.  There you go.

20  Q.  (By Mr. Black)  So we were just looking at Figure 2,

21  right?

22  A.  We were.

23  Q.  And it says:  Figure 2 shows a more detailed mobile

24  communication system using the example GSM mobile

25  communications model that supports both circuit-switched and

1    packet-switched communications.

2         Do you see that?

3    A.  I do.

4    Q.  And then it says:  A mobile host 12, including a

5    computer terminal and mobile radio, communicates over radio

6    interface with one or more base stations, BSs.

7         Correct?

8    A.  I see that.

9    Q.  So the way Forslow was referring to Figure 2 and the BS

10   there was as a base station, right?

11   A.  Partially correct, because the paragraph goes on.

12   Q.  Well, the definition for the BS is base stations, right?

13   A.  As is used in this passage, that's what it says.

14   Q.  And this is a passage in the Forslow patent relating to

15   the description of Figure 2, correct?

16   A.  That's correct.

17   Q.  And Forslow was an Ericsson employee, right?

18   A.  I believe so at that time.

19   Q.  And then he wrote:  Each base station is located in a

20   corresponding cell.

21         Do you see that?

22   A.  I do.

23   Q.  And that's exactly what I was asking you about before.

24   Each cell has a base station, right?

25   A.  A base transceiver system.

1   Q.  But he called it a base station, didn't he?

2   A.  Here --

3   Q.  He is --

4   A.  -- in the context of GSM.

5   Q.  Which is the context of the Forslow patent, right?

6   A.  Well, GPRS on top of GSM is the context of the Forslow

7   patent.

8   Q.  Let's just agree on one thing if we can.  The letters BS

9   in the block on Figure 2, to Forslow, in this reference,

10   would you say invalidates Dr. Jorgensen's invention?  Those

11   letters mean base station, right?

12   A.  That's how they were characterized in this -- this part

13   of Forslow.

14   Q.  And then in the next sentence, it says:  Multiple base

15   stations are connected to a base station controller, left

16   paren, BSC, right paren.

17         Do you see that?

18   A.  That's correct?

19   Q.  He's abbreviating the term "base station controller" to

20   BSC, right?

21   A.  That, he is.

22   Q.  And that's exactly what I was asking you about before.

23   And when I put the diagram up of the state of Texas, you

24   have a BSC that communicates to multiple cells, right?

25   A.  That's correct.

```
 1   Q.  And each cell has a base station in it, correct?

 2   A.  The base transceiver system.

 3           MR. BLACK:  No further questions.

 4           THE COURT:  You pass the witness?

 5           MR. BLACK:  Pass the witness.

 6           THE COURT:  Is there further redirect, Mr. Becker?

 7           MR. BECKER:  Briefly.

 8           THE COURT:  Proceed.

 9                     REDIRECT EXAMINATION

10   BY MR. BECKER:

11   Q.  Dr. Acampora, IV's counsel asked you some questions

12   about tearing up Dr. Jorgensen's patent.  Did you -- do you

13   recall those questions?

14   A.  Yes.

15   Q.  Were you here when Dr. Jorgensen testified that he has

16   no interest in these patents?

17   A.  Yes.

18           MR. BECKER:  No further questions.

19           THE COURT:  Any further cross?

20           MR. BLACK:  One, Your Honor.

21                     RECROSS-EXAMINATION

22   BY MR. BLACK:

23   Q.  As an inventor, man who is issued three patents by the

24   United States Patent Office, do you think he would have an

25   interest -- personal interest in making sure that those
```

```
 1  inventions continued to be recognized, just as you would
 2  with respect to your patents?
 3  A.  You asked about me, if my patents were invalid, then
 4  they should be declared invalid.
 5  Q.  You'd have --
 6  A.  If they're not invalid, then they should not be declared
 7  invalid.
 8  Q.  But you'd certainly be rooting for validity,
 9  wouldn't you?
10  A.  I don't know.
11          MR. BLACK:  Pass the witness.
12          THE COURT:  Further redirect?
13          MR. BECKER:  No, Your Honor.
14          THE COURT:  You may step down, Dr. Acampora.
15          Should this witness be retained, or may he be
16  released?
17          MR. BECKER:  He may be released, Your Honor.
18          THE COURT:  Any objection from Plaintiff?
19          MR. BLACK:  No objection.
20          THE COURT:  Dr. Acampora, you have been released by
21  the Court.  You're free to stay; you're free to leave.
22          THE WITNESS:  Thank you, Your Honor.
23          THE COURT:  Defendants, call your next witness.
24          MR. RUBENSTEIN:  Defendants call Ms. Evelyn Chen.
25          THE COURT:  Ms. Chen, if you'll come forward.
```

```
 1              (Witness sworn.)

 2              THE COURT:  Please come around, and have a seat on

 3     the witness stand.

 4              Ladies and gentlemen of the jury, before the

 5     examination of this witness begins, I want to mention to you

 6     that even though in my preliminary instructions I told you

 7     that witnesses were either called live, or if they couldn't

 8     be live to testify in person, they were presented through a

 9     deposition.  I remind you, Ms. Chen has already testified in

10     this case by deposition, which has been shown to you

11     earlier, and she's also testifying live in this case.

12              This is a bit unusual.  This is done pursuant to an

13     agreement between the parties.  It doesn't concern the jury.

14              But I don't want the fact that you've seen her

15     deposition and now you're hearing her live to be confusing

16     to you in any way, all right.

17              Let's proceed, Mr. Rubenstein.

18              MR. RUBENSTEIN:  Thank you, Your Honor.

19              EVELYN CHEN, DEFENDANTS' WITNESS, SWORN

20                      DIRECT EXAMINATION

21     BY MR. RUBENSTEIN:

22     Q.  Good morning, Ms. Chen.

23     A.  Good morning.

24     Q.  Would you please introduce yourself to the Court and the

25     jury.
```

1   A.   Sure.   Hi.   My name is Evelyn Chen.

2   Q.   Where are you from, Ms. Chen?

3   A.   I currently in live in Plano with my husband, but I grew

4   in Katy outside of Houston.

5   Q.   And do you still have family down toward Houston?

6   A.   I do.   My parents, my brother, and my in-laws.

7   Q.   Ms. Chen, would you please describe for us your

8   educational background starting with college.

9   A.   Sure.   I attended UT Austin, got my bachelor's there in

10   electrical engineering in 2001, worked for two years in

11   Austin helping inventors get patents to protect their

12   inventions and then went back to UT Austin for law school

13   and graduated from there in 2006.

14   Q.   And what did you do after graduating from law school?

15   A.   I moved up to Dallas.   I worked for a law firm there for

16   a few years and then spent two years out in Texarkana

17   working for a judge before moving back to Dallas to go back

18   to my old law firm.

19   Q.   And for whom do you work now, Ms. Chen?

20   A.   Ericsson.

21   Q.   When did you start working at Ericsson?

22   A.   A little over five years ago, November 2013.

23   Q.   Why is it that you came to work at Ericsson?

24   A.   A good friend of mine from school was at Ericsson, and

25   he has always loved his job there and loved working there,

```
 1  and when this opportunity came up, he called me.
 2          I had been familiar with Ericsson because they've
 3  always kind of been on the forefront of telecommunications.
 4  And this felt like a good opportunity to be able to use both
 5  my engineering degree, as well as my law degree, and so I
 6  decided to give it a try.
 7  Q.  And what's your current position at Ericsson?
 8  A.  Senior counsel.
 9  Q.  And for how long have you been in that role?
10  A.  Since I started, so over five years.
11  Q.  And what's the name of the group that you work in?
12  A.  Intellectual property rights and licensing.  We usually
13  call it IPR and licensing for short.
14  Q.  And does your work and the work of this group include
15  patents?
16  A.  It's mainly patents.
17  Q.  Could you please tell us a little bit about your job,
18  maybe give everybody an idea of what you do on a day-to-day
19  basis?
20  A.  Sure.  Generally, my job deals with licensing Ericsson's
21  portfolio.  A lot of it's focused on our patent portfolios
22  that are essential to LTE, the LTE portfolio.  And I meet
23  with potential licensees to discuss Ericsson's patents and
24  support those activities.
25  Q.  Now, with respect to those licensing discussions, how
```

1   many of those have you participated in or been associated

2   with in some capacity at Ericsson?

3   A.   I think over a dozen.

4   Q.   Now, how many patents does Ericsson have?

5   A.   Over 45,000 right now.

6   Q.   And is that worldwide?

7   A.   Yes, sir.

8   Q.   How about in the United States?

9   A.   I think around 13,000.

10   Q.   Does Ericsson license its patents?

11   A.   Certainly.

12   Q.   Why?

13   A.   Well, we've invested a lot in research and development,

14   and we have gotten patents to protect those innovations, and

15   as much of the technology is practiced or used by standards

16   that a lot of companies are implementing in their products,

17   we think it's only fair that they give us a fair royalty for

18   our technology that we developed that they're using.

19   Q.   Now, Ms. Chen, have you heard of something called a

20   claim chart?

21   A.   Yes, sir.

22   Q.   What are claim charts?

23   A.   Claim charts are documents that compare a claim in a

24   patent against a product, or in Ericsson's case, a lot of

25   times the standard to show how this standard uses and

1    matches up with the languages in the claims.

2          And so it's an easier way to show somebody how this

3    technology, this standardized technology is using the

4    invention that is claimed in the patent.

5    Q.  Does Ericsson exchange claim charts during licensing

6    negotiations?

7    A.  Yes, sir.

8    Q.  Why?

9    A.  It's a way to be able to show a potential licensee

10   that they -- to demonstrate to them how they might be

11   infringing or using Ericsson's technology.  This way they

12   don't have to just take our word for it when we reach out

13   and tell them, hey, you're using our patents; we can show

14   them.

15   Q.  And does it give the other party some idea of what's in

16   the portfolio?

17   A.  Yes, it gives them some idea.

18   Q.  Does Ericsson prepare claim charts for each specific

19   licensing negotiation in which it participates?

20   A.  No.

21   Q.  Why not?

22   A.  Well, especially for standardized technologies.  We are

23   comparing or showing how our patents are used by the

24   standard, and so we already have these claim charts prepared

25   as compared to the standard.  So when we are discussing with

1    a company about their use of the standard in our technology,

2    we already have these ready to show them.

3    Q.  So are you saying that these claim charts are -- are

4    prepared independent of any particular negotiation?

5    A.  Yes, sir.

6    Q.  And so after preparing claim charts, what does Ericsson

7    do with them?

8    A.  Well, they're collected and gathered and stored with

9    other claim charts reading on that particular technology,

10   and when we start engaging in a licensing negotiation and we

11   need to share them with the other party, we pull them out

12   and send them over.

13          THE COURT:  Ms. Chen, would you slow down just a

14   little bit, please?

15          THE WITNESS:  Yes, sir.  I'm sorry, Your Honor.

16          THE COURT:   No problem.

17          Let's continue.

18   Q.  (By Mr. Rubenstein)  Now, Ms. Chen, you have mentioned

19   that -- that Ericsson sends claim charts to potential

20   licensees to -- to show examples of Ericsson's patents.

21   What do you mean by examples?

22   A.  Just that.  They're examples.  They're -- not that we

23   don't send over the entire portfolio, but it's just to give

24   them a feel for some of the technologies that are covered by

25   our patents.

1   Q.  How many claim charts does a potential licensee receive

2   from Ericsson during a patent license negotiation?

3   A.  It depends.  It depends on the company we're discussing

4   with.  Some might only want to see a couple or none at all.

5   Others say they want to see all the claim charts that we

6   hold at that particular point in time.  I think in the past

7   year, there have been some where we've sent over 150.

8   Q.  So is it different every time?

9   A.  Yes, sir.

10  Q.  All right.  Now, Ms. Chen, the jury has heard a bit

11  during the course of this trial about a patent license

12  negotiation between Ericsson and ZTE that resulted in a

13  license back in 2014.  Are you familiar with that

14  negotiation?

15  A.  Yes, sir.

16  Q.  How are you familiar with it?

17  A.  I participated in some of the technical discussions and

18  business discussions with ZTE.

19  Q.  And during the negotiation, do you know whether Ericsson

20  sent ZTE claim charts?

21  A.  We did.

22  Q.  And for how many U.S. patents did Ericsson send ZTE

23  claim charts?

24  A.  For infrastructure, I think about 18.

25  Q.  And were there other non-U.S. patents that were --

1    charts that were sent?

2    A.  Yes, sir.

3    Q.  Did Ericsson send ZTE anything other than those claim

4    charts?

5    A.  Yes, sir.

6            MR. RUBENSTEIN:  Mr. Patterson, would you please

7    put up DX-529.

8    Q.  (By Mr. Rubenstein)  Ms. Chen, do you recognize this

9    document?

10   A.  Yes, sir, I do.

11   Q.  What is it?

12   A.  It is a list of example infrastructure patents owned by

13   Ericsson that are essential for practicing the LTE standard.

14   Q.  And is this -- is this one of the documents that was

15   sent to ZTE during the negotiations?

16   A.  Yes, sir.

17   Q.  And how do we know that these are just examples and not

18   an exhaustive list?

19   A.  Well, the title says they're examples.

20   Q.  Why did Ericsson send this additional list to ZTE?

21   A.  This is a typical list that we would share with

22   potential licensees, just to show them, in addition to the

23   claim charts, that we have more patents that would pertain

24   to their technology that they're using.

25   Q.  Were the 18 -- were the charts for the 18 U.S. patents

1    and the additional ones that appear on -- on this list, on

2    DX-529, an exhaustive list of infrastructure patents that

3    Ericsson had?

4    A.  No.

5    Q.  Now, during the --

6              THE COURT:  Just a minute.  Whose phone is

7    sounding?  I'm hearing some device ring.

8              UNIDENTIFIED PERSON:  I'm sorry, that was my watch.

9              THE COURT:  That was your watch?  Everything we

10   wear today makes noise.  Whatever it is, silence it.  I

11   don't want any more interruptions or disruptions of the

12   trial.

13             Continue, counsel.

14             MR. RUBENSTEIN:  Thank you, Your Honor.

15   Q.  (By Mr. Rubenstein)  During the license -- licensing

16   discussions with ZTE, did Ericsson ever do any kind of

17   relative valuation between a subset of its patents compared

18   to a subset of ZTE's patents?

19   A.  No, sir.

20   Q.  And based on your knowledge of Ericsson's licensing

21   discussions with ZTE, did Ericsson ever tell ZTE that the

22   value in Ericsson's entire LTE portfolio of standard

23   essential patents was found only in those 18 U.S. patents

24   for which claim charts were sent?

25   A.  No, sir.

1   Q.  Why not?

2   A.  We wouldn't have done that because it's not true.

3   Q.  Why isn't it true?

4   A.  One, our LTE portfolio contains many patents, more than

5   just those 18 U.S. patents as was shown -- both the list

6   that we sent them in this list, as well as the other claim

7   charted patents that we sent them.

8   Q.  And is the -- is the value of Ericsson's portfolio found

9   just in a small group of patents?

10  A.  No, sir.

11  Q.  Is it found in the whole of the portfolio?

12  A.  Yes, sir.

13  Q.  Based on your knowledge of Ericsson's patent licensing

14  efforts, has Ericsson ever told any potential licensee that

15  the value of its entire LTE standard essential portfolio was

16  found only in a few example patents?

17  A.  No, sir.

18  Q.  Ms. Chen, do you understand the word "exemplary" to have

19  a different meaning in the context of Ericsson's patent

20  license negotiations than it does from the word's ordinary

21  meaning?

22  A.  No, sir.

23  Q.  And if the 18 patents that Ericsson sent to ZTE were

24  supposed to be representative of the breadth of technology

25  in Ericsson's portfolio, does that mean that the other

1    patents in Ericsson's portfolio are just duplicative of the

2    18 that were sent?

3    A.  No, sir.

4    Q.  Why not?

5    A.  These were meant to be -- or claim charted patents are

6    meant to be examples.  Ericsson is a leader in LTE

7    technology -- development and technology.  We have many

8    patents that cover many different aspects of the standard

9    that are not shown -- will not be demonstrated or covered by

10   those 18 U.S. patents.

11   Q.  Thank you, Ms. Chen.

12           MR. RUBENSTEIN:  I pass the witness.

13           THE COURT:  Cross-examination?

14           MS. HENRY:  Yes, Your Honor.

15           THE COURT:  Proceed when you're ready, Ms. Henry.

16           MS. HENRY:  Your Honor, may I approach and provide

17   the witness a binder, please?

18           THE COURT:  You may.

19                      CROSS-EXAMINATION

20   BY MS. HENRY:

21   Q.  Good morning, Ms. Chen.

22   A.  Good morning.

23   Q.  You and I have met before, haven't we?

24   A.  Yes, ma'am.

25   Q.  In fact, we've known each other for a number of years

1    and long before anything having to do with this lawsuit,

2    right?

3    A.   That's right.

4    Q.   We've never been in this situation, though, have we?

5    A.   No.

6    Q.   Well, it's -- it's lovely to see you again regardless of

7    the situation.

8         I'd like to talk to you a little bit about the ZTE

9    claim charts, okay?

10   A.   Sure.

11   Q.   So earlier, when you were -- when you were talking with

12   Mr. Rubenstein, you pulled up DTX-529.

13        MS. HENRY:  Mr. Horseman, could I get DTX-529,

14   please?

15   Q.   (By Ms. Henry)  Now, DTX-529 is a list of patents that

16   Ericsson provided to ZTE as part of the negotiations,

17   correct?

18   A.   Yes, ma'am.

19   Q.   It is not the claim charts that Ericsson provided ZTE,

20   correct?

21   A.   Correct.

22   Q.   Okay.  And -- and you pointed out that on this, on

23   DTX-529, it says examples of Ericsson's patents, correct?

24   A.   Yes, ma'am.

25   Q.   But the word "example" is not the word that ZTE uses

1  when it's describing its claim charts that are provided to

2  potential licensees, right?

3  A.  I'm sorry, did you say that ZTE uses?

4  Q.  I'm sorry.  The word "examples" is not the word that

5  Ericsson uses when it provides claim charts to potential

6  licensees?

7  A.  Correct.  They're claim charts.

8  Q.  Yes.  And they don't use the word "examples" when

9  they're describing those claim charts, correct?

10  A.  No, ma'am.

11  Q.  And, Ms. Chen, you gave some deposition testimony in

12  this case, correct?

13  A.  Yes, ma'am.

14  Q.  Okay.  And as -- at that deposition, Ericsson designated

15  you to speak on its behalf with respect to its licensing

16  practices, correct?

17  A.  Yes, ma'am.

18  Q.  And you were asked several questions about Ericsson's

19  licensing practices, correct?

20  A.  Correct.

21  Q.  And I want to be really clear, you weren't the one who

22  chose the claim charts to send to ZTE, right?

23  A.  Correct.

24  Q.  Okay.  But you testified generally about what goes into,

25  in general, the decision of choosing representative claim

1   charts; is that fair?

2   A.   Yes.

3   Q.   Okay.  And someone, though, at Ericsson chose those 18

4   claim charts to provide to ZTE, correct?

5   A.   For those 18 U.S. patents, yes.

6   Q.   Yes.

7   A.   Uh-huh.

8   Q.   And do you know who that was?

9   A.   I'm not sure.

10  Q.   Okay.  But -- but regardless whoever that was isn't

11  going to come here and testify today, correct?

12  A.   He's no longer with the company.

13  Q.   Thank you.

14       Now, we have testimony in the record about how

15  Ericsson conducts its licensing negotiations, right?

16  A.   Yes.  Yeah, from my deposition.  Yes.

17  Q.   Yes.  Some of that testimony comes from you, correct?

18  A.   Sure, yes.

19  Q.   Yes.  And isn't it true that the claim charts that are

20  chosen by Ericsson to use in its licensing negotiations are

21  chosen to show the breadth of Ericsson's patent holding in

22  the particular standard, correct?

23  A.   Yes, correct.

24  Q.   And isn't it also true that Ericsson sends claim charts

25  to potential licensees so that the licensee will have some

1  comfort regarding exactly what is -- it is Ericsson says it

2  owns?

3  A.  Yes.

4  Q.  And are you aware, Ms. Chen, of whether or not

5  Ericsson -- other Ericsson employees have provided sworn

6  testimony describing these types of claim charts?

7  A.  In this case?

8  Q.  Are you aware that -- whether or not Ericsson employees

9  have provided sworn testimony in this case or other cases

10  describing generally what these types of claim charts are?

11  A.  It's very likely.

12  Q.  Okay.  And you're aware that when Ericsson employees are

13  describing the claim charts that are used in negotiations,

14  they refer to them as representative claim charts, correct?

15  A.  That sounds reasonable.

16  Q.  Okay.  And you're aware that when Ericsson employees

17  have provided sworn statements about these claim charts,

18  that they state that the exchange of such representative

19  claim charts is typical in negotiations for portfolio-wide

20  licenses?

21  A.  That sounds like a reasonable statement.

22  Q.  And that word "representative" is a word that comes from

23  Ericsson's sworn witness statements, right?

24  A.  I'll take your word for it.  I'm not sure who you might

25  be referring to.

1   Q.  All right.  Well, I'll -- I'll be happy to refresh your

2   recollection.

3           MS. HENRY:  Your Honor, may I approach the witness?

4           MR. RUBENSTEIN:  Your Honor, may we approach,

5   please?

6           THE COURT:  Approach the bench.

7           (Bench conference.)

8           MR. RUBENSTEIN:  I just have some concern about

9   this document because it was one of the ones that was

10  subject to some discussion in our pre-trial conference and

11  was not -- and was excluded from the record and from the

12  exhibit list.

13          I just have some concern about how this document

14  is being used and what -- what could be read aloud to the

15  jury from it and what is being said from this document and

16  how it's being characterized to the jury for all the reasons

17  we discussed.

18          THE COURT:  Tell me how you intend to use this, Ms.

19  --

20          MS. HENRY:  Your Honor, I intend to use a very

21  limited portion of this to refresh Ms. Chen's recollection.

22  And unless she contradicts it, I do not intend at all to

23  play it or have it read to the jury.

24          THE COURT:  All right.  Then you should be sure not

25  to reveal the heading or the origin of it as coming from

1    that other litigation.

2              MS. HENRY:  Certainly, Your Honor.

3              THE COURT:  All right.  Let's proceed.

4              MR. RUBENSTEIN:  Thank you, Your Honor.

5              MS. HENRY:  Thank you, Your Honor.

6              (Bench conference concluded.)

7              MS. HENRY:  May I approach, Your Honor?

8              THE COURT:  You may.

9    Q.  (By Ms. Henry)  Ms. Chen, can you please go -- there's a

10   tab on the document that I just provided you.  Could you

11   please read Lines 6 through 11 on Page 5 of that document,

12   and tell me if it refreshes your recollection of whether or

13   not Ericsson employees have provided sworn statements

14   referring to claim charts used in negotiations as, quote,

15   representative.

16   A.  Did you want me to read this out loud or --

17   Q.  No, no, no.  Please just read it to yourself, and see if

18   it refreshes your recollection.

19   A.  Okay.  Yes, it appears he has.

20   Q.  Thank you.

21             And, Ms. Chen, are you aware that other Ericsson

22   employees, under oath, have said that during licensing

23   negotiations, Ericsson presents claim charts to the

24   prospective licensee showing how a representative sample of

25   Ericsson's patents are essential to the standard?

1    A.  That sounds reasonable.

2    Q.  Okay.  And also the use of the term representative

3    there, correct?

4    A.  Correct.

5    Q.  Correct.

6           So if someone was to suggest that the term

7    representative was coined by IV as opposed to Ericsson, that

8    would be incorrect, wouldn't it?

9    A.  I think it's a common word, so I would say so.

10   Q.  And -- and the word representative claim charts is

11   different from the example patents that Mr. Rubenstein put

12   on the screen, correct?

13   A.  Well, one is a list of patents, and the other are claim

14   charts, so I guess yes.

15   Q.  That's correct.

16          And the list of patents says these are examples of

17   patents, correct?

18   A.  Correct.

19   Q.  That's what you and Mr. Rubenstein discussed earlier,

20   correct?

21   A.  Correct.

22   Q.  But the word example is not the word that Ericsson

23   employees use when they're referring to actual claim charts

24   that are provided, correct?

25   A.  Sometimes they're referred to as exemplary, but not in,

1  I guess, the discussion we just had.

2  Q.  Yes.  In the sworn statements of Ericsson employees made

3  under the penalty of perjury, they're referred to as

4  representative claim charts; isn't that correct?

5  A.  I think, yes, it's been referred to that way.

6  Q.  And Mr. Rubenstein also mentioned with you that included

7  in those claim charts provided to ZTE were some foreign

8  patent -- patents.  Do you recall that?

9  A.  Yes.

10  Q.  Okay.  Now, if you were negotiating a U.S. only license,

11  would it matter what foreign patents that company had?

12  A.  Are you asking in the abstract or with respect to

13  Ericsson?

14  Q.  Well, either with respect to Ericsson or in the

15  abstract, either way.

16  A.  Well, with respect to Ericsson, we only do global patent

17  licenses, which is why I asked, because we would never

18  discuss a patent license of Ericsson's patents for just the

19  U.S., but in the abstract, if we're talking about just

20  licensing U.S. patents, then a foreign one might not make

21  sense to discuss.

22  Q.  Exactly.  And the hypothetical license or the

23  negotiation we're talking to -- about in this case -- you're

24  familiar with that terminology, hypothetical negotiation,

25  correct?

1  A.  Yes, ma'am.

2  Q.  That hypothetical negotiation, they would be discussing

3  only the U.S. patents, correct?

4  A.  I guess what are the patents-in-suit; right.

5  Q.  Yes.  Well, and if we're in a U.S. courtroom, then we

6  can only have U.S. patents-in-suit, correct?

7  A.  I would presume so, yes.

8  Q.  Okay.  Now, Ms. Chen, I know that you have not been

9  allowed to be in the courtroom for most of the testimony

10  this week, right?

11  A.  Right.

12  Q.  And that's because of something called the Rule, which

13  prevents fact witnesses from listening to the testimony of

14  other fact witnesses, correct?

15  A.  Correct.

16  Q.  And that's really just to make sure that no one's

17  testimony is influenced by the testimony of someone else; is

18  that fair?

19  A.  Yes.

20  Q.  Okay.  But were you in the courtroom for opening

21  statements?

22  A.  Yes, ma'am.

23       MS. HENRY:  Can I please have Chen Slide No. 1?

24       Thank you, Mr. Horseman.

25  Q.  (By Ms. Henry)  Ms. Chen, do you remember when

1   Mr. Kubehl used this slide in Ericsson's opening statement?

2   A.  Yes.  It looks familiar.

3   Q.  Yes.  And this is a slide depicting the Ericsson

4   employees who were nominated to be finalists for the

5   European Inventor Award of 2014; is that correct?

6   A.  Yes, ma'am.

7   Q.  Okay.  And the picture here shows four inventors, but

8   there are really eight nominees, right?

9   A.  Yes.  I see eight names on here.

10  Q.  Yes.  There are -- I've underlined them just to make it

11  easier to see, correct?

12  A.  Thank you.  Yes.

13  Q.  Okay.  And would it surprise you to know that we've seen

14  a slide or a slide similar to this numerous times throughout

15  the course of this case?

16  A.  I wouldn't know.

17  Q.  But would it surprise you?

18  A.  If it was relevant, no.

19  Q.  Okay.  Well, let's -- let's talk a little bit about

20  that, please.

21          Ericsson is proud of these eight inventors, right?

22  A.  Certainly.

23  Q.  Okay.  Do they represent the best of the best of what

24  Ericsson has to offer in terms of LTE?

25  A.  They and the others in the research and development

 1  group, yes.

 2  Q.  And Ericsson is proud of the patents that these

 3  inventors have come up with, correct?

 4  A.  Yes, ma'am.

 5  Q.  And do those patents represent some of the best of the

 6  best of Ericsson's LTE patents?

 7  A.  I don't know that we would say -- I mean, they're all --

 8  all of our patents are valuable to us.  I don't know that

 9  we've actually singled out any particular one as the best.

10  Q.  Well, these are certainly the inventors that Ericsson

11  has been bringing in front of the jury and touting all week

12  long, right?

13  A.  I wouldn't know.

14  Q.  And if you look -- I just want you to take a note of the

15  names there.  You don't need to read them into the record,

16  but just sort of familiarize yourself with the names, okay?

17  A.  All right.

18  Q.  Okay.

19       MS. HENRY:  Can I please have Chen Slide No. 2?

20  Q.  (By Ms. Henry)  Now, Ms. Chen, we've talked a lot about

21  the 18 U.S. patents that were included in the ZTE claim

22  charts, right?

23  A.  Yes.

24  Q.  Now, I'll represent to you that here up on the screen,

25  I've just made a list of all of those 18 patents, all right?

1    A.  Okay.

2    Q.  Okay.  I think the list is accurate.  I tried very hard

3    to make it, but if you'd like to check me, there is also

4    DTX-536 in your binder, and that's the claim charts

5    themselves.

6    A.  All right.

7    Q.  Okay.  Now, would it surprise you to find out that half

8    of these patents list as named inventors those 18 inventors

9    that Ericsson has been touting all week long?

10   A.  One of those eight are -- no, it wouldn't surprise me.

11          MS. HENRY:  All right.  Could we have Chen Slide

12   No. 2, please?

13   Q.  (By Ms. Henry)  So eight -- excuse me -- nine of those

14   18, half of them list as named inventors one of those eight

15   inventors that Ericsson has been touting all week long.

16          Does that look right to you.

17   A.  I have no reason to object.

18   Q.  All right.  Well, if you have any question, I've listed

19   the PTX here on the slide of each of those patents, and all

20   of those patents are included in your binder, so feel free

21   to check if you'd like to.

22   A.  I don't see any need.

23   Q.  So it's not unreasonable, if we've got a list of patents

24   here, half of whom list as named inventors the very eight

25   Ericsson inventors that Ericsson has been touting all week

1  long, that they've been showing slides up for their awards,

2  it is not unreasonable to say that these are the best of the

3  best of Ericsson's patents, is it?

4  A.  I don't know that I would agree with that.

5  Q.  Well, Ms. Chen, the truth is that these great Ericsson

6  inventors, they really don't matter in this case, do they,

7  regardless of whether or not they've invented these patents

8  or not.

9  A.  I don't think these patents are being asserted.

10  Q.  In fact, the 18 Ericsson inventors that they've been

11  talking about all week long, they could have invented time

12  travel, and it would not affect the issues that this jury

13  has to decide in this case, right?

14  A.  Correct.

15  Q.  We don't doubt that Ericsson has wonderful inventors.

16  Is that a fair statement?

17  A.  I appreciate that, yes.  Thank you.

18  Q.  But Ericsson is not the only company that has good

19  ideas, is it?

20  A.  No.

21  Q.  And the fact that Ericsson has inventors that they're

22  proud of has absolutely nothing to do with whether or not

23  Ericsson is infringing Intellectual Ventures's patents, does

24  it?

25  A.  No.

1   Q.  Totally unrelated, right?

2   A.  Correct.

3   Q.  Yeah.  In fact, it's a bit of a diversion, isn't it?

4           MR. RUBENSTEIN:  Objection, Your Honor.

5   Argumentative.

6           THE COURT:  Overruled.

7   A.  I honestly wouldn't know.  I haven't been following the

8   case.

9   Q.  (By Ms. Henry)  That's right, Ms. Chen.  So while you're

10  counsel at Ericsson -- right?

11  A.  Yes, ma'am.

12  Q.  -- you're not the counsel who has been overseeing this

13  case on behalf of Ericsson, right?

14  A.  Correct.

15  Q.  So it wasn't your decision to put those slides up

16  repetitively in front of the jury, correct?

17  A.  I really don't know how often they were put up.  I have

18  nothing to do with it.

19  Q.  All right.  Thank you.

20          Now, Ms. Chen, can we agree that if Ericsson and

21  T-Mobile are using the patents-in-suit, that they should pay

22  for that use?

23  A.  Yes.

24  Q.  Because patents have value.  They're property rights,

25  and they have value, and they should be respected, right?

1    A.  Yes, ma'am.

2    Q.  Ericsson certainly demands that of anyone it believes is

3    infringing its patents, right?

4    A.  Yes, ma'am.

5    Q.  And Ericsson demands more than just respect if someone

6    is infringing their patents, right?  It demands

7    compensation, right?

8    A.  Yes, ma'am.

9    Q.  And there's nothing wrong with IV making that same

10   demand in this case, is there?

11   A.  No, ma'am.

12   Q.  And whether you create a patent in-house or buy a patent

13   from someone else, it's still a property right, and it still

14   has value, right?

15   A.  Yes, ma'am.

16   Q.  And infringers should still pay for trespassing that

17   property, correct?

18   A.  Correct.

19   Q.  Now, Ms. Chen, we've established that you're not the

20   Ericsson attorney that's been overseeing this case, correct?

21   A.  Yes, ma'am.

22   Q.  But there is someone at Ericsson that is overseeing this

23   case, right?

24   A.  Yes, ma'am.

25   Q.  But it's not you who's meeting with the lawyers every

1  night and deciding which arguments to make and which

2  presentations to make in front of the jury, correct?

3  A.  Correct.

4  Q.  Okay.  And you mentioned during your direct testimony

5  that you clerked for a federal judge; is that right?

6  A.  I think I just said a judge, but, yes, I did clerk for a

7  federal judge.

8  Q.  Okay.  So you have seen a lot of trials; is that right?

9  A.  Yes, ma'am.

10  Q.  Okay.  And have you ever seen a trial where an attorney

11  in open court calls an inventor a liar?

12        MR. RUBENSTEIN:  Objection, Your Honor, relevance

13  and argumentative.

14        THE COURT:  She can answer if she has or she

15  hasn't.  Overruled.

16  A.  I don't remember.  It's possible.  There have been a lot

17  of them that have been very combative.

18  Q.  (By Ms. Henry)  You understand how serious that

19  allegation is, correct, Ms. Chen?

20  A.  To call someone a liar, certainly.

21  Q.  Certainly in open court, correct?

22  A.  It's a serious allegation no matter what.

23  Q.  Yeah.  If you had been advising -- if you had been

24  managing this case, would you have allowed that to happen to

25  Dr. Jorgensen?

1    A.   Not if it wasn't warranted.

2    Q.   Thank you.

3         Now, Ms. Chen, would you be surprised to hear that

4    we've heard several times this week about how Ericsson makes

5    products and IV doesn't?

6    A.   Really have no opinion one way or another.

7    Q.   Do you know why Ericsson's lawyers keep saying that?

8    A.   No.

9    Q.   Okay.  Now, you're familiar with patent law, right?

10   A.   Yes, ma'am.

11   Q.   Okay.  And is there a requirement in patent law that you

12   have to make something in order for your patent to have

13   value?

14   A.   No, ma'am.

15   Q.   And is there a requirement in patent law that you have

16   to make a product in order to be entitled for payment of a

17   reasonable royalty if someone is trespassing on your patent?

18   A.   No, ma'am.

19   Q.   In fact, whether or not a company who owns patents makes

20   products has absolutely nothing to do with whether or not

21   the Defendant infringes those patents; isn't that right?

22   A.   That's right.

23   Q.   It doesn't make your patents any less valuable if you

24   don't make a patent -- make a product, right?

25   A.   Correct.

1  Q.  And it doesn't make IV a second class business citizen

2  because it's made the decision to license its innovations to

3  other companies so that they can go out and make great

4  products, as opposed to making products itself, correct?

5  A.  Correct.

6  Q.  And it would be misleading to suggest otherwise to this

7  jury, wouldn't it?

8  A.  I don't know that I would call it misleading.  It's --

9  I'm not sure what would be misleading.

10  Q.  You don't think it would be misleading to suggest that

11  the fact that IV doesn't make a product somehow means their

12  patents aren't valuable?

13  A.  Oh, that -- that would be misleading.

14  Q.  Now, Ms. Chen, were you in the courtroom during voir

15  dire?

16  A.  No, ma'am.

17  Q.  Okay.  Would it surprise you, then, to find out that

18  Ericsson and T-Mobile's attorneys during voir dire suggested

19  that 1G, 2G, 3G, and 4G are Ericsson's technology?

20  A.  In total?

21  Q.  Just if -- if I used those words, 1G, 2G, 3G, and 4G,

22  that's Ericsson's technology, would that be accurate?

23  A.  Well, there's a lot of Ericsson technology in those

24  standards.  We don't own all of it.

25  Q.  That's correct.  Ericsson did not invent the entirety of

1  LTE, did it?

2  A.  No, ma'am.

3  Q.  It took a lot of companies, and it took a lot of

4  inventors to invent LTE, right?

5  A.  Yes, ma'am.

6  Q.  And Ericsson isn't trying to take credit for all of

7  those inventions, is it?

8  A.  No, ma'am.

9  Q.  And, in fact, Nokia was a contributor to LTE, correct?

10  A.  Yes, ma'am.  To the standardization, yes.

11  Q.  And Nokia makes base stations, just like Ericsson,

12  right?

13  A.  Yes, ma'am.

14  Q.  And Nokia is a competitor of Ericsson; isn't that right?

15  A.  Yes, ma'am.

16  Q.  In fact, Nokia is probably Ericsson's primary

17  competitor; is that fair?

18  A.  Probably not.

19  Q.  Okay.  Well, I'll represent to you that Mr. Norrby,

20  Ericsson's corporate representative, said in his direct that

21  Ericsson and Nokia were the Apple and Samsung of the

22  infrastructure business.  Is that a fair characterization?

23  A.  Sure.

24  Q.  Okay.  They're certainly fierce competitors, fair?

25  A.  Oh, definitely.

1  Q.  Okay.  Now, Nokia is an investor in IV, isn't it?

2  A.  I don't know.

3  Q.  In fact, Nokia invested hundreds of millions of dollars

4  in IV?

5         MR. RUBENSTEIN:  Objection, Your Honor, lacks

6  foundation.

7         THE COURT:  Sustained.

8  Q.  (By Ms. Henry)  Ms. Chen, are you aware of whether or

9  not Nokia has a license to IV's patents?

10 A.  No, ma'am.

11 Q.  You don't know one way or the other?

12 A.  No, ma'am.

13 Q.  Would that be something important for the jury to

14 consider in this case?

15 A.  I don't know.  I don't know what the issues are in this

16 case.

17 Q.  Ms. Chen, you're familiar with the term "inbound

18 license," right?

19 A.  Yes, ma'am.

20 Q.  And an inbound license just means a license that

21 Ericsson takes to someone else's patents; is that fair?

22 A.  Yes, ma'am.

23 Q.  Okay.  And just a way for Ericsson to recognize the

24 value of someone else's invention?

25 A.  Or to -- to license their patents, certainly.

1    Q.  Yeah.  And you certainly wouldn't license them if you

2    didn't -- if you didn't value the technology, right?

3    A.  We wouldn't license if we didn't think we needed it.

4    Q.  All right.  And -- and Ericsson has a lot of what we

5    call cross-licenses; is that fair?

6    A.  Yes, ma'am.

7    Q.  Okay.  And a cross-license is when both companies, you

8    know, sort of -- for lack of a better word, exchange patent

9    rights in each other's patents?

10   A.  We license each other to each other's patents.

11   Q.  Fair enough.  That's -- that's a little overly

12   simplistic, right?

13   A.  Well, it is what it is.  You're licensing your patents

14   to the other party.

15   Q.  Yeah.  And in exchange, you're getting some of their

16   patents, as well, right?

17   A.  Or you're getting a license right to theirs, as well,

18   yes.

19   Q.  Okay.  Now, again, you testified on behalf of Ericsson

20   about its licensing practices; is that correct?

21   A.  Correct.

22   Q.  Okay.  And in prep -- preparation for your testimony,

23   you did some investigation about Ericsson's straight inbound

24   licenses?

25   A.  For my deposition, yes, I did.

1  Q.  All right.  And, again, just to remind the jury, the

2  inbound license is -- is a license when Ericsson takes a

3  license, pays money for someone else's patent, but doesn't

4  get any patent rights in return; is that fair?

5  A.  Correct.

6  Q.  Okay.  I apologize.  That was probably a pretty bad

7  question.

8        All right.  But when you did your investigation of

9  Ericsson's inbound licenses, you found that Ericsson

10 doesn't, in fact, take very many inbound licenses, does it?

11 A.  Correct.  I don't think we have very many pure inbounds.

12 Q.  That's correct.  And, in fact, you found that there were

13 much greater number of outbound licenses than inbound

14 licenses, correct?

15 A.  Greater number of cross-licenses, yes, ma'am.

16 Q.  Yes.  And you would agree with me --

17       THE COURT:  Ms. Henry, you seem to have a habit of

18 commenting on the answers.  When she gives an answer, you

19 say that's correct, or you say yes.  That's an improper

20 statement.  Don't comment on her answers.  Just ask the next

21 question, and let her answer the questions, please.

22       MS. HENRY:  I apologize, Your Honor.  Thank you.

23       THE COURT:  Let's continue.

24 Q.  (By Ms. Henry)  So, Ms. Chen, while Ericsson often

25 charges other companies for the use of its technology, it

1  very rarely pays other companies purely for the use of their

2  own technology; isn't that right?

3  A.  Sorry.  I'm just trying to make sure I understood what

4  you're asking.  It is rare that we take a license to

5  somebody else's patents where they don't need a license to

6  ours.

7  Q.  And is that because Ericsson thinks it's the only one

8  with good ideas?

9  A.  No.

10 Q.  You would agree with me that it's this jury that's going

11 to decide how good of an idea Mr. Jorgensen had, correct --

12 Dr. Jorgensen had, excuse me.

13 A.  Sure.

14 Q.  And it's this jury that's going to decide how much

15 money IV is owed for Mr. Jorgensen's idea; isn't that

16 correct?

17 A.  Yes, ma'am.

18 Q.  Thank you very much.

19         MS. HENRY:  I pass the witness.

20         THE COURT:  Redirect, Mr. Rubenstein?

21         MR. RUBENSTEIN:  Very briefly, Your Honor.

22         THE COURT:  Let's proceed.

23                    REDIRECT EXAMINATION

24 BY MR. RUBENSTEIN:

25 Q.  Ms. Chen, when Ericsson thinks that it needs to take a

1  license, does it take one?

2  A.  Yes, sir.

3  Q.  And do you believe it is okay to come to court and

4  defend yourself against allegations of patent infringement

5  if you believe you do not infringe?

6  A.  Yes, sir.

7  Q.  Thank you.

8          MR. RUBENSTEIN:  Pass the witness.

9          THE COURT:  All right.  Further cross-examination?

10          MS. HENRY:  No, Your Honor.

11          THE COURT:  All right.  Ms. Chen, you may step

12  down.

13          MR. RUBENSTEIN:  Your Honor, may the witness be

14  excused?

15          THE COURT:  Any objection?

16          Any objection to her being excused, Ms. Henry?

17          MS. HENRY:  Oh.  I apologize, Your Honor.  No.

18          THE COURT:  All right.  Then the witness is

19  excused.

20          Ms. Chen, you're free to leave, you're free to

21  stay.

22          THE WITNESS:  Thank you, sir.

23          THE COURT:  All right.  Ladies and gentlemen before

24  the Defendant calls their next witness, we're going to take

25  a recess.

```
 1              Just simply close and leave your notebooks in your
 2    chairs, if you will.
 3              Follow all my instructions, including not to
 4    discuss the case among yourselves, and we'll be back shortly
 5    to continue.
 6              The jury is excused for recess.
 7              COURT SECURITY OFFICER:  All rise.
 8              (Jury out.)
 9              THE COURT:  The Court stands in recess.
10              (Recess.)
11              COURT SECURITY OFFICER:  All rise.
12              THE COURT:  Be seated, please.
13              Are the Defendants prepared to call their next
14    witness?
15              MR. RUBENSTEIN:  Yes, Your Honor.  The Defendants
16    call Dr. Stephen Becker.
17              THE COURT:  All right.  Let me bring in the jury,
18    and we'll get that on the record.
19              Let's bring in the jury, please.
20              COURT SECURITY OFFICER:  All rise.
21              (Jury in.)
22              THE COURT:  Please be seated, ladies and gentlemen.
23              Defendants, call your next witness.
24              MR. RUBENSTEIN:  Thank you, Your Honor.  Defendants
25    call Dr. Stephen Becker.
```

```
 1              THE COURT:  All right.  Dr. Becker, if you'll come
 2    forward and be sworn, please.
 3              (Witness sworn.)
 4              THE COURT:  Please come around, sir, and have a
 5    seat on the witness stand.
 6              Mr. Rubenstein, Dr. Becker is no relation to Jeff
 7    Becker, your co-counsel, is he?
 8              MR. RUBENSTEIN:  Correct, Your Honor.  No relation.
 9              THE COURT:  All right.  We'll get that out of the
10    way.
11              MR. RUBENSTEIN:  All right.
12              THE COURT:  You may proceed with direct
13    examination.
14              MR. RUBENSTEIN:  Thank you, Your Honor.
15         STEPHEN BECKER, PH.D., DEFENDANTS' WITNESS, SWORN
16                      DIRECT EXAMINATION
17    BY MR. RUBENSTEIN:
18    Q.  Good morning, Dr. Becker.
19    A.  Good morning.
20    Q.  Would you please introduce yourself to the jury?
21    A.  Yes.  My name is Stephen Becker.
22    Q.  And where are you from, Dr. Becker?
23    A.  I'm from Austin.  I live in Austin now.  Born and raised
24    in Austin, and other than a few stints in Dallas and
25    Houston, I've lived in Austin all my life.
```

 1  Q.  Would you please tell us a little bit about your

 2  educational background?

 3  A.  Sure.  I have an undergraduate degree in computer

 4  science and electrical engineering from the University of

 5  Pennsylvania.  And then a Master's in finance, a Master's in

 6  business administration from UT Austin, and a Ph.D. in

 7  public policy from UT Austin.

 8  Q.  Now, Dr. Becker, do you belong to any professional

 9  organizations?

10  A.  I do.  I -- I'm a member of the American Economic

11  Association, the American Finance Association, something

12  called the Licensing Executive Society, an organization

13  called the National Association of Certified Valuators and

14  Analysts, and then the American Bar Association, I maintain

15  a membership in a -- an affiliate membership in an org --

16  part of the Bar Association that concerns itself with patent

17  law and licensing activity.  I'm not a -- not a lawyer.

18  Q.  Where do you currently work, sir?

19  A.  I work for a firm called Applied Economics Consulting

20  Group in Austin.  This is a firm that I founded -- actually

21  next month will be the 20th anniversary of the founding of

22  that firm.

23  Q.  And would you please explain to the jury a bit about the

24  type of work that you do?

25  A.  Yes.  For the entirety of that 20 years, what Applied

```
1    Economics does and what I do is provide economic and
2    financial consulting to companies in a variety of
3    industries.
4           The common thread through all of that is that we
5    are always -- almost always looking at the value of assets,
6    either the value of intellectual property assets.  I do a
7    lot of work in the energy industry valuing oil and gas
8    production and sort of a whole host of different kinds of
9    assets.  But the common thread is what's the economic value
10   of things.
11   Q.  And have those projects that you've worked on include
12   patent damages like this case here?
13   A.  They have.
14   Q.  And how many times have you been involved in assessing
15   the value of -- of patents in -- in matters like these?
16   A.  I've been a patent damages expert in over a hundred
17   different patent cases.
18   Q.  And by whom were you retained?
19   A.  Over the last 20 years in those hundred-plus cases, it
20   has fallen about 50/50 times that I work on behalf of the
21   patentholder, like IV in this case, or half the time on
22   behalf of the Defendant in the particular case.
23   Q.  And in this case, you're here on behalf of Ericsson and
24   T-Mobile?
25   A.  Yes, sir.
```

1      MR. RUBENSTEIN:  Your Honor, at this time I'd

2  tender Dr. Becker as an expert witness on the issue of

3  patent damages.

4      THE COURT:  Is there objection?

5      MR. WARD:  No objection.

6      THE COURT:  The Court will recognize the witness as

7  an expert in the designated field.

8      Continue, counsel.

9      MR. RUBENSTEIN:  Thank you, Your Honor.

10 Q.  (By Mr. Rubenstein)  Now, Dr. Becker, before we get into

11 the nuts and bolts of your opinions, you have been in the

12 courtroom during the course of this entire trial; is that

13 right?

14 A.  Most of it.  I was out for a couple of witnesses

15 yesterday.

16 Q.  And have you heard the discussion about the Ericsson --

17 the 18 Ericsson patents that were sent to ZTE?

18 A.  I have.

19 Q.  Can you tell us the only reason why we are talking about

20 those patents in this case, please?

21 A.  Yes.  We'll get into this a little more later in my

22 testimony, but the only reason, at least from the

23 perspective of anything to do with damages in this case,

24 that those 18 patents or really any of Ericsson's patents

25 are relevant is that Mr. Bratic chose to base his entire

1  damages model essentially on those 18 patents.

2  Q.  And do you believe that's proper?

3  A.  No.

4  Q.  All right.  Now, what was your assignment in this case,

5  Dr. Becker?

6  A.  I had two assignments.  The first was to determine a

7  reasonable royalty for the three asserted patents in this

8  case.  That's my primary assignment and the primary thing I

9  have come up with an opinion on.

10         I also was asked to review and comment on

11  Mr. Bratic's opinions, both the opinions that he offered in

12  his report that he filed in this case, and I was here for

13  his testimony, and I'm prepared to offer some comments on

14  the testimony that he gave.

15  Q.  And simply because you are here to discuss with the jury

16  about damages that you think may be appropriate here, that

17  doesn't mean that you believe Ericsson and T-Mobile infringe

18  the patents, does it?

19  A.  No.  I don't have an opinion about that either way, and

20  it wouldn't be appropriate for me to have an opinion.

21         In a patent damages expert's role, same with

22  Mr. Bratic, we have to assume for the purposes of our work

23  that -- you know, what would be the answer if there is a

24  finding that the patents are infringed and if there is no

25  finding that the patents are invalid.

1          So in that world, what's the right damages number,

2    what's reasonable?  But as a patent damages expert, I don't

3    have an opinion on whether there's any infringement and

4    whether the patents are valid or invalid.

5    Q.  Now, before we get into the details of your analysis,

6    would you give us a little bit of a preview of your

7    opinions?

8    A.  Sure.  The opinion that I will explain today is that the

9    appropriate structure of the license that Ericsson and

10   T-Mobile would get from Intellectual Ventures is a

11   non-exclusive U.S. license to the three asserted patents.

12          And with that as the thing that we're trying to

13   value, it's my opinion that the right number, a reasonable

14   number is a lump-sum royalty in the range of 110,000 to up

15   to 1.4 million.

16   Q.  And do you recall hearing Mr. Bratic testify about his

17   belief that the damages should be $77 million?

18   A.  Yes.

19   Q.  That's a pretty big difference, don't you think?

20   A.  It's a very big difference.

21   Q.  Have you studied Mr. Bratic's work to understand how he

22   arrived at his opinions?

23   A.  Yes.  In quite a bit of detail, yes.

24   Q.  Will you be able to tell the jury where you think he got

25   it wrong?

```
 1  A.  I will.
 2  Q.  And would you please give the jury a little bit of
 3  preview of those major errors?
 4  A.  Sure.  I -- there's a lot of -- lot of details to what I
 5  think he got wrong, but at a very high level, there are four
 6  main things that I think explain the difference between his
 7  opinion and what I think is reasonable.
 8          The first is that we heard him talk about this per
 9  subscriber month running royalty where he's counting the
10  number -- not just the number of subscribers but how many
11  months.
12          I think that's unreasonable, and I'll talk to you
13  about why that is.
14          The second point is that this $77 million opinion
15  that he has is based -- he starts with looking at handset
16  licenses, not the base station -- not the base stations or
17  the base station licenses that were available to him that
18  are the issue in this case.
19          Third, I think there's a big issue with how he has
20  used Dr. Chrissan's relative value analysis.  That drives a
21  large inflation in his number.
22          And, fourth, he fails to account for licensed
23  handsets.
24          We'll talk about all four of those.
25  Q.  And do these four errors that we see on this slide
```

1  explain the big difference between your opinion and his?

2  A.  It does.  I think if -- if he had not made those errors,

3  you could start with his 77 million and essentially get all

4  the way down to -- in the range that I have by just fixing

5  those four things.

6  Q.  Okay.  So let's get into the details of your analysis,

7  please.  Would you explain for the jury how you went about

8  determining what you believe to be the reasonable royalty in

9  this case?

10  A.  Sure.  The basic approach that I took is not unlike what

11  Mr. Bratic did, and that's very common in -- for any patent

12  damages expert to do this.  It's something called the

13  hypothetical negotiation.

14        As Mr. Bratic described, we imagine a world back in

15  February of 2013 where Intellectual Ventures and -- on the

16  one hand, and T-Mobile and Ericsson, on the other hand, come

17  into a room and sit down and say, all right, let's put our

18  cards on the table and see if we can negotiate a reasonable

19  royalty for these three patents.

20  Q.  And are there certain assumptions that you have to make

21  in this hypothetical negotiation?

22  A.  Yes.  There are a couple of key assumptions.

23        The first is that the parties come in understanding

24  or at least believing that they need a license.

25        Ericsson and T-Mobile understand that they need to

1    take a license.  They need to leave this negotiation with a

2    license.  There's no dispute about the validity and

3    infringement.

4         The reality is that we're here, that there is a big

5    dispute about the validity and infringement.  But in this

6    negotiation, we assume they're no longer disputing that.

7         Second, the parties are assumed to both be willing

8    to enter into a license, and the result has to be something

9    that's acceptable to both sides.

10        And, lastly, the cards are dealt face up.  There's

11   no secrets in this negotiation.  Intellectual Ventures would

12   know -- IV would know Ericsson and T-Mobile's -- sort of

13   details about their business, and Ericsson and T-Mobile

14   would know things about Intellectual Ventures that in a real

15   negotiation, they may not know.

16   Q.  What type of evidence did you consider while performing

17   your analysis, Dr. Becker?

18   A.  I looked at quite a bit of evidence.  In a case like

19   this, there's thousands and thousands of pages of documents

20   produced by the parties.  My staff and I have reviewed

21   significant portions of that.  There are expert reports,

22   both technical expert reports and damages reports.

23        I've had discussions with Ericsson's technical

24   experts.  I've reviewed deposition testimony and exhibits.

25   And my staff and I also did research on publicly available

1   information about the relevant industry.

2   Q.  And so how did you take this evidence and determine what

3   the outcome of this hypothetical negotiation would be?

4   A.  Well, there's a checklist called the Georgia-Pacific

5   factors that comes from a patent case back in the 1970s that

6   provides sort of a checklist of things that a patent damages

7   expert can look at to determine the outcome of a

8   hypothetical negotiation.

9         It's not -- we don't have to just look at those

10  things, there's oftentimes other evidence that's relevant,

11  but this serves as a checklist.

12  Q.  And did you consider all of these factors?

13  A.  I did.

14  Q.  Were all of them relevant to this case?

15  A.  No.  In any case, you're going to have different factors

16  that turn out to be more important than others.  It depends

17  on the evidence.  And here, not every factor was relevant.

18  Q.  Were there one or two that stuck out to you in this

19  case?

20  A.  Well, as we'll go through in the details of my

21  testimony, I think Georgia-Pacific Factor 1 is a good

22  example of one that I thought was very relevant.  It's -- we

23  see it's the royalties received by the patentee for the

24  licensing of the patent-in-suit.

25        So in the context of this case, that question is:

1   Has IV received royalties specifically attributable to the

2   patents -- to these three patents?  And we'll talk about

3   that evidence, but there's quite a bit of evidence in that

4   regard.

5   Q.  What did you conclude was the most important evidence in

6   this case?

7   A.  The three general areas of evidence that I found to be

8   relevant, first, is the evidence of the reasonable

9   structure.

10         In any patent license, one of the first questions

11  is:  How are we going to structure this?  Is it going to be

12  a single payment that we call a lump-sum payment, or is it

13  going to be a running royalty where every month or every

14  quarter or every year, you make payments based on the amount

15  of sales of the products at issue?  So we've got to decide

16  the structure first.

17         Then I also think that it's important to look at

18  the value allocated by Intellectual Ventures to these three

19  patents.  There's quite a bit of evidence of that, and I

20  think it's highly relevant.

21         The third is I looked at evidence to figure out

22  what I believe is a license amount that those parties could

23  have agreed to that would be consistent with IV's business

24  strategy.

25  Q.  Okay.  Dr. Becker, let's talk about that evidence.  What

1  do you mean by licensed structure?

2  A.  Well, I touched on this a bit, that when you structure a

3  patent license, the parties have to agree how to make the

4  payment.  Generally speaking, patent licenses fall into two

5  categories:  Lump sum or running royalty.

6       Just like you could walk into a car dealership and

7  buy a car and you can say, I'll just -- I'll just write you

8  a check for the whole thing -- that's a lump sum -- or you

9  could agree to pay for it over time.  That's more of a

10  running royalty.

11  Q.  Now --

12  A.  And so we've got to figure out, based on the evidence in

13  the case, which structure is the right one.

14  Q.  Now, Mr. Bratic assumed that it would be a running

15  royalty; is that right?

16  A.  He did.  He assumed a running royalty, and in

17  particular, he assumed something that he -- that is really

18  more than a typical running royalty.  It's -- it's a

19  per-subscriber per-month running royalty.

20  Q.  Do you agree with Mr. Bratic's assumption?

21  A.  No.

22  Q.  And how did you go about figuring out which structure

23  was the most reasonable?

24  A.  So I looked at the evidence in the case, and I find that

25  it is overwhelmingly in support of a lump sum.  And there

 1   are a couple of factors that really drove that -- that

 2   outcome.  I think I have a slide on that.

 3         MR. RUBENSTEIN:  Before we do that, Your Honor,

 4   we're about to get into some confidential information of IV,

 5   and we'd request to seal the courtroom, please.

 6         THE COURT:  All right.  Based on that

 7   representation and counsel's request, I'll order the

 8   courtroom sealed at this time.  Those present not subject to

 9   the protective order in this case should exit the courtroom

10   and remain outside until it's reopened.

11         Mr. Ward?

12         MR. WARD:  Yes, Your Honor.  Since it's IV's

13   confidential information, I'd request the same courtesy that

14   we extended to opposing counsel and let IV remain in the

15   courtroom.

16         THE COURT:  Do you have any problem,

17   Mr. Rubenstein?

18         MR. RUBENSTEIN:  Did you misspeak?  Are you talking

19   about -- oh, to let IV remain in the courtroom.  I'm sorry.

20   I misheard you.  I have no objection to that.

21         THE COURT:  All right.  IV's personnel may remain,

22   since this is IV's confidential information.

23            (Courtroom sealed.)

24            (Sealed Portion No. 8 saved in separate sealed

25   transcript.)

1           (Courtroom unsealed.)

2           THE COURT:  The jury is excused for lunch at this

3  time.

4           COURT SECURITY OFFICER:  All rise.

5           (Jury out.)

6           THE COURT:  Court stands in recess.

7           (Recess.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4     correct transcript from the stenographic notes of the

5     proceedings in the above-entitled matter to the best of my

6     ability.

7

8

9      /S/ Shelly Holmes                        2/7/19
      SHELLY HOLMES, CSR, TCRR                   Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25