1                   IN THE UNITED STATES DISTRICT COURT

2                   FOR THE EASTERN DISTRICT OF TEXAS

3                             MARSHALL DIVISION

4    INTELLECTUAL VENTURES I LLC, )(

5         PLAINTIFF                )(      CIVIL ACTION NO.

6    VS.                          )(      2:17-CV-577-JRG

7                                 )(       MARSHALL, TEXAS

8    T-MOBILE USA, INC., T-MOBILE )(

9    US, INC., ERICSSON INC., AND )(

10   TELEFONAKTIEBOLAGET LM        )(

11   ERICSSON,                     )(      FEBRUARY 7, 2019

12        DEFENDANTS               )(      12:54  P.M.

13                    TRANSCRIPT OF JURY TRIAL

14           BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

15              UNITED STATES CHIEF DISTRICT JUDGE

16   APPEARANCES:

17   FOR THE PLAINTIFF:        Mr. T. John Ward, Jr.
                               Ms. Claire A. Henry
18                             Ms. Andrea L. Fair
                               Mr. Wesley Hill
19                             WARD, SMITH & HILL, PLLC
                               1507 Bill Owens Parkway
20                             Longview, Texas 75604

21   COURT REPORTER:           Ms. Shelly Holmes, CSR, TCRR
                               Official Reporter
22                             United States District Court
                               Eastern District of Texas
23                             Marshall Division
                               100 E. Houston Street
24                             Marshall, Texas 75670

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)

```
 1   FOR THE PLAINTIFF:        Mr. Martin J. Black
                               Mr. Kevin M. Flannery
 2                             DECHERT LLP
                               Cira Centre
 3                             2929 Arch Street
                               Philadelphia, Pennsylvania 19104
 4
                               Mr. Joseph M. Abraham
 5                             Mr. Timothy F. Dewberry
                               Mr. Joshua J. Yi
 6                             Mr. Jacob R. Porter
                               DECHERT LLP
 7                             300 West Sixth Street
                               Suite 2010
 8                             Austin, Texas 78701

 9                             Ms. Nisha N. Patel
                               Mr. Ryan T. Banks
10                             DECHERT LLP
                               2440 W. El Camino Real
11                             Suite 700
                               Mountain View, California 94040
12
13   FOR THE DEFENDANTS:       Mr. Douglas M. Kubehl
                               Mr. Jonathan B. Rubenstein
14                             Mr. Jeffery S. Becker
                               BAKER BOTTS LLP
15                             2001 Ross Avenue
                               Dallas, Texas 75201
16
                               Ms. Melissa R. Smith
17                             GILLAM & SMITH LLP
                               303 South Washington Avenue
18                             Marshall, Texas 75670

19                             Mr. Asim M. Bhansali
                               KWUN BHANSALI LAZARUS LLP
20                             555 Montgomery Street
                               Suite 750
21                             San Francisco, California 94111

22

23

24

25
```

```
 1              (Jury out.)

 2              COURT SECURITY OFFICER:  All rise.

 3              THE COURT:  Be seated, please.

 4              Mr. Ward, are you prepared to go forward with

 5    cross-examination?

 6              MR. WARD:  Yes, Your Honor.

 7              THE COURT:  You may go to the podium and prepare.

 8    I see Dr. Becker is back on the witness stand.

 9              Let's bring in the jury.

10              COURT SECURITY OFFICER:  All rise.

11              (Jury in.)

12              THE COURT:  Please be seated.

13              When we broke for lunch, the Defendants had asked

14    the witness.  Having completed their direct examination of

15    Dr. Becker, we'll now proceed with the Plaintiff's cross

16    examination.

17              Mr. Ward, you may proceed.

18              MR. WARD:  Thank you, Your Honor.

19    STEPHEN BECKER, Ph.D., DEFENDANTS' WITNESS, PREVIOUSLY SWORN

20                        CROSS-EXAMINATION

21    BY MR. WARD:

22    Q.  Good afternoon, Dr. Becker.

23    A.  Good afternoon.

24    Q.  You and I have met before, have we not?

25    A.  We have.
```

1   Q.  We've done this a few times?

2   A.  A couple.

3   Q.  Not in this case, other cases.

4   A.  Yes.

5        MR. WARD:  Let's start out with Bratic Slide No. 5.

6   Q.  (By Mr. Ward) Did you show a slide with the patent

7   damages statute on it?

8   A.  I didn't.

9   Q.  Okay.  The patent damages statute, as Mr. Bratic told

10  us, says:  Upon finding for the complaint, the Court shall

11  award the claimant damages adequate to compensate for the

12  infringement, but in no event less than a reasonable

13  royalty -- and I like to highlight this next part.

14       MR. WARD:  Mr. Horseman?

15  Q.  (By Mr. Ward) -- For the use made of the invention by

16  the infringer.

17       Did I read that correctly?

18  A.  Yes.

19  Q.  You're very familiar with this statute, aren't you?

20  A.  I am.

21  Q.  And it doesn't say for the return on investment within

22  the company owned by the Plaintiff.

23  A.  Correct.  It does not say that.

24       MR. WARD:  Thank you, Mr. Horseman.

25  Q.  (By Mr. Ward)  And so we are supposed to focus on the

```
1   use of the infringing technology made by the infringer,

2   correct?

3   A.  It's -- that's an element of the analysis, yes.

4   Q.  I mean, that's what the statute says, correct?

5   A.  It's the -- it is an amount of compensation that is for

6   that use, but there's a lot that goes into figuring out

7   what's the reasonable amount of compensation.

8   Q.  Fair enough.

9           Now, the -- you said there's a range.  110,000 to

10  1.4 million.

11  A.  Correct.

12  Q.  Have you ever bought a house, Dr. Becker?

13  A.  Yes.

14  Q.  Now, if you went to the bank and you said, I found a

15  house, and they want $1.5 million for it, you'd have to go

16  get an appraisal if you wanted a loan, right?

17  A.  Yes.

18  Q.  Big loan.

19  A.  Yes.

20  Q.  And can you imagine, if you showed back up at your bank,

21  and your appraiser said, the house is worth between 100,000

22  and 1.4 million, what's the bank going to say?

23  A.  They're going to ask what the assumptions are that went

24  into the 110 or the 1.4, which may be very different.

25  Q.  Do you think the bank's going to say, well, we need
```

1  something that tells us what the house is worth; we can't

2  have this range of maybe it's 110,000 or maybe it's 12 times

3  that much; they're going to need a more specific answer,

4  correct?

5  A.  Correct.

6  Q.  You're here to testify once.  We're in the evidence

7  today.  You understand that, don't you?

8  A.  Yes.

9  Q.  Will you tell the jury what the number is that you think

10  is in that range that you think is the real number?

11  A.  Well, I think at --at the end of the day, I would say

12  that it's not more than 1.4 million.  I've explained why I

13  think there are circumstances under which it would be

14  reasonable to accept 110,000.  But at the end of the day, if

15  I had to pick a single number, I would say it's not more

16  than 1.4 million.

17  Q.  But you said the 1.4 million included -- would include a

18  license to the entire portfolio?

19  A.  No.  No, it's only for these three patents.

20  Q.  Right.  But I thought you said that when doing your

21  analysis -- and I said entire portfolio, I'm sorry.  That

22  was a -- a bad statement.

23        The Malibu -- what you call the Malibu portfolio,

24  right?

25  A.  I'm not sure I understand the question.  I know we've

1  talked about the Malibu portfolio is the thing that the

2  three patents-in-suit are in.

3  Q.  Okay.  So you've limited it to that -- those three

4  patents would be 1.4 million?

5  A.  Correct.

6  Q.  And so are you telling the jury that the number really

7  is 1.4 million in your analysis if you had to pick a number?

8  A.  For those -- just those three patents, if there was only

9  one number, I would say 1.4 million.

10  Q.  And that's because you know the 110,000 is pretty

11  ridiculous, right?

12  A.  I do not think it's ridiculous.  I think it's -- it is

13  the one number we have that you can say is consistent with

14  how IV has, in fact, licensed the patents over -- these

15  three patents over and over again.

16          But I recognize that there are other factors that

17  go into the hypothetical negotiation, and that's why I think

18  it's reasonable to be at 1.4 million.

19  Q.  Now, Dr. Becker, like all the experts in this case,

20  you're charging for your time, are you not?

21  A.  Yes.

22  Q.  And how much are you charging for your time?

23  A.  My rate is $625.00 an hour.

24  Q.  And you've had other people in your firm work on this

25  file, have you not?

1    A.   Yes.

2    Q.   How much has your firm billed up to today for the work

3    that it's done on this matter?

4    A.   I don't have an exact figure.   I'd say it's north of --

5    I'd say it's probably in the couple hundred thousand

6    dollars.

7    Q.   So a couple hundred thousand dollars for your analysis?

8    A.   Yes.

9    Q.   You were here for Dr. Acampora, couple hundred thousand

10   for him?

11   A.   Yes.

12   Q.   And then Dr. Wicker, couple hundred thousand for him?

13   A.   Yes.

14   Q.   Now, you also told the jury that during the last 20

15   years, you've done a lot of work in this area?

16   A.   Yes.

17   Q.   And I think you said you worked 50/50 pretty much over

18   those 20 years for Plaintiffs and Defendants?

19   A.   Yes.

20   Q.   That's not exactly what the breakout would be if we just

21   looked at the last three to five years, is it?

22   A.   No.

23   Q.   You've looked at that, haven't you?

24   A.   I haven't looked at it recently, but it -- it ebbs and

25   flows.   And I think in the last couple years, it's --

1   wouldn't be exactly 50/50.

2   Q.  Well, just in the last five years, it's -- you've got 60

3   cases listed in your CV, don't you?

4   A.  60 cases overall or 60 patent cases?

5   Q.  There's 60 cases --

6   A.  Oh, sure, yeah.

7   Q.  And 44 of those 60, would it surprise you, they're

8   working for the defense?

9   A.  Oh, not a bit because my answer about the 50/50 was on

10  patent cases.

11  Q.  Okay.

12  A.  And that 60, I have one specific field that I work in

13  where I -- all the work I do is on the defense side.  It has

14  nothing to do with patents.

15  Q.  At least what we can see in your expert report, you've

16  got 60 cases listed?

17  A.  Yes.

18  Q.  And 75 percent of them roughly are working for the

19  defense?

20  A.  Sure.

21  Q.  And this is your expert report, right?

22  A.  Yes.

23  Q.  And like all the experts, you had to provide us with a

24  report with all your opinions?

25  A.  Yes.

1  Q.  And we get a chance to take your deposition and ask you

2  questions about that report?

3  A.  Correct.

4  Q.  Let's talk about the hypothetical negotiation.  You know

5  -- you know what I'm talking about?

6  A.  Yes, I do.

7  Q.  You've analyzed many patents cases, and you've done this

8  hypothetical negotiation, correct?

9  A.  Yes.

10  Q.  And you talked about T-Mobile's preference for a lump

11  sum as part of that analysis?

12  A.  Yes.

13  Q.  But in the hypothetical negotiation, doesn't it have a

14  different wrinkle here?

15  A.  I'm not sure what you mean.

16  Q.  Well, I didn't hear you talk about the indemnity

17  agreement between T-Mobile and Ericsson.

18  A.  I -- I don't think the -- any indemnity agreement, if it

19  exists, is relevant to the analysis.

20  Q.  You don't think it's relevant to determine the weight of

21  the credibility you give to the people that you interview?

22  A.  I'm not sure what you mean.

23  Q.  Well, didn't you interview folks for Ericsson and

24  T-Mobile when you were trying to figure out what this

25  technology was worth?

1    A.  Yes.

2    Q.  And do you think that Ericsson would have a motivation

3    to minimize that value if they're having to pay all the

4    freight for T-Mobile's use?

5    A.  Well, I can't speak to their motivations.  Certainly the

6    people that I talked to, I found them to be, you know,

7    honestly and, I think, fairly answer my questions.  I wasn't

8    asking them to -- you know, for them to shade things one way

9    or the other.

10   Q.  I wasn't -- I didn't mean to imply that you had.  So you

11   understand that?

12   A.  Okay.  I just wasn't sure.  It sounded like you were

13   suggesting that they were sort of pushing things down just

14   because they're having to pay if there's damages in this

15   case.

16   Q.  Well, I didn't see the indemnity agreement referenced

17   anywhere in your report?

18   A.  No, it's not.

19   Q.  Did you review it?

20   A.  I don't think I've even seen it.  It's not relevant to

21   my analysis.

22   Q.  It's not relevant to your analysis -- is this what

23   you're telling the jury, it's not relevant -- when you go

24   talk to someone who is potentially having to pay damages,

25   it's not relevant to determine if they might have a

1  motivation to angle for a lower number?

2  A.  I don't think so, no.

3  Q.  Because you understand this is a method claim, correct?

4  A.  I understand that there are method claims asserted here.

5  Q.  And you understand, as the Plaintiff, we have focused on

6  the use of the technology by T-Mobile?

7  A.  I -- I understand that.  I've been here this week.

8  Q.  Is that what you did in your analysis?

9  A.  The use of the technology is one factor that is -- that

10  factors into my analysis.

11       MR. WARD:  Could we see Becker Slide 20?

12  Q.  (By Mr. Ward)  Now, this is one of your slides; is that

13  right, Dr. Becker?

14  A.  It is.

15  Q.  And this was the cost of ownership that you pulled

16  from -- it looks like a couple of Defendants' exhibits --

17  or, I'm sorry, Defendants' Exhibits 485?

18  A.  Yes.

19  Q.  And you've got the purchase price --

20  A.  Yes.

21  Q.  -- of 900,000?

22  A.  Yes.

23  Q.  And I think you said that was a -- one of the key

24  components or the starting point in this analysis?

25  A.  It's -- it's a starting point for some -- yeah, I think

1    it's fair that the -- the real starting point is that

2    estimated total cost of ownership, but I understand that

3    when IV calculates those, they start with the purchase

4    price.

5    Q.  And then you've got maintenance fees for U.S. patents in

6    there?

7    A.  Yes.

8    Q.  I say you've got.  It's in the document, correct?

9    A.  Yes.

10   Q.  And prosecution costs and lifetime maintenance fees.

11          That's what the document says, right?

12   A.  Yes.

13   Q.  And then prosecution costs, lifetime annuities for

14   existing international applications?

15   A.  Yes.

16   Q.  Where are expert fees at trial?

17   A.  I don't think they're in this -- this is not -- it

18   doesn't appear to me that when IV is -- the way it measures

19   things, it does not take that into account as the total cost

20   of ownership.

21   Q.  Well, do you know when this document was prepared?

22   A.  This was -- this particular document is prepared at the

23   time they did the acquisition.

24   Q.  2004, right?

25   A.  Yes.

1   Q.  Before anyone's using Voice over LTE, right?

2   A.  Sure.

3   Q.  And when they acquired the portfolio, two of the patents

4   in this suit didn't exist, did they?

5   A.  I think they -- that's true.  They were still

6   applications.

7   Q.  There's nothing in these costs for attorneys at trial,

8   is there?

9   A.  No.

10  Q.  Did you not think those -- if you were going to

11  calculate total estimated cost of ownership, that you'd want

12  to include that when you were trying to determine a fair

13  amount of what it would cost -- what these patents cost IV?

14  A.  Well, I think the -- no, I don't think that that -- that

15  the legal fees of the type that are being expended here

16  would reasonably go into this particular total cost --

17  estimated cost of ownership, because this is the way IV

18  measures things.

19  Q.  This is the way IV measures internally, correct?

20  A.  Yes.

21  Q.  This is not the way they've presented their damages

22  model at this trial, is it?

23  A.  Oh, certainly not.

24  Q.  This is the way you chose to calculate damages, correct?

25  A.  Well, this is a -- an ingredient in the way I think it

```
 1   is reasonable to arrive at a royalty in this case.
 2   Q.  That you think is reasonable, correct?
 3   A.  Yes, but it's consistent with their documents.
 4   Q.  It's consistent with their documents.  Is that what you
 5   said?
 6   A.  Yes.
 7   Q.  And so you've seen documents where IV does calculations
 8   of what infringers owe it based upon its total cost of
 9   ownership of patents?
10   A.  I think it's broader than that.  They -- the documents
11   support that the total cost of ownership is a factor in
12   their measuring the performance of their business model that
13   is -- their whole model is generating revenue from people
14   who they think are using their technology.
15           MR. WARD:  Objection, nonresponsive.
16           THE COURT:  I think it's broader than that was
17   responsive to the question.  I'll allow that.  The remainder
18   of the answer I'll strike as nonresponsive.
19           Let's continue.
20   Q.  (By Mr. Ward)  You have focused on this original
21   purchase price, at least in part, have you not?
22   A.  Yes.
23   Q.  And, in fact, you talked about that purchase price in
24   your report, didn't you?
25   A.  Yes.
```

1  Q.  And you talked about how IV bought these patents at an

2  auction, correct?

3  A.  Yes.

4         MR. WARD:  Let's look at Becker report at Page 42.

5         And just highlight that top paragraph, please, sir,

6  Mr. Horseman.

7  Q.  (By Mr. Ward)  And I've got your entire report, if you

8  want to see it, Dr. Becker, but I really want to focus on

9  this section here.

10        It says:  Because the subject of the asset sales

11  are fairly specialized within industries.

12        Do you see that?

13 A.  Yes.

14 Q.  Will you take a moment just to familiarize yourself with

15 it?

16 A.  Okay.

17 Q.  And would you agree with me that you felt like, because

18 you viewed IV as an insider in this business, that it maybe

19 placed a higher value on this purchase than an outsider

20 would have?

21 A.  Yes.  Than other potential bidders, yes.

22 Q.  And, in fact, you said:  This appears to have been the

23 case in that IV's primary competition in the bidding was the

24 lead inventor.

25 A.  Yes.

```
 1   Q.  That was your belief --

 2   A.  Yes.

 3   Q.  -- correct?

 4        And let's look at what you cite, Footnote 251.  You

 5   cite the deposition of Peter Detkin, March 6th, 2017,

 6   Exhibit 10.

 7   A.  All right.

 8   Q.  Have you reviewed that document recently?

 9   A.  Not recently, no.

10   Q.  Do you think you might have been mistaken about who the

11   primary competition was in that auction?

12   A.  Without looking -- it's been quite a while since I've

13   looked at that document.  I may be --

14   Q.  All right.  Let's look at it.

15   A.  Okay.

16        MR. WARD:  Mr. Horseman, can we pull up Exhibit 10

17   from Detkin.

18        I tell you what, just give me the ELMO, please,

19   ma'am.  I've got it here.  Thank you.

20   Q.  (By Mr. Ward)  Does that look like the exhibit that you

21   were relying on, Dr. Becker?

22   A.  Yes.

23   Q.  And we can go down in the string, but May 17th, 2004,

24   that was the time of the acquisition, was it not?

25   A.  Yes.
```

1  Q.  And it says:  We got these patents this morning at

2  auction for 900,000.

3  A.  Correct.

4  Q.  In addition to the five issued patents, I learned late

5  last week that there are many pending apps, about 10.

6  Unclear how many are still alive, but it's the majority.

7  A.  Okay.

8  Q.  You see that?

9  A.  Yes.

10  Q.  So would you agree that at least at the time of the

11  purchase, it appears that IV was not even aware of the

12  applications that resulted in the patents-in-suit?

13  A.  Well, Mr. Detkin appears to be saying that he wasn't --

14  you know, when he said, I learned late last week, I just

15  don't know the timing as to whether that was before or after

16  the -- the auction had ended.

17  Q.  All right.  Can we look at that in just a minute?

18  A.  (No response.)

19  Q.  Is it okay if we look at that issue in a minute?

20  A.  Sure.

21  Q.  Because that next paragraph says:  After the bidding,

22  the lead inventor went to our rep to offer his services and

23  offered lots of info.

24       You see that?

25  A.  I see that, yes.

1  Q.  And then the -- the last sentence in that preceding

2  paragraph said:  Primary competition in bidding was from the

3  former CEO of the company who had put together a consortium

4  of investors to try to buy the patents.

5       You see that?

6  A.  I do.

7  Q.  And so did you believe that Dr. Jorgensen was the CEO

8  when you wrote the paragraph that said the primary

9  competition was the inventor?

10 A.  I'm not -- you know, I may have inferred that.

11 I certainly understood that the competition was from the

12 former CEO of the company.  This is the document I'm relying

13 on, and that's why I said that it was industry insiders who

14 would be the -- who were apparently the competition in this

15 case.

16 Q.  You understand that Dr. Jorgensen's the CTO.

17 A.  Correct.

18 Q.  Right.  Not the CEO.

19 A.  All right.

20 Q.  I'm not faulting you for missing that, but it was

21 somebody other than Dr. Jorgensen who was trying to bid

22 against IV for the patents.

23 A.  Oh, sure.  I'll -- I'll give you that.  It doesn't

24 change.  It actually confirms what that paragraph in my

25 report was saying, but I'll give you the correction.

```
1   Q.  If we go down -- let's -- I've got to scroll down.

2        If we look down at the email dated April the 8th,

3   2004, do you see that?

4   A.  Yes.

5   Q.  And it's -- it's from Edward Jung or Young to Peter

6   Detkin, Nathan Myhrvold, and Greg Gorder.

7        Do you see that?

8   A.  I see that.

9   Q.  And it says:  These are worth buying.

10  A.  I see that.

11  Q.  And then if we scroll up to the next -- we read these

12  emails when they're printed from the bottom to the top,

13  right?

14  A.  Yes.

15  Q.  And then there's a response on April 8th, and you see

16  the response says:  Unfortunately, it's not that easy.

17  These will be sold at auction along with a bunch of other

18  assets, and I don't have a clue how high the bidding will

19  get.  So we have to decide how high we are willing to go.

20  1 million?  2 million?

21       Do you see that?

22  A.  Yes.

23  Q.  So does it appear there was some internal discussion

24  within IV about how high do we go in the bidding?

25  A.  Sure.  I think that's the case at any auction.
```

1  Q.  And the next entry looks like Mr. Jung says 1 million.

2  A.  Yes.

3  Q.  So that looks like the authority that was given for the

4  auction, correct?

5  A.  Appears to be, yes.

6  Q.  And that was on April the 8th, 2004.

7  A.  Okay.

8  Q.  And so in between the time -- at least according to this

9  email, would you agree with me that in between the time that

10  the authority to purchase for 1 million was given and the

11  time that the patents were purchased, Mr. Detkin appears to

12  have discovered that there were some pending apps?

13  A.  Sure.  That looks like that -- I mean, if I look down,

14  he clearly understood back on April 8th that there were a --

15  a bunch of other assets, and then it looks like by

16  May 17th, he's delved into it further and is now saying that

17  he's focused on the pending applications.

18  Q.  Does it appear to you that when they gave the authority

19  of 1 million, at least according to this email and according

20  to Mr. Detkin, he wasn't aware of the pending apps?

21  A.  I really can't say.  He may or may not have been.

22  Q.  But we know for sure that when the purchase was made,

23  the '517 and '206 patents didn't exist?

24  A.  They hadn't issued.  The applications were pending, but

25  they didn't exist.  The patents hadn't issued.

1    Q.  What's worth more typically, Dr. Becker, a patent or a

2    patent application?

3    A.  A patent, once it's issued.

4    Q.  And so at the time they made this purchase, there was

5    one issued patent in this suit, and that's the '629,

6    correct?

7    A.  Yes.

8    Q.  You recall your testimony about the 18 Ericsson patents

9    that Mr. Bratic used in his valuation?

10   A.  Yes.

11   Q.  You were present for Ms. Chen's testimony, correct --

12   A.  Yes.

13   Q.  -- where she confirmed that others within Ericsson

14   referred to these 18 charted patents as representative?

15   A.  Sure.

16   Q.  And you're the last witness for the defense, correct?

17   A.  I don't know.  I think so.

18   Q.  I think so, too, but do you know of anyone else?

19   A.  I don't know.  It's not my call.

20   Q.  Do you know of anyone who's coming to testify as to the

21   value of any other patents in Ericsson's portfolio as

22   opposed to these 18?

23   A.  Beyond what Ms. Chen has already said, no, I don't know

24   of anybody.

25   Q.  Nothing stopped Ericsson from doing its own valuation

1    for this case, did it?

2    A.  No.

3    Q.  Did you see any expert who issued a report that said

4    those 18 patents had a different value -- technical value

5    than what Dr. Chrissan said?

6    A.  No.

7    Q.  Ericsson certainly had the ability -- the ability to

8    challenge that, didn't they?

9    A.  Well, I -- my recollection is that Dr. Wicker's report

10   addressed the question of whether he believed that

11   Dr. Chrissan's technical valuation analysis was even

12   reliable.

13          So I -- I do recall that they have a technical

14   expert who at least, based on my discussion with him, felt

15   that the Chrissan analysis, even within the 18, was not

16   really a reliable way to come up with the comparison.

17          But beyond that, nobody has -- that I'm aware of

18   has -- other than -- certainly Dr. Chrissan didn't look

19   beyond the 18.

20   Q.  Is the answer to my question that, no, you're not aware

21   of anyone at Ericsson who's going to provide an analysis of

22   the value of any other patents in its portfolio to this

23   jury?

24   A.  Other than the 18?

25   Q.  Correct.

A.  Not beyond Ms. Chen saying that she believes that -- you
know, what she said about it.  I mean, I don't need to
recharacterize her testimony.
Q.  Have you ever heard that saying about it takes a
carpenter to build a barn and any old mule can kick it down?
A.  Yes.
Q.  You certainly weren't provided any licenses from
Ericsson where they had paid inventors for a license to
their patents, correct?
A.  You know, we had a bunch of Ericsson licenses that
I looked at, and some of those were cross-licenses where
Ericsson was -- you know, I just don't know how to answer
that.  I'd have to go back and look at the details of the
licenses that were provided.
Q.  Well, Ms. Chen just testified.  You heard her, didn't
you?
A.  Yes.
Q.  And did you hear her testify that it was extremely rare
for them to have -- them, being Ericsson, to have an inbound
license with an individual inventor where they paid for a
license to an individual inventor's patents?
A.  Sure.  I do recall that testimony, that it's -- it's
rare for Ericsson to -- they just haven't had the
circumstance where they've licensed just sort of only
inbound small number of patents with an individual inventor.

1    That just doesn't happen much in the industry.

2    Q.  In their long and storied history, their being Ericsson,

3    there's not a single license in this case where Ericsson has

4    paid an inventor for a license to any technology?

5    A.  I'm -- I'm only working with the documents in this case,

6    and there's certainly -- I'm not aware of one like that that

7    has been produced in this case.  Whether in their long and

8    storied history they've done that, I have no idea.

9    Q.  There's not any evidence in this case of one, is there,

10   Dr. Becker?

11   A.  Well, sure.  To say there's not evidence in this case,

12   that's true.  Whether that means that they've never done it,

13   we're -- we're not seeing the totality of their long and

14   storied history here.

15          MR. WARD:  Objection, nonresponsive.

16          THE COURT:  The portion of the answer where he

17   says, "well, sure.  To say that there's not evidence in this

18   case, that's true," that's responsive to the question.  The

19   remainder is nonresponsive, and I'll strike it as I sustain

20   the objection.

21          And, Dr. Becker, I'll ask you to limit your answers

22   to the questions asked.

23          THE WITNESS:  Yes, Your Honor.

24          THE COURT:  Mr. Rubenstein is going to get to ask

25   you more questions, as you understand.  So please limit your

1    answers to Mr. Ward's questions at this point.

2              All right.  Let's proceed.

3    Q.  (By Mr. Ward)  Both -- both sides in this case have an

4    opportunity to present evidence, correct?

5    A.  Yes.

6    Q.  And to have you review it?

7    A.  Yes.

8    Q.  And you didn't review any licenses -- Ericsson didn't

9    ask you to review any licenses that it had paid for a

10   license fee with an individual inventor?

11   A.  Not that I recall.

12   Q.  Nor did T-Mobile, did they?

13   A.  Not that I recall, no.  There may be, I just don't have

14   that -- there's a long list of license agreements.  I don't

15   recall any.

16   Q.  Certainly nothing in the presentation that you gave this

17   jury about a license that T-Mobile had taken with an

18   individual inventor?

19   A.  That's true.

20   Q.  In fact, there's not evidence of any license in this

21   case that you've relied upon where Ericsson or T-Mobile has

22   paid money to anyone outside the company that you're relying

23   upon?

24   A.  That's true.

25   Q.  You recall your direct testimony about R allocations?

```
 1    A.   Yes.
 2    Q.   A lot of testimony about those R allocations, right?
 3    A.   Yes.
 4    Q.   That was something that you really focused on?
 5    A.   I think that's fair.  It's an important part of my
 6    analysis.
 7    Q.   In your review of all the documents, the depositions,
 8    the testimony of the witnesses, did you see anything that
 9    would indicate that IV has ever approached a potential
10    licensee and said:  Here's our internal R allocations, we
11    want you to pay us licensing fees according to how we
12    allocate funds among our inventors?
13    A.   No, I haven't seen a circumstance like that.
14    Q.   Not one, was there?
15    A.   No.
16    Q.   The R allocations are what IV uses internally, correct?
17    A.   I disagree with that.
18    Q.   They use them with potential investors?
19    A.   They do.
20    Q.   But not with potential licensees when negotiating
21    licenses, do they?
22    A.   I disagree with that.
23    Q.   Well, the R allocations spread value from a license
24    across potentially every patent in the portfolio, don't
25    they?
```

1    A.   They do.   They -- I think it's every -- yes.

2    Q.   So a license to IV's patents might be with a tech

3    company?

4    A.   Correct.

5    Q.   And that tech company might get a -- a license to a

6    subset of patents that are directly applicable to what that

7    tech company is doing, right?

8    A.   True.

9    Q.   And then they might get a bunch of licenses that read on

10   automobile engines or tires or wheels, right?

11   A.   Sure.   As part of the portfolio license, that's true.

12   Q.   And then IV, because it has investors, would have to

13   allocate a portion of those license fees to unrelated

14   technologies, unrelated patents, correct?

15   A.   They do, that's true.

16   Q.   Because that's their deal with their investors, correct?

17   A.   Yes.

18   Q.   But it's your opinion in this case, IV would sit in a

19   room in the hypothetical negotiation with T-Mobile and

20   Ericsson, and they'd say, okay, T-Mobile, you admit that our

21   patents are infringed and valid, right?

22   A.   Right.

23   Q.   And here are our R allocations that we want to

24   use -- or we want you to use to determine how much money

25   you owe us?

1    A.   That's not what I'm saying in my -- in my work.

2    Q.   You're saying that they would use them, though, in this

3    hypothetical negotiation to allocate how much they think

4    these patents are worth, they being T-Mobile and Ericsson.

5    A.   No.   I think the -- that's not what I'm saying.

6    Q.   Okay.   You did look at lots of license agreements that

7    IV had, correct?

8    A.   Right.

9    Q.   And you looked at the Ericsson licenses that Mr. Bratic

10   relied upon.

11   A.   Yes.

12   Q.   But you determined that none of the licenses, whether

13   they're Ericsson licenses, T-Mobile licenses, IV licenses,

14   that none of them were relevant to your calculations.

15   A.   In terms of the overall license agreements that I --

16   that's true.   I think they're -- my analysis depends in part

17   on the results of the IV licensing activity.

18   Q.   You did not rely upon, though, a single license from

19   Ericsson or T-Mobile in determining that damages owed in

20   this case are between 110,000 and 1.4 million --

21   A.   Correct.

22   Q.   -- did you?

23   A.   Correct.

24   Q.   Would IV have had access to T-Mobile's internal

25   documents at this hypothetical negotiation?

A.  I think they would be aware of the same sort of open

book, cards on the table.  They'd be aware of anything

internal to T-Mobile or Ericsson that was relevant to the

negotiation.

Q.  Well, you understand that IV says that VoLTE on

T-Mobile's network doesn't work as efficiently as it does

without the patents-in-suit.

A.  Sure.  I understand that's -- that's IV's technical

position in this case.

Q.  And you've got to assume infringement in your analysis,

don't you?

A.  I do have to assume infringement.

Q.  And so IV, at this hypothetical negotiation, would have

been aware that internally, Sprint was saying it was running

out of spectrum.

A.  Did you mean to say Sprint?

Q.  No.  T-Mobile.

A.  Okay.

Q.  They would have known that T-Mobile was running out of

spectrum in 2014/2015.

A.  Yes.

Q.  And it's common knowledge that spectrum costs billions

and billions of dollars, correct?

A.  For overall spectrum costs, yes, they're expensive.

Q.  Well, did you review T-Mobile's 10-Ks?

1  A.  I've seen those, yes.

2  Q.  And you've seen that they were acquiring spectrum back

3  at this time, weren't they?

4  A.  Sure.  Every carrier was.

5  Q.  And they were spending billions of dollars to do it,

6  weren't they?

7  A.  I think, yes, every carrier was.

8  Q.  T-Mobile was --

9  A.  Yes.

10  Q.  -- weren't they?

11  A.  Yes.

12       MR. WARD:  And could we see PX-1396, Mr. Horseman?

13       And let's go to Page 9.

14  Q.  (By Mr. Ward)  And you've seen this document during this

15  trial at least, haven't you?

16  A.  Yes, sir.

17  Q.  And did you review it when you were preparing your

18  opinions in your reports?

19  A.  I don't recall.

20  Q.  You don't know if you saw this before you signed your

21  report?

22  A.  I -- I don't know.  It -- there were -- I literally had

23  thousands of documents, so I don't -- I don't remember.

24  Q.  At least you see that internally spectrum was saying,

25  "Why VoLTE?"

1    A.  Yes, sir, I see that.

2    Q.  And then it says:  Technically and economically

3    superior.

4    A.  Yes.

5    Q.  And then:  VoLTE only voice technology for 700 megahertz

6    and critical for us getting the 300 million covered pops in

7    2015.

8            Do you see that?

9    A.  I do.

10   Q.  And do you see down there at the bottom that LTE radio

11   technology, three times more efficient than HSPA?

12   A.  Yes.

13   Q.  Avoids 50 million in HSPA investment in 2015 alone?

14   A.  I do see that statement, yes.

15   Q.  Is this the first time you're seeing this document --

16   A.  No.

17   Q.  -- Dr. Becker?

18   A.  No.  I don't believe it -- certainly it's not the first

19   time I've seen it because I saw it earlier in this week.

20   Q.  Is this the first time you saw it was during this trial?

21   A.  I don't recall.

22   Q.  Maybe?

23   A.  I really can't say.  It's been -- I've looked at a lot

24   of documents.

25   Q.  It's certainly not cited in your report, is it?

1    A.   I don't believe it is.

2    Q.   Not in your report where you laid out your opinions.

3    You didn't focus on this document, did you?

4    A.   No.

5    Q.   And you didn't focus on the 10-K of T-Mobile where they

6    said they were re-farming spectrum because they had switched

7    to VoLTE?

8    A.   Correct.

9    Q.   You didn't cite that document in the body of your

10   report, did you?

11   A.   Correct.

12   Q.   So IV, T-Mobile, Ericsson are sitting in the room.

13   Cards are on the table.   IV has these documents.   T-Mobile,

14   maybe they're sitting in the back of the room.   Ericsson has

15   documents, right?

16   A.   Right.

17   Q.   The indemnity agreement is on the table?

18   A.   I'll -- I'll give you that.   If you think it's relevant,

19   it's on the table.

20   Q.   And they're going to be locked in that room, and they

21   have to come out with an agreement, right?

22   A.   They do.

23   Q.   And you're telling the jury that IV is going to sign a

24   deal that says, we'll take $110,000.00 to give T-Mobile a

25   license to these patents to save billions on spectrum and

```
 1   move voice to LTE?
 2   A.  Well, I -- you've got a lot loaded up in the question
 3   there.  I think it's certainly my opinion that the -- as I
 4   indicated, that the outcome of that negotiation will be no
 5   higher than 1.4 million and that 1.4 million would get the
 6   deal done.
 7          As to whether the premise of that negotiation --
 8   certainly the things you said would be facts that would
 9   inform or -- or opinions that would inform the -- the
10   negotiation.
11   Q.  And you're saying IV would walk out of the room
12   accepting 110,000 to 1.4 million?
13   A.  Absolutely.
14          MR. WARD:  Pass the witness.
15          THE COURT:  All right.  Redirect, Mr. Rubenstein?
16   Stein.  I'm sorry.
17          MR. RUBENSTEIN:  Thank you, Your Honor.
18                   REDIRECT EXAMINATION
19   BY MR. RUBENSTEIN:
20   Q.  Dr. Becker, is it your understanding that here in this
21   case, there is an individual inventor that has come to
22   Ericsson and T-Mobile seeking a royalty?
23   A.  No.
24   Q.  Now, Dr. Becker, you mentioned, in response to some of
25   Mr. Ward's questions, that -- you said that the amount of
```

1  use of the Defendants was one factor into your analysis.

2          Did I get that right?

3  A.  Correct.

4  Q.  Would you please explain how that factored into your

5  analysis.

6  A.  Well, it's one factor out of many.  It's one of the

7  Georgia-Pacific factors.  There's 15 factors.  And that gets

8  factored in, in part the -- T-Mobile's market share we saw

9  as one critical factor.

10         If T-Mobile had been twice as successful as they

11  have in deploying their network and attracting subscribers,

12  they would have more market share, and it would result in a

13  higher royalty in my analysis.

14         If they had fallen flat on their face and had not

15  grown their network or their subscriber base -- we saw a

16  chart from Mr. Bratic that showed they did a 4X growth --

17  then that would be taken into account.

18         So it's -- the extent of use is, in effect -- the

19  way I take it into account is no different than the way

20  Mr. Bratic takes it into account in his analysis.

21  Q.  Now, Dr. Becker, do you remember a -- a series of

22  questions that Mr. Ward asked you in connection with the

23  bankruptcy auction in which these three asserted patents and

24  others were acquired?

25  A.  Yes.

1   Q.  And do you remember the discussion about the timing of

2   when the $1 million authorization was given as compared to

3   when it was perhaps discovered later that there were more

4   assets to be had?

5   A.  Yes.

6   Q.  Now, Dr. Becker, if the jury were to conclude that your

7   $1.4 million number -- reasonable royalty and your range was

8   the right number, and even if we can assume that IV got a

9   good deal for the -- the group of patent assets that it --

10  that it acquired, would that $1.4 million number still be a

11  blockbuster return for IV on those three patents?

12  A.  It would.

13  Q.  And could you explain sort of the order of magnitude?

14  A.  Well, it -- the -- the analysis that I've done is

15  already -- it's based on a 14.71 revenue ratio, which is

16  a -- gosh, it's like a 14 -- 1400 percent return on the

17  acquisition.

18          So 14 times what was paid -- more than 14 times

19  what was paid.  So even if they got a good deal, it's still

20  around five times higher than the -- than the average for

21  the entire fund.  This is still a very good outcome.

22          MR. RUBENSTEIN:  Now, Your Honor, I believe I have

23  to have the courtroom sealed for these last few questions,

24  please.

25          THE COURT:  Are you requesting that the Court seal

```
 1   the courtroom?

 2           MR. RUBENSTEIN:  Yes, Your Honor.

 3           THE COURT:  Based on counsel's request and the

 4   representation that there are confidential and proprietary

 5   matters to be discussed, I'll order the courtroom sealed.

 6           Those present not subject to the protective order

 7   should be excused at this time and remain outside the

 8   courtroom until it's unsealed.

 9           We have an exception you would like to request,

10   Mr. Ward?

11           MR. WARD:  To the extent that it's IV's

12   confidential information, we'd ask that IV personnel be

13   excepted.

14           MR. RUBENSTEIN:  It is.  And no objection.

15           THE COURT:  Then we'll proceed on that basis.

16           (Courtroom sealed.)

17           (Sealed Portion No. 9 saved in separate sealed

18   transcript.)

19           (Courtroom unsealed.)

20           THE COURT:  And with that, ladies and gentlemen of

21   the jury, you're excused until tomorrow morning.

22           COURT SECURITY OFFICER:  All rise.

23           (Jury out.)

24           THE COURT:  All right.  Counsel, it is roughly a

25   quarter until 2:00.  I'm going to take about a 15-minute
```

1    recess.  When I return, I will take up any motions under

2    Rule 50(a) that either Plaintiff or Defendant care to offer.

3            So with that in mind, we stand in recess.

4            COURT SECURITY OFFICER:  All rise.

5            (Recess.)

6            (Jury out.)

7            COURT SECURITY OFFICER:  All rise.

8            THE COURT:  Be seated, please.

9            All right.  The Court is prepared to go forward and

10   take up motions from either Plaintiff or Defendant brought

11   under Federal Rule of Civil Procedure 50(a).

12           Let me mention that it is my typical practice that

13   if counsel for any of the parties would -- well, let me say

14   it another way.

15           Those of you that are going to present closing

16   arguments and you have other counsel present who can handle

17   these motions and perhaps handle the discussions with regard

18   to the charge and verdict, you're welcome to participate,

19   but you're not required to.

20           If you can use your time better preparing for your

21   closing arguments, then -- and your side of the case is

22   covered by other capable counsel, you're not required to be

23   here.

24           I assume that's going to be Mr. Ward, Mr. Black,

25   and Mr. Kubehl, and Mr. Rubenstein?

```
1              MR. RUBENSTEIN:  If I may be excused, as well, that
2    would be --
3              THE COURT:  Are you going to be doing part of the
4    closing argument?
5              MR. RUBENSTEIN:  I don't think so.  I'm happy to
6    stay.
7              THE COURT:  You just want to get out of the trap?
8              MR. RUBENSTEIN:  I'm happy to stay if that's Your
9    Honor's wish.
10             THE COURT:  Well, the general rule is as long as
11   the case is covered --
12             MR. RUBENSTEIN:  We believe it's covered.
13             THE COURT:  -- then other counsel who are not
14   needed to cover it, don't have to be here.
15             MR. KUBEHL:  Thank you, Your Honor.
16             MR. RUBENSTEIN:  Thank you, Your Honor.
17             THE COURT:  All right.  Let's proceed with any
18   motions to be brought under Federal Rule of Civil Procedure
19   50(a).
20             Does Plaintiff have any motions under that
21   particular rule at this time?
22             MR. FLANNERY:  Yes, Your Honor.
23             THE COURT:  If you'd go to the podium and let me
24   hear a recital of the particular motions.  I'll hear
25   argument later.  But I want to identify them at this point,
```

```
 1    Mr. Flannery.
 2            MR. FLANNERY:  You want me to just express the
 3    motion?
 4            THE COURT:  Yes.
 5            MR. FLANNERY:  Okay.
 6            THE COURT:  We'll come back and hear the underlying
 7    argument.
 8            MR. FLANNERY:  Okay.  May it please the Court, Your
 9    Honor.
10            Under Federal Rule of Civil Procedure 50(a), IV
11    would move for judgment as a matter of law now that the
12    Defendant has been fully heard on its defenses in this case,
13    and IV moves for judgment as a matter of law on Defendants'
14    invalidity claims of anticipation and obviousness.
15            IV also moves under Rule 50(a) for judgment as a
16    matter of law that no non-infringing alternatives exist for
17    all of the asserted claims of the patents-in-suit.
18            THE COURT:  Are there other motions under Rule
19    50(a) that Plaintiff wishes to bring?
20            MR. FLANNERY:  No, Your Honor.
21            THE COURT:  All right.  Defendants, what matters
22    under Rule 50(a) do you wish to urge?
23            MS. DREYER:  Yes, Your Honor.  Lauren Dreyer on
24    behalf of Defendants.
25            Defendants move for judgment under Rule 50(a) of
```

1   non-infringement of the '206, '517, and '629 patents as a

2   matter of law because IV has not presented a legally

3   sufficient evidentiary basis for a reasonable jury to find

4   infringement of any asserted claims.

5        THE COURT:  All right.  What else?

6        MS. DREYER:  Defendants also move for judgment

7   under Rule 50(a) of non-infringement of -- non-infringement

8   of the '206, '517, and '629 patents as a matter of law

9   because IV has not presented a legally sufficient

10  evidentiary basis for a reasonable jury to find indirect

11  infringement of any of the asserted claims.

12       THE COURT:  All right.  So you're moving for

13  judgment as a matter of law on both direct and indirect

14  infringement.  What else?

15       MS. DREYER:  Yes, Your Honor.

16       We also move for judgment as a matter of law of no

17  damages because IV has not presented a legally sufficient

18  evidentiary basis for a reasonable jury to find any

19  infringement damages.

20       THE COURT:  All right.  What else?

21       MS. DREYER:  Final -- the last two, Defendants move

22  for judgment under Rule 50(a) of anticipation as a matter of

23  law for the '206 and '517 patents because there's no legally

24  sufficient evidentiary basis for a reasonable jury to find

25  the asserted claims not anticipated.

1          THE COURT:  And do you have anything else?

2          MS. DREYER:  Yes, Your Honor.  One more.

3          Defendants move for judgment under Rule 50(a) of

4     obviousness as a matter of law for the '206, '517, and '629

5     patents because there's no legally sufficient evidentiary

6     basis for a reasonable jury to find the asserted claims not

7     obvious.

8          THE COURT:  Does that conclude Defendants' proffer

9     with regard to Rule 50(a)?

10         MS. DREYER:  Yes, Your Honor.

11         THE COURT:  All right.  Well, it's clear that both

12    Plaintiff and Defendants have diametrically opposed motions

13    under Rule 50(a) with regard to the validity issue.

14         Plaintiff seeking judgment as a matter of law that

15    there is no invalidity.

16         And Defendants seeking judgment as a matter of law

17    that there is invalidity, both based on anticipation and

18    obviousness.

19         So I'll hear competing arguments on those opposed

20    motions first, and then we'll take up the others.

21         Since Defendant is at the podium, I'm happy to hear

22    targeted argument on those matters at this time.

23         MS. DREYER:  Yes, Your Honor.  So --

24         THE COURT:  And if you're going to refer to your

25    notes and read, please slow down.

1              MS. DREYER:  Yes, Your Honor, I will.

2         For anticipation, Defendants move for judgment

3    under 50(a) of anticipation for the '206 and '517 patents.

4         The facts show that each of the elements of those

5    patents are present in the prior art that has been admitted

6    into evidence, and, therefore, there is no legally

7    sufficient evidentiary basis for a reasonable jury to find

8    the asserted claims not anticipated as the law is clear that

9    anticipation must be found where the accused elements are

10   present in the prior art.

11             THE COURT:  Let me hear a responsive argument from

12   Plaintiff.

13             MR. FLANNERY:  Your Honor, Plaintiff opposes the

14   motion on the grounds that there's legally sufficient

15   evidence in the record to show that Defendants have failed

16   to satisfy their burden to prove that each and every element

17   of the asserted claims is found in the prior art reference

18   as presented.

19             THE COURT:  All right.  Do you have any argument in

20   is support of that -- additional argument?

21             MR. FLANNERY:  Your Honor, the -- Dr. Acampora did

22   not prove that each of the asserted claims -- that each

23   element of the asserted claims is found in the prior art

24   references of record.

25             THE COURT:  Anything further?

1          MR. FLANNERY:  No, Your Honor.

2          THE COURT:  All right.  Well, with regard to the

3     competing motions under Rule 50(a) regarding the topic of

4     invalidity, the Court denies both Plaintiff's and

5     Defendants' motions regarding invalidity brought under

6     Rule 50(a).

7          Defendant has also urged judgment as a matter of

8     law under Rule 50(a) regarding non-infringement, both based

9     on direct and indirect theories of infringement.

10         Let me hear argument from Defendant on that,

11    please.

12         MS. DREYER:  Yes, Your Honor.  And just as a point

13    of clarification, in -- our previous argument was for our

14    motion for judgment as a matter of law on anticipation.

15    Defendants had also moved, as I stated earlier, for judgment

16    as a matter of law on obviousness with regards to all

17    patents.  I just wanted to --

18         THE COURT:  And my ruling, by using the broader

19    term "invalidity," encompasses both the included theories of

20    anticipation under 102 and obviousness under 103.

21         MS. DREYER:  Thank you, Your Honor.  I just wanted

22    to clarify for the record.

23         THE COURT:  And in both instances as to both

24    parties, it's denied.

25         MS. DREYER:  Thank you, Your Honor.

1          THE COURT:  Let me hear your arguments regarding

2    non-infringement, both direct and indirect.

3          MS. DREYER:  Yes.  The law is clear, Your Honor,

4    that infringement cannot be found where the accused

5    activities do not meet one or more limitations of the

6    claims.

7          All of the asserted patent claims for the '206

8    patent require end-user quality of service requirements.

9    However, the facts show that only T-Mobile determines

10   quality of service requirements, which are network quality

11   of service requirements, not end-user quality of service

12   requirements.

13         All of the asserted '206 patent claims also require

14   classifying a plurality of packets according to end-user

15   quality of service requirements of said plurality of

16   packets.

17         However, the facts show that Ericsson's base

18   stations do not know the quality of service of the

19   individual packets flowing inside their tunnel and cannot

20   classify packets according to the quality of service

21   requirements of said plurality of packets.

22         Therefore, one or more elements of the asserted

23   claims of the '206 patent are not met, and infringement must

24   be found as a matter of law.

25         All of -- Your Honor, would you like me to do all

1    three patents at this time?

2         THE COURT:  Yes.

3         MS. DREYER:  All of the asserted '517 patent claims

4    require communications with a customer premises equipment,

5    CPE station, which the Court construed as devices residing

6    on the premises of a customer and used to connect to a

7    telephone network, including ordinary telephones, key

8    telephone systems, PBX's, videoconferencing devices, and

9    modems.

10         However, the facts show that the Ericsson base

11   stations only communicate with mobile devices.

12         All of the asserted '517 patent claims also require

13   the step of allocating the shared wireless bandwidth between

14   the wireless base station transmitting in the downlink

15   direction and the at least one CPE station transmitting in

16   the uplink direction based on the analyzed contents and the

17   analyzed reservation requests.

18         However, the facts show that T-Mobile uses separate

19   uplink and downlink bandwidths that are not shared bandwidth

20   allocated between the uplink and downlink directions and

21   cannot allocate based on the analyzed contents and the

22   analyzed reservation requests.

23         Finally, all of the asserted '517 patent claims

24   require the steps of analyzing content of packets to be

25   communicated over the shared wireless bandwidth in a

downlink direction.

However, the facts show that the information IV accused as the analyzed content is not wirelessly communicated in the downlink direction.

Therefore, one or more elements of the asserted claims of the '517 patent are not met, and the '517 patent is not infringed as a matter of law.

All of the asserted '629 patent claims require two steps, the steps of reserving a slot for a data pack -- data packet in a future transmission frame, and reserving another slot for another data packet in a transmission frame subsequent in time to the future transmission frame.

However, the facts show that use of the accused equipment does not perform those steps because the accused Ericsson base station can only allocate a transmission time interval in the current transmission frame and cannot allocate anything in any future time frame.

All of the asserted '629 patent claims also require the step of placing packets in slots of future frames in an isochronous manner.  The Court construed in an isochronous manner to mean according to a consistent time interval.

However, the facts show that use of the accused equipment does not perform that step because the accused Ericsson base stations send packets randomly or irregularly and not according to a consistent time interval.

1          Therefore, one or more elements of the '629 patent

2    claims, are not met and infringement must be found as a

3    matter of law.

4          THE COURT:  Non-infringement.

5          MS. DREYER:  Sorry.  Excuse me.  Thank you, Your

6    Honor.

7          Non-infringement must be found as a matter of law.

8          Finally, with regard to indirect infringement, IV

9    has not presented a legally sufficient evidentiary basis for

10   a reasonable jury to find indirect infringement of any of

11   the asserted claims of the '206, '517, and '629 patents, at

12   least because the facts show that T-Mobile does not directly

13   infringe the asserted claims.

14         Indirect infringement also requires certain

15   elements, including knowledge of the patent, specific intent

16   to cause infringement, or lack of substantial non-infringing

17   uses.

18         IV has not presented a legally sufficient

19   evidentiary basis for a reasonable jury to find any of these

20   elements of indirect infringement have been met.

21         Thank you, Your Honor.

22         THE COURT:  Thank you.

23         Let me hear a response from Plaintiff.

24         MS. FAIR:  Your Honor, as to non-infringement, I'll

25   start with the '206.

1          The challenged claims were no end-user quality of

2    service.  We had Dr. Williams on the stand.  He testified

3    that the end-user quality of service is represented in the

4    QCI values.  He testified that that meets that claim

5    limitation.  And so we have met our burden of proof.

6          A reasonable jury could conclude that that

7    limitation -- that packets be classified based on their

8    end-user quality of service is met through the infringing

9    systems.

10         Second, the Defendants argued that the packets are

11   not classified, but, instead, the packets are placed in

12   bearers.

13         Dr. Williams and Dr. Chrissan testified that

14   packets are addressed by the schedulers in the eNodeB's, and

15   at least on that evidence, if not more, a reasonable jury

16   could conclude that the '206 patent is infringed by the

17   Defendants in this case.

18         As to the '517 patent, the Defendants challenged

19   that the claim limitation addressing customer premises

20   equipment, CPE, is not met.  As the Court knows, there was a

21   dispute about whether or not mobile stations fall under that

22   definition.

23         Dr. Williams, the Plaintiff's infringement expert,

24   testified as to how customer premises equipment are met by

25   the mobile devices that are used in T-Mobile's network.  And

1   based on that, there is sufficient evidence for a reasonable

2   jury to conclude that that claim limitation addressing

3   customer premises equipment is met in this case.

4          Second, the Defendants challenge the claim

5   limitation of allocating between the uplink and downlink in

6   the '517 patent.  The Defendants are asserting an argument

7   that I think we saw starting with claim construction, that

8   this allocation has to be dynamic.

9          We had expert testimony that showed that the claim

10  does not require that, and that the Defendants' systems do,

11  in fact, allocate between the uplink and the downlink, that

12  the schedulers work together.  They pass information

13  together on the PDCCH, and, therefore, there is

14  allocation -- at least on that basis, a reasonable jury

15  could conclude that the '517 patent is infringed.

16         Lastly, as to the '629 patent, the Defendants have

17  challenged first that the reservation limitations cannot be

18  met because they don't happen in the future.  The grants

19  occur every TTI.

20         Dr. Williams testified that the reservations do

21  happen in the future because as the DBS-SABE-DRX

22  functionality works, the system is looking at packets that

23  are going to be arriving from the user equipment.  And

24  though the grants happen every TTI, the reservations occur

25  before that, and, therefore, the reservations occur in the

1    future.

2          Lastly, the Defendants challenged the claim

3    limitation that requires the packets be placed in an

4    isochronous manner.  We had testimony both from Dr. Williams

5    and Dr. Chrissan that these packets, when the user equipment

6    is in voice mode, are generated every 20 milliseconds.  They

7    are placed and sent to the -- to the base station every 40

8    milliseconds.  And, therefore, that occurs at a consistent

9    time interval.

10         And, indeed, Dr. Wicker admitted that that only has

11   to happen once, and that, indeed, it does happen in the

12   Defendants' system, that the packets are placed every --

13   every 40 milliseconds, and, therefore, there is sufficient

14   evidence in the record for a reasonable jury to conclude

15   that the '629 patent is infringed by the Defendants'

16   allegedly infringing services.

17         As to indirect infringement, the first challenge

18   was based on there being no direct infringement.  And for

19   the same reasons that we've already presented, there is

20   sufficient evidence for a reasonable jury to conclude that

21   there is direct infringement.

22         As to knowledge of the patent, Ericsson became

23   aware -- indirect infringement is Ericsson.  And Ericsson

24   was aware of the patent and that the allegedly infringing

25   activity does infringe the patent as of the filing date of

1    the complaint.  And we have presented evidence that -- that

2    they continued in their infringement after that.

3            And, lastly, as to the lack of non-infringing

4    substitutes, there is testimony from Dr. Williams that there

5    are no non-infringing alternatives.  There's no other way to

6    do this in the standard.  And that -- and that evidence is

7    uncontroverted.

8            Dr. Wicker did not present any evidence of

9    non-infringing alternatives.  And based on all of that,

10   there is sufficient evidence for a reasonable juror to

11   conclude that there is indirect infringement in this case.

12           And for those reasons, the Defendants' motion for

13   judgment as a matter of law under Rule 50 on both direct

14   infringement and indirect infringement should be denied.

15           THE COURT:  What's Plaintiff's opposition to the

16   motion with regard to contributory infringement?

17           MS. FAIR:  Your Honor, I believe the challenge on

18   that was based on a lack of alternate ways to do it,

19   non-infringing, substantive ways to do it.  And we had

20   evidence from Dr. Williams that there is no other way to do

21   this in their system.

22           THE COURT:  And it's Plaintiff's position that the

23   knowledge requirement of both the patents and the infringing

24   nature of the accused products is something that can be

25   conferred by the filing of the complaint and that knowledge

1    prior to the filing of the complaint is not necessary to

2    support infringement by inducement or contributory

3    infringement?

4          MS. FAIR:  I'm not sure I understand the Court's

5    question.  The --

6          THE COURT:  Well, according to the evidence as

7    I heard it, there was no evidence to support knowledge by

8    the accused indirect infringer prior to the filing of the

9    complaint.  And my question is:  Is knowledge conferred by

10   the filing of the complaint where that's the sole source of

11   knowledge adequate to support contributory and/or induced

12   infringement?

13         MS. FAIR:  Yes, Your Honor.

14         THE COURT:  Do you have any authority for that,

15   counsel?

16         MS. FAIR:  Your Honor, I would like a moment to

17   confer with my co-counsel.

18         THE COURT:  All right.

19         MS. FAIR:  Your Honor, I wanted to seek

20   clarification before I spoke out of turn.  I was confirming

21   that, in fact, the indirect infringement claims are starting

22   at the time of the filing of the complaint.

23         The direct infringer here is T-Mobile, and so

24   T-Mobile's use doesn't require knowledge of the patent.  The

25   direct use of the method claims doesn't require knowledge.

1          Ericsson, as the indirect infringer, their indirect

2    infringement begins at the time of the filing of the

3    complaint when we provided detailed notice of allegations of

4    what infringes -- of what the patent's claim and what

5    technology infringes that.

6          THE COURT:  But in this case, the Plaintiff alleges

7    direct infringement against both Ericsson and T-Mobile,

8    correct?

9          MS. FAIR:  Yes, Your Honor.  The direct

10   infringement is based on the testing of the systems by

11   Ericsson.

12         THE COURT:  All right.  Do you have any other

13   argument on the infringement -- non-infringement topic?

14         MS. FAIR:  No, Your Honor.

15         THE COURT:  All right.  Well, based on Defendants'

16   arguments seeking judgment as a matter of law under

17   Rule 50(a) with regard to non-infringement based on theories

18   of both direct and indirect infringement with the indirect

19   infringement asserted against Ericsson and the arguments in

20   response from Plaintiff, the Court denies the Defendants'

21   motion for judgment as a matter of law regarding both direct

22   and indirect non-infringement.

23         Let me hear Defendants' arguments briefly on their

24   theory of judgment as a matter of law regarding no proof of

25   damages.

1          MS. DREYER:  Thank you, Your Honor.

2          Defendants move for judgment as a matter of law of

3    no damages because IV's only damages' theory applies a

4    royalty rate to a royalty base of the entire number of

5    subscriber months corresponding to base -- base stations

6    with many features other than those accused.

7          IV failed to offer substantial evidence of a proper

8    apportionment of that royalty base to the accused features,

9    as required by law.

10         IV's damages theory is, therefore, contrary to the

11   legal requirement of apportionment and should be rejected as

12   a matter of law.

13         THE COURT:  Response by Plaintiff?

14         MS. HENRY:  Your Honor, Plaintiff presented

15   evidence from Dr. -- from Mr. Bratic [sic] walking the jury

16   through his analysis for damages which included reviewing in

17   detail Ericsson's own licenses to related LTE technology and

18   then comparing those licenses -- Ericsson's technology to

19   the -- to the three patents-in-suit based on the technical

20   analysis and comparability provided by Dr. Chrissan.  That

21   is the apportionment.  It's perfectly appropriate in this

22   case, and, therefore, there is sufficient evidence for a

23   reasonable jury to conclude for damages.

24         THE COURT:  All right.  Well, with regard to

25   Defendants' motion under Rule 50(a) of the Federal Rules of

1    Civil Procedure, seeking judgment as a matter of law with

2    regard to the issue of damages, that motion is denied.

3         Also, for -- out of an abundance of caution and to

4    be completely clear in the record, the Court's denial of the

5    Defendants' motion regarding both direct and non -- direct

6    and indirect infringement covers the issue of no

7    non-infringing alternatives, as well, though I may not have

8    said that in my ruling.

9         Whatever theories have been urged to support

10   Defendants' motion for non-infringing -- for

11   non-infringement, both direct and indirect, are denied under

12   Rule 50(a).

13        All right.  That appears to leave Plaintiff's

14   motion for judgment as a matter of law regarding no

15   non-infringing alternatives.  Have we already covered that,

16   or does that need to be addressed further?

17        MS. HENRY:  Your Honor, I believe the issue with

18   respect to the Defendants' burden from a damages's

19   perspective to prove the existence of non-infringing

20   alternatives, it -- it may have been covered, but if Your

21   Honor will allow me to elaborate just to clarify the record

22   and ensure that we're -- that -- that we've dotted all our

23   i's and crossed our t's.

24        THE COURT:  Your elaboration is permitted.

25        MS. HENRY:  Thank you, Your Honor.

1          So no non -- non-infringing alternatives is an

2     element of damages for which Defendants bear the burden of

3     proof.

4          Plaintiff put on evidence from Dr. Williams that

5     from a technical perspective, there are no non-infringing

6     alternatives.

7          Plaintiff then put on testimony from Mr. Bratic

8     that from an economic perspective and relying on the

9     technical opinions from Dr. Williams, there are, in fact, no

10    non-infringing alternatives for the patents-in-suit.

11         Now, Dr. Wicker, Defendants' expert, provided

12    absolutely no evidence at all in this trial about the

13    existence of non-infringing alternatives, and neither did

14    Defendants' damages expert, Mr. Bratic.  And, therefore,

15    there is absolutely no evidence in the record of the

16    existence of non-infringing alternatives and nothing that a

17    reasonable jury could rely in order to find there was such.

18         THE COURT:  Is there a response from Defendants?

19         MS. DREYER:  Defendants disagree.  Dr. Jorgensen

20    testified that there were many alternatives in the field,

21    and, therefore, their -- IV has not met their burden to show

22    no substantial non-infringing uses.

23         THE COURT:  All right.  Well, with regard to the

24    Plaintiff's motion for judgment as a matter of law under

25    Rule 50(a) relating to no non-infringing alternatives, that

1    motion is denied.

2         Are there other matters raised by either party

3    under Rule 50(a) that have not been addressed or ruled on by

4    the Court?

5         MR. FLANNERY:  No, Your Honor, not from Plaintiff.

6         MS. DREYER:  No, Your Honor.

7         THE COURT:  All right.  One other matter, counsel.

8         The determination of a priority date -- a patent's

9    priority date is purely a question of law if the facts

10   underlying that determination are undisputed.  This case

11   presents no disputed facts or issues of facts relevant to

12   the District Court's determination.

13        Defendants presented no argument as to whether the

14   omission of the specification in the filing of the '218

15   patent was intended -- was intentional, and, therefore, the

16   Court has no basis to find that the PTO erred in restoring

17   the July 10, 1998 filing date.

18        Accordingly, the Court determines as a matter of

19   law that the priority date for the '218 patent, and,

20   therefore, the '206 patent is July the 10th, 1998.

21        Now, at this point, I would invite counsel for all

22   the parties to meet the Court in chambers at which time I

23   intend to conduct a fulsome and far-reaching -- far-ranging

24   informal charge conference to discuss the latest suggested

25   final jury instruction and verdict form and pay particular

1    attention to the language that is disputed between the

2    parties.

3          And it's my intention to hear openly and informally

4    from both Plaintiff and Defendants, and then having the

5    benefit of that input and an opportunity to reflect upon it,

6    the Court intends to generate what it considers to be the

7    resulting final jury charge and verdict form.

8          And when that is done, it's my intention to deliver

9    that to counsel for the parties with an opportunity to

10   review it.  And after that opportunity to review it, to

11   conduct a formal charge conference on the record where any

12   objections either side believes are appropriate and

13   necessary for the interest of their client can be made and

14   urged.

15         All right.  Also, counsel, we need to not forget to

16   cover in the record those items from the list of

17   pre-admitted exhibits used during today's portion of the

18   trial.  Are those particulars known to the parties at this

19   time, or do you need time to reflect and review your notes

20   before making an offer into the record?

21         MS. HENRY:  I believe some additional time would be

22   beneficial, Your Honor.

23         MS. SMITH:  Agreed, Your Honor.

24         THE COURT:  All right.  I see no reason why we

25   can't do that on the record in the morning before I bring

```
 1    the jury in and begin to give them my final instructions.

 2             MS. SMITH:  Thank you.

 3             THE COURT:  Be prepared to do that first thing in

 4    the morning.

 5             MS. HENRY:  Thank you, Your Honor.

 6             MS. SMITH:  Yes, Your Honor.

 7             THE COURT:  All right.  All right.  The -- the

 8    Court stands in recess.

 9             COURT SECURITY OFFICER:  All rise.

10             Ms. Smith?

11             MS. SMITH:  I apologize, Your Honor.  I wanted to

12    bring it to the Court's attention that I believe the

13    Defendants had requested a bench trial on the issue of

14    claim -- claim preclusion, and we're withdrawing that

15    defense.

16             THE COURT:  All right.

17             MS. SMITH:  I didn't know the right time to alert

18    the Court of that, but...

19             THE COURT:  There's never a wrong time to withdraw

20    something.

21             MS. SMITH:  Thank you.  I appreciate that.  Thank

22    you.

23             THE COURT:  And the Court's already given you its

24    ruling on the 101 issue?

25             MS. SMITH:  Yes.
```

```
1          THE COURT:  So the Court does not anticipate that

2    there are matters that would require a bench trial after the

3    return of the jury's verdict.

4          MS. SMITH:  That's certainly our -- our feeling,

5    Your Honor.

6          THE COURT:  All right.  And I'm not sure that it

7    matters, but -- at this juncture, but, Ms. Henry, you cited

8    to Mr. Bratic in your argument.  I think you meant

9    Dr. Becker, but I've already ruled.

10         MS. HENRY:  Oh, I apologize, Your Honor.  Yes,

11   if -- if I was referring to Defendants' expert, I certainly

12   intended to say Dr. Becker.

13         THE COURT:  And I'll also note, as advised, after

14   my preliminary instructions were given to the jury, I

15   understand that Plaintiffs have dropped their willfulness

16   claim.

17         MS. HENRY:  Yes, Your Honor.

18         THE COURT:  All right.  Take five minutes to gather

19   your things and meet me in chambers, and we'll then conduct

20   an informal charge conference.

21         The Court stands in recess.

22         COURT SECURITY OFFICER:  All rise.

23         (Recess.)

24         (Jury out.)

25         COURT SECURITY OFFICER:  All rise.
```

1          THE COURT:  Be seated, please.

2          The Court has conducted an informal charge

3   conference with counsel for all the parties in chambers.

4   The Court has reviewed the latest submitted -- jointly

5   submitted proposed final jury instructions and verdict form

6   with counsel and has heard fully and in depth from counsel

7   for both sides as to their areas of disagreement and the

8   reasons and supporting rationales for each of their

9   competing submissions.  The Court has taken into account

10   that input.

11          The Court also has entered into discussions and

12   asked questions, and from that process, the Court has now

13   generated what it believes to be an accurate final jury

14   instruction and verdict form.  The Court's delivered that to

15   counsel with an opportunity to review it and will now

16   proceed to conduct a formal charge conference on the record.

17          I'd like one person for each Plaintiff and

18   Defendants to go to the podium, and it's my intention to go

19   through these documents on a page-by-page basis, beginning

20   with the final jury instructions.  And if during that

21   process we come to a place where you believe something

22   improper has been included or something essential has been

23   omitted or for whatever reason you think you should lodge an

24   objection on the record, you will certainly be free to do

25   so.

```
 1              All right.  We'll begin with the final jury

 2    instructions, and we'll begin on Page 1.

 3              Are there objections from either Plaintiff or

 4    Defendant to anything on Page 1 of the final jury

 5    instructions?

 6              MS. HENRY:  No, Your Honor.

 7              MS. DREYER:  No, Your Honor.

 8              THE COURT:  Turning to Page 2, are there objections

 9    from either party?

10              MS. HENRY:  No, Your Honor.

11              MS. DREYER:  No, Your Honor.

12              THE COURT:  Page 3?

13              MS. HENRY:  No, Your Honor.

14              MS. DREYER:  No.

15              THE COURT:  Page 4?

16              MS. HENRY:  No, Your Honor.

17              MS. DREYER:  No, Your Honor.

18              THE COURT:  Page 5?

19              MS. HENRY:  Your Honor, Plaintiff objects to the

20    inclusion of the sentence:  However, an expert witness does

21    not include a witness who offers testimony as to that

22    witness's personal knowledge but who does not offer opinions

23    as an expert.

24              Plaintiffs believes that that sentence is confusing

25    and potentially misleading to the jury.
```

```
 1          THE COURT:  All right.  That objection is
 2   overruled.
 3          Are there any other objections on Page 5?
 4          MS. HENRY:  Not from Plaintiff, Your Honor.
 5          MS. DREYER:  No, Your Honor.
 6          THE COURT:  Turning then to Page 6 of the final
 7   jury instructions, are there objections from either party?
 8          MS. HENRY:  No, Your Honor.
 9          MS. DREYER:  No, Your Honor.
10          THE COURT:  Page 7, are there objections?
11          MS. HENRY:  No, Your Honor.
12          MS. DREYER:  No, Your Honor.
13          THE COURT:  Page 8?
14          MS. HENRY:  No, Your Honor.
15          MS. DREYER:  No, Your Honor.
16          THE COURT:  Page 9?
17          MS. HENRY:  No, Your Honor.
18          MS. DREYER:  No, Your Honor.
19          THE COURT:  Page 10?
20          MS. HENRY:  No, Your Honor.
21          MS. DREYER:  No, Your Honor.
22          THE COURT:  Page 11?
23          MS. HENRY:  No, Your Honor.
24          MS. DREYER:  No, Your Honor.
25          THE COURT:  Page 12?
```

```
 1              MS. HENRY:  No, Your Honor.

 2              MS. DREYER:  No, Your Honor.

 3              THE COURT:  Page 13?

 4              MS. HENRY:  Your Honor, Plaintiff objects to the

 5   inclusion of the sentence:  The asserted claims are not

 6   infringed by the sale or manufacture of a product that is

 7   merely capable of performing every element or limitation.

 8              This is an instruction that has been modified from

 9   an instruction that is also given for apparatus claims.  We

10   believe that in the context of a case where there are only

11   method claims, it is extraneous and confusing to the jury.

12              THE COURT:  All right.  That objection is

13   overruled.

14              Are there other objections related to anything on

15   Page 13?

16              MS. HENRY:  Not from Plaintiff, Your Honor.

17              MS. DREYER:  No, Your Honor.

18              THE COURT:  Turning then to Page 14, are there

19   objections from either party?

20              MS. HENRY:  No, Your Honor.

21              MS. DREYER:  Yes, Your Honor.

22              Defendants object to the failure to include the

23   Defendants' instruction in Docket No. 314-1 regarding

24   Doctrine of Equivalents.  Doctrine of Equivalents must be

25   proven on a claim-by-claim basis, and Defendants contend
```

1    that this instruction fails to inform the jury of that

2    requirement.

3          THE COURT:  All right.  That objection is

4    overruled.

5          Is there anything else on Page 14 from either

6    party?

7          MS. HENRY:  Not from Plaintiff, Your Honor.

8          MS. DREYER:  No, Your Honor.

9          THE COURT:  Turning then to Page 15, are there

10   objections from either party?

11         MS. HENRY:  No, Your Honor.

12         MS. DREYER:  No, Your Honor.

13         THE COURT:  Page 16?

14         MS. HENRY:  No, Your Honor.

15         MS. DREYER:  No, Your Honor.

16         THE COURT:  Page 17?

17         MS. HENRY:  No, Your Honor.

18         MS. DREYER:  Yes, Your Honor.

19         Defendants object to the instruction:  The priority

20   date for the '206 patent is July 10th, 1998.  Defendants

21   contend that the uncontested facts as set forth in its

22   motion for summary judgment on this issue demonstrate that

23   the priority date for the '206 patent is October 24th, 2002,

24   I believe as included in Defendants' instruction in Docket

25   No. 314-1.

```
 1                THE COURT:  That objection is overruled.

 2                Anything else on Page 17?

 3                MS. HENRY:  Not from Plaintiff, Your Honor.

 4                MS. DREYER:  No, Your Honor.

 5                THE COURT:  Page 18, are there objections?

 6                MS. HENRY:  Yes, Your Honor.

 7                Plaintiff objects to the final phrase in the first

 8     paragraph, "you must find that claim invalid."  Plaintiff

 9     requests that that language should be changed to "you should

10     find that claim invalid."

11                THE COURT:  All right.  That objection is

12     overruled.

13                Are there other objections on Page 18?

14                MS. HENRY:  No, Your Honor.

15                MS. DREYER:  No, Your Honor.

16                THE COURT:  Turning then to Page 19, are there

17     objections?

18                MS. HENRY:  No, Your Honor.

19                MS. DREYER:  No, Your Honor.

20                THE COURT:  Page 20, are there objections?

21                MS. HENRY:  No, Your Honor.

22                MS. DREYER:  No, Your Honor.

23                THE COURT:  Page 21, are there objections?

24                MS. HENRY:  No, Your Honor.

25                MS. DREYER:  No, Your Honor.
```

```
 1              THE COURT:  Page 22?
 2              MS. HENRY:  No, Your Honor.
 3              MS. DREYER:  No, Your Honor.
 4              THE COURT:  Page 23?
 5              MS. HENRY:  No, Your Honor.
 6              MS. DREYER:  Yes, Your Honor.
 7              Defendants object to the failure to include the
 8  Defendants' instruction that's provided in Docket No. 314-1
 9  regarding the apportionment of damages to the -- I'm sorry,
10  to the patented features.
11              The law of apportionment requires the jury to be so
12  apprised, and this instruction fails to inform the jury of
13  that -- of that requirement.
14              THE COURT:  All right.  That objection is
15  overruled.
16              Is there anything else on Page 23 from either
17  party?
18              MS. HENRY:  No, Your Honor.
19              MS. DREYER:  No, Your Honor.
20              THE COURT:  Counsel, you will note that beginning
21  at the bottom of Page 23, covering Page 24 and the first
22  half of Page 25, the Court proposes to instruct the jury on
23  all 15 of the Georgia-Pacific factors.
24              Do both sides agree that it's appropriate for the
25  Court to instruct the jury in this case on all 15 factors?
```

```
 1              MS. HENRY:  Yes, Your Honor.

 2              MS. DREYER:  Yes, Your Honor.

 3              THE COURT:  All right.  Turning from Page 23 to

 4    Page 24, are there any objections?

 5              MS. HENRY:  No, Your Honor.

 6              MS. DREYER:  No, Your Honor.

 7              THE COURT:  Page 25, are there any objections?

 8              MS. HENRY:  No, Your Honor.

 9              MS. DREYER:  No, Your Honor.

10              THE COURT:  Turning to Page 26, are there any

11    objections?

12              MS. HENRY:  No, Your Honor.

13              MS. DREYER:  Yes, Your Honor.

14              Defendants object to the instruction to the extent

15    it doesn't include the language in the Defendants'

16    instruction in Docket No. 314-1 regarding the fact that the

17    jurors have to find damages on a per-patent basis, as

18    required by law.  Therefore, the jury is not being

19    reasonably apprised of that requirement.

20              THE COURT:  All right.  That objection is

21    overruled.

22              Anything else on Page 26?

23              MS. HENRY:  No, Your Honor.

24              MS. DREYER:  No, Your Honor.

25              THE COURT:  Any objection to anything on Page 27?
```

```
 1              MS. HENRY:  No, Your Honor.

 2              MS. DREYER:  No, Your Honor.

 3              THE COURT:  Page 28?

 4              MS. HENRY:  No, Your Honor.

 5              MS. DREYER:  No, Your Honor.

 6              THE COURT:  All right.  Page 28 is the final page

 7   of the final jury instructions.

 8              I'll turn next to the verdict form.  We'll begin

 9   with Page 1.

10              Is there objection from either party to anything

11   included in the verdict form no Page 1 thereof?

12              MS. HENRY:  No, Your Honor.

13              MS. DREYER:  No, Your Honor.

14              THE COURT:  Turning then to Page 2, is there any

15   objection?

16              MS. HENRY:  No, Your Honor.

17              MS. DREYER:  No, Your Honor.

18              THE COURT:  Page 3 of the verdict form where

19   Question 1 is located, is there any objection?

20              MS. HENRY:  Not from Plaintiff, Your Honor.

21              MS. DREYER:  Yes.

22              Defendants object because the law requires that the

23   factfinder, the jury here, determine infringement on a

24   per-claim basis.  And this instruction fails to provide a

25   spot on the verdict form where the factfinder can make that
```

```
 1   determination on a per-claim basis under Techsearch v.

 2   Intel, 286 F.3d 1360 and other precedent.

 3           THE COURT:  I've read that case, counsel.  I don't

 4   believe it supports your position, and your objection is

 5   overruled.

 6           We'll turn next to Page 4 of the verdict form

 7   wherein Question 2 is located.

 8           Is there objection from either party to anything

 9   located -- or that should be located on this page?

10           MS. HENRY:  No, Your Honor.

11           MS. DREYER:  No, Your Honor.

12           THE COURT:  Turning then to Page 5, are there

13   objections from either party?

14           MS. HENRY:  No, Your Honor.

15           MS. DREYER:  No, Your Honor.

16           THE COURT:  Turning then to Page 6 where Question 3

17   of the verdict form is located, are there objections from

18   either -- any party?

19           MS. HENRY:  Not from Plaintiff, Your Honor.

20           MS. DREYER:  Yes, Your Honor.

21           Defendants object because the verdict form fails to

22   inform the jury that they need to attribute damages on a

23   per-patent basis as required by law.

24           THE COURT:  All right.  That objection is

25   overruled.
```

1              Anything else on Page 6?

2              MS. DREYER:  No, Your Honor.

3              THE COURT:  We'll turn then to Page 7 of the

4    verdict form, which is the final page of that document.  Are

5    there objections from either party?

6              MS. HENRY:  No, Your Honor.

7              MS. DREYER:  No, Your Honor.

8              THE COURT:  All right.  Counsel, that completes the

9    formal charge conference in this case.

10             As I mentioned earlier, I will expect

11   representatives of both Plaintiffs and Defendants to be

12   prepared before I bring the jury in in the morning to read

13   into the record the items from the list of pre-admitted

14   exhibits used during today's portion of the trial.

15             Thereafter, it is my intention to bring in the

16   jury, give them this charge, and proceed to have counsel for

17   the parties present their closing arguments.

18             Unless there's something further, we stand in

19   recess until tomorrow morning.

20             COURT SECURITY OFFICER:  All rise.

21             (Recess.)

22

23

24

25

1                        CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4     correct transcript from the stenographic notes of the

5     proceedings in the above-entitled matter to the best of my

6     ability.

7

8

9      /S/ Shelly Holmes                    2/7/19
       SHELLY HOLMES, CSR, TCRR             Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25