```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF TEXAS

 3                       MARSHALL DIVISION

 4   INTELLECTUAL VENTURES I LLC, )(

 5       PLAINTIFF              )(    CIVIL ACTION NO.

 6   VS.                       )(    2:17-CV-577-JRG

 7                             )(    MARSHALL, TEXAS

 8   T-MOBILE USA, INC., T-MOBILE )(

 9   US, INC., ERICSSON INC., AND )(

10   TELEFONAKTIEBOLAGET LM      )(

11   ERICSSON,                  )(    FEBRUARY 8, 2019

12       DEFENDANTS            )(    8:30  A.M.

13                  TRANSCRIPT OF JURY TRIAL

14          BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

15             UNITED STATES CHIEF DISTRICT JUDGE

16   APPEARANCES:

17   FOR THE PLAINTIFF:     Mr. T. John Ward, Jr.
                            Ms. Claire A. Henry
18                          Ms. Andrea L. Fair
                            Mr. Wesley Hill
19                          WARD, SMITH & HILL, PLLC
                            1507 Bill Owens Parkway
20                          Longview, Texas 75604

21   COURT REPORTER:        Ms. Shelly Holmes, CSR, TCRR
                            Official Reporter
22                          United States District Court
                            Eastern District of Texas
23                          Marshall Division
                            100 E. Houston Street
24                          Marshall, Texas 75670

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

```
 1  FOR THE PLAINTIFF:      Mr. Martin J. Black
                            Mr. Kevin M. Flannery
 2                          DECHERT LLP
                            Cira Centre
 3                          2929 Arch Street
                            Philadelphia, Pennsylvania 19104
 4
                            Mr. Joseph M. Abraham
 5                          Mr. Timothy F. Dewberry
                            Mr. Joshua J. Yi
 6                          Mr. Jacob R. Porter
                            DECHERT LLP
 7                          300 West Sixth Street
                            Suite 2010
 8                          Austin, Texas 78701

 9                          Ms. Nisha N. Patel
                            Mr. Ryan T. Banks
10                          DECHERT LLP
                            2440 W. El Camino Real
11                          Suite 700
                            Mountain View, California 94040
12

13  FOR THE DEFENDANTS:     Mr. Douglas M. Kubehl
                            Mr. Jonathan B. Rubenstein
14                          Mr. Jeffery S. Becker
                            BAKER BOTTS LLP
15                          2001 Ross Avenue
                            Dallas, Texas 75201
16
                            Ms. Melissa R. Smith
17                          GILLAM & SMITH LLP
                            303 South Washington Avenue
18                          Marshall, Texas 75670

19                          Mr. Asim M. Bhansali
                            KWUN BHANSALI LAZARUS LLP
20                          555 Montgomery Street
                            Suite 750
21                          San Francisco, California 94111

22

23

24

25
```

1          (Jury out.)

2          COURT SECURITY OFFICER:  All rise.

3          THE COURT:  Be seated, please.

4          All right.  Are counsel for the parties prepared to

5    read into the record the items from the list of pre-admitted

6    exhibits used during yesterday's portion of the trial?

7          MS. HENRY:  Yes, Your Honor.  Plaintiff has no

8    exhibits to read into the record this morning.

9          THE COURT:  How about Defendant?

10          MS. SMITH:  Yes, Your Honor.  DX-3, DX-95, DX-395,

11    DX-405, DX-481, DX-482, DX-485, DX-492, DX-520, DX-529,

12    DX-533, DX-572, DX-573, DX-574, DX-576, DX-577, and PTX-331.

13          THE COURT:  Is there any objection from the

14    Plaintiff as to that offer by the Defendants?

15          MS. HENRY:  No, Your Honor.

16          THE COURT:  All right.  Thank you, counsel.

17          Let me say this before I bring in the jury and

18    proceed to begin my final jury instructions.

19          The Court considers its final instructions to the

20    jury and counsel's closing arguments as the most serious

21    part of a very serious process.  Therefore, I'm going to

22    insist that there be no movement, no distractions.

23          Certainly, I don't want any electronic devices to

24    go off.  I don't want people passing papers, whispering,

25    getting up and leaving the room.  If you need to do anything

1    or take care of anything of that nature, do it now before I

2    bring the jury in, because once I bring the jury in, I want

3    as much as is possible everyone to be silent, attentive, and

4    respectful.

5         All right.  Is Plaintiff or Defendant aware of

6    anything else that the Court should consider or take up

7    before I bring in the jury and begin my final jury

8    instructions?

9         MR. WARD:  Nothing from the Plaintiff.

10         MR. KUBEHL:  Nothing from the Defendant.

11         THE COURT:  All right.  Mr. Johnston, please bring

12    in the jury.

13         COURT SECURITY OFFICER:  All rise.

14         (Jury in.)

15         THE COURT:  Good morning, ladies and gentlemen.

16    Please be seated.

17         Ladies and gentlemen of the jury, you've now heard

18    the evidence in this case, and I'll now instruct you on the

19    law that you must apply.

20         I want you to understand that each of you are going

21    to have your own personal written copy of these instructions

22    that I'm now giving you.

23         You'll have those so that you can take them with

24    you to the jury room and refer to them if you choose to.

25         Accordingly, there's no pressing need for you to

1   make notes at this time unless you just want to.  I'd prefer

2   you listen and pay direct attention to the instructions I'm

3   going to give you orally at this time.

4         It's your duty to follow the law as I give it to

5   you.  On the other hand, as I've said previously, you, the

6   jury, are the sole judges of the facts in this case.

7         Do not consider any statement that I have made in

8   the course of the trial or may make in these instructions as

9   an indication that I have any opinion about the facts of the

10  case.

11        You're about to hear closing arguments from the

12  attorneys.  Statements and arguments of the attorneys are

13  not evidence, and they are not instructions on the law.

14  They're intended only to assist the jury in understanding

15  the evidence and the parties' contentions.

16        A verdict form has been prepared for you.  You'll

17  take this form to the jury room during your deliberations,

18  and when you've reached a unanimous agreement as to your

19  verdict, you'll have your foreperson fill in the blanks

20  reflecting those unanimous agreements, date it, sign it, and

21  then notify the Court Security Officer.

22        Answer the questions in the verdict form from the

23  facts as you find them to be.  Do not decide who you think

24  should win the case and then answer the questions to reach

25  that a result.  Again, ladies and gentlemen, your answers

1    and your verdict must be unanimous.

2              In determining whether any fact has been proven in

3    this case, you may, unless otherwise instructed, consider

4    the testimony of all the witnesses, regardless of who called

5    them, and all the exhibits that were admitted and received

6    into evidence, regardless of who produced or introduced

7    them, as well as any stipulations or agreements the parties

8    may have reached in the case.

9              As I've said, you, the jury, are the sole judges of

10   the credibility of all the witnesses and the weight and

11   effect to give to all of the evidence.

12             Now, by allowing testimony or evidence to be

13   introduced over the objection of an attorney, the Court did

14   not indicate any opinion as to the weight or effect of that

15   evidence.

16             As I've said, the attorneys in this case are

17   advocates for their competing parties, their competing

18   clients, and they have a duty to object when they believe

19   evidence has been offered that should not be admitted under

20   the rules of the Court.

21             Now, when the Court sustained an objection to a

22   question addressed to a witness, you must disregard the

23   question entirely, and you may draw no inference about its

24   wording or speculate about what the witness would have said

25   if the Court had allowed them to answer the question.

1          However, if an objection was overruled, then you

2     must treat the answer and the question just as if you would

3     treat any other question and answer where no objection was

4     made.

5          Now, at times during the course of the trial, it's

6     been necessary for the Court to talk with the lawyers here

7     at the bench or by calling a recess and talking to them when

8     you were outside of the courtroom.

9          This happens because during a trial, there are

10    occasionally things that come up that do not directly affect

11    the jury.

12         You should not speculate, ladies and gentlemen,

13    about what was said during such discussions that took place

14    outside of your presence.

15         There are two types of evidence that you may

16    consider in properly finding the truth as to the facts in

17    this case.

18         One is direct evidence, which is direct proof of a

19    fact, such as the testimony of an eyewitness about what the

20    witness personally saw or heard or did.

21         The other is indirect or circumstantial evidence,

22    that is, the proof of a chain of circumstances that

23    indicates the existence or non-existence of certain other

24    facts.

25         As a general rule, the law makes no distinction

1   between direct or circumstantial evidence but simply

2   requires that you find the facts based on the evidence

3   presented during the trial, both direct and circumstantial.

4          It's for you to decide how much weight to give to

5   any and all of the evidence in this case.

6          Now, ladies and gentlemen, from time to time during

7   the trial, you may have seen documents that included

8   redactions in them.

9          Those documents were redacted by the agreement of

10  the Plaintiff and the Defendants, and you are not to

11  consider those redactions as an indication that a party is

12  trying to hide anything from you.  You should not guess or

13  speculate what has been redacted or blacked out in any

14  document.

15         The parties may have stipulated or agreed to some

16  facts in the case.  And when the lawyers for both sides

17  stipulate as to the existence of a fact, you must, unless

18  otherwise instructed, accept the stipulation as evidence and

19  regard the facts as proven.

20         Now, certain testimony over the course of the trial

21  has been presented to you in the form of a deposition.

22         A deposition is the sworn recorded answers to

23  questions asked of a witness in advance of the trial.  If a

24  witness can't be present to testify in person, then the

25  witness's testimony -- testimony may be presented under oath

1  in the form of a deposition.

2          Before the trial, attorneys representing both sides

3  questioned these deposition witnesses under oath.  A court

4  reporter was present, and the questions and the answers were

5  recorded and taken down.

6          Deposition testimony is entitled to the same

7  consideration as testimony given by a witness in person from

8  the witness stand.

9          Accordingly, you should determine the credibility

10  and the importance of deposition testimony to the best of

11  your ability just as if the witness had testified in person.

12          As I instructed you earlier, in this case one

13  witness testified by both deposition and by live testimony.

14  That is not typical, but it was done by the agreement of the

15  parties.

16          Now, while you should consider only the evidence in

17  this case, you are, ladies and gentlemen, permitted to draw

18  such reasonable inferences from the testimony and the

19  exhibits as you feel are justified in the light of common

20  experience.

21           In other words, you may make deductions and reach

22  conclusions that reason and common sense lead you to draw

23  from the facts that have been established by the testimony

24  and the evidence in this case.

25          However, you should not base your decision on any

1  evidence not presented by the parties during the course of

2  the trial, including your own personal experiences with any

3  particular cellular telecommunications provider or

4  equipment.

5          In deciding the facts in this case, you may have to

6  decide which testimony to believe and which testimony not to

7  believe.  You alone are to determine the questions of

8  credibility or truthfulness regarding the witnesses.

9          In weighing the testimony of the witnesses, you may

10  consider the witness's manner and demeanor on the witness

11  stand, any feelings or interest in the case, or any

12  prejudice or bias about the case that he or she may have,

13  and the consistency or inconsistency of his or her testimony

14  considered in the light of the circumstances.

15          Has a witness been contradicted by other credible

16  evidence?  Has he or she made statements at other times or

17  in other places contrary to those made on the witness stand?

18  You must give the testimony of each witness the credibility

19  that you think it deserves.

20          Now, even though a witness may be a party to the

21  action and interested in its outcome, that testimony may be

22  accepted if it's not contradicted by direct evidence or by

23  any inference that may be drawn from the evidence if you

24  believe that testimony.

25          Now, unless I instruct you otherwise, and as I've

 1   told you, you may properly determine the testimony of a

 2   single witness may be sufficient to prove any fact, even if

 3   a greater number of witnesses may have testified to the

 4   contrary, if after considering all the other evidence you

 5   believe that the burden of proof has been met by that single

 6   witness's testimony.

 7           Now, when knowledge of a technical subject matter

 8   may be helpful to the jury, a person who has special

 9   training and experience in that technical field -- we call

10   them an expert witness -- is permitted to state his or her

11   opinions on those technical matters.

12            However, you're not required to accept those

13   opinions.  As with any other witness, ladies and gentlemen,

14   it is solely up to you to decide whether or not to rely upon

15   it.

16           Expert witnesses presented by one party to the

17   litigation must have been disclosed as an expert to the

18   other parties and must have served on the other parties in

19   advance a written disclosure containing his or her opinions

20   that would then be presented at trial.

21           However, an expert witness does not include a

22   witness who offers testimony as to the witness's personal

23   knowledge but who does not offer opinions as an expert.

24           Witnesses of that type are generally referred to as

25   fact witnesses.

1          Now, certain exhibits shown to you over the course

2     of the trial were illustrations.  We call these types of

3     exhibits demonstrative exhibits or sometimes simply

4     demonstratives.  Demonstrative exhibit -- demonstrative

5     exhibits are a party's description, picture, or model to

6     describe something involved in the trial.

7          If your recollection of the evidence differs from

8     the demonstratives that you have been shown, you should rely

9     on your recollection of the evidence.

10          Demonstrative exhibits are sometimes called jury

11     aids.  Demonstrative exhibits, ladies and gentlemen, are not

12     evidence, but a witness's testimony concerning a

13     demonstrative is evidence.

14          Additionally, the following are not evidence, and

15     you must not consider them as evidence in deciding the facts

16     in this case.  Statements, arguments, questions, or

17     objections of the attorneys or anything you may see or hear

18     when the Court is not in session, even if what you see or

19     hear is done or said by one of the parties, one of the

20     witnesses, or one of the attorneys.

21          Now, in any legal action, facts must be proven by a

22     required amount of evidence known as the burden of proof.

23          The burden of proof in this case is on the

24     Plaintiff for some issues and on the Defendants for other

25     issues.

1        There are two burdens of proof that you, the jury,

2   must apply in this case.

3        One is the preponderance of the evidence, and the

4   other is clear and convincing evidence.

5        The Plaintiff in this case, Intellectual Ventures,

6   which you've heard referred to simply as IV throughout the

7   trial, has the burden of proving patent infringement by a

8   preponderance of the evidence.

9        The Plaintiff, IV, also has the burden of proving

10  damages for patent infringement by a preponderance of the

11  evidence.

12       A preponderance of the evidence means evidence that

13  persuades you that a claim is more probably true than not

14  true.  Sometimes this is talked about as being the greater

15  weight and degree of credible testimony.

16       The Defendants in this case, Ericsson and T-Mobile,

17  have the burden of proving patent invalidity by clear and

18  convincing evidence.

19       Clear and convincing evidence means evidence that

20  produces in your mind an abiding conviction that the truth

21  of the parties' factual contentions are highly probable.

22       Although proof to an absolute certainty is not

23  required, the clear and convincing evidence standard

24  requires a greater degree of persuasion than is necessary

25  for the preponderance of the evidence standard.

1          If proof establishes in your mind an abiding

2     conviction in the truth of the matter, then the clear and

3     convincing evidence standard has been met.

4          Now, these standards are different from what you've

5     heard about in criminal proceedings where a fact has to be

6     proven beyond a reasonable doubt.

7          On a scale, ladies and gentlemen, of these various

8     standards or burdens of proof, as you move on one end from

9     preponderance of the evidence where proof need only tip the

10    scales in favor of the party who's proving a fact to beyond

11    a reasonable doubt on the other end of the scale where facts

12    must be proven to a very high degree of certainly, you may

13    think of clear and convincing evidence as being somewhere

14    between those two standards.

15         Now, in determining whether any fact has been

16    proven by a preponderance of the evidence or by clear and

17    convincing evidence, you may, unless otherwise instructed,

18    consider the stipulations of the parties, the testimony of

19    all the witnesses, regardless of who called them, and the

20    exhibits received and admitted into evidence by the Court,

21    regardless of who introduced them.

22         Now, as I did at the start of the case, I'll first

23    give you a summary of each side's contentions.  I'll then

24    provide you with detailed instructions on what each side

25    must prove to win on each of its contentions.

1          As I've previously told you, this case concerns

2     three United States patents.

3          They are United States Patent 6,628,629, which

4     you've heard referred to throughout the trial as the '629

5     patent.

6          Second, United States Patent No. 7,412,517, which

7     you've heard to referred to as the '517 patent.

8          And thirdly, United States Patent RE46,206, which

9     you've heard referred to throughout the trial as the '206

10    patent.

11         I will refer to these three patents collectively as

12    the patents-in-suit or as the asserted patents.

13         Now, the Plaintiff, IV, seeks money damages from

14    the Defendants, Ericsson and T-Mobile, for the use of base

15    stations in T-Mobile's network.  I'll refer to those base

16    stations in T-Mobile's networks -- network as the accused

17    technology.

18         Now, the Plaintiff contends that the accused

19    technology infringes the following claims of the asserted

20    patents.

21         Claims 1 and 4 of the '629 patent.

22         Claims 1 and 4 of the '517 patent.

23         And Claims 109, 112, 118, 140, 144, and 146 of the

24    '206 patent.

25         All of these claims are sometimes referred to as

1   the asserted claims.

2          Now, the Plaintiff, IV, has alleged that the

3   accused technology infringes the asserted claims either

4   literally or through the Doctrine of Equivalents.

5          IV seeks a reasonable royalty from the Defendants,

6   Ericsson and T-Mobile, regarding their alleged infringement.

7          Ericsson and T-Mobile deny that they infringe any

8   of the asserted claims, either literally or through the

9   Doctrine of Equivalents.

10          Ericsson and T-Mobile also contend that all of the

11   asserted claims are invalid.

12          Ericsson and T-Mobile contend that certain of the

13   asserted claims are anticipated by prior art that existed

14   before the Plaintiff's alleged inventions, and, therefore,

15   those asserted claims are invalid.

16          Ericsson and T-Mobile further contend that all of

17   the asserted claims are obvious in view of prior art that

18   existed before Plaintiff's alleged inventions, and,

19   therefore, all the asserted claims are invalid.

20          Ericsson and T-Mobile deny that they owe IV any

21   damages.

22          Invalidity, ladies and gentlemen, is a defense to

23   infringement.  Invalidity and infringement are separate and

24   distinct issues.

25          Your job is to decide whether any of the asserted

1   claims have been infringed and whether any of the asserted

2   claims are invalid.

3        If you decide that any of the asserted claims have

4   been infringed and are also not invalid, then you'll need to

5   further decide the amount of money damages to be awarded to

6   the Plaintiff as compensation for that infringement.

7        Now, before you can decide many of the issues in

8   this case, you'll need to understand the role of patent

9   claims.

10       The patent claims are those numbered sentences at

11  the ends of each patent.

12       The claims are important because it's the words of

13  the claims themselves that define what a patent covers.

14       The figures and the text in the rest of the patent

15  provide a description or examples of the invention, and they

16  provide a context for the claims, but it is the claims

17  themselves, ladies and gentlemen, that define the breadth of

18  the patent's coverage.

19       Each claim is effectively treated as if it were a

20  separate patent, and each claim may cover more or cover less

21  than another claim.

22       Therefore, what a patent covers collectively

23  depends on what each of its claims covers.

24       Claims may describe methods for using technology.

25  And I will call such claims method claims.  In this case,

1  the Plaintiff, IV, has asserted only method claims.

2        You need first to understand what each claim covers

3  in order to decide whether or not there is infringement of

4  the claim and to decide whether or not the claim is invalid.

5        The first step is to understand the meaning of the

6  words used in the patent claim.

7        Now, the law says that it is my role to define the

8  terms of the claims, and it's your role to apply my

9  definitions or constructions to the issues that you're asked

10  to decide.

11         Therefore, as I told you at the beginning of the

12  case, I have determined the meanings of certain claim

13  limitations, and I've provided those definitions to you, and

14  they're listed in your juror notebooks.

15        You must accept those definitions that I've

16  provided of these words in the claims as being correct.

17        It's your job to take these definitions that I've

18  supplied and apply them to the issues that you are asked to

19  decide, including the issues of infringement and invalidity.

20        You should disregard any evidence presented at

21  trial which contradicts or is inconsistent with the

22  constructions and definitions that I have given you.

23        For claim limitations that I have not construed,

24  that is, I haven't defined them or interpreted them, you are

25  to use the plain and ordinary meaning of the terms as

1  understood by one of ordinary skill in the art, which is to
2  say in the field of the technology of the patent at the time
3  of the alleged invention.

4        The meaning of the words of the patent claims must
5  be the same when deciding both infringement and when
6  deciding invalidity.

7        Now, you've been provided with copies of the three
8  asserted patents, and they are in your juror notebooks, and
9  you may use them and refer to them in your deliberations.

10       I'll now explain to you how a claim defines what it
11 covers.

12       A claim sets forth in words a set of requirements.
13 Each claim sets forth its requirements in a single sentence.

14       If a technology satisfies each of these
15 requirements in that sentence, then it is covered by and
16 infringes the claim.

17       There can be several claims in a patent.  A claim
18 may be narrower or broader than another claim by setting
19 forth more or fewer requirements.  The coverage of a patent
20 is assessed on a claim-by-claim basis.

21       In patent law, requirements of a claim are often
22 referred to as the claim elements or the claim limitations.

23       When a method meets all the requirements of a
24 claim, the claim is said to cover that method, and that
25 method is said to fall within the scope of that claim.

1    In other words, a claim covers a method where each
2    of the claim elements or limitations is present in that
3    method.   If a method is missing even one limitation or
4    element of a claim, the method is not covered by the claim.

5    And if the method is not covered by the claim,
6    ladies and gentlemen, the method does not infringe the
7    claim.

8    Now, the beginning portion or preamble of a claim
9    often uses the word "comprising."  The word "comprising,"
10   when used in the preamble of a claim, means including but
11   not limited to or containing but not limited to.

12   When comprising is used in the preamble, if you
13   decide that an accused technology includes all the
14   requirements of that claim, the claim infringed.

15   This is true even if the accused technology
16   contains additional elements or limitations.

17   For example, a claim to a table comprising a
18   tabletop, legs, and glue would be infringed by a table that
19   includes a tabletop, legs, and glue, even if the table also
20   includes wheels to go on the ends of the legs.

21   This case involves two types of patent claims,
22   ladies and gentlemen, independent claims and dependent
23   claims.

24   An independent claim does not refer to any other
25   claim of the patent.  An independent claim sets forth all of

1    the requirements that must be met in order to be covered by

2    that claim.  It's not necessary to look at any other claim

3    to determine what an independent claim covers.

4         However, a dependent claim does not itself recite

5    all the requirements of a claim but refers to another claim

6    for some of its requirements.  In this way, the claim

7    depends on another claim.  It's sometimes said to refer to

8    the other claim.

9         The law considers a dependent claim to incorporate

10   all the requirements of the claims to which it refers or

11   from when it depends.  The dependent claim then adds its own

12   additional requirements.

13        To determine what a dependent claim covers, it's

14   necessary to look at both the dependent claim and any other

15   claim to which it refers or from which it depends.

16        A method that meets all the requirements of both

17   the dependent claim and the claims from which it refers is

18   covered by that dependent claim.

19        Now, a patent owner has the right to stop others

20   from using the invention covered by its patent claims in the

21   United States during the life of the patent.

22        If a person makes, uses, sells, or offers to sell

23   within the United States or imports into the United States

24   what is covered by a patent claim without the patent owner's

25   permission, that person is said to infringe the patent.

1              In reaching your decision on infringement, keep in

2    mind that only the claims of a patent can be infringed.

3              You must compare the asserted claims, as I have

4    defined them, to the accused technology to determine whether

5    or not there is infringement.

6              You should not compare the accused technology with

7    any specific example set out in the patent or with prior art

8    in reaching your decision about infringement.

9              The only correct comparison, ladies and gentlemen,

10   is between the accused technology and the language of the

11   claim itself.

12             You must reach your decision on each assertion of

13   infringement based on my instructions about the meaning and

14   scope of the claims, the legal requirements for

15   infringement, and the evidence presented to you by both of

16   the parties.

17             Also, the issue of infringement is assessed on a

18   claim-by-claim basis.

19             Accordingly, there may be infringement as to one

20   claim, even if there is no infringement as to other claims.

21             I'll now instruct you on the specific rules you

22   must follow to determine whether the Plaintiff, IV, has

23   proven that the Defendants, Ericsson and T-Mobile, have

24   infringed one or more of the patent claims involved in this

25   case.

1          In this case, there are three possible ways that a

2     claim may be infringed, and I'll explain the requirements

3     for each of these types of infringement to you.

4          The three types of infringement are called direct

5     infringement, active inducement, and contributory

6     infringement.

7          Active inducement and contributory infringement are

8     referred to as indirect infringement.  There cannot be

9     indirect infringement without someone else engaging in

10    direct infringement.

11         To prove direct infringement, the Plaintiff must

12    prove that Ericsson's alleged indirect infringement caused

13    direct infringement.

14         In this case, the Plaintiff, IV, alleges that

15    Ericsson, both directly and indirectly, infringes, and that

16    T-Mobile directly infringes the asserted claims.

17         IV's allegations of indirect infringement concern

18    both active inducement and contributory infringement with IV

19    contending that Ericsson's indirect infringement leads to

20    direct infringement by T-Mobile.

21         In order to prove infringement, IV must prove that

22    the requirements for one or more of these types of

23    infringement are met by a preponderance of the evidence,

24    that is, that it's more likely true than not true that all

25    of the requirements or one or more -- of one or more of

1  these types of infringement has been proven.

2          I'll now explain each of these types of

3  infringement in more detail.

4          In order to prove direct infringement of a patent

5  claim, the Plaintiff, IV, must show by a preponderance of

6  the evidence that the accused technology includes each and

7  every requirement or limitation of the claim either

8  literally or under the Doctrine of Equivalents.

9          In determining whether an accused technology

10  directly infringes a patent claim in this case, you must

11  compare the accused technology with each and every one of

12  the requirements or limitations of that claim to determine

13  whether the accused technology literally performs in the

14  United States each and every requirement or limitation

15  recited in the claim.

16          The asserted claims are not infringed by the sale

17  or manufacture of a product that is merely capable of

18  performing every element or limitation.

19          However, a method claim may be infringed even if

20  the infringer performs the infringing method only once.

21          A claim requirement is present if it exists in an

22  accused technology just as it is described in the claim

23  language, either as I've explained that language to you, or

24  if I did not explain it, as would be understood by one of

25  ordinary skill in the art.

1          If an accused technology admits any element recited

2     in a claim, then you must find that that particular

3     technology does not literally infringe that claim.

4          A patent can be directly infringed even if the

5     alleged infringer did not have knowledge of the patent and

6     without the infringer knowing that what it was doing is

7     infringement of the claim.

8          A patent may also be directly infringed even though

9     the accused infringer believes in good faith that what it's

10    doing is not infringement of the patent.

11         Infringement does not require proof that a party

12    copied the asserted claims.

13         A claim requirement is literally present if it

14    existed in an accused technology just as it is described in

15    the claim language, either as I've explained the language to

16    you, or as I've said, if I did not explain it, as it would

17    be understood by its plain and ordinary meaning of one of

18    skill in the art.

19         If an accused technology omits any requirement

20    recited in a claim, then you must find that the particular

21    technology does not infringe that claim.

22         If a person practices a method that does -- does

23    not meet all the requirements of a claim and thus does not

24    literally infringe that claim, there can still be direct

25    infringement if that method satisfies the claim under the

1  Doctrine of Equivalents.

2       Under the Doctrine of Equivalents, a technology

3  infringes a claim if the accused technology performs steps

4  corresponding to each and every requirement of the claim

5  that is*equivalent to, even though not literally met by, the

6  accused technology.

7       The Plaintiff, IV, has alleged that some but not

8  all of the elements of some of the asserted claims are

9  infringed under the Doctrine of Equivalents.

10       For only those claim elements, you may find that an

11  element is equivalent to a requirement of a claim that is

12  not literally met if a person having ordinary skill in the

13  field of the technology of the patent would have considered

14  the differences between them to be insubstantial or would

15  have found that the action in the accused technology, (1),

16  performs substantially the same function, (2), in

17  substantially the same way, (3), to achieve substantially

18  the same result as the requirement of the claim.

19       In order for the action to be considered

20  interchangeable, the action must have been known at the time

21  of the alleged infringement to a person having ordinary

22  skill in the field of the technology of the patent.

23       Interchangeability at the present time is not

24  sufficient.  In order to prove infringement by equivalents,

25  IV must prove the equivalency of each claim element by a

1  preponderance of the evidence.

2          Now, IV also alleges that Ericsson is liable for

3  indirect infringement by actively inducing T-Mobile to

4  directly infringe the asserted claims literally or under the

5  Doctrine of Equivalents.

6          As with direct infringement, you must determine

7  whether there has been active inducement on a claim-by-claim

8  basis.

9          Ericsson is liable for active inducement of a claim

10 if IV proves by a preponderance of the evidence.

11         (1) that the acts are actually carried out by

12 T-Mobile and directly infringe that claim;

13         (2) that Ericsson took action intending to cause

14 the infringing acts by T-Mobile;

15         And, (3), that Ericsson was aware of or willfully

16 blind to the patent and knew that the acts, if taken, would

17 constitute infringement of the patent or that Ericsson was

18 willfully blind to that infringement.

19         If you find that Ericsson was aware of the patent

20 but that Ericsson believed that the acts it encouraged did

21 not infringe the asserted claims, Ericsson cannot be held

22 liable for inducement.

23         In order to establish active inducement of

24 infringement, it's not sufficient that T-Mobile directly

25 infringes the claim, nor is it sufficient that Ericsson was

1    aware of the acts by T-Mobile that allegedly constitute

2    direct infringement.

3           Rather, in order to find active inducement of

4    infringement, you must find either that Ericsson

5    specifically intended T-Mobile to infringe the asserted

6    claims or that Ericsson believed there was a high

7    probability that Ericsson would infringe the asserted claims

8    but deliberately avoided learning the infringing nature of

9    T-Mobile's acts.

10          The mere fact, if true, that Ericsson knew or

11   should have known that there was a substantial risk that

12   T-Mobile's acts would infringe the asserted claims would not

13   be sufficient for active inducement of infringement.

14          The Plaintiff, IV, must prove induced infringement

15   by a preponderance of the evidence.

16          IV alleges that Ericsson is liable for contributory

17   infringement by contributing to the direct infringement of

18   the asserted claims by T-Mobile.

19          As with direct infringement, you must determine

20   contributory infringement on a claim-by-claim basis.

21          Ericsson is liable for contributory infringement of

22   a claim if IV proves by a preponderance of the evidence:

23          (1) Ericsson sells, offers to sell, or imports

24   within the United States a component of a product or an

25   apparatus for use in a process during the time the asserted

1  patents were in force;

2          (2) the component or apparatus has no substantial

3  non-infringing use;

4          (3) the component or apparatus constitutes a

5  material part of the invention;

6          (4) Ericsson was aware of the asserted patents and

7  knew that the products or processes for which the component

8  has no other substantial use may be covered by a claim of

9  one or more of the asserted patents or may -- may satisfy a

10  claim of the same patent under the Doctrine of Equivalents;

11          And, (5), that use directly infringes the claim.

12          In order to prove contributory infringement, IV,

13  the Plaintiff, must prove each of the above requirements

14  have been met by a preponderance of the evidence.

15          I'll now instruct you on the rules that you must

16  follow in deciding whether or not Ericsson and T-Mobile have

17  proven that the asserted claims are invalid.

18          An issued -- excuse me.  All issued United States

19  patents are accorded a presumption of validity based on the

20  presumption that the United States Patent and Trademark

21  Office, which you've heard referred to throughout the trial

22  simply as the PTO or the Patent Office, acted correctly in

23  issuing the patent.

24          To prove that any asserted claim is invalid, the

25  Defendants, Ericsson and T-Mobile, must persuade you by

1   clear and convincing evidence that the claim is invalid.

2         Like infringement, ladies and gentlemen, invalidity

3   is determined on a claim-by-claim basis.

4         You must determine separately for each asserted

5   claim whether that claim is invalid.

6         If one asserted claim is invalid, that does not

7   mean that any other asserted claim is necessarily invalid.

8         Claims are construed in the same way for

9   determining infringement as for determining invalidity.

10         You must apply the claim language consistently and

11   in the same manner for issues of infringement and for issues

12   of invalidity.

13         In making your determine -- determination as to

14   invalidity, you should consider each asserted claim

15   separately.

16         Prior art may include items that were publicly

17   known, or that have been used or offered for sale, or

18   references, such as publications or patents, that disclose

19   the claimed invention or elements of the claimed invention.

20         To be prior art, an item or reference must have

21   been made, known, used, published, or patented either before

22   the invention was made or more than one year before the

23   priority date of the patent.

24         Prior art does not include a publication by an

25   inventor that describes the inventor's own work and was

1  published less than one year before the priority date.

2       The priority date for both the '517 patent and the

3  '629 patent is July the 9th, 1999.

4       The priority date for the '206 patent is July 10th,

5  1998.

6       For the claim to be invalid because it is not new,

7  Ericsson and T-Mobile must show by clear and convincing

8  evidence that all of the requirements of that claim were

9  present in a single previous device or method that was known

10 of, used, or described in a single previous printed

11 publication or patent.  We call these things anticipating

12 prior art.

13      To anticipate the invention, the prior art does not

14 have to use the same words as the claim, but all the

15 requirements of the claim must have been disclosed, either

16 stated expressly or implied to a person having ordinary

17 skill in the art of the technology of the invention so that

18 looking at that one prior art reference, that part -- that

19 person could make and use the claimed invention.

20      In some -- in order for someone to be entitled to a

21 patent, the invention must actually be new, and the inventor

22 must not have lost his or her rights by delaying the filing

23 of an application claiming the invention.

24      In general, inventions are new when the identical

25 apparatus, system, or method has not been made, used, or

1    disclosed before.

2           Anticipation must be determined on a claim-by-claim

3    basis.

4           Now, Ericsson and T-Mobile, the Defendants, contend

5    that certain of the asserted claims are invalid because the

6    claimed inventions are anticipated.

7           If you find that Ericsson and T-Mobile have proven

8    by clear and convincing evidence that a claim is

9    anticipated, you must find that the claim is invalid.

10          Prior art differing from the prior art considered

11   by the Patent Office may, but does not always, consider

12   [sic] more weight than prior art that was considered by the

13   Patent Office.

14          Ericsson and T-Mobile also contend in this case

15   that certain of the asserted claims are invalid as being

16   obvious.

17          Even though an invention may not have been

18   identically disclosed or identically described in a single

19   prior art reference before it was made by an inventor, the

20   invention may have been obvious to a person of ordinary

21   skill in the field of the technology of the patent at the

22   time the invention was made.

23          In this case, Ericsson and T-Mobile bear the burden

24   of establishing obviousness by clear and convincing

25   evidence.

1    In determining whether a claimed invention is

2    obvious, you must consider the level of ordinary skill in

3    the field of technology of the patent that someone would

4    have had at the time the claimed invention was made, the

5    scope and the content of the prior art, and any differences

6    between the prior art and the claimed invention, as well as

7    the ordinary knowledge of a person of ordinary skill at the

8    time of the invention.

9    The skill of the actual inventor is not necessarily

10   relevant because inventors may possess something that

11   distinguishes them from workers of ordinary skill in the

12   art.

13   Keep in mind, ladies and gentlemen, that the

14   existence of each and every element of the claimed invention

15   in the prior art does not necessarily prove obviousness.

16   Most, if not all, inventions re -- rely on the building

17   blocks of prior art.

18   In considering whether a claimed invention is

19   obvious, you should consider whether as of the priority date

20   of the asserted patents there was a reason that would have

21   prompted a person of ordinary skill in the field to combine

22   the known elements in a way that the claimed invention does,

23   taking into account such facts as:

24   (1) whether the claimed invention was merely the

25   predictable result of using prior art elements according to

1   their known function;

2           (2) whether the claimed invention provides an

3   obvious solution to a known problem in the relevant field;

4           (3) whether the prior art teaches or suggests the

5   desirability of combining elements claimed in the invention;

6           (4) whether the prior art teaches away from

7   combining elements in the claimed invention;

8           (5) whether it would have been obvious to try the

9   combinations of elements in the claimed invention, such as

10  when there is a design need or market pressure to solve a

11  problem, and there are a finite number of identified

12  predictable solutions;

13          And, (6), whether the change resulted more from

14  design incentives or other market forces.

15          In determining whether the claimed invention was

16  obvious, consider each claim separately and consider only

17  what was known at the time of the invention.

18          Now, in determining whether the claimed invention

19  was obvious, do not, ladies and gentlemen, use hindsight.

20          In other words, you should not consider what a

21  person of ordinary skill in the art would know now or what

22  has been learned from the teaching of the asserted patents.

23          In making these assessments, you should take into

24  account any objective evidence, sometimes called secondary

25  considerations, that may have existed at the time of the

invention and afterwards that may shed light on

non-obviousness.

The following are possible secondary

considerations, but it's up to each of you to decide whether

secondary considerations of non-obviousness exist at all.

(1) whether the invention was commercially

successful as the result of the merits of the claimed

invention rather than the result of design needs or market

pressure, advertising, or similar activities;

(2) whether the invention satisfied a long-felt

need;

(3) whether others had tried and failed to make the

invention;

(4) whether others copied the invention;

(5) whether there were changes or related

technologies or market needs contemporaneous with the

invention;

(6) whether the invention achieved unexpected

results;

(7) whether others in the field praised the

invention;

(8) whether persons having ordinary skill in the

art of the invention expressed surprise or disbelief

regarding the invention;

(9) whether others sought or obtained rights to the

1 patent from the patentholder;

2          And, (10), whether the inventor proceeded contrary

3 to accepted wisdom in the field.

4          In support of obviousness, you may also consider

5 whether others independently invented the claimed invention

6 before or at the same time as the named inventor thought of

7 it.

8          If you find that Ericsson and T-Mobile have proven

9 the obviousness of a claim by clear and convincing evidence,

10 then you must find that that claim is invalid.

11          Now, several times in these instructions, I

12 referred to a person of ordinary skill in the field of the

13 invention.  It's up to you, ladies and gentlemen, to decide

14 the level of ordinary skill in the field of the invention.

15          In deciding what the level of ordinary skill is,

16 you should consider all the evidence introduced at trial,

17 including:

18          the levels and education -- the levels of education

19 and experience of persons working if the field;

20          the types of problems encountered in the field;

21          prior art solutions to those problems;

22          rapidity with which innovations are made;

23          and the sophistication of the technology.

24          A person of ordinary skill in the art is a

25 hypothetical person who is presumed to have known all of the

1    relevant prior art at the time of the claimed invention.

2           If you find either, (1), Ericsson or T-Mobile has

3    directly infringed, or, (2), that Ericsson has directly

4    infringed [sic] and T-Mobile has directly infringed any

5    asserted claim -- excuse me, that Ericsson has indirectly

6    infringed and T-Mobile has directly infringed any asserted

7    claims and if you also find that the infringed asserted

8    claims are not invalid, then you must consider what amount

9    of damages to award to the Plaintiff, IV.

10          If you find that there was no direct -- no direct

11   infringement by either Ericsson or T-Mobile of any of the

12   asserted claims, then you should not award any damages to

13   IV.

14          I'll now instruct you about the measure of damages,

15   but by instructing you on damages, ladies and gentlemen, I'm

16   not -- I'm not suggesting which party should win this case

17   on any issue.

18          The damages that you award, if any, must be

19   adequate to compensate the Plaintiff, IV, for any

20   infringement that you may find.  You must not award IV more

21   damages than are adequate to compensate for the

22   infringement, nor should you include any additional amount

23   for the purpose of punishing either Ericsson or T-Mobile or

24   for setting any example.

25          IV has the burden to establish the amount of

1  damages by a preponderance of the evidence.  IV is not

2  entitled to damages that are remote or speculative.

3        If you determine that any asserted claim is

4  infringed and is not invalid, then IV is entitled to recover

5  no less than a reasonable royalty for each infringing sale

6  or use of its inventions.

7        IV seeks damages in the form of a reasonable

8  royalty.  A reasonable royalty is defined as the money

9  amount IV and Ericsson and T-Mobile would have agreed upon

10  as a fee for the use of IV's invention at the time the

11  infringement began.

12        The determination of a damages award, ladies and

13  gentlemen, is not an exact science, and the amount need not

14  be proven with unerring precision.

15        You may approximate, if necessary, the amount to

16  which IV is entitled.  However, damages may not be

17  determined by mere speculation.

18        It may be proper to award a damages amount if the

19  evidence shows the extent of the damages as a matter of just

20  and reasonable inference.

21        A royalty is a payment to a patentholder in

22  exchange for the right to make, use, sell, or import the

23  claimed invention.

24        A reasonable royalty is the amount of money to be

25  paid for a license to make, use, or sell the invention that

1  a willing patent owner and a willing prospective licensee

2  would have agreed to immediately before the infringement

3  began as a part of a hypothetical negotiation.

4         In considering this hypothetical negotiation, you

5  should focus on what the expectations of the patentholder

6  and the infringer would have been had they entered into

7  agreement at that time and had they acted reasonably in

8  their negotiations.

9         In determining this, you must assume that both

10  parties believed the patents were valid and infringed and

11  that the patentholder and the infringer were willing to

12  enter into an agreement.

13         The reasonable royalty that you determine must be

14  the royalty that would have resulted from this hypothetical

15  negotiation, not simply the royalty that either party would

16  have preferred.

17         Evidence of things that happened after infringement

18  first began may be considered in evaluating the reasonable

19  royalty only to the extent that the evidence aids in

20  assessing what royalty would have resulted from a

21  hypothetical negotiation.

22         What the parties -- where the parties dispute a

23  matter concerning damages for infringement, it is the

24  Plaintiff's burden to prove that it is more probable than

25  not that the Plaintiff's version is correct.

1          Plaintiff must prove the amount of its damages with

2    reasonable certainty, but not need -- but need not prove the

3    amount of its damages with mathematical precision.

4          However, Plaintiff, again, is not entitled to

5    damages that are remote or purely speculative.

6          The amount you find as damages must be based on the

7    value attributable to the patented technology, as distinct

8    from other unpatented features of the accused technology.

9          Plaintiff, IV, bears the burden to establish the

10   amounts attributable to the patented feature, that is, IV

11   must give evidence tending to separate or apportion between

12   the patented features and the unpatented features.

13         In determining the reasonable royalty, you should

14   consider all the facts known and available to the parties at

15   the time the infringement began.

16         Some of the kinds of factors that you should

17   consider in making your determination are:

18         (1) the royalties received by the patentee for

19   licensing of the asserted patents proving or tending to

20   prove an established royalty;

21         (2) the rates paid by the licensee for the use of

22   other patents comparable to the asserted patents;

23         (3) the nature and scope of the license as

24   exclusive or non-exclusive or as restricted or

25   non-restricted in terms of territory or with respect to whom

1  the manufactured product may be sold;

2           (4) the licensor's established policy and marketing

3  program to maintain his patent monopoly by not licensing

4  others to use the invention or by granting licenses under

5  special conditions designed to preserve that monopoly;

6           (5) the commercial relationship between the

7  licensor and licensee, such as whether they are competitors

8  in the same territory in the same line of business or

9  whether they are inventor and promoter;

10          (6) the effect of selling the patent specialty in

11 promoting sales of other products of the licensee, the

12 existing value of the invention to the licensor as a

13 generator of sales of its non-patented items, and the extent

14 of such derivative or convoyed sales;

15          (7) the duration of the patent and the term of the

16 license;

17          (8) the established profitability of the product

18 made under the patent, its commercial system, and its

19 current popularity;

20          (9) the utility and advantages of the patented

21 invention over the old modes or devices, if any, that had

22 been used for achieving similar results;

23          (10) the nature of the patented invention and the

24 benefits to those who have used the invention;

25          (11) the extent to which the infringer has made use

1  of the invention and any evidence probative of the value of

2  that use;

3          (12) the portion of the profit or of the selling

4  price that may be customary in the particular business or in

5  comparable businesses to allow for the use of the invention

6  or analogous inventions;

7          (13) the value that should be credited to the

8  invention as distinguished from non-patented elements, the

9  manufacturing process, business risk, or significant

10 features or improvements added by the infringer;

11         (14) the opinion testimony of qualified experts;

12         And, (15), the amount that a licensor, such as the

13 patentee, and a licensee, such as the infringer, would have

14 agreed upon at the time the infringement began if both sides

15 had been reasonably and voluntarily trying to reach an

16 agreement, that is, the amount which a prudent licensee who

17 desired as a business proposition to obtain a license to

18 manufacture and sell a particular article embodying the

19 patented invention would have been -- would have been

20 willing to pay as a royalty and yet be able to make a

21 reasonable profit and which amount would have been

22 acceptable to a prudent patentee who was willing to grant a

23 license.

24         Now, ladies and gentlemen, none of these factors is

25 dispositive, and you could -- you should and you can

1    consider the evidence that's been presented to you in this

2    case on each of these factors.

3          You may also consider any other factors which in

4    your mind have increased or decreased the royalty the

5    infringer would have been willing to pay and the patent

6    owner would have been willing to accept acting as normally

7    prudent business people.

8          Now, when determining the reasonable royalty, you

9    may consider evidence concerning the amounts that other

10   parties have paid for rights to the patents in question or

11   for rights to similar technologies.

12         A license agreement need not be perfectly

13   comparable to a hypothetical license that would have been

14   negotiated between the Plaintiffs and Defendants in this

15   case in order for you to consider it.

16         However, if you choose to rely on evidence from any

17   other license agreements, you must account for any

18   differences between those licenses and the hypothetically

19   negotiated license between Plaintiff, IV, and Defendants

20   Ericsson and T-Mobile in terms of the technologies, the

21   economic circumstances of the contracting parties when you

22   make your reasonable royalty determination.

23         In determining the amount of damages, you must

24   determine when damages began.

25         Damages begin to accrue when an issued patent is

1    infringed.  For any of the three asserted patents where you

2    find that an asserted claim is both infringed and not

3    invalid, you may not award any damages for activities

4    occurring before the damages start.

5           Now, with those instructions, ladies and gentlemen,

6    we will now hear closing arguments for the attorneys for

7    both of the parties -- for both sides in this case.

8           Plaintiff, you may now present your first closing

9    argument.

10          Would you like a warning on your time?

11          MR. BLACK:  Yes, Your Honor.

12          THE COURT:  What type of warning?

13          MR. BLACK:  20 minutes, please.

14          THE COURT:  20 minutes left or 20 minutes have been

15   used?

16          MR. BLACK:  No, Your Honor, 20 minutes in, and then

17   I'll finish at 20 -- 25 minutes.

18          THE COURT:  I'll warn you when you have used 20

19   minutes.

20          You may proceed, Mr. Black.

21          MR. BLACK:  Thank you, Your Honor.

22          Ladies and gentlemen of the jury, thank you for

23   your service.  I've seen you folks all week, listening,

24   watching, taking down notes relating to the complex

25   technology at issue in this case.

1          My role in the closing argument is to try to put

2    together the pieces of the puzzle, of the evidence that you

3    heard during this week, and to explain for you why we met

4    our burden of the preponderance of the evidence on the

5    issues of infringement and damages.

6          I will also show that the Defendants failed to meet

7    their much higher burden of clear and convincing evidence on

8    the issue of invalidity.

9          When I'm done, I will explain how to fill in the

10   jury verdict form, and I'll ask you to return a verdict for

11   Intellectual Ventures of $77.3 million, $68.3 million

12   against T-Mobile for direct infringement, and $9 million

13   against Ericsson for their infringement.

14         Now, we are here because of two provisions of the

15   United States Constitution.  Article 1, Section 8, the

16   Constitution grants the right to inventors for patents to

17   protect their intellectual property.  It is property like

18   any other property.  And when that property is used without

19   permission, compensation must be made.

20         The second provision of the Constitution, which is

21   at issue here today, is the Seventh Amendment to the

22   Constitution and the Bill of Rights.  And as Judge Gilstrap

23   pointed out, there is a long history of the right to jury

24   trial in this country.

25         You might ask, though, why do we handle patent

1 cases in jury trials?  We ask a jury of folks who don't have

2 prior experience with complex issues relating to

3 telecommunications.  The lawyers, the expert witnesses have

4 months or years to work on these cases, and then we ask a

5 lay jury to decide it.

6          The reason is because the founders were believers

7 in common sense, and you heard the Court say that in the

8 charge.  You should rely on your common sense.  And that is

9 what we are going to ask you to do today.

10          So let's start at the beginning of the trial with

11 the evidence.  And I'll show you how the pieces all fit

12 together.

13          We first heard from Dr. Jorgensen.  An incredible

14 man, brilliant but humble, a man who invented, a man who

15 began his education at MIT getting a degree in theoretical

16 physics.  He then went on to medical school.  He became a

17 surgeon, but he fell in love with the idea of innovating and

18 in getting into to the telecommunications area.

19          So while he was a surgical resident, he would study

20 at night in the library for two hours to learn

21 telecommunications.  He must have been very tired.

22          And then he left the practice of medicine to join a

23 series of start-ups, some of which were quite successful,

24 and eventually landed as the chief technical officer at

25 Malibu Networks, where he tried to bring to fruition his

1 ideas relating to wireless technology.

2          He saw and he understood when he learned in the

3 library that the way -- voice traffic and data traffic was

4 being handled differently.

5          Voice traffic -- traffic was in packets that were

6 in one pipe.  Data traffic through a completely different

7 system and network.

8          He could see the Internet, which was relatively new

9 at that point, and the potential conversions with

10 telecommunications technology.

11          Today, we all take for granted the phones that we

12 carry around in our pockets, these smartphones.  But the

13 first iPhone was 2007.  That's 11 years ago.  And

14 Dr. Jorgensen was working 10 years before that.

15          It's difficult to think about and remember the pace

16 of technology.  But in those days, the evidence was these

17 phones didn't work very well when it came to data.  They

18 just weren't that sophisticated.

19          But Dr. Jorgensen thought if you could put all the

20 data and all the voice packets in one pipe, you could build

21 incredible wireless technology.  But to do that was going to

22 be very difficult and challenging.

23          Now, he eventually solved the problems, and we

24 heard how he built prototypes, how he built a company, how

25 he grew the company to over a hundred engineers.  He built

1  prototypes.  He spoke to some of the big names in the

2  industry, but then he had bad luck.

3      The Internet bubble burst in 2003, and the company

4  failed because they could not get additional investors.  He

5  was an innovator, and he was before his time.

6      This technology is now being used in the 4G

7  networks that we are all using in our phones today.  That's

8  what happens sometimes.  It's not just about innovation and

9  entrepreneurship, it's also about timing.

10      He did obtain three patents.  And in 2014, T-Mobile

11  and the rest of the industry turned on something called

12  VoLTE, Voice over LTE.  Voice and data on the same channel,

13  that is what he invented.  The ability to handle voice and

14  data on the same channel.  He didn't invent Voice over IP.

15  He didn't invent LTE.  He didn't take any ideas from

16  Ericsson.

17      But he did invent, and he was shown to be the first

18  to invent at this trial, the ability to practically do and

19  put voice and data in the same pipe at the same time.

20      And the value of that invention to T-Mobile is

21  immense, massive spectrum savings, save that company from a

22  competitive challenge it was not ready to meet.

23      This is the T-Mobile 4G network.  Half of the

24  equipment on the network is at issue in this case.  It's

25  Ericsson equipment.  The other half is Nokia equipment.  We

1   have a license with Nokia.  Nokia is an investor in IV, like

2   lots of other companies.

3          We're here because the charge in this case says

4   we're entitled to a reasonable royalty for every performance

5   of the method.

6          Each individual performance of the method is an act

7   of infringement.  Those acts of infringement are coming in

8   the billions.  Every time a packet is sent in a voice call,

9   that's infringement.

10          Every voice call that T-Mobile now serves in the

11   United States in over -- Voice over LTE, which is

12   85 percent of its network, that's infringement.  And we are

13   entitled to a royalty, as the Court just charged, for each

14   and every infringement from T-Mobile.

15          Now, Ericsson is induced and contributed to the

16   infringement by providing equipment and assisting T-Mobile.

17   But the real damages in this case are against T-Mobile who

18   participated in the trial in a way.

19          Now, we have the burden on infringement, and we

20   proved that T-Mobile infringed 10 claims from the '206

21   patent, the '517 patent, and the '629 patent.

22          We brought experts.  We brought Dr. Tim Williams, a

23   Ph.D. in electrical engineering from the University of

24   Texas.  He's an inventor on 26 patents.

25          That testimony was precise.  It was deliberate.  It

1    was not the most exciting testimony at the trial, but it's

2    something that we had to do.

3         Our burden -- our burden was to go through the

4    claims and check every box and prove infringement, and we

5    did that.

6         And we also brought Douglas Chrissan, Dr. Chrissan

7    with a Ph.D. from Stanford University.  He looked at the

8    code.  He worked closely with Dr. Williams.  We met our

9    burden.

10        We checked all the boxes.  I do not have time to go

11   through all of the claims.  I'm just going to show you a

12   few, and I'm going to try to hit the issues that I think the

13   Defendants are going to use as excuses to get out from under

14   their massive liability here.

15        This is Claim 109 and Claim 112.

16        The principal issue on this one seems to be they

17   are pretending that end-user QoS means that the end-user

18   needs to call up the CEO of T-Mobile and tell them what kind

19   of service he wants.  This is nonsense.

20        This patent, which is 80 columns long, is about

21   data networking.  It's about the quality on a data network

22   which is something of tremendous interest to T-Mobile, not

23   just for itself but for its customers.

24        They have to provide great quality of service to

25   their customers.  That's what their business is, or they

1   wouldn't have a business.

2           Now, how do they do that?

3           Now, we learned that in the guts of the base

4   station, the eNodeB, there's a table -- a parameter table,

5   and that parameter table has in it something called QCI

6   Profile.  QCI stands for QoS class identifier, quality of

7   service identifier.  That is the end-user quality of service

8   requirement.  It is in T-Mobile's base station, every single

9   one of them, and it is consulted and used on every single

10  transmission.

11          This is an Ericsson document about the scheduler.

12  It says at the bottom:  Optimize capacity while satisfying

13  QoS for everyone.

14          I asked Dr. Wicker:  Optimize capacity while

15  satisfying QoS?

16          Correct.

17          I'm showing him this document.

18          He said:  That's correct.

19          End-users, right?

20          Right.

21          We proved infringement of all the claims of the

22  '206 patent.

23          And then we moved on to the '517 patent,

24  Claims 1 and 4.

25          The principal debate here was a matter of legal --

1  legal dispute about the meaning of these words.  They're

2  playing games here.  This is the CPE, customer premises

3  equipment.

4       Now, you have to remember that in the old days

5  there were only two types of equipment in a telephone

6  network.  There was a network equipment.  That was AT&T.

7  And there was the customer equipment that you connected to.

8       And by the way, if the network equipment broke,

9  AT&T would fix it.  If the customer equipment broke, that

10  was your problem.

11       This claim element has been defined by the Court.

12  In fact, this definition comes right out of the patent.

13  Devices residing on the premises of a customer and used to

14  connect to a telephone network, including -- and then

15  examples are given.  It's open.  Anything new, anything not

16  in this definition is included, as long as it meets the

17  first two elements.

18       And everybody agrees that mobile phones, hotspots,

19  tablets are used to connect to the wireless telephone

20  network and that the wireless counts.  That's really

21  important.

22       Everybody agrees that wireless counts, but they say

23  all the mobile devices on T-Mobile's network don't count

24  because they don't reside on the premises of the customer.

25       Well, phones don't have addresses.  They don't have

1   Social Security numbers.  They don't get called for jury

2   duty.  But they do -- they are located in a certain place,

3   and they are often located in your home.

4          Now, we showed a number of examples which they

5   continued to ignore during the trial.  These are all on a

6   spreadsheet, PTX-1131.  The device in the middle is a

7   hotspot.  It sits on your home, on your desk, gets radio

8   waves in.  It sends WiFi out.

9          Even under their definition, that would satisfy it.

10  But the way to look at this claim, customer premises

11  equipment, if it's on the customer premises, it satisfies

12  the claim.

13         We had some help from Dr. Acampora on this.  He

14  showed a diagram with his def -- the definition of CPE

15  station at the bottom.  And what did he point to as the CPE

16  station in his analysis?  A personal computer on the left, a

17  notebook computer.

18         There are CPE's everywhere under this definition.

19         The '517 patent, we also had an issue relating to

20  Dr. Wicker's opinions.  We only had to prove that Claim 1

21  infringed.

22         Dr. Wicker, though, said that we didn't show there

23  was allocation of bandwidth that was dynamic.  And I asked

24  him a question because we are having some trouble

25  understanding the position.

1          Claim 1 only has these elements, (a) through (f).

2     Claim 2 adds the element of dynamic allocation.  And we were

3     scratching our heads.  Why is he talking about dynamic

4     allocation?  That's in Claim 2 which is not asserted.

5          And so I asked him:  So in your view, it has to be

6     dynamic scheduling, right?  You have to have dynamic uplink

7     and downlink control.  That's what you just said.  And that

8     element actually appears in Claim 2, correct?

9          That's correct.

10         On the '629 patent, we had a lot of evidence in the

11    trial about the reservation algorithm and isochronous

12    treatment.  Very complicated.

13         For this one, we had to dig into the code.  We got

14    Doug Chrissan -- Dr. Doug Chrissan to come in.  He did a

15    source code review.  We had to close the courtroom.  He then

16    used his analysis.  He worked with Dr. Williams, and

17    Dr. Chrissan validated that analysis to explain the theory.

18         But it's very difficult to explain the workings of

19    the software in the Ericsson base stations in the con --

20    short confines of this courtroom and this proceeding.

21         We did our best, though.  If they had given us the

22    test results at the beginning, we wouldn't have to do any of

23    this, because as you will recall, Dr. Wicker, six days

24    before his report was due, was on the phone with Ericsson in

25    Sweden setting up a set of tests.  And those tests, which he

1   had them planned with very poor service conditions, but

2   nevertheless resulted in data that we were able to use to

3   prove our case, because they've taken this position that

4   there are no reservations and no isochronous treatment.

5          Now, this is Dr. Chrissan's slide.  This was meant

6   for engineers.

7          And he said about the reservations, and I'm looking

8   at the third line:  And at the end -- so when the timer

9   starts, that's when your second voice packet arrives.

10         That's the start of a reservation process that ends

11  with an allocation.  Reservation and then an allocation.

12  That's like making a plane reservation for next month, you

13  hold the reservation open the entire time, but you know

14  what, when it's time to leave, you actually have to go to

15  the airport to check in.  And sometimes your plane is going

16  to get moved a little, sometimes you're going to get bumped,

17  sometimes the flight is canceled.

18         Dr. Williams explained all this in technical deep

19  analysis.  And what he pointed to was Reserve 4 at the

20  bottom here where we see the second reserving step.  But

21  note that this is a blue line with a -- with a mark on one

22  end and a mark on the other.  This is a software process

23  that he said, to an engineer, that that's a reservation

24  process, just as Dr. Chrissan did.

25         Now, we're going to hear, I'm sure, on -- the

1   Defendants stand up and start talking about what happens

2   over here at 81, 81, 81.  But they won't talk about that

3   blue line, that blue line which says Reserve 4.  That was

4   Dr. Williams's opinion.  He was correct.

5          But even without Dr. Williams's opinion, we'd still

6   prevail here because we had an interesting discussion about

7   these tests that Dr. Wicker did.  He said there's a random

8   -- random process.  There's a scheduling competition.

9   Scheduling competition is not a competition where Mr. 40

10  here wins the grant every single time.

11         Their testimony tried to simplify things.  They're

12  wrong.  There is reservations and isochronous behavior in

13  this system.

14         I asked Dr. Wicker about the scheduling competition

15  that he said occurred like when someone goes to a restaurant

16  and gets a random table.

17         And I said, you know, what happens if you go to a

18  crowded restaurant 10 times in a row every Thursday morning

19  and you get the same table?  Wouldn't that make you think

20  someone was keeping a reservation?

21         And he said:  Well, let's see.  So if the person

22  came and it was a crowded restaurant and they always had a

23  table waiting for them, that would be an indication that

24  there may have been a reservation.

25         Yes, that's right.

1          Now, then we heard from Dr. Acampora.

2    Dr. Acampora, we call the man in the box, because he put

3    this slide up from Forslow, a reference that was before the

4    Patent Office.  And he told you, ladies and gentlemen of the

5    jury, that that box on the left was a box.  He's right.

6          It's a box drawn on the page.  He implied it's a

7    box like that Ericsson base station which we've seen, and

8    maybe it will be trotted out again for who knows what

9    reason.

10          But when I pointed out to him that what was

11    actually in that box was a BSS, which is a combination of a

12    BSC and a BTS, he panicked because he knew the truth, that

13    if he had to disclose what was actually in that box that he

14    was pretending was a base station, you -- you would learn

15    that it covered a third of the state of Texas.  And it took

16    me half an hour to get him to admit it.  And even after I

17    showed him the Forslow document that defines a BS as a base

18    station, he still denied it.

19          His evidence was not credible.  It was not

20    convincing.  It certainly was not clear.  They did not meet

21    their burden of clear and convincing evidence.

22          The Turina reference that he relies on was before

23    the Patent Office.

24          We can't tell whether he knew about it or didn't

25    know about it when he wrote his report.  He didn't seem to

1   care.  His report was 950 pages long, and it was prepared by

2   calling his opinions in over the phone to the law firm and

3   then getting documents back and reviewing them.

4          Forslow was also in front of the Patent Office.

5   That's his second reference.  He said, well, maybe they

6   didn't review it.  Well, this is in the record here in

7   DTX-6.  This is the file history for the '206.  This is an

8   IDS.  It shows the Forslow reference, and the line along the

9   bottom:  All references considered except where lined

10   through.  There's no line through it.  The examiner

11   considered it.  Check the box.

12          His final reference was Passas, an article from a

13   magazine, eight pages, talking about wireless ATM, the very

14   technology that Dr. Jorgensen had rejected when he became

15   the inventor here.

16          The real name of this project was the Magic WAND.

17   And Dr. Acampora wanted to come into this courtroom and tell

18   you that while he respects patents because he has many of

19   his own and despite the fact that he's testified over 30

20   times in the last five years, almost always for the defense,

21   that these patents -- all three of them are invalid, all

22   four of examiners who looked at them were wrong, and he's

23   right.  He wanted to take the Magic WAND and make

24   Dr. Jorgensen's patents go away.  And that's not right.

25          THE COURT:  20 minutes have been used.

1           MR. BLACK:   Thank you.

2           We brought Dr. Chrissan in, and he did an analysis

3    for the damages case.   He looked at 18 Ericsson patents.

4    It's their proud list.   Tell you why we know because when we

5    looked at the inventors on these patents -- oops -- we found

6    that they were the Ericsson people in the photograph that

7    they keep showing us from the European Patent Office.

8           He did this very detailed analysis.   They didn't do

9    anything in response.   There was some testimony about

10   Turina.   No one from Ericsson came in to even talk about

11   their own patents.

12          Dr. Chrissan analyzed the patents, and that was

13   the lead -- and lead in for his opinion that they were 20 to

14   25 percent less infrastructure required.   Enormous amounts

15   of money in savings for T-Mobile as a result of the

16   patents-in-suit.

17          That was the feed-in to Dr. Bratic -- Mr. Bratic's

18   expert opinions on damages.   He did an analysis and reached

19   a conclusion that $77.4 million was owed to IV.

20          Now, look, that's an enormous sum of money in -- in

21   any sense.   But for T-Mobile, not really.   This is only 6.3

22   cents -- 6.3 cents per subscriber per month.   30 days in a

23   month, couple of calls a day, we're talking about a fraction

24   of a fraction of a penny for each use of the invention.   The

25   charge says we're entitled to reasonable royalty for each

1    use.  The number's large because T-Mobile's use is so large.

2           Now, Dr. Bratic also gave another opinion that if

3    you were to only look at the infrastructure base, it would

4    be $9 million.  And that leads me to the conclusion here,

5    the jury verdict form.  You'll receive the jury verdict

6    form, and we will ask you to fill out as shown on the

7    screen.

8           Question 1:  Yes, for T-Mobile; yes for Ericsson.

9           Question 2:  No, save the Jorgensen patents.

10          Question 3:  For T-Mobile $68,368,561.00;

11   $9 million for Ericsson.

12          The number that's important to us is the line for

13   T-Mobile.  Ericsson's infringement liability is more limited

14   in time because of the law and because primary mode of

15   infringement here is inducement.

16          The T-Mobile number is the one that's important to

17   us.

18          Finally, I want to thank you once again for your

19   time and attention in this matter.  On behalf of myself, my

20   team, Intellectual Ventures, it's been an honor and a

21   privilege to try this case here before you.  And the fate of

22   IV is in your hands.  Thank you.

23          THE COURT:  Defendant may now present its closing

24   argument to the jury.

25          Would you like a warning on your time, Mr. Kubehl?

```
 1              MR. KUBEHL:  I would, Your Honor.  10 minutes,
 2    please.
 3              THE COURT:  10 minutes remaining.
 4              You may proceed.
 5              MR. KUBEHL:  Thank you, Your Honor.
 6              Good morning, ladies and gentlemen.  I want to
 7    start today with the same message that I came to you with
 8    Monday morning.  Ericsson is here because IV sued Ericsson
 9    and its customer T-Mobile.
10              It's funny to hear that this case is really about
11    T-Mobile and IV.  T-Mobile is a Seattle company.  IV is a
12    Seattle company.  This was a case against T-Mobile only, and
13    really for T-Mobile you all shouldn't be sitting here right
14    now.
15              They chose to sue Ericsson.  That's why we're here
16    today.
17              It's the Ericsson base station that is the only
18    device that's accused of practicing the elements of these
19    method claims.  Those method claims happen inside of the
20    Ericsson base station.  They don't happen across the
21    T-Mobile network.  They happen in the Ericsson base station.
22              Ericsson designed that base station, built that
23    base station.  You can tell from this week, it's -- it's
24    proud of that base station, proud of the work that it did.
25    And it's here to defend itself and its customer, and
```

1    Ericsson has responsibility for this case.

2            The Ericsson base station that's used in T-Mobile's

3    network does not infringe, and that means Ericsson doesn't

4    infringe, and it means its customer, T-Mobile, does not

5    infringe.

6            I want to start by walking through the timeline

7    that we've heard in this case, and I want to do it kind of

8    from the perspective that you're hearing from IV and maybe

9    see some data points that are a little bit different than

10   what match up with the IV story.

11           So you heard this morning and we heard earlier in

12   the trial from Dr. Jorgensen a story of Dr. Jorgensen really

13   starting his inventive concepts that relate to these patents

14   way back -- way back when he was in medical school and in

15   the library and starting his own companies and really coming

16   up with these ideas.  And then I think we heard today that

17   finally he was able to sort of bring them to fruition when

18   he finally got to Malibu.

19           But what we saw on cross-examination of -- of

20   Dr. Jorgensen was that it actually wasn't the case that he

21   went directly from his company, EIS, to Malibu.

22           There was actually a company in between that called

23   Pacific Access.  And he told us on cross-examination that he

24   actually hadn't even started thinking about the issues for

25   his technology for Malibu until he left Pacific Access, and

1    that wasn't until 1998.

2         Well, Malibu started in 1998.  And he filed his

3    patent application in the middle of 1998.  So that -- that

4    story is a little bit different than the one that we heard

5    in direct examination and the one that we heard in the

6    opening today.

7         This is a timeline that IV showed, and we all agree

8    on one thing, that the Jorgensen patents, the asserted

9    patents, were filed here in 1998.

10        And you can see that's kind of smack in the middle

11   of the -- the 2G technology, the second generation of

12   wireless technology.

13        If we go forward on the timeline, in 2004, IV buys

14   patents from Malibu Networks.  And we heard in the opening

15   that it was just three patents.  And I was surprised today

16   that we heard again that it was three patents.  We know the

17   evidence has shown us that it was actually 22 patents.  It

18   wasn't three patents.  It was 22.

19        If we go forward four years from the purchase of

20   the patents, we land at May 2008.  And before we -- before

21   we get to what happened in May 2008, as I understand it, the

22   IV sort of view is that Dr. Jorgensen was ahead of his time,

23   that he had inventions that the industry hadn't caught up

24   with yet, and his inventions really were the key to this

25   Voice over LTE technology.

1          And so eventually down the road, when the industry

2     caught -- caught up with him, those patents would be really,

3     really valuable.

4          So what happened on May 2008, is Verizon did a

5     portfolio-wide deal with IV where they got rights to we

6     heard tens of thousands of patents, and these patents were

7     among those.

8          Now, in -- May 2008, LTE was on the verge of being

9     released, and Voice over LTE was certainly on folks' minds.

10         So you would expect that when we look at the IV

11    documents and how they treated these patents, that they

12    would have been at least discussed, maybe even prominently

13    discussed with Verizon.

14         And -- and we'd also think probably that the

15    internal valuation that IV gave to those patents would be at

16    least pretty decently high.

17         But what we actually see is that they weren't

18    discussed at all.  They weren't shown to Verizon.

19         Mr. Paschke, the corporate representative of IV,

20    told us that in that -- in negotiation with Verizon, these

21    three patents had nothing to do with it, they weren't

22    discussed.

23         And we also know that the valuation that IV gave to

24    those patents at that time was very modest compared to the

25    other IV patents in the portfolio.

```
 1              So if we flash forward, then, to 2014, we sort of

 2    heard the story this morning about that.  On the T-Mobile

 3    side, their view is that T-Mobile was desperate to get this

 4    Voice over LTE technology, and that it would have paid

 5    anything it took to get licensees to these patents,

 6    certainly, gladly would have paid $77 million for a license

 7    to these patents.

 8              Okay.  Well, let's look at another data point.

 9    Three years further.  Three years down the road, just last

10    year, AT&T does a portfolio-wide deal with IV, again,

11    getting rights to tens of thousands of -- of patents.

12              And now -- I mean, now LTE is big.  Voice over LTE

13    is out there.  It's in full swing.  AT&T is using it.  So,

14    certainly, now in the AT&T deal, these three patents are

15    going to be front and center.

16              I mean, these are going to be a big lever point for

17    this deal.  And that valuation, I bet that's really sky

18    rocketed up by now, that internal valuation of the way IV

19    looks at these patents.

20              Mr. Paschke was actually the deal lead on that

21    deal, and he was responsible for picking which patents they

22    would be showing AT [sic] and negotiating with.  And

23    Mr. Paschke told us that in those AT&T discussions, these

24    patents weren't discussed or even shown to AT&T.

25              And as far as the valuation goes, the internal
```

1   valuation for IV these patents actually decreased

2   75 percent from the level it was at in the Verizon deal.

3          So that's -- that's the -- the sort of story we're

4   getting from IV about these patents, but it really doesn't

5   make sense in light of the data points that we have.

6          I want to talk about some of the things that -- at

7   least from our perspective, IV just didn't want you to see

8   in this case.  And one is that base station you heard -- he

9   didn't want us to parade it around.

10          I don't know how many times we heard in this case

11   from the IV side that this case is about intelligent base

12   stations.  We heard it in jury selection.  We heard it in

13   openings.  We heard it from fact witnesses.  I heard it

14   again yesterday.  We do agree that this case is about base

15   stations.

16          IV wants to talk about method claims, and they say

17   this is all about method claims, and so you can't look at

18   the base station.  It's all about T-Mobile's network and the

19   use of the network.  Well, you look at the patent claims,

20   they're happening -- as I said before, they're happening

21   inside the base station.  They're not -- they're not

22   happening in cell phones.  They're in the base station.

23          And Dr. -- Dr. Tim Williams told us:  That's right,

24   they're not happening in cell phones.  And he said -- he

25   said -- he sort of towed the company line here and said:

1    It's really the network that's being implemented here.

2          Well, there's only two parts of this network we're

3    talking about.  It's the base station and the handsets.  And

4    he says:  It's -- it's not the handsets where it's

5    happening.  So we know it's happening in the base stations.

6          One more point in terms of these three patents

7    and -- and the sort of licenses that -- that IV has been

8    making reference to.  They say, oh, we have a license with

9    Nokia or they're a member.  Well, these three patents were

10   not any part of those discussions.  We know that from

11   Mr. Paschke.  He says:  These three patents never have been

12   discussed with any potential licensee.

13         Okay.  How about how the base stations really work?

14   Mr. Christian Skarby lives in Sweden, was actually on

15   vacation in Australia, and flew here from Australia so that

16   he could tell you folks about how his base station works.

17   And you found out that he was actually deposed for two days

18   by IV in this case, and he was the company's representative

19   on how the -- how the base stations work and why the company

20   thinks they don't infringe.

21         And he -- he told us here about some of the work

22   that he did, and he showed us this document, which is

23   Defendants' Exhibit No. 282.  And in this document, he

24   explained that the solution that they had in their base

25   station would use scheduling called DBS, delay based

1   scheduling.  And, in particular, it would do no resource

2   allocation for future TTI's.

3          And then he identified a research document that

4   Ericsson had done back in 2007 where they had identified

5   some technical problems with using future allocations.

6          So this guy -- I mean, maybe he looks a little

7   scary to them.  He's a super nice guy.  He's really smart.

8   He knows his stuff.  How many questions did they ask him on

9   cross-examination?

10          Mr. Johan Norrby is Ericsson's company

11   representative.  Flew here from Sweden to make sure that

12   y'all understood how important this case is for us.  He's

13   been here all week, as has Mr. Skarby.

14          He told about all the work that went into going

15   into the base station, his help in designing that base

16   station, the -- the hundred thousand man years that went

17   into that effort.  And he wasn't asked anything about

18   those -- how those products worked.  He wasn't asked

19   anything about the patents.  IV just didn't want to know.

20          Mr. Stephen Mr. McGrath, T-Mobile's corporate

21   representative, is here.  And he made no bones about it.  He

22   says:  I'm the person at T-Mobile who knows the most about

23   the overall set of facts that are relevant to what we're

24   talking about here in this court.

25          And what they wanted to talk to him about was the

1   -- the un-carrier marketing campaign and the cost of

2   spectrum.  That's about it.

3          There was -- there was one person that they -- they

4   couldn't -- couldn't hide the information from getting out

5   of, and that was Dr. Wicker.  Dr. Wicker is a professor at

6   Cornell University, and he came, and he explained to us his

7   analysis of having looked at the source code and the

8   operation of the base station, and compared it to the

9   patents.

10          And I'll start with the '206 patent.  The '206

11  patent is the patent that IV has identified as the one

12  that's worth half the value out of these three patents.

13          And Dr. Wicker identified a couple of

14  non-infringement bases to you.  He talked about one that

15  dealt with the lack of classification based on QoS of the

16  packets themselves.

17          The other one he talked about was the lack of an

18  end-user quality of service requirement being used in

19  classification in the Ericsson base stations, and he

20  explained that when we're streaming Netflix and we get a

21  frozen screen, that can happen because the bandwidth isn't

22  giving us -- or the network is not giving us enough

23  bandwidth.

24          And he had said that, of course, what we'd all like

25  to do is have a button on our phone that we can push and

1  have our phone push out a message to the network that will

2  give our end-user quality of service requirements to the

3  network so that the network would have to give us more

4  bandwidth.

5        And he explained that that sounds good, but from

6  the network's perspective, that's really tough to do because

7  if -- if you get so many demands of everyone wanting the

8  best, the network would be overloaded.

9        So what T-Mobile has to do is look at all the

10  competing demands that it has and figure out its best way to

11  balance the traffic.

12        We saw that it has a particular network QoS

13  requirement for regular Internet traffic, and then how if

14  there's an abusive user or an extreme user, they have the

15  ability, based on their own requirements, to put that

16  traffic down to a lower level so that it -- it's more fair

17  to the whole network and that one or few users that are

18  abusive users don't end up swamping the network.

19        So he explained that it's network quality of

20  service requirements that are used in the Ericsson base

21  stations in the T-Mobile network, not end-user quality of

22  service requirements.

23        There's really no dispute about this.

24  Dr. Tim Williams is the expert for IV.  And this is the

25  testimony that he gave us on Tuesday, I believe.

1          We asked him:  T-Mobile uses its own network QoS

2     requirements, not end-user QoS requirements, correct?

3          And he said:  Yes.

4          So there's not an expert in this case who believes

5     that the Ericsson base stations in the T-Mobile network are

6     using end-user QoS requirements.  And for that reason,

7     there's no infringement of this claim.

8          Next, the '629 patent.  The '629 patent was the one

9     about reservations.  You have to -- not only do you have to

10    have these packets in a consistent order.  That's this last

11    Claim Step D.  You have to actually reserve slots.  You have

12    to actually look out into the future and make a reservation

13    in particular slots.  And that's -- that's what was found to

14    be missing in this claim.

15         Dr. Wicker explained that he had looked at the

16    Ericsson documentation, and he had come to the same

17    conclusion that they did, that Ericsson had found that it

18    was a bad idea to reserve slots.  That -- that was in

19    Defendants' -- Defendants' Exhibit 277.  And that's the

20    technical report that shows you why they thought it was not

21    a good idea and why at the end they concluded we should not

22    do this.

23         He likened it to a restaurant that doesn't take

24    reservations.  And I say it.  So if Ericsson doesn't use

25    reservations, then how does it figure out how -- how these

1    phones get their turn?  He said:  It's like a restaurant

2    that doesn't take reservations.  You show up and when the

3    network is not overloaded, you get a table right away.

4            And that's why you see regular intervals lots of

5    times, because the Ericsson base station, that box that's

6    designed to handle 8,000 -- just that one card, 8,000 phones

7    at once, is designed to be able to keep up.

8            So you don't end up having these long lines because

9    it can make these super fast decisions.  Remember, he told

10   us a thousand decisions a second this thing can make.

11           So it's not surprising that when the restaurant is

12   not that busy -- you know, if I come to the restaurant every

13   Friday at the same time and it's not that busy, I get a

14   table.  When it starts to get busy, I'm going to have to

15   wait a little bit.  And that's what we saw in the test

16   results.

17           There's one guy in the case on the IV side that

18   looked at the source code.  That was Dr. Doug Chrissan.  And

19   he looked at the code.  He looked at the patent claims, as

20   well.

21           Remember, he did that valuation analysis of the

22   patents.  And so he certainly had the ability to put those

23   two together, his analysis of what the patent required, plus

24   his analysis of the source code, and figure out is there

25   infringement in this case.  And he testified in court:

1    You're not going to hear that from me.  That's not my

2    opinion.  I'm not saying there's infringement here.

3           And so what he did is he did just sort of a -- this

4    is the way the system works.  He had this diagram.  Not on a

5    word on here about reservations.  And then what we saw is

6    Dr. Williams took his diagram and -- and just wrote these

7    blue lines on it, and said:  Well, here's some reservations,

8    here and here.

9           And he originally had these arguments that, well,

10   it's like a process.  Maybe it starts back here, and so

11   since it starts so far back here, it's really kind of

12   looking into the future.

13          But when we cross-examined him on it, he agreed,

14   okay, yeah, the reservation actually isn't ever made until

15   way down here at Time 81.  And -- and Time 81 is actually

16   the time that I'm giving the resources out.  So there's --

17   it's not in the future at all.  There just isn't any

18   reservation.  We're -- we're, again, at the spot where both

19   experts agree there are not reservations here.

20          Okay.  The last patent is the '517 patent, and this

21   is the one where the Court has given us a construction that

22   we have to follow, and that's the CPE device has to reside

23   on the premises of the customer.  And then there's

24   particular examples that are included.

25          And Dr. Wicker showed us what those examples look

1   like.  And the thing they have in common is, they are

2   designed to sit somewhere and work.  It's a customer

3   premises equipment.  It's something that resides on the

4   premise of the customer.

5           Dr. Wicker explained that this is one of those

6   where like we don't probably really need you, Mr. Expert, to

7   tell us this.

8           A mobile phone doesn't reside on the customer's

9   premise, unless, as IV's counsel pointed out, if you take

10   some glue and glue it down and leave it there forever, then

11   maybe we need to think about that, but that's not something

12   that's accused in this case.

13           Regular mobile phones are accused in this case.  He

14   talked about this wireless hotspot.  That's a mobile device

15   you take with you.  It's not something that resides in your

16   home.

17           There's nothing that's accused in this case that

18   isn't mobile.  And that's -- that's the opposite of

19   something that resides on the premise of a customer.

20           Okay.  So just quick wrap-up -- my takeaways for

21   you on these patents would be -- on that '206 patent,

22   there's no end-user QoS requirements used.  Both experts

23   agree.

24           On the '629, there are no reservations, future

25   slots.  I think both experts are pretty close to agreeing,

1   or -- or at least having been cross-examined where they

2   don't -- they don't have a disagreement left.

3          And then on this last one, there are no CPE

4   devices.

5          And then the other argument we talked about in that

6   last one was the idea that it had to have a shared wireless

7   bandwidth.  And, of course, we saw that the Ericsson base

8   station works with these two chunks of bandwidths that are

9   separated by this space in between.  There is no shared

10  wireless bandwidth with the uplink and downlink.  It's two

11  separate bandwidths.

12         Okay.  Invalidity.  The Forslow patent.  The

13  Forslow patent was the Ericsson patent that was filed

14  May 29th, 1998.

15         Now, yesterday, it was suggested that, well, hey,

16  that was only six weeks before.  And then when you kind of

17  put that together with what we heard in the opening that

18  Dr. Jorgensen, maybe -- maybe he was kind of working on this

19  stuff earlier, maybe the jury will kind of think, huh, maybe

20  Forslow wasn't really before.

21         There's no question about that.  The Court

22  instructed us today that the Malibu patent, the '206 patent

23  has a priority date, and it is after the date of the Forslow

24  patent.  Ericsson was first.  Not really any debating that.

25         So then it's a question of is the United States

patent to Forslow, did that disclose the concepts that were

in the '206 patent, Claim 9.  And the '206 patent, Claim 9,

was the idea that you have to classify packets based on

end-user quality of service of the packets, and then you

schedule those packets for transmission.

And you don't have to go very far into Forslow to

find those concepts.  Just this -- just this paragraph right

here, classifying and scheduling packets in accordance with

the quality of service corresponding to the application

packet stream.

And then, of course, Dr. Acampora went into great

depth and great detail on this and showed specifically where

each claim element was, including that end-user quality of

service.

Remember, Mr. Forslow's idea from back then was he

thought, well, you know, maybe it is a good idea to let the

end-users request their quality of service.

That -- Ericsson, you heard this -- this week has a

lot of patents.  You can't practice all of your patents at

the same time.  This is an old 2G idea.  Maybe it was good

at one time.

They have a patent on it, not using it right now.

But it -- it does come before the '206 patent, and it does,

as Dr. Acampora showed, show exactly the same concepts,

and -- and we believe that by clear and convincing evidence

1   we've shown that that '206 patent is invalid.

2          Next was the Turina patent.  If you remember

3   Dr. Acampora's discussion of the Turina patent, we didn't

4   see any -- any specific dis -- discussion today from

5   Plaintiff about this one because this -- this is pretty

6   close.  More than pretty close.  It's right there.

7          That Turina patent, if you remember, was an old

8   Ericsson patent, a 1996 patent that actually is used in LTE.

9          What we're looking at here is Turina's description

10  of sort of an old concept that it built upon to make a new

11  concept, this control system that's used in LTE.

12         So there is an aspect of Turina that's actually

13  used in LTE.  This part of Turina is sort of describing an

14  old concept that it built on.

15         But just because this isn't the actual invention of

16  Turina, it doesn't mean that it's not prior art.  It's still

17  described in a patent.  And if it's describing the same

18  thing, it invalidates.

19         So here what we see is you've got a current frame,

20  a first future frame, and a second future frame.  And you've

21  got reservations of slots that are isochronously placed, and

22  the packets are placed isochronously into those future

23  frames.  And that -- there it is.

24         The last reference that was discussed was the --

25  the Magic WAND article.  And Dr. Acampora gave a very

1  detailed analysis of that and showed where each and every

2  element of the claims were found there.  I'd like to focus

3  on what we saw today, which really what we saw yesterday was

4  pretty amazing.

5       We got done with our case.  We'd showed you, we

6  think, why these patents are invalid.  And then at that

7  point, normally, the Plaintiff puts on a rebuttal case.

8       They have an opportunity to call their own

9  witnesses, tell us why -- why we're wrong, why is this not

10 invalid.  And they waived it.  That was -- that was pretty

11 amazing.

12      One witness they could have called was

13 Dr. Tim Williams.  Dr. Tim Williams did a report on

14 validity.  I was frankly excited to cross-examine

15 Dr. Williams, but they sort of -- they rested.

16      So we're sort of in a situation now where we have

17 shown you evidence of invalidity of these patents, and it is

18 unrebutted.  Other than some lawyer argument, it's

19 unrebutted.  We think we have shown by clear and convincing

20 evidence that these are invalid.

21      I do want to address this issue of Forslow and

22 Turina being on the face of the patents.  We did hear that.

23 And the Judge did give some instructions on how that can

24 color your analysis as you're looking at this.

25      So going back to the timeline, here's a date that

1  you don't -- you haven't really heard before, right?  This

2  is what you would have heard if I'd been able to talk to

3  Dr. Williams yesterday.

4          What happened in the '206 patent was you had

5  several years of going through the Patent Office and a

6  patent actually issued and IV owned the patent at that time

7  and then IV decided, you know what, we think there's a

8  problem with the filing date of this patent.  So let's put

9  it back into the Patent Office in this re-issue proceeding.

10          And you can see what I'm showing you right here,

11  and this is from Plaintiff's Exhibit 6.

12          They were filing that re-issue to correct a filing

13  date error.  Okay.  So they put it back into reissue.  And

14  at some point during --

15          MR. WARD:  Your Honor, I object.  He's arguing

16  facts not in evidence.  He can talk about the document, but

17  there's no evidence --

18          MR. KUBEHL:  There is evidence.  It's in the

19  prosecution history.

20          THE COURT:  If it's -- if it's not been presented

21  in the trial, whether or not it's in the prosecution history

22  is not evidence in the case.

23          MR. KUBEHL:  This prosecution history has been

24  presented in the trial.

25          THE COURT:  I'll allow counsel to continue his

1    argument.

2          MR. KUBEHL:  Okay.  So -- and what we saw, what --

3    what Plaintiff put on the screen was this thing called an

4    information disclosure statement.

5          So that's when you go to the Patent Office, and you

6    say, hey, I know about some prior art.  And as we heard

7    yesterday, you do that because you have to do that.  If you

8    know about prior art, that's material to patentability.  You

9    have to give that to the Patent Office.

10         So they were giving Forslow to the Patent Office

11   through this thing called an information disclosure

12   statement.  And here's -- here's what we see there.  Forslow

13   is listed there.

14         Now, Forslow wasn't the only reference that they

15   gave to the Patent Office.

16         In that particular information disclosure

17   statement, they gave 107 other references.  And then through

18   the course of that re-issue proceeding, they gave a total of

19   367 references to the Patent Office.

20         And in these forms, you can see the date when an

21   examiner considers the references.  Forslow was considered

22   on October 20th, 2011.  Guess what date the other 366

23   references have as a date considered?  October 20th, 2011.

24         The examiner had wrote down the same date for

25   having considered 367 references.  So I'd ask you to take

1    that into account when you assess what it means to have been

2    considered and on the face of the patent.

3         IV's counsel has responded to our validity

4    challenge primarily by making arguments that you shouldn't

5    kill, you shouldn't tear up Dr. Jorgensen's patents.  And I

6    think we heard it again in the opening.  Don't take his

7    patents away.

8         Well, number one, Dr. Jorgensen testified that he

9    doesn't have any interest in these patents anymore.  He --

10   he sold that interest long -- long ago.  He testified that

11   this is not a case where IV is trying to vindicate his

12   rights.  He's on the sidelines.

13        Number two, claims are invalidated, not whole

14   patents.  We're seeking to invalidate the claims that they

15   chose to assert against us here, which are a handful of the

16   claims out of all of the claims in these patents.  And you

17   all will make your decision on -- on whether we've proven

18   that by clear and convincing evidence and --

19        THE COURT:  Counsel, you have nine minutes left.  I

20   apologize.  The objection occurred over the 10-minute mark,

21   or I would have told you.

22        MR. KUBEHL:  Thank you.

23        THE COURT:  But you have nine minutes remaining.

24        MR. KUBEHL:  Thank you, Your Honor.

25        So we -- we do believe that we have shown by clear

1    and convincing evidence that the two Ericsson patents, as

2    well as the Passas reference, do invalidate the claims that

3    are asserted in this case.  And we will ask you on the

4    verdict form to write "yes" to that list of claims that you

5    were shown by Plaintiff.

6            They want you to write "no."  We think that the

7    right answer is to write "yes."

8            This is not a David and Goliath story, although IV

9    would -- would want you to think that.  IV bought

10   Dr. Jorgensen -- I'm sorry, IV -- IV brought Dr. Jorgensen

11   and asked him questions on direct to make it sound like he

12   was describing his inventions.

13           And then on cross-examination, he acknowledged that

14   his testimony was really not about his inventions in the

15   patents at all.

16           The reality is that IV is a big company.

17   They -- they brought Mr. Paschke to talk about IV's billions

18   of dollars of licensing revenue.  IV is one of the largest

19   patentholders in the world.  This is a big company.  It's

20   not a David and Goliath story.

21           This slide is Dr. -- or Mr. Norrby explaining that

22   base stations are not one size fits all.  An Ericsson base

23   station is not a Nokia base station.  It's not a Samsung

24   base station.  They each have their own designs.  They each

25   are proud of their own work.

```
 1              And the fact that there's a Nokia license, which we
 2    know from Mr. Paschke's testimony did not involve
 3    discussions of any of these asserted patents, has nothing to
 4    do with whether the Ericsson base station does or doesn't
 5    infringe these three patents.
 6              Over the past four days, we've showed you documents
 7    that IV didn't want you to see.  I think we've pulled back
 8    the curtain on IV's business.  We've showed you what they
 9    paid for the patents.  We've showed you internally what they
10    expected to fairly receive on the patents.  And we've showed
11    you just how much value IV has put on these three patents
12    across all 70 of their licenses.
13              What IV is asking for here today is 700 times the
14    total amount of revenue that they have ever collected across
15    these 70 license agreements.
16              IV is also asking you to have us pay damages on a
17    per person, per month basis of the use of a phone and not
18    based on the use of the base station.  And that type of
19    agreement is not something that IV has ever entered into.
20    It's not something that Ericsson has ever entered into.
21    It's not something that T-Mobile has ever entered into.
22              At the end of the day, we believe that the proper
23    answer to the damages question should be zero.  We don't
24    infringe, and the patents are invalid.  And we believe the
25    number should be zero.
```

1    The Ericsson and the T-Mobile folks that I've had

2 the privilege to work with, I think, are -- are so

3 fantastic, hard working, unbelievable people.

4    And I really hope that over this week that you've

5 been able to see a little bit of what we see when we work

6 with them.

7    I want to thank you all for being objective, for

8 all the hard work that you've done this week.  You have

9 taken so many notes, been so attentive.  We could not have

10 asked for anything more.  So on behalf of myself, on my

11 co-counsel, our clients, our staff, thank you very much.

12    THE COURT:  All right.  Plaintiffs may now present

13 their final closing argument.  You have 17 minutes

14 remaining.  Would you like a warning on your time?

15    MR. WARD:  If I could have a two-minute warning,

16 Your Honor.

17    THE COURT:  I will give you a two-minute warning.

18 You may proceed when you're ready, counsel.

19    MR. WARD:  Thank you.

20    It seems like a long time ago that I talked to you,

21 but it was just Monday.  We've packed a lot of evidence in,

22 and you all have been attentive.  And I, too, want to thank

23 you.

24    You didn't volunteer but you showed up, and you've

25 served, and for that, I do thank you.  Because I know we've

1  taken you away from your businesses, away from your -- your

2  lives and your families and things that you --  you need to

3  be doing, but you figured out, too, that this dispute is not

4  going to get resolved without you all deciding it.

5        Mr. Kubehl said, well, we could have filed this

6  case up in Seattle.  We'd done that, they'd say, oh, you

7  should have sued Ericsson.  It's not our fault.  We've sued

8  Ericsson down here.  They'd said, oh, it's not our fault.

9  It's T-Mobile's fault.  They're good at passing the buck.

10       So we've got them both in one spot where they've

11 got to sit at the same table.

12       I'm going to remind you of this because there's --

13 I told you these were going to be things that you saw play

14 out in this case, and I didn't know how -- how much you

15 would see them, but we're going to talk about them.

16       They talked about how T-Mobile -- this is a

17 T-Mobile document -- how the rest of the industry is stupid

18 and broken, how T-Mobile doesn't have to play by the rules.

19 And I know they're talking about in business.  But they

20 don't think the rules apply to them anywhere, because you've

21 got to ask yourself, if what Mr. Kubehl just told you was

22 true, would we be sitting in this courtroom?

23       If IV's experts were in agreement with the

24 Defendants' experts that things don't infringe, do you think

25 that we would be standing in this courtroom?

```
1              You are the sole judges of the credibility of the

2     witnesses and the evidence.  That's what you were just

3     instructed.  So I'm not going to be diving too deep into the

4     technology.  Number one, that's not my forte.

5              But, number two, you all have been listening to it

6     all week, and I think you probably have a good idea about

7     how these things work.  But I do want to give you some

8     information that will help you make this decision about who

9     do we trust?

10             You were presented with diametrically opposing

11    opinions on infringement and damages, and I'll talk to you

12    about validity, too.  I'm looking forward to that.

13             I'm not going to stand up here and call anyone a

14    liar or a perjurer.  That's improper.  That's your job.  You

15    all get to make that decision.

16             You've seen this document.  We told you about

17    T-Mobile's problems with their network, that they were

18    running out of spectrum.

19             You've seen that going to the VoLTE increased the

20    throughput by a factor of 10X.  You all know this technology

21    was successful, and it's not VoLTE.

22             Our technology enables them to put the voice in the

23    same data pipe, to have a high quality wireless network from

24    these intelligent base stations.

25             You've seen this document, "Why VoLTE?"  Because
```

1   it's technically and economically superior.

2        Did you find it interesting that when I was

3   cross-examining Dr. Becker yesterday, he really started

4   studying this document.  Their damages expert.

5        It certainly appeared to me that he had not seen it

6   before.  And when I asked him that, he said:  Well, no, I've

7   seen it this week.

8        Their damages expert for first time during this

9   trial, whether it was yesterday or Monday, figures out that

10  internally T-Mobile is saying that this technology is

11  technically and economically superior.

12       Think about that because we know that their

13  subscribers went through the roof.  We know that their

14  profits tripled.  Mr. Bratic told you that.  We know what

15  they were telling the world.  They were talking about the

16  implementation of new technologies, how it enabled them to

17  expand their capacity by re-farming existing spectrum,

18  moving voice traffic to VoLTE frees up spectrum, and how

19  they became the leader in the rate of adoption of VoLTE.

20       And this one is a little bit hard to read.  It's

21  Plaintiff's Exhibit 184 at 25.  But I've been telling you

22  billions and billions of dollars is what this spectrum cost.

23       If you want to confirm it, every witness has

24  confirmed it, but this gives you an idea.  It says:  The

25  cost of spectrum is high, bids -- this is talking about

1    auctions -- total to almost $20 billion in the 2008

2    700 megahertz auction.

3         And then in 2014, bids topped $43 billion.  This

4    stuff is expensive.  They want to maximize their use of it.

5         Now, let's talk about who was asked questions and

6    who wasn't.  They told you:  Well, we brought Mr. McGrath.

7    We had Mr. Norrby sitting here.

8         Remember when I asked Mr. McGrath, if he's the

9    person -- Mr. Kubehl just said:  He knows more about this

10   than anybody.  Well, he's a lawyer.  And he knows the rules

11   require that if you know more about it than anybody, then

12   you get disclosed as an individual with knowledge of

13   relevant facts.

14        He wasn't ever disclosed as an individual with

15   knowledge of relevant fact.  He's a nice guy.  They brought

16   him down here and sat him up on the stand.

17        Did they ask him a single question that

18   contradicted anything that we presented in the evidence or

19   that we presented in the document while cross-examining him?

20   Not one thing.  He confirmed everything we said.

21        They had to have it.  Saved them billions of

22   dollars in spectrum.  They were running out of it.  He

23   didn't dispute one thing, and they're going to criticize us

24   for not asking the right questions?  What am I supposed to

25   ask him.

1         Then they say Mr. Norrby -- Mr. Norrby could have

2    told them.  He was their witness.  He's been sitting at the

3    table.  They didn't ask him any questions.  What are we

4    supposed to ask him?  Why didn't you tell him anything that

5    contradicted what the Plaintiffs have said?  But you did

6    learn that there's indemnity agreement.  That's why they're

7    over here trying to keep the damages down because Ericsson

8    is footing the bill.

9         And you're right, this is not a case about David

10   and Goliath.  I'm not sitting here saying that IV is some

11   small company.

12        We proved infringement, and they brought you

13   Dr. Wicker who has testified for Defendants non-stop.  And

14   Mr. Black cross-examined him.  And you all were here.  You

15   all got to see what happened during that cross-examination.

16   And they did exactly what I told you they'd do during

17   opening.

18        Remember, I said they don't really feel strongly

19   about this non-infringement position because they're going

20   to switch horses in the middle of trial, and switch horses

21   they did.  Not to a very good one, but they switched to

22   Dr. Acampora who tried to convince you -- and I felt sorry

23   for you because I couldn't even follow it, his presentation

24   of what was supposed to be clear and convincing evidence.

25        And you heard me just object about facts outside

1    the record because he was showing you this information

2    disclosure statement, and then he told you those references

3    that Dr. Acampora relied upon that are on the face of two of

4    the patents before the examiner were provided by IV.

5            And they said:  Oh, but the date -- date on the

6    form.  This is the same date.  There's no evidence in the

7    record of when that examiner examined these references.

8    There's just evidence of the date that the examiner signed

9    the form.

10           Is that playing by the rules?  They don't play by

11   the rules outside this courtroom.  They don't play by the

12   rules inside this courtroom.

13           Let's talk about what does apply in this courtroom,

14   and that's the law.  And Dr. Becker had to admit what he

15   didn't show you, what Mr. Bratic did, that damages are to be

16   no less -- and no less than a reasonable royalty for the use

17   made of the invention by the infringer. They don't want to

18   talk about that, do they?

19           They didn't present any testimony that there was

20   any other way to do this than Dr. Jorgensen's inventions

21   that are now owned by IV.

22           What they want to talk about is R allocations and

23   the investments made by IV.  And it got me thinking, we're

24   talking about a method that T-Mobile uses to maximize its

25   spectrum.  There's an analogy here.

1          Think about oil and gas business of Halliburton and

2    -- and Exxon-Mobil get together and there's a method for

3    rapidly extracting gas -- oil and gas from the ground.  And

4    Halliburton sells the drilling rig.  Exxon uses it and pumps

5    out millions and millions of dollars.  Makes millions of

6    dollars from that -- use of that patented method.  They

7    going to look at Halliburton and say, oh, well, you've got

8    to collect some portion of the drilling rig.  Don't look

9    at -- don't look at Exxon.  We used it all.  We put the

10   method together.  We customized it for our use.  We saved

11   billions.  We made millions.  But don't -- don't look at

12   that.  Look at what the -- the -- what Halliburton did.  It

13   makes no sense.

14          You look at the use of the infringing technology.

15   They want to attack Dr. Jorgensen.  Mr. Black went through

16   his qualifications.  I'm not going to go through them again.

17   They call him a liar in open court because he was paid

18   $300.00 an hour.

19          And then, lo and behold, what do we learn about the

20   Defendants' experts?  They're getting paid $725.00 an hour,

21   $750.00 an hour.  And that's fine.  Multiples of what they

22   make as university professors, but somehow Dr. Jorgensen is

23   a liar.

24          Was he lying when he told you all about how he got

25   in his car and he drove around and he -- he was using this

1   technology?  He was excited to tell you all that.  Yet now

2   they want to spin around and say, oh, no this has to be

3   anchored in the house.  Because they've got to make you

4   believe he's a liar.  That's what they've got to make you

5   believe.  They get called down for it.  They'll apologize to

6   the Court.  But they won't apologize to Dr. Jorgensen.

7           They won't say anything good about anybody but

8   T-Mobile and Ericsson.  Boy, they're smart.  They've got

9   good inventors.  And they do.  They have good patents.

10  Nothing good about Dr. Jorgensen's past, his present, IV.

11          How do you think Dr. Jorgensen would have faired if

12  he showed up at T-Mobile's door, here's my patent.  How do

13  you think he would have faired?  About as well as IV fairs.

14  We're not an individual inventor.  We are not David.  We're

15  right there in the same league with them.  You see how they

16  treat us.  And you know how they treat individual inventors

17  because they can't present a single license that they have

18  ever paid anyone money for anyone else's technology.  All

19  they talk about is their awards, how great they are.

20          Mr. Bratic, the only expert who actually looked at

21  licenses to LTE technology, he looked at it.  He had to go

22  to Ericsson licenses.  And I don't think they thought about

23  this.

24          Remember, they were telling you about -- this is

25  Mr. Kubehl in opening, talking about Ericsson in 2014 and

1    this European Patent Office award.

2            And I'm sure they're great inventors, they're great

3    guys.  They have valuable patents.  And he told you

4    Ericsson -- Ericsson wasn't -- wasn't one of several

5    companies that were recognized for this.  They were the

6    company in LTE that was recognized for this.  And I'm sure

7    they were.

8            But you know what they didn't cross-check?  They

9    didn't cross-check these names with the patents that they

10   said were representative of the value of their property

11   because those super star inventors that we said had

12   comparable technology that Dr. Chrissan made his comparison

13   with, they show up on the face of half of the

14   patents -- half of those 18 patents.  Their super star

15   inventors.  You think we picked the right patents to compare

16   to?  You think they wish they'd cross-checked it now?

17           So they brought Ms. Chen, a very nice lady.  And

18   she -- she did what she had to do.  She said:  No, no,

19   they're not representative.

20           But then Ms. -- Ms. Henry said:  Well, now wait a

21   minute.  Let me show you some of these sworn declarations

22   before -- before your ox was in a ditch, and let's see what

23   you were saying outside of this courtroom.  Somewhere else

24   you swore that they were representative.

25           They're going to say what suits them at the time

1    because the rules don't apply to T-Mobile and Ericsson.

2    That's what they think.  That's what they think.  Because

3    T-Mobile is the un-carrier.  Remember that?  And now you've

4    seen they are unwilling to respect our property.  They're

5    unwilling to pay for using it.  They're unwilling to even

6    acknowledge that it has any value.

7              THE COURT:  Two minute remaining.

8              MR. WARD:  They talk like IV -- like it's some

9    second class citizen because it doesn't make a product.

10   You all saw the list of companies that have invested in IV.

11             They want you to believe that after Verizon pays

12   110 million for a license, invests $250 million in this

13   company.  I'm not going to say what AT&T paid.  You all

14   remember it.  I can't say it in open court.  That IV would

15   get locked in a room in this hypothetical negotiation and

16   walk out with $110,000.00 with these companies finally

17   having to admit that the patents are valid and infringed.

18   Give me a break.  That's what they want you to believe.

19   They start out talking about money.  It's about money.

20             There's going to be a phone call made when you all

21   come back with a verdict.  You're going to pass it up.  The

22   Judge will inspect, and Ms. Lockhart will read it out.  And

23   they're going to scurry outside -- outside the courthouse

24   and grab their phones.  And it's going to go one of two

25   ways.  Mr. Legere -- Mr. McGrath is making this call to the

1   CEO -- we got away with it.  We broke the rules.  We're the

2   un-carrier.  Everyone else is stupid.  Keep on trucking.  We

3   don't have to pay for using people's property.

4          Or it could go another way.  Mr. McGrath could say,

5   they figured it out.  We threw up lots of smoke screens,

6   lots of defenses, but they figured it out.  And we might

7   want to change the way that we do business and start

8   respecting property.

9          You all get to decide which one of those phone

10  calls gets made.

11         Thank you for your time, and we look forward to

12  receiving your verdict.

13         THE COURT:  All right.  Ladies and gentlemen,

14  you've heard closing arguments for the attorneys for the

15  parties.  I now have a few final instructions to give you

16  before you begin your deliberations.

17         You must perform your duty as jurors without bias

18  or prejudice as to any party.  The law does not permit you

19  to be controlled by sympathy, prejudice, or public opinion.

20         All parties expect that you will carefully and

21  impartially consider all the evidence, follow the law as

22  I have given it to you, and reach a just verdict, regardless

23  of the consequences.

24         Answer each question in the verdict form from the

25  facts as you find them to be in this case, follow the

1    instructions -- following the instructions that the Court

2    has included and given you.

3         Do not decide who you think should win and then

4    answer the questions accordingly.

5         Again, ladies and gentlemen, your answers and your

6    verdict in this case must be unanimous.  You should consider

7    and decide this case as a dispute between persons of equal

8    standing in the community, equal worth, and holding the same

9    or similar stations in life.

10        This is true in patent cases between corporations,

11   partnerships, and individuals.  A patent owner is entitled

12   to protect his or her rights under the laws of the United

13   States.  This includes bringing a suit in a United States

14   District Court for money damages for infringement.

15        The law recognizes no distinction among types of

16   parties.  All corporations, partnerships, and other

17   organizations stand equal before the law regardless of their

18   size and regardless of who owns them, and they are to be

19   treated as equals.

20        Now, when you retire to the jury room to deliberate

21   on your verdict, as I've told you, you will each have a copy

22   of this final jury instruction or the Court's charge to the

23   jury to take with you.

24        If during your deliberations you desire to review

25   any of the exhibits which the Court has admitted into

1    evidence over the course of the trial, then you should

2    advise me by written note, signed by your foreperson, and

3    delivered to the Court Security Officer.  I will then send

4    that exhibit or those exhibits to you.

5           Once you retire, you should select your foreperson

6    and then conduct your deliberations.

7           If you recess during your deliberations, follow all

8    the instructions that the Court's given you about your

9    conduct during the trial.

10          After you have reached your verdict, your

11   foreperson is to fill in the unanimous answers to the

12   questions on the verdict form, date it, sign it, and notify

13   the Court Security Officer.

14          Do not reveal your answers until such time as you

15   are discharged, unless otherwise directed by me.  And you

16   must never disclose, ladies and gentlemen, to anyone, not

17   even to me, your numerical division on any question.

18          Any notes that you've taken over the course of the

19   trial are aids to your memory only.

20          If your memory should differ from your notes, then

21   rely on your memory and not your notes.  The notes are not

22   evidence.  And a juror who has not taken notes should rely

23   on his or her independent recollection of the evidence and

24   not be unduly influenced by the notes of other jurors.

25          Notes are not entitled to any greater weight than

1  the recollection or impression of each juror about the

2  testimony.

3          If you want to communicate with me at any time

4  during your deliberations, you should give a written message

5  or question to the Court Security Officer, signed by your

6  foreperson, who will then -- the Court Security Officer will

7  bring it to me.  I'll then respond as promptly as possible,

8  either in writing or by having you brought back into

9  courtroom where I can address you orally.

10         I will always first disclose to the attorneys in

11 the case your question and my response before I answer any

12 question.

13         After you have reached a verdict and I have

14 discharged you from your service as jurors, you're not

15 required to talk with anyone about your service in the case.

16         But by the same token, as I told you the first day,

17 at that point when you are discharged, you will be free to

18 discuss your service in the case or anything about it if you

19 choose to.  The choice in that regard, ladies and gentlemen,

20 after you are discharged, will be totally yours.  It will be

21 totally up to you.

22         I'll now hand one clean copy of the verdict form

23 and eight copies of these final jury instructions to the

24 Court Security Officer to deliver to you in the jury room.

25         Ladies and gentlemen of the jury, you may now

1  retire to the jury room to conduct your deliberations.  We

2  await your verdict.

3          COURT SECURITY OFFICER:  All rise.

4          (Jury out.)

5          THE COURT:  Be seated, please.

6          Counsel, you are welcome to wait here in the

7  courtroom for the jury's verdict to be returned.  You're

8  also welcome to wait offsite as long as you are close enough

9  by where you can be here promptly.

10         If you are not waiting in the courtroom, you should

11 make sure that my law clerks have an accurate cell phone

12 number where you can be reached if the Court receives a

13 question or if the jury returns a verdict.

14         Pending a question from the jury or a return of

15 their verdict, the Court stands in recess.

16         COURT SECURITY OFFICER:  All rise.

17         (Recess.)

18         (Jury out.)

19         COURT SECURITY OFFICER:  All rise.

20         THE COURT:  Be seated, please.

21         All right.  Counsel, we've received two notes from

22 the jury.  I'll address Note No. 1 first and then the second

23 note.

24         Note No. 1 is dated today's date, and it reads as

25 follows:

1              Can we have Forslow and Turina patents, as well as

2    DX-520, 481, 482-485, 492, 331, 577, 576, 574, PX-396,

3    PX-331, PTX-1464, 1466, 324, 52, 53, and 57.

4              Then the note continues:  We need Chrissan's source

5    code analysis and Ericsson's base station operation.

6               It's signed by Ms. Rambin, Juror No. 8, who I

7    presume is the foreperson.

8              If counsel will approach, I have two copies for

9    each side -- Xerox copies of the note.

10             And for the record, I will mark the original

11   Note No. 1 with a "1" in the upper right-hand corner and

12   deliver it to the court -- courtroom deputy.

13             Counsel, we've pulled most of these

14   specifically-identified exhibits already.

15             What we have not done is deal with the request in

16   the bottom right of the note regarding Dr. Chrissan and the

17   source code analysis and base station operation.

18             If there are specific exhibits that relate to that

19   that are not called out in the note that both sides can

20   agree should be sent back, I will consider that.

21             Otherwise, I'm inclined to tell the jury that the

22   testimony of Dr. Chrissan regarding the source code analysis

23   and the base station operation are matters that they'll have

24   to rely on their memory of his testimony in regard to.

25             And I'd like both sides to consult with each other

1   about the exhibits that we've already pulled together and

2   the language that I just mentioned on the note, and let me

3   know if you think we have a complete response that is

4   without objection we -- I can send back to the jury.

5          Now, before we do that, though, I'm going to read

6   you Note No. 2.

7          Note No. 2 is signed by Ms. Rambin.  It's dated

8   today's date.  And it says:

9          Can we have Jorgensen and Skarby's testimonies?

10          In regard to this note, which I'll mark with a "2"

11   and give to the court -- courtroom deputy, I've prepared the

12   following response, and I'd like counsel's comments on that.

13          Members of the jury, in response to your second

14   jury note regarding the testimonies of Jorgensen and Skarby,

15   you will have to rely on your memories of the evidence which

16   these witnesses gave from the witness stand.

17          As I told you earlier, the transcript of their

18   testimony will not be available for you to use during your

19   deliberations.

20          That's my proposed response to Note No. 2.

21          If somebody from each side would approach, I have

22   another two copies of this second note that you may have,

23   two for each side.

24          MS. SMITH:  Thank you.

25          THE COURT:  Let's take the easy -- easiest one up

1  first.

2      Does anybody have an objection to the proposed

3  response from the Court to Note No. 2?

4      MR. WARD:  No, Your Honor.

5      MR. KUBEHL:  No, Your Honor.

6      THE COURT:  All right.  Now, with regard to

7  Note No. 1, I'm going to hand the court -- courtroom deputy

8  the stack of exhibit files that we've preliminarily pulled.

9      The note also requests the Forslow and Turina

10 patents, and I don't think we have those exhibits in this

11 stack.  We have pulled what we can identify from the

12 specifically-identified exhibit numbers that are in this

13 note.

14     I'd like both sides to meet and confer about what

15 we've pulled, agree on anything else that needs to be added

16 to it, and then I'd like to hear from you on how you think

17 best to respond to the request regarding

18 Dr. Chrissan's -- what I can only assume to be his testimony

19 regarding source code and base station operations.

20     So with that, we'll go off the record and afford

21 each side a chance to meet and confer with the other.

22     When you're ready to come back on the record, we'll

23 do that and see where both sides are.

24     We're off the record.

25     (Off the record discussion.)

```
 1            THE COURT:  All right.  We're back on the record.

 2            We've had a discussion between the parties' counsel

 3    and the Court about how to best and most accurately respond

 4    to Jury Note No. 1.

 5            Based on that discussion, it's the Court's

 6    understanding that counsel for all the parties would at this

 7    juncture prefer to send back responsive specific exhibits to

 8    the request for the Forslow and Turina patents, as well as

 9    the specified Plaintiff's and Defendants' Exhibits that were

10    named by number in the note, with two exceptions, DX-520 and

11    PX-331.

12            With regard to the -- with regard to those two

13    exhibits, counsel for both sides have requested more time to

14    review it and discuss with each other how best to respond to

15    the jury's request.  And my initial response to the jury in

16    this case would be to tell the jury:  We are considering

17    those two exhibits, and I'll respond to them subsequently.

18            With regard to the language that's handwritten near

19    the end of the first jury note about Dr. Chrissan, it's my

20    understanding that both sides agree that the proper response

21    would be to send back the folders of source code that he had

22    on the witness stand with him when he gave his testimony.

23            Is that correct?

24            MR. WARD:  That's correct.

25            MR. KUBEHL:  Yes.
```

1           THE COURT:  And do we have those identified in some

2    specific way?

3           MR. WARD:  They're Plaintiff's Exhibit 892 and 893.

4           THE COURT:  All right.  So we would send them those

5    two Plaintiff's exhibits and the others that are specified,

6    except the two that we're going to hold out and let you all

7    figure what to do with it.

8           DX-520 and PX-331, based on discussions, appear to

9    be in native format.  They've been reduced to disks or DVDs.

10   The parties are not sure, given the width of the actual

11   original documents, if they're easily printable.

12          I'll respond to the jury's note with those two

13   exceptions as indicated, and then once the parties have had

14   a chance to further review DX-520 and PX-331, the Court

15   intends to have another discussion with counsel off the

16   record.

17          And then assuming that we can arrive at an

18   agreement and a consensus on how best to respond, I'll note

19   that on the record.  And then whatever the result or

20   solution is, we'll send that back to them at that time.

21          Does that sound agreeable to both Plaintiff and

22   Defendant?

23          MR. WARD:  Fine from Plaintiff.

24          MR. KUBEHL:  Yes, sir.

25          THE COURT:  I will do this.  I'll have my staff

1    make sure that we have the actual exhibits that are going to

2    go back now, and then I will work on a written response to

3    Juror Note No. 1.  I'll come back and read that to counsel

4    and get your approval before I send it, along with the

5    specific exhibits, to the jury.

6              While I'm working on that response and while staff

7    is confirming that we have the right exhibits pulled that

8    are specified in the note, except DX-520 and PX-331, we'll

9    stand in recess.

10             COURT SECURITY OFFICER:  All rise.

11             (Recess.)

12             COURT SECURITY OFFICER:  All rise.

13             THE COURT:  All right.  Have a seat, please.

14             Let's go off the record again.

15             (Off the record discussion.)

16             THE COURT:  While we've been off the record, we

17   have reviewed the requested exhibits requested in Jury

18   Note No. 1, and the parties have agreed to the specific

19   exhibits that correspond with the requested exhibit numbers.

20             The parties have agreed that DX-49 is the Turina

21   patent, and DX-52 is the Forslow patent.

22             The parties have agreed with regard to the written

23   request concerning Dr. Chrissan's source code analysis and

24   Eric -- Ericsson base station operation, to send in PX-892

25   and PX-893.

```
 1            And then with regard to PX-331 and DX-520, the
 2   parties have agreed to have those native files on disks
 3   shown to the jury by way of a monitor and disk player that's
 4   been demonstrated in the courtroom by the Court's IT
 5   personnel.
 6            The parties also have agreed that if once the disk
 7   player and monitor are sent into the jury regarding those
 8   two exhibits, PX-331 or DX-520, if the jury requires any
 9   assistance in operating the player or maneuvering through
10   the disk contents, that they can request the assistance of
11   Mr. McNeill, the Court's IT employee, who has been
12   instructed simply to address any operational questions they
13   might have about the equipment and nothing else.
14            Is that all correct, Plaintiff?
15            MR. WARD:  Plaintiff agrees.
16            THE COURT:  Defendant?
17            MR. KUBEHL:  Defendant agrees.
18            THE COURT:  All right.  If you'll -- if you'll both
19   approach, I have one clean copy of a revised written
20   response to Jury Note No. 2.
21            I think it sets forth what I've just said, but if
22   you'll look at it, and let me know on the record if you have
23   any objections to this written response -- to
24   Jury Note No. 1, I'm sorry.  I said 2, I meant 1.
25            MS. HENRY:  No objection from Plaintiff, Your
```

1   Honor.

2          MS. SMITH:   None from the Defendants, Your Honor.

3          THE COURT:   All right.   You've already reviewed the

4   response to Jury Note No. 2.   You've agreed to it on the

5   record, and I've already signed the written response.

6          I'm going to give the original response to

7   Jury Note No. 1 and original response to Jury Note No. 2,

8   along with the identified files that have been pulled and

9   the source code files that relate to PX-892 and 893 to the

10  Court Security Officer to be delivered to the jury.

11          And I'll direct Mr. McNeill to deliver the visual

12  aid screen and disk player with the burned disk installed

13  regarding PX-331 and DX-520 to the jury room.

14          If you'll come around, Ms. Denton, Ms. Lockhart has

15  got it all put together.   Please take that to the jury, and

16  then Mr. McNeill will wheel the monitor and disk player

17  around and take it into the jury room, as well.

18          If you'll do that at this time, Mr. McNeill.

19          And that should effectuate a response to both

20  Jury Note No. 1 and Jury Note No. 2.

21          Barring another note or the return of a verdict,

22  counsel, we stand in recess.

23          COURT SECURITY OFFICER:   All rise.

24          (Recess.)

25          (Jury out.)

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated, please.

 3              Counsel, we've gotten a third note from the jury.

 4   I'll mark it as No. 3 and hand the original to the courtroom

 5   deputy.

 6              I have two copies for each side if you want to

 7   approach and pick up some copies.  Ms. Lockhart will give

 8   them to you.

 9              I'll read the rather short note into the record,

10   and then we'll discuss it.

11              The note reads as follows:  We need the diagram of

12   Ericsson's base station and the diagram of Jorgensen's base

13   station.

14              Signed by Ms. Rambin as foreperson and dated

15   today's date.

16              I'm assuming these may be demonstratives or

17   included in experts' reports.  I'm open to suggestions as to

18   how best to respond.

19              MR. WARD:  Your Honor, you want us to confer before

20   we --

21              THE COURT:  Let's go off the record.

22              (Off the record discussion.)

23              THE COURT:  From our off the record discussion, it

24   appears that both sides believes this is a request for

25   demonstratives and does not relate to admitted evidence that
```

1   I can send back to the jury.

2           Is that right, Plaintiff?

3           MR. WARD:  That's correct.

4           THE COURT:  Is that right, Defendant?

5           MR. KUBEHL:  Correct.

6           THE COURT:  All right.  Let me do this, I'm going

7   to ask you all to remain in the courtroom.  I'll step down

8   briefly and try to write a very short response to the jury

9   that embodies that.  I'll be back, read it into the record,

10  get your approval, and then we'll send it to the jury.

11          I'll be back in a minute.

12          COURT SECURITY OFFICER:  All rise.

13          (Recess.)

14          COURT SECURITY OFFICER:  All rise.

15          THE COURT:  Be seated, please.

16          Counsel, if you'll approach, I have a copy of this

17  proposed written response for each side.

18          Let me read it into the record, and then I'll see

19  if you have any responses.

20          Members of the jury, in response to your third jury

21  note, it appears to the Court and to counsel for the parties

22  that what you are requesting are demonstratives that were

23  used with certain witnesses when they testified.  As I have

24  instructed you, demonstratives are not evidence, but the

25  testimony of a witness while using a demonstrative,

1    sometimes called a jury aid, is evidence.  However, you must

2    rely on your memory of that evidence.

3            Plaintiff have any objection to me sending that

4    written response back to the jury?

5            MS. HENRY:  May we have one moment, Your Honor?

6            No objection, Your Honor.

7            THE COURT:  Defendant?

8            MR. KUBEHL:  No objection.

9            THE COURT:  All right.  Ms. Denton, I'll hand you

10   the original written response for you to return and deliver

11   to the jury.

12           All right.  Counsel, pending another note or a

13   return of a verdict, we stand in recess.

14           COURT SECURITY OFFICER:  All rise.

15           (Recess.)

16           COURT SECURITY OFFICER:  All rise.

17           THE COURT:  Please be seated.

18           Counsel, I've received the following note from the

19   jury:

20           We have a verdict.

21           Signed by Mary Rambin, Juror No. 8, who is our

22   apparent foreperson.

23           Let's bring in the jury, please.

24           COURT SECURITY OFFICER:  All rise.

25           THE COURT:  Ms. Lockhart, I'll hand you the note

1  for the file.

2          (Jury in.)

3          THE COURT:  Please be seated.

4          Ms. Rambin, I understand you're the foreperson of

5  the jury; is that correct?

6          THE FOREPERSON:  Yes, sir.

7          THE COURT:  Has the jury reached a verdict?

8          THE FOREPERSON:  We have.

9          THE COURT:  Would you hand the signed and dated

10  verdict form to the Court Security Officer, who will bring

11  it to me?

12          Ladies and gentlemen, I'm going to announce the

13  verdict into the record at this time.  I'm going to ask each

14  member of the jury to listen very carefully because after

15  I've done that, I'm going to ask each of you if this is your

16  verdict so that we can confirm on the record that it is the

17  unanimous verdict of all eight members of the jury.

18          Turning to the verdict form, beginning on Page 3

19  wherein Question 1 is found:  Did Plaintiff, Intellectual

20  Ventures, prove by a preponderance of the evidence that

21  Defendants have infringed any of the asserted claims of the

22  patents-in-suit?

23          As to Defendant, T-Mobile, the answer is yes.

24          As to Defendant, Ericsson, the answer is yes.

25          Turning to Page 4 of the verdict form wherein

1   Question 2 is located:  Did the Defendants, T-Mobile and

2   Ericsson, prove by clear and convincing evidence that any of

3   the following asserted claims are invalid?

4         There under each of the asserted claims of the

5   three patents-in-suit are listed, and with regard to each

6   claim of the asserted patents, the jury has answered:  No.

7         Turning then to Page 6 where Question 3 of the

8   verdict form is found:  What sum of money if paid today has

9   Intellectual Ventures proven by a preponderance of the

10  evidence would compensate Intellectual Ventures for the

11  infringement you have found in Question 1?

12        With regard to Defendant, Ericsson, the number

13  is $9 million.

14        With regard to Defendant, T-Mobile, the number is

15  $34 million.

16        Turning to the seventh and final page of the

17  verdict form, I find that it is dated with today's date, and

18  it is signed by Ms. Mary Rambin as foreperson of the jury.

19        Ladies and gentlemen, let me poll you at this time

20  and make sure that this verdict unanimously reflects the

21  decision of all eight members of the jury.

22        If this is your verdict as I have read it, would

23  you please stand at this time?

24        (Jury polled.)

25        THE COURT:  Thank you.  Please be seated.

113

1              Let the record reflect that each member of the jury

2    immediately stood and rose in response to the Court's

3    question confirming that this is, in fact, the unanimous

4    verdict of all members of the jury.

5              I will hand the original executed verdict form to

6    the courtroom deputy to be included in the papers of this

7    case.

8              And the Court accepts your verdict.

9              Ladies and gentlemen, this now completes the trial

10   of this case.  And from the very beginning, I have

11   instructed you over and over about not discussing the case

12   with anyone and only discussing it among yourselves once you

13   had heard all the evidence and retired to deliberate.

14             I'm releasing you from that instruction.  I'm

15   releasing you from all the instructions as your service as

16   jurors has now come to an end.  That means you're free to

17   talk about your service in this case with anyone you would

18   like, and by the same token, you're also free not to mention

19   it to anyone that you would not like to mention it to.

20             Let me explain to you that the practice in this

21   court has been for more years than I can remember that when

22   a verdict is returned in a case like this and accepted by

23   the Court and the jury is discharged, that if the jury wants

24   to talk about their service with any of the lawyers, they're

25   free to initiate a conversation and talk about it.

1          On the other hand, if they don't want to discuss

2    it, they're not required to in any way, and the lawyers

3    cannot initiate a conversation with you about your service

4    in this case.

5          If there's going to be a conversation, you'll have

6    to initiate it -- initiate it.  They're not able to do that.

7          Now, by the same token, I will tell you that.    I

8    expect that you will find them somewhere near the front

9    steps of the courthouse so that when you leave, you'll have

10   to walk by them to get to your cars.  That's what I used to

11   do when I was in practice here.

12         And if you want to talk, they'll be available for

13   you to stop and talk to.  If you don't, simply walk past,

14   and go to your vehicles and do whatever you want to do.  The

15   decision is yours and yours alone.

16         I will mention to you that I'm not unaware that the

17   weather has changed much for the colder in the last day, and

18   I don't expect anybody to want to stand around and talk on

19   the sidewalk this late in the afternoon on a cold Friday.

20         Consequently, I've asked both the lead counsel for

21   the national firms and the lead counsel for the local firms

22   on each side of the case to give me a cell phone number, and

23   I have copies of that, and I will give that to you in just a

24   minute, and if at some later date you want to call one or

25   more or all of those lawyers and discuss the case and your

1  service, you'll have a cell phone number that they'll

2  answer, and you can do that.

3         By the same token, if you don't want to do that,

4  you're under absolutely no obligation to, and you don't even

5  have to take the cell phone numbers with you if you don't

6  want to.  It's strictly 100 percent up to you.

7         I know the lawyers are interested in your

8  impressions of the evidence and the trial and their conduct.

9  And I know they'd be interested in feedback from you, but,

10  again, ladies and gentlemen, that is strictly 100 percent

11  your decision and your decision only.  You are free to do

12  it, but you are under no -- no obligation, no compulsion to

13  do it whatsoever.

14         Also, ladies and gentlemen, I want to let you know

15  how much the Court appreciates your service in this case.

16  This has been a difficult trial.  It's taken a lot of time.

17  It's taken you away from your work and your families.  We've

18  stayed late.

19         I find in my experience in this part of the country

20  that jurors would rather stay late and be away from their

21  families fewer days than be away from their work and their

22  families more days but quit at an early time each day.  And

23  so we've stayed late to get this trial complete.  And you

24  have rendered a very real and important public service by

25  serving on this jury.

116

1             As I told you when the jury was selected, in my

2    personal opinion, the second highest form of public service

3    is that any American citizen can render for their country,

4    and that's worthy of appreciation and an expression of

5    appreciation and gratitude for the service that you've

6    rendered.

7             Our constitutional system, which requires and

8    allows for those guarantees that I mentioned to you when you

9    were first selected, including the Seventh Amendment of the

10   Constitution and the Bill of Rights that guarantees a right

11   to a trial by jury in a civil case like this, they depend,

12   absolutely depend on citizens such as yourselves being

13   willing to make the sacrifice, the very real sacrifice that

14   you've each made, and that is important, and that is worthy

15   of note, and it is worthy of appreciation and gratitude.

16             In that regard, I'd like to ask a personal favor of

17   you.  Now that I am discharging you as jurors, you're free

18   to leave, but I would like to ask you as a personal favor if

19   you would leave the jury box in just a moment, and go back

20   into the jury room, because I'd like to come into the jury

21   room, and I'd like to shake each one of your hands, and I'd

22   like to look you in your eyes and in person tell you

23   face-to-face thank you for your service.  You don't have to

24   do that, but I will not keep you very long, and if you would

25   do that as a personal favor, I would very much appreciate

1    it.

2         Ladies and gentlemen, this completes the trial of

3    this case.  This completes your service as jurors in this

4    case.  And if you'll meet me in the jury room, I will be

5    there shortly.

6         The jury is discharged.

7         COURT SECURITY OFFICER:  All rise.

8         (Jury out.)

9         THE COURT:  Counsel, as I noted, the Court accepts

10   the verdict of the jury.  That completes the trial of this

11   case, and you are excused.

12        COURT SECURITY OFFICER:  All rise.

13        (Court adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

118

1                          <u>CERTIFICATION</u>

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     <u>/S/ Shelly Holmes</u>                     <u>2/8/19</u>
     SHELLY HOLMES, CSR, TCRR                Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25